UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M.R.S. ENTERPRISES, INC.<br>Plaintiff,<br><br>v.<br><br>SHEET METAL WORKERS'<br>INTERNATIONAL ASSOCIATION<br>LOCAL 17 - BOSTON and SHEET<br>METAL WORKERS' INTERNATIONAL<br>ASSOCIATION<br>Defendants. | C.A. No. 05 10694 JLT |

### AFFIDAVIT OF JOSEPH BERGANTINO
### IN SUPPORT OF DEFENDANT SHEET METAL WORKERS LOCAL 17'S
### MOTION TO DISMISS COMPLAINT

I, Joseph Bergantino, being duly sworn, depose and say under penalty of perjury as follows:

1. I am the Business Manager of Sheet Metal Workers Local 17 and have served in this position since June 2002. I previously served as a business agent for eight (8) years beginning in July 1994. The facts described in this affidavit are personally known to me. If called as a witness, I could and would competently testify to the contents of this affidavit.

2. Sheet Metal Workers Local 17 and M.R.S. Enterprises, Inc. ("M.R.S.") are parties to a collective bargaining agreement, the Standard Form Union Agreement for the Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry, for the term August 1, 2001 through July 31, 2005 ("Local 17 Agreement"). A true and correct copy of the Local 17 Agreement is attached as Exhibit A hereto.

3. To my knowledge, Local 17 has never received a copy of any grievance submitted by M.R.S. under the Local 17 Agreement concerning the performance of work at the Employer's Logan Airport job site in 2003-2004.

4. I did receive a copy, by certified mail, of a letter dated November 22, 2004 to Michael J. Sullivan, General President of the Sheet Metal Workers International Association, ("S.M.W.I.A." or "International") from Jane I. Milas of Garcia & Milas in New Haven on behalf of M.R.S. In this letter M.R.S. raised a grievance under Article X, Section 1 of its collective bargaining agreement with the S.M.W.I.A. alleging failure to supply qualified labor at Logan Airport. A true and correct copy of Ms. Milas' letter to Mr. Sullivan is attached as Exhibit B hereto.

5. M.R.S. and the S.M.W.I.A. were parties to the National Siding and Decking Agreement. Local 17 is not a party to that agreement.

6. I later received a copy of a letter dated December 20, 2004, from M.R.S. President Roland O. Levesque, Sr. to General President Sullivan in which Levesque complained that the International had not suitably responded to its grievances over the work at Logan Airport. A true and correct copy of Mr. Levesque's December 20, 2004 letter to Mr. Sullivan is attached as Exhibit C hereto.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 22nd DAY OF JUNE, 2005.

_/s/ Joseph Bergantino_
Joseph Bergantino

**CERTIFICATE OF SERVICE**

I hereby certify that the above Affidavit has been served by first class mail upon the plaintiff's attorney, James F. Grosso at O'Reilly, Grosso & Gross, P.C. at 1671 Worcester Road, Framingham, MA 01701 and the co-defendant's attorney, Michael T. Anderson at Davis, Cowell & Bow, LLP at 8 Beacon Street, 4th floor, Boston, MA 02108 this 24th day of June, 2005.

/s/ Paul F. Kelly

# STANDARD FORM OF UNION AGREEMENT
## SHEET METAL, ROOFING, VENTILATING AND AIR CONDITIONING CONTRACTING DIVISIONS OF THE CONSTRUCTION INDUSTRY

Agreement entered into this 12th day of August 2001 by and between Boston Roofing Contractor Associations of the B.T.E.A and the Sheet Metal and Airconditioning Contractors National Association (SMACNA) - Boston hereinafter referred to as the Employer, and Local Union No. 17 of Sheet Metal Workers' International Association, hereinafter referred to as the Union, for Bristol (north of Dighton), Essex, Middlesex, Norfolk, Plymouth (north of Wareham), and Suffolk Counties of Eastern Massachusetts and the towns of Harvard and Lancaster of Worcester County.

### ARTICLE I

**SECTION 1.** This Agreement covers the rates of pay and conditions of employment of all employees of the Employer engaged in but not limited to the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all air-veyor systems and air handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (C) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; (e) all craft related drafting, both manual and computer aided, will be done by members or apprentices. This does not include architectural layouts provided by engineering firms or primary contractors; and (f) all other work included in the jurisdictional claims of Sheet Metal Workers' International Association.

**SECTION 2.** Employers signatory to this agreement must be in possession of a bona fide fabrication shop meeting sanitary and safety standards and capable of fabricating duct work and fittings.

**SECTION 3.** Fabrication of square or rectangular ductwork and fitting or low velocity round ductwork and fittings for installation within the geographical territory of this bargaining unit must carry the Local 17 Building Trades label.
This label will show that the ductwork described has been fabricated by a contractor signatory to this agreement.

### ARTICLE II

It is the opinion of both Associations that the following obligations are imposed by this Article II.

**SECTION 1.** No Employer shall subcontract or assign any of the work described herein which is to be performed at a jobsite to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project.

**SECTION 2.** Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for prefabrication of materials covered herein, such prefabrication shall be subcontracted to fabricators who are in signed agreement with Local Union #17 and/or who pays their employees engaged in such fabrication, not less than the total beneficial wage for comparable sheet metal fabrication, as established under provisions of this Agreement.
The Employer agrees to provide to a Union business agent or business manager, upon request, written and signed evidence of equalization of the total beneficial wage package from any supplier of low pressure spiral duct and fittings and/or rectangular duct and fittings.

**SECTION 3.** (a) The Employer agrees that no evasion of the terms, requirements and provisions of the Standard Form of Union Agreement, including all addenda attached thereto, will take place by the setting up of another business to do work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder. If and when the Employer shall perform any work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer through its officers, directors, partners or stockholders, exercised either directly or indirectly, management, control or majority ownership of such other entity, the terms and conditions of this agreement shall be applicable to all such work.
This clause shall only be applicable to job site work as that term is used in the construction industry proviso to Section 8(e) of the National Labor Relations Act.

(b) The Employer further agrees that if and when it performs prefabrication work otherwise covered by the Standard Form of Union Agreement, including all addenda attached thereto, under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer through its officers, directors, partners or stockholders, exercises either directly or indirectly, management, control or majority ownership of such other entity, the employees of such other entity shall receive not less than the prevailing wage for comparable sheet metal fabrication, as established under the terms of this agreement.
This is not to be interpreted to exclude any customer of the company from purchasing said fabrication.

(c) The parties agree that disputes concerning the meaning and application of Section 1 and 2 hereof shall be resolved in accordance with Article X and without resort to strike or lockout.

(d) If any word/sentence/paragraph or section of this language is found to be illegal that portion will be removed from this Article or rewritten to comply with the law.
The remainder of this Article will stand as negotiated.

### ARTICLE III

**SECTION 1.** The Employer agrees that none but journeymen and apprentice sheet metal workers shall be employed on any work described in Article I and further, for the purpose of proving jurisdiction, agrees to provide the Union with written evidence of assignment on the Employer's letterhead for certain specified items of work to be performed at a jobsite prior to commencement of work at the site. List of such specific items, which may be revised from time to time, as agreed to by and between SMACNA and SMWIA, shall be provided to the Employer.

### ARTICLE IV

**SECTION 1.** The Union agrees to furnish upon request by the Employer duly qualified journeymen and apprentice sheet metal workers in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement.

**SECTION 2.** The Union shall select and refer applicants for employment without discrimination against such applicants by reason of or in any way affected by Union membership, by-laws, regulations,

constitutional provisions, or any other aspect or obligation of Union membership, policies or requirements. Parties to the Agreement recognize the obligations, which have been or may be imposed upon the Employers relative to equal employment and non-discrimination and it is agreed that both parties will meet these obligations under affirmative action plans, which have been jointly accepted by the parties where such plans are in existence.

