UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| M.R.S. ENTERPRISES, INC. | ) | |
|     Plaintiff | ) | |
| | ) | |
| V. | ) | C.A. NO.  05-CV-10694-JLT |
| | ) | |
| SHEET METAL WORKERS' | ) | |
| INTERNATIONAL ASSOCIATION | ) | |
| LOCAL 17 - BOSTON, and | ) | |
| SHEET METAL WORKERS' | ) | |
| INTERNATIONAL ASSOCIATION | ) | |
|     Defendants | ) | |

OPPOSITION OF THE PLAINTIFF, M.R.S. ENTERPRISES, INC.
TO THE  MOTIONS TO DISMISS FILED BY THE DEFENDANTS, SHEET METAL
WORKERS INTERNATIONAL ASSOCIATION LOCAL 17 - BOSTON AND SHEET
METAL WORKERS INTERNATIONAL ASSOCIATION

INTRODUCTION AND SUMMARY OF ARGUMENT

This is an action brought by the Plaintiff for breach of a collective bargaining agreement

by the Sheet Metal Workers' International Association and its Affiliated Local Union No. 17 in

Boston, Massachusetts.  The Complaint also contains allegations of material misrepresentation

with respect to the skill and abilities of the sheet metal workers that both the International and

the Local Union promised to supply to the Plaintiff for work on its Terminal A, Delta Airlines

project at the Logan Airport in Boston, Massachusetts.

In opposition to the Motions to Dismiss filed by the Defendant, Sheet Metal Workers'

International Association (SMWIA) and Sheet Metal Workers' International Association Local

17 (Local 17), the Plaintiff, M.R.S. Enterprises, Inc. (M.R.S.) will show that the collective bargaining agreement between M.R.S. and the SMWIA known as the National Siding and Decking Agreement ("the Agreement") provides a grievance and arbitration procedure which is exclusive and takes precedence over any other grievance procedure in any other collective bargaining agreement entered into by the employer.  Therefore, the claim by Local 17 that M.R.S. never demanded arbitration against it is groundless since the demand by M.R.S. to the SMWIA for arbitration pursuant to "the Agreement"  constituted demand for arbitration against Local 17 as well.

M.R.S. will also show that both the SMWIA and Local 17 waived their right to arbitrate the grievance by refusing to respond to the demand of M.R.S. on November 22, 2004.

Lastly, M.R.S. will show that notwithstanding the strong body of federal law favoring the enforceability of an agreement to arbitrate now codified in 301(a) of the Labor Management Relations Act 29 U.S.C. Sec. 185 (a) et seq. (LMRA) and the Federal Arbitration Act, 9 U.S.C. Sec. 1 et seq.,(FAA) M.R.S. cannot be compelled to arbitrate its grievance through "the Agreement" arbitration procedure because half of the arbitration panel consists of employees of the Defendant, SMWIA, and therefore M.R.S. cannot get a fair impartial hearing. Also, the MRS claim for misrepresentation by the SMWIA is not an arbitrable issue.

<u>STATEMENT OF THE FACTS</u>

A.    <u>The Parties and Their Collective Bargaining Relationship</u>

M.R.S. was signatory to a collective bargaining agreement with the SMWIA known as the National Siding and Decking Agreement ("the Agreement") effective January 1, 2000 and expiring on May 31, 2005.  (Complaint ¶7)  A true copy of "the Agreement"  is attached as Exhibit A to the Affidavit of Steven D. Levesque attached hereto as Exhibit 1.  M.R.S. was also

signatory to a collective bargaining agreement with Local 17 in Boston which was effective August 1, 2001 and which will expire on July 31, 2005. (Complaint ¶8) A true and accurate copy of the Local 17 Agreement is attached as Exhibit B to the Affidavit of Steven D. Levesque attached hereto as Exhibit 1. Both agreements contain similar grievance/arbitration procedures involving three steps with the final step in each procedure resulting in a hearing before either the Siding and Decking Arbitration Board or the National Joint Adjustment Board. Both are comprised of three representatives of employers signatory to a Sheet Metal Workers agreement and three union officials appointed by the SMWIA. (Complaint ¶24) Article X, Section 1 of "the Agreement" provides, however, that "The grievance procedures of the National Siding and Decking Agreement are the sole and exclusive remedy for any asserted breaches of this Agreement and supercede the grievance procedures of any other collective bargaining agreement that the Employer is signatory." Since the M.R.S. project at Terminal A in Boston was performed pursuant to "the Agreement", any grievances arising on the project had to be processed through "the Agreement" arbitration machinery and not through any arbitration provision in the Local 17 Agreement.

On April 8, 2003, Roland O. Levesque and Steven D. Levesque of M.R.S. met with representatives of Crown Corp., to whom M.R.S. was a subcontractor, Anthony Asher, attorney for the National Siding and Decking Association, Joseph Nigro, Assistant to the President of the International, Michael J. Sullivan, President of the International Union, and Joseph Bergantino, Business Manager for Local 17. The meeting took place in Washington, DC and was held for the purpose of discussing the Terminal A project of M.R.S. (Complaint ¶10) See also Affidavit of Roland O. Levesque attached hereto as Exhibit 2. At that April 8, 2003 meeting, all parties agreed that M.R.S. would install the composition metal panel siding system required on the

Terminal A project pursuant to "the Agreement" and that Local 17 was prepared to supply specialty sheet metal workers and specialty trainees who had the requisite skills and competency to install the metal panel siding system on the project.  (Complaint ¶11)  See Exhibit 2, the Affidavit of Roland O. Levesque.

B.    "The Agreement"

As previously stated, M.R.S. was signatory to "the Agreement" with the SMWIA.  That collective bargaining agreement contains in Article X, a three-step grievance/arbitration procedure.  The full text of Article X provides as follows:

ARTICLE X

The Union and the Employer, whether party to this Agreement independently or as a member of a multi-employer bargaining unit, agree to utilize and be bound by this Article.  The grievance procedures of the National Siding and Decking Agreement are the sole and exclusive remedy for any asserted breaches of this Agreement and supersede the grievance procedures of any other collective bargaining agreement that the Employer is signatory.

**SECTION 1**.  Step 1.  Grievances of the Employer or the Union, arising out of the interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible.  Both parties may participate in conferences through representatives of their choice.

To be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within thirty (30) calendar days of the first knowledge of the facts giving rise to the grievance.

**SECTION 2**.  Step 2.  Grievances not disposed of under the procedure described in Section 1 of this Article may be appealed jointly or by either party to the Siding and Decking Grievance Panel ("Grievance Panel").  Duplicate copies of the appeal shall be mailed to the following addresses:  Siding and Decking Grievance Panel, 25800 Northwestern Highway, Suite 1000, Southfield, Michigan 48075 and Sheet Metal Workers International Association, Jurisdictional Department, 1750 New York Avenue, N.W., Washington, D.C. 20006.  The Grievance Panel shall be composed of two (2) members, one (1) of which shall be appointed by the General President of the Sheet Metal Workers International Association and one (1) of which shall be appointed by the National

Association of Siding and Decking Contractors.  Both sides shall have equal voting power.  The Grievance Panel shall meet promptly but in no event more than fourteen (14) calendar days following receipt of such appeal, unless such time is extended by mutual agreement of the Grievance Panel.

The Grievance Panel is empowered to render such decisions and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation.  Except in the case of deadlock, the decision of the Grievance Panel shall be final and binding.

**SECTION 3**.  Step 3.  Grievances not settled as provided in Section 2 of this Article may be appealed jointly or by either party to the Siding and Decking Arbitration Board ("Arbitration Board").  The Arbitration Board shall consist of three (3) members appointed by the Union and three (3) members appointed by the Association.  Submissions shall be made and decisions rendered under such procedures as may be prescribed by such Board.  Appeals to the Arbitration Board shall be submitted within thirty (30) days after termination of the procedures described in Section 2 of this Article.  The decision of the Arbitration Board shall be final and binding.

C.    Demand for Arbitration

On November 22, 2004, M.R.S. through its former counsel, Garcia and Milas, sent a written demand to Michael J. Sullivan, President of the SMWIA, demanding arbitration for breach of the collective bargaining agreement by the Union on the Terminal A project.  The letter specifically requested that the parties proceed to Step 1 of the Grievance/Arbitration Procedure contained in Article X, Section 1 of "the Agreement".  See Exhibit C to Exhibit 1, the Affidavit of Steven D. Levesque attached hereto.  As of December 20, 2004, the SMWIA had not responded to the November 22nd demand for arbitration by M.R.S.  On December 20, 2004, Roland O. Levesque, President of M.R.S. sent a letter to Michael J. Sullivan regarding the failure of the SMWIA to respond the grievance demand.  See Exhibit D to Exhibit 1, the Affidavit of Steven D. Levesque attached hereto.

The parties met at the offices of the SMWIA in Washington, DC on January 28, 2005.  The purpose of the meeting was to respond to the statement made by M.R.S. in its December 20,

2004 letter that it would be terminating its agreements with the SMWIA and all of its local affiliated unions upon the expiration of the individual contracts. M.R.S. had prepared a three-page agenda listing the issues that it offered as the reasons why it was terminating its relationship with the SMWIA. One of the reasons was the monetary damages suffered by M.R.S. at the Terminal A project in Boston. See Exhibit E to Exhibit 1, the Affidavit of Steven D. Levesque attached hereto. After a series of e-mails throughout the month of February 2005 and a letter from Steven D. Levesque demanding a response to the agenda items discussed at the January 28, 2005 meeting, Joseph Nigro finally sent a written response dated March 2, 2005 dealing with most of the issues raised at the January 28th meeting and formally rejecting any claim for money damages by M.R.S. for the Terminal A project. See Exhibit G to Exhibit 1, the Affidavit of Steven D. Levesque attached hereto. At no time did Joseph Nigro or Michael J. Sullivan refer to the January 28th meeting in Washington, DC as a Step 1 Grievance Procedure. The letter from Joe Nigro was received almost four months after the demand made by M.R.S. on November 22, 2004.

<u>ARGUMENT</u>

I.      <u>The Union Waived Its Right to Arbitrate</u>

The Union has still not responded to the request by the Employer dated November 22, 2004. Although in its Motion to Dismiss, the SMWIA claims that it responded through the January 28, 2005 meeting, the truth of the matter is that the January 28, 2005 meeting was called to convince M.R.S. not to terminate its relationship with the SMWIA. In the December 20, 2004 letter, M.R.S. stated that because the SMWIA had failed to entertain its grievance, it intended to terminate all of its relationships with the SMWIA and its local affiliated unions at the expiration of those various agreements. When Joe Nigro invited M.R.S. to the January 28th meeting, he

specifically requested that M.R.S. list all of the issues that caused it to notify the SMWIA of its intent to terminate the agreements. As a result of that request, Roland Levesque prepared a three-page agenda which contained only one mention of the Terminal A damages sustained by the company.

In the Motion to Dismiss, both Defendants claim that it was the responsibility of M.R.S. to proceed to Step 2 and then Step 3 of the grievance procedure once it determined that it had either no response from the SMWIA pursuant to Step 1 or that the March 2, 2005 letter constituted a rejection of the Step 1 grievance. M.R.S. will address that contention in the next argument regarding the futility of continuing the arbitration procedure due to the bias of the ultimate arbitration board.

II.     The Arbitration Clause Does Not Provide for an Impartial Arbitrator

The claim by M.R.S. is not the typical grievance that is contemplated by a grievance arbitration procedure such as that contained in Article X, Section 1 of "the Agreement". For the most part, grievances occur between the local union referring sheet metal workers to the employer. If the local union representative and the employer cannot resolve the issue through Step 1, either party can then get an evaluation of its grievance through the Siding and Decking Grievance Panel which is composed of one employer appointed by the National Association of Siding and Decking Contractors (NASDC) and one union member appointed by the SMWIA. (Article X, Section 2) Presumably, the employer and the international union representative can give a fair hearing to the local union and local employer regarding the merits of the grievance. The arbitration can become final and binding at Step 2 unless the panel deadlocks. In the case of a deadlock, the parties then may proceed to the last step before the Siding and Decking Arbitration Board, which consists of three employers appointed by NASDC and three union

representatives appointed by the SMWIA. (Article X, Section 3) For the following reasons, it is clear that M.R.S. could not obtain a fair hearing before an impartial arbitrator as contemplated by both the LMRA, the FAA and the strong Federal Court policy of deference to arbitration. See United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 and its progeny.

A.    Grievance is Against the SMWIA

In this case, M.R.S. is seeking monetary damages from the SMWIA for misrepresentation of the skill and ability of the sheet metal workers that would be referred to M.R.S. on the Terminal A project and for breach of "the Agreement" provision that requires M.R.S. to obtain its employees from the SMWIA and its local affiliated union in the area where the contract is to be performed. M.R.S. has specifically alleged that the SMWIA caused it serious monetary damage as a result of its failure to live up to the promises made at the April 8, 2003 meeting in Washington, DC. The SMWIA, therefore, is the party against whom the grievance was filed.

B.    The Defendant is the Arbitrator

At Step 2 and Step 3 of the grievance procedure, which the SMWIA claims were not pursued by M.R.S., one half of the arbitration panels, one member at the Step 2 level and three members at the Step 3 level, are representatives of the SMWIA. In fact, at the Step 3 level, Michael J. Sullivan, President of the SMWIA, either sits as an arbitrator or appoints the three SMWIA representatives. The so-called Defendants in this grievance will be sitting as judges at the arbitration hearing. How can M.R.S. possibly get a fair hearing especially when it is seeking a multi-million dollar monetary damage award against the SMWIA? There is no impartial arbitrator. As the National Labor Relations Board stated in Sinclair Refining Company and Oil, Chemical and Atomic Workers International Union, AFL-CIO, 145 N.L.R.B. 732,

> "Although the third arbitrator was in terms one of the three arbitrators
> or the third arbitrator, he was in effect *the* arbitrator. The company
> and the union arbitrators were admittedly partisans…In the proceeding
> before the impartial arbitrator, the two partisans arbitrators
> represented respectively, the Company and the Union, and they were,
> in practice, at that stage, representatives or advocates for those whom
> they represented." Id at p.736 note 5.

Even if M.R.S. concedes that its January 28, 2005 meeting with Michael J. Sullivan and Joseph Nigro constituted a Step 1 Grievance Procedure, the futility of pursuing the grievance to Step 2 and maybe Step 3 (if there was a deadlock reached at Step 2) becomes glaring apparent. The International President and his Special Assistant have already told M.R.S. that they will not pay any money damages for the Terminal A project. See the March 2, 2005 letter from Nigro, Exhibit G to Exhibit 1, the Affidavit of Steven D. Levesque. At the Step 2 level of the grievance procedure, it is highly likely that either Michael J. Sullivan or Joseph Nigro or two other employees of Michael J. Sullivan, would serve as the SMWIA representatives on the Step 2 Grievance Panel. Even more absurd, would be a hearing at Step 3 where Michael J. Sullivan, possibly Joseph Nigro, and at least two other employees of Michael J. Sullivan would sit as half of the "Arbitration Board" hearing the M.R.S. grievance seeking multi-million dollar damages against Michael Sullivan and his SMWIA.

> "Arbitrator is defined in Black's ( Black's Law Dictionary, fourth edition)
> as a *private, disinterested person*, chosen by the parties to a disputed question,
> for the purpose of hearing their contention and giving judgment between them"
> University Overland Express, Inc. and Robert H. Connor, 129 N.L.R.B. 82, 90
> (1960)

It is absurd for the Defendants to claim that M.R.S. should have exhausted its administrative remedies by pursuing its grievance against a Defendant who would be serving as the judge. *"No qualification is more important than that of impartiality. It may well be that no person can be absolutely free from bias or prejudice of any kind, but it is not too much to expect*

*an arbitrator to be able to put aside any personal inclinations and stand between the parties with an open mind."* Elkouri & Elkouri, How Arbitration Works, 6th Edition, Chapter 4.9.C, p. 182 (2003) How is the SMWIA going to put aside its personal stake in this grievance and stand between itself and M.R.S. with an open mind, as "a disinterested person to give judgment"? The answer is obvious, there is no way that the SMWIA can serve in any capacity on an arbitration panel that entertains the grievance of M.R.S.   See Pitta v. Hotel Association of New York City, Inc. 806 F.2d 419,424 note 2 (1986). An arbitration award may be vacated if there is "evident partiality" of the arbitrator, 9 U.S.C. Sec. 10 (b) (1982), a standard that may be met by inferences from objective facts inconsistent with impartiality. Citing Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145 (1968). See also Crow Construction Company v. Jeffrey M. Brown Assoc., Inc. 264 F. Supp 2d 217, 220. "Congress vested the federal courts with the power to vacate an arbitration award where there was evident partiality in the arbitrators."

III.    The Misrepresentation Claim is Not One Subject to the Arbitration Procedure

Article X, Section 1 provides that "Grievances of the Employer or the Union, arising out of the interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible." The scope of the arbitration agreement, therefore, is any grievance arising out of the interpretation of or enforcement of the contract. The claim of M.R.S. that the SMWIA misrepresented the quality of the skills and ability of the sheet metal workers that it had available to refer to M.R.S. on its Terminal A project does not involve an interpretation or enforcement of "the Agreement". The claim is one in tort for misrepresentation and the damages resulting from the reliance by M.R.S. on the representations of the SMWIA that it had trained sheet metal workers who could skillfully install the metal composition panel siding on the Terminal A project. A clear distinction can be

drawn between the requirement in Article IV, Section 1 of "the Agreement" where the Union agrees to furnish upon request by the employer ". . . duly qualified building trades Journeypersons, Specialty Sheet Metal Workers, and Specialty Trainees . . . in sufficient numbers as may be necessary to properly execute work contracted for by the Employer . . ." and the representations made by Michael J. Sullivan and Joseph Nigro at the April 8, 2003 meeting that the SMWIA would train and provide skilled sheet metal workers to M.R.S. for its Terminal A project.  M.R.S. has two claims against the SMWIA, one in contract for breach of Article IV, Section 1 and one in tort for misrepresentation regarding the training to be given to the sheet metal workers who would be supplied to M.R.S.  The misrepresentation claim is not one that arose out of the interpretation or enforcement of "the Agreement" and, therefore, would never be subject to the grievance/arbitration procedure in Article X.

IV.     The Employer is not Unwilling to Arbitrate the Dispute

M.R.S. is not seeking to avoid arbitration but simply seeking to obtain a fair hearing before an impartial arbitrator.  The Motion to Dismiss, therefore should be denied and the Court should treat it as a Motion to Stay pending arbitration before an impartial arbitrator agreed to by both parties or, in the absence of an agreement, appointed by the Court.  If M.R.S. were forced to continue to pursue arbitration through Article X, Section 1 of "the Agreement", it would end up with a final and binding decision issued by the SMWIA, the principle Defendant in this case, and then be left with the extremely limited scope of review by the District Court.  *"No qualification is more important than that of impartiality."* Elkouri & Elkouri, supra.

CONCLUSION

Based on the foregoing argument and the cases cited therein, M.R.S. should not be forced to pursue an arbitration procedure before a kangaroo court.  M.R.S. is entitled to a fair hearing

before an impartial arbitrator and respectfully requests that this Court deny the Motions to Dismiss, filed by the SMWIA and Local 17, and either allow the litigation to continue or direct the parties to final and binding arbitration before an impartial arbitrator agreed to by the parties or appointed by the Court.

Dated July 21, 2005                                    O'Reilly, Grosso & Gross, P.C.


                                                       By: /s/  James F. Grosso
                                                       James F. Grosso, BBO# 213320

                                                       1671 Worcester Road, Suite 205
                                                       Framingham, MA 01701
                                                       Tel:(508)620-0055; Fax: (508)620-7655

                                                       Attorneys for the Plaintiff, M.R.S
                                                       Enterprises, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

M.R.S. ENTERPRISES, INC.       )
      Plaintiff       )
      )
V.       )       C.A. NO. 05-CV-10694-JLT
      )
SHEET METAL WORKERS'       )
INTERNATIONAL ASSOCIATION       )
LOCAL 17 - BOSTON, and       )
SHEET METAL WORKERS'       )
INTERNATIONAL ASSOCIATION       )
      Defendants       )

AFFIDAVIT OF STEVEN D. LEVESQUE
IN SUPPORT OF THE PLAINTIFFS'
OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS

I, Steven D. Levesque, upon oath, depose and state under the penalties of perjury as follows:

1.      I am Vice President of M.R.S. Enterprises, Inc. (M.R.S.) of Plainville, Connecticut and have worked for the company for ___ years. I have personal knowledge of all of the facts contained in this affidavit and can competently testify to the contents of this affidavit if called as a witness.