SECTION 3. Bargaining unit employees hereunder shall include Owner/Members, i.e. employees of incorporated Employers who: (a) are officers, directors, or majority stockholders of an incorporated Employer; (b) perform work covered by the terms of this Agreement; and (c) are listed on the Registration Statement filed with the Sheet Metal Workers' National Pension Fund and National COLA Fund. Contributions on behalf of Owner/Members shall be made to the National Pension Fund for all hours for which the Owner/Member is paid or entitled to payment. In any event, however, no less than the minimum regular hours per week as required by this agreement for all bargaining unit employees shall be paid. The term "Minimum regular hours per week" shall be defined as the number of hours per week for which an employee receives straight time wages. Owner-members should refer to Addendum #38 conditions of participation.

SECTION 4. The Employer shall have the right to reject any applicant for employment.

## ARTICLE V

SECTION 1. The Employer agrees to require membership in the Union, as a condition of continued employment of all employees performing any of the work specified in Article I of this Agreement, within eight (8) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable ground for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership.

SECTION 2. If during the term of this Agreement the Labor-Management Relations Act of 1947 shall be amended by Congress in such manner as to reduce the time within which an employee may be required to acquire Union membership, such reduced time limit shall become immediately effective instead of and without regard to the time limit specified in Section 1 of this Article.

SECTION 3. The provisions of this Article shall be deemed to be of no force and effect in any state to the extent to which the making or enforcement of such provisions is contrary to law. In any state where the making and enforcement of such provision is lawful only after compliance with certain conditions precedent, this Article shall be deemed to take effect as to involved employees immediately upon compliance with such conditions.

## ARTICLE VI

SECTION 1. The regular working day shall consist of eight (8) hours labor in the shop or on the job between six thirty (6:30) a.m. and four (4:00) p.m. and the regular working week shall consist of five (5) consecutive eight (8) hour days labor in the shop or on the job, beginning with Monday and ending with Friday of each week. All full time or part time labor performed during such hours shall be recognized as regular working hours and paid for at the regular hourly rate. Except as otherwise provided pursuant to Section 4 of this Article, all work performed outside the regular working hour and performed during the regular work week shall be at one and one half (11/2) times the hourly rate except Sundays and Holidays where overtime will be paid at two (2) times the hourly rate.

Employees shall be at the shop or project site at the scheduled starting time each day and shall remain until quitting time.

SECTION 2. New Year's Day, Presidents' Day, Patriots' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day or days locally observed as such, and Sunday shall be recognized as holidays. All work performed on holidays shall be paid as follows: Two (2) times the regular rate.

SECTION 3. It is agreed that all work performed outside of regular hours during the regular workweek and on holidays shall be performed only upon notification by the Employer to the local Union in advance of scheduling such work. Preference on overtime and holiday work shall be given to men on the job or in the shop on a rotation basis so as to equalize such work as nearly as possible. The foreman for the job or shop shall call the Union hall and report the members who are working the overtime in the shop or on the job.

SECTION 4. Shift work and the pay and conditions therefor shall be only as provided in written addendum attached to this Agreement. Energy conservation - Retrofit work performed outside the regular work day in occupied buildings shall be performed under shift work conditions to be established by the local parties or by the National Joint Adjustment Board on the request of each party, if not locally provided. Shift work will be granted on a job-by-job basis under the guidelines set forth in "Resolution 78".

SECTION 5. A special requirement committee shall be implemented, to be comprised of two (2) representatives from both sides, namely the Business Manager of Local 17 and one other elected business representative; and two (2) owners from the Employers side. The purpose of this committee is to make whatever arrangements might be necessary to compete with non-union people, and other conditions, which might require special consideration. Notification for consideration will be given to the Union by the Employer, not less than three (3) working days prior to the bid date. Every consideration will be given the Employer to increase his work force as a result of any action taken by this committee.

## ARTICLE VII

SECTION 1. When employed in a shop or on a job within the limits of (See Addendum #5) employees shall be governed by the regular working hours specified herein and shall provide for themselves transportation within the said limits from home to shop or job at starting time and from shop or job to home at quitting time, and the Employer shall provide, or pay, for all necessary additional transportation during working hours.

SECTION 2. When employed outside of the limits specified in Section 1 of this Article, and within the jurisdiction of the Union, employees shall provide transportation for themselves which will assure their arrival at the limits specified in Section 1 of this Article at regular starting time, and the Employer shall provide or pay for all additional transportation for such jobs, including transportation from such job back to the limits specified in Section 1 of this Article which will assure arrival at such limits at quitting time. As an alternative to the foregoing method, travel expense may be paid by a zone or other method of payment. If this alternative method is used, it will be as provided in a written addendum attached hereto.

## ARTICLE VIII

**SECTION 1.** The minimum rate of wages for journeymen sheet metal workers covered by this Agreement when employed in a shop or on a job within the jurisdiction of the Union to perform any work specified in Article I of this Agreement shall be (see Addendum #6-8-9-10-15-17) except as hereinafter specified in Section 2 of this Article.

**SECTION 2.** On all work specified in Article I of this Agreement, fabricated and/or assembled by journeymen sheet metal workers and apprentices within the jurisdiction of this Union, or elsewhere, for erection and/or installation within the jurisdiction of any other Local Union affiliated with Sheet Metal Workers' International Association, whose established wage scale is higher than the wage scale specified in this Agreement, the higher wage scale of the jobsite Union shall be paid to the journeymen employed on such work in the home shop or sent to the jobsite.

**SECTION 3.** The provisions of Section 2 of this Article, Section 2 of Article II and Section 1 of Article III shall not be applicable to the manufacture for sale to the trade or purchase of the following items:

1. Ventilators
2. Louvers
3. Automatic and fire dampers
4. Radiator and air-conditioning unit enclosures
5. Fabricated pipe and fittings for residential installations and light commercial work as defined in the locality
6. Mixing (attenuation) boxes
7. Plastic skylights
8. Air diffusers, grilles, registers
9. Sound attenuators
10. Chutes
11. Double-wall panel plenums
12. Angle rings

**SECTION 4.** The provisions of Section 2 of this Article shall not be applicable to Air Pollution Control Systems fabricated for the purpose of removing air pollutants, excluding air conditioning, heating and ventilating systems. In addition, the provisions of Section 2 of this Article will not be applicable to the manufacture of spiral pipe and fittings for high-pressure systems.

**SECTION 5.** Except as provided in Sections 2 and 6 of this Article, the Employer agrees that journeymen sheet metal workers hired outside the territorial jurisdiction of this Agreement shall receive the wage scale and working conditions of the local Agreement covering the territory in which such work is performed or supervised.

**SECTION 6.** When the Employer has any work specified in Article I of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by another Agreement with another Union affiliated with the Sheet Metal Workers' International Association, and qualified sheet metal workers are available in such area, he may send no more than two (2) sheet metal workers per job into such area to perform any work which the Employer deems necessary, both of whom shall be from the Employer's home jurisdiction. All additional sheet metal workers shall come from the area in which the work is to be performed. Journeymen sheet metal workers covered by this Agreement, who are sent outside of the area covered by this Agreement, shall be paid at least the established minimum wage scale specified in Section 1 of this Article but in no case less than the established wage scale of the local Agreement covering the territory in which such work is performed or supervised, plus all necessary transportation, travel time, board and expenses while employed in that area, and the Employer shall be otherwise governed by the established working conditions of that local Agreement. If employees are sent into an area where there is no local Agreement of the Sheet Metal Workers' International Association covering the area then the minimum conditions of the home local Union shall apply.

**SECTION 7.** In applying the provisions of Section 2, 5, and 6 of this Article VIII, the term "wage scale" shall include the value of all applicable hourly contractual benefits in addition to the hourly wage rate provided in said Sections.

**SECTION 8.** Welfare benefit contributions shall not be duplicated.

When sheet metal workers are employed temporarily outside the jurisdiction of their home local Union, the parties signatory to this Agreement agree to arrange through the Health & Welfare Trust Fund to transmit health and welfare contributions made on behalf of the employee to the Health and Welfare Fund in the employee's local Union.

The parties to this Agreement agree to establish a system for continuing health and welfare coverage for employees working temporarily outside the jurisdiction of the local collective bargaining agreement when health and welfare contributions are transmitted on their behalf by trust funds from other areas.