2.      M.R.S. was signatory to a collective bargaining agreement with the Sheet Metal Workers' International Association (SMWIA) referred to as the National Siding and Decking Agreement (the Agreement). M.R.S. was signatory to the agreement through the National

Association of Siding and Decking Contractors (NASDC).  M.R.S. terminated its relationship with the SMWIA at the expiration of the Agreement on May 31, 2005.  M.R.S. had been signatory to the Agreement since 1992.

3.     Pursuant to Article I, Section 6 of the Agreement, M.R.S. was signatory to a collective bargaining agreement with Local 40 in Connecticut and Local 17 in Boston, Massachusetts. Article I, Section 6 of the Agreement requires that as a condition of the Agreement, the employer must sign a SMWIA local building trades collective bargaining agreement.  A true and correct copy of the Agreement is attached hereto as Exhibit A.

4.     M.R.S. contracted to perform the installation of the composition metal panel siding and stud framing for Delta Airlines on its Terminal A project at Logan Airport in Boston, Massachusetts.  Again, pursuant to Article I, Section 6 of the Agreement, M.R.S. entered into a written collective bargaining agreement with Sheet Metal Workers Local 17, in Boston.  A true and accurate copy of the Local 17 Agreement is attached hereto as Exhibit B.

5.     As a result of the failure of both the SMWIA and Local 17 in Boston to supply qualified journeymen, specialty sheet metal workers and specialty trainees to M.R.S. on the Terminal A project, M.R.S. suffered a loss of $3,515,491.

6.     On November 22, 2004, we caused our attorney, Garcia and Milos to file a written request for arbitration with the SMWIA pursuant to Article X, Section 1 of the Agreement.  A true and accurate copy of that letter is attached hereto as Exhibit C.  Article X, Section 1, referred to as Step 1 of the Grievance Procedure, requires that the employer directly involved or his representative meet with the duly authorized representative of the Union to resolve the dispute.  Article X, Section 1 does require that a grievance must be filed within 30 days following the occurrence giving rise to the grievance or within 30 days after first knowledge of

the facts giving rise to the grievance. Although M.R.S. continued to work on the Terminal A project until March 2005, it was fully aware of the losses it had incurred by November 22, 2004 and therefore its notice was timely under the contract.

7.    M.R.S. has never received a response, either in writing or orally, from the SMWIA to its November 22, 2004 grievance.

8.    On December 20, 2004, my father, Roland Levesque, President of M.R.S., sent a letter to Michael Sullivan, General President of SMWIA, regarding the failure of the SMWIA to respond to the grievance filed on November 22, 2004 and informing the General President that it was the intention of M.R.S. to terminate all of its collective bargaining agreements with the International and Local Sheet Metal Workers Unions on their effective expiration dates. A true and accurate copy of that letter is attached hereto as Exhibit D.

9.    As a result of my telephone call to Joseph Nigro, Special Assistant to Michael Sullivan, a meeting was scheduled in the offices of the SMWIA in Washington, DC on January 28, 2005. M.R.S. prepared an agenda of topics to be discussed at that January 28th meeting. A true and accurate copy of the agenda is attached hereto as Exhibit E. The agenda shows that the basis for the meeting was to salvage the relationship between the Sheet Metal Workers Union and M.R.S. Eight items with various subcategories were listed on the agenda and a discussion of the monetary loss at Terminal A was number 7 on that list. The first six topics involved improving the competitive nature of siding and decking contractors like M.R.S. so that the Sheet Metal Workers could obtain a larger market share of the composition metal panel siding work. The meeting on January 28, 2005 was never couched as a Step 1 grievance meeting and most of the issues discussed had nothing to do with the M.R.S. grievance over the Terminal A project.

10.     Following the January 28, 2005 meeting, I engaged in e-mail correspondence to Michael Sullivan and Joseph Nigro commencing on February 1, 2005 and ceasing on March 4, 2005. A true and accurate copy of those e-mails is attached hereto as Exhibit F. The substance of all of the e-mail communications involved the failure of the SMWIA to address any or all of the issues listed on the M.R.S. agenda and discussed at the January 28, 2005 meeting. The e-mails repeatedly referred to the fact that M.R.S. had to make business decisions regarding the future of its relationship with the Sheet Metal Workers and that M.R.S. needed responses from the SMWIA on the items contained in the January 28th agenda.

11.     Finally on March 2, 2005, I received a two-page letter from Joseph Nigro addressing several of the items on the January 28th agenda, including a refusal to respond to the financial loss of M.R.S. on the Terminal A project. A true and accurate copy of that letter is attached hereto as Exhibit G. The letter in no way refers to any step of the grievance procedure as contained in Article X, Section 1.

12.     Since the SMWIA never responded to our grievance letter of November 22, 2004, M.R.S. felt that any attempt to pursue the grievance to Step 2 in front of the Siding and Decking Grievance Panel or through to Step 3, the Siding and Decking Arbitration Board, which would include Michael Sullivan and Joseph Nigro as participants, would be futile. Joe Nigro had already informed M.R.S. in this March 2nd letter (Exhibit G) that the union would not pay any damages.

13.     Because the Agreement required 150 days notice of termination prior to its expiration date, M.R.S. was forced to give notice to the SMWIA of its intent to terminate the Agreement when it expired on May 31, 2005 by sending its notice in December 2004. M.R.S. deemed it to be a further futile effort to continue the grievance arbitration procedure contained in the

Agreement since it had notified the Union of its intent to terminate that contract and could expect no fair treatment from either the Siding and Decking Grievance Panel or the Siding and Decking Arbitration Board which is comprised of equal numbers of employers who are signatory to the Agreement and representatives of the SMWIA. M.R.S. would never receive proper consideration of its grievance before an impartial panel. Both the union representatives and the signatory employer representatives would have a vested interest in denying the grievance of M.R.S. since M.R.S. was terminating its relationship with the sheet metal workers union and would be performing the composition metal panel siding work with another building trade union.

I swear under the penalties of perjury that the foregoing is true and accurate.


_____
Steven D. Levesque, Vice President
M.R.S. Enterprises, Inc.

Dated:  July __, 2005

EXHIBIT A



**RECEIVED**

APR 2 7 2001

**MRS ENTERPRISES, INC.**

NATIONAL

SIDING AND DECKING

AGREEMENT

FOR THE

UNITED STATES OF AMERICA

BETWEEN

NATIONAL ASSOCIATION OF
SIDING AND DECKING
CONTRACTORS

AND

SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION
AFL-CIO

January 1, 2000 - May 31, 2005

85

**NATIONAL ASSOCIATION OF**
**SIDING AND DECKING CONTRACTORS**
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000
Phone: 248-746-2818
Facsimile: 248-746-2760

**SHEET METAL WORKERS**
**INTERNATIONAL ASSOCIATION**
1750 New York Avenue NW
Washington, DC 20006
Phone: 202-783-5880
Facsimile: 202-662-0890

# TABLE OF CONTENTS

**Introduction**
 Parties to the Agreement

**Article** I ~ .
  Scope of Agreement
  National Maintenance Agreement
  Resolution 78

**Article** 11                                      .....    5
 Subcontract Clause
 Integrity Clause

**Article** III                                      6
  Journey person Employment Requirement
  Letter of **Assignment**

**Article** IV . .
 Qualified Building Trades Journey Persons,
 Specialty Sheet Metal Workers, and Specialty
 Trainees

**Article** V ......................                  .... 8
 Union Security

**Article** VI ...............                        .... 9
 Hours of Work
 Overtime
 Holidays
 Make-up Days
 Shift Work
 Pay Day
 Show-up Pay

**Article** VII                                      . . 11
 Fifty Mile Free Zone
 Travel Pay, Mileage, Board and Expenses

i

**Article VIII** ....... Anniversary Date Journey
person Wage Rate Specialty Sheet Metal
Worker Wage Rate Specialty Trainee Wage
Rate Workers Hired Outside Home Local
Mobility of Manpower Ratios Health and
Welfare Contribution SASMI National Pension
Fund P. A. L. International Training Institute ... 12

National Siding and Decking Industry Promotion Fund
National Siding and Decking Training Fund Local Industry
Promotion Fund Local Apprenticeship Fund N. E. M. 1.
Florence Carlough Scholarship Fund S. M. 0. H. 1.

**Article IX** .
        Tools and Transportation of Tools          .........          23

**Article X**                                        .............          23
        Grievance Procedure

**Article XI** ....                                  .............          25
        Safety Equipment

**Article XII**                                      .............          26
        Jurisdictional Boards

**Article XIII** ...                                                         
        Duration of Agreement
        Federal and State Law Provisions

**Signature Page**                       ...............          26

        ....................................... **Letter** of Assent          **28**

**Addendum** ........          . . . . . . . . .          .... 29

# NATIONAL SIDING
# AND
# DECKING AGREEMENT

## NATIONAL ASSOCIATION OF SIDING AND DECKING CONTRACTORS
### AND
### SHEET METAL WORKERS 'INTERNATIONAL ASSOCIATION AFL-CIO

Agreement entered into this 1st day of June 2000, by and between the National Association of Siding and Decking Contractors (NASDC) and the Sheet Metal Workers' International Association (SMWIA or Union).

### ARTICLE I

**SECTION 1.** This Agreement covers the rates of pay and conditions of employment of all employees of the Employer engaged in job site fabrication, handling, erection, installation, dismantling, conditioning, adjustment, alterations, repairing and servicing of all ferrous or nonferrous metal work and all other material used in lieu thereof of those items set forth in Section 2 of this Article. The provisions of this contract shall govern the performance of such work in any geographic area, including any area within the jurisdiction of any local union affiliated with SMWIA.

The Employer further agrees that the operating of any equipment or new technology which has as its essential purpose replacing or changing those jobs or procedures traditionally performed by sheet metal workers, and all other sheet metal work, will be covered by this Agreement and considered to be the jurisdictional claims of the Sheet Metal Workers' International Association.

**SECTION 2.**

(a)    Exterior application of manufactured and/or job site fabricated metal decking, siding and exterior appurtenances thereto, excluding all roofs (with the exception of the work described in Section 2(b) and Section 7 of this Article 1).

(b)    The erection of pre-engineered metal buildings, pre-manufactured gas stations and appurtenances thereto.

(c)    The erection and/or job site fabrication of draft or fire curtains and appurtenances thereto.

**SECTION 3. Any work** not specifically covered under the terms and conditions of this Agreement shall be performed under the terms and conditions of the appropriate Local Building Trades Collective Bargaining Agreement (Local Agreement). Specifically excluded under the terms and conditions of this Agreement are: all types of metal lagging (including lagging and decking on industrial paint finishing systems) and all air systems, commercial or industrial and all roofs (with the exception of the work described in Section 2b and Section 7 of this Article 1).

**SECTION 4.**

(a)    The Employer agrees to notify the Business Manager of the job site Local Union of any work outlined in Article 1, Section 2, which the Employer is going to bid, prior to bid.

(b)    It is further agreed that to determine preponderance and historical practice of the scope of work noted in Article 1, Section 2, there must be a due process mechanism for both the Union and the Employer.

1.    If a Business Manager objects to the use of this Agreement based on the historical practice and that the preponderance of work noted in the scope of work in Article 1, Section 2, is performed in accordance with the building trades area wages and standards, the burden of proof to use this Agreement shall be on the Employer and/or its association.

2.    If this Agreement has been utilized historically within a Local Union in the performance of the scope of work in Article 1, Section 2, and the Local Union's Business Manager challenges the use of this Agreement, then the burden of proof of controlled market share based on the preponderance of work performed in accordance with the building trades area wages and standards shall be on the Local Union.

3.    In any event, if the Local Union is doing the prepoderance of the work in Article 1, Section 2, the Employer will be allowed to bring in the first two (2) Journey persons; the job site Local Union shall supply the second two (2) Journey persons; thereafter the workers shall be supplied on a fifty-fifty (50/50) basis, i.e. the Employer will be allowed to bring in the fifth Journey person; the job site Local Union shall supply the sixth Journey person, etc.

**SECTION 5.** This is a separate stand-alone Collective Bargaining Agreement, and its provisions shall govern the performance of any work described in Article I of this Agreement. Where this National Agreement is silent, the conditions of the Local Building Trades Agreement shall prevail.

**SECTION 6.** As a condition of this Agreement, the Employer agrees to sign a SMWIA Local Building Trades Collective Bargaining Agreement where the contractor's home office is located. It is understood that the grievance procedure of the

2

3

6

7

number of sheet metal workers within forty-eight (48) hours, excluding Saturday, Sunday and holidays, the Employer may directly hire such employees from any source and refer them to the Union.

## ARTICLE V

**SECTION 1.** The Employer agrees to require membership in the Union, as a condition of continued employment of all employees performing any of the work specified in Article 1 of this Agreement, within eight (8) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable grounds for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership.

**SECTION 2.** If during the term of this Agreement the LaborManagement Relations Act of 1947 shall be amended by Congress in such manner as to reduce time within which an employee may be required to acquire Union membership, such reduced time shall become immediately effective instead of and without regard to the time limit specified in Section 1 of this Article.

**SECTION 3.** The provisions of this Article shall be deemed to be of no force and effect in any state to the extent to which the making or enforcement of such provision is contrary to law. In any state where the making and enforcement of such provision is lawful only after compliance with certain conditions precedent, this Article shall be deemed to take effect as to involved employees immediately upon compliance with such conditions.

8

## ARTICLE V1

**SECTION 1.** The regular work day shall consist of eight (8) hours labor on the job between 6:00 a.m. and 6:00 p.m., and the regular work week shall consist of five (5) consecutive eight (8) hour days labor on the job, beginning with Monday and ending with Friday of each week.

(a) Where conditions warrant, as determined by the Employer, and with advance notification to the Local Union, the regular work day may consist of ten (10) hours labor on the job between 6:00 a.m. and 6:00 p.m. and the regular work week shall consist of four (4) ten (10) hour days labor on the job, between Monday and Friday. The ten (10) hour schedule must last at least one week.

(b) Except as otherwise provided pursuant to Sections 1 (c) and Section 2 of this Article, all work performed outside the regular working hours and performed during the regular work week and on Saturday shall be paid at one and one-half (111/2) times the regular rate, except all hours worked on Sundays and holidays shall be paid at two (2) times the regular rate.

New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, or days locally observed as such, and Sunday shall be recognized as holidays. All work performed on holidays shall be paid as follows: two (2) times the regular rate of pay.

(c) Notwithstanding the provisions of Section 1 (a) and (b) of this Article, when conditions warrant, a makeup day may be scheduled for Monday through Saturday between the hours of 6:00 a.m. and 6:00 p.m. with a maximum of ten (10) hours a day. Anything over ten (10) hours will

9

be at time and a half. Time lost during a week including holidays may be made up by working up to ten (10) hours a day Monday through Saturday. However, no makeup day shall be less than eight (8) hours even if overtime applies on those hours over forty (40). The Employer shall notify the Union when scheduling a makeup day.

**SECTION 2.**

(a)  Shifts may be established when considered necessary by the Employer, with advance notification to the Union. Shift hours and rates will be as follows:

First Shift: Eight (8) hours pay for eight (8) hours worked plus one-half (1/2) hour unpaid lunch period. Starting time between the hours 6:00 a.m. to 8:00 a.m.

Second Shift: Eight (8) hours pay for seven and onehalf (71/2) hours worked plus one-half (1/2) hour unpaid lunch period. Starting time between the hours 2:30 p.m. to 4:30 p.m.

Third Shift: Eight (8) hours pay for seven (7) hours worked plus one-half (1/2) hour unpaid lunch period. Starting time between the hours 10:00 p.m. to 12:00 midnight.

Shifts shall be established and continued for a minimum of three (3) consecutive work days.

(b)  The determination of the start of multiple shifts is the prerogative of the Employer. If it is necessary to use employees from a previous shift within a twenty-four (24) hour period, the overtime provisions of Section 1 (b) of this Article shall apply and the shift shall be considered the first day of shift operations for purposes of satisfying the requirement that shifts shall be established for a minimum of three (3) consecutive work days.

(c)  By mutual consent of the Employer and the Local Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job.

**SECTION 3.** Wages at the established rates specified herein shall be paid on the job at or before quitting time of each week as specified in the Local Agreement for the Employer's home area. However, employees when discharged shall be paid in full.

**SECTION 4.** Each employee who reports for work by direction of the Employer, and is not placed to work, shall be entitled to two (2) hours pay at the established rate, unless properly notified two (2) hours prior to commencement of work.

**ARTICLE VII**

**SECTION 1.** Employees employed on a job within fifty (50) miles of the job site Local Union's contractual referral point or place of residence, whichever is closer, shall be governed by the regular working hours specified herein and shall provide for themselves necessary transportation within said limits from home to job at starting time and from job to home at quitting time.

**SECTION 2. When** employed outside of the limits specified in Section 1 of this Article, each employee shall receive cents per mile in accordance with the formula established by the Internal Revenue Service (I.R.S.) (taxsites.com) for such travel mileage. The amount established by the I.R.S. shall be reviewed on January 1 of each year and shall remain in effect for that calendar year. As of the signing of this Agreement, the mileage formula was thirty-two and one-half ($0.32.5) cents per mile. At the Employer's choice, as to the foregoing method, board and expenses shall be paid.

10

11

## ARTICLE VIII

**SECTION 1.** All wage and fringe benefit payments due pursuant to this Agreement will only be effective on the anniversary date of the Local Agreement. Building Trades Journey person(s), Specialty Sheet Metal Workers and Specialty Trainees performing any work specified in Article I of this Agreement shall have their hourly wage rate determined by reference to the appropriate building trades SFUA, as modified by the provisions of this Agreement.

(a)   Building Trades Journey person(s) shall receive the Journey person(s) wage rate and fringe benefits specified in the appropriate Local Agreement. Contributions on behalf of Journey person(s) to Industry Promotion Funds shall be made as specified in Addendum 1. All other working conditions for such employees shall be as set forth in this Agreement.

(b)        Specialty Sheet Metal Workers shall be paid as follows:

1 st 30 days:   45% of Journey person wage rate in Local Agreement

2nd through 6th month:   45% of Journey person wage rate in Local Agreement plus pension fund and local insurance only;

7th through 12th month:   45% of Journey person wage rate in Local Agreement plus fringe benefits specified in Addendum 1;

2nd year* -   55% of Journey person wage rate in Local Agreement plus fringe benefits specified in Addendum 1;

3rd year* -        70% of Journey person wage rate in Local Agreement plus fringe benefits specified in Addendum 1;

4th year* -   70% of Journey person wage rate in Local Agreement plus fringe benefits specified in Addendum 1;

5th year* -   70% of Journey person wage rate in Local Agreement plus fringe benefits specified in Addendum 1;

6th year   Specialty Worker eligible for a Journey person upgrade. Accredited work hours in conjunction with each local union's training and/or upgrading procedures should be the basic criteria for specialty sheet metal workers to achieve Journey person status in their respective local unions.

**SECTION 2.** For purposes of this Agreement, the home local shall mean the local union having geographic jurisdiction where the Employer's primary place of business is located.

(a)   For all work performed within the home local, and where employees are sent outside the home local to perform work in a geographic area that is not within the jurisdiction of another local union, wages shall be determined by reference to the building trades SFUA governing the home local.

(b)   For those Building Trades Journey person(s), Specialty Sheet Metal Workers and Specialty Trainees sent outside the home local or hired outside the home local, to perform work within the jurisdiction of another local union, such employees' wage rate shall be determined by reference to the building trades SFUA for the job site local unless the home local's total wage package is higher.

* The Association Office shall keep track of contributions to establish an accredited year as 1500 hours worked. The Association Office will forward these hours to the SMWIA, attention of the General President, at the end of each calendar quarter.

12

13

(c)    In all cases, all fringe benefits and working conditions for such employees shall be governed by the provisions of this Agreement.