**SECTION 9.** Wages at the established rates specified herein shall be paid before noon on the third day following the closing of the work week in the shop or on the job at or before quitting time on Friday of each week, and no more than two (2) days' pay will be withheld. However, employees when discharged shall be paid in full.

**SECTION 10.** Journeymen sheet metal workers, who report for work by direction of the Employer and are not placed to work, shall be entitled to two (2) hours pay at the established rate. This provision, however, shall not apply under conditions over which the Employer has no control.

**SECTION 11.** Each Employer covered by this Agreement shall employ at least one (1) journeyman sheet metal worker who is not a member of the firm on all work specified in Article I of this Agreement.

**SECTION 12(a).** Contributions provided for in Section 12(b) of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of Employers, stabilize and improve Employer-Union relations, and promote, support and improve the employment opportunities for employees. No part of any such payments, however, shall be used for any other purpose, except as expressly specified above.

**(b).** The Employer shall pay the Sheet Metal and Air Conditioning Contractors' National Industry Fund of the United States (IFUS) seven cents ($0.07) per hour for each hour worked on and after the effective date of this Agreement by each employee of the Employer covered by this Agreement. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to IFUS, 4201 Lafayette Center Drive, Chantilly, Virginia 20151-1209; mailing address, P.O. Box 220956, Chantilly, Virginia 20153-0956, or for the purpose of transmittal, through the Local Area Industry Fund.

**(c).** IFUS shall submit to the Sheet Metal Workers' International Association not less often than semi-annually written reports de-

scribing accurately and, in reasonable detail the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds. One time per year, the IFUS shall include in such written report a financial statement attested to by a certified public accountant containing its balance sheet and detailed statement of annual receipts and disbursements. Further specific detailed information in regard to IFUS activities or its receipts and/or expenditures shall be furnished to the Sheet Metal Workers' International Association upon written request.

(d). Grievances concerning use of IFUS funds for purposes prohibited under Section 12(a) or for violations of other subsections of this Section may be processed by the Sheet Metal Workers' International Association directly to the National Joint Adjustment Board under the provisions of Article X of this Agreement. In the event such proceeding results in a deadlock, either party may, upon ten (10) days notice to the other party, submit the issue to final and binding arbitration. The Arbitrator shall be selected by the Co-Chairmen of the National Joint Adjustment Board. The arbitrator shall be authorized to impose any remedial order he deems appropriate for violation of this Section, including termination of the Employer's obligation to contribute to the IFUS. The authority of the Arbitrator is expressly limited to a determination of a deadlock issue under this Section, (Section 12, Article VIII), and no other.

SECTION 13(a). Contributions provided for in Section 13(b) of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of Employers, stabilize and improve Employer-Union relations, and promote, support and improve the employment opportunities for employees. No part of any such payments, however, shall be used for any other purpose except as expressly specified above.

(b). The Employer shall pay to the Sheet Metal Industry Promotion Fund (hereinafter referred to as the Local Industry Fund), twenty four cents ($0.24) per hour for each hour worked beginning August 12, 2001 and effective February 1, 2002 thirty cents ($0.30) per hour by each employee of the Employer covered by this Agreement. Payments shall be made monthly on or before the 20th day of the succeeding month. Any payment not received to the Local Industry Fund must be paid in an equal additional payment to wages.

(c). The fund shall furnish to the Business Manager of the Union, not less often than semi-annually, written reports describing in reasonable detail the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds. One time per year, the Fund shall include in such written report, a statement by a certified public accountant and containing its balance sheet and detailed statement of receipts and disbursements. Further specified detailed information in regard to fund activities or its receipts and/ or disbursements shall be furnished to the Business Manager of the Union upon his written request.

(d). Grievances concerning use of local industry fund monies to which an Employer shall contribute for purposes prohibited under Section 13(a) or for violations of other subsections of this Section shall be handled under the provisions of Article X of this Agreement. The National Joint Adjustment Board shall be authorized to impose any remedial order for violation of this Section, including termination of the Employer's obligation to contribute to the local industry fund.

SECTION 14. The Employers will contribute to the International Training Institute for the Sheet Metal and Air Conditioning Industry twelve cents ($0.12) per hour for each hour worked on and after August 1, 1997 by each employee of the Employer covered by this Agreement. Three cents ($0.03) per hour of the contribution to the International Training Institute shall be forwarded by the trustees of the International Training Institute to the National Energy Management Institute Committee, a jointly administered trust fund. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to the office of the International Training Institute as designated by the trustees of the Fund, or for purposes of collection and transmittal through Sheet Metal Workers Local #17 Joint Apprentice Committee.

The parties agree to be bound by the Agreements and Declaration of Trusts establishing the International Training Fund for the Sheet Metal and Air Conditioning Industry, and the National Energy Management Institute Committee, and amendments thereto as may be made from time to time and hereby designate as their representatives on the board of trustees such trustees as are named, together with any successors who may be appointed pursuant to said agreements.

## ARTICLE IX

SECTION 1. Journeymen and apprentice sheet metal workers covered by this Agreement shall provide for themselves all necessary hand tools. (See Addendum #28)

SECTION 2. (a) Journeymen and apprentice sheet metal workers covered by this Agreement shall not be permitted or required as a condition of employment to furnish the use of automobile or other conveyance to transport men, tools, equipment or materials from the shop to job, from job to job, from job to shop; facilities for such transportation to be provided by the Employer. This provision shall not restrict the use of an automobile or other conveyance to transport its owner and personal tools from home to shop or job at starting time or from shop or job to home at quitting time.

(b). Journeymen and Apprentice Sheet Metal Workers covered by this agreement will not be discriminated against by the Employer because of their choice of residency.

SECTION 3. Any contractor doing work at an active nuclear facility shall arrange for a physician's medical examination both on hiring and layoff and the employee will receive wages for these days.

## ARTICLE X

SECTION 1. Grievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible. An Employer may have the local association present to act as his representative.

To be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, first knowledge of the facts giving rise to the grievance.

SECTION 2. Grievances not settled as provided in Section 1 of this Article may be appealed by either party to the Local Joint Adjustment Board having jurisdiction over the parties and such Board shall meet promptly on a date mutually agreeable to the members of the Board, but in no case more than fourteen (14) calendar days following the request for its services, unless the time is extended by mutual agreement of the parties or Local Joint Ad-

justment Board. The Board shall consist of an equal number of representatives of the Union and the local Employers' Association and both sides shall cast an equal number of votes at each meeting. The local Employers' Association, on its own initiative, may submit grievances for determination by the Board as provided in this Section. Except in the case of a deadlock, a decision of a Local Joint Adjustment Board shall be final and binding.

Notice of appeal to the Local Joint Adjustment Board shall be given within thirty (30) days after termination of the procedures prescribed in Section 1 of this Article, unless the time is extended by a mutual agreement of the parties.

**SECTION 3.** Grievances not disposed of under the procedure prescribed in Section 2 of this Article, because of a deadlock or failure of such Board to act, may be appealed jointly or by either party to a Panel, consisting of one (1) representative appointed by the Labor Co-Chairman of the National Joint Adjustment Board and one (1) representative appointed by the Management Co-Chairman of the National Joint Adjustment Board. Appeals shall be mailed to the National Joint Adjustment Board. *Notice of appeal to the Panel shall be given within thirty (30) days after termination of the procedures prescribed in Section 2 of this Article. Such Panel shall meet promptly but in no event more than fourteen (14) calendar days following receipt of such appeal, unless such time is extended by mutual agreement of the Panel members. Except in case of deadlock, the decision of the Panel shall be final and binding.

Notwithstanding the provisions of Paragraph 1 of this Section, an Employer who was not a party to the Labor Agreement of the area in which the work in dispute is performed may appeal the decision of the Local Joint Adjustment Board, including a unanimous decision, and request a Panel hearing as set forth in Section 3 of this Article, providing such appeal is approved by the Co-Chairman of the National Joint Adjustment Board.