**SECTION 3.** All job crews will be made up of the following ratios:

**When Working Inside the Home Local Jurisdiction:**

| | |
|---|---|
| **First Person** | **-Journey person** |
| **Second Person** | **-Specialty** |
| **Third Person** | **-Specialty** |
| **Fourth Person** | **-Specialty** |

These ratios now repeat.

**When Working Outside the Home Local Jurisdiction:**

| | | | |
|---|---|---|---|
| **First Person** | **-Journey person** | **Ninth Person** | **-Journey person** |
| **Second Person** | **-Specialty** | **-Tenth Person** | **-Local Specialty** |
| **Third Person** | **-Local Journey person** | **Eleventh Person** | **-Specialty** |
| **Fourth Person** | **-Specialty** | **Twelfth Person** | **-Local Journey person** |
| **Fifth Person** | **-Specialty** | **Thirteenth Person** | **-Specialty** |
| **Sixth Person** | **-Local Journey person** | **Fourteenth Person** | **-Local Specialty** |
| **Seventh Person** | **-Local Specialty** | **Fifteenth Person** | **-Journey person** |
| **Eighth Person** | **-Local Specialty** | **Sixteenth Person** | **-Local Specialty** |

These ratios now repeat.

Where the local union provides a Building Trades Journey person, that Journey person shall be qualified for the work required.

In addition, one (1) out of every four (4) employees may be a Specialty Trainee. A Specialty Trainee may only replace a Specialty Sheet Metal Worker in the above ratios.

**SECTION 4.**

(a)    The Employer agrees to be bound by the Agreement and Declaration of Trust documents, and any amendments thereto, which establish any health and welfare fund with which an employee covered by this Agreement participates.

(1)    The Employer shall contribute on behalf of all Building Trades Journey person(s) to the health and welfare fund established in the Local Agreement for the employee's home local in the amount specified by such agreement.

Where Building Trades Journey person(s) are employed outside the jurisdiction of their home local, employers signatory to this Agreement shall contribute health and welfare contributions to the health and welfare fund for the employee's home local. There shall be no duplication of health fund contributions.

(2)    The Employer may elect to pay health fund contributions on Specialty Sheet Metal Workers, either to a local health fund or to the National Sheet Metal Workers' Health Fund, as long as there is no interruption of health care benefits to the participant. Prior to any change of the health fund benefits, both the Association and SMWIA must be contacted.

(3)    When Building Trades Journey person(s), Specialty Sheet Metal Workers and Specialty Trainees are hired outside the home local to perform work within the jurisdiction of another local union, health insurance contributions on behalf of such employees shall be paid in accordance with the rate of the job site local.

(b)   Where an Employer is obligated to contribute to the NHF, the Employer will remit as directed by the Board of Trustees to the Sheet Metal Workers' National Health Fund on hours paid. Premium hours worked (overtime hours) will be paid for at an equivalent premium contribution rate. The NHF contribution rate for Plan 9 benefits during the calendar year 2000 is $3.34 per hour. The Employer agrees to honor the annual rate increase, to be determined by the Board of Trustees, provided such notice of the increase is communicated to the Employer sixty (60) days prior to the effective date and the increase in the contribution rate to the NHF shall not exceed twenty-five (25) percent of the previous contribution rate per year.

**SECTION 5.** The Employer shall make contributions to the Stabilization Agreement of Sheet Metal Industry (SASMI) for work performed under this Agreement on behalf of all Specialty Sheet Metal Workers and Specialty Trainees.

**SECTION 6.** The Employer agrees to be bound by the Agreement and Declaration of Trust Document, and any amendments thereto, establishing the Sheet Metal Workers' National Pension Fund "NPF" or any local pension fund to which contributions are due. Contributions will be remitted as directed by the Board of Trustees of the applicable fund.

Effective June 1, 2000, the Employer shall make a contribution to the NPF which shall not exceed $3.26 per hour for all hours worked by a Specialty Sheet Metal Worker. Nothing in this Agreement shall limit the ability of Specialty Sheet Metal Workers to request that the NPF reciprocate contributions to their Home Local Union's Pension Fund under the terms of the International Reciprocity Agreement. Further, the parties to this CBA understand that contributions made under this CBA and predecessor CBA's are subject to the International Reciprocity Agreement.

16

Effective June 1, 2001, the Employer shall make a contribution to the NPF which shall not exceed $3.46 per hour for all hours worked by a Specialty Sheet Metal Worker.

Effective June 1, 2002, the Employer shall make a contribution to the NPF which shall not exceed $3.56 per hour for all hours worked by a Specialty Sheet Metal Worker.

**SECTION 7.** The Employer agrees to honor political contribution authorization from its employees who are union members in the following form:

"I hereby authorize the Employer to deduct from my pay Five ($0.05) Cents for each hour worked, and to forward that amount to SMWIA-PAL. This authorization is signed voluntarily and with the understanding that my voluntary contributions to SMWIA-PAL and/or AFL-CIO Committee on Political Educational Political Contribution Committee "COPE-PCC" will be used to make political contributions and expenditures in connection with federal, state and local elections. I am aware that the contribution is subject to the prohibitions and limitations of the Federal Election Campaign Act, that the suggested Five ($0.05) Cents an hour donation is only a guideline, that I am free to contribute more or less than the suggested amount without reprisal and the SMWIA and its affiliated local union will not favor or disadvantage me by reason of the amount of my contribution or my decision not to contribute. This authorization may be revoked at any time by mailing notices of revocation by U.S. Registered or Certified Mail, Return Receipt Requested, to the Treasurer, SMWIA-PAL, 1750 New York Avenue, N.W., Washington, DC 20006, and to my Employer. Contributions or gifts to SMWIA-PAL are not deductible as charitable contributions for federal income tax purposes."

17

The political contribution deduction shall be made on each pay period, during which an employee who has performed compensated service has in effect a voluntarily executed political contribution deduction authorization. The money shall be remitted within twenty (20) days following the first (1st) day of each month thereafter to PAL Political Fund, 1750 New York Avenue, N.W., Washington DC 20006, accompanied by a form stating the name and hours worked for each employee for whom a deduction has been made.

**SECTION 8. Contributions** provided for in this Section will be used to promote programs of industry education, training, negotiation and administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the Siding and Decking Industry, improve the technical and business skills of Employers, stabilize and improve Employer-Union relations and promote support and improve the employment opportunities for employees. No part of any such payments, however, shall be used for any other purpose except as expressly specified above.

(a)    The Employer shall pay the appropriate Local Industry Fund (where the work is performed), as per the local agreement, to maximum of Ten ($0.10) Cents; and the National Association of Siding and Decking Industry Promotion Fund (NASD IPF) Thirty ($0.30) Cents per hour for each hour worked after the effective date of this Agreement by each employee (Building Trades Journey person(s) and Specialty Sheet Metal Workers) of the Employer covered by this Agreement.

(b)    The Forty ($0.40) Cents per hour contribution to the NASD IPF and local industry funds shall be remitted by a single check on or before the twentieth (20th) day of the succeeding month, along with the prescribed remittance form which will indicate the home local for each

employee. Checks and remittance forms will be addressed to the National Association of Siding and Decking Contractors, 1000 Maccabees Center, 25800 Northwestern Highway, Southfield, Michigan 48075-1000. NASDC shall remit all contributions to the industry fund of the employee's home local within ten (10) days of receipt, together with reports identifying the sources of the contributions.

(c)    The NASD I PF shall submit to the Sheet Metal Workers' International Association not less often than semi-annually written reports describing accurately and in reasonable detail the nature of activities in which they engaged or which they support directly or indirectly with any of their funds. One time per year, the NASD IPF shall include in such written report a financial statement attested to by a certified public accountant containing their balance sheets and detailed statements of annual receipts and disbursements. Further specific detailed information in regard to the NASD IPF activities or their receipts and/or expenditures shall be furnished to SMWIA upon written request.

(d)    Grievances concerning use of NASD IPF funds for purposes prohibited under Section 8(a) or violations of other subsections of this Section may be **processed by SMWIA** directly to the Siding and Decking Arbitration Board under the provisions of Article X, Section 3 of this Agreement. In the event such proceeding results in a deadlock, either party may, upon ten (10) days notice to the other party submit the issue to final and binding arbitration. The Arbitrator shall be selected by the General President of the Union and the President of the Association. The Arbitrator shall be authorized to impose any remedial order he deems appropriate of violation of this Section, including termination of the Employer's obligation to contribute to the NASD IPF. The authority of the

Arbitrator is expressly limited to a determination of a deadlocked issue under this Section (Section 8, Article VIII), and no other.

(e) Grievances concerning use of local industry fund monies to which an Employer shall contribute for purposes prohibited under Section 8(a) or for violations of other subsections of this Section shall be handled under the provisions of Article X of this Agreement. The Siding and Decking Arbitration Board, under the provisions of Article X, Section 3 shall be authorized to impose any remedial order for violation of this Section, including termination of the Employer's obligation to contribute to the local industry fund.

**SECTION 9.**

(a) The Employer will    contribute to the International Training Institute ("ITI") for the Sheet Metal and Air Conditioning Industry Ten ($0.10) Cents per hourfor each hour worked by each employee of the Employer covered by this Agreement. Payment shall be made on or before the twentieth (20th) day of the succeeding month and shall be remitted as designated by the Trustees of the Fund, or for purposes of collection and transmittal through Sheet Metal Workers' National Benefit Funds, P.O. Box 14176, Ben Franklin Postal Station, Washington DC 20044. The above mentioned Ten ($0.10) Cents contribution to the ITI shall be used for the training of siding and decking industry workers.

Effective June 1, 2001, the Employer will contribute to the ITI, twelve ($0.12) cents per hour for all hours worked by a Specialty Sheet Metal Worker.

The Employer and the Union shall encourage the ITI to implement a training program with the coordination of an instructor.

20

(b) Effective July 1, 2000 there is hereby created the National Siding and Decking Training Fund ("NSDTF"). The Trustees for the NSDTF shall be appointed by the National Association of Siding and Decking Contractors. The General President of SMWIA shall appoint two (2) advisors to the NSDTF Effective November 1, 2001, this Fund shall be administered jointly by an equal number of representatives of the Employers and the Union, in accordance with the Fund's Declaration and Agreement of Trust. Said Trust shall conform to all requirements of law and a copy of same, together with any amendments thereto, shall be considered as part of this Agreement as though it was set forth herein at length. The Employer agrees to pay ten ($0.10) cents per hour worked to this Fund. This contribution shall be remitted by check on or before the twentieth (20th) day of the succeeding month, along with the prescribed remittance form. Checks and remittance forms will be addressed to the National Association of Siding and Decking Contractors, 1000 Maccabees Center, 25800 Northwestern Highway, Southfield, Michigan 48075-1000.

(c) The Employer will contribute to the appropriate Local Joint Apprenticeship Fund in conformity with this Section. This contribution shall be paid on all hours worked by all employees covered by this Agreement. Payment should be made to the Local Joint Apprenticeship Fund established in the appropriate Local Agreement. For Building Trades Journey person(s) (and apprentices and pre-apprentices as noted in Article IV, Section 1), the contribution shall be the amount established in the Local Agreement. For Specialty Sheet Metal Workers and Specialty Trainees, the contribution shall be the amount established in the Local Agreement, subject to a maximum contribution of Ten ($0.10) cents per hour for each hour worked by Specialty Sheet Metal Workers and Specialty Trainees.

21

For those employees performing work within the jurisdiction of the home local, or sent to perform work outside the home local, as provided in Article VIII, Section 2(a) or (b), contributions shall be made to the Local Joint Apprenticeship Fund established in the Local Agreement for the home local.

For employees hired outside of the jurisdiction of the home local to perform work within the jurisdiction of another local union, as provided in Article VIII, Section 2(b), contributions shall be made to the Local Joint Apprenticeship Fund established in the Local Agreement for the job site.

(d)  The Employer will contribute to the National Energy Management Institute Committee, a jointly administered trust fund, Three ($0.03) Cents per hour for each hour worked by each employee of the Employer covered by this Agreement. Payment shall be made on or before the twentieth (20th) day of the succeeding month and shall be remitted as designated by the Trustees of the Fund, or for the purposes of collection and transmittal through Sheet Metal Workers' National Benefit Funds, P.O. Box 14176, Ben Franklin Postal Station, Washington, DC 20044.

**SECTION 10.**

(a)  The Employer agrees to make a charitable contribution in the amount of One ($0.01) Cent per hour for each hour worked by all Specialty Sheet Metal Workers and Specialty Trainees of the Employer covered by this Agreement to the Sheet Metal Scholarship Fund. Payment shall be made on or before the twentieth (20th) day of the succeeding month and shall be remitted as designated by the Trustees of the Fund, or for purposes of collection and transmittal through Sheet Metal Workers' National Benefits Fund, P.O. Box 14176, Ben Franklin Postal Station, Washington, DC 20044.

22

(b)  The Employer will contribute to the Sheet Metal Occupational Health Institute, Inc. Trust Fund Two ($0.02) Cents per hour for each hour worked by each employee of the Employer covered by this Agreement. Payment shall be made on or before the twentieth (20th) day of the succeeding month and shall be remitted as designated by the Trustees of the Fund, or for purposes of collection and transmittal through Sheet Metal Workers' National Benefit Funds, P.O. Box 14176, Ben Franklin Postal Station, Washington, DC 20044.

**ARTICLE IX**

**SECTION 1. All** employees covered by this Agreement shall provide for themselves all necessary hand tools.

**SECTION 2. All** employees covered by this Agreement shall not be permitted or required as a condition of employment to furnish the use of automobile or other conveyance to transport men, tools, equipment or materials; facilities for such transportation to be provided by the Employer. This provision shall not restrict the use of an automobile or other conveyance to transport its owner and his or her personal tools.

**ARTICLE X**

The Union and the Employer, whether party to this Agreement independently or as a member of a multi-employer bargaining unit, agree to utilize and be bound by this Article. The grievance procedures of the National Siding and Decking Agreement are the sole and exclusive remedy for any asserted breaches of this Agreement and supersede the grievance procedures of any other collective bargaining agreement that the Employer is signatory.

**SECTION 1. Step** 1. Grievances of the Employer or the Union, arising out of the interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved

23

and the duly authorized representative of the Union, if possible. Both parties may participate in conferences through representatives of their choice.

To be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within thirty (30) calendar days of the first knowledge of the facts giving rise to the grievance.

**SECTION 2.** Step 2. Grievances not disposed of under the procedure described in Section 1 of this Article may be appealed jointly or by either party to the Siding and Decking Grievance Panel ("Grievance Panel") Duplicate copies of the appeal shall be mailed to the following addresses: Siding and Decking Grievance Panel, 25800 Northwestern Highway, Suite 1000, Southfield, Michigan 48075 and Sheet Metal Workers International Association Jurisdictional Department, 1750 New York Avenue, NW, Washington, D.C. 20006. The Grievance Panel shall be composed of two (2) members, one (1) of which shall be appointed by the General President of the Sheet Metal Workers International Association and one (1 of which shall be appointed by the National Association of Siding and Decking Contractors. Both sides shall have equal voting power. The Grievance Panel shall meet promptly but in no event more than fourteen (14) calendar days following receipt of such appeal, unless such time is extended by mutual agreement of the Grievance Panel.

The Grievance Panel is empowered to render such decisions and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation. Except in the case of deadlock, the decision of the Grievance Panel shall be final and binding.

**SECTION 3.** Step 3. Grievances not settled as provided in Section 2 of this Article may be appealed jointly or by either

24

party to the Siding and Decking Arbitration Board ("Arbitration Board"). The Arbitration Board shall consist of three (3) members appointed by the Union and three (3) members appointed by the Association. Submissions shall be made and decisions rendered under such procedures as may be prescribed by such Board. Appeals to the Arbitration Board shall be submitted within thirty (30) days after termination of the procedures described in Section 2 of this Article. The decision of the Arbitration Board shall be final and binding.

**SECTION 4.** In the event of a non-compliance within thirty (30) calendar days following the mailing of a decision of the Siding and Decking Grievance Panel or the Siding and Decking Arbitration Board, a local party may enforce the award by any means including proceedings in a court of competent jurisdiction in accord with applicable state and federal law. If the party seeking to enforce the award prevails in litigation, such party shall be entitled to its costs and attorney's fees in addition to such relief as is directed by the courts.

**SECTION 5.** Failure to exercise the right of appeal at any step thereof within the time limit provided therefor shall void any right of appeal applicable to the facts and remedies of the grievances involved. There shall be no cessation of work by strike or lockout while the procedures provided for in this Article are pending. Except in case of deadlock, the decision of the Siding and Decking Arbitration Board shall be final and binding.

**ARTICLE XI**

Where the Employer is required to furnish safety equipment the employee shall sign a statement to the effect that he has received the equipment and that he will return the equipment when he finishes the job.

25

## ARTICLE XII

**SECTION 1.** It is understood and agreed that the Employers signatory to this Agreement shall not sign a stipulation to be bound to the Plan for Settlement of Jurisdictional Disputes in the Construction Industry, local or regional jurisdictional disputes board, nor to be bound by their decisions with regard to any work within the scope of Article I of this Agreement. Any such stipulation that previously may have been entered into, or on behalf of the Employer, is rescinded by execution of this Agreement. It is further understood that the parties to this Agreement shall not submit any dispute with regard to any work within the scope of Article I of this Agreement to the Plan for Settlement of Jurisdictional Disputes in the Construction Industry or local or regional jurisdictional disputes board.

**SECTION 2.** The foregoing Section 1 shall remain in effect until all other Employers in the construction industry having agreements with this, or any other union, affiliated with the Building and Construction Trades' Department, have signed a stipulation to be bound by the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry, or its successors with regard to any work within the scope of Article 1 of this agreement.

## ARTICLE XIII

**SECTION 1.** This Agreement and Addendum, attached hereto, shall become effective on the 1st day of June, 2000, and remain in full force and effect until the 31st day of May 2005, and shall continue in full force from year to year thereafter unless written notice of reopening is given by any party to the other parties not less than ninety (90) days prior to the expiration date.

**SECTION 2.** If, pursuant to federal or state law, any provision of this Agreement shall be found by a court of competent

jurisdiction to be void or unenforceable, all of the other provisions of this Agreement shall remain in full force and effect. The parties agree to meet and negotiate a substitute provision.

**SECTION 3.** Each Employer hereby waives any right it may have to repudiate this Agreement during the term of this Agreement, or during the terms of any extension, modification or amendment to this Agreement.

**SECTION 4.** Employers bound by this Agreement shall include those which have executed a written authorization which designates the Association to act as that Employer's collective bargaining representative for all matters relating to this Agreement. Such Employer shall hereafter be bound by any subsequent modification, renewal or renegotiation of this Agreement by said Association, unless the Employer withdraws its authorization by written notice to that Association, as well as the Union and such notice is received by the Association and the Union, at least one hundred and fifty (150) days prior to the current expiration date of this Agreement.

**In witness whereof,** the parties hereto affix their signatures and seal this 10th day of January, 2001.

National Association
of Siding and Decking

By:
        Richard Pellar, President

Sheet Metal Workers' International
Association

By:
        Michael Sullivan, General President

LETTER OF ASSENT

This is to certify that the undersigned Employer has examined and agrees to comply with all of the existing terms and conditions of the Collective Bargaining Agreement (CBA) by and between Sheet Metal Workers' International Association (Union), 1750 New York Avenue, N.W., Washington DC 20006, and National Association of Siding and Decking Contractors, (NASDC), 1000 Maccabees Center, 25800 Northwestern Highway, Southfield, MI 48075, hereinafter called the "Association." It is also agreed by the undersigned Employer that any notice given by the Union to the Association pursuant to the provisions of the CBA shall be notice to the Employer and shall have the same legal force and effect as though it were served upon the Employer personally. Finally, the Employer agrees that, unless he notifies the Union and the Association to the contrary by registered mail at least one hundred fifty (150) days prior to the termination date of this CBA or any subsequent Agreements, the Employer will be bound and adopt all agreements reached by the Union and the Association during subsequent negotiations.

FOR THE EMPLOYER:

By: -Ku-t h-o ΠZ e-d-F!fe-p re s e n - ta t i v e        Workers' Compensation No.:
Its:

                              State Unemployment Comp No..