**SECTION 4.** Grievances not settled as provided in Section 3 of this Article may be appealed jointly or by either party to the National Joint Adjustment Board. Submissions shall be made and decisions rendered under such procedures as may be prescribed by such Board. Appeals to the National Joint Adjustment Board shall be submitted within thirty (30) days after termination of the procedures described in Section 3 of this Article. (Copies of the procedures may be obtained from the National Joint Adjustment Board.*)

**SECTION 5.** A Local Joint Adjustment Board, Panel and the National Joint Adjustment Board are empowered to render such decisions and grant such relief to either party, as they deem necessary and proper, including awards of damages or other compensation.

**SECTION 6.** In the event of non-compliance within thirty (30) calendar days following the mailing of a decision of a Local Joint Adjustment Board, Panel of the National Joint Adjustment Board, a local party may enforce the award by any legal means including proceedings in a court of competent jurisdiction in accordance with applicable state and federal law. The prevailing party in litigation to enforce an award shall be entitled to its costs and attorney's fees in addition to such other relief as is directed by the courts.

**SECTION 7.** Failure to exercise the right of appeal at any step thereof within the time limit provided therefore shall void any right of appeal applicable to the facts and remedies of the grievances involved. There shall be no cessation of work by strike or lockout during the pendency of the procedures provided for in this Article. Except in case of deadlock, the decision of the National Joint Adjustment Board shall be final and binding.

\* All correspondence to the National Joint Adjustment Board shall be sent to the following address: National Joint Adjustment Board, P.O. Box 220956, Chantilly, VA 22022-0956.

## ARTICLE XI

**SECTION 1.** All duly qualified apprentices shall be under the supervision and control of a Joint Apprenticeship and Training Committee composed of six (6) members, three (3) of whom shall be selected by the Employer, and three (3) by the Union. Said Joint Apprenticeship and Training Committee shall formulate and make operative such rules and regulations as they may deem necessary and which do not conflict with the specific terms of this Agreement, to govern eligibility, registration, education, transfer, wages, hours, working conditions of duly qualified apprentices and the operation of an adequate apprentice system to meet the needs and requirements of the trade.

**SECTION 2.** The Joint Apprenticeship and Training Committee designated herein shall serve for the life of this Agreement, except that vacancies in said Joint Apprenticeship and Training Committee caused by resignation or otherwise, may be filled either party hereto, and it is hereby mutually agreed by both parties hereto, that they will individually and collectively cooperate to the extent that duly qualified apprentices be given every opportunity to secure proper technical and practical education experience in the trade, under the supervision of the Joint Apprenticeship and Training Committee.

**SECTION 3.** It is the understanding of the parties to this Agreement that the funds contributed by signatory Employers to the International Training Institute and any Local Joint Apprenticeship and Training Fund (Local JATC) will not be used to train apprentices or journeymen who will be employed by Employers in the Sheet Metal Industry not signatory to a collective bargaining agreement providing for contributions to the International Training Institute and a Local JATC. Therefore, the trustees of the International Training Institute and Local JATC shall adopt and implement a Scholarship Loan Agreement Program which will require apprentices and journeymen employed by signatory Employers to repay the cost of training either by service following training within the Union sector of the industry or by actual repayment of the cost of training if the individual goes to work for a non-signatory Employer in the Sheet Metal Industry. The cost of training shall include the reasonable value of all International Training Institute and Local JATC materials, facilities and personnel utilized in training. If a Local JATC does not implement the Scholarship Loan Agreement, the Local JATC shall be prohibited from utilizing International Training Institute materials and programs.

**SECTION 4.** It is hereby agreed that the Employer shall apply to the Joint Apprenticeship and Training Committee and the Joint Apprenticeship and Training Committee shall grant apprentices on the basis of one (1) apprentice for each four (4) journeymen regularly employed on a yearly basis and one (1) apprentice for each six (6) journeymen regularly employed on a yearly basis thereafter. Provided however, an Employer will not be entitled to an apprentice if the Employer has an apprentice on layoff for lack of work. Any deviation from this formula must be agreed to, in writing, by the Business Manager of Local #17.

**SECTION 5.** All applicants for apprenticeship shall serve an ap-

apprenticeship of five (5) years and such apprentices shall not be in charge of work on any job and shall work under the supervision of a journeyman until apprenticeship terms have been completed and they have qualified as journeymen.

**SECTION 6.** A graduated hourly rate of wages for apprentices indentured after August 12, 2001 shall be established and maintained in the following percentage basis of the established hourly rate of journeymen sheet metal workers.

| | |
|---|---|
| First Year Probationary | 40% (plus 40% SASMI, $0.50 Equality Fund) |
| Second Year | 45% (plus 45% SASMI) |
| Third Year | 50% |
| Fourth Year (1st half) | 60% |
| Fourth Year (2nd half) | 65% |
| Fifth Year (1st half) | 75% |
| Fifth Year (2nd half) | 85% |

Effective August 1, 2001:

| | H&W | Pension | Annuity | I.P. | App. | Equality | SASMI |
|---|---|---|---|---|---|---|---|
| First Year | full | — | — | — | | $0.10* | 40% in wages |
| Second Year | full | full | $1.25 | — | full | $0.50 | 45% in wages |
| Third Year (1st half) | full | full | $1.50 | — | full | $0.50 | 50% in SASMI |
| Third Year (2nd half) | full | full | $1.75 | — | full | $0.50 | 50% in SASMI |
| Fourth Year (1st half) | full | full | $2.00 | full | full | $0.50 | 60% in SASMI |
| Fourth Year (2nd half) | full | full | $2.25 | full | full | $0.50 | 65% in SASMI |
| Fifth Year (1st half) | full | full | $2.75 | full | full | $0.50 | 75% in SASMI |
| Fifth Year (2nd half) | full | full | $2.75 | full | full | $0.50 | 85% in SASMI |

**\* For first year apprentices Equality Fund contribution ($0.50) is added to the wages.**

The term **"FULL"** refers to the rate paid, per hour, by Employers for journeymen sheet metal workers employed under this agreement.

This section shall not have the effect of reducing the wage progression schedule of any apprentice who was indentured prior to the effective date of this agreement.

Apprentices will not be allowed to work overtime until all journeymen in the shop or on the job site have been offered the scheduled overtime.

### ARTICLE XII

**SECTION 1.** This agreement and Addenda Numbers 1 through 43 attached hereto shall become effective on the 12th day of August 2001 and remain in full force and effect until the 31st day of July 2005 and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date. In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party.

**SECTION 2.** Notwithstanding any other provision of this Article, or any other Article of this agreement, whenever an amendment to the Standard Form of Union Agreement shall be adopted by the National Joint Labor Relations Adjustment Committee, any party to this agreement, upon the service of notice to all other parties hereto, shall have this agreement reopened thirty (30) days thereafter, for the sole and only purpose of attempting to negotiate such amendment or amendments into this agreement for the duration of the term hereof. There shall be no strike or lockout over this issue.

IN WITNESS WHEREOF, the parties hereto affix their signatures and seals this 23rd day of July 2002.