Company Name

Address-                      Federal Employer ID No.:

Security Deposit
yes or no The undersigned Business Representative of SMWIA Local certifies that he/she has been provided a copy of the foregoing agreement. Sheet Metal Workers Local


                    Business Manager


Address

NOTE:   Please execute the above in triplicate. Return one (1) copy to SMWIA, 1750 New YorkAvenue, N.W., Washington DC, 20006, and one (1) copy to NASDC, 1000 Maccabees Center, 25800 Northwestern Hwy., Southfield, MI, 48075.

ADDENDUM
Effective June 1, 2000 **through May** 31, 2005

**Specialty Worker:**
 1st accredited year -

| | |
|---|---|
| 1 st 30 days: | 45% of Journey person wage rate in Local Agreement |
| 2nd through 6th month: | 45% of Journey person wage rate in Local Agreement plus pension fund and local insurance only; |
| 7th through 12th month: | 45% of Journey person wage rate in Local Agreement plus full benefit contributions; |
| 2nd accredited year | 55% of Journey person wage rate in Local Agreement plus full benefit contrbutions. |

3rd - 5th accredited year -

| | |
|---|---|
| Base Wage | (70% of Local Building Trade Rates) |
| Health Fund | As per Local Agreement or NHF |
| National Pension Fund | $3.26 |

Additional NPF contribution of .20 an hour as of June 1, 2001 ... $3.46

Additional NPF contribution of . 10 an hour as of June 1, 2002 ... $3.56

| | |
|---|---|
| SASMI | 3% of base wage, H&W, and Pension contribution |
| Local Appr entice Fund | As per Local Agreement, maximum $0.10 |
| International Training Institute | $0.10 |

| | |
|---|---|
| Additional ITI contribution of .02 an hour as of June 1, 2001 | $0.12 |
| NSDTF ...................................... .................................................. | $0.10 |
| NASD IPF ........................................ .................................................. | $0.30 |
| SMOHIT ....................................... .................................................. | $0.02 |
| Scholarship ..................................... .................................................. | $0.01 |

**ADDENDUM**
-- Continued --

6th accredited year -

Specialty Worker eligible for a Journey person upgrade. Accredited work hours in conjunction with each local union's training and/or upgrading procedures should be the basic criteria for specialty sheet metal workers to achieve Journey person status in their respective local unions.

All current Specialty Workers will maintain the 70% wage scale. All Specialty Workers who have completed five (5) years as a Specialty Worker under the National Siding and Decking Agreement as of July 1, 1998 will become eligible for Journey person status.

**Building Tradesman:**
Base Wage ................................As per Building Trades Rates
Fringe Benefits .........................As per Building Trades Rates
Local Industry Fund .........As per Local Agreement, maximum $0. 10
NSDTF ................................................ ....................................... $0.10
NASD IPF ............................................ ..................................... $0.30

Where a UNION collects the local fringe benefits as set forth above, the Local Union is required to send a copy of the local monthly contribution report to the National Association of Siding & Decking Contractors and the Sheet Metal Workers' International Union offices.

W01 28296. DOC/cik/a29/5234 1 /

30

**STANDARD FORM OF UNION AGREEMENT**

**SHEET METAL, ROOFING, VENTILATING AND AIR CONDITIONING**

**CONTRACTING DIVISIONS OF THE CONSTRUCTION INDUSTRY**

**BOSTON AREA**

**SHEET METAL WORKERS**
**LOCAL UNION NO. 17**
**1157 ADAMS STREET**
**DORCHESTER, MA 02124-5788**
**(617) 296-1680**

**AUGUST 1, 2001**
**TO**
**JULY 31, 2005**

AGREEMENT entered into this 12th day of August 2001 by and between Boston Roofing Contractor Associations of the B.T.E.A and the Sheet Metal and Air Conditioning Contractors National Association (SMACNA) - Boston hereinafter referred to as the Employer, and Local Union No. 17 of Sheet Metal Workers' International Association, hereinafter referred to as the Union, for Bristol (north of Dighton), Essex, Middlesex, Norfolk, Plymouth (north of Wareham), and Suffolk Counties of Eastern Massachusetts and the towns of Harvard and Lancaster of Worcester County.

**ARTICLE I**

**SECTION 1.**  This Agreement covers the rates of pay and conditions of employment of all employees of the Employer engaged in but not limited to the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all air-veyor systems and air handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (C) testing and balancing of all air-handling equipment and duct work; (d) the preparation of all shop and field sketches used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; (e) all craft related drafting, both manual and computer aided, will be done by members or apprentices.  This does not include architectural layouts provided by engineering firms or primary contractors; and (f) all other work included in the jurisdictional claims of Sheet Metal Workers' International Association.

**SECTION 2.**  Employers signatory to this Agreement must be in possession of a bona fide fabrication shop meeting sanitary and safety standards and capable of fabricating duct work and fittings.

**SECTION 3.**  Fabrication of square or rectangular ductwork and fitting or low velocity round ductwork and fittings for installation within the geographical territory of this bargaining unit must carry the Local 17 Building Trades label.

This label will show that the ductwork described has been fabricated by a contractor signatory to this Agreement.

**ARTICLE II**

It is the opinion of both Associations that the following obligations are imposed by this Article II.

**SECTION 1.**  No Employer shall subcontract or assign any of the work described herein which is to be performed at a jobsite to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project.

**SECTION 2.**  Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for prefabrication of materials covered herein, such prefabrication shall be subcontracted to fabricators who are in signed Agreement with Local Union #17 and/or who pays their employees engaged in such fabrication, not less than the total beneficial wage for comparable sheet metal fabrication, as established under provisions of this Agreement.

The Employer agrees to provide to Union business agent or business manager, upon request, written and signed evidence of equalization of the total beneficial wage package from any supplier of low pressure spiral duct and fittings and/or rectangular duct and fittings.

**SECTION 3.  (a)** The Employer agrees that no evasion of the terms, requirements and provisions of the Standard Form of Union Agreement, including all addenda attached thereto, will take place by the setting up of another business to do work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder.  If and when the Employer shall perform any work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer through its officers, directors, partners or stockholders, exercised either directly or indirectly, management, control or majority ownership of such other entity, the terms and conditions of this Agreement shall be applicable to all such work.

This clause shall only be applicable to job site work as that term is used in the construction industry proviso to Section 8(e) of the National Labor Relations Act.

**(b)** The Employer further agrees that if and when it performs prefabrication work otherwise covered by the Standard Form of Union Agreement, including all addenda attached thereto, under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer through its officers, directors, partners or stockholders, exercises either directly or indirectly, management, control or majority ownership of such other entity, the employees of such other entity shall receive not less than the prevailing wage for comparable sheet metal fabrication, as established under the terms of this Agreement.

This is not to be interpreted to exclude any customer of the company from purchasing said fabrication.

**(c)** The parties agree that disputes concerning the meaning and application of Section 1 and 2 hereof shall be resolved in accordance with Article X and without resort to strike or lockout.

**(d)** If any word/sentence/paragraph or section of this language is found to be illegal that portion will be removed from this Article or rewritten to comply with the law.

The remainder of this Article will stand as negotiated.

## ARTICLE III

**SECTION 1.**  The Employer agrees that none but journeymen and apprentice sheet metal workers shall be employed on any work described in Article I and further, for the purpose of proving jurisdiction, agrees to provide the Union with written evidence of assignment on the Employer's letterhead for certain specified items of work to be performed at a jobsite prior to commencement of work at the site.  List of such specific items, which may be revised from time to time, as agreed to by and between SMACNA and SMWIA, shall be provided to the Employer.

## ARTICLE IV

**SECTION 1.**  The Union agrees to furnish upon request by the Employer duly qualified journeymen and apprentice sheet metal workers in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement.

3

**SECTION 2.** The Union shall select and refer applicants for employment without discrimination against such applicants by reason of or in any way affected by Union membership, by-laws, regulations, constitutional provisions, or any other aspect or obligation of Union membership, policies or requirements. Parties to the Agreement recognize the obligations, which have been or may be imposed upon the Employers relative to equal employment and non-discrimination and it is agreed that both parties will meet these obligations under affirmative action plans, which have been jointly accepted by the parties where such plans are in existence.

**SECTION 3.** Bargaining unit employees hereunder shall include Owner/Members, i.e. employees of incorporated Employers who: (a) are officers, directors, or majority stockholders of an incorporated Employer; (b) perform work covered by the terms of this Agreement; and (c) are listed on the Registration Statement filed with the Sheet Metal Workers' National Pension Fund and National COLA Fund. Contributions on behalf of Owner/Members shall be made to the National Pension Fund for all hours for which the Owner/Member is paid or entitled to payment. In any event, however, no less than the minimum regular hours per week as required by this Agreement for all bargaining unit employees shall be paid. The term "Minimum regular hours per week" shall be defined as the number of hours per week for which an employee receives straight time wages. Owner-members should refer to Addendum #38 conditions of participation.

**SECTION 4.** The Employer shall have the right to reject any applicant for employment.

## ARTICLE V

**SECTION 1.** The Employer agrees to require membership in the Union, as a condition of continued employment of all employees performing any of the work specified in Article I of this Agreement, within eight (8) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable ground for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fee uniformly required as a condition of acquiring or retaining membership.

**SECTION 2.** If during the term of this Agreement the Labor-Management Relations Act of 1947 shall be amended by Congress in such manner as to reduce the time within which an employee may be required to acquire Union membership, such reduced time limit shall become immediately effective instead of and without regard to the time limit specified in Section 1 of this Article.

**SECTION 3.** The provisions of this Article shall be deemed to be of no force and effect in any state to the extent to which the making or enforcement of such provisions is contrary to law. In any state where the making and enforcement of such provision is lawful only after compliance with certain conditions precedent, this Article shall be deemed to take effect as to involved employees immediately upon compliance with such conditions.

## ARTICLE VI

**SECTION 1.** The regular working day shall consist of eight (8) hours labor in the shop or on the job between six thirty (6:30) a.m. and four (4:00) p.m. and the regular working week shall consist of five (5) consecutive eight (8) hour day's labor in the shop or on the job, beginning with Monday and ending with Friday of each week. All full time or part time labor performed during such hours shall be recognized as regular working hours and paid for at the regular hourly rate. Except as otherwise provided pursuant to Section 4 of this Article, all work performed outside the regular working hour and performed during the regular work week shall be at one and one half (1 ½) times the hourly rate except Sundays and Holidays where overtime will be paid at two (2) times the hourly rate.

4

Employees shall be at the shop or project site at the scheduled starting time each day and shall remain until quitting time.

**SECTION 2.**  New Year's Day, Presidents' Day, Patriots' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, and Christmas Day or days locally observed as such, and Sunday shall be recognized as holidays.  All work performed on holidays shall be paid as follows: Two (2) times the regular rate.

**SECTION 3.**  It is agreed that all work performed outside of regular hours during the regular workweek and on holidays shall be performed only upon notification by the Employer to the local Union in advance of scheduling such work. Preference on overtime and holiday work shall be given to men on the job or in the shop on a rotation basis so as to equalize such work as nearly as possible.  The foreman for the job or shop shall call the Union hall and report the members who are working the overtime in the shop or on the job.

**SECTION 4.**  Shift work and the pay and conditions therefore shall be only as provided in written addendum attached to this Agreement.  Energy conservation - Retrofit work performed outside the regular work day in occupied buildings shall be performed under shift work conditions to be established by the local parties or by the National Joint Adjustment Board on the request of each party, if not locally provided.  Shift work will be granted on a job-by-job basis under the guidelines set forth in "Resolution 78".

**SECTION 5.**  A special requirement committee shall be implemented, to be comprised of two (2) representatives from both sides, namely the Business Manager of Local 17 and one other elected business representative; and two (2) owners from the Employers side.  The purpose of this committee is to make whatever arrangements might be necessary to compete with non-union people, and other conditions, which might require special consideration.  Notification for consideration will be given to the Union by the Employer, not less than three (3) working days prior to the bid date.  Every consideration will be given the Employer to increase his work force as a result of any action taken by this committee.

## ARTICLE VII

**SECTION 1.**  When employed in a shop or on a job within the limits of (See Addendum #5) employees shall be governed by the regular working hours specified herein and shall provide for themselves transportation within the said limits from home to shop or job at starting time and from shop or job to home at quitting time, and the Employer shall provide, or pay, for all necessary additional transportation during working hours.

**SECTION 2.**  When employed outside of the limits specified in Section 1 of this Article, and within the jurisdiction of the Union, employees shall provide transportation for themselves which will assure their arrival at the limits specified in Section 1 of this Article at regular starting time, and the Employer shall provide or pay for all additional transportation for such jobs, including transportation from such job back to the limits specified in Section 1 of this Article which will assure arrival at such limits at quitting time.  As an alternative to the foregoing method, travel expense may be paid by a zone or other method of payment.  If this alternative method is used, it will be as provided in a written addendum attached hereto.

## ARTICLE VIII

**SECTION 1.**  The minimum rate of wages for journeymen sheet metal workers covered by this Agreement when employed in a shop or on a job within the jurisdiction of the Union to perform any work specified in Article I of this Agreement shall be (see Addendum #6-8-9-10-11-12(a)-17) except as hereinafter specified in Section 2 of this Article.

**SECTION 2.** On all work specified in Article I of this Agreement, fabricated and/or assembled by journeymen sheet metal workers and apprentices within the jurisdiction of this Union, or elsewhere, for erection and/or installation within the jurisdiction of any other Local Union affiliated with Sheet Metal Workers' International Association, whose established wage scale is higher than the wage scale specified in this Agreement, the higher wage scale of the jobsite Union shall be paid to the journeymen employed on such work in the home shop or sent to the jobsite.

**SECTION 3.**   The provisions of Section 2 of this Article, Section 2 of Article II and Section 1 of Article III shall not be applicable to the manufacture for sale to the trade or purchase of the following items:

1.  Ventilators
2.  Louvers
3.  Automatic and fire dampers
4.  Radiator and air-conditioning unit enclosures
5.  Fabricated pipe and fittings for residential installations and light commercial work as defined in the locality
6.  Mixing (attenuation) boxes
7.  Plastic skylights
8.  Air diffusers, grilles, registers
9.  Sound attenuators
10. Chutes
11. Double-wall panel plenums
12. Angle rings

**SECTION 4.**   The provisions of Section 2 of this Article shall not be applicable to Air Pollution Control Systems fabricated for the purpose of removing air pollutants, excluding air conditioning, heating and ventilating systems.   In addition, the provisions of Section 2 of this Article will not be applicable to the manufacture of spiral pipe and fittings for high-pressure systems.

**SECTION 5.**   Except as provided in Sections 2 and 6 of this Article, the Employer agrees that journeymen sheet metal workers hired outside the territorial jurisdiction of this Agreement shall receive the wage scale and working conditions of the local Agreement covering the territory in which such work is performed or supervised.

**SECTION 6.**   When the Employer has any work specified in Article I of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by another Agreement with another Union affiliated with the Sheet Metal Workers' International Association, and qualified sheet metal workers are available in such area, he may send no more than two (2) sheet metal workers per job into such area to perform any work which the Employer deems necessary, both of whom shall be from the Employer's home jurisdiction. All additional sheet metal workers shall come from the area in which the work is to be performed. Journeymen sheet metal workers covered by this Agreement, who are sent outside of the area covered by this Agreement, shall be paid at least the established minimum wage scale specified in Section 1 of this Article but in no case less than the established wage scale of the local Agreement covering the territory in which such work is performed or supervised, plus all necessary transportation, travel time, board and expenses while employed in that area, and the Employer shall be otherwise governed by the established working conditions of that local Agreement.  If employees are sent into an area where there is no local Agreement of the Sheet Metal Workers' International Association covering the area then the minimum conditions of the home local Union shall apply.

**SECTION 7.**   In applying the provisions of Section 2, 5, and 6 of this Article VIII, the term "wage scale" shall include the value of all applicable hourly contractual benefits in addition to the hourly wage rate provided in said Sections.

**SECTION 8.**   Welfare benefit contributions shall not be duplicated.

When sheet metal workers are employed temporarily outside the jurisdiction of their home local Union, the parties signatory to this Agreement agree to arrange through the Health & Welfare Trust Fund to transmit health and welfare contributions made on behalf of the employee to the Health and Welfare Fund in the employee's local Union.

The parties to this Agreement agree to establish a system for continuing health and welfare coverage for employees working temporarily outside the jurisdiction of the local collective bargaining Agreement when health and welfare contributions are transmitted on their behalf by trust funds from other areas.

**SECTION 9.**  Wages at the established rates specified herein shall be paid before noon on the third day following the closing of the work week in the shop or on the job at or before quitting time on Friday of each week, and no more than two (2) days' pay will be withheld.  However, employees when discharged shall be paid in full.

**SECTION 10.**  Journeymen sheet metal workers, who report for work by direction of the Employer and are not placed to work, shall be entitled to two (2) hours pay at the established rate.  This provision, however, shall not apply under conditions over which the Employer has no control.

**SECTION 11.**  Each Employer covered by this Agreement shall employ at least one (1) journeyman sheet metal worker who is not a member of the firm on all work specified in Article I of this Agreement.

**SECTION 12(a).**  Contributions provided for in Section 12(b) of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining Agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of Employers, stabilize and improve Employer-Union relations, and promote, support and improve the employment opportunities for employees.  No part of any such payments, however, shall be used for any other purpose, except as expressly specified above.

**(b).**  The Employer shall pay the Sheet Metal and Air Conditioning Contractors' National Industry Fund of the United States (IFUS) seven cents ($0.07) per hour for each hour worked on and after the effective date of this Agreement by each employee of the Employer covered by this Agreement.  Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to IFUS, 4201 Lafayette Center Drive, Chantilly, Virginia 20151-1209; mailing address, P.O. Box 220956, Chantilly, Virginia 20153-0956, or for the purpose of transmittal, through the Local Area Industry Fund.

**(c).**  IFUS shall submit to the Sheet Metal Workers' International Association not less often than semi-annually written reports describing accurately and, in reasonable detail the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds. One time per year, the IFUS shall include in such written report a financial statement attested to by a certified public accountant containing its balance sheet and detailed statement of annual receipts and disbursements. Further specific detailed information in regard to IFUS activities or its receipts and/or expenditures shall be furnished to the Sheet Metal Workers' International Association upon written request.

**(d).**  Grievances concerning use of IFUS funds for purposes prohibited under Section 12(a) or for violations of other subsections of this Section may be processed by the Sheet Metal Workers' International Association directly to the National Joint Adjustment Board under the provisions of Article X of this Agreement.  In the event such proceeding results in a deadlock, either party may, upon ten (10) days notice to the other party, submit the issue to final and binding arbitration.  The Arbitrator shall be selected by the Co-Chairmen of the National Joint

Adjustment Board. The Arbitrator shall be authorized to impose any remedial order he deems appropriate for violation of this Section, including termination of the Employer's obligation to contribute to the IFUS. The authority of the Arbitrator is expressly limited to a determination of a deadlock issue under this Section, (Section 12, Article VIII), and no other.

**SECTION 13(a).** Contributions provided for in Section 13(b) of this Article will be used to promote programs of industry education, training, negotiation and administration of collective bargaining Agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of Employers, stabilize and improve Employer-Union relations, and promote, support and improve the employment opportunities for employees. No part of any such payments, however, shall be used for any other purpose except as expressly specified above.

**(b).** The Employer shall pay to the Sheet Metal Industry Promotion Fund (hereinafter referred to as the Local Industry Fund), twenty four cents ($0.24) per hour for each hour worked beginning August 12, 2001 and effective February 1, 2002 thirty cents ($0.30) per hour by each employee of the Employer covered by this Agreement. Payments shall be made monthly on or before the 20th day of the succeeding month. Any payment not received to the Local Industry Fund must be paid in an equal additional payment to wages.

**(c).** The fund shall furnish to the Business Manager of the Union, not less often than semi-annually, written reports describing in reasonable detail the nature of activities in which it is engaged or which it supports directly or indirectly with any of its funds. One time per year, the Fund shall include in such written report, a statement by a certified public accountant and containing its balance sheet and detailed statement of receipts and disbursements. Further specified detailed information in regard to fund activities or its receipts and/or disbursements shall be furnished to the Business Manager of the Union upon his written request.