**Boston Roofing Contractors Association of the B.T.E.A. and Sheet Metal & Airconditioning Contractors National Association – Boston (Specify Name of Association or Contractor)**

By:_____
Signature of Officer or Representative
EMPLOYERS ASSOCIATION

Local Union 17 - Eastern Mass
of Sheet Metal Workers' International Union

By:_____
Signature of Officer or Representative
LOCAL UNION NO. 17

### Negotiating Committee

| For the Union | For the Employer |
|---|---|
| Michael Walsh, Chairman | Kevin R. Gill, Chairman |
| Edward Foley, Secretary | Thomas J. Gunning, Secretary |
| Joseph Bergantino | Joseph F. Cullen |
| Robert Butler | W. Thomas Hanna |
| Fred Creager | Richard W. Dupre |
| William Dinon | Paul M. LeBel |
| John Healy | Paul M. LeBel Jr. |
| Festus Joyce | Stephen P. Affanato |
| Neal Kelleher | Peter O'Leary |
| David McCarren | Jeff Chase |
| Michael Sheehan | |
| James Wool | |

### ADDENDA
ADDENDA to (Form A-3-84)
Standard Form of Union Agreement

**No. 1 (a)** It is expressly included herein, for the purpose of indicating more specifically, but not by any means limiting hereto, that supplementary to Article I of this **AGREEMENT** also covers the handling, setting, erecting, installation, assembling, dismantling, adjustment, alteration, reconditioning, repairing, servicing of all fans, filters of all types, blowers, sheaves, belts and guards of all kinds, plenums including prefabricated insulated casings and air chamber panels, with or without other equipment, louvers, screens, registers, grills, diffusers of all kinds, including those in connection with lighting fixtures and ceilings, dampers of all kinds, sound traps, mixing boxes, attenuators of all kinds, access doors related to air-handling systems, dryers, sprayers, power and gravity ventilators, acoustical material within duct work, dust collectors and recovery systems, breaching, hoods, convector and radiator and similar enclosures and covers, with or without backs, flexible tubing and connections thereto, and all such air-handling systems and to all other sheet metal work covered by this **AGREEMENT** and by the jurisdictional claims of the Sheet Metal Workers' International Association.

Flashings: All types including through flashing to be done by Sheet Metal Workers. Flashing is to be defined as: Through wall, gutters, down spouts, coping, termination bars, and other appurtenances, under the claimed jurisdiction of the Sheet Metal Workers International Association.

Architectural sheet metal shall include: Fascia, skylights, column covers, metal siding, metal roofing and soffits.

All toilet partitions, lockers, and shelving to be done by the Sheet Metal Worker.

(b) The provisions of Article I and Article VIII Section 2 shall apply to spiral pipe and all related fittings, shall apply to manufacture of turning vanes, in addition the parties do agree that the purchase of said items shall be from a manufacturer or contractor who pays the hourly rate of wage set forth herein, or higher.

(c) In keeping with the provisions of Article I relative to drafting and sketching, said drawings and sketches must carry stamped identification of a member of the Sheet Metal Workers' International Association. The Employers and/or Employer agree to cooperate with officials of the Union in matters pertaining to work and contracts.

(d) Spiral pipe will not be permitted on the low pressure or conventional side of a pressure reduction device. This will not apply in remodeling and repair work being done in an industrial plant or the office of said plant if it is a part of the plant's structure. Any revamping of, or adding to the building's structure and the mechanical work included therein will be considered new construction. Clarification of any questions in the interpretation of this Article shall be settled at a pre-bid job conference.

(e) The use of conduit and/or spiral pipe is not permitted in a conventional system.

The use of flexible hose is not permitted on a conventional system, except as specified in Addendum #2.

**No. 2 DEFINITION:**

The classification of a system for this purpose will not be determined by static pressure or velocity, but rather by the following requirements:

a. A high-pressure system will have airtight ductwork of special construction. It will be made airtight by mechanical means such as welding, gasketing and/or caulking.

b. In addition, for a system to be considered high pressure, it must have pressure reduction devices such as one of the following:

> Pressure reducing valve with lined duct.
> Pressure reducing valve with sound trap.
> Attenuation box with pressure reducing valve.
> Double duct or mixing box with valve.
> Peripheral high velocity system.

c. Any supply system that does not have both airtight construction and a pressure reduction device will be considered a conventional system.

d. The requirements and definitions stated above refer to both supply and return and exhaust systems, except in addition to the aforementioned, a high velocity return exhaust system must have metal flues or metal risers to be of airtight construction to qualify.

**FLEX CONNECTIONS**

e. The use of flexible hose will be permitted in accordance with the following:

f. Where the pressure reducing device is an "octopus" type box, a 5'0" maximum length of flexible hose may be used on the inlet side of the box. In addition, a 5'0" maximum length of flexible hose may be used from the box to each outlet. Flex will be limited to 5'0" expanded on all systems and will be continuous and no pipe or fittings to be used between Flex section. Runoffs will consist of conventional pipe and fittings to a point no more than 5'0" from the outlet.

g. A maximum 5'0" of flex is permitted in a perimeter window unit system and may be used to connect from unit to unit in series.

h. Where a special type of outlet requiring an "in-between" connection is used on a system, the connection to the diffuser may be made by using five (5) feet maximum length.

**No. 3** No high velocity powder actuated tools will be permitted. The low velocity powder actuated tools will be permitted. This tool may be used by the mechanic or apprentice who has been personally instructed in its use in accordance with Industrial Bulletin #22 prescribed by the Massachusetts Department of Labor and Industries.

**No. 4** Reference: Article VI Section 1 "on the job" and "on the project site" shall mean "if possible within the travel schedule".

All overtime work will be paid at one and one half (1 1/2) times the hourly rate except when that overtime is on a Sunday or Holiday when the rate will be two (2) times the hourly rate.

Fabrication in the Employer's shop will be at one and one half (1 1/2) times the hourly rate outside of the regular working hours on Monday through Saturday. Sunday and Holidays will be done at two (2) times the hourly rate.

**No. 5 Reference: Article VII Section 1**

(a) All Employers with principal place of business within a radius of no more than fifteen (15) miles from Park Square, Boston shall be considered as resident contractors of Boston, Massachusetts and shall be governed in matters of travel and transportation from a point identified as Park Square, Boston, Massachusetts. All Employers with principal place of business outside the radius referred to herein above shall be considered as resident contractors of their respective town or city and shall be governed in matters of travel and transportation from a point identified as the Town Hall or City Hall of the Employers' respective town or city.

Effective no more than sixty (60) days from the date of this contract or the date of future signings by new contractors it will be the one time option of those Employers beyond the fifteen (15) mile radius to choose to be a Boston based contractor for the purpose of figuring mileage and travel. This choice, once made, will be for the duration of this agreement and successor agreements. Should an Employer beyond the fifteen (15) mile radius elect to become a Boston based shop, it is clearly understood that the Employer will not be requested to pay any travel or mileage to employees working in the shop.

(b) When employed in a shop or on a job within the limits of no more than five (5) road miles from the points referred to above, employees shall be governed by the regular working hours specified herein and shall arrange for necessary transportation within said limits from home to shop or job at starting time and from shop or job to home at quitting time and the Employer shall provide for all additional transportation during working hours. The shop shall not be a starting point.

(c) When employed outside of the five (5) mile limit from the points referred to in Sections 1 and 2 of Article VII and within the jurisdiction of the Union, employees shall be furnished with or shall arrange transportation which will assure their departure from the five (5) mile limits specified, no earlier than one half (1/2) hour before starting time and returning will assure arrival at such limits no later than one half (1/2) hour after quitting time.

(d) Employees traveling from the departure point referred to in this Article and not using Employer furnished transportation shall be paid at the current IRS rate for each mile traveled from the five (5) mile point to the job and from the job to the five (5) mile point.

(e) Employees directed or sent by the Employer during the work hours from shop to job, job to job, job to shop shall be paid at the current IRS rate for all miles traveled when other than the Employer furnished transportation is used.

(f) Travel time within the workday shall be considered as work time and shall be paid at the current hourly rate of wage.

Parking and Tolls: The Employer shall pay all tolls and parking fees the first and last day on the job. In difficult parking areas the Employer will notify the workmen one day prior to layoff. It is further agreed the Employer shall transport the men's tools to and from difficult parking area jobs.

(g) Travel time outside of the workday not including the hours between midnight and 6:00 a.m. shall be payable at the current hourly rate of wage. Travel time between the hours of midnight and 6:00 a.m. shall be paid at one and one half (1 1/2) times the going hourly rate of wage, except Sundays and holidays where it shall be paid at two (2) times the hourly rate.

(h) Traveling expenses on airplanes and trains shall include fares, berths, sleepers, parlor cars, meals, etc., and shall be paid by the Employer. On the day of departure, single time shall be paid workmen for the number of hours taken on the journey up to four-thirty (4:30) p.m. When the journey extends beyond four-thirty (4:30) p.m. they shall receive, in addition to their regular day's pay, such additional hours pay, under the provisions of Article VII, as is required in travel, but not to exceed four (4) hours in any one day.