**(d).** Grievances concerning use of local industry fund monies to which an Employer shall contribute for purposes prohibited under Section 13(a) or for violations of other subsections of this Section shall be handled under the provisions of Article X of this Agreement. The National Joint Adjustment Board shall be authorized to impose any remedial order for violation of this Section, including termination of the Employer's obligation to contribute to the local industry fund.

**SECTION 14.** The Employers will contribute to the International Training Institute for the Sheet Metal and Air Conditioning Industry twelve cents ($0.12) per hour for each hour worked on and after August 1, 1997 by each employee of the Employer covered by this Agreement. Three cents ($0.03) per hour of the contribution to the International Training Institute shall be forwarded by the trustees of the International Training Institute to the National Energy Management Institute Committee, a jointly administered trust fund. Payment shall be made on or before the 20th day of the succeeding month and shall be remitted to the office of the International Training Institute as designated by the trustees of the Fund, or for purposes of collection and transmittal through Sheet Metal Workers Local #17 Joint Apprentice Committee.

The parties agree to be bound by the Agreements and Declaration of Trusts establishing the International Training Fund for the Sheet Metal and Air Conditioning Industry, and the National Energy Management Institute Committee, and amendments thereto as may be made from time to time and hereby designate as their representatives on the board of trustees such trustees as are named, together with any successors who may be appointed pursuant to said Agreements.

**SECTION 1.**  Journeymen and apprentice sheet metal workers covered by this Agreement shall provide for themselves all necessary hand tools.  (See Addendum #30)

**SECTION 2.  (a)** Journeymen and apprentice sheet metal workers covered by this Agreement shall not be permitted or required as a condition of employment to furnish the use of automobile or other conveyance to transport men, tools, equipment or materials from the shop to job, from job to job, from job to shop; facilities for such transportation to be provided by the Employer.  This provision shall not restrict the use of an automobile or other conveyance to transport its owner and personal tools from home to shop or job at starting time or from shop or job to home at quitting time.

**(b).**  Journeymen and Apprentice Sheet Metal Workers covered by this Agreement will not be discriminated against by the Employer because of their choice of residency.

**SECTION 3.**  Any contractor doing work at an active nuclear facility shall arrange for a physician's medical examination both on hiring and layoff and the employee will receive wages for these days.

## **ARTICLE X**

**SECTION 1.**  Grievances of the Employer or the Union, arising out of interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible.  An Employer may have the local association present to act as his representative.

To be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, first knowledge of the facts giving rise to the grievance.

**SECTION 2.**  Grievances not settled as provided in Section 1 of this Article may be appealed by either party to the Local Joint Adjustment Board having jurisdiction over the parties and such Board shall meet promptly on a date mutually agreeable to the members of the Board, but in no case more than fourteen (14) calendar days following the request for its services, unless the time is extended by mutual Agreement of the parties or Local Joint Adjustment Board.  The Board shall consist of an equal number of representatives of the Union and the local Employers' Association and both sides shall cast an equal number of votes at each meeting.  The local Employers' Association, on its own initiative, may submit grievances for determination by the Board as provided in this Section.  Except in the case of a deadlock, a decision of a Local Joint Adjustment Board shall be final and binding.

Notice of appeal to the Local Joint Adjustment Board shall be given within thirty (30) days after termination of the procedures prescribed in Section 1 of this Article, unless the time is extended by a mutual Agreement of the parties.

**SECTION 3.**  Grievances not disposed of under the procedure prescribed in Section 2 of this Article, because of a deadlock or failure of such Board to act, may be appealed jointly or by either party to a Panel, consisting of one (1) representative appointed by the Labor Co-Chairman of the National Joint Adjustment Board and one (1) representative appointed by the Management Co-Chairman of the National Joint Adjustment Board.  Appeals shall be mailed to the National Joint Adjustment Board.  *Notice of appeal to the Panel shall be given within thirty (30) days after termination of the procedures prescribed in Section 2 of this Article.  Such Panel shall meet promptly but in no event more than fourteen (14) calendar days following receipt of such appeal, unless such time is extended by mutual Agreement of the Panel members.  Except in case of deadlock, the decision of the Panel shall be final and binding.

Notwithstanding the provisions of Paragraph 1 of this Section, an Employer who was not a party to the Labor Agreement of the area in which the work in dispute is performed may appeal the decision of the Local Joint Adjustment Board, including a unanimous decision, and request a Panel hearing as set forth in Section 3 of this Article, providing such appeal is approved by the Co-Chairman of the National Joint Adjustment Board.

**SECTION 4.**  Grievances not settled as provided in Section 3 of this Article may be appealed jointly or by either party to the National Joint Adjustment Board.  Submissions shall be made and decisions rendered under such procedures as may be prescribed by such Board.  Appeals to the National Joint Adjustment Board shall be submitted within thirty (30) days after termination of the procedures described in Section 3 of this Article.  (Copies of the procedures may be obtained from the National Joint Adjustment Board.*)

**SECTION 5.**  A Local Joint Adjustment Board, Panel and the National Joint Adjustment Board are empowered to render such decisions and grant such relief to either party, as they deem necessary and proper, including awards of damages or other compensation.

**SECTION 6.**  In the event of non-compliance within thirty (30) calendar days following the mailing of a decision of a Local Joint Adjustment Board, Panel of the National Joint Adjustment Board, a local party may enforce the award by any legal means including proceedings in a court of competent jurisdiction in accordance with applicable state and federal law.  The prevailing party in litigation to enforce an award shall be entitled to its costs and attorney's fees in addition to such other relief as is directed by the courts.

**SECTION 7.**  Failure to exercise the right of appeal at any step thereof within the time limit provided therefore shall void any right of appeal applicable to the facts and remedies of the grievances involved.  There shall be no cessation of work by strike or lockout during the **pendency** of the procedures provided for in this Article.  Except in case of deadlock, the decision of the National Joint Adjustment Board shall be final and binding.

* All correspondence to the National Joint Adjustment Board shall be sent to the following address: National Joint Adjustment Board, P.O.  Box 220956, Chantilly, VA 22022-0956.

## ARTICLE XI

**SECTION 1.**  All duly qualified apprentices shall be under the supervision and control of a Joint Apprenticeship and Training Committee composed of six (6) members, three (3) of whom shall be selected by the Employer, and three (3) by the Union.  Said Joint Apprenticeship and Training Committee shall formulate and make operative such rules and regulations as they may deem necessary and which do not conflict with the specific terms of this Agreement, to govern eligibility, registration, education, transfer, wages, hours, working conditions of duly qualified apprentices and the operation of an adequate apprentice system to meet the needs and requirements of the trade.

for the life of this Agreement, except that vacancies in said Joint Apprenticeship and Training Committee caused by resignation or otherwise, may be filled either party hereto, and it is hereby mutually agreed by both parties hereto, that they will individually and collectively cooperate to the extent that duly qualified apprentices be given every opportunity to secure proper technical and practical education experience in the trade, under the supervision of the Joint Apprenticeship and Training Committee.

**SECTION 3.**   It is the understanding of the parties to this Agreement that the funds contributed by signatory Employers to the International Training Institute and any Local Joint Apprenticeship and Training Fund (Local JATC) will not be used to train apprentices or journeymen who will be employed by Employers in the Sheet Metal Industry not signatory to a collective bargaining Agreement providing for contributions to the International Training Institute and a Local JATC.   Therefore, the trustees of the International Training Institute and Local JATC shall adopt and implement a Scholarship Loan Agreement Program which will require apprentices and journeymen employed by signatory Employers to repay the cost of training either by service following training within the Union sector of the industry or by actual repayment of the cost of training if the individual goes to work for a non-signatory Employer in the Sheet Metal Industry.   The cost of training shall include the reasonable value of all International Training Institute and Local JATC materials, facilities and personnel utilized in training.   If a Local JATC does not implement the Scholarship Loan Agreement, the Local JATC shall be prohibited from utilizing International Training Institute materials and programs.

**SECTION 4.**   It is hereby agreed that the Employer shall apply to the Joint Apprenticeship and Training Committee and the Joint Apprenticeship and Training Committee shall grant apprentices on the basis of one (1) apprentice for each four (4) journeymen regularly employed on a yearly basis and one (1) apprentice for each six (6) journeymen regularly employed on a yearly basis thereafter.   Provided however, an Employer will not be entitled to an apprentice if the Employer has an apprentice on layoff for lack of work.   Any deviation from this formula must be agreed to, in writing, by the Business Manager of Local #17.

**SECTION 5.**   All applicants for apprenticeship shall serve an apprenticeship of five (5) years and such apprentices shall not be in charge of work on any job and shall work under the supervision of a journeyman until apprenticeship terms have been completed and they have qualified as journeymen.

**SECTION 6.**   A graduated hourly rate of wages for apprentices indentured after August 12, 2001 shall be established and maintained in the following percentage basis of the established hourly rate of journeymen sheet metal workers.

| | | |
|---|---|---|
| First Year | Probationary   ...........40% (plus 40% SASMI, $0.50 Equality Fund*) |
| Second Year | ...............................45% (plus 45% SASMI) |
| Third Year | ...............................50% |
| Fourth Year | (1st half) ....................60% |
| Fourth Year | (2nd half) ...................65% |
| Fifth Year | (1st half) ....................75% |
| Fifth Year | (2nd half) ...................85% |

| | H&W | Pension | Annuity | I.P. | App. | Equality | SASMI | Local Pension |
|---|---|---|---|---|---|---|---|---|
| First Year | full | none | none | none | $0.10 | * | 40% in wages | none |
| Second Year | full | full | $1.25 | none | full | none | 45% in wages | full |
| Third Year (1st half) | full | full | $1.50 | none | full | none | 50% in SASMI | full |
| Third Year (2nd half) | full | full | $1.75 | none | full | none | 50% in SASMI | full |
| Fourth Year (1st half) | full | full | $2.00 | full | full | $0.50 | 60% in SASMI | full |
| Fourth Year (2nd half) | full | full | $2.25 | full | full | $0.50 | 65% in SASMI | full |
| Fifth Year (1st half) | full | full | $2.75 | full | full | $0.50 | 75% in SASMI | full |
| Fifth Year (2nd half) | full | full | $2.75 | full | full | $0.50 | 85% in SASMI | full |

**\* For first year apprentices Equality Fund contribution ($0.50) is added to the wages.**

The term **"FULL"** refers to the rate paid, per hour, by Employers for journeymen sheet metal workers employed under this Agreement.

This section shall not have the effect of reducing the wage progression schedule of any apprentice who was indentured prior to the effective date of this Agreement.

Apprentices will not be allowed to work overtime until all journeymen in the shop or on the job site have been offered the scheduled overtime.

## <u>ARTICLE XII</u>

**SECTION 1.**  This Agreement and Addenda Numbers 1 through 46 attached hereto shall become effective on the 12th day of August 2001 and remain in full force and effect until the 31st day of July 2005 and shall continue in force from year to year thereafter unless written notice of reopening is given not less than ninety (90) days prior to the expiration date.  In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party.

**SECTION 2.**  Notwithstanding any other provision of this Article, or any other Article of this Agreement, whenever an amendment to the Standard Form of Union Agreement shall be adopted by the National Joint Labor Relations Adjustment Committee, any party to this Agreement, upon the service of notice to all other parties hereto, shall have this Agreement reopened thirty (30) days thereafter, for the sole and only purpose of attempting to negotiate such amendment or amendments into this Agreement for the duration of the term hereof. There shall be no strike or lockout over this issue.

IN WITNESS WHEREOF, the parties hereto affix their signatures and seals this 23rd day of July 2002. Amended July 1, 2004.

Boston Roofing Contractors Association of the B.T.E.A. and Sheet Metal & Air Conditioning Contractors National Association – Boston (Specify Name of Association or Contractor)

By:_____
     Signature of Officer or Representative / EMPLOYERS ASSOCIATION


Local Union 17 - Eastern Mass. of Sheet Metal Workers' International Union

By: _____
     Signature of Officer or Representative / LOCAL UNION NO. 17

Negotiating Committee

| For the Union | For the Employer |
|---|---|
| Michael Walsh, Chairman | Kevin R. Gill, Chairman |
| Edward Foley, Secretary | Thomas J. Gunning, Secretary |
| Joseph Bergantino | Joseph F. Cullen |
| Robert Butler | W. Thomas Hanna |
| Fred Creager | Richard W. Dupre |
| William Dinon | Paul M. LeBel |
| John Healy | Paul M. LeBel Jr. |
| Festus Joyce | Stephen P. Affanato |
| Neal Kelleher | Peter O'Leary |
| David McCarren | Jeff Chase |
| Michael Sheehan | |
| James Wool | |

## **ADDENDA**
ADDENDA to (Form A-3-84)
Standard Form of Union Agreement

**No. 1 (a)** It is expressly included herein, for the purpose of indicating more specifically, but not by any means limiting hereto, that supplementary to Article I of this Agreement also covers the handling, setting, erecting, installation, assembling, dismantling, adjustment, alteration, reconditioning, repairing, servicing of all fans, filters of all types, blowers, sheaves, belts and guards of all kinds, plenums including prefabricated insulated casings and air chamber panels, with or without other equipment, louvers, screens, registers, grills, diffusers of all kinds, including those in connection with lighting fixtures and ceilings, dampers of all kinds, sound traps, mixing boxes, attenuators of all kinds, access doors related to air-handling systems, dryers, sprayers, power and gravity ventilators, acoustical material within duct work, dust collectors and recovery systems, breaching, hoods, convector and radiator and similar enclosures and covers, with or without backs, flexible tubing and connections thereto, and all such air-handling systems and to all other sheet metal work covered by this Agreement and by the jurisdictional claims of the Sheet Metal Workers' International Association.

Flashings: All types including through flashing to be done by Sheet Metal Workers. Flashing is to be defined as: Through wall, gutters, down spouts, coping, termination bars, and other appurtenances, under the claimed jurisdiction of the Sheet Metal Workers International Association.

Architectural sheet metal shall include: Fascia, skylights, column covers, metal siding, metal roofing and soffits.

All toilet partitions, lockers, and shelving to be done by the Sheet Metal Workers.

**(b)** The provisions of Article I and Article VIII Section 2 shall apply to spiral pipe and all related fittings, shall apply to manufacture of turning vanes, in addition the parties do agree that the purchase of said items shall be from a manufacturer or contractor who pays the hourly rate of wage set forth herein, or higher.

**(c)** In keeping with the provisions of Article I relative to drafting and sketching, said drawings and sketches must carry stamped identification of a member of the Sheet Metal Workers' International Association. The Employers and/or Employer agree to cooperate with officials of the Union in matters pertaining to work and contracts.

13

**(d)** Spiral pipe will not be permitted on the low pressure or conventional side of a pressure reduction device.  This will not apply in remodeling and repair work being done in an industrial plant or the office of said plant if it is a part of the plant's structure.  Any revamping of, or adding to the building's structure and the mechanical work included therein will be considered new construction.  Clarification of any questions in the interpretation of this Article shall be settled at a pre-bid job conference.

**(e)** The use of conduit and/or spiral pipe is not permitted in a conventional system.

The use of flexible hose is not permitted on a conventional system, except as specified in Addendum #2.

## No. 2 DEFINITION:

The classification of a system for this purpose will not be determined by static pressure or velocity, but rather by the following requirements:

**a.**  A high-pressure system will have airtight ductwork of special construction.  It will be made airtight by mechanical means such as welding, gasketing and/or caulking.

**b.**  In addition, for a system to be considered high pressure, it must have pressure reduction devices such as one of the following:

       Pressure reducing valve with lined duct.
       Pressure reducing valve with sound trap.
       Attenuation box with pressure reducing valve.
       Double duct or mixing box with valve.
       Peripheral high velocity system.

**c.**  Any supply system that does not have both airtight construction and a pressure reduction device will be considered a conventional system.

**d.**  The requirements and definitions stated above refer to both supply and return and exhaust systems, except in addition to the aforementioned, a high velocity return exhaust system must have metal flues or metal risers to be of airtight construction to qualify.

## FLEX CONNECTIONS

**e.**  The use of flexible hose will be permitted in accordance with the following:

**f.**  Where the pressure reducing device is an "octopus" type box, a 5'0" maximum length of flexible hose may be used on the inlet side of the box.  In addition, a 5'0" maximum length of flexible hose may be used from the box to each outlet.  Flex will be limited to 5'0" expanded on all systems and will be continuous and no pipe or fittings to be used between Flex section. Runoffs will consist of conventional pipe and fittings to a point no more than 5'0" from the outlet.

**g.**  A maximum 5'0" of flex is permitted in a perimeter window unit system and may be used to connect from unit to unit in series.

**h.**  Where a special type of outlet requiring an "in-between" connection is used on a system, the connection to the diffuser may be made by using five (5) feet maximum length.

**No. 3**  No high velocity powder actuated tools will be permitted.  The low velocity powder actuated tools will be permitted.  This tool may be used by the mechanic or apprentice who has

14

Case 1:05-cv-10694-JLT Document 13-4 Filed 07/21/2006 Page 15 of 26

been personally instructed in its use in accordance with Industrial Bulletin #26 prescribed by the Massachusetts Department of Labor and Industries.

**No. 4** Reference: Article VI Section 1 "on the job" and "on the project site" shall mean "if possible within the travel schedule".

All overtime work will be paid at one and one half (1 1/2) times the hourly rate except when that overtime is on a Sunday or Holiday when the rate will be two (2) times the hourly rate.

Fabrication in the Employer's shop will be at one and one half (1 ½) times the hourly rate outside of the regular working hours on Monday through Saturday. Sunday and Holidays will be done at two (2) times the hourly rate.

## No. 5 Reference: Article VII Section 1

**(a)** All Employers with principal place of business within a radius of no more than fifteen (15) miles from Park Square, Boston shall be considered as resident contractors of Boston, Massachusetts and shall be governed in matters of travel and transportation from a point identified as Park Square, Boston, Massachusetts. All Employers with principal place of business outside the radius referred to herein above shall be considered as resident contractors of their respective town or city and shall be governed in matters of travel and transportation from a point identified as the Town Hall or City Hall of the Employers' respective town or city.

Effective no more than sixty (60) days from the date of this contract or the date of future signings by new contractors it will be the one time option of those Employers beyond the fifteen (15) mile radius to choose to be a Boston based contractor for the purpose of figuring mileage and travel. This choice, once made, will be for the duration of this Agreement and successor Agreements. Should an Employer beyond the fifteen (15) mile radius elect to become a Boston based shop, it is clearly understood that the Employer will not be requested to pay any travel or mileage to employees working in the shop.

**(b)** When employed in a shop or on a job within the limits of no more than five (5) road miles from the points referred to above, employees shall be governed by the regular working hours specified herein and shall arrange for necessary transportation within said limits from home to shop or job at starting time and from shop or job to home at quitting time and the Employer shall provide for all additional transportation during working hours. The shop shall not be a starting point.

**(c)** When employed outside of the five (5) mile limit from the points referred to in Sections 1 and 2 of Article VII and within the jurisdiction of the Union, employees shall be furnished with or shall arrange transportation which will assure their departure from the five (5) mile limits specified, no earlier than one half (½) hour before starting time and returning will assure arrival at such limits no later than one half (½) hour after quitting time.

**(d)** Employees traveling from the departure point referred to in this Article and not using Employer furnished transportation shall be paid at the current IRS rate for each mile traveled from the five (5) mile point to the job and from the job to the five (5) mile point.

**(e)** Employees directed or sent by the Employer during the work hours from shop to job, job to job, job to shop shall be paid at the current IRS rate for all miles traveled when other than the Employer furnished transportation is used.

**(f)** Travel time within the workday shall be considered as work time and shall be paid at the current hourly rate of wage.

Parking and Tolls: The Employer shall pay all tolls and parking fees the first and last day on the

15

job. In difficult parking areas the Employer will notify the workmen one day prior to layoff. It is further agreed the Employer shall transport the men's tools to and from difficult parking area jobs.

**(g)** Travel time outside of the workday not including the hours between midnight and 6:00 a.m. shall be payable at the current hourly rate of wage. Travel time between the hours of midnight and 6:00 a.m. shall be paid at one and one half (1 1/2) times the going hourly rate of wage, except Sundays and holidays where it shall be paid at two (2) times the hourly rate.