Due to reasons beyond the control of the parties to this AGREEMENT certain jobs require a full eight (8) hour day on the job and when compliance with the departure and arrival schedule prevents this, such cases shall be treated as special cases and consideration for exemption would be given after investigation by the parties involved.

No. 6  Reference: Article VIII Section 1

Hourly wage rate schedule as follows:
August 1, 2001                                    $31.82 per hour
(effective 9/1/01 the rate is $30.81 per hour due to the contribution of $1.01 to NPF)

Future increases due under this agreement are as follows:

    February 1, 2002   -   $1.25 per hour
    August 1, 2002     -   $1.25 per hour
    February 1, 2003   -   $1.25 per hour
    August 1, 2003     -   $1.25 per hour
    February 1, 2004   -   $1.25 per hour
    August 1, 2004     -   $1.30 per hour
    February 1, 2005   -   $1.30 per hour

To be allocated as per agreement by vote of the membership.

Employers will be notified at least thirty (30) days in advance of such allocations.

(a) Payment by check is permitted Monday through Thursday inclusive. Payment by check on Friday requires the Employer to give the employee one half (1/2) hour during working hours to cash the check. Employees must be paid before noon on the third day following the closing of the workweek (ex: week ending on Sunday, men must be paid before noon on Wednesday). The contractor must have a checking account drawn on a local bank.

Failure to pay before noon on the third day will entitle employees to one half (1/2) hour during working hours to cash their check. In the event a holiday should fall between the end of the workweek and payday or a situation beyond the control of an Employer (i.e. computer breakdown) shall cause checks to be late no penalty shall be imposed. Employers agree to make every effort to meet payday regardless of these problems.

(b) Each Employer agrees to withhold from the above stated hourly rate of wages, subject to the receipt of a signed Authorization Card from the employee, the amounts set forth hereinafter:

Working Dues schedule for Journeymen:

| Date | Working Dues | PAL | Total |
|---|---|---|---|
| August 1, 2001 | $1.27 | $0.04 | $1.31 |
| February 1, 2002 | $1.30 | $0.04 | $1.34 |

Working Dues schedule for Apprentices:

| | | | |
|---|---|---|---|
| August 1, 2001 | $0.58 | $0.04 | $0.62 |

The withholdings are to be remitted by each Employer to the "Sheet Metal Workers (Local Union 17) Working Dues" (separate check) in the name of, and to the credit of, the respective member of the Union from whom said deductions were made.

(c) Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

(d) The Union has the right to allocate a negotiated hourly increase by membership vote, to any aspect of it's wage and/or benefit program.

(e) It is clearly understood that the $0.04 contribution to PAL (separate check) effective August 1, 2001 will be a voluntary contribution on the part of the member.

No. 7(a) An employee injured while working and forced to leave his employment in order to obtain medical treatment for such an injury shall be paid full wages and benefits for time lost on this account on the day on which he is injured. Where, while still employed by the Employer under who the injury was received, additional treatments are required during the working hours for this injury, the employee shall be paid full wages and benefits for the time absent for this purpose. The second half of this paragraph shall apply only to an injury, which does not prevent the employee from continuing his work.

(b) The Employer further agrees that all members of the Union in his employ shall be protected in accordance with the Massachusetts Workmen's Compensation Act.

(c) It is further agreed that any Employer, party to this AGREEMENT, that is not subject by law to the Massachusetts State Unemployment Act, shall become a voluntary subject to the law in the employment of members of the Union.

**No. 8(a)** The Employer shall pay to the "Sheet Metal Workers' (Local Union 17) Insurance Fund" amounts set forth hereinafter:

February 1, 2002 - $4.82

For all hours used in travel or worked between six thirty (6:30) a.m. to four thirty (4:30) p.m., with one half hour for lunch, by apprentices and journeymen sheet metal workers and shall pay to said Fund the required amount per hour for all the hours actually worked between the hours of four-thirty (4:30) p.m. and six thirty (6:30) a.m. Failure to contribute to the Fund shall be a violation of contract.

**(b)** This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this fund shall be made on a weekly basis. Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

**No. 9(a)** The Employer shall pay to the Sheet Metal Workers-National Pension Fund (NPF) amounts set forth hereinafter:

September 1, 2001     $5.05

For all hours used in travel or worked between 6:30 a.m. to 4:30 p.m. by apprentices and journeymen sheet metal workers and shall pay to said Fund the required amount per hour for all the hours actually worked between the hours to 4:30 p.m. and 6:30 a.m. Failure to contribute to the Fund shall be a violation of contract.

**(b)** This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this Fund shall be made on a weekly basis. Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

**No. 10(a)** The Employer shall pay to the Sheet Metal Workers Local Union 17 Annuity Fund the amount set forth hereinafter:

August 1, 2001     $4.60

For all hours used in travel or worked between six thirty (6:30) a.m. to four -thirty (4:30) p.m., with one half hour for lunch, by apprentices and journeymen sheet metal workers and shall pay to said Fund the required amount per hour for all hours actually worked between the hours of 4:30 p.m. and 6:30 a.m. Failure to contribute to the fund shall be a violation of contract.

**(b)** This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this fund shall be made on a weekly basis. Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

**(d)** The Employer agrees to contribute to the Sheet Metal Workers International SASMI (Stabilization Agreement for the Sheet Metal Industry) in the amount prescribed by that agreement which is currently three percent (3%) of the total package, less the Industry Promotion Fund.

**No. 11(a)** All Funds, Local and National, shall be paid through the Sheet Metal Workers' Local Union No.17 Insurance Fund Office, 43 Kingston Street, Boston, MA 02111. This will include the Insurance, Pension, Annuity, Working Dues, Apprentice Training, Labor Management Cooperation Trust (Equality), SASMI, National Training, Industry Promotion, and National Industry Fund. Reporting forms may be obtained from the Insurance Fund Office.

**(b)** The Employer shall make available to the Insurance, Pension, Annuity, Working Dues, Apprentice Training, Industry Promotion and Labor Management Cooperation Trust (Equality) and SASMI funds any and all records of the covered Employees that the several Funds may require in connection with the sound and efficient operation of the several Funds.

**(c)** The Insurance, Annuity, Joint Apprenticeship and Training Fund and Equality funds shall be jointly administered.

**(d)** All funds are due and payable as described herein no later than the 20th day of the succeeding month.

**No. 12** The Employer and/or employees agree the Union has the right to remove its members and apprentices from shop and/or job where the Employer and/or their representatives have failed to remit the monies due the Fund or Funds on dates agreed by trustees.

It is further agreed the employees shall be compensated in full for the number of work hours lost due to said work stoppage caused by delinquency.

**No. 13** The business manager and agents of the Union shall have the right and privilege, at all times, of going through the shops or premises, or buildings where work is being done, to examine the receipts of members employed there, check their pay stubs and transact any other business he may have to do in the performance of his duties.

**No. 14(a)** Men boarded on a five (5) day basis or less shall be paid the necessary expenses for room and board, and in no case shall the amount be less than twenty-five dollars ($25.00) per day on all jobs bid after August 1, 2001.

The Employer shall pay or furnish transportation weekly to and from the job, and departure and arrival shall conform to the limits and schedule as outlined in Article VII.

**(b)** Men boarded on a seven (7) day basis shall be paid the necessary expenses for room and board and in no case shall the amount be less than twenty-five dollars ($25.00) per day on all jobs bid after August 1, 2001.

The Employer shall pay for transportation at the start and finish of the job, and departure and arrival shall conform to the limits and schedule as outlined in Article VII.

**(c)** The exception is the jurisdiction area of Local #17 of Eastern Massachusetts that shall be paid on the basis of twenty dollars ($20.00) per day on all jobs bid after August 1, 2001 if the Employer elects to pay board rather than mileage and travel time this subsistence will be for the duration of the job. The Employer will not be liable for absenteeism or any resultant lost work time. An Employee missing Friday or Monday will not be paid board for a non-working weekend.