**(h)** Traveling expenses on airplanes and trains shall include fares, berths, sleepers, parlor cars, meals, etc., and shall be paid by the Employer. On the day of departure, single time shall be paid workmen for the number of hours taken on the journey up to four-thirty (4:30) p.m.

When the journey extends beyond four-thirty (4:30) p.m. they shall receive, in addition to their regular day's pay, such additional hours pay, under the provisions of Article VII, as is required in travel, but not to exceed four (4) hours in any one day.

Due to reasons beyond the control of the parties to this Agreement certain jobs require a full eight (8) hour day on the job and when compliance with the departure and arrival schedule prevents this, such cases shall be treated as special cases and consideration for exemption would be given after investigation by the parties involved.

## No. 6   Reference: Article VIII Section 1

Hourly wage rate schedule as follows:

August 1, 2001                          $31.82 per hour
(effective 9/1/01 the rate is $30.81 per hour due to the contribution of $1.01 to NPF)

Future increases due under this Agreement are as follows:

February 1, 2002  - $1.25 per hour
August 1, 2002     - $1.25 per hour
February 1, 2003  - $1.25 per hour
August 1, 2003     - $1.25 per hour
February 1, 2004  - $1.25 per hour
August 1, 2004     - $1.30 per hour
February 1, 2005  - $1.30 per hour

To be allocated as per Agreement by vote of the membership.

Employers will be notified at least thirty (30) days in advance of such allocations.

**(a)** Payment by check is permitted Monday through Thursday inclusive. Payment by check on Friday requires the Employer to give the employee one half (½) hour during working hours to cash the check. Employees must be paid before noon on the third day following the closing of the workweek (ex: week ending on Sunday, men must be paid before noon on Wednesday). The contractor must have a checking account drawn on a local bank.

Failure to pay before noon on the third day will entitle employees to one half (½) hour during working hours to cash their check. In the event a holiday should fall between the end of the workweek and payday or a situation beyond the control of an Employer (i.e. computer breakdown) shall cause checks to be late no penalty shall be imposed. Employers agree to make every effort to meet payday regardless of these problems.

**(b)** Each Employer agrees to withhold from the above stated hourly rate of wages, subject to

the receipt of a signed Authorization card from the employee, the amounts set forth
Case 1:05-cv-10624-JLT Document 31 Filed 07/31/2005 Page 17 of 26
hereinafter:

Working Dues schedule for Journeymen:

| Date | Working Dues | PAL | Total |
|------|------|------|------|
| August 1, 2001 | $1.27 | $0.04 | $1.31 |
| February 1, 2002 | $1.30 | $0.04 | $1.34 |

Working Dues schedule for Apprentices:

| | | | |
|------|------|------|------|
| August 1, 2001 | $0.58 | $0.04 | $0.62 |

The withholdings are to be remitted by each Employer to the "Sheet Metal Workers (Local Union 17) Working Dues" (separate check) in the name of, and to the credit of, the respective member of the Union from whom said deductions were made.

**(c)** Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

**(d)** The Union has the right to allocate a negotiated hourly increase by membership vote, to any aspect of its wage and/or benefit program.

**(e)** It is clearly understood that the $0.04 contribution to PAL (separate check) effective August 1, 2001 will be a voluntary contribution on the part of the member**.**

**No. 7(a)** An employee injured while working and forced to leave his employment in order to obtain medical treatment for such an injury shall be paid full wages and benefits for time lost on this account on the day on which he is injured. Where, while still employed by the Employer under who the injury was received, additional treatments are required during the working hours for this injury, the employee shall be paid full wages and benefits for the time absent for this purpose. The second half of this paragraph shall apply only to an injury, which does not prevent the employee from continuing his work.

**(b)** The Employer further agrees that all members of the Union in his employ shall be protected in accordance with the Massachusetts Workmen's Compensation Act.

**(c)** It is further agreed that any Employer, party to this Agreement, that is not subject by law to the Massachusetts State Unemployment Act, shall become a voluntary subject to the law in the employment of members of the Union.

**No. 8(a)** The Employer shall pay to the "Sheet Metal Workers' (Local Union 17) Insurance Fund" amounts set forth hereinafter:
February 1, 2004 - $7.32

For all hours used in travel or worked between six thirty (6:30) a.m. to four thirty (4:30) p.m., with one half hour for lunch, by apprentices and journeymen sheet metal workers and shall pay to said Fund the required amount per hour for all the hours actually worked between the hours of four-thirty (4:30) p.m. and six thirty (6:30) a.m. Failure to contribute to the Fund shall be a violation of contract.

**(b)** This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this fund shall be made on a weekly basis. Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment. For Contractors signatory to this agreement and also members of Boston SMACNA & the Boston Roofing Contractors Association, these contributions must be received in the fund office no later than the close of business on or before the fifteenth (15th) day of the second month following the month in which the hours were worked.

**No. 9(a)** The Employer shall pay to the Sheet Metal Workers–National Pension Fund (NPF) amounts set forth hereinafter:

September 1, 2001          $5.05

For all hours used in travel or worked between 6:30 a.m. to 4:30 p.m. by apprentices and journeymen sheet metal workers and shall pay to said Fund the required amount per hour for all the hours actually worked between the hours to 4:30 p.m. and 6:30 a.m.  Failure to contribute to the Fund shall be a violation of contract.

**(b)** This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this Fund shall be made on a weekly basis.  Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment.

**No. 10(a)** The Employer shall pay to the Sheet Metal Workers Local Union 17 Supplemental Pension Fund amounts set forth hereinafter:

February 1, 2004 - $.56

For all hours used in travel or worked between six thirty (6:30) a.m. to four thirty (4:30) p.m., with one half hour for lunch, by apprentices and journeymen sheet metal workers and shall pay to said Fund the required amount per hour for all the hours actually worked between the hours of four-thirty (4:30) p.m. and six thirty (6:30) a.m.  Failure to contribute to the Fund shall be a violation of contract.

**(b)** This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this fund shall be made on a weekly basis.  Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment. For Contractors signatory to this agreement and also members of Boston SMACNA & the Boston Roofing Contractors Association, these contributions must be received in the fund office no later than the close of business on or before the fifteenth (15th) day of the second month following the month in which the hours were worked.

**(d)** It is mutually agreed to protect against unfunded liability for the Supplemental Fund; the parties agree that from the total wage and fringe benefit package agreed to by the Employer under this Agreement, the Employer and the Union agree that the Union, in making any permitted allocations of Employer contributions at the various times specified in this Agreement among the various funds, will make such allocations, as far as is practicable, to achieve or maintain the fully funded status of vested benefit liabilities under the Sheet Metal Workers Local Union No. 17 Supplemental Pension Fund in accordance with the funding recommendations of the Trustees of the Sheet Metal Workers Local Union No. 17 Supplemental Pension Fund from time to time (provided such recommendations are made pursuant to and consistent with the Trustees' obligations under the Sheet Metal Workers Local Union No. 17 Supplemental Pension Fund Trust Agreement). The foregoing shall not constitute a guaranty by the Union or its members of, or relieve or release the Employer from, the Employer's funding obligations as may be required by law.

**No. 11(a)** The Employer shall pay to the Sheet Metal Workers Local Union 17 Annuity Fund the amount set forth hereinafter:

February 1, 2004      $5.00

For all hours used in travel or worked between six thirty (6:30) a.m. to four -thirty (4:30) p.m., with one half hour for lunch, by apprentices and journeymen sheet metal workers and shall pay to said Fund the required amount per hour for all hours actually worked between the hours of 4:30 p.m. and 6:30 a.m. Failure to contribute to the fund shall be a violation of contract.

**(b)** This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this fund shall be made on a weekly basis.  Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment. For Contractors signatory to this agreement and also members of Boston SMACNA & the Boston Roofing Contractors Association, these contributions must be received in the fund office no later than the close of business on or before the fifteenth (15th) day of the second month following the month in which the hours were worked.

**No. 12(a)** The Employer agrees to contribute to the Sheet Metal Workers International SASMI (Stabilization Agreement for the Sheet Metal Industry) in the amount prescribed by that Agreement which is currently three percent (3%) of the total package, less the Industry Promotion Fund.  *The parties acknowledge all contributions are to be paid on an "hours worked" basis as defined since inception (August 1, 1996 - $.50).*      *Effective 1-1-04 $1.13*

 **No. 13(a)**  All Funds, Local and National, shall be paid through the Sheet Metal Workers' Local Union No.17 Insurance Fund Office, 43 Kingston Street, Boston, MA 02111.  This will include the Insurance, Pension, Local Pension, Annuity, Working Dues, Apprentice Training, Labor Management Cooperation Trust (Equality), SASMI, National Training, Industry Promotion, and National Industry Fund.  Reporting forms may be obtained from the Insurance Fund Office.

**(b)** The Employer shall make available to the Insurance, Pension, Local Pension, Annuity, Working Dues, Apprentice Training, Industry Promotion and Labor Management Cooperation Trust (Equality) and SASMI funds any and all records of the covered Employees that the several Funds may require in connection with the sound and efficient operation of the several Funds.

**(c)** The Insurance, Annuity, Local Supplemental Pension, Joint Apprenticeship and Training Fund and Equality funds shall be jointly administered.

**(d)** All local funds are due and payable as described herein no later than the 20th day of the succeeding month.  For Contractors signatory to this agreement and also a member of Boston SMACNA & the Boston Roofing Contractors Association, these contributions must be received in the fund office no later than the close of business on or before the fifteenth (15th) day of the second month following the month in which the hours were worked.

**(e)** The National Funds (National Pension, International Training Institute, NEMI, SMOHI, SMWISF & SASMI) are due and payable as described herein no later than the 20th day of the succeeding month.

**No. 14** The Employer and/or employees agree the Union has the right to remove its members and apprentices from shop and/or job where the Employer and/or their representatives have failed to remit the monies due the Fund or Funds on dates agreed by trustees.

It is further agreed the employees shall be compensated in full for the number of work hours lost due to said work stoppage caused by delinquency.

19

**No. 15** The business manager and agents of the Union shall have the right and privilege, at all times, of going through the shops or premises, or buildings where work is being done, to examine the receipts of members employed there, check their pay stubs and transact any other business he may have to do in the performance of his duties.

**No. 16** Men boarded on a five (5) day basis or less shall be paid the necessary expenses for room and board, and in no case shall the amount be less than twenty-five dollars ($25.00) per day on all jobs bid after August 1, 2001.

The Employer shall pay or furnish transportation weekly to and from the job, and departure and arrival shall conform to the limits and schedule as outlined in Article VII.

**(a)** Men boarded on a seven (7) day basis shall be paid the necessary expenses for room and board and in no case shall the amount be less than twenty-five dollars ($25.00) per day on all jobs bid after August 1, 2001.

The Employer shall pay for transportation at the start and finish of the job, and departure and arrival shall conform to the limits and schedule as outlined in Article VII.

**(b)** The exception is the jurisdiction area of Local #17 of Eastern Massachusetts that shall be paid on the basis of twenty dollars ($20.00) per day on all jobs bid after August 1, 2001 if the Employer elects to pay board rather than mileage and travel time this subsistence will be for the duration of the job.  The Employer will not be liable for absenteeism or any resultant lost work time.  An Employee missing Friday or Monday will not be paid board for a non-working weekend.

**No. 17(a)** Both parties agree that the hourly contribution by the Employer to the Sheet Metal Industry Promotion Fund may be increased by the Employers' Association provided at least a six month notice is given all Employers who contribute to the Fund.

> February 1, 2004        $0.40 per hour

Effective February 1, 1998, seven ($0.07) cents to the National Industry Fund.

**(b)** The Employer shall pay to The Sheet Metal Workers Apprentice and Training Fund the amount set forth hereinafter:

> August 1, 2003        $0.86 per hour

Ten cents ($0.10) of which shall be forwarded to the ITI.  The ITI shall forward three cents ($0.03) of this ten ($0.10) to the National Energy Management Institute (NEMI).

**(c)** The Sheet Metal Workers' Apprentice and Training Fund is for the purpose of education and training of indentured apprentices and for the administration cost of the Joint Apprentice Committee.  Failure to contribute to the Fund shall be a violation of the contract.  The receipt and disbursement of the monies in the Apprentice Training account shall be the sole responsibility of the Joint Apprentice Committee, comprising an equal number of members from SMACNA – Boston and Local Union #17.  The Industry Fund will help in every way possible in the upgrading and retraining of journeymen sheet metal workers.

**(d)** Contributions to this fund shall be made on a weekly basis.  Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment. For Contractors signatory to this agreement and also members of Boston SMACNA & the Boston Roofing Contractors Association, these contributions must be received in the fund office no later than the close of business on or before the fifteenth (15th) day of the second month following the month in which the hours were worked.

**No. 18** The stewards, both in the shop and in the field, shall be appointed by the Union from the Sheet Metal Workers' Local Union 17 members in the employ of the Employer. Each steward will be appointed from among the first sheet metal workers employed on the site. The Union shall notify the Employer of the name of the Steward when he is appointed. Each such steward shall, provided there is work he is qualified to perform, be the last man, other than the foreman, to be discharged. In the event a steward is laid off because of a shop or job site temporarily closing down, he shall be the first man other than the foreman rehired for that job, provided he is qualified to perform the work required.

The amount of stewards on any job site for individual Employers will be determined by Local Union 17. The steward will protect all work under our jurisdiction, regardless of who is performing this work, without harassment or discrimination by his Employer. Any dispute arising over the interpretation of this Section shall be subject to adjustment under the provisions of Article X. There will be no transfer or discharge of a steward, or work stoppage by the Union, until a grievance meeting is held or permission is given, by the Union.

**No. 19** FOREMEN: Shall receive minimum amounts above the going rate as set forth below:

Crew of three (3) to seven (7) inclusive       $1.50 per hour minimum.
Crew of eight (8) to fifteen (15) inclusive    $3.00 per hour minimum.
Crew of sixteen (16) and up inclusive          $4.00  per hour minimum.

**No. 20** Foremen shall notify the employee at least two (2) hours before a man is laid off. Failure to notify the employee will entitle the employee to receive two (2) hours' pay. Upon layoff, a man is to receive a full statement of his earnings. Also, he is to receive his notification slip for Unemployment Compensation benefits as required by law. (See Addenda #7(c).

**No. 21** It is further agreed that on jobs of eight (8) or more men, the Employer shall furnish a heated shelter of at least 100 square feet of floor area for the purpose of storing clothes, tools and eating of lunches; it shall be furnished with benches or chairs.

**No. 22** Jurisdictional controversies affecting or involving parties to this Agreement shall be settled in accordance with the provisions and intent of Agreement between Sheet Metal Workers' International Association and other National or International Unions directly involved or by decisions rendered by regularly constituted authorities recognized by Sheet Metal Workers' International Association, including any jurisdictional council voluntarily set up by the A.F. of L. Building Trades.

**No. 23** It is agreed that the apprentice ratio be as follows:

One (1) apprentice for the first four (4) journeymen regularly employed on a yearly basis.

One (1) apprentice for every six (6) mechanics regularly employed on a yearly basis thereafter.

Any deviation from this formula must be agreed to, in writing, by the Business Manager.

**No. 24**  Parties to this contract do hereby agree to train all journeypersons in the OSHA 10-Hour Construction Safety Course by August 1, 2004 with the cost to be shared equally and comply with and be governed by the safety provisions outlined in Industrial Bulletins Numbers 12 and 22, issued by the Department of Labor and Industries of the Commonwealth of Massachusetts and the Federal Occupational Safety and Health Act.

**No. 25** Testing and Balancing (description of reference in Article I, Section 1 (c) of Standard Form). Any drawings, floor layouts, fan data or outlet sheets that are required by the Employer for testing and balancing shall be prepared by sheet metal journeymen or apprentices covered

21

by this agreement.  Any typing or duplicating may be done by office personnel; the work shall be deemed complete when accepted by the engineer of approving authority.

**No. 26** In the event of a government imposed wage freeze or limitation; the Employer agrees to pay any and all increases that cannot be paid on account of said mandatory wage freeze or limitation immediately upon the removal of rescission.

**No. 27** The Union shall have the right to reopen this contract to allocate (by membership vote) to any new fund it desires to start upon thirty (30) day notice to SMACNA - Boston.  The Union has the right to allocate (by membership vote) to the following International Funds:

The Henry Jackson and Diabetes Foundations, National Pension Plan, International Trust, International Health and Welfare.

## No. 28 Certified Payroll, Cash Payments, Escrow Fund and Bond Requirements

Any Employer who works in the area jurisdiction of Local 17, but having its fabrication shop outside the area jurisdiction of Local 17, will furnish upon request of Local 17 a certified payroll record of wages and fringe benefit payments made to sheet metal worker employees of the shop, specifying the hours worked, including straight and overtime hours worked.  Certification shall be made by an officer of the company.

If at any time Local 17 has serious doubt about the ability of any Employer, having an Agreement with Local 17 for three (3) years or less, to meet his contractual wage and fringe benefit payments, or if at any time this Employer does not have sufficient funds for payroll checks and fringe benefit payments, or if a payroll check bounces, Local 17 may require this Employer to pay wages and fringe benefit payments by cash or certified check on a weekly basis.

In addition, Local 17 may require this Employer, working in the area jurisdiction of Local 17, to establish an escrow fund or furnish a bond, in such form and manner as required by Local 17 and/or the fringe benefit trust funds, to insure that wages and fringe benefit payments be made in a prompt and proper way.

## No. 29 Shaftwork

If a man works in a shaft, the Employer will provide plank material on the floor below.  Anyone required to work 40 feet above the ground, or 40 feet above a permanent structure, such as on a staging, swing stage, bosun's chair or skylight shall comply with OSHA regulations.

## No. 30 Tools

A toolbox shall be made available by the Employer on every job site of sufficient size to store all basic sheet metal tools used by sheet metal worker employees on the job site. In the event of fire, or in the event of theft, resulting from forcible entry (where there is evidence of such forcible entry) the Employer shall be responsible for loss of such tools and the tools shall be replaced or the sheet metal worker employee reimbursed up to three hundred and fifty dollars ($350.00) after substantiation and proof is made by the employee of the tools he had on the job site and employee presents a paid receipt of purchase, or the Employer may opt to purchase replacement tools.  At any time the Employer shall have the right to ask for, and the sheet metal worker employee shall furnish, a list of his basic sheet metal tools at the job site.

In any case where there is a question of the value of tools and amount of reimbursement, the matter may be referred to the Union's business representative and the Employer and his association representative for resolvement.

22

If a sheet metal worker employee is injured on the job, the steward or a fellow sheet metal worker employee shall be allowed to see that proper care and attention is given to the injured worker.  If it is necessary to move the injured worker to a hospital or medical center for medical treatment, the Employer shall designate a qualified medic, steward, sheet metal worker employee or company representative to accompany such injured worker to the hospital or medical center.

The employee accompanying the injured person shall be paid full wages and benefits for the time necessary to see that the injured employee receives adequate medical attention.  They shall also be reimbursed for any expense incurred by them in pursuit of such care including, but not limited, to parking mileage and/or taxi or carfare upon presentation of receipts to the Employer.

## No. 32 Hazardous Conditions

All work performed by the Employer and sheet metal worker employees shall comply with all local, state and federal safety and right-to-know laws.  In working under hazardous conditions, which would include heavy dust, paint spraying, abnormal air pressure, radiation and asbestos removal, the Employer and sheet metal worker employee shall work under and abide by all regulations covering such hazardous conditions, as required by local, state and federal laws.

The sheet metal worker employee shall wear all safety equipment required by local, state and federal laws.  Failure of any employee to wear such equipment as instructed by the Employer may result in his discharge.

## No. 33 Savings Clause

If any word, sentence, paragraph or section in the Agreement is ruled illegal, that portion in question will be jointly renegotiated and/or rewritten to comply with the law.

**No. 34** State and Federal "Right-To-Know" laws and Massachusetts "Jury Pay" law are to be recognized by the signatories to this Agreement.

**No. 35** Labor Management Cooperation Trust (Equality Fund)

**(a)** Effective August 1, 2001, the Employer shall pay to the "Sheet Metal Workers Local #17 Labor Management Cooperation Trust" fifty cents ($0.50) per hour for all hours used in travel

or work between 6:30 a.m. to 4:30 p.m. by apprentices and journeymen sheet metal workers and shall pay to said fund the required amount per hour for all hours actually worked between the hours of 4:30 p.m. and 6:30 a.m. Failure to contribute to the fund shall be a violation of contract.