**No. 15(a)** Both parties agree that the hourly contribution by the Employer to the Sheet Metal Industry Promotion Fund may be increased by the Employers' Association provided at least a six month notice is given all Employers who contribute to the Fund.

August 1, 2001     $0.24 per hour
February 1, 2002   $0.30 per hour

Effective February 1, 1998, seven ($0.07) cents to the National Industry Fund.

(b) The Employer shall pay to The Sheet Metal Workers Apprentice and Training Fund the amount set forth hereinafter:

August 1, 2002    $0.56 per hour

Ten cents ($0.10) of which shall be forwarded to the ITI. The ITI shall forward three cents ($0.03) of this ten ($0.10) to the National Energy Management Institute (NEMI).

(c) The Sheet Metal Workers' Apprentice and Training Fund is for the purpose of education and training of indentured apprentices and for the administration cost of the Joint Apprentice Committee. Failure to contribute to the Fund shall be a violation of the contract. The receipt and disbursement of the monies in the Apprentice Training account shall be the sole responsibility of the Joint Apprentice Committee, comprising an equal number of members from SMACNA – Boston and Local Union #17. The Industry Fund will help in every way possible in the upgrading and retraining of journeymen sheet metal workers.

(d) Contributions to the fund shall be made on a weekly basis. Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

**No. 16** The stewards, both in the shop and in the field, shall be appointed by the Union from the Sheet Metal Workers' Local Union 17 members in the employ of the Employer. Each steward will be appointed from among the first sheet metal workers employed on the site. The Union shall notify the Employer of the name of the Steward when he is appointed. Each such steward shall, provided there is work he is qualified to perform, be the last man, other than the foreman, to be discharged. In the event a steward is laid off because of a shop or job site temporarily closing down, he shall be the first man other than the foreman rehired for that job, provided he is qualified to perform the work required.

The amount of stewards on any job site for **individual Employers** will be determined by Local Union 17. The steward will protect all work under our jurisdiction, regardless of who is performing this work, without harassment or discrimination by his Employer. Any dispute arising over the interpretation of this Section shall be subject to adjustment under the provisions of Article X. There will be no transfer or discharge of a steward, or work stoppage by the Union, until a grievance meeting is held or permission is given, by the Union.

**No. 17(a)** FOREMEN: Shall receive minimum amounts above the going rate as set forth below:

Crew of three (3) to seven (7) inclusive    $1.50 per hour minimum.
Crew of eight (8) to fifteen (15) inclusive    $3.00 per hour minimum.
Crew of sixteen (16) and up inclusive    $4.00 per hour minimum.

**No. 18** Foremen shall notify the employee at least two (2) hours before a man is laid off. Failure to notify the employee will entitle the employee to receive two (2) hours' pay. Upon layoff, a man is to receive a full statement of his earnings. Also, he is to receive his notification slip for Unemployment Compensation benefits as required by law. (See Addenda #7(c).

**No. 19** It is further agreed that on jobs of eight (8) or more men, the Employer shall furnish a heated shelter of at least 100 square feet of floor area for the purpose of storing clothes, tools and eating of lunches; it shall be furnished with benches or chairs.

**No. 20** Jurisdictional controversies affecting or involving parties to this **AGREEMENT** shall be settled in accordance with the provisions and intent of agreement between Sheet Metal Workers' International Association and other National or International Unions directly involved or by decisions rendered by regularly constituted authorities recognized by Sheet Metal Workers' International Association, including any jurisdictional council voluntarily set up by the A.F. of L. Building Trades.

**No. 21** It is agreed that the apprentice ratio be as follows:

One (1) apprentice for the first four (4) journeymen regularly employed on a yearly basis.

One (1) apprentice for every six (6) mechanics regularly employed on a yearly basis thereafter.

Any deviation from this formula must be agreed to, in writing, by the Business Manager of Local #17.

**No. 22** Parties to this contract do hereby agree to train all journeypersons in the OSHA 10-Hour Construction Safety Course by August 1, 2004 with the cost to be shared equally and comply with and be governed by the safety provisions outlined in Industrial Bulletins Numbers 12 and 22, issued by the Department of Labor and Industries of the Commonwealth of Massachusetts and the Federal Occupational Safety and Health Act.

**No. 23** Testing and Balancing (description of reference in Article I, Section 1 (c) of Standard Form). Any drawings, floor layouts, fan data or outlet sheets that are required by the Employer for testing and balancing shall be prepared by sheet metal journeymen or apprentices covered by this agreement. Any typing or duplicating may be done by office personnel. The work shall be deemed complete when accepted by the engineer of approving authority.

**No. 24** In the event of a government imposed wage freeze or limitation; the Employer agrees to pay any and all increases that cannot be paid on account of said mandatory wage freeze or limitation immediately upon the removal of rescission.

**No. 25** The Union shall have the right to reopen this contract to allocate (by membership vote) to any new fund it desires to start upon thirty (30) day notice to SMACNA - Boston. The Union has the right to allocate (by membership vote) to the following International Funds:

The Henry Jackson and Diabetes Foundations, National Pension Plan, International Trust, International Health and Welfare.

**No. 26 Certified Payroll, Cash Payments, Escrow Fund and Bond Requirements**
Any Employer who works in the area jurisdiction of Local 17, but having its fabrication shop outside the area jurisdiction of Local 17, will furnish upon request of Local 17 a certified payroll record of wages and fringe benefit payments made to sheet metal worker employees of the shop, specifying the hours worked, including straight and overtime hours worked. Certification shall be made by an officer of the company.

If at any time Local 17 has serious doubt about the ability of any Employer, having an agreement with Local 17 for three (3) years or less, to meet his contractual wage and fringe benefit payments, or if at any time this Employer does not have sufficient funds for payroll checks and fringe benefit payments, or if a payroll check bounces, Local 17 may require this Employer to pay wages and fringe benefit payments cash or certified check on a weekly basis.

In addition, Local 17 may require this Employer, working in the area jurisdiction of Local 17, to establish an escrow fund or furnish a bond, in such form and manner as required by Local 17 and/or the fringe benefit trust funds, to insure that wages and fringe benefit payments be made in a prompt and proper way.

### No. 27 Shaftwork

If a man works in a shaft, the Employer will provide plank material on the floor below. Anyone required to work 40 feet above the ground, or 40 feet above a permanent structure, such as on a staging, swing stage, bosun's chair or skylight shall comply with OSHA regulations.

### No. 28 Tools

A toolbox shall be made available by the Employer on every job site of sufficient size to store all basic sheet metal tools used by sheet metal worker employees on the job site. In the event of fire, or in the event of theft, resulting from forcible entry (where there is evidence of such forcible entry) the Employer shall be responsible for loss of such tools and the tools shall be replaced or the sheet metal worker employee reimbursed up to three hundred and fifty dollars ($350.00) after substantiation and proof is made by the employee of the tools he had on the job site and employee presents a paid receipt of purchase, or the Employer may opt to purchase replacement tools. At any time the Employer shall have the right to ask for, and the sheet metal worker employee shall furnish, a list of his basic sheet metal tools at the job site.

In any case where there is a question of the value of tools and amount of reimbursement, the matter may be referred to the Union's business representative and the Employer and his association representative for resolvement.

### No. 29 Injured Sheet Metal Workers

If a sheet metal worker employee is injured on the job, the steward or a fellow sheet metal worker employee shall be allowed to see that proper care and attention is given to the injured worker. If it is necessary to move the injured worker to a hospital or medical center for medical treatment, the Employer shall designate a qualified medic, steward, sheet metal worker employee or company representative to accompany such injured worker to the hospital or medical center.

The employee accompanying the injured person shall be paid full wages and benefits for the time necessary to see that the injured employee receives adequate medical attention. They shall also be reimbursed for any expense incurred by them in pursuit of such care including, but not limited, to parking mileage and/or taxi or carfare upon presentation of receipts to the Employer.