(b) This hourly fringe benefit rate, if this fund is discontinued or reduced, can be designated to wages or existing funds as per vote of the members.

**(c)** Contributions to this fund shall be made on a weekly basis.  Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment. For Contractors signatory to this agreement and also members of Boston SMACNA & the Boston Roofing Contractors Association, these contributions must be received in the fund office no later than the close of business on or before the fifteenth (15th) day of the second month following the month in which the hours were worked.

**No. 36** New Market Recovery as a part of a continued, mutual effort to recover the area market, parties to this Agreement agree that:

**(a)** Local #17 will notify the contractors association of any new signatory contractors.

**(b)** Each contractor agrees to notify the Union, periodically of any new projects they have contracted for.

**No. 37** It is clearly understood that companies working in a bargaining area other than the bargaining area in which their shop is located shall be governed by the two-man rule. Additional employees required to man a project in that situation shall be assigned by the Union office. Employees assigned in that manner may be utilized on that particular project and may not be assigned or transferred to any other project or job site within that or any other geographic bargaining area.

**No. 38** On a joint venture, for a job located within the jurisdiction of Local Union #17, and an Employer located outside the jurisdiction of Local Union #17, the sketching and fabricating of said job must be performed within the jurisdiction of Local #17.

**No. 39** New Service Committee EAP Parties to this Agreement recognize the existence of the Sheet Metal Workers Local #17 Service Committee as a functioning employee assistance program.  The Service Committee was formed to assist the members of Local #17 and their families with problems arising from drug and/or alcohol abuse.

The Service Committee is run by members of Local #17 and is in addition to coverage offered under the Health and Welfare program of Local #17.

**No. 40 Owner-Members:** (Reference Article IV Section 3)

Contributions to all funds shall be made by or on behalf of any person who is an Owner-Member, as defined below, on the basis of 40 hours per week, payable monthly, plus actual hours in excess of forty (40).  If such contributions are not timely paid by or on behalf of the Owner-Member, he shall be terminated from all participation in the Funds for this purpose, a person will be considered as an Owner-Member if (a) he or his spouse owns, directly or indirectly, all or any portion of the capital or profits interest in the business, or works with the tools, or acts as employer, contractor or jobber, or otherwise participates in the management of the company on a day-to-day basis in the Sheet Metal Industry; and (b) he is a member of Local No. 17. Reports will be made monthly, based on the last payroll date of each month to coincide with each weekly payment. For Contractor owner-members signatory to this agreement and also members of Boston SMACNA & the Boston Roofing Contractors Association, these contributions must be received in the fund office no later than the close of business on or before the fifteenth (15th) day of the second month following the month in which the hours were worked.

**No. 41 Coffee Breaks:**

There will be two (2) ten (10) minute coffee breaks during the normal workday.  One break in the morning and one in the afternoon.  It is clearly understood that the time allocated for the coffee break will be paid and all fringe benefit funds will be contributed to at the appropriate rates.

**No. 42 Re-opener**
The Union shall have the right to reopen this contract for the sole purpose of discussing a bonding requirement for the national funds.

**(a):** Both parties agree to allow a reopening of this contract for a mutually agreeable, industry related matter.

**No. 43 Memorandum of Understanding**

      In Plant Market Recovery

By Agreement reached July 29, 1994, Sheet Metal Workers Local #17 and the Boston Roofing and Sheet Metal and Air Conditioning Contractors Association of the Building Trades Employers Association, a committee will be formed to attempt to arrive at an arrangement to recover "in plant" maintenance work within this jurisdiction.

Several innovative models were discussed in an attempt to formulate a marketable crew rate for the work described herein.

**No. 44** The employer shall supply raingear during inclement weather.

**No. 45** Local 17 members shall be paid wages only for one (1) bereavement day for immediate family.

**No. 46** The Sheet Metal and Air Conditioning Contractors National Association Boston Inc. (SMACNA Boston) and the Sheet Metal Workers International Union Local 17, concur that on August 1, 1996, the parties agreed to participate in the Stabilization Agreement of the Sheet Metal Industry (SASMI). The parties also acknowledge that all contributions have been paid on the premise of "hours worked" since the first contribution up to the present time. At no time did either party attempt to amend or modify the intent of our original agreement through the collective bargaining process, or do we have any desire to do so today. The parties will continue to submit contributions as defined in our collective bargaining agreement on an "hours worked" basis.

IN WITNESS WHEREOF, the parties hereto affix their signatures and seals this 1st day of July 1, 2001. Amended July 1, 2004

Boston Roofing Contractors
Associations of the Building Trades
Employers' Association and Sheet Metal
and Air Conditioning National Association Boston (SMACNA Boston Inc.)

BY
_____
Thomas J. Gunning, Executive Director, Boston Roofing Contractors Association of the B.T.E.A and SMACNA Boston Inc

BY
_____
Joseph Bergantino, Business Manager, Local Union No. 17 of Sheet Metal Workers' International Association

BY
_____
Autonomous Contractors

EXHIBIT C

# GARCIA & MILAS

ATTORNEYS AND COUNSELORS AT LAW
A PROFESSIONAL CORPORATION

44 TkmmULL STREET

NEW HAVEN, CT

06510

JANE 1. MILAS

(203) 773-3824

FACSMLE

(203) 782-2312

E-MAIL
jmilas@garcixnilas.com

November 22, 2004

VIA CERTIFIED MAIL, RETURN RECEIPT
Mr. Michael J. Sullivan General President Sheet
Metal Workers International Association 1750 New
York Avenue, N.W. Washington, D.C 20006
Re: M.R.S. Enterprises, Inc.
Delta Terminal A at Logan Airport

Dear Mr. Sullivan:

This office represents M.R.S. Enterprises, Inc. in connection with the abovereferenced project. Pursuant to Article X, section 1 of the Agreement between M.R.S. Enterprises, Inc. ("MRS") and the Sheet Metal Workers International Association ("SMWA"), MRS raises the following grievance:

Breach of the Agreement by the SMWA in connection with the Delta Terminal A project at Logan Airport, for failure to supply duly qualified Building Trades Journey persons, Specialty Sheet Metal Workers, and Specialty Trainees in sufficient numbers and ratios stipulated during the April 8, 2003 meeting in Washington, D.C. as may be necessary to property execute work contracted for by the Employer in the manner and under the conditions specified in the Agreement.

M. Sullivan
November 22, 2004
Page two


      MRS requests that this grievance proceed to step one, as provided in Article X, section 1 of the Agreement.

                        Sincerely yours,



                        Jane I. Milas

cc.      Roland Levesque

      Joseph Bergantino Business Manager Local 17, Sheet Metal Workers International Association 1157 Adams Street Dorchester, MA 02124-5788 (via certified mail)

EXHIBIT D

December 20, 004


Mr. Michael Sullivan General President
Sheet Metal Workers International Association
1750 New York Avenue, NW
Washington, DC 20006

Dear Mr. Sullivan.

We have not received a suitable response from the Sheet Metal Workers International Association (SMWIA) to our grievance against the SNIWIA with respect to the financial harm caused to our firm by the SMWIA on the Delta Terminal A project at Logan Airport, Boston. Massachusetts.

to addition, the local and national representatives of the SIvIWIA have failed to enact a comprehensive plan for market recovery within New England to ensure that MRS Enterprises fric. by employing members SMWLk. remains competitive with other trades

Therefore. in accordance with Article VIII, Section 4 of the National Association of Siding and Decking Contractors (NASDC) Agreement, we have given formal notice to terininate the Agreement on the stipulated expiration date- We will do the same with respect to Agreements with Local 40 and Local 17 as well.

Thank you.

Sincerely.


Roland 0. Levesque Sr.
President


Cc:    Richard Pellar. President NASDC
       Anthony Asher, NASDC
       Joseph Bergentino Business Manager SMWIA Local 17
       David Roche -- Business Manager, SMWIA Local 40

Meeting with SMWIA - Washington D-C
January 28, 2004
Agenda

Attendees:    Michael Sullivan - SMWIA
              Joseph Nigro – SMWIA
              Roland Levesque Sr. - MRS
              Steven Levesque - MRS

1. **MRS Enterprises Inc.**

Specialty Contractor

Metal Wall Systems
Composite Panel Systems
Metal Roof Systems
Structural Steel
Pre engineered Metal Buildings
Miscellaneous Metals
Glass & Glazing
Louvers

**Signatory to SMWIA since 1986**

**"Last of the Mohicans" Only remaining SMWIA si2natory contractor active in New England capable of pursuing large / complex projects**

2. **New England Market**

Construction Management - Impact on the Marketplace
Packaging of Trades
Signatory to Carpenters
Glass & Glazing Contractors major players
Canadian Manufacturers impact on the marketplace
Open shop contractors

3. **Sheet Metal Workers in New England**

Core Business in HVAC
Architectural Sheet Metal
Sheet Metal Union a non factor in the exterior cladding of buildings

**4. Competition**

Glass & Glazing Houses - signatory to other trades
Lymo Construction
Maddision Associates
Sunrise Erectors
Ken Hennan Inc.
Open shop contractors
SMWIA - Local 40

**5. Wage Disparity**

Sheet metal versus Carpenters
Quality of Manpower
Productivity Erosion of
Profitability
 Cannot Compete

**6. Competing Trade Unions**

Entrepreneurial attitude
Target money
Value MRS Enterprises Inc
Quality Manpower
Apprenticeship Training program
They "Fight for the Work"
 Strategic Alliance between Competing Unions impacting Sheet Metal Trend
-Other trades doing the work previously performed by SMW

**7. Delta Project**

Lessons learned with Lymo - Signatory to SMWIA
April 8, 2003 meeting in Washington D.C.
Union promises not met
2 million dollar bond to Crown Corr
Quality of manpower -Untrained to perform the work
Journeyman to apprentice ratios
Unskilled work force to perform stud framing
Grievance - Admission of Responsibility
Financial impact to MRS - Discuss damages

**Delta Project should have been the poster project for the SMWIA to demonstrate their core competency in performin2 this type of work**

**8. Future of MRS Enterprises / SMWIA**

**SMWIA must share the risk with MRS Enterprises Inc.**

Financial restitution to MRS Enterprises Inc for Delta project.
Current - cash settlement
Long ten-n financing
SMWIA - Commitment to market recovery
Target Money
Training of Employees
Bonifide Apprenticeship program
Specialty Agreement - Commitment moving forward

"Change the Culture" - We employ, not the SMWIA
Local union ( #40, # 17,#3 8) - Employer friendly

**We have a choice in what trade we use going forward**

Carpenters
lronworkers

**They value the potential wages and benefits we will pay over the next 20 years.**

**800,000 man hours per year. $ 1.5 million in benefits paid per year**

**Next twenty year $ 30 - 50 million dollars in benefits**

EXHIBIT F

**steve levesque**

| | |
|---|---|
| **From:** | steve levesque [slevesque@mrsenterprises.com] |
| **Sent:** | Tuesday, February 01, 2005 3:47 PM |
| To: | msullivan@smwia.org'; 'jnigro@smwia.org' |
| Cc: | lrievesquesr@mrsenterprises.com' |
| **Subject:** | MRS Enterprises continued relationship with SMWIA |

Gentlemen,
Thank you for the opportunity to discuss the past and current issues affecting the ongoing relationship between the Sheet Metal Workers International Association and MRS Enterprises Inc.
Given the circumstances, we sincerely appreciate your courtesy and due consideration on what we all recognize are complex issues.
We affirm General President Michael Sullivan's recommendation that we set a two week time limit to resolve negotiate these issues, which includes restitution to MRS for financial harm caused on the Delta project and a mutually agreed upon market recovery strategy for New England.
We are sending, via overnight mail, a summary page of the outstanding items. Please review in earnest for continued dialogue.
Thank you.
Steven

Page 1 of 1

steve levesque

From:      steve levesque [slevesque@mrsenterprises.com]

Sent:      Wednesday, February 02, 2005 2:03 PM

To:        lmsullivan@smwia.org'; 'jnigro@smwia.org'

Cc:        lrievesquesr@mrsenterprises.com'

Subject:   MRS Enterprises Inc - Letter regarding outstanding issues

Gentlemen,
Please see the attached letter. I am sending the original via overnight mail.
Regards,
Steven Levesque

6/14/2005

**steve levesque**

From:       steve levesque [slevesq u e@mrsenterp rises. com]

Sent:       Wednesday, February 09, 2005 7:56 AM

To:         'jnigro@smwia.org'

Cc:         lrlevesquesr@mrsenterprises.com'; 'msullivan@smwia.org'

Subject: MRS - SMWIA relationship


Joe,
Please advise me if there is further information you may require as you evaluate the information I sent to you last week.
 Please call me to discuss recent events in our marketplace which continues to impact our ability to compete.
We look forward to your response.
 Regards,
Steven

steve levesque

**From:**     steve levesque [slevesque@mrsenterprises.com)
**Sent:**     Thursday, February 10, 2005 6:51 PM
To:          'jnigro@smwia.org'
Cc:          lrlevesquesr@mrsenterprises.com'; 'msullivan@smwia.org'
**Subject:** MRS Enterprises Inc.

Joe,
It is my sincere hope that tomorrow's meeting provides meaningful dialogue for all concerned parties.
First and foremost, we need timely resolution to the financial impact caused to our firm on the Delta project.
Secondly, the business decisions by our firm over the last six 12 months were a direct consequence of the Delta project. It was a matter of survival.
I anticipate that you will share the contents of our February 2, 2005 letter to General President Sullivan and you with representatives of Local 40, 38 and 17.
I apologize for not sending a summary of the projects we lost to other trades, are currently bidding or plan to bid in the next several weeks. I would rather that we deal with the issues as outlined in our February 2, 2005 letter. The rest will fall into place.
Regardless of the outcome, we are proud of our accomplishments over the past twenty years and our association with the SMWIA.
Best regards,
Steven

steve levesque

| | |
|---|---|
| From: | steve levesque [slevesque@mrsenterprises.com] |
| Sent: | Monday, February 21, 2005 8:38 AM |
| To: | 'jnigro@smwia.org';'msullivan@smwia.org' |
| Cc: | lrlevesquesr@mrsenterprises.com' |

Subject: MRS Enterprises - SMWIA - continued relationship


 Gentlemen,
We await your response to our January 28, 2005 meeting and follow up correspondence with regards to maintaining an ongoing relationship between the SMWIA and MRS Enterprises Inc.

**steve levesque**

| | |
|---|---|
| **From:** | steve levesque [slevesque@mrsenterprises.com] |
| **Sent:** | Monday, February 21, 2005 4:08 PM |
| **To:** | 'Michael Sullivan' |
| **Subject:** | RE: **MRS Enterprises - SMWIA - continued relationship** |

Michael,

We are hopeful that a solution will be developed for our mutual benefit.

Thank you.

Steven

----- Original Message ----

From: Michael Sullivan [mailto:msullivan@smwia.org]

Sent: Monday, February 21, 2005 2:23 PM

To: slevesque@mrsenterprises.com

Subject: Re: MRS Enterprises - SMWIA - continued relationship

   Steve Joe will call soon we are closed today and will be traveling tomorrow Mike

----- Original Message ----

From: steve levesque <slevesque@mrsenterprises.com>

To: Joe Nigro <jnigro@smwia.org>; Michael Sullivan <msullivan@smwia.org>

CC: rlevesquesr@mrsenterprises.com <rlevesquesr@mrsenterprises.com>

Sent: Mon Feb 21 08:38:04 2005

Subject: MRS Enterprises - SMWIA - continued relationship

Gentlemen,

We await your response to our January 28, 2005 meeting and follow up correspondence with regards to maintaining an ongoing relationship between the SMWIA and MRS Enterprises Inc.

Thank you.

Steven

I

steve levesque

...... .

. . . .....

| | |
|---|---|
| **From:** | steve levesque [slevesque@mrsenterprises.com] |
| **Sent:** | Wednesday, February 23, 2005 10:52 AM |
| **To:** | 'jnigro@smwia.org'; 'Michael Sullivan' |
| **Cc:** | lrlevesquesr@mrsenterprises.com' |

**Subject:** MRS - SMWIA

Gentlemen,
Thank you for your telephone call yesterday to discuss the issues impacting our relationship with the SMWIA.
Please provide us with a formal response to the six items addressed in my February 1, 2005 correspondence.
Both Roland Sr and I will review your response and assess the benefit of continuing our relationship with the SMWIA.
We would be agreeable to meet with you in the next few weeks.
 Regards,
Steven

Page 1 of 1

steve levesque

From:     steve levesque [slevesque@mrsenterprises.com]

Sent:     Tuesday, March 01, 2005 9:08 AM

To:       'jnigro@smwia.org'; 'Michael Sullivan'

Cc:       lrlevesquesr@mrsenterprises.com'

Subject: MRS - SMWIA

 Gentlemen,
Please advise me as to when we can expect your formal response. Thank you.
Steven

## steve levesque

**From:**          steve levesque [slevesque@mrsenterprises.com]
**Sent:**          Tuesday, March 01, 2005 1:48 PM
**To:**            'Michael Sullivan'
**Subject:**       RE: MRS - SMWIA

Michael,

Thank you.

Regards,

Steven

----- Original Message ----From: Michael Suilivan
[mailto:msullivan@smwia.org] Sent: Tuesday, March 01, 2005
12:35 PM To: slevesque@mrsenterprises.com Subject: Re: MRS
-SMWIA

Steve it will be there

Soon


----- Original Message ----From: steve levesque <slevesque@mrsenterprises.com> To:
Joe Nigro <jnigro@smwia.org>; Michael Sullivan <msullivan@smwia.org> CC:
rlevesquesr@mrsenterprises.com <rlevesquesr@mrsenterprises.com> Sent: Tue Mar 01
09:08:15 2005 Subject: MRS - SMWIA

Gentlemen,



Please advise me as to when we can expect your formal response. Thank you.


Steven

I

steve levesque

From:     steve levesque [slevesque@mrsenterprises.com]

Sent:     Friday, March 04, 2005 1:36 PM

To:       'jnigro@smwia.org'; 'Michael Sullivan'

Subject: MRS - SMWIA

Gentlemen,
We would appreciate your expeditious response to our letter. We have business decisions to make, an your timely
response may hold future benefit for both parties. Thank you.
    Steven

EXHIBIT G

1750 New York Avenue, NW.
Washington, D.C. 20006-5386
Phone: (202) 783-5880
Fax: (202) 662-0894


JOSEPH J. NIGRO
Assistant to the General President


March 2, 2005


Mr. Steven D. Levesque
MRS Enterprises, Inc.
41 Northwest Drive
Plainville, CT 06062

Dear Mr. Levesque:

This letter is in response to the financial and non-financial issues you submitted in your letter of February 1, 2005.

First, with respect to the financial.. issues, the International is not authorized by its Constitution to loan money.  No monies of the International may be loaned to any person or corporation.  Since the investment was structured to repay the loan, the investment you proposed'will not be necessary. In any event, our Constitution. does set forth an investment policy Which would not include the type of investment proposed. Constitutionally, and therefore legally, the SMWIA is unable to provide the monetary assistance MRS Enterprises is seeking.

With respect to the Specialty Agreement (National Siding and Decking Agreement), the General President has the assurances of the business managers of our New England locals and assures you that MRS Enterprises will have full mobility of manpower throughout New England for siding work. The wage structure of the Siding and Decking Agreement will not be revised although target money may be available. The Siding and Decking Agreement will be renegotiated shortly and become effective June 1, 2005. The General President will designate an International employee as the point of contact for MRS Enterprises in New England. Further, the General President agrees with your request that the SMWIA and MRS Enterprises meet on a quarterly basis to discuss current market conditions, trends, competition and upcoming projects in order to develop collectively a strategic plan to secure the sheet metal work.

On prevailing wage work, the carpenters wages are generally below the wages for sheet metal workers throughout the United States. I - am sure that - our local unions - will continue to police prevailing wage projects to be sure that sheet metal wages, are being paid for -sheet metal work. Our, local unions will work with- you on prevailing wage projects within the legal -limits of the law. Ratios are not required unless a particular state prevailing wage law has -established a ratio requirement.