### No. 30 Hazardous Conditions

All work performed by the Employer and sheet metal worker employees shall comply with all local, state and federal safety and right-to-know laws. In working under hazardous conditions, which would include heavy dust, paint spraying, abnormal air pressure, radiation and asbestos removal, the Employer and sheet metal worker employee shall work under and abide by all regulations covering such hazardous conditions, as required by local, state and federal laws.

The sheet metal worker employee shall wear all safety equipment required by local, state and federal laws. Failure of any employee to wear such equipment as instructed by the Employer may result in his discharge.

### No. 31 Savings Clause

If any word, sentence, paragraph or section in the agreement is ruled illegal, that portion in question will be jointly renegotiated and/or rewritten to comply with the law.

**No. 32** State and Federal "Right-To-Know" laws and Massachusetts "Jury Pay" law are to be recognized by the signatories to this agreement.

**No. 33** Labor Management Cooperation Trust (Equality Fund)

(a) Effective August 1, 2001, the Employer shall pay to the "Sheet Metal Workers Local #17 Labor Management Cooperation Trust" fifty cents ($0.50) per hour for all hours used in travel or work between 6:30 a.m. to 4:30 p.m. by apprentices and journeymen sheet metal workers and shall pay to said fund the required amount per hour for all hours actually worked between the hours of 4:30 p.m. and 6:30 a.m. Failure to contribute to the fund shall be a violation of contract.

(b) This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

(c) Contributions to this fund shall be made on a weekly basis. Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

**No. 34.** New Market Recovery As a part of a continued, mutual effort to recover the area market, parties to this Agreement agree that:

(a) Local #17 will notify the contractors association of any new signatory contractors.

(b) Each contractor agrees to notify the Union, periodically of any new projects they have contracted for.

**No. 35** It is clearly understood that companies working in a bargaining area other than the bargaining area in which their shop is located shall be governed by the two-man rule. Additional employees required to man a project in that situation shall be assigned by the Union office. Employees assigned in that manner may be utilized on that particular project and may not be assigned or transferred to any other project or job site within that or any other geographic bargaining area.

**No. 36** On a joint venture, for a job located within the jurisdiction of Local Union #17, and an Employer located outside the jurisdiction of Local Union #17, the sketching and fabricating of said job must be performed within the jurisdiction of Local #17.

**No. 37** New Service Committee EAP Parties to this Agreement recognize the existence of the Sheet Metal Workers Local #17 Service Committee as a functioning employee assistance program. The Service Committee was formed to assist the members of Local #17 and their families with problems arising from drug and/or alcohol abuse.

The Service Committee is run by members of Local #17 and is in addition to coverage offered under the Health and Welfare program of Local #17.

**No. 38 Owner-Members:** (Reference Article IV Section 3)

Contributions to all funds shall be made by or on behalf of any person who is an Owner-Member, as defined below, on the basis

of 40 hours per week, payable monthly, plus actual hours in excess of forty (40). If such contributions are not timely paid by or on behalf of the Owner-Member, he shall be terminated from all participation in the Funds for this purpose, a person will be considered as an Owner-Member if (a) he or his spouse owns, directly or indirectly, all or any portion of the capital or profits interest in the business, or works with the tools, or acts as employer, contractor or jobber, or otherwise participates in the management of the company on a day-to-day basis in the Sheet Metal Industry; and (b) he is a member of Local No. 17. Payments to all funds are due and payable on or before the 20th day of the succeeding month.

### No. 39 Coffee Breaks:
There will be two (2) ten (10) minute coffee breaks during the normal workday. One break in the morning and one in the afternoon. It is clearly understood that the time allocated for the coffee break will be paid and all fringe benefit funds will be contributed to at the appropriate rates.

### No. 40 Reopener
The Union shall have the right to reopen this contract for the sole purpose of discussing a bonding requirement for the national funds.

**No. 40(a):** Both parties agree to allow a reopening of this contract for a mutually agreeable, industry related matter.

### No. 41 Memorandum of Understanding
In Plant Market Recovery

By agreement reached July 29, 1994, Sheet Metal Workers Local #17 and the Boston Roofing and Sheet Metal and Air Conditioning Contractors Association of the Building Trades Employers Association, a committee will be formed to attempt to arrive at an arrangement to recover "in plant" maintenance work within this jurisdiction.
Several innovative models were discussed in an attempt to formulate a marketable crew rate for the work described herein.

**No. 42** The employer shall supply raingear during inclement weather.

**No. 43** Local 17 members shall be paid wages only for one (1) bereavement day for immediate family.
**IN WITNESS WHEREOF**, the parties hereto affix their signatures and seals this 1st day of August 2001.

Boston Roofing Contractors
Associations of the Building Trades
Employers Association and Sheet Metal
and Airconditioning National Association - Boston


BY _____
    Thomas J. Gunning, Executive Director, B.T.E.A.,
    SMACNA - Boston

BY _[signature]_____
    Contractor  M.R.C. ENTERPRISES, INC

BY _[signature] 4/6/03_____
    Joseph Bergantino, Business Manager
    Local Union No. 17 of
    Sheet Metal Workers'
    International Association

# GARCIA & MILAS

ATTORNEYS AND COUNSELORS AT LAW
A PROFESSIONAL CORPORATION

44 TRUMBULL STREET
NEW HAVEN, CT
06510

JANE I. MILAS
(203) 773-3824

FACSIMILE
(203) 782-2312

E-MAIL
jmilas@garciamilas.com

November 22, 2004

VIA CERTIFIED MAIL, RETURN RECEIPT

Mr. Michael J. Sullivan
General President
Sheet Metal Workers International Association
1750 New York Avenue, N.W.
Washington, D.C 20006

    Re: M.R.S. Enterprises, Inc.
        Delta Terminal A at Logan Airport

Dear Mr. Sullivan:

    This office represents M.R.S. Enterprises, Inc. in connection with the above-referenced project. Pursuant to Article X, section 1 of the Agreement between M.R.S. Enterprises, Inc. ("MRS") and the Sheet Metal Workers International Association ("SMWA"), MRS raises the following grievance:

    Breach of the Agreement by the SMWA in connection with the Delta Terminal A project at Logan Airport, for failure to supply duly qualified Building Trades Journey persons, Specialty Sheet Metal Workers, and Specialty Trainees in sufficient numbers and ratios stipulated during the April 8, 2003 meeting in Washington, D.C. as may be necessary to property execute work contracted for by the Employer in the manner and under the conditions specified in the Agreement.

M. Sullivan
November 22, 2004
Page two

      MRS requests that this grievance proceed to step one, as provided in Article X, section 1 of the Agreement.

Sincerely yours,

Jane I. Milas

JIM/mef
cc.   Roland Levesque

      Joseph Bergantino
      Business Manager
      Local 17, Sheet Metal Workers International Association
      1157 Adams Street
      Dorchester, MA 02124-5788 (via certified mail)

**MRS ENTERPRISES, INC.**

December 20, 2004

Mr. Michael Sullivan
General President
Sheet Metal Workers International Association
1750 New York Avenue, NW
Washington, DC 20006

Dear Mr. Sullivan,

We have not received a suitable response from the Sheet Metal Workers International Association (SMWIA) to our grievance against the SMWIA with respect to the financial harm caused to our firm by the SMWIA on the Delta Terminal A project at Logan Airport, Boston, Massachusetts.

In addition, the local and national representatives of the SMWIA have failed to enact a comprehensive plan for market recovery within New England to ensure that MRS Enterprises Inc, by employing members SMWIA, remains competitive with other trades.

Therefore, in accordance with Article VIII, Section 4 of the National Association of Siding and Decking Contractors (NASDC) Agreement, we have given formal notice to terminate the Agreement on the stipulated expiration date. We will do the same with respect to Agreements with Local 40 and Local 17 as well.

Thank you.

Sincerely,

Roland O Levesque Sr.
President

Cc:  Richard Pellar, President NASDC
     Anthony Asher, NASDC
     Joseph Bergentino – Business Manager SMWIA Local 17
     David Roche – Business Manager SMWIA Local 40