With respect to ratios, MRS Enterprises in retrospect never took advantage of the ratios in the Siding and Decking Agreement to utilize to the fall extent possible specialty workers it could have brought from its own area. This subject should be discussed at our next meeting.

We are aware that there are several major construction managers and general contractors who are signed to the Carpenters in New England. The SMWIA and other trades believe that the Carpenters' subcontracting clause if applied to the entire project is unlawful and subject to legal challenge. The SMVVIA is prepared to take on that challenge given the correct set of facts. The General President's office should be advised if MRS Enterprises is being compelled to use carpenters instead of sheet metal workers for sheet metal work on any project.

The SMWIA does not have a separate job targeting fund. Many of our local unions do have such funds. The business managers of our New England locals have agreed to review the rules of their respective job targeting funds to help MRS Enterprises to compete.

Your points concerning the effects of combining of work into bid packages by construction managers, as well as marketing the benefits of using sheet metal workers on siding, decking and metal roofs, are well taken. Pursuing these points will take time, as you can imagine, but the General President is committed to pursuing them and wishes to discuss these issues at the next quarterly meeting with you.

With respect to ongoing grievances against MRS Enterprises, the business managers agreed at our meeting to place all grievances in abeyance for the time being.

The General President is committed to working diligently with MRS Enterprises and other siding contractors to compete effectively throughout New England. Please advise when you would like to meet in the next quarter, April - June.

Sincerely,


Joseph Nigro
Assistant to the General President


JN/PJR/pas
cc: Michael J. Sullivan, Gen. Pres.
    Thomas J. Kelly, Gen. Sec. Treas.
    Joseph Bergantino, Bus. Mgr., LU 17
    Stephen Quaranto, Bus. Mgr., LU 38
    David A. Roche, Bus. Mgr., LU 40
    Kevin Mulcahy, Bus. Mgr., LU 63

opeiu #2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


M.R.S. ENTERPRISES, INC.               )
      Plaintiff                              )
                                       )
V.                                     )          C.A. NO.  05-CV-10694-JLT
                                       )
SHEET METAL WORKERS'                   )
INTERNATIONAL ASSOCIATION              )
LOCAL 17 - BOSTON, and                 )
SHEET METAL WORKERS'                   )
INTERNATIONAL ASSOCIATION              )
      Defendants                            )


AFFIDAVIT OF ROLAND O. LEVESQUE SR.
IN SUPPORT OF THE PLAINTIFFS'
OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS


I, Roland O. Levesque, Sr., upon oath, depose and state under the penalties of perjury as follows:

1.     I am President of M.R.S. Enterprises, Inc. (M.R.S.) of Plainville, Connecticut and have worked for the company for 20 years.  I have personal knowledge of all of the facts contained in this affidavit and can competently testify to the contents of this affidavit if called as a witness.

2.     M.R.S. was signatory to a collective bargaining agreement with the Sheet Metal Workers' International Association (SMWIA) referred to as the National Siding and Decking Agreement (the Agreement).  M.R.S. was signatory to the agreement through the National Association of Siding and Decking Contractors (NASDC).  M.R.S. terminated its relationship

with the SMWIA at the expiration of the Agreement on May 31, 2005. M.R.S. had been signatory to the Agreement since 1992.

3.    Pursuant to Article I, Section 6 of the Agreement, M.R.S. was signatory to a collective bargaining agreement with Local 40 in Connecticut and Local 17 in Boston, Massachusetts. Article I, Section 6 of the Agreement requires that as a condition of the Agreement, the employer must sign a SMWIA local building trades collective bargaining agreement. A true and correct copy of the Agreement is attached as Exhibit A to the Affidavit of my son, Steven D. Levesque.

4.    M.R.S. contracted to perform the installation of the composition metal panel siding and stud framing for Delta Airlines on its Terminal A project at Logan Airport in Boston, Massachusetts. Again, pursuant to Article I, Section 6 of the Agreement, M.R.S. entered into a written collective bargaining agreement with Sheet Metal Workers Local 17, in Boston. A true and accurate copy of the Local 17 Agreement is attached as Exhibit B to the Affidavit of my son, Steven D. Levesque.

5.    As a result of the failure of both the SMWIA and Local 17 in Boston to supply qualified journeymen, specialty sheet metal workers and specialty trainees to M.R.S. on the Terminal A project, M.R.S. suffered a loss of $3,515,491.

6.    On November 22, 2004, we caused our attorney, Garcia and Milos to file a written request for arbitration with the SMWIA pursuant to Article X, Section 1 of the Agreement. A true and accurate copy of that letter is attached as Exhibit C to the Affidavit of my son, Steven D. Levesque. Article X, Section 1, referred to as Step 1 of the Grievance Procedure, requires that the employer directly involved or his representative meet with the duly authorized representative of the Union to resolve the dispute. Article X, Section 1 does require that a grievance must be filed within 30 days following the occurrence giving rise to the grievance or within 30 days after

first knowledge of the facts giving rise to the grievance. Although M.R.S. continued to work on the Terminal A project until March 2005, it was fully aware of the losses it had incurred by November 22, 2004 and therefore its notice was timely under the contract.

7.      M.R.S. has never received a response, either in writing or orally, from the SMWIA to its November 22, 2004 grievance.

8.      On December 20, 2004, I sent a letter to Michael Sullivan, General President of SMWIA, regarding the failure of the international union to respond to the grievance which our attorney filed on November 22, 2004. In that letter, I also advised General President Sullivan that it was my intention to terminate all of the collective bargaining agreements between M.R.S. and the SMWIA and its local unions on their effective expiration dates.

9.      My son, Steven D. Levesque, telephoned Joseph Nigro, Special Assistant to General President, Michael J. Sullivan sometime after my December 20th letter. During that telephone conversation, Joe Nigro invited us to meet with him and General President Sullivan to discuss whatever issues had caused M.R.S. to send its notice of termination. In response to that invitation, my son Steven Levesque and I traveled to Washington, DC on January 28, 2005 and met with General President Sullivan, Joe Nigro and Rick McClees. I personally prepared an agenda of the topics which I wanted to discuss with the international union representatives and which, if not addressed by the union, would result in a termination of our relationship. I included eight topics with subheadings that I believed were critical to the ability of M.R.S. to continue to perform siding and decking work with sheet metal workers. Item 7 referred to the Terminal A project in Boston which, as I referred to on the agenda, "Should have been the poster project for the SMWIA to demonstrate their core competency in performing this type of work." Of the nine

sub-topics under Delta Project, only two dealt with the grievance and monetary loss to M.R.S. The other seven referred to the lack of training by the SMWIA of its own sheet metal workers.

10.     After the meeting was concluded, my son Steven sent ten e-mails between February 1 and March 4, 2005 requesting a response to the items discussed at the January 28th meeting. Finally, on March 2, 2005, we received a letter from Joe Nigro addressing most, if not all, of the items contained on the January 28th agenda and advising us that the union would not pay any monetary damages to M.R.S. for losses it incurred on the Terminal A project.  A true and accurate copy of that letter is attached to the Affidavit of Steven D. Levesque as Exhibit G.  The March 2, 2005 letter from Joe Nigro never referred to any level of the grievance procedure contained in Article X, Section 1 of the Agreement.

11.     As of the January 28th meeting, several grievances had been filed against M.R.S. by Locals 40, 38 and 63 seeking back pay awards because M.R.S. had utilized carpenters to install the composition metal panel siding that the sheet metal workers are not capable of installing. M.R.S. also has a collective bargaining agreement with the New England Regional Council of Carpenters covering all six New England states.

12.     As I stated in my December 20, 2004 letter to General President Sullivan, I sent written notices of termination in December 2004 which was more than 150 days prior to the expiration of the Agreement on May 31, 2005 and the Local 40 Agreement in Connecticut on June 30, 2005 as required by the terms of both collective bargaining agreements.

13.     Step 2 of the Grievance Procedure, Article X, Section 1 of the Agreement, requires a hearing before the Siding and Decking Grievance Panel which is comprised of two members, one appointed by NASDC and one appointed by the SMWIA.  If no decision is reached before the Siding and Decking Grievance Panel, either party may appeal to the Siding and Decking

Arbitration Board which is comprised of three members appointed by NASDC and three members appointed by SMWIA. Because the SMWIA did not respond to my Step 1 request in November 2004, I had no reason to believe that the SMWIA would respond to the Step 2 procedure. The last step of the grievance procedure before the Siding and Decking Arbitration Panel would put M.R.S. before General President Sullivan and two other representatives of the SMWIA to sit in judgment on my grievance. In addition, I had already sent written notice of my intent to terminate our contracts with the sheet metal workers so I believe there was absolutely no chance that M.R.S. would get a fair hearing before the Siding and Decking Arbitration Panel on its composition metal panel siding grievance at the Terminal A project.

14.     Since the filing of this litigation, my concerns about M.R.S. not receiving a fair hearing have been confirmed. Local 40 grieved the termination of the collective bargaining agreement and M.R.S. was summoned to the National Joint Adjustment Board (NJAB) as provided in the Local 40 collective bargaining agreement. As I previously stated, M.R.S. complied with the terms and conditions of the collective bargaining agreement by giving its notice of termination 150 days prior to the contract's expiration. The agreement between M.R.S. and Local 40 was a Section 8(f) pre-hire agreement so my notice also complied with federal labor law. A memorandum of law to that effect prepared by my counsel is attached to this Affidavit as Exhibit A. I attended the hearing before the NJAB accompanied by counsel on Monday, June 27th. As I expected, three representatives of the  Sheet Metal  and Air Conditioning Contractors Association of North America (SMACNA) and General President Sullivan along with two other representatives of SMWIA presided over the hearing. The only questions asked of me from the SMACNA representatives was what other collective bargaining agreements M.R.S. had with other building trades unions. Despite the fact that I terminated the agreement according to its

terms, and according to federal labor law, I received a decision from the NJAB on Tuesday, July 5th that ordered M.R.S. to execute a collective bargaining agreement with Local 40. As far as the NJAB is concerned, M.R.S. will never be able to terminate its relationship with any sheet metal workers local union because it has already rejected the attempt by M.R.S. to terminate the contract according to its terms and conditions and federal labor law.

15.    I fully expect that pursuing the Terminal A grievance all the way to the Siding and Decking Arbitration Panel will result in the same sort of biased opinion that M.R.S. received from the NJAB on the termination grievance.

I swear under the penalties of perjury that the foregoing is true and accurate.

_____
Roland O. Levesque, Sr. President
M.R.S. Enterprises, Inc.


Dated:  July __, 2005

NATIONAL JOINT ADJUSTMENT BOARD
FOR THE SHEET METAL INDUSTRY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE MATTER OF                                    \*
                                                   \*
M.R.S. ENTERPRISES, INC.                           \*
                                                   \*
AND                                                \*
                                                   \*
SHEET METAL WORKERS' INTERNATIONAL                 \*
UNION LOCAL NO. 40                                 \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MEMORANDUM OF M.R.S. ENTERPRISES, INC.

M.R.S. Enterprises, Inc. herewith responds to the submission of Sheet Metal Workers'
International Association Local 40 (Local 40) pursuant to Article X, Section 8, of the expiring
collective bargaining agreement alleging an impasse in negotiations.

FACTS

M.R.S. Enterprises, Inc. (M.R.S.) became signatory to the National Siding and Decking
Agreement on or about 1987.  At approximately the same time, M.R.S. joined the National
Siding and Decking Contractors Association (NASDC).  M.R.S. is engaged solely in the erection
of composite metal panels and other siding and decking work.  M.R.S. does not perform heating,
ventilating and air conditioning work, or other sheet metal work contained in the jurisdictional

claims of the sheet metal worker. For several years, M.R.S. was signatory to only the National Siding and Decking Agreement and was not signatory to any sheet metal worker local agreement. Approximately seven years ago, M.R.S. executed a collective bargaining agreement with Local 40 in Connecticut and four years ago executed a collective bargaining agreement with Local 17 in Massachusetts. The only reason for executing the local agreements was that it was a requirement for being signatory to the National Siding and Decking Agreement. M.R.S. executed the Local 17-Massachusetts Agreement because it had work at Logan Airport. At no time did M.R.S. ever belong to the Associated Sheet Metal and Roofing Contractors of Connecticut (ASMRCC) or the Sheet Metal and Air Conditioning Contractors of North American, Boston Chapter (SMACNA). M.R.S. always negotiated its National Siding and Decking Agreement through NASDC. Because M.R.S. is a siding contractor, it never participated in any negotiations with either Local 40 or Local 17 over the terms and conditions of the local sheet metal worker agreements. M.R.S. also never gave its bargaining rights to either ASMRCC or SMACNA. In fact, the Local 40 Agreement which expires on June 30, 2005 was never signed by any representative of M.R.S. and M.R.S. was not included as a member of ASMRCC for collective bargaining purposes. There does not exist, therefore, a signed collective bargaining agreement between M.R.S. and Local 40. Copies of the unsigned signature pages are attached hereto as Exhibit A.

On December 20, 2004, M.R.S. notified General President, Michael Sullivan, of the Sheet Metal Workers' International Association (SMWIA) that it was giving notice pursuant to Article VIII, Section 4 of the National Siding and Decking Agreement that it was terminating that agreement upon its expiration in May 2005. By letter of the same date, M.R.S. notified NASDC that it was terminating the agreement with the SMWIA. By letters dated December 22,

2004, M.R.S. notified Mr. David Roche, Business Manager of Local 40 that it was terminating the Local 40 Agreement pursuant to Article XV upon its expiration on June 30, 2005 and notified Mr. Joseph Bergantino, Business Manager for Local 17 that it was terminating its agreement with Local 17 effective upon its expiration date of June 30, 2005.  Copies of all notification letters are attached to this Memorandum as Exhibit B.  Whatever negotiations have taken place between ASMRCC and Local 40, have taken place without the participation of M.R.S.  As was its practice over the past 18 years, M.R.S. has never participated in collective bargaining for the local sheet metal worker contracts in any state where it has performed siding and decking work.  Over the course of its 18 years as a signatory to both the Siding and Decking Agreement and the Local 40 and Local 17 Agreements, M.R.S. has always hired its sheet metal workers directly, trained them to perform siding and decking work and then obtained membership in the Sheet Metal Workers Local for those employees.  Very seldom, if at all, did Local 40 ever refer sheet metal workers to M.R.S. to perform siding and decking work.  It is also a fact that Local 40 has never trained any of the sheet metal workers employed by M.R.S. who install composition metal panel materials.

<u>ARGUMENT</u>

It is the position of M.R.S. that it has properly terminated its Section 8(f) agreement with Local 40 pursuant to the decision in <u>John Deklewa & Sons</u>, 282 NLRB 1375 (1987), 843 F. 2d 770 (3rd Cir. 1988) and subsequent decisions affirming Deklewa, specifically <u>James Luterbach Construction</u>, 315 NLRB No. 147 (1994) and <u>Haas Electric v. NLRB</u>, 299 F.3d 23 (1st Cir. 2002).  Deklewa made it abundantly clear that Section 8(f) agreements may be terminated at their expiration and that the employer has no obligation to bargain with the union after termination. Luterbach, Haas and other cases since Deklewa have dealt with the timeliness of the

notice of termination to the union and to any multi-employer association bargaining on behalf of the terminating employer. The case law is also abundantly clear that the employer cannot terminate during the term of the contract or while a successor is being negotiated by the multi-employer group to which it has given its bargaining rights or after the successor agreement has been executed. See <u>Twin City Garage Door Co.,</u> 297 NLRB 119 (1989), <u>Reliable Electric Co.</u> 286 NLRB 834 (1987) and <u>Kephart Plumbing</u> 285 NLRB 612 (1987). (The employers attempted to repudiate after contract was negotiated and ratified.)

In this case the union was aware that M.R.S. was not represented by the ASMRCC group from the very outset of negotiations because the company name was not included in the list of employers represented by ASMRCC. The question now becomes what obligation did M.R.S. have to negotiate with Local 40? Since the agreement was a Section 8(f) one, M.R.S. could terminate it at its expiration and have no further obligation to the union. I submit that the termination of the Local 40 agreement by the December 22, 2004 letter was timely and comes within the circuit courts of appeals decisions in Deklewa and Haas Electric, supra. When M.R.S. terminated its Section 8(f) relationship with Local 40 on December 22, 2004, the contract was to expire on June 30, 2005. The notice was unequivocal and was sent more than 150 days prior to the contract expiration as required by Article XV, Section 5. Under the Agreement and the First Circuit decision in Haas Electric, supra, the notice to the union was timely. Furthermore, unlike the facts in Haas, M.R.S. did nothing inconsistent with its intention to terminate it relationship with the union as outlined in the notice. No one from M.R.S. participated in any of the negotiating sessions from beginning to end. The facts in this case are better than the ones in Haas.

In Luterbach, supra, the Board applied a two-part test to determine, in the Section 8(f), multi-employer bargaining context, whether or not the withdrawing employer has "…recommitted to the union that it will be bound by… the multi-employer negotiations." M.R.S. does not qualify under either part of the test.  It was not part of the multi-employer group when the negotiations commenced and the union was aware of that fact.  Representatives of M.R.S. never participated in or were present at any Local 40 negotiations.  Since the answer to the first part of the Luterbach test is not in the affirmative, the Board will not even look to the second part of the test, whether M.R.S. made a distinct affirmative action to recommit to the union that it would be bound to whatever was negotiated by the ASMRCC group. The only affirmative action that M.R.S. took was to terminate its Section 8(f) relationship with Local 40 in a timely manner and according to the collective bargaining agreement.

M.R.S. never gave any notice to ASMRCC because it was never a member of the association and had never designated the association as its collective bargaining representative. While the Local 40 Agreement provides in Article XV, Section 5, that any employer who executes the Agreement automatically designates the ASMRCC as its bargaining agent, M.R.S. already had a collective bargaining agent, NASDC.  As a siding and decking contractor, M.R.S. is more closely aligned with the contractors throughout the United States who belong to the National Siding and Decking Contractors Association and who negotiate directly with the SMWIA in Washington, DC for a national agreement.  These national siding contractors are only signatory to local sheet metal worker agreements because they are required to do so pursuant to the National Siding and Decking Agreement and to have a resource for journeymen sheet metal workers to work in a ratio with the specialty sheet metal workers employed by M.R.S.   M.R.S. fulfilled its legal and contractual obligations with respect to notice when it sent letters dated

December 20, 2004 to the International President and NASDC and when on December 22, 2004 it sent letters of termination to the Business Managers for Local 40 and Local 17.  M.R.S. had no obligation to send any notice to ASMRCC, although on February 7, 2005 it notified ASMRCC that it did not recognize it as an association representing it or as a procedure for the settlement of grievances because the grievance that had arisen should have been resolved pursuant to the National Siding and Decking Agreement and not the Local 40 Agreement.  A copy of the February 7, 2005 letter is also attached hereto as Exhibit C.

The position of M.R.S. relies heavily upon the fact that the contract is a Section 8(f) pre-hire agreement.  The language of the agreement corroborates this fact because there is no Section 9(a) recognition clause in the agreement which expires on June 30th and Local 40 has as one of its proposals for the successor agreement to the present one the inclusion of Section 9(a) recognition language.  Pursuant to the case law stated above, the collective bargaining agreement between M.R.S. and Local 40 as well as the National Siding and Decking Agreement constitute Section 8(f) pre-hire agreements which may be terminated by either side at their expiration with no continuing obligation to negotiate.

<u>CONCLUSION</u>

M.R.S. respectfully suggests that it complied with Federal Labor Law and the terms and conditions of the National Siding and Decking Agreement and the collective bargaining agreement with Local 40 with respect to the termination procedure and that because all the contracts are Section 8(f) pre-hire agreements, M.R.S. has no duty to negotiate with Local 40 after the contract expires on June 30, 2005.  As a result of the Section 8(f) pre-hire status of this agreement, M.R.S. cannot be required to arbitrate before the National Joint Adjustment Board

pursuant to Article X, Section 8, its decision to terminate the collective bargaining agreement

upon its expiration.

                                          M.R.S. ENTERPRISES, INC.
                                          By its attorney,


DATED: June 23, 2005                      _____
                                          James F. Grosso
                                          O'Reilly, Grosso & Gross, P.C.
                                          1671 Worcester Road, Suite 205
                                          Framingham, MA 01701-5400
                                          Tel:  508/620-0055
                                          Fax: 508/620-7655