UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

M.R.S. ENTERPRISES, INC. )
  Plaintiff )
  )
V. )  C.A. NO.  05-CV-10694-JLT
  )
SHEET METAL WORKERS' )
INTERNATIONAL ASSOCIATION )
LOCAL 17 - BOSTON, and )
SHEET METAL WORKERS' )
INTERNATIONAL ASSOCIATION )
  Defendants )

PLAINTIFF, M.R.S. ENTERPRISES, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO REMOVE THE STAY AND
VACATE THE ARBITRATION AWARD

INTRODUCTION

This action originated with a Complaint being filed in April 2005 by the Plaintiff, M.R.S.

Enterprises, Inc. (M.R.S.) against the Sheet Metal Workers' International Association (SMWIA)

and its affiliated local in Boston, Local 17 (Local 17) (together the Union).  The Complaint was

for a breach of the collective bargaining agreement between M.R.S. and the Union and for

money damages resulting from that breach.  Although the collective bargaining agreement

contained an arbitration clause, M.R.S. contended that the Union had waived its right to

arbitration by refusing to proceed after Step 1.

After denying the Defendants' Motion to Dismiss, the Court then allowed a Motion filed

by the Union to Stay this action and to refer the parties to arbitration pursuant to the collective

bargaining agreement.  The arbitration took place on August 16 and 17, 2006 in Boston before

the Siding and Decking Grievance Panel as provided by the agreement.  After post hearing briefs

were filed by all parties on October 31, 2006, the Siding and Decking Grievance Panel requested that the parties provide supplemental briefs addressing the issue of the timeliness of the grievance.

Supplemental briefs were filed on December 8, 2006 and on January 16, 2007 the Siding and Decking Grievance Panel issued its decision denying the grievance of M.R.S. on the grounds that it was not filed within 30 days of the occurrence of the dispute which gave rise to the grievance as required by the collective bargaining agreement. A true and accurate copy of the Siding and Decking Grievance Panel Award is attached hereto as Exhibit A.  M.R.S. herewith files a Motion to Remove the Stay Order issued by this Court on January 18, 2006 and to Vacate the Arbitration Award along with this Memorandum of Law in Support Thereof.

<u>BRIEF STATEMENT OF THE FACTS</u>

*(Because the facts have been presented to the court by both parties several times with supporting affidavits and references to the record, MRS will provide a very brief summary of the facts here)*

A.    <u>The Parties and Their Collective Bargaining Relationship</u>

M.R.S. was signatory to a collective bargaining agreement with the SMWIA known as the National Siding and Decking Agreement ("the Agreement") effective from January 1, 2000 to May 31, 2005.  (Complaint ¶7)  (A true copy of "the Agreement" was attached as Exhibit A to the Affidavit of Steven D. Levesque which was attached to the Complaint as Exhibit 1.)  M.R.S. was also signatory to a collective bargaining agreement with Local 17 in Boston which was effective from August 1, 2001 to July 31, 2005.  (Complaint ¶8)  (A true and accurate copy of the Local 17 Agreement was attached as Exhibit B to the Affidavit of Steven D. Levesque which was attached to the Complaint as Exhibit 1).   Both agreements contain similar grievance/arbitration procedures involving three steps with the final step in each procedure resulting in a hearing before either the Siding and Decking Arbitration Board or the National

Joint Adjustment Board. Both are comprised of three representatives of employers signatory to a Sheet Metal Workers agreement and three union officials appointed by the SMWIA. (Complaint ¶24)  Article X, Section 1 of "the Agreement" provides, however, that "The grievance procedures of the National Siding and Decking Agreement are the sole and exclusive remedy for any asserted breaches of this Agreement and supersede the grievance procedures of any other collective bargaining agreement that the Employer is signatory."  Since the M.R.S. project at Terminal A in Boston was performed pursuant to "the Agreement", any grievances arising on the project had to be processed through "the Agreement" arbitration machinery and not through any arbitration provision in the Local 17 Agreement.

On April 8, 2003, Roland O. Levesque and Steven D. Levesque of M.R.S. met with representatives of Crown Corp., to whom M.R.S. was a subcontractor, Anthony Asher, attorney for the National Siding and Decking Association, Joseph Nigro, Assistant to the President of the International, Michael J. Sullivan, President of the International Union, and Joseph Bergantino, Business Manager for Local 17.  The meeting took place in Washington, DC and was held for the purpose of discussing the Terminal A project of M.R.S.  (Complaint ¶10)  (See also Affidavit of Roland O. Levesque which was attached to the Complaint as Exhibit 2).  At that April 8, 2003 meeting, all parties agreed that M.R.S. would install the composition metal panel siding system required on the Terminal A project pursuant to "the Agreement" and that Local 17 was prepared to supply specialty sheet metal workers and specialty trainees who had the requisite skills and competency to install the metal panel siding system on the project.  (Complaint ¶11)  (See Exhibit 2, the Affidavit of Roland O. Levesque attached to the Complaint)

B.      "The Agreement"

The full text of Article X provides as follows:

ARTICLE X

The Union and the Employer, whether party to this Agreement independently or as a member of a multi-employer bargaining unit, agree to utilize and be bound by this Article. The grievance procedures of the National Siding and Decking Agreement are the sole and exclusive remedy for any asserted breaches of this Agreement and supersede the grievance procedures of any other collective bargaining agreement that the Employer is signatory.

SECTION 1. Step 1. Grievances of the Employer or the Union, arising out of the interpretation or enforcement of this Agreement, shall be settled between the Employer directly involved and the duly authorized representative of the Union, if possible. Both parties may participate in conferences through representatives of their choice.

To be valid, grievances must be raised within thirty (30) calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within thirty (30) calendar days of the first knowledge of the facts giving rise to the grievance.

SECTION 2. Step 2. Grievances not disposed of under the procedure described in Section 1 of this Article may be appealed jointly or by either party to the Siding and Decking Grievance Panel ("Grievance Panel"). Duplicate copies of the appeal shall be mailed to the following addresses: Siding and Decking Grievance Panel, 25800 Northwestern Highway, Suite 1000, Southfield, Michigan 48075 and Sheet Metal Workers International Association, Jurisdictional Department, 1750 New York Avenue, N.W., Washington, D.C. 20006. The Grievance Panel shall be composed of two (2) members, one (1) of which shall be appointed by the General President of the Sheet Metal Workers International Association and one (1) of which shall be appointed by the National Association of Siding and Decking Contractors. Both sides shall have equal voting power. The Grievance Panel shall meet promptly but in no event more than fourteen (14) calendar days following receipt of such appeal, unless such time is extended by mutual agreement of the Grievance Panel.
The Grievance Panel is empowered to render such decisions and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation. Except in the case of deadlock, the decision of the Grievance Panel shall be final and binding.

SECTION 3. Step 3. Grievances not settled as provided in Section 2 of this Article may be appealed jointly or by either party to the Siding and Decking Arbitration Board ("Arbitration Board"). The Arbitration Board shall consist of three (3) members appointed by the Union and three (3) members appointed by the Association. Submissions shall be made and decisions rendered under such procedures as may be prescribed by such Board. Appeals to the Arbitration Board shall be submitted within thirty (30) days after termination of the

procedures described in Section 2 of this Article.  The decision of the Arbitration Board shall be final and binding.

C.    <u>Demand for Arbitration</u>

On November 22, 2004, M.R.S. through its former counsel, Garcia and Milas, sent a letter to Michael J. Sullivan, President of the SMWIA, demanding arbitration for breach of the collective bargaining agreement by the Union on the Terminal A project.  The letter specifically requested that the parties proceed to Step 1 of the Grievance/Arbitration Procedure contained in Article X, Section 1 of "the Agreement".  (See Exhibit C to Exhibit 1, the Affidavit of Steven D. Levesque attached to the Complaint).

The parties met at the offices of the SMWIA in Washington, DC on January 28, 2005 to respond to the statements made by M.R.S. in a December 20, 2004 letter notifying the SMWIA that M.R.S. would be terminating its agreements with the SMWIA and all of its local affiliated unions upon the expiration of the individual contracts and to discuss the monetary damages suffered by M.R.S. at the Terminal A project in Boston. (See Exhibit E to Exhibit 1, the Affidavit of Steven D. Levesque attached to the Complaint).   Joseph Nigro sent a written response dated March 2, 2005 dealing with most of the issues raised at the January 28th meeting and formally rejecting any claim for money damages by M.R.S. for the Terminal A project.  The letter from Joe Nigro was received almost four months after the grievance demand was made by M.R.S. on November 22, 2004.

M.R.S. filed the Complaint in this action on April 7, 2005 and after denying the Defendants" Joint Motion to Dismiss, this Court allowed the Defendants' Motion to Stay and ordered the parties to arbitration. The matter was arbitrated before the Siding and Decking Grievance Panel on August 16 and 17, 2006. On January 16, 2007, the panel issued its decision, denying the grievance on the basis that it was not timely filed.

- 5 -

<u>ARGUMENT</u>

**A.    The Defendants Waived the Issue of Timeliness of the Grievance**

At the Step 1 meeting in Washington, D.C., neither the SMWIA nor Local 17 raised the issue of the timeliness of the M.R.S. grievance. By not raising it at the first level of the grievance/arbitration procedure, the Union has waived the defense. "...*in order to be entitled to present the issue of the timeliness of a grievance to an arbitrator, the issue must have been legitimately raised by the Union so that there is a bona fide procedural timeliness question to be determined by the arbitrator.*" <u>United Steelworkers of America, AFL-CIO-CLC, et al v. Cherokee Electric Cooperative</u> 1987 U.S. Dist. Lexis 13344, 127 L.R.R.M. 2375 (U.S.D.C.N.D. AL) During the two days of arbitration in the Step 2 procedure, no evidence was presented by the Union regarding the timeliness, or lack thereof, of the grievance except for a passing comment by the attorney for the SMWIA in his opening statement.  During the two days of arbitration, all the evidence presented by M.R.S. and all of the defenses presented by the Defendants involved the skill level of the manpower supplied by the Sheet Metal Workers and the damages caused to M.R.S.  (A complete transcript of the two days of hearings is attached hereto as Exhibit B. All references in this memorandum to the transcript will be listed as Tr. p. # )

The Union also waived its right to claim timeliness of the grievance when it filed its Motion to Stay the Proceedings in this Court and to refer the matter to the "live" arbitration.  The SMWIA specifically argued to this Court in its Memorandum in Support of its Motion to Stay that:  ". . . the Court may not similarly defer a stay motion while a live arbitration is pending.  Now that the International Union has taken the initiative to move the grievance forward to Step 2, arbitration is not really a defense, but an ongoing proceeding before the National Siding and Decking Grievance Panel." (SMWIA Motion to Stay, p.6, Par. B.)  Further in its memorandum,

the SMWIA stated: "All parties agree that the Employer initiated a Step 1 grievance under Article X, Section I of the Agreement on November 22, 2004 . . . All parties agree that the International Union met with M.R.S. to discuss the damages demand on January 28, 2005, with follow-up correspondence over the following month fleshing out the Employer's $3,500,000 claim and asking for the Union's initial 'formal response'." (SMWIA Motion to Stay, p.7, Par. C. 1)  The SMWIA then acknowledged "Any grievance that has not been settled at Step 1 may be appealed jointly or by either party to the Siding and Decking Grievance Panel."  "Step 1 provides no time limits, and requires no formal structure for settlement discussions." (SMWIA Motion to Stay, p.8, Par. C. 1).

Lastly the SMWIA stated in its memorandum that: "The International Union's current invocation of Step 2 moots any argument that it has been too passive until now." (SMWIA Motion to Stay, p.9)   The SMWIA could and should have raised the timeliness defense at Step 1 of the procedure. It did not. The Union also never raised the defense in either its Motion to Dismiss or its Motion to Stay.  It is disingenuous for the Union to raise it at this time especially after convincing this Court that the matter was arbitrable and the dispute should be determined by the arbitration panel.   Since the SMWIA and Local 17 never raised the issue of the timeliness of the grievance, either at the first step of the arbitration procedure or before this court, they have waived that defense.

**B.    The Arbitrators' Exceeded their Authority by Deciding that the Grievance was not Timely Because that Issue was Not Before Them**

There was no evidence presented during the two days of hearings dealing with the timeliness of the grievance.  The attorney for the SMWIA mentioned in his opening argument that M.R.S. had "sat on its rights".  That was the only mention of any timeliness argument.  The transcript is devoid of any evidence regarding the timeliness of the filing of the grievance.  By

refusing to address the evidence that was presented at the hearing and, instead, by finding that the grievance was not timely, the Arbitrators exceeded their authority by deciding an issue that was not presented to them.  See Limbach v. Sheet Metal Workers International Association, 619 F. Supp 1073, 1078-1080,*"The issue of invalidity of the 1984 agreement, however, was not submitted for arbitration at any time. Thus, the NJAB exceeded the jurisdiction granted to it by the 1984 agreement in deciding the issue of invalidity."*

In this case, the arbitrators specifically asked all of the parties, at the outset of the proceedings on day one, if there were any procedural issues before them and whether or not the parties had agreed to submit their grievance to the National Siding and Decking Grievance Panel. (Tr. p.6)  All of the parties stated that they had agreed to submit the dispute to the panel. (Tr. p. 21)  Never did either the SMWIA or Local 17 raise the issue of the timeliness of the filing of the grievance by M.R.S. on November 22, 2004. *"While an arbitrator has broad power to fashion remedies on the issues the parties have empowered him to resolve,...he lacks authority to decide questions the parties have not agreed to submit to him."* Courier-Citizen v. Boston Electrotypers Union No.11, 702 F. 2d 273, 281 (1st Cir. 1983). *"...the agreement by which these parties contracted to settle such disputes explicitly provides that 'the decision of the arbitrators shall be specifically limited to the matter submitted to him'".* Delta Airlines, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local 85  409 F. Supp. 873, 875.

Moreover, neither the SMWIA nor Local 17 raised the issue of the 30-day limitation for filing a grievance at the Step 1 procedure which occurred in Washington, D.C. in January, 2005. *"Issues not raised at the initial stage of the grievance procedure could not, without consent of all the parties, be properly decided at a later stage."* International Union of Electrical, Radio, Machine Workers, AFL-CIO v. General Electric Co., 429 F. 2d 412, 413 (1st Cir. 1970).

Finally, the Federal Arbitration Act, 9 U.S.C. Sec. 10(d) provides for setting aside an arbitration award if the arbitrators exceeded their power by deciding an issue not submitted to them. See Western Electric Incorporated v. Communication Workers of America, AFL-CIO, 450 F. Supp. 876, 881 (E.D.N.Y.) *"The powers of an arbitrator are defined by agreement of the parties: the question they submit both establishes and limits the arbitrator's jurisdiction."*

This Court may vacate the award of the arbitrators in this case because the arbitration panel exceeded its authority in ruling on an issue that was not presented to them. *"The courts are precluded from considering factual or legal issues which are, by voluntary agreement, made the subject of arbitration. Judicial intrusion is restricted to extraordinary situations indicating abuse of arbitral power or exercise of power beyond the jurisdiction of the arbitrator."* Mobil Oil Corporation v. Local 8-766, Oil, Chemical & Atomic Workers International Union, 600 F. 2d 322, 326 (1st Cir. 1979).  As this Court stated in Limbach, *supra,* at p.1079, "This is such an extraordinary situation."

**D.    The Grievance was Timely Filed**

M.R.S. initiated its grievance by sending the letter dated November 22, 2004.  At that time the project was nearly completed.  The grievance was for breach of contract and money damages incurred by M.R.S. on the Terminal A project at Logan Airport.  Until the job was completed, M.R.S. could not know the amount of its damages and therefore any grievance prior to that time would have been premature.  In the case of Berklee College of Music v. Berklee Chapter of the Massachusetts Federation of Teachers Local 4412, AFT,AFL-CIO, 858 F. 2d. 31 (1st Cir 1988) the Court of Appeals reversed a District Court Order vacating an arbitration award on the basis of timeliness.  The Court stated, "… *the contract rule in question concerns procedural time limits, and the Supreme Court has recently reiterated that 'rules of procedure*

*should be liberally construed and . . . 'mere technicalities' should not stand in the way of consideration of a case on its merits.' "* at p.33.

M.R.S. had been complaining about the quality of the sheet metal workers being referred to it by Local 17 for the entire job. M.R.S. hired and fired almost 134 Local 17 members and Local 17 continued to send more unqualified people to the job (Tr. pp.229-232). A grievance regarding the skill level of the referrals during the project would have been futile, since Local 17 did not have members skilled in siding and decking work. Joe Bergantino, the Business Manager of Local 17 at the time, also testified that he would not permit M.R.S. to utilize carpenters to augment its crews (Tr. pp.216-217). M.R.S. had no option, but to complete the project and then proceed against the Union for money damages. The filing of the grievance seeking money damages on November 22, 2004 was timely.

The contract provision regarding the 30-day time limit for filing grievances permits the grievant 30 days from the time the occurrence is first ascertainable to file the grievance if it was not ascertainable. The money damages for M.R.S. could not have been ascertainable until the job was completed or almost completed. That time period was on or about November 2004. The filing of the grievance was timely even by the standards of the contract procedure.

### E.    There was Evident Partiality of the Arbitrators

At the outset of the hearing, M.R.S. challenged the partiality of Arbitrator Dean Ball who was appointed by the Defendant, SMWIA. When pressed regarding the number of times he found in favor of a contractor as a Siding and Decking Grievance Panel member, Arbitrator Ball refused to answer. As it turns out, even the Arbitrator appointed by the National Siding and Decking Association, Michael Asher, is the son of Anthony Asher who participated with the SMWIA in forcing M.R.S. to utilize Sheet Metal Workers from Local 17 on the Terminal A

Delta Airlines project.  *". . . it is not too much to expect an arbitrator to be able to put aside any personal inclinations and stand between the parties with an open mind."*  Elkouri and Elkouri How Arbitration Works, 6th Edition, Chapter 4.9C, page 182, 2003.  An arbitration award may be vacated if there is "evident partiality" of the arbitrator.  Pitta v. Hotel Association of New York City, Inc. 806 Fd. 2d. 419, 424 note 2 (1986).  The Uniform Arbitration Act also provides that an arbitration award may be vacated if there is evident partiality of the arbitrator.  9 USC §10(b) *"Congress vested the federal courts with the power to vacate an arbitration award where there was evident partiality in the arbitrators."*  Crow Construction Company v. Jeffrey M. Brown Associates Inc., 264 F. Supp. 2d. 217,220. See also Commonwealth Coatings Corp. v. Continental Casualty Company, 393 US 145 (1968).

## CONCLUSION

The Court should remove the stay it issued pending the outcome of the arbitration and vacate the award of the Siding and Decking Grievance Panel based on the cases cited herein and the arguments made.

M.R.S. ENTERPRISES, INC.
By its attorney,


DATED:  February 15, 2007          _____/s/ *James F. Grosso*_____
                                    James F. Grosso – BBO 213320
                                    O'Reilly, Grosso & Gross, P.C.
                                    1671 Worcester Road, Suite 205
                                    Framingham, MA 01701-5400
                                    Tel:  508/620-0055
                                    Fax:  508/620-7655

EXHIBIT A

**DECISION OF THE ARBITRATION PANEL**

| | |
|---|---|
| Grievant: | MRS Enterprises |
| Respondents: | Sheet Metal Workers International Association and Sheet Metal Workers Local No. 17 |
| Step II Hearing: | August 16-17, 2006 |
| Post Hearing Briefs: | Filed October 31, 2006 |
| Supplemental Briefs: | Filed December 8, 2006 |

This grievance concerns work performed by MRS Enterprises ("MRS") at the Delta Terminal A Project at Boston's Logan Airport which began in the fall of 2003. The Grievant alleges violation of Article IV, Section 1 of the National Siding & Decking Agreement for failure to provide sufficient skilled workmen.[1] MRS contends it suffered damages in the amount of $3,180,779 as a result of the alleged breach by the unions.

Following the Step II hearing and the parties' post-hearing briefs, the arbitration panel gave the parties a final opportunity to address Article X, Section 1, which requires that "to be valid, grievances must be raised within 30 calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within 30 calendar days of the first knowledge of the facts giving rise to the grievance."

For the reasons set forth below, it is the unanimous decision of the grievance panel that this grievance be denied because it is untimely. The decision is reached without resort to the Respondents' arguments; the evidence submitted by MRS is conclusive on this issue.

Roland Levesque is the owner of MRS. He testified as follows:

> ➤ MRS began construction on August 1, 2003 and completed its work by December 2004, including punch list items (Volume 1, page 67, 74-75).[2]
> ➤ He knew in October 2003 that MRS was not getting an adequate supply of skilled labor and, as a consequence, was suffering increased labor costs (Volume 1, page 133-134).
> ➤ MRS filed its grievance on November 22, 2004.

---

[1] Local 17 contests the authority of this panel to render a decision against it because it was not named as a party in the Step I grievance. For the reasons set forth below, it is not necessary to reach a decision on this or several other issues raised at the hearing.

[2] MRS did "extra" work through March 2005, but this was not part of the Terminal A Project at issue.

The alleged violations were resolved long before October 23, 2004 (30 days before November 22, 2004). The following witnesses, presented by MRS, all indicated that the staffing and related damage occurred essentially in the fall of 2003 through January-February 2004: Roland Levesque (Volume I, page 140-142); Venance Lafrancois, Peter Johnson of Skanska, Scott D'Angelo of MRS, and John Pickford of Crown Corr. MRS's own summary of damages, Employer Exhibit 9, is dated October 25, 2004. As MRS's own counsel stated at the hearing, "the violations and damage had to be at least before October."

Thus, MRS did not file the grievance within 30 days of the violation.

MRS argues, however, that its grievance should not be barred for the following reasons:

1.  That it did not have to file the grievance until the job was completed in March 2005 or 30 days after the base contract was finished in December 2004.

2.  The "critical fact" is that the union accepted MRS's November 22, 2004 letter as "initiation of the grievance."

3.  There are no time limits between Step I and Step II of the grievance procedure.

4.  The unions are estopped from raising the issue because they filed a motion in federal court requesting the complaint be stayed so the parties could continue the arbitration.

MRS's arguments are not persuasive. First, the project's completion date is irrelevant. Second, the union's acceptance of the November 22nd letter is not "critical" to the issue in any manner nor has MRS offered any rationale to support this assertion. Third, while there are no time limits between Step I and Step II, the period at issue is the delay in filing the Step I grievance, not the period between Step I and Step II. Fourth, the proceedings before the U.S. District Court did not address, let alone have any bearing, on whether MRS timely filed its grievance within 30 days of its knowledge of the alleged contract violation.

Article X, Section 2 states that "the grievance panel is empowered to render such decision and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation. Except in the case of deadlock, the decision of the grievance panel shall be final and binding."

It is the decision of this grievance panel that the grievance filed by MRS is denied for the reasons set forth above.

_Dean Ball_
Dean Ball
W0502796

Michael J. Asher

2

                        EXHIBIT B                            1

1                  Volume 1, Pages 1-299

2

3

4
        IN THE MATTER OF:
5
               M.R.S. ENTERPRISES, INC.
6
                      and
7
               SHEET METAL WORKERS' INTERNATIONAL
8               ASSOCIATION LOCAL 17 - BOSTON

9                      and

10              SHEET METAL WORKERS' INTERNATIONAL
                ASSOCIATION
11

12                  ***********************
13

14
                   Wednesday, August 16, 2006
15                       9:25 a.m.

16              Hilton Hotel at Logan Airport
                      Harborside Drive
17                  Boston, Massachusetts

18

19                  ***********************

20

21              FLYNN REPORTING ASSOCIATES
                    One Exchange Place
22              Worcester, Massachusetts 01608
                (508) 755-1303 * (617) 536-2727
23                TOLL FREE: (888) 244-8858

24

FLYNN REPORTING ASSOCIATES

2

```
 1    APPEARANCES:

 2         Michael J. Asher, Esq., Arbitrator
           SULLIVAN, WARD, ASHER & PATTON, P.C.
 3         1000 MacCabees Center
           25800 Northwestern Highway
 4         Southfield, Michigan 48075-1000

 5
           H. Dean Ball, Arbitrator
 6         SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION
           9939 Chestnut Ridge Road
 7         Heiskell, Tennessee  37754

 8
           James F. Grosso, Esq.
 9         O'REILLY, GROSSO & GROSS, P.C.
           1671 Worcester Road, Suite 205
10         Framingham, Massachusetts 01701
           for M.R.S. Enterprises, Inc.

11

12         Paul F. Kelly, Esq.
           SEGAL, ROITMAN & COLEMAN
13         11 Beacon Street, Suite 500
           Boston, Massachusetts 02108
14         for Sheet Metal Workers' International
                Association Local 17 - Boston.

15

16         Michael Anderson, Esq.
           DAVIS, COWELL & BOWE, L.L.P.
17         8 Beacon Street, 4th Floor
           Boston, Massachusetts 02108
18         for Sheet Metal Workers'
                International Association.

19

20         Also Present:  M. Benny Hernandez.

21

22

23

24
```

FLYNN REPORTING ASSOCIATES

3

1                    I N D E X

2   Testimony of:      Direct  Cross  Redirect Recross

3   ROLAND O. LEVESQUE, SR.
       by Mr. Grosso      40              166
4      by Mr. Anderson           100             175
       by Mr. Kelly              144             178
5

6   JOSEPH J. BERGANTINO
       by Mr. Grosso     186              205
7      by Mr. Kelly              203             217

8

9   VENANCE JR LAFRANCOIS
       by Mr. Grosso     217              294
       by Mr. Anderson           243
10     by Mr. Kelly              284

11

    PETER D. JOHNSON
12     by Mr. Grosso     269
       by Mr. Anderson           278
13     by Mr. Kelly              281

14

15                  E X H I B I T S

16  Exhibit No.     Description

17    Joint 1       NASD Agreement

18    Joint 2       Standard Form of Union
                    Agreement
19
      Joint 3       Letter dated 11/22/04
20
      Joint 4       Complaint
21
      Joint 5       SMWA's Answer
22
      Joint 6       Letter dated 8/17/05
23
      Joint 7       Answer of SMW Local 17
24
      Employer 1    Subpoena (fax)

FLYNN REPORTING ASSOCIATES

4

```
 1     Employer 2    Letter dated 8/15/06

 2     Employer 3    Grievance

 3     Employer 4    Letter dated 4/14/03

 4     Employer 5    E-mail dated 4/17/03

 5     Employer 6    E-mail dated 4/17/03
                     and e-mail dated 4/21/03
 6
       Employer 7    Letter dated 10/14/03
 7
       Employer 8A   Fax dated 12/28/01
 8
       Employer 8B   Agenda of 11/19/02 meeting
 9
       Employer 8C   Fax dated 12/30/03
10
       Employer 8D   Fax dated 10/30/04
11
       Employer 8E   Fax dated 2/28/05
12
       Employer 9    Litigation Against the Union
13
       Employer 10   E-mail dated 10/21/03
14
       Employer 11   Employee Report
15

16       ALL EXHIBITS MAILED BY COURT REPORTER TO
         ARBITRATOR ASHER AND ARBITRATOR BALL
17

18

19

20

21

22

23

24
```

FLYNN REPORTING ASSOCIATES

5

```
 1                P R O C E E D I N G S

 2

 3                ARBITRATOR ASHER:  I'm Michael Asher,

 4    chair.

 5                ARBITRATOR BALL:  Dean Ball,

 6    secretary.

 7                MR. LEVESQUE:  Roland Levesque,

 8    president of M.R.S. Enterprises.

 9                MR. GROSSO:  James Grosso, attorney

10    for M.R.S. Enterprises.

11                MR. LEVESQUE:  Steven Levesque, M.R.S.

12    Enterprises.

13                MR. D'ANGELO:  Scott D'Angelo, M.R.S.

14    Enterprises.

15                MR. LAFRANCOIS:  Venance LaFrancois,

16    employee of M.R.S. Enterprises.

17                ARBITRATOR ASHER:   Would you please

18    spell your name?

19                MR. LAFRANCOIS:  V-E-N-A-N-C-E

20    L-A-F-R-A-N-C-O-I-S.

21                MR. GROSSO:  Also known as JR.

22                MR. ANDERSON:  I am Michael Anderson

23    of Davis, Cowell & Bowe for the Sheet Metal Workers'

24    International Association.
```

FLYNN REPORTING ASSOCIATES

6

```
1                    MR. HERNANDEZ:  I'm Benny Hernandez.
2    I'm representing the Sheet Metal Workers'
3    International.
4                    MR. KELLY:  I'm Paul Kelly, and I'm
5    the attorney for the Sheet Metal Workers' Local 17
6    here in Boston.
7                    ARBITRATOR ASHER:  Do all parties
8    agree we're here for the second stage hearing of the
9    grievance by M.R.S. filed on November 22, 2004?
10                   MR. GROSSO:  That's correct.
11                   MR. ANDERSON:  That's correct.
12                   ARBITRATOR ASHER:  Do the parties
13   agree to the timely notice of this hearing?
14                   MR. GROSSO:  Yes.
15                   MR. ANDERSON:  Yes. Yes.
16                   ARBITRATOR ASHER:  Are there any
17   procedural objections to this panel having authority
18   to render a decision that would bind the grievant
19   SMWIA and the Local?
20                   MR. KELLY:  My understanding is that
21   the grievance that is before you today is against
22   the International.  It's M.R.S.'s grievance against
23   the International.  I don't believe there is any
24   mention in that grievance of a claim against
```

FLYNN REPORTING ASSOCIATES

7

1    Local 17.

2                MR. ANDERSON:  And that is the

3    International's understanding as well.

4                MR. GROSSO:  And I would disagree with

5    that because we originally started this action --

6    previous counsel started this action with this

7    letter of November 22, 2004 which resulted in a

8    meeting in Washington, D.C. which has now been

9    characterized as Step 1 of this procedure.  We had

10   gone to federal court suggesting that the

11   arbitration procedure had been waived, and the court

12   thought otherwise and ordered us to Step 2.  The

13   complaint, which my Brother is going to submit as an

14   exhibit, is against both the International and

15   Local 17.  Local 17 actually supplied the manpower

16   that is the subject of this grievance.  The project

17   was performed under the National Siding and Decking

18   Agreement, and I don't have to tell you gentlemen

19   that that is a nationwide agreement, that manpower

20   is provided by the local unions, and as the case

21   goes on you will see the connection between the

22   International and Local 17 with respect to the

23   assignment of the work and the referral of the

24   manpower.

FLYNN REPORTING ASSOCIATES

8

```
 1              If you look at Article 10 of the

 2    National Siding and Decking Agreement, the preamble

 3    states "The grievance procedures of the National

 4    Siding and Decking Agreement are the sole and

 5    exclusive remedy for any asserted breaches of this

 6    agreement and supersedes the grievance procedures of

 7    any other collective bargaining agreement that the

 8    employer is signatore," so as a procedural matter

 9    and as a practical matter, we would be prevented

10    from bringing a grievance against Local 17 under its

11    collective bargaining agreement because that

12    procedure has been trumped by the National Siding

13    and Decking Agreement.  We must proceed according to

14    this agreement.  We have no right to go after

15    Local 17 because this job was done pursuant to this

16    agreement, and I think that language makes it fairly

17    clear that we have to go after both through this

18    procedure.

19              MR. KELLY:  I don't disagree with

20    that, but I do say that if you have to go against

21    both under this procedure, you must go against both

22    under this procedure, and the grievance which is the

23    basis of the jurisdiction of the panel, is not a

24    grievance against Local 17.
```

FLYNN REPORTING ASSOCIATES

9

1              ARBITRATOR ASHER:  Mr. Grosso --

2              MR. GROSSO:  I'm not sure I understand

3     that last statement.

4              ARBITRATOR ASHER:  I think he's

5     stating that Local 17 remains a party of this

6     grievance.

7              MR. KELLY:  Local 17 was a party to

8     the litigation, and that's, frankly, why I'm here.

9     The litigation was terminated with the understanding

10    that the underlying dispute which was the

11    November 22nd grievance would be resolved in

12    accordance with the contractual procedures.  The

13    November 22nd grievance did not state a claim

14    against Local 17.  It stated a claim between M.R.S.

15    and the International.

16             MR. GROSSO:  The litigation was

17    brought against both the International and Local 17.

18    It was not terminated.  It was stayed, and the judge

19    ordered us to go to Step 2 of the arbitration, and

20    in that complaint both Local 17 and the

21    International were parties and, again, I can't

22    pursue an arbitration against Local 17 unless I do

23    it through this procedure, and that's the local that

24    supplied the manpower pursuant to this contract.  I

FLYNN REPORTING ASSOCIATES

10

1  don't know how Local 17 can extricate itself from

2  the authority of this board.

3           ARBITRATOR ASHER:  Was Local 17 made a

4  party to this grievance?

5           MR. ANDERSON:  We have the grievance

6  letter here.  We're going to end up putting it all

7  into the record in any event, but if we're looking

8  at this, we might as well have the document before

9  the panel.

10          MR. GROSSO:  Local 17 is not named in

11  the November 22, 2004 letter.  That is a factual

12  statement; however, the letter states that the

13  grievance is a result of the failure to supply

14  journey persons, specialty sheet metal workers,

15  specialty trainees in sufficient numbers and ratios

16  as stipulated in the April 8th agreement to perform

17  the work.  The evidence that you will hear later

18  today is going to show that Local 17 was a party to

19  that April 8th meeting; that Local 17 was to be the

20  entity to supply these journey persons, specialty

21  workers, and specialty trainees, not the

22  International.  So I would say the fact that

23  Local 17 is not specifically named in this

24  November 22nd letter, I don't think is a waiver of

FLYNN REPORTING ASSOCIATES

11

1   the grievance against Local 17 because the specific

2   charge can only go against Local 17.  They would

3   supply the manpower, not the International.

4            ARBITRATOR ASHER:  Mr. Kelly, has

5   Local 17 raised this precise issue before this time

6   either in a court proceeding or in Stage 1 of this

7   hearing or in all the attempts to schedule this

8   matter?

9            MR. KELLY:  Well, not with respect to

10  your last point.  With the scheduling of this, this

11  was done without any comments or input, as far as I

12  know, from Local 17.

13           MR. ANDERSON:  This August 15, 2006

14  document as far as I know is the first time that

15  M.R.S. has explicitly stated a claim against

16  Local 17 as part of the grievance procedure.

17           MR. GROSSO:  The purpose of --

18           ARBITRATOR ASHER:  What is this

19  August 15, 2006 document?

20           MR. GROSSO:  I have copies of all the

21  exhibits I intend to put in.  I made copies for each

22  of the arbitrators.

23           MR. ANDERSON:  Jim, is it the first

24  document in the stack?

FLYNN REPORTING ASSOCIATES

12

1          MR. GROSSO:  I don't think so.  There

2     it is.  I only prepared this yesterday for the

3     purpose of clarity.  It is excerpted from the

4     complaint which my Brother was seeking to put in as

5     an exhibit without objection from me.  He has the

6     entire complaint.  I simply excerpted from our

7     complaint the sections and articles of the two

8     agreements, the National Siding and Decking

9     Agreement and the Local 17 Agreement, so that you

10    would have in front of you what the issue is.  That

11    had not been placed in the November 22nd letter

12    which predecessor counsel had supplied.  I did it

13    for convenience.  If my Brother objects to the

14    filing of this, that's fine.  I'm not trying to

15    create a new party here.  It was simply excerpted

16    from the complaint which my Brother was going to put

17    into evidence.  Clearly, Local 17 is mentioned.  All

18    the things in that document I prepared yesterday are

19    from that very complaint.

20          ARBITRATOR ASHER:  The document we're

21    referring to right now is a three-page document

22    entitled Grievance that you prepared, Mr. Grosso?

23          MR. GROSSO:  That is correct.

24          ARBITRATOR ASHER:  This is basically a

FLYNN REPORTING ASSOCIATES

13

1    capsule summary of your position in the case?

2              MR. GROSSO:  That's correct.

3              ARBITRATOR ASHER:  It addresses your

4    exposure or your purported exposure of the

5    International and the Local.

6              MR. GROSSO:  That's correct.

7              ARBITRATOR ASHER:  We still get to the

8    issue in the November '04 grievance, which is the

9    complaint that initiated this matter.  It is agreed

10   that Local 17 is not named as a party; is that

11   correct?

12             MR. GROSSO:  That is correct.

13             ARBITRATOR ASHER:  Nevertheless, in

14   the events that have led up to today, including the

15   court proceedings, Local 17 has not objected to its

16   inclusion in these claims on the basis that it was

17   not named as a party in the November 22, 2004

18   grievance.

19             MR. KELLY:  These proceedings that are

20   here today or in the court proceeding?

21             ARBITRATOR ASHER:  Both.

22             MR. KELLY:  I can tell you that in the

23   court proceedings more than a year ago

24   Mr. Bergantino, who was the business manager of

FLYNN REPORTING ASSOCIATES

14

1  Local 17, filed an affidavit saying that M.R.S. had

2  never filed a grievance against Local 17.  That was

3  in support of the motion to dismiss the complaint

4  against Local 17.  Ultimately, the complaint, as I

5  think Mr. Grosso said, was stayed by the judge.

6            ARBITRATOR ASHER:  And the court never

7  reached that question?

8            MR. KELLY:  Correct.

9            MR. ANDERSON:  What Mr. Kelly is

10  saying is correct.  The International's position in

11  moving to stay was that the grievance against the

12  International needed to proceed through the steps of

13  the grievance procedure, but the Local's position

14  was that no grievance had been filed against

15  Local 17 at all.

16            ARBITRATOR ASHER:  Do you agree with

17  that, Mr. Grosso?  In the court proceeding they did

18  raise the issue they're raising now of Local 17 not

19  being named as a party?

20            MR. GROSSO:  I don't have Local 17's

21  answer in front of me, but I do know they filed a

22  motion to dismiss with an affidavit from

23  Mr. Bergantino.  I'll take my Brother at his word

24  that that is what is contained in the affidavit.

FLYNN REPORTING ASSOCIATES

15

```
 1             MR. KELLY:  I don't have copies for
 2    the panel, but I can make copies and we can
 3    introduce Mr. Bergantino's affidavit as an exhibit
 4    in this proceeding if that would facilitate matters.
 5             MR. GROSSO:  I think the point we're
 6    dueling over is a very critical point.  The system,
 7    for better or worse, that has been established with
 8    this National Siding and Decking Agreement is a set
 9    of rules and regulations, terms and conditions by
10    which employers may perform siding and decking work
11    around the country.  Implicit in the document is
12    that you must be using the local union as the
13    supplier of your manpower.  The International does
14    not supply your manpower, but the local union does.
15    The contract also says that if you have a problem
16    under this agreement you must arbitrate through this
17    agreement and not the local agreement.  Local 17,
18    except for the November 22nd letter, has always been
19    part of this procedure.  As I said earlier, I could
20    not have filed a grievance against Local 17 under
21    Local 17's agreement.  This grievance -- the
22    substance of the grievance is the failure to supply
23    he manpower and the manpower supplied by Local 17
24    pursuant to this agreement.  This agreement clearly
```

FLYNN REPORTING ASSOCIATES

16

1   states you get your people from the local union, so

2   the local union is tied in through this agreement,

3   and that's our position.

4            ARBITRATOR ASHER:  Anything else on

5   that point?  Are there any other procedural issues

6   that the parties would like to raise or any

7   objections to this proceeding going forward and the

8   authority of this board to render a decision?

9            MR. GROSSO:  I have two,

10  Mr. Arbitrator.  First, with respect to your

11  specific question about the authority of this board,

12  I noticed that prior to this hearing Arbitrator Ball

13  was in a discussion with Michael Anderson, the

14  attorney for the Sheet Metal Workers' International

15  Association and Mr. Hernandez, the International

16  representative, and I would suggest -- well, first,

17  before I make the suggestion, I would ask Arbitrator

18  Ball if this proceeding was discussed by

19  Mr. Anderson and Mr. Hernandez and you in that

20  meeting?

21            ARBITRATOR BALL:  No.

22            MR. GROSSO:  I think it was not

23  appropriate for an attorney for one of the

24  participants in this arbitration to be having a

FLYNN REPORTING ASSOCIATES

17

1   conversation with the arbitrator ex-parte, and so I

2   would raise the objections.

3              ARBITRATOR ASHER:  I think you

4   indicated Mr. Hernandez.

5              MR. GROSSO:  There was a discussion

6   between the three of them just outside the door

7   here.

8              MR. ANDERSON:  And, for the record,

9   what Mr. Ball said is correct.

10             ARBITRATOR ASHER:  What was

11  discussed?

12             ARBITRATOR BALL:  We were just

13  basically introducing ourselves.  This is the first

14  time I ever met him.

15             MR. GROSSO:  Okay.  I would raise also

16  the issue of bias and prejudice of the arbitrators

17  in this panel, specifically Mr. Ball, and I would

18  ask if Mr. Ball has ever served on a panel where a

19  contractor has prevailed.  In other words, receives

20  more than an impasse, actually won the case.

21             ARBITRATOR ASHER:  Why don't you state

22  the basis.  Before we interrogate the arbitrators

23  why don't you state the basis for assuming that the

24  panel is prejudiced to the extent it can't hear the

FLYNN REPORTING ASSOCIATES

18

1   case.

2           MR. GROSSO:  The basis for my

3   assertion is that it is an impossibility under this

4   structure for an employer to ever win a case, that

5   at best he gets an impasse or a deadlock.  It is my

6   assertion that in every one of these cases the

7   arbitrator appointed by the Sheet Metal Workers'

8   International Association will always find for the

9   union and will not find for the contractor;

10  therefore, it is an impossibility for the contractor

11  to win.  At best, the chairman of the panel will

12  vote against the employer representative of the

13  panel and we have a deadlock, and the procedure is

14  such that when you get all the way to the last step,

15  if you still have a deadlock, there is no

16  resolution, so it is my position that in this

17  structure the employer cannot win.

18          ARBITRATOR ASHER:  Does that exhaust

19  any procedural positions?

20          MR. GROSSO:  This is not a procedural

21  issue, but it is probably best brought up at this

22  point.  It is in your packet, Mr. Arbitrator, and I

23  have given it to my Brother and to Arbitrator Ball.

24  I had requested of this panel that they subpoena

FLYNN REPORTING ASSOCIATES

19

1    Joseph Bergantino as a witness in this case.  In

2    Massachusetts the leading case which my Brother,

3    Mr. Kelly, was involved in, Bay State Gas versus

4    Utility Workers' Local 273 I believe states that in

5    order to enforce a subpoena for the attendance of a

6    witness in an arbitration panel in court that that

7    subpoena must be issued by the arbitration panel.

8    While I have the authority as a party to subpoena a

9    witness, I have no authority to go into court in

10   Massachusetts and enforce that subpoena if the

11   witness doesn't show up, but the court in that

12   decision clearly said that an arbitration panel is

13   a, quote, tribunal and that you have the authority

14   to subpoena a witness, and if the witness fails to

15   show up, I may then go into court and enforce your

16   subpoena.  My request was denied by this panel, and

17   I placed in my packet and I would like to put it on

18   the record, my request to the National Siding and

19   Decking Association with a copy of the subpoena to

20   Mr. Bergantino and then a copy of my letter

21   yesterday back to the National Siding and Decking

22   Association confirming that the panel had denied my

23   request.  I had asked Martha in the Siding and

24   Decking office to put in writing what she told me on

FLYNN REPORTING ASSOCIATES

20

1   the telephone that the panel had, in fact, rejected

2   my request, and for whatever reason I never received

3   that, so I sent a confirming letter, and you'll see

4   that it was received by the attached fax.  That is

5   the extent of my --

6               ARBITRATOR ASHER:  Why don't we have

7   them marked.  Do we have an extra set?

8               MR. GROSSO:  Yes.  I guess I have two

9   exhibits.  It will be this exhibit first that shows

10  the cover sheet.  The first exhibit, Employer 1,

11  will be the fax dated August 14, 2006 with my

12  request.  It's a three-page document.  I'll describe

13  each one of the pages and then I will offer it.

14  Page 1 is a fax cover sheet dated August 14, 2006 to

15  Martha at the National Association of Siding and

16  Decking Contractors with a request for a subpoena

17  and a copy of that subpoena is attached.  That is

18  Page 2.  The third page is a copy of the fax showing

19  that it had been received.  I would offer that as

20  Employer 1.

21              MR. ANDERSON:  No objection.

22              MR. KELLY:  This is the August 14th

23  fax?

24              MR. GROSSO:  That's correct.  Employer

FLYNN REPORTING ASSOCIATES

21

```
 1    Number 2 is my letter dated August 15th to
 2    Mr. Asher at the National Association of Siding and
 3    Decking Contractors acknowledging or confirming the
 4    message I had received from his office that the
 5    panel had rejected my request to subpoena
 6    Mr. Bergantino.  I have no further procedural
 7    issues.
 8              ARBITRATOR ASHER:  Thank you,
 9    Mr. Grosso.
10              MR. ANDERSON:  For the record, from
11    the International, our answer in the court
12    litigation sets forth the defenses, some of which
13    could be styled procedural in nature limitations or
14    things of that nature, and all of those defenses are
15    properly before this panel, but we have no objection
16    to the authority of this panel to proceed at this
17    point.
18              ARBITRATOR ASHER:  That's it for the
19    procedural issues?
20              MR. ANDERSON:  Jim, let's get the
21    joint exhibits done.
22              ARBITRATOR ASHER:  Before we do that,
23    is that everything on procedure?
24              MR. GROSSO:  Yes.
```

FLYNN REPORTING ASSOCIATES

22

1          MR. ANDERSON:  Yes.

2          (Short recess taken.)

3          ARBITRATOR ASHER:  Mr. Grosso, in

4    terms of the procedural issues that you raised --

5    I'm sorry, the first being Local 17's objection to

6    this proceeding, including them as a party, we're

7    going to take that matter under advisement -- get

8    the proofs and make a decision in the entire matter

9    including that issue.

10          Mr. Grosso, your objection regarding

11   Mr. Ball's conversation that he had with

12   Mr. Anderson, I think what we heard is basically

13   small talk, and in the course of this arbitration

14   we're going to have some give and take, walking in

15   and out and so forth, and I caution the parties to

16   just be aware of that and the appearance of

17   impropriety.  It will give respect to the other side

18   and suspicion won't be raised.

19          The bias and prejudice -- either side

20   has their position regarding whether they're getting

21   a fair shake on a tribunal in front of a judge or in

22   front of a jury, and so I take that as an advocate's

23   aggressive position on that.

24          The subpoena -- this panel does not

FLYNN REPORTING ASSOCIATES

23

1    issue subpoenas and we never have, and, on that

2    matter, I'll just caution the Local or the party

3    that might have control over some situation of

4    Mr. Bergantino that the panel rendering a decision

5    will consider the evidence presented, and there is a

6    standard jury instruction that the omission of

7    evidence that otherwise could have presided within

8    the control of a party can be construed against that

9    party, particularly if he's a central witness, so

10   I'm sure you're aware of that, and that will be part

11   of our decision.

12            MR. GROSSO:  Thank you.

13            MR. KELLY:  Can I speak for a moment?

14            ARBITRATOR ASHER:  Sure.

15            MR. KELLY:  I don't know if

16   Mr. Bergantino will show up or not, but I can tell

17   you that as someone who's been a representative of

18   Local 17 for a number of years, Mr. Bergantino is

19   the most recent business manager.  He is no longer

20   the business manager.  He has started working at

21   another job.  He has, unfortunately, been served not

22   just in this proceeding but in other proceedings

23   with numerous subpoenas that have arisen out of

24   disputes that were ongoing when he was the business

FLYNN REPORTING ASSOCIATES

24

1   manager for Local 17.  It is hardship on

2   Mr. Bergantino to be leaving his job and running off

3   to testify, so to the extent it can be managed, we

4   will endeavor to do so, but I just want everybody to

5   understand that Mr. Bergantino is not a full-time

6   union official who is ducking these proceedings.  He

7   is an employee of an employer at this point who is

8   not a party to these proceedings.

9              ARBITRATOR ASHER:  Procedurally,

10  witnesses.  We have the parties present.

11             MR. GROSSO:  Right.  I have additional

12  witnesses, but I didn't have them all come at the

13  same time.

14             ARBITRATOR ASHER:  What about

15  sequestration of the witnesses?  Who are the parties

16  sitting here?

17             MR. GROSSO:  Those two are just

18  additional witnesses for M.R.S., and, obviously, if

19  you don't want them present during the testimony,

20  it's up to you.

21             MR. ANDERSON:  I think it would be

22  better to sequester.

23             ARBITRATOR ASHER:

24             MR. KELLY:  I would think so, too.

FLYNN REPORTING ASSOCIATES

25

1              MR. GROSSO:  Mr. Steven Levesque is

2       not going to be a witness, so I would ask if he can

3       stay.

4              MR. ANDERSON:  No objection.

5              MR. GROSSO:  I just explained to them

6       why they have to leave the room.  I don't know how

7       the panel -- I guess I understand completely your

8       ruling and appreciate the ruling on your

9       reservation, if you will, on the Local 17 issues, so

10      then does the panel want this recap of the grievance

11      which I prepared, as you said, sort of like a

12      position statement or not?

13             ARBITRATOR ASHER:  I'm going to get to

14      that in a second.  In terms of the procedure, I

15      would like brief opening remarks from each party.

16      Of course, the grievant will go first and present

17      your case, and then there will be the opportunity to

18      cross-examine, and the panel may have some questions

19      for the witnesses.  It doesn't matter if the

20      International or the Local proceeds next.  As stated

21      in the letter, the general rules will apply but

22      we'll be more lenient, but we'll weight things and

23      keep things concentrated and pointed to the issues.

24                   Are there any stipulations -- factual

FLYNN REPORTING ASSOCIATES

26

1    stipulations that we can enter into right now, for

2    instance, in terms of the contracts that apply?

3              MR. ANDERSON:  Well, we can talk about

4    the joint exhibits.  I think we should get those

5    marked and in before we get going.

6              MR. GROSSO:  We'll stipulate, and I

7    won't speak for my Brother or the Local 17

8    agreement -- I'll let him address that -- but we

9    have agreed to two joint exhibits.  Joint Exhibit 1

10   is the National Siding and Decking Agreement

11   pursuant to which we are here, and Joint Exhibit

12   Number 2 is the Collective Bargaining Agreement that

13   M.R.S. Enterprises actually -- a copy of it -- the

14   one that it actually signed with Local 17 in Boston.

15   My Brother wants to put a little tail onto that

16   joint stipulation.

17             MR. ANDERSON:  We'll stipulate that

18   the Local 17 agreement is authentic, but we reserve

19   our position and I'm sure Local 17 reserves it's

20   position about jurisdiction.  It doesn't mean that

21   this panel has the authority to enforcement rules.

22   And, Jim, let's also talk about the grievance

23   letter.

24             MR. GROSSO:  I would not object.  Do

FLYNN REPORTING ASSOCIATES

27

1    you want this to be Joint 3?

2                MR. ANDERSON:  Yes.  They're all

3    there.  I made the mistake of giving them to you.

4                MR. GROSSO:  I'll take care of that.

5    This will be Joint Number 3, and it is the original

6    grievance filed on November 22, 2004 by predecessor

7    counsel Garcia and Milles (phonetic.)

8                MR. ANDERSON:  The court complaint

9    will be Joint 4.

10               MR. GROSSO:  No objection.

11               MR. ANDERSON:  The International's

12   answer --

13               MR. GROSSO:  Joint 5?

14               MR. ANDERSON:  Yes.  What I would like

15   for Joint 6 -- this is the letter moving this to

16   Step 2.

17               MR. GROSSO:  No objection.  What's the

18   date on that, Mike?

19               MR. ANDERSON:  The date is August 17,

20   2005.

21               MR. GROSSO:  Is that it?

22               MR. ANDERSON:  That's all I've got.

23               MR. GROSSO:  I gave you all my copies

24   of what I'm putting in, Paul.

FLYNN REPORTING ASSOCIATES

28

1                    ARBITRATOR ASHER:  Do you have a copy

2     of Joint 6?

3                    MR. KELLY:  Would anybody object to a

4     joint exhibit, that being the answer of the Sheet

5     Metal Workers of Local 17 in the court proceeding?

6                    MR. GROSSO:  I don't have an objection

7     to it, but do you have copies for everybody?

8                    MR. KELLY:  I don't know, but I'll

9     reserve Joint 7, and then I'll supply copies.

10                    (Discussion off the record.)

11                    MR. ANDERSON:  I just want to be clear

12     that Local 17 is now participating provisionally and

13     reserving its objections on jurisdiction.

14                    MR. KELLY:  Thank you for promoting

15     that.

16                    MR. ANDERSON:  We are now on the

17     record.

18                    MR. KELLY:  I'm here, and I

19     acknowledge the ruling of the panel and reserve

20     whatever rights Local 17 has in this proceeding.

21                    ARBITRATOR ASHER:  Opening remarks?

22                    MR. GROSSO:  Well, do you want this as

23     an exhibit or not?  It's at the discretion of the

24     panel.

FLYNN REPORTING ASSOCIATES

29

1            MR. ANDERSON:  I don't object to the

2    panel considering it as long as the International's

3    position is clear that this August 15, 2006 document

4    cannot expand the scope of the grievance beyond

5    whatever was filed in 2004.

6            MR. GROSSO:  I don't have any problem

7    with that.

8            ARBITRATOR ASHER:  I think it's really

9    more of a demonstrative exhibit, so I would consider

10   it substantive evidence.  I would consider this a

11   position statement.  It's not evidence.  For

12   purposes of clarity of the record, though, we can

13   mark it.

14           MR. GROSSO:  It will be Employer

15   Number 3.

16           MR. KELLY:  I just want to be clear on

17   behalf of Local 17 that we do not consider this

18   document to be a grievance under the Standard Form

19   of Union Agreement.  This is not something that the

20   employer and the union have discussed and processed

21   to this point.  It's a document which is styled as a

22   grievance, but it hasn't been processed under the

23   collective bargaining agreement to which it refers.

24           ARBITRATOR ASHER:  This is not a

FLYNN REPORTING ASSOCIATES

30

1    grievance.  It's dated yesterday date or today.  I

2    consider this a position statement to facilitate

3    the --

4              MR. GROSSO:  That's fine with me.

5              MR. ANDERSON:  Jim, what about the

6    number on this?

7              MR. GROSSO:  Employer 3.  If I may, an

8    opening statement?

9              ARBITRATOR ASHER:  Yes, please.

10             MR. GROSSO:  I'll be as brief as I

11   can.  This proceeding is a grievance brought by

12   M.R.S. Enterprises, Inc. on the Delta Airlines

13   project, which is just across that bridge, known as

14   Terminal A.  Very briefly, Skanska USA was the

15   general contractor for the construction of that

16   project.  Crown Corr, Inc. was a subcontractor to

17   Skanska for the metal panel exterior wall system and

18   M.R.S. Enterprises, Inc. was a subcontractor to

19   Crown Corr, Inc. to actually perform the

20   installation of the exterior metal panel system.

21             The system involved the installation

22   of light gauge metal framing, metal studs, if you

23   will, a dense glass insulation board which was

24   screwed to the studs, a vapor barrier, and then the

FLYNN REPORTING ASSOCIATES

31

1   metal panel fascia to form the entire exterior of

2   the wall system.

3          The evidence is going to show that

4   M.R.S. Enterprises intended to install the

5   structural portion, the light gauge metal framing,

6   the dense glass board with a subcontractor,

7   Conn Acoustics, who has an agreement with the

8   Carpenters but does not have an agreement with the

9   Sheet Metal Workers.

10          We intend to show through the evidence

11  that sometime in April of 2003 before the job began

12  the International Union and Crown Corr, Inc. made

13  the determination that the entire metal panel

14  exterior wall system, including the framing and the

15  dense glass insulation board, would be done by Sheet

16  Metal Workers from Local 17 in Boston.  When that

17  decision was made, M.R.S. was directed to do that

18  work with Sheet Metal Workers, which meant they

19  could no longer use Conn Acoustics to do that work.

20          We will present evidence to show that

21  notwithstanding a diligent search, M.R.S. could not

22  find a framing subcontractor to install that light

23  gauge metal framing and dense glass board who had a

24  contract with the Sheet Metal Workers.  There were

FLYNN REPORTING ASSOCIATES

32

1    none around.  As a result, M.R.S. was forced to do

2    it itself.  We will off evidence to show there was a

3    meeting, that same meeting in Washington, D.C. when

4    it was decided to claim all of the work for the

5    Sheet Metal Workers that the International and

6    Local 17 made promises to M.R.S. that it would

7    supply it with sufficient numbers of skilled

8    Sheet Metal Workers, specialty workers, apprentices,

9    trainees who would be able to install the metal

10   studs and glass board insulation, that they would

11   train these people and have sufficient numbers for

12   M.R.S. to perform the work.  As it turns out, that

13   was not the case.  You'll hear testimony of the

14   quality of the work and the quality of the workmen

15   regarding the skill level of the people referred

16   from Local 17.  In fact, they had never done this

17   work before.  You will hear not only from M.R.S. but

18   you will hear from the general contractor as to the

19   performance.  It was so bad that at one point Crown

20   Corr was threatened with termination by Skanska

21   because it was so far behind schedule and, of

22   course, Crown Corr wasn't doing the work, M.R.S. was

23   doing the work, so the nature of the grievance is

24   that under Article 4 of the National Siding and

FLYNN REPORTING ASSOCIATES

33

1    Decking Agreement and under Article 4, both

2    Section 1s of the Local 17 agreement, the union

3    failed to supply skilled journeymen and apprentices

4    to perform the installation of this light gauge

5    metal framing and the dense glass board insulation,

6    and I want to make that very clear.  We are not

7    seeking damages for the metal panel installation.

8    We are only seeking the damages that M.R.S. incurred

9    as a result of the lack of skill and the inability

10   of the Local 17 referrals to install the light gauge

11   metal framing and the dense glass board.  It's an

12   amazing number.

13              Conn Acoustics had given us a bid,

14   which we will show you, of approximately

15   $1.9 million to do the framing portion.  It ended up

16   costing almost $3.2 million --excuse me -- it cost

17   $4.3 million.  There was a delta, a loss, if you

18   will, of $3.2 million on behalf of M.R.S.  We have

19   reduced the number, by the way, from the number that

20   is contained in the original complaint, and which

21   you now have as a joint exhibit, because there was

22   an owner-supplied insurance package called OCIP --

23   owner-controlled insurance package.  We had a sum of

24   some $340,000 for the premium that we anticipated

FLYNN REPORTING ASSOCIATES

34

1    being charged by the insurance company.  Ultimately,

2    they never charged us that money, so we reduced the

3    money we're looking for by that amount, so the

4    essence of the grievance is the failure to supply

5    men, which is a breach of both agreements.

6    Article 4, Section 1 of each agreement provides that

7    the union will supply skilled people, and we are

8    seeking damages in the amount of approximately

9    $3,180,000, the cost to M.R.S. over and above what

10   it would have cost M.R.S. if it had been allowed to

11   do the work with Conn Acoustics, and we will offer

12   you evidence to show that the International refused

13   to permit, as did Local 17, the use of any other

14   trade on the installation of that stud framing,

15   except Sheet Metal Workers.

16            That's our position and our opening

17   statement.  Thank you.

18            MR. ANDERSON:  On behalf of the

19   International, M.R.S. is failing to take

20   responsibility for its own managerial failures on

21   this project, and it is belatedly trying to shift

22   the cost of those failures to the unions that work

23   on it.  You'll hear evidence that this was a

24   difficult project in some respects, particularly at

FLYNN REPORTING ASSOCIATES

35

1    the beginning, around the time autumn and winter of

2    2003, but you're also going to hear that the

3    International did everything it could to supply

4    skilled labor, including specialty workers and

5    apprentices from a number of other sources, not just

6    Local 17 but from other places all around the

7    country, and that by the end of 2003 any manpower

8    issues had largely been resolved.

9              You are also going to hear that under

10   the agreement both M.R.S. and Crown Corr had the

11   right to and did take advantage of the option to

12   bring in labor from other sources if and when the

13   Sheet Metal Workers in Boston were not able to meet

14   the full demand.  You will hear specific rebuttal to

15   M.R.S.'s contention that the Sheet Metal Workers

16   refused to permit other trades on the job.  In

17   particular, you're going to hear that iron workers

18   from Iron Workers Local 7 were brought in to do

19   welding work at a time when Local 17 and the Sheet

20   Metal Workers were not able to supply them.

21             You're also going to hear that under

22   the Collective Bargaining Agreement, this is a right

23   that M.R.S. always had.  If M.R.S. did not avail

24   itself of the multiple ultimate sources to bring in

FLYNN REPORTING ASSOCIATES

36

 1    labor, it cannot turn around and look to the

 2    International for damages.

 3             Second, although the International

 4    still does not have a precise picture of what

 5    M.R.S.'s case for damages is going to be, as we

 6    understand it, M.R.S. is going to be claiming

 7    damages for problems that had absolutely nothing to

 8    do with the number or quality of Sheet Metal Workers

 9    on the project.  In particular, M.R.S. is claiming

10    damages for an extremely expensive process where

11    they were required to rip out the installation of

12    exterior metal panels where the problem was not

13    workmanship or the number of workers, but it was the

14    design of the project and, in fact, what M.R.S. is

15    now trying to do is trying to claim damages against

16    the union for what was fundamentally a design error

17    for which M.R.S. needs to look elsewhere.

18             Finally, M.R.S. has slept on its

19    rights.  The problems they complain about and the

20    damage that they complain about was all known to

21    M.R.S. in late 2003 or early 2004.  This grievance

22    comes far too little and far too late to state a

23    claim on which this panel can award relief.  The

24    essence of grievance processing under the contract

FLYNN REPORTING ASSOCIATES

37

1    is that the parties have to claim their violations

2    in a timely manner, and this principal is usually

3    enforced against unions by management, that is when

4    grievants show up months after they suffered some

5    adverse job action to complaint that they should be

6    made whole.  In those cases, this panel will enforce

7    the plain meaning of the contract to require that

8    those grievances be made timely, and the panel is

9    going to have to do the same as to M.R.S. in this

10   case.

11            MR. KELLY:  I have no opening to make

12   at this time.

13            ARBITRATOR ASHER:  Before we get into

14   the proofs, just give me a little bit of a time line

15   on the job.  For instance, M.R.S. began working

16   when, approximately?

17            MR. GROSSO:  The project was bid in

18   early 2003.  The construction work actually began on

19   August 1st or thereabouts, the last week of July or

20   the beginning of August of 2003.  The change order

21   work and final completion occurred sometime in March

22   or April of 2005.

23            ARBITRATOR ASHER:  Mr. Grosso, how

24   many witnesses do you intend to call?

FLYNN REPORTING ASSOCIATES

38

```
 1                    MR. GROSSO:  I hope to call six

 2      witnesses.  I hope to get through at least four and

 3      hopefully five today, except for Mr. Levesque, who

 4      will be the longest witness.  The other witnesses

 5      will be brief.  I understand the policy about not

 6      having redundancy and to avoid let's get to the

 7      point and to be direct, so the other witnesses will

 8      be brief and for specific things, whereas

 9      Mr. Levesque will probably be the longest.  If we go

10      from 9:00 to 5:00 today, hopefully we'll be done

11      except for Mr. Pickford because he cannot be here

12      until 11:00 a.m. tomorrow morning.  He is flying in

13      with Mr. Pellar, who I believe is being called by

14      the International.  If Mr. Pickford was here today,

15      I would finish my case today, or I would hope to

16      anyway.

17                    ARBITRATOR ASHER:  In the process of

18      building these walls, what are we going to call the

19      light gauge metal framing and insulation board?

20      That's the work at issue?

21                    MR. GROSSO:  That's correct.

22                    ARBITRATOR ASHER:  How are we going to

23      refer to that?

24                    MR. GROSSO:  We could refer to it as
```

FLYNN REPORTING ASSOCIATES

39

1   the structural support system.

2                ARBITRATOR ASHER:  In the process of

3   the construction, where does that work fit in -- the

4   initial work, the middle, or --

5                MR. GROSSO:  It's a very interesting

6   question because we're going to present some

7   testimony for you on that point.  Skanska for one

8   reason or another packaged two systems together.

9   Section 05400, which is basically this light gauge

10  metal framing structural support system, is usually

11  bid to other contractors, and then 07400 is the

12  actual sheet metal exterior panel installation.

13  They packaged the two together.  They wanted to buy

14  the system for whatever reason, so M.R.S. and Crown

15  Corr bid that system, combining those two

16  specification sections to Skanska.  After the

17  structural steel is erected, this light gauge metal

18  framing is then installed on the exterior of the

19  walls.  That goes in first.  It's the same type of

20  system that you have in the interior of a building

21  for drywall.  You have a track.  You place these

22  metal studs in the track.  You fasten them to the

23  structural columns and then they attach this dense

24  glass, a fiberglass dense board as an insulation.

FLYNN REPORTING ASSOCIATES

40

1    That is attached to the studs that you just

2    installed, and then the metal panels are attached or

3    there is a vapor barrier and then the metal panels

4    are attached, so ultimately you have a complete

5    exterior wall system.   On the inside they would

6    attach their Gypsum board or drywall to the interior

7    finishes.

8                   ARBITRATOR ASHER:  So the work at

9    issue here is the first work that's performed?

10                  MR. GROSSO:  That's correct.

11                  ARBITRATOR ASHER:  Before the erection

12   of the walls?

13                  MR. GROSSO:  Exactly.   The frame.

14                  MR. KELLY:  After the steel, right.

15                  MR. GROSSO:  Right.   The iron and then

16   the structural support for the panels.  We are not

17   contesting the panels.

18                  MR. GROSSO:  If the panel is ready, my

19   first witness is Roland Levesque, Senior.

20                  Roland O. Levesque, Sr., sworn.

21                  DIRECT EXAMINATION OF ROLAND LEVESQUE

22   BY MR. GROSSO:

23       Q.   Would you please state your full name for

24   the panel.

FLYNN REPORTING ASSOCIATES

41

```
 1     A.   Roland O. Levesque, Senior.

 2     Q.   Are you employed, sir?

 3     A.   Yes.

 4     Q.   With whom are you employed?

 5     A.   M.R.S. Enterprises.

 6     Q.   How long have you been employed by M.R.S.?

 7     A.   Twenty years.

 8     Q.   Prior to being employed by M.R.S. were you

 9  employed?

10     A.   I was employed at Morin Building Products.

11     Q.   Could you spell that?

12     A.   M-O-R-I-N Building Products, Incorporated.

13     Q.   When did you leave that company?

14     A.   1986.

15     Q.   Then did you form M.R.S. or did you go to

16  work for M.R.S.?

17     A.   I formed M.R.S.

18     Q.   What type of work does M.R.S. perform?

19     A.   Metal wall panel systems.

20     Q.   For further clarification, where is M.R.S.

21  located?

22     A.   Plainville, Connecticut.

23     Q.   Could you describe what you mean by metal

24  panel wall systems?
```

FLYNN REPORTING ASSOCIATES

42

1     A.    Exterior clapboard for buildings, thin

2   composite, form panel construction, vertical panels

3   that may be other than insulated single skin

4   panels.  Basically, anything metal that is installed

5   as clapboard we have installed and furnished over

6   the years.

7     Q.    Are your employees represented by a union?

8     A.    Yes, they are.

9     Q.    What union was that?

10    A.    Up until June 30th of last year 2005 the

11  Sheet Metal, Iron Workers, and I had an agreement

12  with the Carpenters and Operating Engineers.

13    Q.    In the years 2003, 2004, and the first

14  quarter of 2005 did you have a collective bargaining

15  agreement with the Sheet Metal Workers?

16    A.    Yes, I did.

17    Q.    Are you familiar with a project known as

18  Terminal A at Boston Logan Airport?

19    A.    Yes, I am.

20    Q.    How are you familiar with that?

21    A.    We provided and installed the exterior

22  metal package, including metal framing, dense glass,

23  vapor barrier, and thin composite metal wall systems

24  on the exterior.

FLYNN REPORTING ASSOCIATES

43

1     Q.    How did you first learn about this project?

2     A.    Well, the project was well known come late

3    summer or early fall of 2002.  We were contacted by

4    Permasteelisa.

5     Q.    Could you spell that for the stenographer,

6    please?

7     A.    P-E-R-M-A-S-T-E-E-L-I-S-A.  They're a large

8    worldwide curtain wall contractor, and they wanted

9    us to furnish the package that I just described --

10   the metal framing, dense glass, vapor barrier, and

11   exterior composite panel for this project.

12    Q.    After you were contacted by Permasteelisa

13   what did you do?

14    A.    We purchased drawings and began to estimate

15   the job.  Customarily, we do not install stud

16   framing.  That's something that we don't do, and in

17   this particular case we solicited the help of a

18   company in Connecticut, Conn Acoustics, to bid that

19   package for us.  Simultaneous to that, which is

20   customarily done at M.R.S. with a large project, we

21   also informed the business agent in the local area

22   as to what we planned to do so there were no

23   surprises.

24    Q.    Did you prepare a bid for Permasteelisa?

FLYNN REPORTING ASSOCIATES

44

```
 1        A.   Yes, we did.

 2        Q.   What happened to that bid?

 3        A.   We submitted it in December of 2002 to

 4   Permasteelisa.

 5        Q.   Did Permasteelisa ultimately bid the

 6   project?

 7        A.   I'm not sure if they did or not.  They may

 8   have pulled out at the last minute.  As part of that

 9   advising of the locals, we also tell them about

10   manpower if we know roughly what the manpower is.

11   In this particular case, we were interested in the

12   metal studs.  Joe Bergantino and I had a gentlemen's

13   agreement that was way before the International got

14   involved or anybody that they would do the metal

15   panels and he would be fine with allowing the

16   Carpenters to what they traditionally do with the

17   metal studs.

18        Q.   How did you arrive at this agreement with

19   Mr. Bergantino?

20        A.   Several discussions on how we'd proceed

21   with the project.

22        Q.   Did you meet with him?

23        A.   Yes.

24        Q.   So let's go back into the process.
```

FLYNN REPORTING ASSOCIATES

45

1    Obviously, Permasteelisa never performed the work on

2    this project?

3        A.   That's correct.

4        Q.   How did you end up performing work on this

5    project?

6        A.   I knew the personnel and the owner of Crown

7    Corr.  I had a long history with them, not doing

8    work but participating in various venues, including

9    the National Siding and Decking Board, so I

10   contacted Mr. Pellar to see if he was planning to do

11   the furnishing and installation of that package and

12   would he consider subcontracting it.

13       Q.   Who is Mr. Pellar?

14       A.   He's the president of Crown Corr.

15       Q.   So you approached Mr. Pellar at Crown Corr,

16   and was he receptive to your offer?

17       A.   Yes, he was.

18       Q.   Did you prepare a bid for Crown Corr?

19       A.   Yes, we did.

20       Q.   Could you breakdown your bid?  Was it

21   similar to the bid you gave to Permasteelisa?

22       A.   It was exactly the same as we gave to

23   Permasteelisa.  The total package -- metal framing,

24   dense glass, vapor barrier, and the exterior

FLYNN REPORTING ASSOCIATES

46

1   composite panels.

2       Q.   Did you include the framing being performed

3   by a subcontractor?

4       A.   Yes.  We had carried Conn Acoustics' price

5   in our bid to do the installation and the studs,

6   dense glass, and vapor barrier.

7       Q.   Ultimately, did you reach agreement with

8   Crown Corr?

9       A.   Yes, we did.

10      Q.   They signed your bid?

11      A.   Yes.

12      Q.   Bear with me just one moment.  I have a

13  copy of the actual bid from Conn Acoustics here

14  which I would like to offer into evidence.  Let me

15  show you this document.  Have you ever seen that

16  before?

17      A.   Yes, I have.

18      Q.   What is that?

19      A.   That's the bid from Conn Acoustics for the

20  Terminal A project at Logan for the metal framing,

21  dense glass, and vapor barrier.

22           MR. GROSSO:  I would like to offer

23  this as the next numbered employer's exhibit,

24  Employer Exhibit Number 4.

FLYNN REPORTING ASSOCIATES

47

```
 1              MR. ANDERSON:  No objection.

 2              MR. GROSSO:  Each of the arbitrators

 3   has it in their folder.  The date on it is April 14,

 4   2003.

 5              MR. ANDERSON:  This spread sheet is

 6   not part of the exhibit, is it?

 7              MR. GROSSO:  No.  That's later.

 8              MR. ANDERSON:  I just wanted to make

 9   sure.

10       Q.   Now, looking at what has been marked as

11   Employer's Exhibit 4, Mr. Levesque, could you

12   explain the breakdown of that price?

13       A.   The price is broken down between the two

14   buildings -- the satellite building and Terminal A,

15   and there is a cost for all the various components,

16   including the engineering.

17       Q.   If we look at -- just take the Delta

18   terminal paragraph at the top, their price on that.

19   Could you further break down the elements of that

20   price?

21       A.   Metal stud framing and sheathing.

22       Q.   Let me stop you there.  What is the

23   sheathing?

24       A.   That's dense glass for $670,000.
```

FLYNN REPORTING ASSOCIATES

48

```
 1       Q.   Then you have --

 2       A.   Engineering is $12,000.  High-lift crane

 3  allowance is $30,000, and the total bid for the

 4  Terminal A building was $712,000.

 5       Q.   And the satellite building is broken out in

 6  the same way?

 7       A.   The same manner.

 8       Q.   So you were subcontracting only the metal

 9  stud framing and sheathing to Conn Acoustics and not

10  the panels?

11       A.   That's correct.

12       Q.   Now, after Crown Corr had accepted your bid

13  what happened?

14       A.   The next main event to happen in the second

15  week of April 2003 there was a meeting called in

16  Washington.  I don't know if Mr. Pellar initiated it

17  or did the union, but it --

18       Q.   Before you get into what happened at the

19  meeting, could you tell us who was present?

20       A.   There was Mike Sullivan.

21       Q.   And who is Mike Sullivan?

22       A.   The president of the Sheet Metal

23  International.

24       Q.   Anybody else?
```

FLYNN REPORTING ASSOCIATES

49

1        A.    Tony Asher, counsel for NASDC.  Danny

2   Pasquinucci, who is the local International

3   representative for this area.  Joe Nigro, who was

4   Mr. Sullivan's assistant.  Richard Pellar.  I was

5   there.  Mr. Hernandez, who is present here today,

6   was at the meeting.  I believe Fred Machewski was

7   also at the meeting.

8        Q.    Who is Mr. Machewski?

9        A.    He is an International representative for

10   the Midwest.

11        Q.    What was the purpose of the meeting?

12        A.    The purpose of the meeting was to discuss

13   the Delta project and how we would proceed.  At that

14   time they informed me that they were planning to try

15   to have a jurisdictional dispute or that process

16   with the Carpenters in an attempt to get all the

17   work.  In other words, Mr. Sullivan and the

18   International wanted to get the total package under

19   the Sheet Metal Agreement for this particular

20   project.

21        Q.    What do you mean by "all the work?"

22        A.    Metal framing, dense glass, vapor barrier,

23   and exterior composite wall panels.

24                    ARBITRATOR ASHER:  Which would be the

FLYNN REPORTING ASSOCIATES

1    work subbed to Conn Acoustics?

2              MR. GROSSO:  That's correct.

3    Q.   Was anybody from Local 17 present at this

4    meeting?

5    A.   Joe Bergantino.

6    Q.   What was your position on that discussion?

7    Did you have any input in that decision?

8    A.   I did not have any input in that decision.

9    Everybody at the table knew that I had prepared a

10   price originally, including Joe Bergantino, using

11   Carpenters.

12   Q.   And at that time Crown Corr had your bid

13   proposal which showed that Conn Acoustics --

14   A.   That's right.

15   Q.   Did Conn Acoustics have a collective

16   bargaining agreement with the Sheet Metal Workers?

17   A.   Not to my knowledge.

18   Q.   So did you discuss at that meeting what you

19   were going to do now that your subcontractor didn't

20   have an agreement with the Sheet Metal Workers?

21   A.   Basically, it was to go out and see if we

22   could find somebody that employed Sheet Metal

23   Workers.  That was our first process to determine if

24   we could find somebody that could do that type of

FLYNN REPORTING ASSOCIATES

51

1    work.

2        Q.    At that time how long would you say you had

3    had a collective bargaining agreement with the Sheet

4    Metal Workers?  This was April of 2003 you said?

5        A.    Yes.

6        Q.    For how many years had you been signatory

7    to a collective bargaining agreement with the Sheet

8    Metal Workers?

9        A.    '87.

10       Q.    So from 1987 to 2003?

11       A.    Yes.

12       Q.    Sixteen years?

13       A.    Yes.

14       Q.    And during that 16 years that you had an

15   agreement with the Sheet Metal Workers had you ever

16   installed the metal stud framing and sheathing with

17   Sheet Metal Workers?

18       A.    No, we did not.

19       Q.    So did you have something to say at this

20   meeting about the fact that Sheet Metal Workers were

21   not going to do this work?

22       A.    Yes, but the decision was not mine.  The

23   decision was already made when I got there anyway.

24       Q.    How was that decision communicated?

FLYNN REPORTING ASSOCIATES

52

1        A.    Well, it was stated at the meeting that

2    they were seeking to do the total package, which

3    included all the elements that I previously

4    described, with Sheet Metal Workers and that they

5    were going to challenge the Carpenters.

6        Q.    How were they going to challenge the

7    Carpenters?  What would set this challenge in

8    motion?

9        A.    To my recollection, that was not discussed

10   at that meeting.  If it was, I don't recall it.

11       Q.    At that meeting did you raise the issue at

12   all about the ability of the Sheet Metal Workers to

13   perform this work?

14       A.    Yes, I did.

15       Q.    What did you say?

16       A.    I told them that customarily Sheet Metal

17   Workers do not do stud work, it's not part of their

18   jurisdiction, and, obviously, they would not be

19   trained to do that type of work.

20       Q.    And what was the response, if any?

21       A.    Well, the response was not to me directly.

22   It was between Mr. Sullivan and Mr. Bergantino.

23   Mr. Sullivan told Mr. Bergantino that he would have

24   to provide qualified manpower and training in order

FLYNN REPORTING ASSOCIATES

53

1    to fulfill the obligation they were about to embark

2    on.

3         Q.   Were there any commitments made to you that

4    you, in fact, would be supplied with skilled and

5    trained Sheet Metal Workers?

6              MR. KELLY:  Objection.  I think This

7    is a characterization that counsel wants to make,

8    but I think it would be more appropriate if the

9    witness testified what was said by whom at that

10   meeting.  Whether it was a commitment or wasn't a

11   commitment, we can let the panel decide, but I think

12   it's important to figure out who is talking when

13   these things are being said.

14        Q.   Let's go back, Mr. Levesque.  You said that

15   Mr. Sullivan told Mr. Bergantino --

16        A.   Yes.

17        Q.   -- who, again, was the business manager of

18   Local 17 in Boston, that he would supply or that he

19   was to supply to you skilled craftsmen.  Did he say

20   that?

21        A.   Yes, he did.

22        Q.   And did Mr. Bergantino make any response?

23        A.   Yes.  I'll amplify on that.  He told

24   Mr. Bergantino that he would provide skilled

FLYNN REPORTING ASSOCIATES

54

1   craftsmen, training, and that the job was going to

2   be done under the National Siding and Decking

3   Agreement.

4       Q.   That is Mr. Sullivan making these

5   statements?

6       A.   They were making these statements face to

7   face.  They were sitting across from each other.

8       Q.   Did Mr. Bergantino make any response?

9       A.   He reacted with anger.  He was about to say

10  something and Joe Nigro, who was the former business

11  manager of Local 17, asked him to step out for a few

12  minutes, and they went out and whatever they did in

13  that time frame.

14      Q.   Before Mr. Nigro interceded did

15  Mr. Bergantino say anything?

16      A.   Not that I recall, but he was getting ready

17  to stand up.  The answer is no.

18      Q.   You can't say what he was getting ready to

19  do.  So the answer is, He did not make any

20  statement?

21      A.   No, he did not.

22      Q.   So at the end of this meeting what

23  happened?

24      A.   At the end of the meeting we all proceeded

FLYNN REPORTING ASSOCIATES

55

```
 1   based on the directions that were established at the
 2   meeting.
 3        Q.   So what was the next thing that M.R.S. did?
 4        A.   We went out and looked around to see if we
 5   could find somebody in the sheet metal industry that
 6   had the ability and was doing this type of work.
 7        Q.   What type of work?
 8        A.   Metal stud, dense glass, and vapor barrier.
 9        Q.   Did you find any contractors to perform
10   this type of work?
11        A.   I did not.
12        Q.   Let me finish the question.
13        A.   I'm sorry.
14        Q.   Did you find any contractor to perform this
15   type of work and who had an agreement with the Sheet
16   Metal Workers Local 17?
17        A.   No, I did not.
18        Q.   So then what did you do?
19        A.   We decided that the only way we could do it
20   was with our own forces and Local 17 personnel.
21        Q.   How did you determine to tackle that
22   project doing it with your own forces?
23        A.   How did I determine -- would you rephrase
24   that?  I'm not sure exactly what you're asking me.
```

FLYNN REPORTING ASSOCIATES

56

1      Q.    Did you have any discussions with

2    Mr. Bergantino and Local 17 about the quality and

3    skill level of his members to do this type of work?

4      A.    Yes.  He was committed to training and said

5    that he would provide the skill level that we

6    required.

7      Q.    Did you have any agreement or any

8    discussions about how that training would take

9    place?

10     A.    I agreed to furnish materials and personnel

11   to train some of his people so that they could

12   continue teaching it in their program.

13     Q.    When did you do this?

14     A.    It was in May of 2003.

15     Q.    Had work begun yet?

16     A.    No.

17     Q.    So specifically for the panel's benefit,

18   would you explain exactly what you told

19   Mr. Bergantino you would do with respect to

20   training?

21     A.    I would provide materials.  By that I mean

22   composite wall panels and stud framing.  A training

23   module that was provided by NASDC had already been

24   shipped to Local 17 for their training, but it did

FLYNN REPORTING ASSOCIATES

57

1    not include stud work and it did not include

2    composite wall panels.  I agreed to furnish that

3    material and a competent person to train their

4    personnel.

5         Q.   And did you do that?

6         A.   Yes, I did.

7         Q.   Who did you provide as competent personnel?

8         A.   Marcel Cyr, a sheet metal worker from

9    Local 40.

10        Q.   Where is Local 40?

11        A.   Hartford, Connecticut.

12        Q.   Can you spell Marcel's name?

13        A.   M-A-R-C-E-L.  Last name C-Y-R.

14        Q.   Now, did you, in fact, dispatch Mr. Cyr to

15   Boston?

16        A.   Yes, we did -- after discussing it with

17   Mr. Bergantino so that we had an agreeable schedule,

18   Marcel came to Local 17's training center to train

19   people.

20        Q.   Do you know about when that happened?

21        A.   I believe it was probably early June by

22   then.

23        Q.   Of 2003?

24        A.   2003.

FLYNN REPORTING ASSOCIATES

58

1    Q.    How long did Mr. Cyr stay in Boston?

2    A.    Three days.

3    Q.    Did Local 17 send any journeymen and/or

4    apprentices or specialty workers to meet with

5    Mr. Cyr?

6    A.    They did not.

7    Q.    Did anybody show up?

8    A.    Yes -- a retiree showed up.

9    Q.    Just one?

10   A.    Just one person.

11   Q.    So were you table to perform the training

12   work that you and Mr. Bergantino had agreed to?

13   A.    We were not.

14   Q.    And so did Mr. Cyr come back to

15   Connecticut?

16   A.    Yes.  He came back to work.

17   Q.    Prior to actually commencing work on the

18   site of Terminal A did M.R.S. do anything else in

19   preparation for this project?

20   A.    Yes, we did.

21   Q.    What did you do?

22   A.    We had some logistical issues -- getting

23   the trailer and all the equipment in preparation for

24   the job.

FLYNN REPORTING ASSOCIATES

59

```
 1      Q.   Did you terminate your relationship with

 2   Conn Acoustics?

 3      A.   Yes.  We had to because they -- well, we

 4   terminated the relationship to do the installation.

 5   They would still be panelizing the system in their

 6   shop in Connecticut.

 7      Q.   So they did perform some work but not on

 8   the job site?

 9      A.   Off site, yes.

10      Q.   What did they do?

11      A.   Some of the areas were panelized.  By that

12   I mean installing the system in units of 12, 13, 14

13   feet long pre-assembled rather than one stud at a

14   time, and the assembly of those units was done in

15   Connecticut by Conn Acoustics.

16      Q.   When did you actually begin work on the

17   Terminal A project?

18      A.   August 1, 2003.

19      Q.   Were you present on that job site on a

20   daily basis?

21      A.   No, I was not.

22      Q.   Between the April meeting in Washington,

23   D.C. and the commencement of work on August 1st did

24   you have any discussions with Mr. Pellar at Crown
```

FLYNN REPORTING ASSOCIATES

60

1    Corr either electronically, through e-mail,

2    telephonically, or face-to-face about using

3    Carpenters to install the stud work?

4        A.   Yes, I did.

5        Q.   Let me show you this document and ask you

6    if you've ever seen that before.

7        A.   Yes, I have.

8            MR. ANDERSON:  Would you tell us what

9    you're looking at?

10           MR. GROSSO:  Yes.  We'll be offering

11   an e-mail -- there are two e-mails in the package I

12   gave you -- in the folder.

13           MR. ANDERSON:  This is April 17th of

14   '03?

15           MR. GROSSO:  That's correct and

16   there's another one dated April 21st.

17       A.   I see them.

18           MR. GROSSO:  They're also in the

19   arbitrators' packets.

20       Q.   Can you identify it, sir?

21       A.   It's e-mail to Mr. Pellar of Crown Corr

22   dated April 17, 2003 relative to the installation of

23   metal framing, dense glass, and vapor barrier.

24       Q.   Who sent it?

FLYNN REPORTING ASSOCIATES

61

1      A.   I did.

2           MR. GROSSO:  I would like to offer

3  that document as Employer's Exhibit 5.

4      Q.   Now, in this e-mail it's addressed to Rich.

5  Who is Rich?

6      A.   Mr. Richard Pellar is the president of

7  Crown Corr.

8      Q.   In the first sentence you say "Regardless

9  what Mike Sullivan wants to accomplish on the Delta

10  project."  What were you talking about?

11      A.   I'm talking about the studs on the Delta

12  project.

13      Q.   What else were you suggesting to Mr. Pellar

14  in this e-mail?

15      A.   That he reconsider -- although it may not

16  be explicit in the e-mail, that he reconsider the

17  decision that was made to do the studs with Sheet

18  Metal Workers.

19      Q.   Well, if you would read the rest of the

20  sentence right after the words "Delta project" --

21      A.   "I firmly believe that the Carpenters are

22  the best trade for the stud framing.  Currently

23  Local 17 cannot provide competent, trained manpower

24  for the panel work and have never installed studs on

FLYNN REPORTING ASSOCIATES

62

1    this scale."

2        Q.   And then later in the second paragraph you

3    referred to a Tom Harrington.  Who was he?

4        A.   He was the head of the Carpenters for the

5    New England district.

6        Q.   Did you get a response from Mr. Pellar?

7        A.   Yes, I did.

8            MR. GROSSO:    This is the next e-mail

9    in everybody's folder and it's dated April 21st.

10   You will see it's from Roland Levesque to Rich

11   Pellar, but in the middle of the page you'll see an

12   e-mail from Rich Pellar to Roland Levesque.  I would

13   like to offer this as Employer's Exhibit 6.

14            ARBITRATOR ASHER:  Any objection to 5

15   or 6?

16            MR. ANDERSON:  No.

17       Q.  Mr. Levesque, if you'll look at what has

18   been marked now as Employer's Exhibit Number 6, if

19   we start from the bottom up as these e-mails tend to

20   go, is the bottom message the one that you just

21   described which has been marked as Employer's

22   Number 5?

23       A.   Yes.

24       Q.   And just above that with the time of

FLYNN REPORTING ASSOCIATES

63

1   9:28 a.m., which is approximately an hour and six

2   minutes after your e-mail, is there a response from

3   Mr. Pellar?

4        A.   Yes, there is.

5        Q.   What does he say?

6        A.   He says "Thanks for you honest thoughts.  I

7   spoke with Harrington and he is not in the mood to

8   sit down and bargain.  He said if that's what the

9   meeting is for he says no point.  Any thoughts."

10       Q.   And, did you respond to Mr. Pellar's

11  response?

12       A.   Yes, I did.

13       Q.   Is that the paragraph that's at the top of

14  the page?

15       A.   Yes.

16       Q.   It says approximately 11:38 a.m. on the

17  same day?

18       A.   Yes.

19       Q.   What did you say to him?

20       A.   "Does he recognize that Sheet Metal will

21  challenge the stud installation in concert with the

22  Iron Workers?  The Carpenters will not be able to

23  prove preponderance of work for the panels.  Is he

24  willing to risk losing both?  The Iron Workers can

FLYNN REPORTING ASSOCIATES

64

1    make a good case for the studs because the studs are

2    structural."

3        Q.   So did the Carpenters ever get involved in

4    the performance of any of this work?

5        A.   No, they did not.

6        Q.   You say you were not on that job site on a

7    daily basis, so I'm not going to ask you questions

8    about times when you weren't there, but I am going

9    to show you this and ask you if you have ever seen

10   this before.

11            MR. GROSSO:  This is, for the panel

12   and for my Brothers, a set of meeting minutes, and

13   on the top of it it says Crown Corr, Inc. and it's

14   dated October 14, 2003.  Each one of you has it

15   somewhere in your folder.

16       A.   Yes, I have seen this document.

17       Q.   What is it?

18       A.   It's meeting minutes from a meeting that

19   was at the job site between Local 17, Sheet Metal

20   Workers International, M.R.S., and Crown Corr.

21       Q.   Does it show you in attendance?

22       A.   Yes, it does.

23            MR. GROSSO:  I would like to offer

24   that as Employer's Number 7, please.

FLYNN REPORTING ASSOCIATES

65

```
 1              MR. ANDERSON:  No objection.
 2     Q.   Please read that to yourself and then I'll
 3  ask you some specific questions.
 4     A.   Okay.
 5     Q.   If we look at the document, sir, and I'm
 6  giving you the official document marked as
 7  Employer's Exhibit Number 7.  If you'll look at the
 8  purpose of the meeting, the very first paragraph --
 9     A.   Yes.
10     Q.   -- what was the purpose of the meeting?
11     A.   To establish manpower requirements and
12  rules for working under the Siding and Decking
13  Agreement for the project.
14     Q.   Now, in Paragraphs 1 and 2 you talked about
15  training?
16     A.   Yes.
17     Q.   Paragraph 2 talks about certified welders?
18     A.   Yes.
19     Q.   Was there a problem with getting welders
20  from Local 17?
21     A.   Yes, there was.
22     Q.   What was the problem?
23     A.   They didn't have any or some of them who
24  came to the job did not have the proper
```

FLYNN REPORTING ASSOCIATES

66

1   certification papers.

2       Q.    If you'll look at Paragraph 8, Siding and

3   Decking classifications and manpower ratios, what

4   was that issue?

5       A.    The issue was to try to make sure that we

6   had the correct ratio of siding and decking

7   employees to journeymen.

8       Q.    Was there a problem with that ratio?

9       A.    Yes, there was because, Number 1, Local 17

10  does not have any specialty workers so we conceded

11  and allowed apprentices in lieu of specialty, but

12  the ratio was never as outlined in the National

13  Siding and Decking Agreement.

14      Q.    If you'll look at the third line of

15  Paragraph 8 where it says "manpower was very heavy

16  on journeymen," do you see that?

17      A.    Yes.

18      Q.    And then in parentheses Number 22, what

19  does that mean?

20      A.    That's the manpower journeymen manpower on

21  the job.

22      Q.    So there were 22 journeymen and four

23  apprentices?

24      A.    Yes.

FLYNN REPORTING ASSOCIATES

67

1    Q.    And is that the ratio that is called for in

2    the National Siding and Decking Agreement?

3    A.    No, it's not.

4    Q.    Now, I see another sentence on the line at

5    the end "no specialty workers --

6    A.    Yes.

7    Q.    -- are on the payroll or available."  What

8    does that mean?

9    A.    That Local 17 did not have any specialty

10   workers to send us to the job site, therefore, there

11   were none on the payroll.

12   Q.    So at the end of that paragraph it talks

13   about recruiting and training specialty workers?

14   A.    Yes.

15   Q.    And did Local 17 do that?

16   A.    No, they did not.

17   Q.    Now, that's it for my questions on this

18   exhibit.

19              ARBITRATOR ASHER:  Mr. Levesque, at

20   this point when was construction to begin in

21   relation to this -- October 14, 2003?

22   A.    The construction began August 1st.

23              ARBITRATOR ASHER:  So had the work at

24   issue already begun?

FLYNN REPORTING ASSOCIATES

68

1    A.    Yes.  We just didn't have the trained

2    personnel or the ratio of apprentices that we were

3    allowed and promised.

4                MR. GROSSO:  I have a series of

5    documents.  There are five.  The front page of each

6    one says National Association of Siding and Decking

7    Contractors.  They are dated December 28, 2001;

8    July 20, 2002; December of '03; October of '04;

9    February of '05.  I would offer them as Exhibit

10   Numbers 8A through 8E, I guess.  Look at those

11   documents and tell me if you recognize them.

12   A.    Yes, I do.

13   Q.    What are they?

14   A.    They are monthly reports from the National

15   Association of Siding and Decking Contractors

16   outlining the hours worked in that particular month

17   with some running totals for year-to-date,

18   et cetera, that were provided to the board members

19   on a monthly basis.

20   Q.    How did these documents happen to come into

21   your possession?

22   A.    I was a member of the board of the National

23   Siding and Decking Association, and I received a

24   copy of these monthly.

FLYNN REPORTING ASSOCIATES

69

1              MR. GROSSO:  Again, I would offer

2    those as Employer Exhibits 8A through 8E.

3              MR. KELLY:  Which is which?

4              MR. GROSSO:  8A will be the document

5    dated December 28, 2001.  8B will be the document

6    dated November 19, 2002.  8C will be the document

7    dated December 30, 2003.  8D will be the document

8    dated October 30, 2004.

9              (Discussion off the record.)

10              ARBITRATOR ASHER:  Admitted.

11    Q.   If we just take for the moment the first

12    one, which is 8A, would you explain what each column

13    represents?

14    A.   Man hours worked that current month,

15    year-to-date.

16    Q.   Before that, let's start with the column on

17    the extreme left.

18    A.   On the extreme left is the local union

19    number.

20    Q.   If we see "Ottawa Number 1," and then

21    there's Peoria and a series of numbers?

22    A.   Yes.

23    Q.   What is this?

24    A.   The numbers are the local numbers and the

FLYNN REPORTING ASSOCIATES

70

1    Peoria office.

2        Q.    What I'm going to ask the panel to draw

3    their attention to is Local 17, which is about

4    halfway down the page.  The first column is the

5    local and the next column is the name of the

6    contractor and the third column lists the man hours

7    reported that month and the next column is hours

8    YTD, hours reported year-to-date.  The next column

9    refers to a contribution that is being made to the

10   NASDTF.  What fund is that, sir?

11       A.    I don't know off the top of my head.

12       Q.    That, again, shows a year-to-date number?

13       A.    I think it's the training fund.

14       Q.    So then I'll specifically ask this

15   question.  In this particular document, Employer's

16   Exhibit 8A, do you see Local 17 listed?

17       A.    Yes, I do.

18       Q.    Do you see any employer in the contractor

19   column?

20       A.    Lymo Construction Company.

21       Q.    Are there any hours reported?

22       A.    No, there are none.

23       Q.    How about for the year-to-date?

24       A.    None.

FLYNN REPORTING ASSOCIATES

71

1      Q.    Looking at 8B, and this is the report for

2    November of 2002, again, do you see Local 17 listed?

3      A.    Yes, I do.

4      Q.    Are there any contractors?

5      A.    Lymo Construction.

6      Q.    Any hours?

7      A.    None.

8      Q.    How about year-to-date?

9      A.    None.

10     Q.    Now, if I show you what has been marked as

11   8C, which is dated December 30th of 2003, was '03

12   the time when you were now working on the Delta

13   project?

14     A.    Yes, it was.

15     Q.    Do you see Local 17?

16     A.    Yes, I do.

17     Q.    Do you see any contractors?

18     A.    Crown Corr.

19     Q.    And that's the same Crown Corr that you

20   were subcontracted to?

21     A.    Yes.

22     Q.    How many hours are reported?

23     A.    64 man hours that month.

24     Q.    How many for the year?

FLYNN REPORTING ASSOCIATES

72

1      A.    521.

2      Q.    So for the entire year of 2003 521 hours

3   were reported for work done under the National

4   Siding and Decking Agreement?

5      A.    That's right.

6      Q.    If you'll look at October of 2004 on

7   Exhibit Number 8D, the same questions, do you see

8   Local 17 listed?

9      A.    Yes, I do.

10      Q.    Do you see any contractors?

11      A.    Three contractors -- CCL Construction,

12   East Iowa Decks, and Lymo Construction.

13      Q.    And are there hours reported for each of

14   those?

15      A.    There are 12,714 hours for CCL.  That's

16   year-to-date.  There are 119 1/2 for the month of

17   October.

18      Q.    And how about East Iowa Decks?

19      A.    384 for the month and zero year-to-date.

20      Q.    And Lymo?

21      A.    Lymo -- zero zero.

22      Q.    Now, were you making contributions under

23   this agreement in October of 2004?

24      A.    If we had specialty workers on the job,

FLYNN REPORTING ASSOCIATES

73

1    yes, we would have.

2         Q.    So if they are not specialty workers, you

3    don't pay under this form?

4         A.    No, you don't.

5         Q.    So are you saying then that you only had

6    journeymen and apprentices from Local 17 on your

7    payroll?

8         A.    That's correct.

9         Q.    Where would those contributions go?

10        A.    Local 17 for the local people and Local 40

11   for the M.R.S. people that we brought in from

12   Connecticut.

13        Q.    The last Exhibit Number 8E dated

14   February of '05, again, do you see Local 17?

15        A.    Yes, I do.

16        Q.    Do you see hours reported?

17        A.    Yes.  For CCL Construction there is

18   1001 1/2 hours for the  month and 1188.5 for

19   year-to-date.

20        Q.    Any other hours reported for any other

21   contractors?

22        A.    No.

23        Q.    In February of '05 what was the status of

24   the Delta project?

FLYNN REPORTING ASSOCIATES

74

1    A.    We were at the tail end of the job for our

2    work and the project was almost ready to open.

3              (Short recess taken.)

4              ARBITRATOR ASHER:  I have a question.

5    Mr. Levesque, when was the projected completion date

6    for the outside of the project?

7    A.    They wanted to be in originally I believe

8    in April of 2005.

9              ARBITRATOR ASHER:  This is for your

10   work, your contract, April of '05?

11   A.    Yes.

12             ARBITRATOR ASHER:  And your actual

13   completion date?

14   A.    We completed the regular work sometime in

15   December, but we were on the site doing some extra

16   work up until March, I believe.

17   Q.    Of what year?

18   A.    Both of those were 2005.  December 2004 was

19   when we were done with our work, and March of 2005

20   we were totally off the job with the work that we

21   had performed the remainder of the year -- the

22   school year.

23   Q.    You were not clear on that answer.  When

24   did you finish what you called the regular work?

FLYNN REPORTING ASSOCIATES

75

```
 1     A.   December 2004.

 2     Q.   Then the extra work, the punch list items,

 3  when did you finish that?

 4     A.   December 2004.

 5     Q.   So what work was left after that?

 6     A.   Extra work on the existing building.

 7     Q.   What did you complete that extra work?

 8     A.   March 2005.

 9     Q.   Did the terminal open in April of 2005?

10     A.   Somewhere around that date.  I don't know

11  exactly, but yes.

12     Q.   It was in the month of April?

13          ARBITRATOR ASHER:  What do you mean by

14  extra work?

15     A.   We replaced some panels on the existing

16  structures of the towers.

17     Q.   Meaning?

18     A.   Stair towers in the existing building that

19  was adjacent to Terminal A.

20     Q.   So this was not part of the Terminal A

21  project?

22     A.   No.  It was extra work.

23          ARBITRATOR ASHER:  The contract at

24  issue here was really finished in December 2004;
```

FLYNN REPORTING ASSOCIATES

76

```
 1   correct?

 2       A.   Yes.

 3            ARBITRATOR ASHER:  But at the outset

 4   of the project you anticipated a completion date of

 5   when?

 6       A.   About December, November of 2004.

 7            ARBITRATOR ASHER:  So approximately

 8   the same time?

 9       A.   Same time.

10            ARBITRATOR ASHER:  For the work that's

11   at issue in this grievance what was the projected at

12   the outset and the actual completion date of that

13   work?

14       A.   The stud work?  Is that what you're

15   referring to?

16            ARBITRATOR ASHER:  Yes.

17       A.   It would be the same time frame or within

18   days of the completion because there was a stud work

19   crew and they were followed by a panel crew

20   immediately behind them.

21            ARBITRATOR ASHER:  So the work that's

22   at issue here continued throughout your --

23            MR. GROSSO:  Right to the end.

24       A.   Right.
```

FLYNN REPORTING ASSOCIATES

77

 1    Q.   I think where we left off you had just

 2  finished looking at those reports of hours that were

 3  reported to the National Siding and Decking

 4  Agreement.  Now, in response to questions from the

 5  arbitrator you just explained that the contract was

 6  finished about the same time that you anticipated

 7  that it would be finished; is that right?

 8    A.   That's correct.

 9    Q.   So why are you claiming additional monies

10  to complete this work if, in fact, you finished it

11  around the same time you always intended to finish

12  it?

13    A.   If you'll look at the overtime and some of

14  the costs that I outlined in my summary of

15  additional costs, I think that speaks for itself.

16    Q.   Well, let's look at it.

17         MR. GROSSO:  This is in everyone's

18  packet.  It says Litigation Against The Union, and

19  it lists all the various numbers which I'm going to

20  have the witness testify to.

21    Q.   Have you seen that document, sir?

22    A.   Yes, I have.

23    Q.   What is it?

24    A.   It's a list of additional costs associated

FLYNN REPORTING ASSOCIATES

78

1   with the work at Terminal A at Logan Airport.

2       Q.   Who prepared this?

3       A.   I did.

4            MR. GROSSO:  I would like to offer

5   that as Employer Number 9.

6            MR. ANDERSON:  I have no objection to

7   it being admitted based on it's something that he

8   prepared, but we preserve any evidentiary objections

9   to the basis for this preparation.

10           MR. GROSSO:  And I understand.  It's a

11  chalk.  It's a summary.  He has with him all the

12  back-up which during the lunch break I would be more

13  than happy to let you look at, Mike, and if you want

14  it in evidence, we can put it into evidence.  It's a

15  breakdown that forms the basis for this summary.

16  Obviously, you have to reserve your right to

17  challenge.

18           MR. ANDERSON:  I will want to see

19  those exhibits then.

20           ARBITRATOR ASHER:  I'll consider this

21  demonstrative.

22      Q.   Mr. Levesque, would you please explain this

23  breakdown and what these numbers represent and how

24  you arrived at these numbers starting from the top?

FLYNN REPORTING ASSOCIATES

79

1    A.   The first item on the top is "stud and
2    track labor, M.R.S."  The exhibits are -- when I
3    repeated this, the exhibits were for my own use so
4    that I could go back and characterize what I had
5    done.
6    Q.   But for the record, this pile of
7    information here, the computer printouts, are these
8    the documents that you used to come up with these
9    numbers?
10    A.   They are a part of the documents.
11    Q.   If you'd continue.  What did it cost M.R.S.
12    to do the stud and track labor?
13    A.   $1,633,833.
14    Q.   I suppose the easiest thing to do would be
15    to compare it to the Conn Acoustics' bid, if we can
16    do that with everyone having copies of this
17    already.  That was Employer Exhibit 4.  Now, is that
18    the total for both the Delta terminal that the
19    satellite building?
20    A.   No.  It's only for Terminal A and not for
21    the satellite.
22    Q.   Do you have something later on for the
23    satellite?
24    A.   Yes, I do.

FLYNN REPORTING ASSOCIATES

80

1       Q.   So if we compare the $1.6 million, what was

2    the price for the metal stud framing and sheathing

3    that Conn Acoustics had given you?

4       A.   Roughly $1.2 million.

5       Q.   The metal stud framing and sheathing on

6    Exhibit 4?

7       A.   $670,000.

8       Q.   Does that correspond to the stud and track

9    labor?

10      A.   Yes.  That's the same item.

11      Q.   So how much was Conn Acoustics?

12      A.   I'm sorry, this also has the sheathing.  I

13   have a separate line item for sheathing.

14      Q.   Why don't we add those two together.  One

15   and two come to approximately what?

16      A.   $1.8 million.

17      Q.   What was the number that Conn Acoustics had

18   given you?

19      A.   $670,000.

20      Q.   $670,000 versus $1.8 million?

21      A.   Yes.

22      Q.   How did that number get to be so high,

23   almost three times?

24      A.   Workmanship, lack of good workmanship, and

FLYNN REPORTING ASSOCIATES

81

1    people were not trained.  Nobody took the obligation

2    that was promised in Washington in April to heart.

3    The training wasn't there.  The manpower wasn't

4    qualified.  They sent us people off the streets.

5    They issued an apprentice book the day before

6    sometimes.

7         Q.   Did you work a lot more hours?

8         A.   Absolutely.  We worked some overtime, too.

9         Q.   What was your schedule?  To reach the

10   December deadline for completion did you work a

11   scheduled overtime?

12        A.   Yes, we did.

13        Q.   What was that?

14        A.   Ten-hour days when we could.

15        Q.   How many days a week?

16        A.   On the weeks we worked overtime it was

17   every day.

18        Q.   Did you work seven days a week?

19        A.   No.  We did not work on Sundays.

20        Q.   So how many days did you work?

21        A.   At the most six.

22        Q.   Did you work six ten-hour days?

23        A.   I believe we worked five ten-hour days and

24   a regular day on Saturday.

FLYNN REPORTING ASSOCIATES

82

1    Q.    So 58 hours?

2    A.    Yes.

3    Q.    How many weeks did you do that?

4    A.    Without consulting the records, I can't

5    answer that.

6    Q.    Looking at the next item, quality control,

7    what is that?

8    A.    Because we had untrained help, we put a

9    quality control person on to observe and make sure

10   that the stud framing was installed properly.

11   Q.    The next item, Item 4, boom lifts, how much

12   was that?

13   A.    $165,804.

14   Q.    Did Conn Acoustics give you a price for the

15   boom lifts?

16   A.    Yes, they did.  They gave an allowance of

17   $30,000.

18   Q.    And it cost you $165,000?

19   A.    Yes.

20   Q.    Why was that?

21   A.    It goes back to the same answer as before.

22   It took longer to do it with Sheet Metal Workers

23   than it would under the contract with Conn

24   Acoustics.

FLYNN REPORTING ASSOCIATES

83

1     Q.    And the forklift, what was the purpose of

2     the forklift?

3     A.    To distribute materials.

4     Q.    Was that involved in Conn Acoustics' price?

5     A.    No, it was not.

6     Q.    Is that something that Conn Acoustics would

7     have done, or would you have supplied the material?

8     A.    Conn Acoustics should have done it for the

9     part of the work they did.  They didn't break it

10    down and they should have.

11    Q.    So that was included in the Conn Acoustics'

12    price?

13    A.    Yes.

14    Q.    Now, you have labor supervision.  What is

15    that?

16    A.    It's additional supervision we provided for

17    the job.

18    Q.    Why did you have to provide additional

19    supervision?

20    A.    Because it was continuous training.

21    Q.    What do you mean by continuous training?

22    A.    The people that we got from the Local 17

23    could not do any layout work.  They didn't know how

24    to use a transit, an electronic level, so we had to

FLYNN REPORTING ASSOCIATES

84

1   have people there to supervise that and do all the

2   layout for them.  We could not send them out with a

3   set of plans and just tell them to do the work.

4   They didn't have any trained people.

5       Q.   The next item, Item 2, shop overtime, one

6   for panel fabrication and one for stud assembly.

7   Why were those incurred?

8       A.   When we were working overtime in the field,

9   we were also working overtime in the shop to

10  maintain the progress of the field.

11      Q.   Now, you've got insulation and sheathing

12  labor and in parentheses it says CCI.  What does

13  that stand for?

14      A.   It should be CCL, not CCI, but it was built

15  by Crown Corr, so it can remain that way.

16      Q.   What was that charge incurred for?

17      A.   Because we were falling behind on the

18  schedule because we didn't have not enough manpower,

19  so Crown Corr asked if we would take their

20  assistance and do part of the work on the satellite

21  building.

22      Q.   So did you subcontract some of that work to

23  CCL?

24      A.   Yes -- on a T & M basis.

FLYNN REPORTING ASSOCIATES

85

1    Q.    Do you know where they got their employees?

2    A.    They brought some of their own employees

3    from Indiana and they also hired some people from

4    Local 17.

5    Q.    You have stud framing materials and costs

6    associated with that.  Why are you charging for the

7    framing materials?

8    A.    Because that was covered under the

9    materials quote.

10    Q.    From Conn Acoustics?

11    A.    Yes.

12    Q.    Then you have boom lifts and forklifts

13    again with CCI.

14    A.    But those were paid for by M.R.S., so there

15    was no cost associated with it here.

16    Q.    So you have not added anything in for that?

17    A.    No.

18    Q.    The same thing, you have labor supervision

19    CCI, but you don't have a number for that?

20    A.    No, because it's in there.  It's their

21    number.

22    Q.    The last few items, vapor barrier --

23    A.    Mobilization.

24    Q.    -- is that material that was also supposed

FLYNN REPORTING ASSOCIATES

86

1    to be supplied by Conn Acoustics?

2        A.    Yes.

3        Q.    What is the CCI administrative fee?

4        A.    That was five percent cost added onto their

5    labor, materials, whatever they provided.

6        Q.    They had a five percent markup?

7        A.    Yes.

8        Q.    Ratio of apprentices to journeymen, why is

9    there a cost associated with that?

10       A.    Because if we were to use the proper ratio,

11   that was the difference using the formula that's in

12   the NASDC Agreement, and using their rate of

13   differential, that's the sum that I came up with not

14   only for the personnel that M.R.S. had on the job,

15   but also for the people that Crown Corr had on the

16   job.

17       Q.    You keep referring to a percentage in the

18   National Siding and Decking Agreement.  What is that

19   percentage?

20       A.    Roughly 50 percent.

21       Q.    And what does that mean?

22       A.    It means you have 50 percent -- that's the

23   figure I used.  I think it's even less than that.

24   You can have more than that, but I used 50 percent

FLYNN REPORTING ASSOCIATES

87

```
 1   for this charge.  It's the ratio of journeymen to

 2   apprentices.

 3        Q.   Is that one to one -- 50 percent?

 4        A.   Yes, it is.

 5        Q.   What percentage did you have on this job?

 6        A.   I can't tell you off the top of my head.  I

 7   would have to go back and look at the figures.

 8        Q.   But this represents the difference between

 9   the 50 percent and what you actually paid?

10        A.   Yes -- in man hours.  I have it calculated

11   in man hours and rate per hour.

12        Q.   You have a subtotal.  What is the subtotal?

13        A.   That's the subtotal for all the items.

14        Q.   How much is it?

15        A.   $4,372,299.

16        Q.   What was Conn Acoustics' bid?

17        A.   $1,191,500.

18        Q.   Now, this front page, those two numbers

19   that you testified to, that is just for the stud and

20   sheathing work; is that right?

21        A.   That's right.

22        Q.   There is nothing in here for the panels?

23        A.   No, there is not.

24        Q.   Let me ask you another question.  You heard
```

FLYNN REPORTING ASSOCIATES

88

1    Mr. Anderson's opening statement, and he referred to

2    some change in design and a cost to you to remove

3    panels that had already been installed and then to

4    reinstall them based on the new design.  Did you

5    hear that?

6        A.   Yes, I did.

7        Q.   Are you including any of that cost in these

8    numbers?

9        A.   No, we are not.

10       Q.   So that length of wall that had to be

11   removed and replaced, whatever that cost M.R.S., you

12   have not included in here?

13       A.   It's not reflected in these numbers.

14       Q.   It's not in the stud and track labor --

15       A.   No, it's not.

16       Q.   -- or the vapor barrier?

17       A.   No, it's not.

18       Q.   If we turn to the second page, there's a

19   total and then there's a number called OCIP?

20       A.   Yes.

21       Q.   Is that the number that it turns out you

22   did not have to pay?

23       A.   That's correct.

24       Q.   So the correct number for damages that you

FLYNN REPORTING ASSOCIATES

89

1    are seeking is the $3,180,779 and not the

2    $3,515,491?

3        A.    That is correct.

4            ARBITRATOR ASHER:  Mr. Levesque, were

5    you paid the full amount of the Conn Acoustics' bid,

6    $1.1 million?

7        A.    I beg your pardon?

8            ARBITRATOR ASHER:  Were you paid the

9    $1,191,500?

10       A.    Were we paid?

11           ARBITRATOR ASHER:  Yes, Item 19.  You

12   were paid the full amount of that -- M.R.S. was paid

13   for that work, the full amount?

14       A.    Yes.  That was part of the contract.

15           ARBITRATOR ASHER:  Were you paid

16   anything over and above that amount for this work at

17   issue?

18       A.    No.

19           ARBITRATOR ASHER:  Did you submit

20   change orders?

21       A.    No, there were change orders.  That's the

22   cost of doing the job with people who are not

23   qualified to do the work.

24           ARBITRATOR ASHER:  No change orders

FLYNN REPORTING ASSOCIATES

90

1    were submitted for this?

2        A.    For this?

3                ARBITRATOR ASHER:  Yes, for these

4    extra costs.

5        A.    No.  These were not chargeable to Skanska

6    or to Crown Corr to anybody else.

7                ARBITRATOR ASHER:  Because it was

8    still within your scope?

9        A.    Yes.

10       Q.    To further follow up on that question from

11    Arbitrator Asher, these numbers don't represent a

12    change in the scope of work?

13       A.    No, they do not.

14       Q.    They didn't give you additional work?

15       A.    No.

16       Q.    It just cost you this much money to do the

17    work you originally bid on?

18       A.    Yes.

19       Q.    In fact, Crown Corr took deductions from

20    your contract price based on the work they

21    performed?

22       A.    That's also correct.

23       Q.    Now, at some point in this project did you

24    have any discussions with the administrator for the

FLYNN REPORTING ASSOCIATES

91

```
 1   Local 17 benefit funds?

 2       A.   Yes, I did.

 3       Q.   And what was the reason for this

 4   conversation?

 5       A.   Well, because of cash flow problems we had

 6   fallen behind on some of our benefits, and he was

 7   calling to see when we would pay the benefits.

 8       Q.   Who called you?

 9       A.   Bob Keough.

10       Q.   What was the nature of the conversation?

11   What did you say to him and what did he say to you?

12       A.   He asked me when I would be able to pay the

13   benefits, so he could work out a schedule so we

14   could meet our benefits, and then he volunteered a

15   statement.  He said, After reviewing the reports and

16   the list of manpower, he said, You've got the dregs

17   of the Local or something to that effect.

18       Q.   Now, when the job was over and you tallied

19   up these numbers, did you request a meeting with the

20   International to talk about this project?

21       A.   Yes, we did.

22       Q.   Did such a meeting take place?

23       A.   Yes, it did.

24       Q.   When did it take place?
```

FLYNN REPORTING ASSOCIATES

92

```
 1      A.   December 2005, I believe.

 2      Q.   Let me show you this document and see if

 3  you if you've ever seen it before.

 4      A.   Yes, I have.

 5      Q.   What is that?

 6      A.   It's a letter that we sent to the

 7  International outlining some of our concerns, costs,

 8  et cetera.

 9      Q.   Is it a letter?

10      A.   It's a letter.

11      Q.   But it says "meeting."

12      A.   We were requesting a meeting with them,

13  yes.

14      Q.   But it lists attendees, so is this a

15  letter, or is this minutes of a meeting or an agenda

16  of a meeting that took place with a list of the

17  people who attended?

18      A.   Let me look at this a bit closer.

19           ARBITRATOR ASHER:  January 28, 2004.

20           MR. ANDERSON:  Jim, I believe that

21  year is wrong.

22           MR. GROSSO:  It's 2005 because it's

23  after the job.

24           MR. ANDERSON:  Can we stipulate that
```

FLYNN REPORTING ASSOCIATES

93

1    for the record?

2              MR. GROSSO:  Yes, please.

3              MR. ANDERSON:  This is a meeting on

4    January 28, 2005 --

5              MR. GROSSO:  -- that took place in

6    Washington, D.C.

7              MR. ANDERSON:  And the January 28,

8    2004 date is one year incorrect.

9              MR. GROSSO:  That's correct.

10        A.   This was an agenda.

11        Q.   Well, it says "attendees," so is this the

12   agenda of a meeting that actually took place with

13   those people in attendance?

14        A.   These were the people -- there was another

15   person here.

16        Q.   You cannot talk to anybody.  You cannot ask

17   anyone for help here.  If you can't testify to this,

18   we won't put it in.  If you don't recognize this

19   document, we won't put it in.

20        A.   I recognize the document, but if it's the

21   minutes of the meeting, I don't think it is, there

22   was a Mr. McCleese was also in attendance.  That's

23   what's confusing me.

24        Q.   We won't offer this document, but did you

FLYNN REPORTING ASSOCIATES

94

1  have a meeting ultimately in Washington, D.C. on or

2  about January 2005?

3      A.   Yes, we did.

4      Q.   Who, according to your recollection, was

5  present?

6      A.   Mike Sullivan, president of the Sheet Metal

7  International; Joe Nigro, his assistant, Rich

8  McCleese.

9      Q.   Who is Rich McCleese?

10      A.   An International representative.  I think

11  he's the head of the reps., Steve Levesque, and

12  myself.

13      Q.   What was the purpose of the meeting?  Who

14  called it?

15      A.   We requested a meeting.

16      Q.   What was the purpose of the meeting?

17      A.   The purpose of the meeting was to see if we

18  could reconcile the issues that had occurred at

19  Delta and also to try to determine if there was any

20  way they could provide us some relief.

21            ARBITRATOR ASHER:  At this time you

22  had already filed a grievance?

23      Q.   Did this meeting occur after you had filed

24  your grievance dated November 22, 2004?

FLYNN REPORTING ASSOCIATES

95

1    A.   Yes, it did.

2    Q.   Was this the meeting that has been

3    constituted as Step 1 of this procedure?

4    A.   Yes, it is.

5    Q.   So did you discuss with the representatives

6    of the International Union what had happened on the

7    Delta project?

8    A.   Yes, we did.

9    Q.   And you said you asked them for some

10   relief.  Specifically, what did you ask for?

11            MR. ANDERSON:  I have to object.

12   Evidence of settlement proposals should not be

13   before the arbitration panel.

14            MR. GROSSO:  Okay.  I'm not sure this

15   is a settlement discussion as much as a demand.  I

16   would phrase it more in the element of a demand and

17   then the response as opposed to --

18            MR. ANDERSON:  We can stipulate then

19   offers were made and there was no resolution

20   achieved at Step 1.  I don't think that the contents

21   of those proposals is appropriate for the

22   arbitrators to consider.

23   Q.   Then let me ask you this question, and

24   before you answer give Mr. Anderson a chance to

FLYNN REPORTING ASSOCIATES

96

1    object if he wishes.  Did you resolve the issues

2    that you raised at this meeting in January of 2005

3    with the International representatives?  Did you

4    resolve the issues that you raised?  He hasn't said

5    anything about an objection, so you can answer.

6        A.   No, we did not.

7        Q.   So as a result of that, we are now here?

8        A.   That is correct.

9        Q.   Now, is it your position that you are

10   seeking reimbursement from the International and

11   Local 17 for the money that you ended up paying that

12   exceeded the bid you had from Conn Acoustics for the

13   installation solely of the studding and sheathing on

14   this project?

15       A.   Yes, it is.

16            MR. GROSSO:  May I have just one

17   moment?  I think I'm done.

18            (Short recess taken.)

19       Q.   Just a couple of more questions,

20   Mr. Levesque.  I think you heard in the opening

21   statement by the International that the whole reason

22   you lost money on this job was because of the fact

23   that you poorly managed it and that it wasn't the

24   fault of the Sheet Metal Workers, but it was more

FLYNN REPORTING ASSOCIATES

97

1    the fault of management that this project cost so

2    much money.  Could you briefly describe your

3    career?  Did you go to college?

4        A.    Yes, I did.

5        Q.    When you were in college, did you work

6    during the summers?

7        A.    Yes.  I worked as an iron worker.

8        Q.    And what did you do as an iron worker?

9        A.    Metal buildings, metal panels, structural

10   steel -- anything that an iron worker was accustomed

11   to doing.

12       Q.    When did you start in the construction

13   industry?

14       A.    Well, the first time I worked on a

15   construction job was in 1958.

16       Q.    After you graduated from college, you said

17   that you had worked for a company called Morin?

18       A.    Yes.

19       Q.    What did Morin do?

20       A.    Morin in the early years was an installer

21   of metal wall panels.

22       Q.    How many years did you work for Morin?

23       A.    Twenty-eight years.

24       Q.    What work did you perform for Morin during

FLYNN REPORTING ASSOCIATES

98

1   those 28 years?

2       A.    After college I started to work for them.

3   I worked for them about four years as an iron worker

4   and as a supervisor.  Then I headed their

5   engineering department.  I was also the head of

6   their manufacturing.  At one time Morin was the

7   largest providers of metal wall panels in the

8   country.  During the years that I was there we did

9   about 26 power plants, and I was the manager on all

10  of them.

11      Q.    Were those power plants larger than

12  Terminal A?

13      A.    Oh, absolutely.

14      Q.    Were metal panels involved in those

15  projects?

16      A.    Every one of them.

17      Q.    And were you successful in those projects?

18      A.    Yes, we were.

19      Q.    I think you said you had been with

20  M.R.S. --

21      A.    Twenty years this year.

22      Q.    M.R.S. Specializes in metal panel wall

23  systems?

24      A.    Yes, they do.

FLYNN REPORTING ASSOCIATES

99

1     Q.   And you do engineering work?

2     A.   Yes, I do.

3     Q.   Have you ever had a situation on a project

4     similar to what you had on Terminal A in terms of

5     the cost overruns to complete the project?

6     A.   No, we have not.

7     Q.   Now, in your opinion, could M.R.S. have

8     done something else in terms of managing this

9     project that would have saved or at least mitigated

10    at least some of these losses that you're claiming?

11    A.   No, not in the course of the job.

12              MR. GROSSO:  I have no further

13    questions at this time.

14              MR. ANDERSON:  I do want to see the

15    exhibits that are the back-up, and that is going to

16    take a little bit of time.

17              MR. GROSSO:  It's 11:45.  Do want to

18    break for lunch and you can look through them?

19              MR. ANDERSON:  Yes.  I don't think it

20    makes sense to start cross until we finish lunch.

21              ARBITRATOR ASHER:  On this issue of

22    the breakdown of all the costs, Mr. Levesque, you're

23    going to be here tomorrow; right?

24    A.   Yes.

FLYNN REPORTING ASSOCIATES

100

```
 1                    ARBITRATOR ASHER:  Do you want to put

 2     that portion aside when you've had time to review

 3     it?

 4                    (Discussion off the record.)

 5                    CROSS-EXAMINATION OF ROLAND LEVESQUE

 6     BY MR. ANDERSON:

 7          Q.   Mr. Levesque, I'm Michael Anderson, and I

 8     represent the Sheet Metal Workers' International

 9     Association.  M.R.S. doesn't normally do stud

10     framing, does it?

11          A.   No, it does not.

12          Q.   And your managers are not normally managing

13     employees who are doing stud framing?

14          A.   We manage it when we -- we provided studs

15     before with our package.  Our managers are familiar

16     with the subs.  It's just that the work was

17     performed by a sub rather than by our own people.

18          Q.   And the reason why you reached out to Conn

19     Acoustics was that you needed somebody familiar with

20     doing stud framing; is that right?

21          A.   I wanted somebody who was an expert.

22          Q.   M.R.S. is not an expert the way

23     Conn Acoustics is?

24          A.   We have knowledge of studs and how they go
```

FLYNN REPORTING ASSOCIATES

101

1    together and all of that.  We just don't have the

2    manpower to do it.

3         Q.   But if I could ask the question again,

4    M.R.S. is not an expert in stud framing the way that

5    Conn Acoustics is?

6         A.   No.

7         Q.   Would that be correct?

8         A.   That would be correct.

9         Q.   Now, at the time you got the bid from Conn

10   Acoustics you didn't know whether there was going to

11   be a jurisdictional dispute the Sheet Metal Workers

12   and the Carpenters, did you?

13        A.   That's right, I did not know.

14        Q.   And you accepted Conn Acoustics' bid on the

15   understanding they would be having Carpenters doing

16   this?

17        A.   That's correct.

18        Q.   I take it that Conn Acoustics is not

19   governed by the Sheet Metal Workers' contract?

20        A.   That's right.

21        Q.   Conn Acoustics is not bound by, for

22   instance, the same apprentice ratios that appear in

23   the Sheet Metal contract?

24        A.   That's correct.

FLYNN REPORTING ASSOCIATES

102

1    Q.   Did you participate at all in the

2    jurisdictional grievance for the plan for the

3    resolution of jurisdictionals?  Does that ring any

4    bells?

5    A.   For which?

6    Q.   The arbitration that decided which union

7    would be assigned --

8    A.   No, I did not participate in that.

9    Q.   Did you hear about the outcome of that?

10    A.   Yes, I have.

11    Q.   Do you remember when that decision came

12    down?

13    A.   I have it listed here somewhere, I

14    believe.  July 28, 2003.

15    Q.   And that was shortly before the work on the

16    project actually began?

17    A.   Two days, three days.

18    Q.   After the project was awarded to the Sheet

19    Metal Workers did you have any conversations with

20    anybody at the Carpenters about the Delta job?

21    A.   No, I did not.

22    Q.   Did you seek to adjust your bid based on

23    the award to the Sheet Metal Workers?

24    A.   The bid was already submitted with a bond

FLYNN REPORTING ASSOCIATES

103

1    and everything.  I didn't have the opportunity to

2    adjust the bid.

3         Q.   Well, in your view, did the jurisdictional

4    award change the structure of your labor costs?

5         A.   If the proper training would have been

6    provided and the workmanship skills to the Sheet

7    Metal Workers, I don't know if it would have changed

8    it.

9         Q.   But you don't know whether employees

10   working for Conn Acoustics would have been entitled

11   to the same wage and benefit package that the Sheet

12   Metal Workers would?

13        A.   They have a different rate, if that's what

14   you're asking.

15        Q.   You don't know whether they --

16        A.   It's comparable depending on the area.

17        Q.   Do you know for sure what the wage and

18   benefit package rate would have been for employees

19   of Conn Acoustics?

20        A.   Not off the top of my head, but, like I

21   said, it's comparable.

22        Q.   Now, how about apprentices to journeymen

23   ratios, do you know if that would have been the

24   same?

FLYNN REPORTING ASSOCIATES

104

```
 1        A.   No, I don't.

 2        Q.   Did anyone from the Sheet Metal Workers

 3   International tell you in April of 2003 that the

 4   overall labor costs of the Delta job would be no

 5   more than what Conn Acoustics had bid?

 6        A.   No.

 7        Q.   Did you ever show the Conn Acoustics' bid

 8   to anybody in the Sheet Metal International?

 9        A.   No, I did not.

10        Q.   How about anybody at Local 17?

11        A.   No, I did not.

12        Q.   Did anybody make you any sort of guarantees

13   about what the upper limit of your labor costs would

14   be?

15        A.   No.

16        Q.   You had been a signatory for the Sheet

17   Metal Workers since 1987.  Do I have that right?

18        A.   Somewhere around there.

19        Q.   Had you ever participated in grievance

20   proceedings involving the Sheet Metal Workers before

21   this?

22        A.   Yes, I have.

23        Q.   How many?

24        A.   I was a panelist on one case in
```

FLYNN REPORTING ASSOCIATES

105

 1    Connecticut, and we participated in a grievance last

 2    April.

 3        Q.    When were you a panelist in Connecticut?

 4        A.    About four years ago.

 5        Q.    You were actually an arbitrator in the way

 6    that Mr. Asher is?

 7        A.    Yes.

 8        Q.    Who was the other arbitrator?

 9        A.    Danny Pasquinucci.

10        Q.    And Danny Pasquinucci is a --

11        A.    International rep.

12        Q.    -- representative for the Sheet Metal

13    Workers?

14        A.    Yes.

15        Q.    Do you remember when that was?  You said

16    several years ago?

17        A.    It was about four years ago.  I don't

18    remember the exact date.  No, I don't.

19        Q.    Now, you had suggested that with the metal

20    stud framing the decision had already been made by

21    somebody else to assign that to the Sheet Metal

22    Workers.  Do I have that right?

23        A.    Yes, you do.

24        Q.    Do you know who had already made that

FLYNN REPORTING ASSOCIATES

106

```
 1   decision?

 2        A.   No, I don't.

 3        Q.   If I suggested that it was the arbitrator

 4   in the jurisdictional dispute, would that sound

 5   right to you?

 6        A.   No, it would not.

 7        Q.   Who do you think actually made that

 8   decision?

 9        A.   I would think it was either Mike Sullivan

10   or Richard Pellar.  One of them.  Richard Pellar

11   initiated the jurisdictional dispute.

12        Q.   The dispute was against the Carpenters;

13   correct?

14        A.   Yes.

15        Q.   And as far as you understand, the

16   arbitrator ended up deciding between the claims of

17   the Sheet Metal Workers and the Carpenters?

18        A.   They decided in favor of the Sheet Metal

19   Workers.

20        Q.   Against the Carpenters?

21        A.   Yes.

22        Q.   And that was after you had submitted your

23   bid based on the Conn Acoustics' subcontract bid?

24        A.   Yes, it was.
```

FLYNN REPORTING ASSOCIATES

107

1     Q.    And, once again, after that decision came

2    down assigning to the Sheet Metal Workers M.R.S. did

3    not seek to change its bid?

4     A.    That's correct.

5     Q.    Let me refer you to Employer Exhibit 6.

6          MR. ANDERSON:  If you could show that

7    to the witness --

8     A.    Uh-huh.

9     Q.    I'm looking at the middle portion.  It says

10    "I spoke with Harrington and he is not in the mood

11    to sit down and bargain."  As you understand it,

12    were the Carpenters seeking the panel work as well

13    as the stud installation?

14    A.    I cannot substantiate that.  They might

15    have.  I don't have that knowledge.  I heard rumors

16    to that effect, but I don't know.

17    Q.    If the job had been awarded to the

18    Carpenters entirely, that would have meant that the

19    Carpenters would have been doing panel installation

20    as well as stud work; is that right?

21    A.    That is correct.

22    Q.    And that would have been outside the scope

23    of Conn Acoustics' bid?

24    A.    The panels would have, yes.

FLYNN REPORTING ASSOCIATES

108

1    Q.    Do you have any knowledge about Carpenters'
2    competence doing panel work?
3    A.    Yes.
4    Q.    And what is that?
5    A.    There are three contractors here in the
6    Boston area right now that we know very well that
7    are using Carpenters and successfully, so based on
8    that, I would think there has to be some degree of
9    competence.
10    Q.    But has M.R.S. ever used Carpenters to do
11    paneling work?
12    A.    Yes, we have.
13    Q.    On what jobs?
14    A.    We used them a few years ago on a couple of
15    jobs in Hartford.
16    Q.    Now, let's talk about the module that was
17    shipped to Local 17 for training.  Did
18    Mr. Bergantino ever tell that you Local 17 had staff
19    that could use the module and train people?
20    A.    No, he did not.
21    Q.    So I take it that he needed M.R.S. to
22    supply someone to do that training; is that right?
23    A.    I would think so.
24    Q.    And that ended up being Marcel Cyr?

FLYNN REPORTING ASSOCIATES

109

```
1       A.    That's correct.

2       Q.    Aside from the three days in June of 2003,

3  did M.R.S. make anybody else available to train

4  Local 17 employees --

5       A.    No, we did not.

6       Q.    -- or Local 17 members?

7       A.    No.

8       Q.    How much notice did M.R.S. give in advance

9  of Mr. Cyr's availability?

10      A.    It was an open window.  He could have been

11 there at anytime.  They told us to send him there

12 that week and that's what we did.  He could have

13 gone again.  He could have been there a month.  We

14 had made a commitment.

15      Q.    Did ever ask that Mr. Cyr return to Boston

16 to run the module?

17      A.    No, I did not.

18      Q.    So were there any M.R.S. Requests that

19 there be training on the module after June of 2003?

20      A.    There were verbal requests but none in

21 writing.

22      Q.    When were those verbal requests made?

23      A.    Between May and the start of the job.

24      Q.    Any after the start of the job?
```

FLYNN REPORTING ASSOCIATES

110

1     A.    There were many discussions about training

2     after that, but I don't know if --

3     Q.    But any requests to have training on the

4     module?

5     A.    No.

6     Q.    Now, Mr. Levesque, if I have it right, work

7     began on the project on August 1, 2003 and it

8     concluded as of about December of 2004; is that

9     right?

10    A.    That's right.

11    Q.    When the work concluded, I take it that it

12    finished on schedule?

13    A.    Close to schedule, yes.

14    Q.    And after completion had there been any

15    complaints from the clients or any other contractors

16    about the quality of the work that M.R.S. did?

17    A.    None.

18    Q.    I take it that the job was performed by

19    Sheet Metal Workers under the Siding and Decking

20    Agreement from August of 2003 through its

21    completion?

22    A.    That's correct.

23    Q.    During the course of this job was there a

24    time period that was especially bad as far as lack

FLYNN REPORTING ASSOCIATES

111

1  of manpower?

2      A.    I think we were lacking proper manpower for

3  the entire job.  There may have been some brief

4  periods where it may not have been as acute, but

5  that was a common denominator for this job.  It was

6  discussed weekly.

7      Q.    Was there a time when the International

8  took over more of a role from Local 17 in providing

9  manpower?

10      A.    The International?

11      Q.    Yes.

12      A.    Not to my knowledge.

13      Q.    Do you remember working with Jim Neary?

14      A.    Oh, yes.

15      Q.    Where he is from?

16      A.    He's from Connecticut.

17      Q.    Was he was representing the International?

18      A.    He represented the International, but he

19  didn't bring along any manpower.

20      Q.    Do you know whether he helped to secure

21  manpower from other areas?

22      A.    He did not, to my knowledge.

23      Q.    Now, by February of 2004 once you working

24  with a substantial number of employees from the

FLYNN REPORTING ASSOCIATES

112

1    Sheet Metal Workers Local 40?

2        A.    No.  We had the same contingent of workers

3    from Local 40 throughout the job.  I believe

4    Local 40 through Local 17 sent three or four men and

5    referred them to Local 17, but the contingency of

6    men that spent time on the job was pretty consistent

7    after the job got up to speed.

8        Q.    Did you have employees from any other areas

9    besides Boston?

10        A.    Yes.  I think we had three employees from

11    Detroit.

12        Q.    As well as employees given you by Crown

13    Corr?

14        A.    Crown Corr participated and did the work on

15    the satellite building, but we did not have any of

16    their employees on our payroll, except for a short

17    period of time when they had men on the job but had

18    no place to put them.

19        Q.    Now, was there ever a time when Iron

20    Workers were working on your job?

21        A.    Yes.

22        Q.    Did you ever get a grievance from the Sheet

23    Metal Workers about the use of Iron Workers?

24        A.    No, I did not because they were requested

FLYNN REPORTING ASSOCIATES

113

1    by the Sheet Metal to supplement the welders on the

2    job.

3        Q.    Did the Sheet Metal Workers tell you that

4    M.R.S. was barred from bringing in workers from any

5    other source?

6        A.    By "source" do you mean union?

7        Q.    Let's start with off the street.  As you

8    understand it, could M.R.S. have hired workers off

9    the street and brought them to the Sheet Metal --

10       A.    I'm sure we could have.

11       Q.    As you understand the operation of the

12   contract, could you have done so?

13       A.    Yes.

14       Q.    M.R.S. usually hires employees independent

15   of the union and then brings them to the union to

16   sign up; isn't that right?

17       A.    We've done that in the past, yes.

18       Q.    That's your normal practice in Connecticut,

19   isn't it?

20       A.    It is.

21       Q.    Now, was there ever a time when M.R.S. was

22   required to pay a penalty for the timeliness or the

23   quality of its work?

24       A.    There were no penalties.

FLYNN REPORTING ASSOCIATES

114

1      Q.    Help me to understand this.  Stud and track

2    labor is typically something done prior to the

3    installation of panels; isn't that right?

4      A.    Yes.  It supports the panels.

5      Q.    On the Logan job you would have had to do

6    the stud and track labor before the panels were

7    installed?  I take that back.  Were you doing stud

8    and track labor throughout the duration of the

9    project?

10     A.    Yes.

11     Q.    So you do stud and track labor and that is

12    immediately followed by the installation of the

13    panel?

14     A.    That is correct.

15     Q.    Would it be fair to say that the two

16    operations are connected?

17     A.    They are connected because one supports the

18    other.

19     Q.    There was a time when M.R.S. had problems

20    with its exterior walls; isn't that right?

21     A.    There was an engineering issue raised by

22    Crown Corr.

23     Q.    Can you explain exactly what the

24    engineering issue was?

FLYNN REPORTING ASSOCIATES

115

1     A.    Crown Corr hired a separate engineering

2   firm to review the engineering done by a local

3   engineer, and they chose to use the firm that they

4   had hired and replaced the engineer of record.

5     Q.    Who was the local engineer that you first

6   used?

7     A.    Sabbagh Associates.

8     Q.    Can you spell that?

9     A.    S-A-B-B-A-G-H Associates.

10     Q.    Sabbagh Associates had designed -- tell me

11   exactly what they designed.

12     A.    They designed the stud framing system for

13   the project, submitted it, and received approval for

14   it.

15     Q.    But it turns out that Sabbagh Associates

16   design didn't work; isn't that right?

17     A.    Not necessarily.

18     Q.    Well, there was a problem with the stud

19   framing system; isn't that right?

20     A.    There was a problem that Crown Corr stated,

21   but Sabbagh was never given the opportunity to

22   review that situation.

23     Q.    Did Crown Corr say what the problem was?

24     A.    The design basically.

FLYNN REPORTING ASSOCIATES

116

 1      Q.    Crown Corr at that point was not

 2   complaining about the quality of workmanship?

 3      A.    No.

 4      Q.    What was needed to be done once Crown Corr

 5   brought in its separate engineer?

 6      A.    Change in stud gauge and the fastening

 7   method were the two most acute problems.

 8      Q.    Can you explain what the change in the stud

 9   gauge was?

10      A.    In some places they went from 16 or 18 to

11   12 gauge in particular locations.

12      Q.    I'm sorry, it went from 16 to 18?

13      A.    In some instances, 12 gauge.  The spacing

14   was also changed in some places.

15      Q.    Which was different than the specification

16   that you were using at the beginning?

17      A.    It was not different than the

18   specifications.  It was different than what Sabbagh

19   had designed.  It met the requirements of the

20   specifications.

21      Q.    By the way, when you got Conn Acoustics'

22   bid, were they working off of Sabbagh's design?

23      A.    They were working off architectural

24   drawings, specifications, plans and specs.

FLYNN REPORTING ASSOCIATES

117

1     Q.    But Conn Acoustics, were they relying on

2     any particular specification of gauge?

3     A.    The project specifications listed 16 gauge.

4     Q.    As a result of Crown Corr's intervention,

5     that changed, didn't it?

6     A.    That's correct.

7     Q.    So they were using different gauge?

8     A.    That's correct.

9     Q.    With different spacing?

10    A.    In some instances, they still used 16

11    gauge, but in other instances they increased the

12    gauge.

13    Q.    And that change made a difference in how

14    much time it would take to do the stud framing work,

15    didn't it?

16    A.    It didn't change the time.  It changed the

17    cost of the materials for the studs.

18    Q.    Now, didn't there come a point where M.R.S.

19    actually had to rip out walls that had already been

20    installed and reinstall it?

21    A.    As a result of that change that Crown Corr

22    wanted to make, yes.

23    Q.    And that's work that involved stud framing?

24    A.    It did.

FLYNN REPORTING ASSOCIATES

118

1       Q.   So, in other words, you had to pay for the
2    labor to put the walls up to begin with?
3       A.   Yes.
4       Q.   And then you had to tear it down and do it
5    all over again?
6       A.   That's correct.
7       Q.   And you had not counted on that extra work
8    when you got a bid from Conn Acoustics in April, did
9    you?
10       A.   No, I did not.
11       Q.   You said there was change in the fastening
12    method.  Could you explain that further?
13       A.   Well, the design specifications allowed for
14    powder-actuated tubes.  Ramset and Hilti is a common
15    brand, and the engineer that eventually -- that
16    Crown Corr had hired had us change to fasteners
17    where you drill and use Number 14 fasteners.
18       Q.   So you had to use a different fastening
19    method --
20       A.   Yes.
21       Q.   -- when you reinstalled the stud framing --
22       A.   That's correct.
23       Q.   -- per Crown Corr's direction?
24       A.   Yes, through the engineer.

FLYNN REPORTING ASSOCIATES

119

1               ARBITRATOR ASHER:  Let me ask a

2      question.  Did any design changes -- any work

3      required because of the design changes, are they

4      included in your report?

5           A.   No, they are not.

6               ARBITRATOR ASHER:  Did you submit

7      change orders for design change work?

8           A.   I could not.  I had a contract, plans, and

9      specs.  I could not request a change order when we

10     have the contract plans in place.

11          Q.   Well, let me come back to that then.  I

12     understood from what you said that you had to do a

13     certain degree of stud framing twice; is that right?

14          A.   That's correct.

15          Q.   And stud framing is what you included in

16     Item Number 1, stud and track labor; correct?

17          A.   Correct.

18          Q.   So this total for total stud and track

19     labor includes both the labor required to put the

20     wall up the first time and the labor required to put

21     it up a second time?

22          A.   That's incorrect.

23          Q.   Could you explain why?

24          A.   Because we job cost.  That was isolated on

FLYNN REPORTING ASSOCIATES

120

1    its own because we also had a potential lawsuit

2    against Sabbagh and maybe against the engineer that

3    Crown Corr hired, so we isolated that cost as a

4    separate item.

5        Q.   Well, when you say isolated it as a

6    separate item, I need to be clear about this.

7    You're claiming against the International

8    $1.6 million in stud and track labor.  The work that

9    your employees had to do to put this wall up a

10   second time, you're telling me was stud framing

11   work?

12       A.   Yes.

13       Q.   So I want to know why this $1.6 million

14   figure does not include the extra work that it took

15   to do that wall a second time.

16       A.   Because it's very simple.  We job cost by

17   cost everything we do on a job.  That part of it was

18   isolated because we knew that we had a potential

19   claim against the engineer and so it was carried

20   separately.  It was not duplicated.

21       Q.   How did you carry that if not under stud

22   and track labor?

23       A.   It was carried as an engineering problem.

24       Q.   You allocated to the engineering problem

FLYNN REPORTING ASSOCIATES

121

1    what kind of work?  The time to it took to put wall

2    up the second time?

3        A.    And the time it down to tear it down and

4    put it up the second time.

5        Q.    Now, all of this work was work that you

6    were doing with the same crew of employees; right?

7        A.    That's correct.

8        Q.    You didn't have a separate squad to put

9    things up and take them down?

10        A.    We increased the manpower level to

11    compensate for that.

12        Q.    By the way, just so we understand, when did

13    you have to take to the wall down and put it back

14    up?

15        A.    It started roughly October 8, 2003, give or

16    take a day.

17        Q.    Do you know when you completed putting up

18    this replacement wall up?

19        A.    No, I don't.

20        Q.    I want to look at the back-up here.

21    Mr. Levesque, I'm looking at the job items running

22    from, let's say, install thin composite wall, for

23    instance.  How did you differentiate that from other

24    types of work?

FLYNN REPORTING ASSOCIATES

122

1                MR. ANDERSON:  I'll withdraw that.

2        Q.    How many categories did you have to

3    differentiate the kind of work that your employees

4    did on the project?

5        A.    Maybe 200, give or take.

6        Q.    So install thin composite walls, studs

7    slash track, you're saying was kept distinct from

8    the work on putting the wall back up?

9        A.    That is correct.

10        Q.    But I take it that included in the stud and

11    track labor is work involved using the different

12    gauge that Crown Corr's engineer required?

13        A.    Yes.

14        Q.    Changing the gauge and the spacing?

15        A.    In some instances.  I don't know if there

16    was any of it on the wall that was removed, but in

17    some instances there was.

18        Q.    Gauge and spacing were things that Conn

19    Acoustics considered when they put in their bid;

20    isn't that right?

21        A.    Yes.

22        Q.    In your calculations have you made any

23    attempt to compensate for the effect of those

24    changes?

FLYNN REPORTING ASSOCIATES

123

1     A.    What changes?

2     Q.    The changes in engage and spacing, for

3   instance.

4     A.    No.  With Conn Acoustics, if I would have

5   used them, they would have bid the job just like we

6   did with plans and specs. and any change would be

7   absorbed in their price.

8     Q.    Really?  Let me have you look at Employer's

9   Exhibit 4.  Could you read Footnote 3 at the bottom?

10    A.    About the gauge of studs?

11    Q.    Yes.

12    A.    That is an item we would have had to pay

13  extra if the gauge was changed.

14    Q.    You would have had to pay Conn Acoustics

15  more?

16    A.    Yes, but you have to remember that the

17  original design by Sabbagh, a registered engineer in

18  the State of Massachusetts and who does nothing else

19  for a living, used 16-gauge, and it worked in his

20  calculations, and they were submitted to the owner

21  and the architect, and they all came back stamped as

22  approved.

23    Q.    And that was before Conn Acoustics put its

24  bid in?

FLYNN REPORTING ASSOCIATES

124

1    A.   Yes.  Conn Acoustics did their bid at the

2    beginning of the job.  Sabbagh was part of their

3    package, but he did not start designing until maybe

4    April or May after we had a letter of intent.

5    Q.   But you're contemplating a lawsuit against

6    Sabbagh, aren't you?

7    A.   We've considered it, yes.

8    Q.   And I take it that Crown Corr's engineer,

9    who I believe is Larson; is that correct?

10    A.   Yes.

11    Q.   And Crown Corr's engineer said Sabbagh's

12    design was no good?

13    A.   That's correct.

14    Q.   And you ended up having to use the design

15    that Larson gave you?

16    A.   We had no choice.

17    Q.   Was there ever a time when Hilti

18    powder-actuated guns were used in the stud framing?

19    A.   Yes, there was.

20    Q.   Was there ever a time when M.R.S. believed

21    that the Sheet Metal Workers were not using the

22    Hilti guns appropriately?

23    A.   I would have to ask that question of JR.

24    He's much more familiar than I am.  Not to my

FLYNN REPORTING ASSOCIATES

125

1    knowledge.

2        Q.    Do you know whether Hilti representatives

3    ever came to the job site?

4        A.    Oh, yes.  They came frequently at the

5    beginning of the job.

6        Q.    Was there ever a time when Hilti

7    representatives were going to show the Sheet Metal

8    Workers the proper use of the Hilti gun?

9        A.    Yes, training.

10       Q.    In fact, didn't it happen that the Hilti

11   representatives had to admit that even they could

12   not use the Hilti guns in order to do the stud

13   framing appropriately?

14       A.    There was one particular plate that an

15   employee, and I don't think he was a Local 17

16   employee either, was trying to hold a 3/16th plate

17   over his head and he shot with a Hilti gun to

18   temporarily hold it, and it failed.  It didn't

19   penetrate, so it fell to the ground, and that's the

20   catalyst that started this entire fiasco by the

21   engineer.  That was the catalyst.

22       Q.    So if I understand the story right, a Hilti

23   representative came to try to do an installation

24   correctly with the Hilti gun?

FLYNN REPORTING ASSOCIATES

126

1    A.   We called Hilti before the job started, and

2    when we first started the job, Hilti was there to

3    make sure that the proper pins were being used and

4    the proper shots.  During the course of the job

5    every couple of weeks the Hilti representative would

6    come and would train the new men that came to the

7    job because in today's marketplace everybody has to

8    be trained.

9    Q.   But at some point M.R.S. needed to change

10   from using Hilti pins to a different kind of

11   fastener; is that right?

12   A.   Only at the insistence of Larson.

13   Q.   Right.  But because Larson, Crown Corr's

14   engineer, told you that you should not be using

15   Hilti pins anymore --

16   A.   That's right.

17   Q.   -- then you had to go to a different

18   method?

19   A.   That's right.

20   Q.   And that required more training for the new

21   method; right?

22   A.   Yes.

23   Q.   Now, when you claim stud and track labor at

24   $1.6 million against the International, I take it

FLYNN REPORTING ASSOCIATES

127

1    that includes the work that was done with Hilti

2    pins?

3        A.    Yes.

4        Q.    And that also includes the work that was

5    done with the replacement method that Larson

6    required?

7        A.    All except the replacement work.

8        Q.    By "replacement work" you're talking about

9    the work that was done to erect the new wall?

10       A.    Yes.

11       Q.    Now, Mr. Levesque, has anyone threatened

12   M.R.S. with a lawsuit over this project?

13       A.    Not to my knowledge.

14       Q.    Aside from Sabbagh, has M.R.S. threatened a

15   lawsuit against anybody relating to this project

16   besides the unions?

17       A.    Besides what we're talking about now, no.

18       Q.    How many supervisors did M.R.S. have on the

19   job site on a given day?

20       A.    Average -- five, probably four or five.

21       Q.    These are not Local 17 members, I take it?

22       A.    No, they're not.

23       Q.    These are longtime employees of M.R.S.?

24       A.    That's correct.

FLYNN REPORTING ASSOCIATES

128

1      Q.    I take it that the supervisor's job was to

2  make sure that workers were doing their jobs right;

3  is that correct?

4      A.    That's part of it.

5      Q.    And if workers were installing something in

6  an incorrect way, it was the supervisor's job to

7  catch it at the moment?

8      A.    We also had a quality control person that

9  we hired for the job.

10     Q.    Were there any instances of poor

11  workmanship by Sheet Metal Workers employed by

12  M.R.S. that were not caught immediately by

13  supervisors?

14     A.    That is always possible.

15     Q.    Do you know of that?

16     A.    No, I don't.

17     Q.    Now, I see, for example, looking at

18  Employer Exhibit Number 7, and this is the document

19  labeled Crown Corr, Item Number 2 says that M.R.S.

20  has an immediate need for four welders.  Wasn't the

21  immediate need to get welders to fasten the

22  replacement plates on?

23     A.    In some instances, yes, we needed welders.

24     Q.    You needed to do welding as part of this

FLYNN REPORTING ASSOCIATES

129

1   rework?

2       A.   No.  I don't think we did any in the

3   rework, but in certain areas where we had

4   long-length studs, the penthouse, some places that I

5   can't verify that we did any welding on the rework.

6       Q.   Had you planned to use welders at the

7   beginning of the project?

8       A.   No, we had not.

9       Q.   So the need for welders only showed up

10  while the project was happening?

11      A.   As a result of Larson.

12          MR. GROSSO:  Let him finish his

13  question before you answer; otherwise, she can't get

14  both of you.

15          (Discussion off the record.)

16      Q.   So when you say "as a result of Larson,"

17  you're referring to Crown Corr's engineer?

18      A.   That's right.

19      Q.   If I can place a month when Crown Corr's

20  engineer said that Sabbagh's plans needed to change,

21  would October of 2003 sound correct to you?

22      A.   Sure.

23      Q.   Do I have it right then that Larson said

24  that welding needed to be done, whereas at the

FLYNN REPORTING ASSOCIATES

130

1  beginning of the project you thought that welding

2  would not be needed?

3      A.   That's correct.

4      Q.   Was Conn Acoustics told that welding would

5  be necessary on this project?

6      A.   They were not because there was none

7  required by the specifications.

8      Q.   I take it that your claim against the

9  unions includes the unions' alleged inability to

10  provide welders for you; is that right?

11      A.   The claim against the unions?

12      Q.   Right.

13      A.   I don't see that itemized on my list.

14      Q.   But welding was involved in some of the

15  stud and track labor that you've itemized here?

16      A.   Yes.

17      Q.   Would you agree with me that welding is a

18  more time-consuming process than, let's say, the use

19  of a Hilti pin?

20      A.   It can be depending on who is doing the

21  wedding.

22      Q.   But you have a lot more equipment to use?

23      A.   You have a lot more equipment, but it

24  depends on how much weld you're putting down and who

FLYNN REPORTING ASSOCIATES

131

1    the individual is.

2        Q.    If you're doing a lot of welding, that

3    takes longer than --

4        A.    If you put in a three-inch weld, yes, but

5    this welding was not that kind of welding.

6        Q.    Do you know of any written documents after

7    January of 2004 where M.R.S. told anybody that

8    staffing was inadequate on the job?

9        A.    Without researching the documents, I can't

10   tell you one way or the other.

11       Q.    You don't know?

12       A.    No, because I'm not the only one that was

13   requesting manpower.

14       Q.    But you would agree with me that there were

15   a lot of e-mails between M.R.S. and Crown Corr and

16   the unions?

17       A.    And Crown Corr and the unions.

18       Q.    Understood.  And there were a lot of

19   e-mails between October of 2003 and January of 2004?

20       A.    If that was the beginning of the project.

21       Q.    Right.  Where people were saying that

22   staffing was not good?

23       A.    That's right.

24       Q.    Just to repeat, are you aware of any

FLYNN REPORTING ASSOCIATES

132

1    e-mails or other written documents after January

2    2004 where that complaint was made?

3         A.   Without consulting the records, no, I can't

4    answer that.

5         Q.   Now, just going through the stud and track

6    labor --

7                   MR. ANDERSON:  And, Jim, we may have

8    to talk about how to describe what's in all this

9    without actually burdening the record.

10                  MR. GROSSO:  Okay.

11        Q.   Let me hand this to you, Mr. Levesque.

12                  ARBITRATOR ASHER:  Is this a good time

13   to break?

14                  MR. ANDERSON:  How about five more

15   minutes and let's see where we are?

16        Q.   Mr. Levesque, the stud and track labor that

17   you're claiming as Item 1, this is labor that you

18   paid for on a weekly basis; isn't that right?

19        A.   That's correct.

20        Q.   So in the first week of January of 2004 you

21   paid a set amount for stud and track labor, and you

22   are now saying that you paid too much for the labor,

23   that that labor cost was --

24        A.   That it took too long to perform.

FLYNN REPORTING ASSOCIATES

133

1     Q.    Pardon?

2     A.    That it took too long to perform.

3     Q.    Right, and, therefore, the way in which

4  M.R.S. was damaged was that it's payroll was too

5  heavy; correct?

6     A.    Correct.

7     Q.    And you paid that payroll out on a weekly

8  basis?

9     A.    Yes.

10     Q.    So let's go back to October of 2003.  Was

11  there any doubt in your mind at that point that you

12  were not getting adequate staffing on the job from

13  the Sheet Metal Workers?

14     A.    There was no doubt.

15     Q.    For each week during October of 2003 you

16  had to pay out what you believed to be more than you

17  should have been paying for labor?

18     A.    Without analyzing each week individually,

19  that's a fair statement.

20     Q.    But week by week you were paying out more

21  than what you thought you should have?

22     A.    Right.

23     Q.    Did you believe that that was a result of

24  the union's violation of the agreement?

FLYNN REPORTING ASSOCIATES

134

1    A.   At that point in time we were just trying

2    to get manpower that was qualified and trying to get

3    the job to move forward.

4    Q.   I understand.

5    A.   We didn't have much time for analyzing

6    every penny that went into the job.

7    Q.   But you knew as of October 2003 that you

8    were not getting --

9    A.   The progress was not satisfactory.

10   Q.   You were not getting an adequate supply of

11   skilled labor from Local 17 you believed; is that

12   correct?

13   A.   Yes.

14   Q.   And that would be true through November of

15   2003 and December of 2003?

16   A.   Yes.

17   Q.   For each month for which you're claiming

18   damages you were aware at the time that you were not

19   getting sufficient manpower from the locals; is that

20   right?

21   A.   Yes.

22   Q.   And the way that damaged M.R.S. is that on

23   a week-by-week basis through that time period you

24   were having to pay more than what you thought you

FLYNN REPORTING ASSOCIATES

135

1    should for labor?

2        A.    Yes.

3        Q.    So, for example, boom lifts, do you know

4    when you paid the rental expense for those boom

5    lists?  Let me back up.  Let me refer you to Item

6    Number 4.  I'm looking at Number 4, boom lifts,

7    $165,000.  Is that a rental fee for boom lifts?

8        A.    Yes.

9        Q.    Do you know when you paid for the rental on

10    those boom lifts?

11        A.    Not off the top of my head without

12    consulting the records, no.

13        Q.    Were those boom lifts ever used on the

14    rework of the wall?

15        A.    No.

16        Q.    How about the forklift?

17        A.    No, it was not.

18        Q.    Do you know when you paid for the rental

19    fee on the forklift?

20        A.    No.

21        Q.    Was it in 2003?

22        A.    If the invoice was in 2003 and you allow

23    for processing, I would suppose that it is.

24        Q.    And you have the invoices and all these

FLYNN REPORTING ASSOCIATES

136

1   things?

2       A.   We'll provide you with everything.

3       Q.   If you would, please.

4            MR. ANDERSON:  Jim, it doesn't have to

5   be this minute, but I would like to see that before

6   we close.

7       A.   It will not be today and it will not be

8   tomorrow.  We can send it to you.  There are boxes

9   and boxes and boxes of that stuff.

10           MR. GROSSO:  We'll talk about it.

11      Q.   For Number 6, labor supervision, exactly

12  who were you paying for labor supervision?

13      A.   That's the value of the additional labor

14  that we had to provide, labor supervision as a

15  result of having to continuously supervise and train

16  people coming to the job.

17      Q.   So that is the compensation of the

18  supervisors?

19      A.   Yes.  It's a percentage.

20      Q.   You calculated that based on the thought

21  that a supervisor -- you should have had only "X"

22  number of supervisors and you needed to hire "X"

23  plus one or two?

24      A.   Possibly.  It's a learning curve.

FLYNN REPORTING ASSOCIATES

137

1    Q.    You have here Number 7, shop overtime for

2    panel fabrication.  I thought you told me that panel

3    work was not included in your itemization of

4    damages?

5    A.    But we had to work overtime on the makeup

6    because at some point during the job we were way

7    behind schedule, so that's why we had to work the

8    overtime and for that time we calculated money that

9    was used to work the shop and the overtime to keep

10   up with the field requirements.  There was a

11   schedule situation.

12   Q.    Now, the need to do the rework of the wall

13   that Larson said you had to re-do, that put you back

14   on your schedule, didn't it?

15   A.    Somewhat.

16   Q.    And that had effects on your work on the

17   rest of the project?

18   A.    Well, that was compensated for by the fact

19   that Crown Corr did the work on the satellite

20   building, so that offset that part of it.

21   Q.    So Crown Corr actually took over and did

22   work that was originally assigned to you?

23   A.    That's correct.

24   Q.    And by doing that Crown Corr actually made

FLYNN REPORTING ASSOCIATES

138

1   it easier to finish on time; right?

2       A.   Absolutely.

3       Q.   And it reduced the labor that you would

4   have had to pay for?

5       A.   I paid for the labor.  It didn't reduce any

6   labor.

7       Q.   But Crown Corr supervised them?

8       A.   They didn't do it for free.

9       Q.   So Crown Corr supervised them on the

10  project?

11      A.   Yes.  They brought in their own

12  supervisors.

13      Q.   They did it with Sheet Metal Workers, I

14  take it?

15      A.   Iron Workers and Sheet Metal Workers.  They

16  used both.

17      Q.   Because the Sheet Metal Workers were not

18  objecting to the use of Iron Workers when they were

19  needed; is that right?

20      A.   My supervision was Iron Workers.

21      Q.   But I'm talking about not supervisors but

22  rank and file workers.

23      A.   Rank and file -- they never allowed Iron

24  Workers on the job except for a few welders for a

FLYNN REPORTING ASSOCIATES

139

1   short period of time.

2                   MR. ANDERSON:  Give me a minute.  We

3   may rest, but I think it makes sense to break for

4   lunch.

5                   ARBITRATOR ASHER:  Okay.

6                   MR. GROSSO:  It's about 20 to 1:00

7   right now.

8                   ARBITRATOR ASHER:  Whatever you guys

9   want.

10                  (Lunch break taken.)

11      Q.   Mr. Levesque, just a few more questions.

12   As a sheet metal contractor, were you familiar with

13   the International's job bank?

14      A.   I've heard of it.

15      Q.   Do you know what it is?

16      A.   Yes.

17      Q.   What is it?

18      A.   It's supposed to work as a pool where

19   people from around the country can call and try to

20   get additional manpower.

21      Q.   Did you ever call on the job bank to help

22   you on the Logan project?

23      A.   No, but I understand the Local did.

24      Q.   One thing that I want to clear up.  All of

FLYNN REPORTING ASSOCIATES

140

```
 1    the rework job on the exterior walls we've talked

 2    about, did you use any boom lifts at all?

 3         A.   Sure.

 4         Q.   But you're saying that the rental for those

 5    boom lifts is not included in Item 4 on your list?

 6         A.   To my knowledge, it's not.

 7         Q.   That the cost of renting boom lifts for the

 8    rework is somehow separated out?

 9         A.   Yes.

10         Q.   And would this show up on the receipts?

11         A.   You mean invoices?

12         Q.   Right, on the invoices that you listed as

13    Exhibit B.

14         A.   Probably when they code the invoice it

15    should be.

16         Q.   On those invoices, and I'm talking about

17    the invoices that are the back-up for your items on

18    Employer Exhibit 9 --

19         A.   That's stud and track?

20         Q.   Right.  Now, Most of those invoices are

21    dated prior to September 2004; isn't that right?

22         A.   Well, you're talking about the Crown Corr

23    invoices that --

24         Q.   Well, let's start with the Crown Corr
```

FLYNN REPORTING ASSOCIATES

141

1    invoices.

2        A.    Exhibit 9 is a Crown Corr item.

3        Q.    Let's start with the Crown Corr invoices.

4    Most of those are dated prior to September 2004,

5    aren't they?

6        A.    Yes.

7        Q.    And when you're looking at the labor costs

8    that are referred to in Item Number 1, most of those

9    labor costs were for work done prior to September of

10   2004; isn't that right?

11            MR. GROSSO:  Number 1?

12       A.    No, that's not right.

13       Q.    I'm sorry, September 2004.  Why don't you

14   look at the stack you have there.  Maybe it's the

15   one next to you.

16            MR. GROSSO:  We could probably

17   expedite this and save time for the panel.  There's

18   a date on the document of October 25, 2004, so it

19   has to be at least before October.

20            MR. ANDERSON:  I'm asking about

21   September 2004.

22       Q.    So this document, Employer Exhibit 9,

23   doesn't claim, obviously, for anything after

24   October 25th?

FLYNN REPORTING ASSOCIATES

142

```
1      A.   No, it's not.

2      Q.   So what I'm asking you is, Would it be fair

3   to say that most of the work that is listed in Item

4   Number 1 is work that was actually done in September

5   2004 and earlier?

6      A.   Yes.

7      Q.   Now, one more item I need to ask you about

8   on Number 11, stud framing materials.  Would those

9   materials include the Hilti pins and the Hilti

10  powder-activated guns?

11     A.   No, they do not.

12     Q.   Would that include the fasteners that the

13  Larson firm told you to use?

14     A.   That was extracted from a Crown Corr

15  invoice?

16     Q.   Well, I'm looking at Number 11.  It just

17  has CCI in parentheses next to it.

18     A.   Okay.

19     Q.   What I'm asking you is, On that item does

20  that include --

21     A.   That would not include fasteners.

22     Q.   Do you know whether the stud framing

23  materials that you paid for were the same cost as

24  what Conn Acoustics budgeted for in its bid?
```

FLYNN REPORTING ASSOCIATES

143

1      A.   We bought it from the same supplier.

2      Q.   So that number really should be the same,

3   shouldn't it?

4      A.   Yes, it should be.

5      Q.   Would it make a difference that you changed

6   the gauge on the studs?

7      A.   Yes, it would.

8      Q.   And that would cause you to pay more for

9   the stud framing materials?

10     A.   Yes.

11     Q.   And, as I understand it, Larson did tell

12  you to change the gauge?

13     A.   In some areas.

14     Q.   And that would be included in Number 11?

15     A.   I would think so.

16     Q.   Now, finally, Mr. Levesque, would it be

17  fair to say that by, say, June of 2004 you had all

18  the employees working on the Delta job that you

19  would end up having by its completion?

20     A.   I can't answer that.  Numerically maybe,

21  but I can't answer that.

22     Q.   That's all I have for now.  Thank you.

23  Jim, I think Paul has some questions.

24           MR. KELLY:  Yes, I do.

FLYNN REPORTING ASSOCIATES

144

```
 1            CROSS-EXAMINATION OF ROLAND LEVESQUE

 2    BY MR. KELLY:

 3        Q.   You talked earlier about the meeting in

 4    April of 2003.  I believe it was in Washington,

 5    D.C.?

 6        A.   Yes.

 7        Q.   Do you remember what the date of that

 8    meeting was?

 9        A.   I believe it was April 8th.

10        Q.   And that was the meeting you characterized

11    Joe Bergantino as being angry at one point?

12        A.   Yes.

13        Q.   Do you remember that?

14        A.   Yes.

15        Q.   Do you remember a discussion about

16    specialty workers at that meeting?

17        A.   Sure.

18        Q.   What is a specialty worker?

19        A.   It's a classification used under the

20    National Siding and Decking Association.  It's a

21    person that is hired as a sheet metal worker at a

22    different rate and different benefits than the

23    normal journeyman.

24        Q.   Is it fair to say that the specialty worker
```

FLYNN REPORTING ASSOCIATES

145

1   receives wages and benefits below a field

2   construction journeyman?

3       A.   It is.

4       Q.   And it is a classification under the Siding

5   and Decking Agreement which is not under the

6   Standard Form Agreement, for example?

7       A.   That is also correct.

8       Q.   Tell me what the discussion was at the

9   April 8, 2003 meeting concerning the subject of

10  specialty workers.

11      A.   When Mr. Sullivan told the whole group and

12  specifically Joe Bergantino that this job would be

13  done under the terms and conditions set forth in the

14  National Siding and Decking Agreement, he didn't

15  have any specialty workers, and I also believe that

16  he wasn't pleased about the fact that it was being

17  done under the Siding and Decking Agreement rather

18  than the Local agreement, and that's where he got

19  agitated.

20      Q.   Let me see if I understand what you just

21  said.  Are you saying that Mr. Bergantino's

22  agitation was over the application of the National

23  Siding and Decking Agreement?

24      A.   That's my recollection.

FLYNN REPORTING ASSOCIATES

146

1    Q.    And it had nothing to do with specialty

2    workers?

3    A.    That's part of -- when you do that, you use

4    specialty workers.  You have a ratio.

5    Q.    Did you understand that the Delta terminal

6    job was pursuant to a project labor agreement --

7    A.    Yes.

8    Q.    -- that the building trades had entered

9    into?

10    A.    Yes.

11    Q.    And it was required to be done union -- all

12    the work on the job?

13    A.    Correct.

14    Q.    Or at least under the PLA?

15    A.    Correct.

16    Q.    Was it because of that project labor

17    agreement that you signed the document that is in

18    evidence as Joint Exhibit Number 2?

19    A.    Which document are you talking about?

20        MR. GROSSO:  Let me show you.

21    Q.    You signed a document called the Standard

22    Form of Union Agreement.

23    A.    Yes.

24    Q.    And that an agreement, as I understand it,

FLYNN REPORTING ASSOCIATES

147

1    was between you and Local 17?

2         A.    Yes.   We had an agreement.

3         Q.    And you had never signed an agreement with

4    Local 17 before?

5         A.    That agreement was signed before that job.

6         Q.    That agreement was signed in June of 2003,

7    wasn't it?

8         A.    Could be, but the reason we signed that

9    agreement had nothing to do with the Delta job.

10        Q.    It didn't?

11        A.    No, because in order to be considered a

12   local contractor where you can hire your own people

13   without going to the hall, that's a benefit of

14   having a local agreement, but the agreement -- and

15   that was not my stipulation, that was mandated by

16   Mr. Sullivan that the job was going to be done under

17   the Siding and Decking Agreement.   That was one of

18   the items that was part of the April 8th meeting.

19   The National Siding and Decking was to govern the

20   job.

21        Q.    Your understanding is that at least the

22   economic benefits from the employee's side of the

23   National Siding and Decking Agreement are not as

24   substantial as the economic benefits of the Standard

FLYNN REPORTING ASSOCIATES

148

```
 1   Form Union Agreement?

 2       A.   Well, you would have to define the

 3   difference, so what are you getting at?

 4       Q.   You said that the reason that

 5   Mr. Bergantino was upset was because the Siding and

 6   Decking Agreement was going to govern that job?

 7       A.   Yes.

 8       Q.   Right?

 9       A.   Yes.

10       Q.   The alternative to the Siding and Decking

11   Agreement would have been the Standard Form Union

12   Agreement; correct?

13       A.   Right.

14       Q.   Didn't you understand that Mr. Bergantino

15   thought that the Standard Form Union Agreement had

16   economic benefits for his members that were far

17   superior to the National Siding and Decking

18   Agreement?

19       A.   Absolutely.

20       Q.   Now, if I understand correctly, it was also

21   at that meeting that the discussion about the stud

22   framing work took place and that it was going to be

23   done by Sheet Metal Workers as opposed to

24   Carpenters?
```

FLYNN REPORTING ASSOCIATES

149

1    A.   That's correct.

2    Q.   Did you raise at that meeting the question

3    of what contractor you were going to be able to get

4    to do that work?

5    A.   No, we did not discuss contractors.

6    Q.   You at that point had had discussions with

7    Conn Acoustics?

8    A.   We had, yes.

9    Q.   Conn Acoustics had not yet submitted a bid

10   to you, had they?

11   A.   We had a verbal price on them.  They didn't

12   confirm it in writing until probably a little bit

13   later, but we had -- his pricing we had and it was

14   part of our bid package.

15   Q.   But at the time you received Conn

16   Acoustics' bid on April 13th you knew you were not

17   going to be able to use Conn Acoustics?

18   A.   Not necessarily, because this was going

19   through a jurisdictional dispute, and if you

20   consider the preponderance of the work in this area,

21   a good way to decide on that factor, which is quite

22   often the case, then the Carpenters would have -- so

23   by that time it was still up in the air.  We didn't

24   find that out, as you probably know, until much

FLYNN REPORTING ASSOCIATES

150

1    later.

2         Q.    Until the end of July?

3         A.    Yes.

4         Q.    Now, you had a contract yourself with the

5    Carpenters?

6         A.    That's correct.

7         Q.    Thus, no matter which way the

8    jurisdictional dispute went, you were going to be

9    the subcontractor to Crown Corr?

10        A.    Yes.

11        Q.    When did you submitted your bid to Crown

12   Corr?

13        A.    December 13, 2002.

14        Q.    Your testimony, if I understand it, is that

15   you carried in the Crown Corr bid a Conn Acoustics

16   number which was not supplied to you in writing

17   until several months later?

18        A.    That is correct.

19        Q.    Do you have a copy of the bid that you

20   submitted to Crown Corr?

21        A.    I don't have it with me, but I have it at

22   the office.

23        Q.    Your testimony earlier was that at some

24   point you reached agreement with Crown Corr based on

FLYNN REPORTING ASSOCIATES

151

1    the bid that you submitted.  Do you recall that?

2         A.   Yes.

3         Q.   When was it that you reached agreement with

4    Crown Corr?

5         A.   The exact date I don't remember.  It was a

6    verbal discussion.  If I checked the records, I

7    could probably pinpoint it.

8         Q.   What records would you have to check to

9    pinpoint that date?

10        A.   E-mails maybe.  I know it was originally in

11   a conversation.  He told us that we had the job and

12   we proceeded from there.

13        Q.   Do you remember when it was that Crown Corr

14   got the job from Skanska?

15        A.   No, I don't.

16        Q.   Do you know one way or another whether

17   Crown Corr had bid the job to Skanska at the time

18   you bid the job to Crown Corr?

19        A.   No, I don't.

20        Q.   With respect to the period between December

21   of 2002, which I believe you said is when you

22   submitted your bid to Crown Corr, and April of 2003,

23   somewhere in that period I assume is when Crown Corr

24   said, We got the job?

FLYNN REPORTING ASSOCIATES

152

1    A.   Yes.

2    Q.   Can you give me some idea of when it was in

3  that period?

4    A.   No, I can't.

5    Q.   Did the agreement that you reached with

6  Crown Corr, vis-a-vis this job, did the terms of

7  that agreement differ from the terms of your bid to

8  Crown Corr?

9    A.   No.

10    Q.   So the numbers on your bid were the numbers

11  that Crown Corr accepted?

12    A.   Well, I don't know if they were the

13  original numbers.  There was some exchange but --

14    Q.   That's what I'm asking.  The original bid

15  you sent to Crown Corr was December of 2002?

16    A.   Uh-huh.

17    Q.   And after that there was some back and

18  forth and eventually there was an agreement reached

19  between you and Crown Corr, but the financial terms

20  differed from the December bid?

21    A.   Yes.

22         MR. KELLY:  I believe it would assist

23  the panel to resolve this case, and, frankly, the

24  parties to understand it if we had access to the bid

FLYNN REPORTING ASSOCIATES

153

1    that M.R.S. submitted to the Crown Corr and, also,

2    the ultimate contract that was reached between

3    Crown Corr and M.R.S. and, therefore, I would ask

4    that those documents be produced through this

5    proceeding.

6                    MR. GROSSO:  I don't have a problem

7    with that.  We'll bring them the first thing

8    tomorrow morning.

9        Q.    Now, you indicated, Mr. Levesque, that

10    after the April meeting you went looking for an

11    alternative to Conn Acoustics; is that correct?

12        A.    Yes.

13        Q.    I understood from your testimony just a

14    couple of minutes ago that Conn Acoustics was at

15    least contingently still on the contract pending the

16    outcome of the jurisdictional dispute proceedings;

17    is that correct?

18        A.    That's correct.

19        Q.    So you were looking for a substitute for

20    Conn Acoustics if such a substitute were to become

21    necessary?

22        A.    That's correct.

23        Q.    And you indicated that you could not find

24    any Local 17 contractor to take the place of

FLYNN REPORTING ASSOCIATES

154

1   Conn Acoustics?

2       A.   That performed stud work, that's right.

3       Q.   Did you locate any non-Local 17 contractor?

4       A.   Not in Sheet Metal.

5       Q.   To do the stud work?

6       A.   Right.

7       Q.   You didn't find any sheet metal contractor,

8   whether it was a Local 17 contractor or --

9       A.   I didn't do a worldwide search, but not in

10  New England.

11           (Discussion off the record.)

12      Q.   So your testimony is you looked in

13  New England for a Sheet Metal contractor that could

14  do the stud work, and you were unable to find one?

15      A.   Yes.

16      Q.   And you indicated that you sent Mr. Cyr to

17  the Local 17 training center in June of '03?

18      A.   Late May, early June -- around that time

19  frame.

20      Q.   And somebody showed up to take the

21  training, a retiree I think you said?

22      A.   That's what I was told by Mr. Cyr.

23      Q.   Did Mr. Cyr train that person?

24      A.   I don't know the answer to that.  I'm sure

FLYNN REPORTING ASSOCIATES

155

1    they had dialogue about the product.

2        Q.   My question is, Were the three days that

3    Mr. Cyr was, according to your testimony, present in

4    Boston to provide training, was that sufficient

5    training to get someone up to speed on the metal

6    studs?

7        A.   The answer to that is no, but after the

8    third day and nobody was showing up, there was no

9    interest, so we ordered him back.  If they had

10   requested Mr. Cyr later, he would have gone back.

11   We would have honored our commitment.

12       Q.   I appreciate that, but I guess my question

13   is, How long would it take to train someone to do

14   this stuff using the system that was in place at the

15   training center?

16       A.   It would probably -- if you did it eight

17   hours a day, it would probably about three weeks or

18   so, but our hope was to train not only personnel but

19   to train the people that were involved in the

20   educational training for Local 17, so they, in turn,

21   would include it in their curriculum.  That was the

22   goal.  That was the end result of that training

23   process.

24       Q.   The answer to my question was three weeks?

FLYNN REPORTING ASSOCIATES

156

1    A.    Yes.

2    Q.    Are you saying that it would be three weeks

3    of full-day training in order to do this work?

4    A.    That's my estimation.

5    Q.    That's more than a college course?

6    A.    I don't know about that.  A college course

7    takes a few more hours than that.

8    Q.    Well, three weeks?  You're talking eight

9    hours a day for 15 days is what it's going to take

10   to learn this?

11   A.    You have to remember that part of that

12   process would have also included panel installation.

13   In that module we're talking about there are seven

14   or eight different types of panels, plus the stud

15   work, the layout, laser work.  That's my estimation.

16   I don't know.  I'm not a trainer, but if we had the

17   cadre of people that do the apprenticeship training,

18   that was the goal -- to get those people on board

19   and get them going so that they could train other

20   people.  It would have been beneficial for not only

21   Local 17 and M.R.S. but anybody else in Sheet Metal.

22   Q.    Do you recall in October there was an

23   injury on the job?

24   A.    There were several injuries on the job.  I

FLYNN REPORTING ASSOCIATES

157

1    don't recall any in particular.

2        Q.   Let me just ask you if my understanding is

3    accurate, but I understood there were sheet metal

4    plates that were affixed to the beams and that the

5    wall system attached to these plates.  Is that

6    accurate?

7        A.   Well, if you're referring to the situation

8    about the plate that I described earlier over the

9    door of the entry ways, it had hit him but he didn't

10   lose any time from work that I know of, and that's

11   what precipitated the review of it by the engineer.

12       Q.   I think we're talking about the same thing.

13   I don't know the specifics of it, but it was my

14   understanding that there was a plate attached to an

15   overhead beam that came down?

16       A.   Yes.  He was in a scissor lift and he was

17   working by himself, I don't know why, but he was

18   hanging onto one, and I guess he shot it with the

19   other end, and when he turned around, it fell down

20   and --

21       Q.   But it was a long piece?

22       A.   Ten feet long and eight inches wide of

23   3/16ths material.

24       Q.   That plate is attached to the beam?

FLYNN REPORTING ASSOCIATES

158

1      A.   It is.

2      Q.   Then is it true that the wall system is

3   then attached to that plate?

4      A.   That was a horizontal support that carried

5   a trim piece.  The wall was not totally dependent on

6   that plate.  There was a termination piece over the

7   entry way.

8      Q.   It was my understanding that that plate and

9   plates like it had up until that point been attached

10   with these Hilti guns.  Is that your understanding?

11      A.   That's how it was designed, yes.

12      Q.   That's what the specs. said?

13      A.   Yes.

14      Q.   And it was shortly after that incident that

15   a change was made by this other engineering firm?

16      A.   That's when Crown Corr initiated a review,

17   yes.

18      Q.   Wasn't it required at that point that these

19   plates be welded to the beams?

20      A.   No, it was not.

21      Q.   Wasn't it?

22      A.   No.

23      Q.   Isn't that why there was an immediate need

24   for welders?

FLYNN REPORTING ASSOCIATES

159

```
1       A.    No.

2       Q.    What was the immediate need for welders?

3       A.    Where we had long-span studs that spanned

4    more than 12 or 14 feet, whatever, they required a

5    special clip at the top that the engineer decided

6    had to be welded rather than fastened with screws.

7       Q.    The clips had to be welded?

8       A.    Yes.

9       Q.    To hold the horizontal stud piece?

10      A.    Yes.

11      Q.    And the engineer that you were just

12   referring to, this was Larson, Crown Corr's

13   engineer, and not the other fellow Sabbagh?

14      A.    That is correct.  Sabbagh was the engineer

15   that prepared all the drawings that were approved

16   and that's who we were using up until that point.

17      Q.    You also testified about a meeting in

18   January of 2005.  Do you remember that testimony?

19      A.    A meeting in January of 2005?

20      Q.    Erroneously dated January 2004.  I

21   understood you to be saying you understood that to

22   be a grievance dispute resolution meeting pursuant

23   to the November 22, 2004 grievance?

24      A.    We did not consider it that way, but we
```

FLYNN REPORTING ASSOCIATES

160

1  were informed by the union for the Sheet Metal

2  International later that under the rules of the

3  National Siding and Decking that type of a meeting

4  can be considered the first step, and that's how it

5  came about.  That was a meeting to describe our

6  position and it occurred at Delta, as I stated, and

7  how we'd resolve it for the future.

8      Q.   You characterized that meeting as a meeting

9  at which you were trying to reconcile issues and

10  hopefully provide some relief to M.R.S.?

11     A.   Yes.

12     Q.   And that meeting was preceded by a

13  grievance dated November 22, 2004?

14     A.   That's correct.

15     Q.   So however you characterize it, it was a

16  meeting after the grievance for the purpose, if

17  possible, of resolving it?

18     A.   Yes.

19     Q.   Fair enough?

20     A.   Fair enough.

21     Q.   There was no representative of Local 17 at

22  that meeting, was there?

23     A.   No, there was not.

24     Q.   And no representative of Local 17 was

FLYNN REPORTING ASSOCIATES

161

1    invited to that meeting, was there?

2        A.    Not to my knowledge.

3        Q.    You did indicate that you served in a

4    capacity similar to Mr. Ball and Mr. Asher at some

5    point four or five years ago?

6        A.    Yes.

7        Q.    Was that pursuant to the National Siding

8    and Decking Agreement?

9        A.    Yes.

10       Q.    Did Mr. Asher appoint you?

11       A.    Yes.

12            MR. ANDERSON:  You have to be clear

13   which Mr. Asher.

14       Q.    Mr. Anthony Asher is the administrator, as

15   I understand it?

16       A.    That is right.

17       Q.    It's typical in your experience that

18   Mr. Anthony Asher appoints the employer

19   representative to the panels?

20       A.    That's correct.

21       Q.    And you were appointed by him in that case?

22       A.    Yes, that is also correct.

23       Q.    And is it also your understanding that the

24   SMWIA appoints the employee representative to the

FLYNN REPORTING ASSOCIATES

162

1    panel?

2        A.    Yes.

3        Q.    Had you ever had grievances as an employer?

4        A.    Before this project, never.

5        Q.    You never had a union bring you a

6    grievance?

7        A.    No, sir --  in all the years that I can

8    remember anyway.

9        Q.    You indicated that you did have an

10   agreement with -- Local 40 I think is your home

11   local?

12       A.    It is.

13       Q.    Was that the National Siding and Decking

14   Agreement that you've had since 1987?

15       A.    That was also the Local agreement.

16       Q.    Similar to the Standard Form?

17       A.    We had a Standard Form Agreement and also a

18   National Siding and Decking Agreement at that time.

19       Q.    With respect to your estimate of time that

20   it would take to train somebody in this wall system,

21   you were describing the length of time it would take

22   some completely inexperienced person like me, for

23   example, to learn how to do that?

24       A.    Yes.

FLYNN REPORTING ASSOCIATES

163

1     Q.   It would not take a journeymen Sheet Metal

2   Worker that long to do it to, would it, to learn how

3   to do it?

4     A.   That would depend on the individual.  I

5   can't make a judgment on that.  Some people can

6   catch on in a day or two, there's no doubt about

7   that, but I think overall to do a real good job and

8   understand the process it takes time.  I've been in

9   it a few years, and I'm still learning, so I think a

10   fresh guy who came to the training program may know

11   the basics, but you couldn't let him loose on a job

12   by himself.

13     Q.   But, as I understand it from your testimony

14   in this proceeding, that is exactly what happened?

15     A.   What?

16     Q.   Untrained people were let loose on the job.

17     A.   That's correct.

18     Q.   And I can understand the problem if they

19   should have had three weeks of training and didn't

20   get it, but I further understand that after some

21   period of time of doing this work they were going to

22   acquire the skills, at least if not to understand

23   the entire system and all the different variations

24   of it, at least after some period of time they would

FLYNN REPORTING ASSOCIATES

164

1    be able to do the work that was required of this

2    job?

3        A.   You would expect that, and I will not

4    answer that specifically because I think the two

5    people from my company that will follow me spent

6    every day on that job and are much better qualified

7    to answer that question.  You would expect it, I

8    agree, but --

9        Q.   You would expect that after a month or so

10   on the job, you'd be able to do it, wouldn't you?

11       A.   For some people, yes, but they can give you

12   a lot better answer for those questions in this

13   specific case than I can.

14       Q.   I have two more questions, Mr. Levesque.  I

15   understood you earlier to be saying that what you

16   did was you took a percentage of the supervisory

17   costs that you incurred on the job and attributed

18   those to this overage problem?

19       A.   Yes.

20       Q.   That's what happened?

21       A.   Yes.

22       Q.   What percentage did you take?

23       A.   Four months is what I used, I believe,

24   according to my notes that I made at the time.

FLYNN REPORTING ASSOCIATES

165

1       Q.    In other words, a percentage of your

2    supervisory costs is the same percentage as four

3    months bears to the entire course of the job?

4       A.    Yes.

5       Q.    And the course of the job I think you've

6    already stated went from August of '04 to December

7    of '05?

8       A.    That is accurate.

9       Q.    So we're talking about -- I'm sorry, August

10    of '03 to December of '05?

11       A.    '04.

12       Q.    So we've got about 16 months, and the

13    percentage that you applied is approximately

14    25 percent?

15       A.    Yes.

16       Q.    Why did you choose four months?

17       A.    In discussing it with JR and some of the

18    other people on site, that's what we came up with.

19       Q.    But does that mean it took you four months

20    longer to do the job?

21       A.    No, not necessarily, but additional

22    personnel it may have taken during certain times of

23    the project.

24       Q.    One of the other things I think you put on

FLYNN REPORTING ASSOCIATES

166

1    your list of costs is you had extra shop time, and I

2    guess what I'm trying to get my head around is that

3    notion that if you had a project in the field that

4    you considered to be unproductive, why did an

5    otherwise unproductive field crew cause your shop to

6    incur overtime?

7        A.    Well, our shop is geared to what's

8    happening in the field, and we were working overtime

9    and we needed to work overtime in the shop to

10   maintain that.  We don't have a large work force in

11   the shop.  It's a very small work force.

12       Q.    But your work force in the shop was

13   essentially preassembling the systems to be

14   installed in the field?

15       A.    That's correct.

16               MR. KELLY:  No further questions.

17               MR. GROSSO:  I have a couple on

18   redirect.

19               REDIRECT EXAMINATION OF ROLAND LEVESQUE

20   BY MR. GROSSO:

21       Q.    On this whole issue of manpower from

22   Local 17, Mr. Levesque, both -- let's go back to

23   what Mr. Anderson asked you.  He said, Weren't you

24   entitled under the contract to go outside of

FLYNN REPORTING ASSOCIATES

167

1    Local 17 and bring in other people if they were

2    unable to supply you with any.  Do you remember that

3    question?

4        A.   Yes, I do.

5        Q.   In fact, weren't you getting people already

6    from Local 17 who were coming off the streets?

7        A.   Yes.

8        Q.   And, in fact, didn't you go as far away as

9    Detroit to try to get people to work on this

10   project?

11       A.   Yes, we did.

12       Q.   Did you get anyone from Detroit?

13       A.   We got three people from Detroit.

14       Q.   Did they know what they were doing?

15       A.   Absolutely.

16       Q.   Why did you call Detroit as opposed to

17   Washington, D.C. or Connecticut or New York?

18       A.   Because the business manager there and I

19   have served on a couple of boards together and I

20   know that they were using the National Siding and

21   Decking Agreement before we were in this region, so

22   I contacted him and he sent us three very good men.

23       Q.   Again, in response to one of Mr. Anderson's

24   questions, he said, Isn't it your practice to find

FLYNN REPORTING ASSOCIATES

168

1   your own employees in Connecticut and then put them

2   into the union.  Do you remember that question?

3        A.   Yes.

4        Q.   In fact, you did that, didn't you?

5        A.   Yes.

6        Q.   Who trained those men and about how many

7   people are we talking about?

8        A.   Well, over the years everybody that worked

9   for us in Connecticut.

10       Q.   But how many people did you have on your

11  work force from Connecticut when you were doing the

12  Delta job?

13       A.   For the Delta job we provided 12 to 13 of

14  our own people.

15       Q.   Were those people that you, as Mr. Anderson

16  suggested, hired off the street and then applied for

17  membership in Local 40?

18       A.   At some point in time that is also

19  correct.

20       Q.   Who trained those 12 to 13 people?

21       A.   M.R.S.

22       Q.   Were they trained by Local 40?

23       A.   No, they were not.

24       Q.   Now, in your previous testimony, and again

FLYNN REPORTING ASSOCIATES

169

1    referring to that April 2003 meeting in Washington,

2    D.C., you testified that the Sheet Metal Workers

3    International president, Mr. Sullivan, told

4    Mr. Bergantino that they were going to do all this

5    work and that he was to supply you with trained men;

6    is that correct?

7        A.    That is correct.

8        Q.    And did he supply you with trained men?

9        A.    No, he did not.

10        Q.    So in response to Mr. Kelly's question

11    about how long it takes to train somebody, that

12    training would have to be done by M.R.S. employees;

13    right?

14        A.    That would be the best method.

15        Q.    Well, they weren't coming to you trained?

16        A.    No.

17        Q.    So if they were going to get trained, who

18    was going to train them?

19        A.    M.R.S.

20        Q.    Not Local 17 and not International?

21        A.    That's correct.

22        Q.    Now, a little bit about this rework.  I

23    think you said in your original testimony and I

24    think you said it several times in response to

FLYNN REPORTING ASSOCIATES

170

1    Mr. Anderson's questions that you are not charging

2    the cost of the rework in this grievance, are you?

3         A.   No, we are not.

4         Q.   Now, you hired the Sabbagh firm to do the

5    engineering for the wall systems; is that correct?

6         A.   Yes.

7         Q.   Did they have to submit shop drawings to

8    the design team for this project?

9         A.   Yes, they did.

10        Q.   Did they do that?

11        A.   Yes.

12        Q.   Were they approved by the architect?

13        A.   Yes, they were.

14        Q.   And did they include the 16-gauge metal

15   studs --

16        A.   Yes.

17        Q.   -- and the fastening system use the Hilti

18   guns?

19        A.   That is correct.

20        Q.   And that was all approved by the architect

21   in charge of the project?

22        A.   That is correct.

23        Q.   Now, did the architect change the design

24   for this system?

FLYNN REPORTING ASSOCIATES

171

```
 1     A.    No.

 2     Q.    Who changed it?

 3     A.    Crown Corr or --

 4     Q.    So they're the ones that came in and

 5  changed the whole system because this one plate fell

 6  down?

 7     A.    Yes.

 8     Q.    About how many feet of wall had been

 9  installed when this change occurred?

10     A.    Eight hundred.

11     Q.    Eight hundred feet?

12     A.    Yes.

13     Q.    And in that expanse of 800 feet had any one

14  of those wall panels failed?

15     A.    No, they had not.

16     Q.    Become detached from the structure?

17     A.    No, they had not.

18     Q.    So the only failure was this one plate?

19     A.    That's correct.

20     Q.    And then Crown Corr redesigned the method

21  to build and fasten these wall panels for the

22  remainder of the job?

23     A.    Yes.

24     Q.    That changed the gauge of the stud and the
```

FLYNN REPORTING ASSOCIATES

172

1    fastening system?

2        A.    Yes, it did.

3        Q.    Now, I think you told Mr. Anderson in

4    response to one of his questions you had five or so

5    supervisors on an average day.  Do you remember

6    that?

7        A.    Yes.

8        Q.    Mr. Anderson asked you another question

9    about, Isn't it true that one of your supervisors

10   saw something being done improperly that it would be

11   immediately corrected.  Did you hear that?

12       A.    Yes.

13       Q.    Did you have one supervisor for every

14   Local 17 person working on the project?

15       A.    Not necessarily.

16       Q.    You didn't have a one-to-one ratio of

17   supervisors to workers?

18       A.    No.

19       Q.    So could your one supervisor see if some of

20   the Sheet Metal Workers, in fact, were doing

21   something wrong?  Could he police everybody on that

22   job?

23       A.    It's impossible to do that unless you have

24   a one-on-one ratio.

FLYNN REPORTING ASSOCIATES

173

```
 1        Q.   Now, at one point I think Mr. Anderson
 2   said, Isn't it true that at the January 2004, and
 3   I'm paraphrasing his question, that you had a
 4   sufficient numbers of employees from Local 17, and I
 5   think he backed it up by saying, Because you didn't
 6   have any requests to the Union to give you more
 7   people.  Do you remember that?
 8        A.   Yes, I remember the question.
 9        Q.   Well, isn't it true that, Yes, you were
10   getting people referred from Local 17, but were they
11   trained?
12             MR. ANDERSON:  This is a little bit
13   leading.
14        Q.   What was the quality of the Local 17
15   members that were being supplied to you in
16   sufficient numbers after January 1, 2004?
17        A.   They were not different from the first
18   people on site that needed training.
19        Q.   So you had numbers, but you didn't have
20   trained numbers?
21        A.   That's correct.
22        Q.   There were a number of questions about
23   charging for the boom lifts and forklift and other
24   things.  When you were doing the rework on this
```

FLYNN REPORTING ASSOCIATES

174

1    800 feet of wall panel, did you stop all other

2    operations to do that rework?

3         A.   No, we did not.

4         Q.   So were you continuing to do the walls

5    while you were also removing and replacing the

6    800 feet of wall?

7         A.   Absolutely.

8         Q.   So is it possible that you were using boom

9    lifts on the newer sections rather than on the

10   rework?

11        A.   Sure.

12        Q.   Lastly, Mr. Kelly said to you, Isn't it

13   true that sooner or later after working for a few

14   weeks on the job these Local 17 men would figure out

15   how to do it.  Do you remember that question?

16        A.   Yes.

17        Q.   Whose responsibility was it to train these

18   people?

19        A.   Local 17.

20        Q.   One last question and it goes back to the

21   beginning.  I think Mr. Anderson asked you if Iron

22   Workers worked on the project.  Can you tell me in

23   what capacity Iron Workers worked on the project?

24        A.   Welding clips.

FLYNN REPORTING ASSOCIATES

175

1     Q.   Did they do any installation of studs?

2     A.   No, they did not.

3          MR. GROSSO:  I have no further

4     questions.

5          MR. ANDERSON:  Just some brief

6     recross.

7          RECROSS-EXAMINATION OF ROLAND LEVESQUE

8     BY MR. ANDERSON:

9     Q.   Mr. Levesque, you just testified that it

10    would be impossible to have supervisors work in a

11    one-to-one relationship with the Sheet Metal Workers

12    they were supervising.  Did the M.R.S. supervisors

13    get any special training themselves in stud training

14    before this job started?

15    A.   Some did and some did not.

16    Q.   Who got that training?

17    A.   We trained some of them and some of them

18    were involved in other projects where they

19    supervised stud installation or that we

20    subcontracted to somebody else.

21    Q.   Again, what expertise did M.R.S. bring to

22    the training of their supervisors in this kind of

23    stud training?

24    A.   The expertise that I've just discussed.

FLYNN REPORTING ASSOCIATES

176

```
 1   They were involved in other projects where studs

 2   were being installed.  Studs were being installed as

 3   a back-up to metal wall panels on almost every job.

 4        Q.   Right, but I understood you to testify

 5   beginning this morning that the reason M.R.S. looks

 6   to sub out this kind of work to firms like

 7   Conn Acoustics is that M.R.S. does not normally do

 8   this kind of work?

 9        A.   That is correct.

10        Q.   So let me ask the question again.  What is

11   M.R.S. drawing on, what resources and knowledge is

12   it drawing on when it trains its own supervisors in

13   how to do this work?

14        A.   We have a few Carpenters on our payroll,

15   too, and those people are very knowledgable and

16   that's who we use, plus their experience in the

17   field when they observe studs being installed and

18   we're ahead of them when we're putting metal panels

19   up and also when we hire a sub to do something.

20        Q.   You observe how the sub does the work?

21        A.   Sure.  We have our own supervisors doing

22   that.

23        Q.   Is that the same as observing your own

24   employees and supervising them than actually doing
```

FLYNN REPORTING ASSOCIATES

177

1    it?

2        A.    Pretty close.

3        Q.    Now, on the question of the rework

4    occurring while other operations were going on, do I

5    have it right that M.R.S. did not stop all other

6    operations, that it continued to do other work while

7    the rework was going on?

8        A.    Yes.

9        Q.    And that would include stud and track work?

10       A.    Yes.

11       Q.    While the rework on that wall was going on,

12   weren't you having to divert at least some workers

13   from what would have otherwise been stud and track

14   work to do the rework?

15       A.    There were a few of those, yes.

16       Q.    And the rework had an effect on the overall

17   schedule of the project's progress, didn't it?

18       A.    It may have had some impact.

19       Q.    In order to stay on that schedule, you had

20   to do things like schedule overtime?

21       A.    Yes.

22       Q.    And overtime not just on the employees who

23   were actually working on the rework but everybody

24   else on the crew as well; correct?

FLYNN REPORTING ASSOCIATES

178

1     A.   You have to reschedule.

2     Q.   So some workers that were doing stud and

3    track labor were having to do overtime because some

4    labor was being diverted from that work to the

5    rework; isn't that right?

6     A.   Yes.

7          MR. ANDERSON:  Nothing further.

8          RECROSS-EXAMINATION OF ROLAND LEVESQUE

9    BY MR. KELLY:

10     Q.   What was the value of the rework which you

11    said was taken out?  There has to be a value to the

12    800 feet that was removed.  What was the value of

13    that work?

14     A.   Keep in mind the stud framing that was

15    there was not destroyed.  It was reused.  But the

16    value was $372,607.

17     Q.   $372,000 was the rework of the 800 feet?

18     A.   Yes.

19     Q.   How many feet were involved altogether?

20     A.   On the job?

21     Q.   Yes.

22     A.   Almost 200,000 square feet.

23     Q.   200,000 square feet?

24     A.   Yes.

FLYNN REPORTING ASSOCIATES

179

1     Q.   How many is that in linear feet?

2     A.   That would be a wag on my any.  It's a very

3   small portion of the overall job.

4     Q.   That was a very small portion of the

5   overall job?

6     A.   Yes.  There was a lot of curtain wall and

7   there was a lot of glass in that wall.  The panels

8   and the stud frames that were removed were not

9   destroyed, but they were reused.  In some places

10   they were reinforced by a heavier gauge stud and the

11   clips were replaced.

12     Q.   I'm looking at Conn Acoustics, which you

13   said priced out the entire terminal at $600,000 and

14   some odd, and you're saying $372,000 is what we

15   spent to rework the 800 feet?

16     A.   That's right.

17     Q.   The other portion of your bid, if I have

18   this figured out accurately, you submitted a bid to

19   Crown Corr which included the stud framing portion

20   and it also included the panel portion?

21     A.   That is correct.

22     Q.   And your original plan was to have

23   Conn Acoustics or somebody else do the stud system

24   at $1.1 million; right?

FLYNN REPORTING ASSOCIATES

180

```
 1      A.   That's right.

 2      Q.   What was the value of the panel system?

 3      A.   I would have to tally it up.  I don't know

 4 off the top of my head.

 5      Q.   You don't know what the value of this

 6 contract was altogether?

 7      A.   Eight and a half million in the beginning.

 8      Q.   Of which the studs were 1.1?

 9           MR. GROSSO:  1.19.

10      Q.   Let's call it 1.2.  Was there any other

11 work that you subcontracted out?

12      A.   No.

13      Q.   So of the 8.5 less the 1.2 was yours?

14      A.   Yes.  Keep in mind that includes materials,

15 too.  The finished product on the outside, and that

16 material is much more expensive than studs.

17      Q.   What is the labor material breakout of the

18 $8.5 million?

19      A.   Without going back and looking at the bid

20 documents, I can't tell you.

21           MR. GROSSO:  We'll do so tomorrow.

22           ARBITRATOR ASHER:  Mr. Levesque, give

23 me a range of the number of workers you had on the

24 site.
```

FLYNN REPORTING ASSOCIATES

181

```
1      A.   Average?

2            ARBITRATOR ASHER:  Average.

3      A.   I would suggest that you ask the project

4  manager who is coming up next.  He has a better

5  handle on that than I do.

6            MR. GROSSO:  I actually have the list

7  of the total number of employees, and I will put him

8  in through JR.  He was on the job every day and he

9  can tell you what the average number was on a daily

10 basis.

11     A.   He kept all the job records.  I could take

12 a guess, but he will be able to tell you a lot

13 better than I can.

14           ARBITRATOR ASHER:  Is it your position

15 that assuming a worker or workers were unqualified

16 as you would consider them under the agreement that

17 you had the ability to go out and hire them from

18 anywhere including any trained union or non-trained

19 union worker?

20     A.   What is the question?

21           ARBITRATOR ASHER:  The question is,

22 Assuming you felt the workers were not qualified

23 after a certain period pursuant to the contract, you

24 could hire a worker from any source wherever?
```

FLYNN REPORTING ASSOCIATES

182

1     A.   Mike Durant, the business agent for the

2   Iron Workers, was there every day of the week, and

3   we tried many times when we were in a bind to get

4   Local 17 to allow us to use some of the Iron Workers

5   that we knew had done this work before, and the

6   answer was always the same.  I can produce Mike

7   Durant if somebody would subpoena him because he was

8   there every day of the week on site, and I talked to

9   him every time I went which was roughly twice a

10   week.  I'm sure JR and Scott D'Angelo had a lot more

11   conversations with Mike Durant than I did, and it

12   would have eased the pain for everybody.  We

13   probably wouldn't be here today if somebody would

14   have conceded and said, Let's get the job done the

15   best way so that M.R.S. can survive.

16            ARBITRATOR ASHER:  So your position

17   is, Whether practically you felt it could be done or

18   not, the contract permitted your company to take

19   that action to retain workers outside Sheet Metal?

20     A.   I'm a union contractor and the contractor

21   that I worked for for 28 years was a union

22   contractor.  I've dealt with unions all the time.

23   Once somebody wins an award, the local business

24   manager controls the job after that, as far as the

FLYNN REPORTING ASSOCIATES

183

1    award.  Don't take my testimony for it.  Ask JR.  I

2    wish I would have known because I would have

3    produced Mike Durant because we asked him and he was

4    willing and ready, and, as I stated over a minute

5    ago, if that would have happened, and I don't need a

6    whole crew, but you get some people and we probably

7    wouldn't be here having this grievance today.

8                MR. GROSSO:  I would draw the panel's

9    attention to the National Siding and Decking

10   Agreement, Article 5.  I think this covers the

11   question that you just asked.  If, in fact, M.R.S.

12   had gone to another trade union and sought workers

13   from either the Carpenters Union or the Iron Workers

14   Union, within eight days after being hired on that

15   job, they would have to become members of the Sheet

16   Metal Workers Union, so from a practical standpoint

17   you couldn't work members of another trade union for

18   more than a week because I'm sure they wouldn't give

19   up the union they were in to join the Sheet Metal

20   Workers for that one job, so while he has the right

21   under the contract, it really refers to taking

22   non-union people on your payroll because within

23   eight days they have to join the union.

24                MR. ANDERSON:  I think this is really

FLYNN REPORTING ASSOCIATES

184

1    an issue of contract interpretation that we can

2    leave until after the hearing, but while we're

3    talking about it, I would also refer the panel to

4    Article 4, the last sentence that explicitly gives

5    the employer the right in the event the union is

6    unable to supply an adequate supply of people within

7    48 hours to directly hire employees from any source

8    and refer them to the union.  We'll get into the

9    testimony further about the use of Iron Workers on

10   the job.

11             MR. GROSSO:  And I would simply say

12   that those two paragraphs are not inconsistent or

13   contradictory because it does say that once you hire

14   these people, you have to refer them to the union,

15   and that union is the Sheet Metal Workers Union.

16             ARBITRATOR ASHER:  Your position is

17   that Article 4 interacts with --

18             MR. GROSSO:  Article 5.

19   A.   If I may make a statement, if I had the

20   money that I've spent over the years bringing

21   somebody in after seven or eight days and paying

22   their initiation fees because they are normally

23   broke and then a week later they're gone because

24   they don't like to work outside, I could retire.

FLYNN REPORTING ASSOCIATES

1               ARBITRATOR ASHER:  One more question.

2    Do we have a common agreement of what is a

3    duly-qualified worker per the agreement?

4               MR. ANDERSON:  I don't think it's

5    defined.

6               MR. GROSSO:  No, it isn't.  There is

7    no definition in the contract.  I think, obviously,

8    our definition would probably differ from my

9    Brothers' definition.

10              ARBITRATOR ASHER:  But the employer is

11   not contending that anytime they need to train or

12   direct an employee, that is per se unqualified per

13   the contract?

14              MR. GROSSO:  I would say in response

15   to that question, When an employer directs employees

16   on how to do certain things, I don't think that

17   person is untrained or unskilled, but, as you're

18   going to hear from the next two witnesses, if

19   someone comes to the job site and can't do anything,

20   can't do any portion of the work, I would consider

21   that person to be unskilled or untrained.

22   A.   I would say at least they should have

23   training as part of their apprenticeship and that

24   would demonstrate that somebody cares about this

FLYNN REPORTING ASSOCIATES

186

1    segment of the industry.

2                    ARBITRATOR ASHER:  Okay.

3                    (Discussion off the record.)

4                    JOSEPH J. BERGANTINO, sworn.

5                DIRECT EXAMINATION OF JOSEPH BERGANTINO

6    BY MR. GROSSO:

7        Q.   Would you please give your full name to the

8    panel, Mr. Bergantino.

9        A.   Joseph J. Bergantino.

10       Q.   Are you presently employed, sir?

11       A.   I am.

12       Q.   With whom?

13       A.   MBTA.

14       Q.   Would you specify for the panel what the

15   MBTA stands for?

16       A.   Massachusetts Bay Transportation Authority.

17       Q.   What is your position with the MBTA?

18       A.   Sheet metal worker.

19       Q.   How long have you held that position?

20       A.   About three weeks.

21       Q.   Prior to that time were you employed?

22       A.   Prior to going to the MBTA I was unemployed

23   for a while and prior to that I was employed.

24       Q.   With whom were you employed?

FLYNN REPORTING ASSOCIATES

187

```
 1       A.    SMW Local 17.

 2       Q.    What position did you hold with the Sheet

 3  Metal Workers Local 17?

 4       A.    At the end business manager.

 5       Q.    How long were you the business manager?

 6       A.    Four years.

 7       Q.    Prior to being a business manager?

 8       A.    Business agent.

 9       Q.    Again, for Local 17?

10       A.    Correct.

11       Q.    How many years altogether did you serve as

12  an elected or appointed official of Local 17?

13       A.    Eighteen years.

14       Q.    In the period from January 1, 2003 through

15  April 1, 2005 were you a business manager for

16  Local 17?

17       A.    Yes.

18       Q.    Were you familiar with the Terminal A

19  project?

20       A.    I was.

21       Q.    Were you involved in work on that project

22  or supplying manpower for work on that project?

23       A.    I was -- jointly.

24       Q.    I want to bring your specific attention --
```

FLYNN REPORTING ASSOCIATES

188

1    jointly with who?

2        A.    SMWIA.

3        Q.    Meaning, the International?

4        A.    Yes.

5        Q.    Let's go back, if you will, to the late

6    fall and winter of 2002 and maybe even into January

7    or February of 2003.  First of all, do you know

8    Roland Levesque?

9        A.    Senior and junior.

10        Q.    Do you know them both?

11        A.    Yes.

12        Q.    Do you know the company that they work for?

13        A.    M.R.S. Nutmeg.

14        Q.    Again, in that time frame I just mentioned

15    did you ever have any conversations with Roland

16    Levesque, Senior about him bidding the metal panel

17    siding work on Terminal A?

18        A.    Yes.

19        Q.    Do you remember how he told you he was

20    planning to bid that work?

21        A.    There was some confusion as far as under

22    what program that job was going to be bid.  I was

23    originally under the impression that it was under

24    MassPort under a prevailing rate, and it came to be

FLYNN REPORTING ASSOCIATES

189

1    proven after the fact that it was private job that

2    Delta was funding and they were using the National

3    Siding and Decking Agreement on that.

4       Q.   But in addition to that confusion, as you

5    termed it, did Mr. Levesque tell you that he

6    intended to split up the work that he was bidding,

7    that he would subcontract out the stud and

8    sheathing, and that he would do the panel work

9    himself?  Did he discuss that with you?

10      A.   I don't believe originally we had

11   discussions on the stud work or the sheathing.  It

12   was mostly on the panel work.

13      Q.   What was the discussion you remember about

14   being mostly on the panel work?

15      A.   Originally the first discussion we had was

16   that he was going to be bidding a big siding job in

17   Boston, and come to find out it was the Terminal A

18   project.  As time went on, we found out that he

19   didn't bid it directly.  It was actually Crown Corr

20   out of Indiana, I believe, that was the primary

21   bidder on the project through Beacon Skanska or

22   Skanska was the general contractor on the job, and

23   after the fact I found out he was going to be

24   subbing the work off of Crown Corr.  Originally I

FLYNN REPORTING ASSOCIATES

190

1    thought he was competing against Crown Corr and some

2    other siding companies that weren't affiliated with

3    the Sheet Metal Workers for the job originally, and

4    then come to find out Crown Corr was the primary

5    sheet metal contractor to bid the job and that he

6    was subbing the work off of Crown Corr.

7        Q.   When you say "he" --

8        A.   M.R.S.

9        Q.   When you finally figured out who was going

10   to do the work, did Mr. Levesque come to you and

11   tell you that he had subcontracted out the stud work

12   and the sheathing to a company called Conn Acoustics

13   and --

14       A.   No.

15       Q.   Let me finish the question.  And that he

16   intended to install the studs and the sheathing with

17   Carpenters and that he was going to use Local 17

18   people to do the metal panels?

19       A.   I don't remember that at all.

20       Q.   You don't remember that discussion?

21       A.   No.

22       Q.   So then it's fair to say you never entered

23   into an agreement, a gentleman's agreement it has

24   been termed, with Mr. Levesque, Senior that it was

FLYNN REPORTING ASSOCIATES

191

1    okay for him to use Conn Acoustics and Carpenters to

2    install the studs and the sheathing while you and

3    your Local 17 members would do the panel work?

4        A.    No.

5        Q.    You never made such a deal?

6        A.    I don't remember that.

7        Q.    You don't remember that?

8        A.    No.  The only reference to another craft

9    doing the studs and Sheetrock was when a grievance

10   was filed against us by the Carpenters Union.

11   Actually, we had the grievance hearing here at this

12   particular hotel, where originally that whole

13   project was supposed to be done 100 percent by Sheet

14   Metal Workers by direction of our International, and

15   because of the grievance, I was willing to work out

16   an arrangement with the Carpenters local.  Our

17   International approved the agreement, but the

18   Carpenters rejected the agreement on the studs and

19   the Sheetrock.

20       Q.    So what was the agreement that you were

21   willing to abide by?

22       A.    I was willing to work out with the

23   Carpenters Union, I think it was Local 218 which

24   covers this area, that we would allow them to do the

FLYNN REPORTING ASSOCIATES

192

1    studs and the Sheetrock and we would do the metal

2    panels.  Their general executive secretary, or

3    whatever his title was at the time, of the

4    New England Regional Council of Carpenters rejected

5    that offer.  He wanted the whole package, at which

6    time we went through arbitration and through the

7    green book discussion.

8        Q.   And, ultimately, the Sheet Metal Workers

9    prevailed in that impartial jurisdictional dispute

10   board hearing; correct?

11       A.   Right.

12       Q.   Now, prior to the challenge by the

13   Carpenters to the assignment of the work to the

14   Sheet Metal Workers, were you present at a meeting

15   in Washington, D.C. on or about April 8, 2003?

16       A.   Correct.

17       Q.   Were you when the matter of assigning the

18   work to the Sheet Metal Workers and the fact that it

19   would be all done under the National Siding and

20   Decking Agreement was discussed?

21       A.   I was.

22       Q.   Was your International president there?

23       A.   He was.

24       Q.   Was Mr. Levesque there?

FLYNN REPORTING ASSOCIATES

193

```
1      A.   He was.

2      Q.   And you were there?

3      A.   Correct.

4      Q.   Mr. Nigro?

5      A.   Correct, and there were two other people

6   there as well.

7      Q.   Was it Mr. Sullivan who made the assignment

8   of the work to the Sheet Metal Workers?

9      A.   Crown Corr made the assignment of the work,

10   I believe, to the Sheet Metal Workers, and he was

11   the contractor at hand.

12      Q.   But was it discussed at this meeting as to

13   whether or not Crown Corr was going to do that?

14      A.   In the discussions it was said that it

15   would be done with all Sheet Metal Workers.

16      Q.   And then who was it that suggested the work

17   had to be done under the National Siding and Decking

18   Agreement?

19      A.   The contractors as well as everybody was in

20   agreement that it was a private job and that it

21   could be done under the Siding and Decking Agreement

22   and that for us to be competitive we needed to use

23   the Sheet Metal Workers.

24      Q.   Did you have any problem with that
```

FLYNN REPORTING ASSOCIATES

194

1   decision?

2        A.   Like I said, originally there was some

3   confusion which I did have at the time because I

4   thought it was a prevailing rate job under MassPort,

5   but, like I said, it was proven that it was a

6   private job, therefore, the National Siding and

7   Decking Agreement could be used on that project.

8        Q.   So is it fair to say that until you

9   realized that it was a private job, you wanted the

10  job done under the building trades rate?

11       A.   Yes.

12       Q.   And the National Siding and Decking

13  Agreement provides for lower rates; correct?

14       A.   There are various rates under the Siding

15  and Decking Agreement.

16       Q.   But are they less than the --

17       A.   Some are; some are not.  Some are specialty

18  rates and some are classified rates, to the best of

19  my knowledge.

20       Q.   Did you make any statements at that meeting

21  as to whether or not you had any specialty workers

22  within your Local?

23       A.   Local 17 at that time had no classified or

24  specialty workers.

FLYNN REPORTING ASSOCIATES

195

1        Q.    So all you had were journeymen and

2    apprentices?

3        A.    That is correct.

4        Q.    On the subject of Local 17 membership, are

5    you familiar with the training programs of your

6    Local?

7        A.    I am.

8        Q.    Does your Local train its apprentices in

9    the installation of light gauge metal framing studs

10   and sheathing?

11       A.    We do at times, yes.

12       Q.    What do you mean you do at times?  Is it

13   part of the curriculum or not?

14       A.    It's part of the architectural program.  We

15   have a siding module out in back of our training

16   center that we teach how to put up the studs and we

17   also teach the panels.  We also teach light-coated

18   copper and zinc and other aspects of the

19   architectural industry.

20       Q.    Is it your testimony that that module that

21   is on the site at Local 17's headquarters actually

22   includes the installation of studs?

23       A.    It is.

24       Q.    How long has that been there?

FLYNN REPORTING ASSOCIATES

196

1     A.   I can't be specific, but I would say it's

2 got to be two or three years anyway, if not more,

3 give or take.

4     Q.   Is it true that that was delivered just

5 prior to the beginning of the Terminal A job?

6     A.   I don't think it was.  I think we've had it

7 for a while because it cost the training fund a fair

8 amount of money to do the concrete work and the

9 electrical work to construct the module because it

10 came in pieces.  That structure was up and in place

11 way before I believe this project started.

12     Q.   Did you ever enter into an agreement or an

13 understanding with Roland Levesque, Senior about

14 specifically training Local 17 journeymen and

15 apprentices on the installation of this metal panel

16 siding project for Terminal A?

17     A.   We talked about it, yes.

18     Q.   Did you come to some arrangement?

19     A.   Yes.

20     Q.   What was the arrangement, as you remember

21 it?

22     A.   That he would give us materials to use that

23 they were going to be using out here to train our

24 people with that showed up to train.

FLYNN REPORTING ASSOCIATES

197

1      Q.    And was he going to also provide you with a

2      trainer?

3      A.    He was.

4      Q.    And did he?

5      A.    I believe he did.

6      Q.    Do you remember how many Local 17

7      journeymen and apprentices were trained by the

8      M.R.S. trainer?

9      A.    I don't remember.

10      Q.    Did you specifically direct any of your

11      people to attend that training program?

12      A.    The notification was sent out to I believe

13      all the unemployed journey persons that there was a

14      course available.  The scheduling was all screwed up

15      between when M.R.S.'s instructor showed up and when

16      we were going to schedule it.  We had a minimal

17      amount of time to notify the unemployed people.

18      They were told on a Monday that this instructor was

19      going to be there on a Tuesday or a Wednesday.  We

20      had to rush to get a letter out as quickly as

21      possible to the unemployed members to show up to

22      attend, so there was a scheduling problem at that

23      point.

24      Q.    Didn't you and Mr. Levesque agree on the

FLYNN REPORTING ASSOCIATES

198

1   week or the days that the trainer would be there?

2   Didn't you come to some agreement on when it was

3   going to happen?

4       A.   I believe that was through the training

5   coordinator's schedule.

6       Q.   And not with you?

7       A.   I don't really remember the exact.  I

8   remember some discussion on it, but I don't remember

9   exactly.

10      Q.   Do you remember testifying before the

11  National Labor Relations Board in a 10-K proceeding

12  involving Lymo Construction about four or five years

13  ago?

14      A.   I do.

15      Q.   Do you remember what your testimony was at

16  that hearing about the training that Local 17

17  provides for its members regarding metal panel

18  siding?

19      A.   I'm not sure.

20      Q.   If I were to suggest to you that you

21  testified that the only training that Local 17 does

22  for metal panel siding is, quote, on-the-job

23  training, would that refresh your memory?

24      A.   It's possible.

FLYNN REPORTING ASSOCIATES

199

1    Q.    So you might have testified to that?

2    A.    I could have, but I don't remember.  I can

3    clarify some point of that, if I may --

4    Q.    Go right ahead.

5    A.    The training that is done in our facility

6    is just -- most of the training is done on the job.

7    That's why it's a joint partnership training

8    committee between the employers and the unions to

9    jointly train our apprentices, and most of the

10    training in any part of our industry is done on the

11    job and in most crafts.  You give them the basics,

12    the theories in the classroom, and then hands-on,

13    most of it is done in the field in any craft.

14    Q.    But you don't specifically train specialty

15    workers in Local 17, do you?

16    A.    No.

17    Q.    Specialty workers are the people who do

18    specific things other than duct work and general

19    sheet metal work; is that correct?

20    A.    It depends on how you look at it.  My

21    interpretation of a specialty worker would be

22    specifying one particular part of our industry,

23    which our industry is very vast, but, again, they

24    could be used in any part of our industry, so it's

FLYNN REPORTING ASSOCIATES

200

```
 1    an open-ended type of a classification I would

 2    imagine.

 3         Q.   But again --

 4         A.   That's my interpretation of it.  We don't

 5    have any specialty workers, so, therefore, I don't

 6    know for sure.  That's only my interpretation.

 7         Q.   At any point between January 1, 2003 and

 8    August 1, 2003 did you ever suggest to either your

 9    International Union or to Mr. Levesque at M.R.S.

10    that you were not interested in performing the stud

11    work, that you wanted to install the panels?

12         A.   As I stated earlier, during the grievance

13    hearing we discussed with the Carpenters in their

14    grievance against us that we would consider making

15    an arrangement with them to keep harmony on the job

16    to allow them to do stud and Sheetrock, and they

17    refused our offer.

18         Q.   Prior to the Terminal A job, do you have

19    any idea how many projects in the Local 17 Boston

20    area, how many jobs were there were where Local 17

21    Sheet metal Workers installed the studs and the

22    sheathing?

23         A.   No, I don't.  I don't have that

24    information.  I don't know.
```

FLYNN REPORTING ASSOCIATES

201

1    Q.   Do you know if there was one?

2    A.   I know that the UMass. Boston campus with

3    the new building they built out, that the

4    architectural Sheet Metal Workers Tech did stud work

5    out there.

6    Q.   When was that?

7    A.   Probably four or five years ago anyway.  I

8    can remember when that building was being built.

9    All the soffits and the roof levels were all done

10   with the stud work that the metal attached to.  That

11   was the support system for the metal.

12   Q.   Now, were you business agent for Local 17

13   when Terminal E here at Logan Airport was

14   constructed?

15   A.   For a short time.

16   Q.   Wasn't Terminal E actually ongoing at the

17   same Terminal A was?

18   A.   I believe it's still ongoing now.

19   Q.   But do you remember whether or not it was

20   in progress at the same time?

21   A.   Like I said, Terminal E has been going on

22   for years, different phases of it.

23   Q.   Doesn't Terminal E also have metal panel

24   siding similar to Terminal A?

FLYNN REPORTING ASSOCIATES

202

1     A.   It does.

2     Q.   Did the Sheet Metal Workers also install

3 those?

4     A.   I don't believe so.

5     Q.   Do you know who did?

6     A.   Lymo.

7     Q.   Your buddy.  You know if, in fact, Lymo did

8 it himself or did he subcontract it out?

9     A.   I don't know what he did.  I'm assuming he

10 did it under his company.

11     Q.   And you know it was done by another trade?

12     A.   Correct.

13     Q.   But that work was not done by the Sheet

14 Metal Workers?

15     A.   Correct.

16     Q.   And the only job you can remember at this

17 point is the UMass. Boston project?

18     A.   Off the top of my head, yes.

19     Q.   And that was soffits or was it the entire

20 wall system?

21     A.   I believe it was a soffit system with no

22 metal studs.

23     Q.   Were the walls metal panels as well?

24     A.   I don't know.  I don't remember offhand if

FLYNN REPORTING ASSOCIATES

203

1    it's brick or metal out there.

2        Q.    Do you know how many contractors, if any,

3    are signatory to the National Siding and Decking

4    Agreement that are local here in Massachusetts?

5        A.    In Massachusetts?

6        Q.    Yes.

7        A.    I don't know if any in Massachusetts are

8    signatory.

9        Q.    Do you have any framing contractors

10   signatory to Local 17?

11       A.    Not to my knowledge.

12             MR. GROSSO:  I have no further

13   questions.

14             MR. ANDERSON:  No cross.

15             CROSS-EXAMINATION OF JOSEPH BERGANTINO

16   BY MR. KELLY:

17       Q.    The testimony that you referred to or that

18   Jim referred to in the Lymo case, was that testimony

19   prior to the installation of the module that you

20   discussed earlier?

21       A.    I believe that it was.

22       Q.    So prior to the installation of the module,

23   would it have been true that the only training you

24   got on framing and metal siding would have been on

FLYNN REPORTING ASSOCIATES

204

1    the job?

2         A.    Again, there was a little bit probably in

3    the school itself in the architectural program.  I

4    don't know to what extent, but I don't teach that

5    part of the curriculum.  Actually, I don't teach

6    anything over there at all.  I'm just a trustee of

7    the fund.

8         Q.    You indicated that Mr. Levesque agreed to

9    provide materials and a trainer.  What was it that

10   you agreed to provide in connection with that

11   training?

12        A.    I forget how the discussion took place, if

13   I suggested it or if we just had a gentlemen's

14   discussion that if we had the materials that were

15   going to be installed, it might be an advantage to

16   try to get our people a little more familiar with

17   the actual system that they were going to be using

18   out here.

19        Q.    My question is, You indicated that you sent

20   out a notice to your unemployed journeymen.  Did you

21   promise to do anything more than send out a notice

22   to your unemployed journeymen?

23        A.    No.

24        Q.    Did you guarantee any number of people to

FLYNN REPORTING ASSOCIATES

205

1   show up?

2       A.    No.

3               MR. GROSSO:  I have a couple more.

4               REDIRECT EXAMINATION OF MR. BERGANTINO

5   BY MR. GROSSO:

6       Q.    At the meeting in April in Washington, D.C.

7   when it was determined that this project was going

8   to be done under the National Siding and Decking

9   Agreement, did Mr. Sullivan direct you to train

10  members of Local 17 to work on this project?

11      A.    Did he direct me to train?  I don't

12  remember that, no.

13      Q.    Did he say anything to you about training

14  Local 17 members to be productive on this project?

15      A.    That we claimed the work under the Sheet

16  Metal Workers and that we were going to man the job

17  with Sheet Metal Workers and perform the work.

18      Q.    But did he talk anything about training

19  Sheet Metal Workers to do this work?

20      A.    I don't remember specifically.

21      Q.    You knew at the time that you had no

22  specialty workers; right?

23      A.    Yes, I agree with that.

24      Q.    Did you tell Mr. Sullivan that you had no

FLYNN REPORTING ASSOCIATES

206

1   specialty workers?

2       A.    Yes.

3       Q.    So all you had was journeymen and

4   apprentices?

5       A.    Correct.

6       Q.    Did Mr. Sullivan say anything to you about

7   training specialty workers who could perform under

8   the National Siding and Decking Agreement?

9       A.    Can you repeat that, please?

10      Q.    Yes.  Did Mr. Sullivan say to you that you

11  should train specialty workers in Local 17 so they

12  could perform the type of work covered by the

13  National Siding and Decking Agreement?  Did he say

14  anything like that to you?

15      A.    There was discussion on it, but I don't

16  remember specifically being directed.

17      Q.    So at the time did you have anybody trained

18  in the installation of light gauge metal studs and

19  sheathing?

20      A.    We've had people who have done it in the

21  past.  We've had members of Local 17 who have worked

22  for M.R.S. Nutmeg in the past on various jobs around

23  the City of Boston and Cambridge and wherever for

24  years whenever they came to town.

FLYNN REPORTING ASSOCIATES

207

1    Q.   I understand, but I'm going to ask you the

2   question again.  Specifically drawing your attention

3   to the studs, not the metal panels, not the copper,

4   not the metal panels, the studs and the sheathing

5   installation.

6    A.   Well, studs can be anything.  We call it

7   supports for our work.  Whether it's light gauge

8   metal, whether it's angle iron, channel iron,

9   I beams, we support our work.  Whatever that support

10   system is, normally we install it.

11    Q.   But I'm being very specific.

12    A.   In this case, it was a light gauge metal

13   stud, I believe, or a heavy gauge metal stud.

14    Q.   But it's not an angle and it's not a

15   channel iron, and it's not an I beam.  I'm talking

16   specifically about the same type of light gauge

17   metal stud that a carpenter installs on the inside

18   of every building for drywall.

19    A.   You're saying on the inside of every wall.

20   This was on the exterior.

21    Q.   But it was the same type of stud?

22    A.   It was a support for the metal panels that

23   went up.

24    Q.   It's your testimony that you had people in

FLYNN REPORTING ASSOCIATES

208

```
 1   Local 17 who were trained on the installation of

 2   those studs?

 3      A.   You don't need to be a rocket scientist to

 4   put those in.

 5      Q.   Did you ever receive any communications

 6   from either John Pickford from Crown Corr or from

 7   JR LaFrancois at M.R.S. --

 8      A.   Sure have.

 9      Q.   -- requesting trained Sheet Metal Workers

10   to install the stud and sheathing?

11      A.   Trained people -- I remember it was after

12   some phone calls and some disputes and arguments and

13   discussions on the job sites, and I believe it was

14   Crown Corr, John Pickford I think was his name, who

15   was the project manager for Crown Corr, put his

16   requests in writing and directed I believe after a

17   meeting that we had out here at the airport because

18   there was a lot of -- if you want to get right down

19   to the brass tacks, the people that were running the

20   project I believe didn't know what they were doing

21   and who were in supervisory positions, whether they

22   were Iron Workers or Sheet Metal Workers from

23   another local union, which I don't like to talk

24   about.  You could probably ask almost any member of
```

FLYNN REPORTING ASSOCIATES

209

1     Local 17 or any other local that worked on the

2     project as a worker about the supervisory positions

3     that were telling them what to do and how to do it

4     and where to start and where to jump around to and

5     the whole nine yards.

6          Q.    Let me go back to my question.

7          A.    Yes.

8          Q.    My question was, Were you receiving

9     communications from John Pickford requesting skilled

10    people from Local 17?

11         A.    I don't remember word for word what was in

12    the communication, but it was for manpower.

13         Q.    Were you able to supply them with the

14    manpower trained to do the work that they were

15    seeking?

16         A.    We gave them manpower when they requested

17    it.

18         Q.    But were they trained in the

19    installation --

20         A.    They were qualified Sheet Metal Workers.

21         Q.    Meaning they could do the sheet metal work?

22         A.    Sheet metal is sheet metal, whether it's

23    flat sheet panels or in studs.

24         Q.    Did Mr. Pickford ever tell you that he was

FLYNN REPORTING ASSOCIATES

210

1    not getting sufficient manpower from Local 17 and

2    that he wanted to use Iron Workers to do this work?

3         A.   I don't remember if it was Pickford that

4    said that he wanted to use Iron Workers.  There were

5    so many people pointing fingers out here at this

6    project and people telling people what to do and

7    moving people around.  Everybody's head was spinning

8    with all the fingerpointing that was going on out

9    here.

10        Q.   Do you know someone named Bobby Butler?

11        A.   I certainly do.

12        Q.   Who is Bobby Butler?

13        A.   Business agent for Local 17.

14        Q.   Do you ever remember Mr. Pickford

15   complaining that he couldn't get certified welders

16   from Local 17?

17        A.   I know he had a concern about it.

18        Q.   Do you remember what the concern was?

19        A.   Well, when he wants 20 the next day and

20   when we were in the middle of a building boom, we

21   accommodated his requests as soon as possible.

22        Q.   Let me show you this.  Have you ever seen

23   this?

24                  MR. ANDERSON:  Do you have a copy?

FLYNN REPORTING ASSOCIATES

211

```
 1                  MR. GROSSO:  Yes.

 2         Q.    Did you ever see this?

 3         A.    It's possible.  I'm still reading it to see

 4    if it rings a bell.

 5         Q.    Okay.  Let me know when you're finished.

 6         A.    Pretty much.

 7         Q.    Now that you've seen this --

 8         A.    It rings a bell.

 9         Q.    In fact, doesn't the last sentence say

10    "This e-mail confirms the previous teleconference

11    that I had with you, Joe Bergantino, and Steve

12    McKenzie this afternoon?"

13         A.    That's what it says.

14                  MR. GROSSO:  I would like to offer

15    this as Employer's Exhibit 10.

16                  MR. ANDERSON:  No objection.

17         Q.    I'm going to ask you a bunch of questions.

18    First of all, who sent this e-mail?

19         A.    John Pickford.

20         Q.    And that's the person you just described as

21    the project manager for Crown Corr?

22         A.    Yes.

23         Q.    He's addressing it to Bobby Butler.  Who is

24    Mr. Butler?
```

FLYNN REPORTING ASSOCIATES

212

1     A.    He's the business agent for Local 17.

2     Q.    So he was one of your associates or

3 actually he worked for you?

4     A.    He worked for the Local, yes.

5     Q.    And was he responsible for this project?

6     A.    At that point in time for the Local, yes.

7     Q.    Now, Mr. Pickford is asking Mr. Butler for

8 both mechanics and welders.  I suppose mechanics is

9 just regular journeymen --

10    A.    Right.

11    Q.    -- as opposed to welders.  He is

12 complaining that he's not getting enough of either

13 and he's complaining that he needed ten or twelve

14 welders, three showed up and none of them were

15 certified.  Do you remember all of these issues

16 going on?

17    A.    Some of those issues.

18    Q.    Do you see the date of this e-mail?

19    A.    Yes.

20    Q.    What is it?

21    A.    October 21, 2003.

22    Q.    And this project started around August 1st;

23 correct?

24    A.    Probably, yes, somewhere in the summer.

FLYNN REPORTING ASSOCIATES

213

1    Q.   So three months into this project we're

2   still having disputes between the contractors and

3   Local 17 about getting enough skilled people on this

4   project; is that fair?

5    A.   Well, there were a lot of situations that

6   were going on at the time.  We would send people out

7   and they would lay them off and request another ten

8   or twelve or fifteen -- however many people they

9   were looking for.  It was a revolving door out

10   here.  A lot of that had to do with my personal

11   feelings, but the supervisory role of some of the

12   people who were out here running the different crews

13   for either M.R.S. or Crown Corr.  Originally this

14   job started under Crown Corr because of the dispute

15   between the Carpenters and the Sheet Metal Workers

16   because M.R.S. is signatory for the Carpenters as

17   well as the Iron Workers where Crown Corr was not.

18   Therefore, the project started under Crown Corr.

19   All the Local 17 members were working on this

20   project at the beginning and were on the Crown Corr

21   payroll until the decision was rendered by the

22   arbitrator that the Sheet Metal Workers were going

23   to do all the work.  M.R.S. then was supposedly put

24   on the books as the subcontractor to Crown Corr,

FLYNN REPORTING ASSOCIATES

214

1    which based on the decision from the arbitrator it

2    was supposed to be all Sheet Metal Workers.

3    M.R.S. had Iron Workers running the crews as project

4    manager on the job site.  There was a Local 7 Iron

5    Worker here, which is the Boston Iron Workers local.

6    There was an Iron Worker from Seattle, Washington

7    out here.  I don't remember if he was working for

8    Crown Corr or M.R.S. at the time, possibly Crown

9    Corr.

10        Q.   But they were supervisors?

11        A.   Doesn't matter.  The job was supposed to be

12   manned by all Sheet Metal Workers.

13        Q.   Well, were these people doing the work?

14        A.   They were in the field supervising our men.

15        Q.   But they were not performing any work?

16        A.   I can't say for sure if they weren't.  I

17   believe some of them were.

18        Q.   Did you file a grievance over that?

19        A.   No, I did not.  The International sent an

20   International rep. out here to monitor the project

21   because of a lot of the stuff that was going on.

22   There was a lot of turmoil on this project.

23        Q.   Do you see this paragraph from Mr. Pickford

24   saying "You have a large local and I can't imagine

FLYNN REPORTING ASSOCIATES

215

1    that you can't find ten or twelve certified

2    welders?"

3        A.    I see that.

4        Q.    Were you able to supply him with certified

5    welders?

6        A.    As I stated earlier, we were in the middle

7    of a building boom and we reached out to our sister

8    locals.  We had full employment in the City of

9    Boston in Local 17.  We reached out to our sister

10    locals to get certified welders to try to meet their

11    needs and requests.

12        Q.    Ultimately, didn't the certified welders

13    show up from the Local 7 Iron Workers?

14        A.    We didn't send them.  I think there were a

15    few Iron Workers that did show up.  I believe so.

16        Q.    Were you ever approached by Mr. Levesque

17    for M.R.S. or his project manager, Mr. LaFrancois,

18    with a request to use iron Workers To supplement

19    your crews?

20        A.    I know there was discussion on it.

21        Q.    What was your position on that?

22        A.    My position was that if I was directed and

23    there was an agreement made between all the

24    contractors, Crown Corr and M.R.S. and the Sheet

FLYNN REPORTING ASSOCIATES

216

1   Metal Workers, that all Sheet Metal Workers would

2   man the project.

3       Q.   So, notwithstanding, the fact that you had

4   full employment in your local, there was a building

5   boom going on in the City of Boston, you couldn't

6   provide enough certified welders and you couldn't

7   provide mechanics, you still refused to allow M.R.S.

8   or Crown Corr to use Local 7 Iron Workers to

9   supplement your crews?

10      A.   I believe they supplemented the crews with

11  Sheet Metal Workers all over the country -- from

12  Michigan, Ohio.  These were people that were brought

13  in either by Crown Corr or M.R.S.  They were Sheet

14  Metal Workers, not Iron Workers.

15      Q.   My question to you, though, which I would

16  appreciate a response to -- my question to you was,

17  Notwithstanding your full employment and your

18  inability to supply the people that they were

19  requesting, you refused to allow Crown Corr and

20  M.R.S. to supplement their work crews with Local 7

21  Iron Workers?

22      A.   Probably.  They're not Sheet Metal Workers.

23      Q.   Did they ever ask you if they could use

24  Carpenters?

FLYNN REPORTING ASSOCIATES

217

```
1        A.    Maybe.

2        Q.    Your answer I trust would be the same?

3        A.    Probably, yes.

4              MR. GROSSO:  No further questions.

5              MR. ANDERSON:  No questions.

6        RECROSS-EXAMINATION OF JOSEPH BERGANTINO

7   BY MR. KELLY:

8        Q.    Did they actually ever bring those people

9   on the job -- the Iron Workers?

10       A.    I believe there were Iron Workers on the

11  project throughout the whole project.

12       Q.    But I mean aside from supervisors, were

13  there Iron Workers that were actually workers?

14       A.    I don't really remember, to be honest with

15  you.  I don't remember for sure.

16             (Short recess taken.)

17             VENANCE JR LAFRANCOIS, sworn.

18        DIRECT EXAMINATION OF VENANCE JR LAFRANCOIS

19  BY MR. GROSSO:

20       Q.    Would you please give your full name to the

21  arbitration panel.

22       A.    Venance LaFrancois, Jr.

23       Q.    How are you referred to?

24       A.    JR.
```

FLYNN REPORTING ASSOCIATES

218

1    Q.    So is it okay to refer to you throughout

2  this proceeding as JR?

3    A.    Yes.

4    Q.    Are you presently employed, JR?

5    A.    Yes, I am.

6    Q.    With whom?

7    A.    M.R.S. Enterprises.

8    Q.    How long have you been employed with them?

9    A.    Roughly about eight to nine years.

10    Q.    Prior to that time were you working?

11    A.    Yes.

12    Q.    With whom were you working?

13    A.    I worked for a structural steel company

14  that did metal siding, decking, stairs,

15  pre-engineered buildings.

16    Q.    How long have you been involved in this

17  industry?

18    A.    Approximately since 1985, so 21 or 22

19  years.

20    Q.    Has it been mostly with those two

21  companies?

22    A.    Three companies in total.

23    Q.    What was the other company?

24    A.    A structural steel Company called Kenerect.

FLYNN REPORTING ASSOCIATES

219

```
 1      Q.   Are you a member of any trade union?

 2      A.   Yes -- the Iron Workers Local 15.

 3      Q.   Where is that?

 4      A.   Hartford, Connecticut.

 5      Q.   How long have you been a member of the Iron

 6   Workers Local 15?

 7      A.   Since '85.

 8      Q.   The same 21 years?

 9      A.   Yes.

10      Q.   Did you also go through an apprentice

11   program with the Iron Workers?

12      A.   No, I didn't.

13      Q.   How did you become an Iron Worker?

14      A.   The first company I worked for was a

15   company my uncle owned, and I was trained by him.

16   We worked close hand in hand together.  That's how I

17   was trained.  I was brought in and organized.

18      Q.   What is your position with M.R.S.

19   Enterprises?

20      A.   My current position?

21      Q.   Yes.

22      A.   Project manager.

23      Q.   How long have you been a project manager?

24      A.   Roughly three years -- three or four years.
```

FLYNN REPORTING ASSOCIATES

220

```
 1      Q.    What are your duties as a project manager?
 2      A.    Field superintendent, project manage jobs,
 3   manpower requirements, filling, overseeing jobs.
 4      Q.    I'm going to draw your attention to the
 5   Delta Terminal A project at Boston Logan Airport.
 6   Are you familiar with that project?
 7      A.    Yes.
 8      Q.    Did you work on that project?
 9      A.    Yes, I did.
10      Q.    What job did you perform on that project?
11      A.    I was project manager on that job -- site
12   project manager.
13      Q.    What were your duties as the site project
14   manager?
15      A.    To oversee the entire project.
16      Q.    Were you there on a daily basis?
17      A.    Every day.
18      Q.    Every single day of the job?
19      A.    Yes.
20      Q.    As part of your duties, were you required
21   to recruit manpower for M.R.S. to do the work?
22      A.    Correct.  I would call the union halls and
23   I would e-mail the union halls for manpower
24   requirements, and I'd also bring in my own people
```

FLYNN REPORTING ASSOCIATES

221

1   from Connecticut.

2       Q.   Whose decision was it as too how many

3   employees you needed and would use on the project?

4       A.   It was our decision.  We would hire the

5   employees needed to maintain a certain schedule so

6   we would man the job accordingly.

7       Q.   Were you involved in the preparation of the

8   bid for this project?

9       A.   Very little.  I had seen the project but

10  did not do the estimating on it.

11      Q.   Did anybody from M.R.S. advise you as to

12  the labor portion of the bid, as to what they

13  thought it was going to take from the labor side to

14  do this job?

15      A.   We always review that with the general

16  foreman.  The superintendent will review the man

17  hours that it takes to do a job, and the rating and

18  scheduling we'll go through and make sure everybody

19  is aware up front, yes.

20      Q.   So at the beginning of the job you have an

21  idea as to what the company bid for the number of

22  man hours to get it done?

23      A.   Absolutely.

24      Q.   Is your responsibility to make sure that

FLYNN REPORTING ASSOCIATES

222

1   you don't exceed that number?

2       A.   Yes, it is.

3       Q.   It's your job to do it at the bid amount or

4   less; correct?

5       A.   Absolutely.  We have to make the budget.

6       Q.   Is that information that you have in mind

7   when you're calling a hall and asking for referrals?

8       A.   Absolutely.

9       Q.   You said you've been eight or ten years

10  with M.R.S.?

11      A.   Yes.

12      Q.   What types of projects have you supervised

13  for M.R.S.?

14      A.   Pretty much all of their bigger projects.

15  Football stadiums.  We did Tufts University.  Pretty

16  much all the bigger projects I've ran.

17      Q.   Have you done projects similar to

18  Terminal A with metal panel wall systems?

19      A.   Yes.

20      Q.   Do you personally know what productivity

21  you can expect from the M.R.S. employees when you're

22  doing a metal panel wall system?

23      A.   Yes.

24      Q.   Do you know how many panels they can put up

FLYNN REPORTING ASSOCIATES

223

1   a day and do you know how to get the job done?

2       A.   You have to.  You have to bid and be

3   competitive.

4       Q.   Have you been involved in any M.R.S.

5   projects where the metal panels were attached to a

6   light gauge metal stud frame with a dense glass

7   board sheathing?

8       A.   Yes.

9       Q.   Have you been involved in projects other

10  than the Terminal A project that had those?

11      A.   Yes.

12      Q.   Have you been involved with projects where

13  M.R.S. subcontracted out a portion of the work?

14      A.   Yes.

15      Q.   What part was subcontracted out?

16      A.   Metal studs.

17      Q.   What about the sheathing?

18      A.   The sheathing we did.

19      Q.   So pick a job.

20      A.   I have to go back to that sheathing,

21  meaning the metal panels we did.  The studs and the

22  dense glass were subbed out.

23      Q.   Who performed that work?

24      A.   It was a subcontractor.

FLYNN REPORTING ASSOCIATES

224

1    Q.    Do you know what trade you used?

2    A.    The Carpenters.

3    Q.    Do you remember a recent job where that

4    happened?

5    A.    There was a job in Rhode Island we did.  I

6    think Conn Acoustics was the contractor that did the

7    subcontracting work for us.

8    Q.    Have you been involved with more than one

9    job where Conn Acoustics did this type of work for

10   you?

11   A.    I'm certain our company has.  Myself I

12   project managed that one in particular.

13   Q.    Just the one in Rhode Island?

14   A.    Yes.

15   Q.    How about other projects where you used

16   other subcontractors besides Conn Acoustics where

17   you were the project manager?

18   A.    Not that I recall.

19   Q.    Now, would you be supervising the work of

20   the subcontractor?

21   A.    We would supervise, yes.  We would

22   supervise their work.

23   Q.    In terms of --

24   A.    The productivity.

FLYNN REPORTING ASSOCIATES

225

1     Q.    -- scheduling them in and out?

2     A.    Yes.

3     Q.    And have there been projects where M.R.S.

4  has done the installation of light gauge metal

5  frames, studs, and dense glass board with its own

6  employees?

7     A.    Smaller jobs.

8     Q.    What do you mean by "smaller jobs?"

9     A.    We typically don't do the metal studs and

10  dense glass.  We typically sub it out, but we've

11  done smaller jobs that I was not the project manager

12  on; however, I know we've done smaller jobs.

13     Q.    So when you first got to this job, when was

14  that -- the Terminal A job?

15     A.    Somewhere around October 4th.

16     Q.    Of what year?

17     A.    2003.

18     Q.    What was the first group of employees you

19  placed on the job?

20     A.    We started with M.R.S. employees.

21     Q.    From where did they come?

22     A.    From Local 40 out of Hartford.

23     Q.    Connecticut?

24     A.    Yes.

FLYNN REPORTING ASSOCIATES

226

1    Q.    About how many people are we talking about?

2    A.    We probably started off the job -- prior to

3    me getting there we probably had 12, 15, 18 guys

4    there.

5    Q.    Now, in this case did you use a

6    subcontractor for the light gauge metal framing?

7    A.    No, we could not because the job went into

8    arbitration and Sheet Metal International won it, so

9    we had to use all Sheet Metal Workers.

10    Q.    So did M.R.S. use its own employees?

11    A.    Yes.

12    Q.    And was it your job to supervise them?

13    A.    I was supervising and taking care of the

14    whole job, yes; however, I had foremen underneath me

15    that were taking care of those tasks on a

16    hand-to-hand basis.

17    Q.    What was the productivity level or the

18    capability of the men that you brought from Local 40

19    with respect specifically to the installation of the

20    studs and the sheathing?

21    A.    If I had M.R.S. guys on it, it was good.

22    Q.    Had they done this work before?

23    A.    Yes, they had.

24    Q.    So did you assign them to installing the

FLYNN REPORTING ASSOCIATES

227

```
 1   metal frame and the sheathing?

 2        A.   Yes.

 3        Q.   Do you know who supervised them besides you

 4   as an overall supervisor?

 5        A.   Yes.  We had Scott D'Angelo as a foreman.

 6        Q.   Anybody else?

 7        A.   We had Earl Bates.

 8        Q.   Now, at some point did you have to utilize

 9   more than the crew of M.R.S. employees from

10   Connecticut?

11        A.   Certainly, yes.

12        Q.   What did you do?

13        A.   We called the business agent, Bobby

14   Butler.  I verbally called and requested for men.  I

15   e-mailed for men and we received men.

16        Q.   Who is Bobby Butler?

17        A.   Bobby Butler was the business agent for

18   that job.

19        Q.   For what union?

20        A.   Local 17.

21        Q.   Sheet Metal Workers?

22        A.   Yes.

23        Q.   What did you get in response to your

24   request from Local 17?
```

FLYNN REPORTING ASSOCIATES

228

1    A.    Every time I did order men, if I ordered

2    five, I got two.  If I ordered ten, I got six, and

3    so I never got the full amount of manpower

4    requested.

5    Q.    What were the qualifications of the

6    manpower that did show up?

7    A.    Well, each guy that came in had to be

8    physically trained on the site.  I had to pair them

9    up with an M.R.S. employee to be able to balance

10   trying to get some production because I couldn't

11   take two skilled journeymen from the Local 17 hall

12   and say, Here you go, here are some metal studs.

13   I'd take a foreman from Local 17 because they

14   requested that I put one of their men as a foreman

15   on site several times, but they couldn't figure it

16   out.  They couldn't figure out the metal studs.  The

17   quality of the man wasn't there.  They did not know

18   metal studs, period.  They were not accustomed to

19   the work.

20   Q.    Now, in the performance of the installation

21   of the stud work are there any directions you have

22   to follow, any plans?

23   A.    Yes.  I couldn't give their guys, the

24   Local 17 guys, a set of stud drawings because they

FLYNN REPORTING ASSOCIATES

229

1    really did not know how to read the stud drawings.

2    It was big issue, so we always had to put an foreman

3    or an M.R.S. journeymen and team them up with a

4    Local 17 man, but the manpower as it increased, it

5    became harder and harder because we have more

6    Local 17 guys than company guys.

7        Q.   Did you have enough company guys to spread

8    around among the Local 17 guys?

9        A.   We had about 25 company guys, 20 or 25

10   company guys, so we had total of 130 Local 17 guys.

11   No, we really didn't have enough M.R.S. guys to

12   spread around with the Local guys.

13       Q.   You said 130 Local 17 guys.  Were they all

14   on the job at the same time?

15       A.   No.

16       Q.   What would you say the average size of the

17   work force was through the life of the project, so

18   not just the beginning and not just the end but

19   through the whole project?  What would you say the

20   average work force was?

21       A.   Oh, 60 to 70 guys.

22       Q.   How many of those were M.R.S. Local 40

23   people?

24       A.   Like I said, we had 20 to 25 M.R.S. guys on

FLYNN REPORTING ASSOCIATES

230

1   that job.

2       Q.   So 35 to 40 were Local 17 people?

3       A.   Yes.

4       Q.   I'm going to show you a document and ask

5   you if you can identify it.

6            MR. GROSSO:  I'm referring to the

7   roster that's in everybody's folder.  It's a roster

8   of employees that M.R.S. identified on the project.

9            MR. ANDERSON:  This document, Jim?

10           MR. GROSSO:  Yes.

11      Q.   Can you identify this document?

12      A.   Yes.

13      Q.   What is it?

14      A.   It's the manpower that was on that job from

15   Local 17 guys, Local 40 guys, and there are also

16   some guys from Detroit on here.

17           MR. GROSSO:  I would like to offer

18   this as Employer's Exhibit 11.

19           MR. ANDERSON:  No objection.

20      Q.   Now, sir, is this a list of the union

21   members from Local 17 who were referred to you

22   pursuant to your requests?

23      A.   Correct.

24      Q.   Did all of these roughly 130 people work on

FLYNN REPORTING ASSOCIATES

231

1    the Delta project?

2        A.    Yes.

3        Q.    There has been testimony that many of the

4    employees who were referred to M.R.S. by Local 17

5    were sent back.  Is that true?

6        A.    Yes -- if they didn't pass the drug test.

7    There was prescreening on the job.  There were

8    several instances where the guys couldn't pass the

9    drug test.

10        Q.    But aside from the people who were

11    immediately disqualified, did you actually bring

12    people onto your work force and then discharge them

13    shortly thereafter?

14        A.    Yes.

15        Q.    Why did you do that?

16        A.    Because some of them were not qualified to

17    do the work.

18        Q.    What would be your estimate of the

19    percentage of people referred to you from Local 17

20    who were unqualified to do the work?

21        A.    A very high percentage.

22        Q.    What do you mean by "a very high

23    percentage?"  Is it 50 percent, two-thirds,

24    80 percent?

FLYNN REPORTING ASSOCIATES

232

```
 1      A.   It's probably closer to 70 percent.

 2      Q.   Were unqualified?

 3      A.   Yes.

 4      Q.   How about the other 30 percent?

 5      A.   We actually had to do on-site training and

 6   we trained them, and we were able to continue on the

 7   job with these people.

 8      Q.   Aside from being unqualified, were there

 9   any other reasons why you would have discharged

10   these employees or sent them back to the hall?

11      A.   Yes.  There were several instances of

12   insubordination where the Local 17 men were fighting

13   amongst themselves, and I had to terminate a few

14   people because two Local 17 guys were fighting on

15   the site.  One urinated in each other's bags.  That

16   was one instance.  The president of the Local was

17   physically pushing their supervisors in the

18   trailer.  There were quite a few instances of

19   abnormal stuff that would happen.

20      Q.   How about showing up for work?

21      A.   That was another one.  Tardiness.

22   Total disregard for coming in on time in the

23   morning.  Coffee breaks -- instead of taking a

24   15-minute coffee break.  If you didn't walk around
```

FLYNN REPORTING ASSOCIATES

233

1    every day on the hour, on the hour, on the hour and

2    watch the men, what they were doing, how they were

3    doing it, coffee breaks, lunch breaks, and when it

4    was time to leave we have to set up a check station

5    in the morning so the guys would check in and check

6    out.  That was the only way to control everything.

7        Q.   Did you ever complain to anybody about

8    this?

9        A.   Absolutely.

10       Q.   Who did you complain to?

11       A.   I complained to the International.  I

12   complained to Bobby Butler.  As a matter of fact,

13   there was a meeting called where we sat down and

14   went through work hours, break times, so everybody

15   was clear and on the same page.

16       Q.   Did things get better?

17       A.   For the first week maybe.

18       Q.   Then what happened?

19       A.   They just continued throughout the job.

20       Q.   Now, how about safety on the project?

21       A.   The safety -- we had a few Local 17 guys

22   that got thrown off because of several verbal

23   warnings they were given.  The site safety guy, not

24   myself, came and grabbed me and had them escorted

FLYNN REPORTING ASSOCIATES

234

1    off the site.

2        Q.    Who did the site safety guy work for?

3        A.    Skanska and Crown Corr.  There were two

4    that would walk around the site.  They had a

5    no-tolerance policy for time-offs.

6        Q.    How about accidents on the project?

7        A.    Yes.  We had quite a bit of accidents.  As

8    soon as the weather started to change, I would say

9    mid-October or the latter part of October to

10   probably the end of November we had probably 17 to

11   19 employees that reported injuries.  As a matter of

12   fact, Skanska had come to see me with their safety

13   people.  They requested a meeting.  They were

14   actually going to throw us off the site.

15       Q.    What was the reason given for throwing you

16   off the site?

17       A.    Because of all the injuries we had.  With

18   all the trades combined, we had more injuries than

19   all the trades combined on the site in one month.

20       Q.    That's 17 to 19 injuries occurred in one

21   month?

22       A.    Close to a month.  It was between the

23   months of October and November.  I could look at the

24   records.

FLYNN REPORTING ASSOCIATES

235

1     Q.   Were they serious injuries?

2     A.   A couple of them.  One was a little bit

3   more serious than the rest.   A lot of them were

4   just cuts, claims to have back injuries, eye

5   injuries.  It's not your typical stuff that would

6   stop a guy from working.

7     Q.   What happened to these men?  Did they leave

8   the project?

9     A.   Some of them did.

10     Q.   And some of them continued to work?

11     A.   Some of them sought medical attention.  It

12   was an OSHA job, so they would have to go to the

13   site representative for medical help, so if they

14   were given clearance to come back to work, they had

15   no choice -- either come back to work or quit.

16     Q.   Do you know a person named John Pickford?

17     A.   Yes, I do.

18     Q.   Who is he?

19     A.   He works for Crown Corr.

20     Q.   What were his duties on this job?

21     A.   He was the project manager for Crown Corr

22   that the oversee the bar work and another company

23   called A Walls, which was the curtain wall

24   installer.

FLYNN REPORTING ASSOCIATES

236

1       Q.    I'm going to show you what was previously

2    marked as Employer's Exhibit Number 10.

3             MR. GROSSO:  This is that e-mail from

4    Mr. Pickford that we just introduced through

5    Mr. Bergantino.

6       A.    Okay.

7       Q.    Are you listed in there as being a

8    recipient of a copy?

9       A.    Yes, I am.

10      Q.    Have you ever seen this before?

11      A.    Absolutely because the threat that John

12   made if he didn't have people by orientation time

13   tomorrow morning, he would call the Iron Workers

14   Local 7 for people, and John did make that threat

15   come true.  He hired five Iron Workers.

16      Q.    Were you having difficulty in October of

17   2003 getting manpower from Local 17?

18      A.    Yes.  Every time I made a request for

19   manpower, I never received the quantities I was

20   looking for.

21      Q.    And what about the quality?

22      A.    That either.  That's why there was such a

23   turnaround on the manpower.

24      Q.    Are you familiar with an individual known

FLYNN REPORTING ASSOCIATES

237

1    as Jim Neary?

2         A.   Yes, I am.

3         Q.   Who is he?

4         A.   He was the International representative on

5    site.  He was sent there to oversee once there were

6    so many problems going on with the Local 17 men,

7    there was a lot of back and forth between 17,

8    International, Crown Corr, M.R.S., so they sent

9    Jim Neary to the site to observe.

10        Q.   When you say "they," you're referring to

11   whom?

12        A.   The International.

13        Q.   The Sheet Metal Workers International?

14        A.   Yes.

15        Q.   How long did Mr. Neary stay on the job?

16        A.   I don't recall the total length of time he

17   was there.  I really didn't pay a whole lot of

18   attention to Mr. Neary.

19        Q.   When he was there, was he there every day?

20        A.   I would say not every day.  I would see him

21   probably a couple of times a week.

22        Q.   For roughly how many weeks would you see

23   him a couple of times a week?

24        A.   He was probably there for six or seven

FLYNN REPORTING ASSOCIATES

238

1   weeks maybe.

2       Q.   Did you ever have any discussions with

3   Mr. Neary about your request for manpower from

4   Local 17?

5       A.   Absolutely.

6       Q.   What was the nature of those discussions?

7       A.   He would call Bobby himself when we

8   requested men to make sure that we tried to get men

9   on the site.

10      Q.   When you say "Bobby" --

11      A.   Bobby Butler from Local 17.  Certainly, he

12  wasn't happy that we ended up hiring five of the

13  Iron Workers, but M.R.S. also went to seek elsewhere

14  for men.  We also went to Detroit -- made a call to

15  the Detroit local to try to get some more Sheet

16  Metal guys out there, and we were able to get some

17  out of Detroit and Illinois.

18      Q.   Did you ever request Mr. Butler permission

19  to use either Iron Workers from Local 7 or

20  Carpenters from Local 218 to supplement the Local 17

21  work force?

22      A.   Absolutely.

23      Q.   Did you specifically ask Mr. Butler if you

24  could do that?

FLYNN REPORTING ASSOCIATES

239

1    A.    Yes.

2    Q.    And what was the response?

3    A.    Bobby responded that if he could, he would

4    let me, but his hands were tied with the

5    International.

6    Q.    Did he explain what he meant when he said

7    his hands were tied with the International?

8    A.    Bobby didn't agree with the decision that

9    was made with the entire package going to Sheet

10    Metal.  It was a burden on his back.  This comment

11    was made to me kind of off the record.  He did not

12    agree with that.  He would rather have seen a

13    Carpenter and Sheet Metal mix on site rather than

14    just plain Sheet Metal.

15    Q.    Did he say that in words or something close

16    to that to you?

17    A.    Yes.

18    Q.    What work did he anticipate the Carpenters

19    would have done?

20    A.    Metal studs.

21    Q.    So Mr. Butler wanted to do the panels?

22    A.    Not only that.  We also had the discussion

23    of Iron Workers.  Bobby had a relationship with the

24    other unions in the city to work with.  The Iron

FLYNN REPORTING ASSOCIATES

240

1    Workers D.A. was on the site every day trying to get

2    a piece of the action, so Bobby -- if he could have,

3    he was trying to please the Iron Workers as well

4    because they worked together hand in hand on a lot

5    of jobs.  If Bobby could have, I felt that he would

6    have let me bring in some more people to

7    supplement.  We were not getting from Local 17 the

8    total manpower required for the job.

9        Q.    But is it fair to say that you were never

10    allowed to use either Iron Workers or Carpenters to

11    supplement the Local 17 work force?

12                MR. KELLY:  Objection.

13                ARBITRATOR ASHER:  What's the

14    objection?

15                MR. KELLY:  Well, it's a leading

16    question, for one.  If there are conversations that

17    will bring out what is fair to say and what is not

18    fair to say.  Maybe we can hear what those

19    conversations are, but to say what is fair to say

20    and then put a conclusion on it --

21                MR. GROSSO:  I'll rephrase.

22        Q.    Did you ever specifically ask Mr. Butler if

23    you could use either Iron Workers or Carpenters to

24    supplement his work force?

FLYNN REPORTING ASSOCIATES

241

1      A.    Yes.

2      Q.    And what was his answer?

3      A.    He could not let me do so.

4      Q.    Did you ever actually hire any Carpenters

5  or Iron Workers to do stud work on this project?

6      A.    M.R.S. technically did not.  The letter

7  that you saw floating around a while ago was sent by

8  John Pickford.  John Pickford and Bobby Butler and

9  Bergantino had a conversation that they didn't get

10 the welders that we requested and so John Pickford

11 made a call to the Local 7 Iron Workers and got five

12 Iron Workers welders on the site.

13     Q.    But did they do anything other than weld?

14     A.    No.

15     Q.    Did you have to weld all the studs that

16 were being installed on the project?

17     A.    No.

18     Q.    So they only worked on the studs that --

19     A.    A smaller portion of certain walls that

20 needed welding.

21     Q.    But did you ever, either you or Crown Corr,

22 hire either Iron Workers or Carpenters to install

23 studs that did not require welding?

24     A.    No, we could not.

FLYNN REPORTING ASSOCIATES

242

1    Q.    How did the work progress with the work
2    force that you just described in terms of time?
3    A.    Well, the productivity wasn't there.  If I
4    were to put two of my M.R.S. guys together that were
5    typically installing metal panels, sometimes we
6    would get progress reports of 20 to 25.  They
7    probably seen up to close to 30 panels in a day;
8    however, when I put any of the best of the Local 17
9    guys that we were training on site at all times, but
10   even at their best I could never get the panel
11   counts that we were looking for.  We were always
12   behind on productivity.
13   Q.    So you were behind on productivity and you
14   were having trouble manning the work force, so how
15   did you get the job done?  Let me preface that by
16   this question.  Was the job completed when it was
17   supposed to be completed?
18   A.    Pretty close, yes.
19   Q.    So how did you do that?
20   A.    We worked overtime.  We worked six, seven
21   days a week.
22   Q.    Did you use more manpower than you would
23   have?
24   A.    Absolutely.  This job had no reason to be

FLYNN REPORTING ASSOCIATES

243

1    run with the total amount of manpower we had.

2                MR. GROSSO:  Can I have one minute?  I

3    think I'm done.

4                (Short recess taken.)

5                MR. GROSSO:  I'm done.

6          CROSS-EXAMINATION OF VENANCE JR LAFRANCOIS

7    BY MR. ANDERSON:

8        Q.   Mr. LaFrancois, I'm Michael Anderson, and I

9    represent the International.  Let me direct your

10   attention to Employer Exhibit Number 10, this

11   e-mail.

12       A.   Yes.

13       Q.   In the third to last sentence Mr. Pickford

14   says "If I do not have the men by orientation time

15   tomorrow morning, I may have to call Local 7."

16       A.   Correct.

17       Q.   He's referring to the Iron Workers Local 7?

18       A.   Yes.

19       Q.   Mr. Pickford did, in fact, call the Iron

20   Workers, didn't he?

21       A.   Yes.

22       Q.   Did you ever get a grievance from the

23   International about the use of Iron Workers?

24       A.    I never received a grievance for the use of

FLYNN REPORTING ASSOCIATES

244

1   the Iron Workers, no, not personally.

2       Q.   Now, October 2003, this was about the time

3   that M.R.S. was having to rework the exterior wall

4   in one location; isn't that right?

5       A.   Correct.

6       Q.   The welders that were being sought, were

7   those welders that needed to work on the rework?

8       A.   We had rework and also regular contract

9   work that we were doing.

10      Q.   At the beginning of the contract had you

11  anticipated the need to use welders?

12      A.   For the 12-gauge clips, yes.

13      Q.   But there was something for which you had

14  not anticipated welders; right?

15      A.   That's correct.

16      Q.   What was that?

17      A.   We had some rework on some of the metal

18  studs.

19      Q.   Is this the project we've discussed that

20  Larson Engineering ordered the rework on?

21      A.   Correct.

22      Q.   Now, if I understand it right, there were a

23  lot of communications between Crown Corr and M.R.S.

24  by e-mail about staffing and manpower issues; is

FLYNN REPORTING ASSOCIATES

245

1    that right?

2        A.    Right.

3        Q.    Communications, say, from John Pickford

4    that you would have been copied on?

5        A.    Right.

6        Q.    Have you ever seen an e-mail about a

7    manpower shortage dated after January 2004?

8        A.    I'd have to look back in my e-mails.

9        Q.    Do you recall anything like that?

10       A.    Probably not after January.

11       Q.    Would it be fair to say that October of '03

12   through January of '04 was the hot time for issues

13   about manpower?

14       A.    Well, certainly, they wanted to close up

15   the building.  Scheduling issues -- always from that

16   time every job that you run is closing up the

17   building.

18       Q.    And there would have been more concerns

19   raised about manpower through January of 2004 than

20   afterwards?

21       A.    Would you repeat that again?

22       Q.    Would it be fair to say that there were

23   more e-mails raising concerns about manpower prior

24   to the end of January 2004 than afterwards?

FLYNN REPORTING ASSOCIATES

246

1     A.    Could be, yes.

2     Q.    Have you ever been trained in stud work

3     yourself?

4     A.    Not necessarily trained, but I've observed

5     subcontractors installing stud work.

6     Q.    But you have not been trained, for example,

7     on the module like the one at Local 17?

8     A.    Yes, I have, but not on the Local 17

9     module.

10    Q.    Who trained you?

11    A.    I worked for a company called Kenerect, and

12    we erected modules, and, as typical as at Logan, we

13    made them in eight-foot sections and set them with a

14    crane that was a lot of times under the Iron Workers

15    jurisdiction.

16    Q.    When you did this at Kenerect, was that the

17    type of stud work that you were doing on Terminal A?

18    A.    Forty-foot high walls with dense glass on

19    it, yes.

20    Q.    Does M.R.S. have a training program for its

21    employees in Connecticut in stud work?

22    A.    We teach the guys in the office.  We

23    usually have job meetings with the employees at

24    least once a month.  We teach blueprint reading,

FLYNN REPORTING ASSOCIATES

247

1    lasers, so to say that is particular to metal studs,

2    no, it's generalized for a trade -- metal panels,

3    metal studs, dense glass, blue skin.

4        Q.    The type of training that any journeyman

5    Sheet Metal Worker would have?

6        A.    No, not Sheet Metal.

7        Q.    That would be Iron Work?

8        A.    We teach it to the Iron Workers.  I can't

9    say that in general because our guys were Sheet

10   Metal at one time.  They're Iron Workers now.  The

11   guys that we had employed at M.R.S. were Sheet Metal

12   trained to do that type of work, correct.

13       Q.    So I understand that you typically sub out

14   to firms like Conn Acoustics when you do stud work;

15   is that correct?

16       A.    Yes.

17       Q.    Would it be fair to say that that's because

18   Conn Acoustics has greater expertise in stud work

19   than M.R.S. has?

20       A.    That's what they do every day.

21       Q.    Stud work is not what M.R.S. does every

22   day?

23       A.    No.

24       Q.    That would include M.R.S.'s supervisors?

FLYNN REPORTING ASSOCIATES

248

1     A.    No.

2     Q.    Now, when you subcontract stud work, does

3   the subcontractor usually have its own

4   supervisors --

5     A.    Yes.

6     Q.    -- looking after their own employees?

7     A.    Yes.

8     Q.    In that case, what M.R.S. supervisors do is

9   they observe what Conn Acoustics' supervisors are

10   doing?

11     A.    Correct.

12     Q.    Now, prior to the Terminal A job was there

13   ever a job that M.R.S. did involving stud work that

14   was as large as Terminal A?

15     A.    Not that I was involved in.

16     Q.    As the site project manager, is it fair to

17   describe you that way for Terminal A?

18     A.    Correct.

19     Q.    Did you think you had the right to hire

20   employees from any source you needed?

21     A.    We had to maintain the Local 17 agreement,

22   which we did; however, when Local 17 couldn't

23   provide the men, I told Bobby and Bergantino that we

24   tried to get from other locals, which we did, which

FLYNN REPORTING ASSOCIATES

249

1  was Detroit and Illinois and they didn't have a

2  problem with that because they were Sheet Metal.

3      Q.   But also had some people that were not

4  Sheet Metal at all working on the project; is that

5  right?

6      A.   Tell me which ones.

7      Q.   I'm looking at the list.

8           MR. ANDERSON:  I'm looking at Employer

9  Number 11, Jim.

10           MR. ANDERSON:  Yes.

11      Q.   I see Iron Workers, Local 7.  I see

12  laborers, operating engineers on this list.  Am I

13  right to say that these were people who were covered

14  by, say, the Iron Workers Agreement, in particular

15  the Iron Workers Agreement, and yet they worked on

16  the Delta project?

17      A.   The Iron Workers that you see were the Iron

18  Workers that were put on the job per that letter

19  that was flying around for five Iron Workers that

20  John Pickford had called for.

21      Q.   John Pickford said "I will staff with

22  Local 7?"

23      A.   Correct -- not M.R.S.

24      Q.   And the International knew about the use of

FLYNN REPORTING ASSOCIATES

250

1    those Iron Workers, didn't they -- Jim Neary?

2        A.    Yes.  Jim Neary and Butler knew about it.

3        Q.    Did anyone ever file a grievance over the

4    use of those Iron Workers?

5        A.    Not to me they didn't.

6        Q.    As you understood the contract, M.R.S. was

7    not in violation of the contract by calling those

8    Iron Workers in when it did, was it?

9        A.    No.  That got ironed out with Jim Neary.

10   That was a temporary thing.

11       Q.    Because Local 17 couldn't supply the

12   relevant people?

13       A.    Yes.

14       Q.    In fact, did the International file any

15   grievances at all against M.R.S. during this

16   project?

17       A.    Never to me.

18       Q.    Now, when M.R.S. bid assuming a certain

19   number of man hours would be needed for the project,

20   does the gauge of the stud that you're using factor

21   into how many man hours you are likely going to have

22   to use?

23       A.    Yes.

24       Q.    Would it be fair to say that welding takes

FLYNN REPORTING ASSOCIATES

251

1    longer than simply using a Hilti gun?

2        A.    Not necessarily because the length of weld

3    may be compensated by six shots versus one inch of

4    weld.

5        Q.    But welding, in general, could take longer

6    than doing the same fastening through a Hilti gun?

7        A.    No.

8        Q.    You wouldn't agree with that?

9        A.    No, because if you're shooting six shots

10   and you're doing one inch of weld, it's not going to

11   take you any longer to do one inch of weld than six

12   shots.

13       Q.    Doesn't it take a lot longer to assemble

14   all the equipment for a weld as opposed to --

15       A.    No.  You get boom lifts that come with the

16   welders right in the boom lifts.  It's a small box,

17   hand-held.

18       Q.    How about spacing?  If the spacing on studs

19   is tighter, I take it would it would take longer to

20   get the job done?

21       A.    That's all estimated in the parts and

22   pieces.

23       Q.    Understood.  Would you say it would take

24   longer to use certain kinds of fasteners than it

FLYNN REPORTING ASSOCIATES

252

1   does to use a Hilti gun?

2      A.   Depending on the fasteners.

3      Q.   The answer would be yes?

4      A.   Yes.

5      Q.   Isn't it true that after the Larson Company

6   got involved in the project that the gauge of the

7   studs that you had to use changed?

8      A.   It was not necessarily the gauge of the

9   studs.  It was some of angles, the beam, the kicker

10  coming down.  It's not necessarily the gauge.  That

11  doesn't have a whole lot of merit on it.  There was

12  some additional framing that was required -- kickers

13  and then the Hilti fasteners had to be changed to

14  fasteners.  That was the only difference.

15     Q.   The new fasteners that had to be used I

16  take it takes longer to install than the Hilti guns?

17     A.   Yes.

18     Q.   And when you made your original estimate

19  for the number of man hours, I take it that you were

20  planning on using the Hilti guns rather than the

21  fasteners you later had to use?

22     A.   Not necessarily because we still -- the

23  studs that with we currently do now are done with

24  fasteners.  There was no difference.  It was just

FLYNN REPORTING ASSOCIATES

253

1    that the job was spec'd out with Hilti.  Can I say

2    that the estimator took off Hilti fasteners?  To him

3    it made no difference.  When he estimated the job,

4    he estimated the job, whether it be fasteners or

5    Hiltis.  It's the same difference to him because we

6    typically don't use a Hilti product; however, that

7    job was spec'd out by the estimator --

8        Q.    But the original requirements called for

9    the use of Hiltis; correct?

10       A.    Spec'd out for Hiltis, yes.

11       Q.    That then changed to fasteners?

12       A.    Correct.

13       Q.    As I understand it, fasteners take longer

14   than Hiltis?

15       A.    Correct.

16       Q.    Now, in terms of productivity, did you ever

17   have any problems with the productivity of any of

18   your Connecticut-based Local 40 Sheet Metal Workers?

19       A.    No.

20       Q.    Those were guys who are now Iron Workers

21   you say?

22       A.    Correct.

23       Q.    The same guys, different union?

24       A.    Yes.

FLYNN REPORTING ASSOCIATES

254

1      Q.    That's because M.R.S. terminated its

2    agreement with Local 40 in 2005?

3      A.    I think so, yes.

4      Q.    The same crew then became subject to the

5    Iron Workers' Collective Bargaining Agreement?

6      A.    Correct.

7      Q.    But at the time they worked on the Delta

8    project they were still Sheet Metal Workers?

9      A.    Yes.

10     Q.    Now, who trained the Local 40 Sheet Metal

11   Workers before they went on the Delta job?

12     A.    Our project managers, field

13   superintendents.

14     Q.    Did you have any special facilities, or was

15   it just in discussions?

16     A.    In our shop, M.R.S.'s shop, and general job

17   site experience.

18     Q.    How often do you hire new employees out of

19   Local 40 or did you at the time?  Is it a pretty

20   stable crew?

21     A.    These guys have been with the company for a

22   long time.

23     Q.    And these are guys that M.R.S. hired, not

24   that were initially referred by Local 40?

FLYNN REPORTING ASSOCIATES

255

1       A.   Correct.  They were under the International

2   agreement.

3       Q.   Siding and Decking?

4       A.   Yes.

5       Q.   Now, you described that you would order

6   five men and get two from Local 17, order ten and

7   get six.  When did this first start happening --

8   that kind of worker shortfall?

9       A.   As soon as we started installing the metal

10  panels and doing studs at the same time.

11      Q.   Would that be in about October of '03?

12      A.   End of September or October.

13      Q.   Studs and panel.  Was it October of 2003

14  when the rework was ordered by Larson?

15      A.   Sometime in mid-October, yes.

16      Q.   The rework on those sections, did that

17  require you to assign manpower that would otherwise

18  have been available for other stud work?

19      A.   We had a specific crew that was just doing

20  repairs.

21      Q.   And this was a crew that had prior to the

22  rework been doing stud work?

23      A.   Yes.

24      Q.   But for the rework they would have been

FLYNN REPORTING ASSOCIATES

256

1  doing stud work as well?

2      A.   Yes.

3      Q.   Were these all Local 40 people on the

4  rework crew?

5      A.   Local 40 and Local 17 -- a mixture.

6      Q.   Now, when you got fewer people than you had

7  asked for, did the project grind to a halt, or did

8  it simply proceed more slowly than you wanted it to?

9      A.   It proceeded.

10     Q.   So there were no days when you walked away

11  from the building site because you didn't have

12  enough workers?

13     A.   No.

14     Q.   Who was the first representative of the

15  International that you remember on the scene?  Would

16  it have been Danny Pasquinucci?

17         MR. GROSSO:  You can't look to him for

18  the answer.  If you know, you know.  If you don't

19  know, you don't know.

20     A.   We were in the meeting with Crown Corr.  I

21  think it was Danny Pasquinucci and there was also

22  another gentleman.

23     Q.   Fred Machewski?

24     A.   Right.

FLYNN REPORTING ASSOCIATES

1     Q.    Do you understand why they were there?

2     A.    There were some issues with the

3  International, Local 17 manpower issues, guys coming

4  in late.  We had made a lot of complaints and they

5  were there to address some of them.

6     Q.    So as you understood it, they were there on

7  behalf of the International to make sure that

8  Local 17 followed through on manpower issues?

9     A.    Certainly, and they also had a big meeting

10  with all the men on the site and talked about how

11  important this project was to the International and

12  how they needed to do their work and to be on time

13  and not to miss any time -- the whole speech.

14     Q.    Who gave that speech, do you remember?

15     A.    I think it was Danny who made the speech.

16     Q.    Do you recall when he gave that speech?

17     A.    Not the date exactly, no, I don't.

18     Q.    Did you ever feel that Danny or Fred or

19  anybody from the International was trying to

20  sabotage the project?

21     A.    Danny, as I recall, was a pretty straight

22  shooter.  Me and Fred didn't see eye to eye.

23     Q.    Aside from your personal disagreement,

24  though, was Fred trying to help resolve manpower

FLYNN REPORTING ASSOCIATES

258

1    problems?

2        A.    I didn't really talk to Fred.  Danny was my

3    key guy.

4        Q.    And you had a good relationship with Danny?

5        A.    Yes.

6        Q.    Now, I'll suggest that Danny worked at the

7    Delta site during the autumn and winter of 2003.

8    Does that sound right to you?

9        A.    Yes.

10       Q.    After Danny left Jim Neary came in?

11       A.    Yes.

12       Q.    Would it sound right that Jim Neary was

13   there from January of 2004 onward?

14       A.    Yes, because Jim Neary was not there when

15   there were a lot of problems.

16       Q.    So it was Danny who was there when there

17   were a lot of problems?

18       A.    Yes.

19       Q.    And that would have been late 2003?

20       A.    As I recall, yes.

21       Q.    When these problems were occurring in late

22   2003, was there any question in your mind that

23   M.R.S. was not getting duly-qualified workers from

24   Local 17?

FLYNN REPORTING ASSOCIATES

259

```
 1      A.   Yes.

 2      Q.   I'm sorry, there was a question or there

 3  wasn't?

 4      A.   Yes, we were not getting qualified men.

 5      Q.   There was no question in your mind that you

 6  were not getting the duly-qualified workers that you

 7  wanted from Local 17?

 8      A.   That's correct.

 9      Q.   Now, did the size of your crew on the

10  Terminal A project ever get to be as low as, say,

11  40 workers?

12      A.   Uh-huh.

13      Q.   Yes?

14      A.   Yes.

15      Q.   One thing I want to ask.  Referring you

16  back to Employer 11, when qualified workers were

17  brought in from other states like, say, Illinois,

18  were they referred to Local 17?  Do they show up in

19  your records as Local 17 journeymen?

20      A.   They had to go through the hall, yes,

21  Local 17.

22      Q.   So, for instance, I'm looking at David

23  Bayer on this roster.

24      A.   Okay.
```

FLYNN REPORTING ASSOCIATES

1    Q.    He's from Libertyville, Illinois, but he's

2    listed as Sheet Metal Worker 17.  I take it that

3    he's not actually an original member of Local 17 but

4    somebody brought in from Illinois who is then

5    referred to Local 17?

6    A.    Yes.

7    Q.    Do you have an estimate about how many

8    people were brought in from outside New England to

9    work on the job?

10    A.    Oh, probably eight to ten guys possibly.

11    Q.    Did you have any problems with anybody that

12    was brought in from outside Massachusetts, that is

13    with their qualifications?

14    A.    Yes, I did.

15    Q.    How many did you have a problem with?

16    A.    Probably half.

17    Q.    Did you send them off the project?

18    A.    Yes.

19    Q.    Now, with the employees that you had to

20    send back because they were not up to snuff, and I'm

21    talking generally about people referred by Local 17,

22    how long would it take you to figure out that they

23    needed to be sent back, they were not going to make

24    it?

FLYNN REPORTING ASSOCIATES

261

1      A.    Sometimes one day; sometimes a few days.

2      Q.    But usually less than a week?

3      A.    Yes.

4      Q.    And you gave an estimate that about

5  70 percent didn't make it past first week; is that

6  right?

7      A.    You asked me how many guys were terminated

8  on the job, and I said approximately 70 percent of

9  the total guys, so now you're asking me a second

10  question, so repeat the question.

11     Q.    What percentage would you estimate did not

12  last longer than a week?

13     A.    Roughly 35 or 40 percent.

14     Q.    Now, you understood that you were subject

15  to the Siding and Decking Agreement on this job;

16  right?

17     A.    Yes.

18     Q.    And that agreement gave you the right to

19  discharge or lay people off for just cause?

20     A.    Correct.

21     Q.    Did the International ever file any

22  grievances against M.R.S. over any of your layoff

23  decisions?

24     A.    No.

FLYNN REPORTING ASSOCIATES

262

1    Q.   Did anyone ever file a grievance claiming

2    back pay for any kind of disciplinary action you

3    took on behalf of M.R.S.?

4    A.   Not that I know of.

5    Q.   Now, for the remainder, and I'm talking

6    about the those employees that were not laid off,

7    typically did they remain with M.R.S. for the

8    duration of the project?

9    A.   Yes.

10   Q.   So that by the time the project ended most

11   M.R.S.'s complement of workers had been there for a

12   considerable period of time; would that be fair to

13   say?

14   A.   Yes.

15   Q.   I realize that you can't give precise

16   numbers.  All I'm asking is for your best estimate.

17   During the period from the beginning of the project

18   through, let's say, the end of 2003 how many people

19   would you have to lay off in a given week on

20   average?

21   A.   Lay off or terminate?

22   Q.   However you label it -- end their

23   employment on the project.

24   A.   Probably about 55 or 60 people, not per

FLYNN REPORTING ASSOCIATES

263

1   week, but in that time span.

2       Q.   For that time span?

3       A.   Yes.

4       Q.   And then after January of '04 did you have

5   to terminate people at the same rate?

6       A.   No, because we had trained them at that

7   point.

8       Q.   Talking about safety for a moment, did

9   M.R.S. ever file any reports describing any of the

10  injuries its employees had incurred as a result of

11  their own negligence?

12      A.   Not that I recall.

13      Q.   You're accustomed to taking care of safety

14  issues on site normally?

15      A.   Yes.

16      Q.   Would you agree with me that workers are

17  encouraged to report injuries no matter how minor

18  and that's a good thing for safety?

19      A.   Absolutely.

20      Q.   Are you aware of any efforts that the

21  International took to bring in employees aside from

22  Local 17?

23      A.   Not really because we were the ones that

24  initiated it.  M.R.S. called for some people out of

FLYNN REPORTING ASSOCIATES

264

1    Detroit, so, no.  Everybody came through 17.  That's

2    where the manpower was coming from.

3        Q.   Is it possible that people came through 17

4    that were brought in by the International?

5        A.   It's possible.

6        Q.   Now, at one point didn't Crown Corr bring

7    in its employees and make them available to work on

8    the M.R.S. project?

9        A.   Yes.

10       Q.   Do you remember when that happened?

11       A.   Probably somewhere around the end of

12   November or December.

13       Q.   Of 2003?

14       A.   Yes.

15       Q.   And these were also Sheet Metal Workers;

16   correct?

17       A.   Yes.

18       Q.   So what was the relationship?  Were they

19   employed by Crown Corr and Crown Corr simply

20   backcharged M.R.S. for their wages?

21       A.   Yes.

22       Q.   But they were supervised by Crown Corr?

23       A.   Yes.

24       Q.   Do you know whether Crown Corr brought in

FLYNN REPORTING ASSOCIATES

265

1    these workers as a result of discussions with the

2    International?

3        A.    I don't know.

4        Q.    Do you know whether M.R.S. ever gave any

5    thought to using the International union's job bank?

6        A.    I recall there were some calls made to that

7    bank.

8        Q.    Do you know who made them?

9        A.    I don't.

10       Q.    Do you know if Local 17 tried to go through

11   the job bank?

12       A.    It's possible.  I remember some discussion

13   on that with John Pickford and Bobby Butler.

14       Q.    Now, I want to talk about what M.R.S. was

15   allowed to do in order to deal with the shortage of

16   manpower.  Would you agree with me that what M.R.S.

17   can do and what it can't do is defined by the

18   contract, by the collective bargaining agreement?

19       A.    Yes.

20       Q.    In your experience in administering the

21   contracts, it's not just up to the unilateral

22   decision of the local union what an employer may do

23   under the contract; would you agree with that?

24       A.    Well, they can both come to a decision that

FLYNN REPORTING ASSOCIATES

266

1   works for the benefit of both parties.

2       Q.   But if the local union representative takes

3   the position about the application of the contract

4   that is wrong or unreasonable, you would agree with

5   me that at that point the contractor can do

6   something about it?

7       A.   Maybe, yes.

8       Q.   In a situation like this if Local 17 had

9   said you can't use anybody outside of Local 17, what

10  would you have done?

11      A.   They never said we couldn't use people

12  outside of Local 17.

13      Q.   I understand.  I'm asking a hypothetical.

14      A.   They merely said we couldn't use Iron

15  Workers or Carpenters.

16      Q.   Right, if somebody like Joe Bergantino or

17  Bobby Butler had said, We don't want you to use

18  Local 40 people, don't do it, in your role as

19  contract administrator, would you have seen a way

20  that the employer could have dealt with that

21  position?

22           MR. GROSSO:  I'm going to object to

23  the question because that never happened.  The union

24  never objected to the use of Local 40 people the

FLYNN REPORTING ASSOCIATES

267

1    employer used Local 40 people and others, so why are

2    we going down this path?

3                MR. ANDERSON:  What I'm trying to

4    explore is that if there was something that M.R.S.

5    was hearing from Local 17 about its options in the

6    event of a manpower shortfall that was incorrect,

7    that the employer had a remedy under the agreement

8    to deal with that.

9                ARBITRATOR ASHER:  Maybe you can break

10   it down a little more.

11               MR. GROSSO:  Are you asking him for

12   legal opinion as to what he thinks his rights are

13   under the contract?

14               MR. GROSSO:  I'm asking him as the

15   on-site administrator of the contract that if the

16   local union rep. tells you something that is too

17   restrictive, are you bound by that interpretation or

18   is there something you can do.

19               MR. GROSSO:  That's a legal opinion

20   he's asking for.

21               MR. ANDERSON:  Then I'll withdraw the

22   question and save it for the brief.

23                    (Discussion off the record.)

24               MR. ANDERSON:  Nothing further from

FLYNN REPORTING ASSOCIATES

268

1    the International.

2              MR. GROSSO:  Why don't you ask your

3    couple, and then I'm going to ask a favor from the

4    panel that maybe we can run 15 minutes beyond 5:00.

5    I have my next witness here who is an employee of

6    Skanska and who can only be here now.  He cannot

7    come back tomorrow, so I would like to take him out

8    of order and do my redirect and then you can do

9    recross.  Because we control JR, we can make him be

10   here tomorrow morning, but we can't make this other

11   guy come back tomorrow.  I'll be very, very brief

12   with him.  The scope of Mr. Johnson is very, very

13   small.

14             ARBITRATOR ASHER:  Do the parties

15   stipulate whether the employees were under just

16   cause or an at-will condition in the time frame?

17   Michael, you mentioned just cause in your questions,

18   and I think we should establish that if there is an

19   agreement on that.

20             MR. GROSSO:  My belief is that there

21   is no just cause provision for termination in either

22   the National Siding and Decking Agreement or the

23   Local 17 agreement.  Typically, in building trades

24   agreements the only guy that gets just cause is the

FLYNN REPORTING ASSOCIATES

269

```
 1    steward.  Everybody else is at will, but I suppose
 2    we could --
 3                MR. ANDERSON:  Well, the contract
 4    speaks for itself.
 5                MR. GROSSO:  Right, that's correct.
 6                MR. ANDERSON:  And if I made an
 7    incorrect assumption about that --
 8                (Short recess taken.)
 9                PETER D. JOHNSON, sworn.
10                DIRECT EXAMINATION OF PETER JOHNSON
11    BY MR. GROSSO:
12        Q.   Would you state your full name for the
13    panel, please.
14        A.   Peter Donald Johnson.
15        Q.   Are you employed, sir?
16        A.   Yes.
17        Q.   With whom are you employed?
18        A.   Skanska.
19        Q.   How long have you worked for Skanska?
20        A.   I started working for them on
21    December 4, 2000.
22        Q.   Were you employed by Skanska at the time
23    the Delta Terminal A project was constructed at
24    Logan Airport?
```

FLYNN REPORTING ASSOCIATES

270

1      A.    Yes.

2      Q.    And what was your position with Skanska at

3  the time?

4      A.    General superintendent.

5      Q.    For that project?

6      A.    Yes.

7      Q.    Are you familiar with Crown Corr?

8      A.    Yes.

9      Q.    Are you familiar with a company called

10  M.R.S. Enterprises?

11      A.    Yes.

12      Q.    Did they both work on that project?

13      A.    M.R.S. worked for Crown Corr who had a

14  contract with us.

15      Q.    What work did they perform?

16      A.    Crown Corr?

17      Q.    M.R.S.

18      A.    They managed the metal siding and

19  installation and metal studs.

20      Q.    Did Skanska put that package together for

21  this project?

22      A.    Yes, Skanska put the package together with

23  Crown Corr.

24      Q.    How did M.R.S. get involved in the project?

FLYNN REPORTING ASSOCIATES

271

1    A.   Crown Corr subbed some of the work to

2  M.R.S.

3    Q.   Did Crown Corr perform any work?

4    A.   Yes.

5    Q.   What did they do?

6    A.   They did curtail wall and also at one point

7  in time they brought in some work force and worked

8  on the satellite with the metal panels and studs.

9    Q.   Were you on the job every day?

10    A.   Unless I was on vacation.

11    Q.   So it's fair to say you were on the job

12  every day except for when you were on vacation?

13    A.   Yes.

14    Q.   Did you have an opportunity to observe the

15  installation of the metal stud support system and

16  dense glass board sheathing and metal panel

17  installation?

18    A.   Did I observe it?

19    Q.   Yes.  Did you see it?

20    A.   Yes.

21    Q.   Would you walk around the job site every

22  day?

23    A.   Yes.

24    Q.   Could you describe for the panel what you

FLYNN REPORTING ASSOCIATES

272

1    observed especially in the time frame between August

2    of 2003 and the end of 2003, the job that had just

3    started?

4        A.    Actually, the job wasn't started then.

5        Q.    I'm sorry, when the installation of this

6    work started.

7        A.    Well, Skanska had concerns, along with

8    myself, that the schedule wasn't being met, and we

9    had a couple of meetings with Crown Corr about

10   productivity and in regards to their overall

11   performance on the job at the time.

12       Q.    Prior to Crown Corr becoming the

13   subcontractor on this job had Skanska reached any

14   conclusion as to who would be performing this work?

15   And by that I mean mostly the trade, rather than the

16   contractor.

17       A.    No.

18       Q.    So Skanska had no preference as to what

19   trade did this work?

20       A.    No.

21       Q.    Were you --

22       A.    I'm speaking for myself.  I can't say that

23   Skanska or AB didn't have any preference, but the

24   people who were putting the package together didn't

FLYNN REPORTING ASSOCIATES

273

1  have any preference.

2      Q.   It went out for bid, and whoever won it,

3  won it?

4      A.   Yes.

5      Q.   Why, if you know, did the job get behind

6  schedule?

7      A.   Why did it get behind schedule -- because

8  the production wasn't there.  Linear footage, square

9  footage, numbers didn't work out, the work wasn't

10 getting done quick enough to meet the rest of the

11 schedule.

12     Q.   In your opinion, was there sufficient

13 manpower working on this phase of the project?

14     A.   I don't recall, to be honest with you.

15     Q.   Well, as the superintendent how many jobs

16 have you supervised?

17     A.   Over the last 20 years I would say at least

18 20.

19     Q.   So you have some feeling for productivity

20 and whether or not a project is undermanned or

21 properly manned?

22     A.   Yes.

23     Q.   Would you say that the work force of M.R.S.

24 in performing this work during that time frame I

FLYNN REPORTING ASSOCIATES

274

1   described was appropriate?

2       A.   I think there were enough men on site.  I'm

3   not sure the productivity from that labor force was

4   what it should have been.

5       Q.   Did you arrive at any opinion as to the

6   skill level of the people doing this work?

7       A.   As to the skill level, no.  Just the

8   productivity.

9       Q.   Do you have any examples of why you thought

10  the productivity was not what was necessary?

11      A.   Well, when I would have area

12  superintendents do a board count or a square footage

13  count, the numbers would be off from what we would

14  anticipate being done.

15      Q.   And what would be the basis of your

16  anticipation?  What would you expect to be done?

17      A.   From past performance of similar type

18  projects.

19      Q.   So you looked at projects that had the same

20  type of metal panel construction --

21      A.   Yes.

22      Q.   -- and you looked at the productivity that

23  occurred on those jobs as compared to what was

24  occurring on this job?

FLYNN REPORTING ASSOCIATES

275

1      A.    That's correct.

2      Q.    When you say that the square footage or

3   whatever measure you used was off, can you give us

4   some idea?  Was it 90 percent of production or

5   60 percent of production or 30 percent of

6   production?

7      A.    I would say it was -- well, depending on

8   what we were looking at, whether it was linear

9   footage or studs or number of sheets of dense glass,

10  it was probably anywhere from 40 percent to

11  60 percent off of what we would have expected.

12     Q.    40 to 60 percent off?

13     A.    Yes.

14     Q.    So, in other words, what was being produced

15  was somewhere between 40 and 60 percent of what

16  should have been installed?

17     A.    I would say so.

18     Q.    Did that continue throughout the project?

19     A.    There was a time when Crown Corr brought in

20  some additional of their own manpower I believe,

21  their own work force, that those numbers became more

22  in balance I guess you could say.

23     Q.    How do you know that Crown Corr brought in

24  its own work force?

FLYNN REPORTING ASSOCIATES

276

1     A.   Being told by Crown Corr that those were

2  his work force.

3     Q.   So they were not people from Local 17 in

4  Boston?

5     A.   I don't believe they were.

6     Q.   So with the addition of the Crown Corr work

7  force working on the satellite building and what was

8  going on with the M.R.S. work force, the

9  productivity increased?

10    A.   Yes.

11    Q.   Did the job ultimately get finished on

12 time?

13    A.   Yes, it did.

14    Q.   What about schedule?  Did M.R.S. work just

15 a regular work week through the end of the project?

16    A.   No.  They worked overtime, Saturdays,

17 Sundays.  They were there ten-hour days, twelve-hour

18 days, whatever it would take to make the schedule.

19    Q.   This was something you observed yourself?

20    A.   Yes.

21    Q.   When that type of work takes place, do you

22 have to be on the job?

23    A.   Someone from Skanska was there, whether it

24 was myself or one of the area superintendents.

FLYNN REPORTING ASSOCIATES

277

1      Q.    To your knowledge, did Skanska ever issue a

2   warning to either Crown Corr or M.R.S. of

3   termination for failure to meet the schedule?

4      A.    I don't know if it was actually a

5   termination letter, but I'm sure there were letters

6   sent out saying, You're behind schedule.

7      Q.    Were you ever present at any meetings in

8   the job site trailer where a threat of termination

9   may have taken place?

10     A.    Not to my recollection.

11     Q.    How was the safety on this project,

12  specifically for the M.R.S. work force?

13     A.    There was one month where we had a rash of

14  accidents with the Sheet Metal or the M.R.S.

15  employees, and we had a meeting with Crown Corr and

16  M.R.S. and I believe it was the agent from Local 17,

17  and once we had that meeting, things calmed down a

18  bit.  The safety side of things picked back up to

19  where it had been for the rest of the job.

20     Q.    Have you ever been on a project where you

21  had seen -- what number did you say of accidents

22  occurred?

23     A.    I didn't.

24     Q.    Do you have any idea of how many occurred?

FLYNN REPORTING ASSOCIATES

278

1     A.    No.

2     Q.    Had you ever been on a project where the

3    number of accidents similar to that occurred in a

4    one month's span?

5     A.    No.

6     Q.    Were they serious accidents?

7     A.    I don't remember what the severity was.  To

8    me, any accident is serious.  If a guy cuts his

9    finger or breaks his arm, to me, it's the same.  It

10   pulls the same value.

11    Q.    Did that cause any concern to Skanska?

12    A.    Yes, it did.  That's why we had the meeting

13   and called everybody in to see if we could figure

14   out what the problem was.

15          MR. GROSSO:  No further problems.

16          CROSS-EXAMINATION OF PETER JOHNSON

17   BY MR. ANDERSON:

18    Q.    Mr. Johnson, I'm Michael Anderson, and I

19   represent the Sheet Metal Workers International.

20   Mr. Grosso asked you about the time period from

21   August 2003 to the end of 2003.  Were you

22   supervising the project for Skanska throughout its

23   completion?

24    A.    Yes, I was.  I was there from 2000 until

FLYNN REPORTING ASSOCIATES

279

1  2005.

2      Q.   I understand.  Do you recall that M.R.S.

3  had to rework one of its exterior walls?  Does that

4  ring any bells for you?

5      A.   There was work that had to be reworked in

6  areas.

7      Q.   Were you familiar with what happened

8  between Crown Corr and M.R.S. that led up to that

9  rework?

10     A.   No, I'm not.

11     Q.   Do you know how much that rework had an

12  effect on the productivity of the overall project?

13     A.   Considering it got done on time, I would

14  say that M.R.S. and Crown Corr worked the issue out

15  through overtime and Saturdays to make up the

16  schedule.

17     Q.   When you say it got done on time, you mean

18  the project got completed in March of 2005?

19     A.   That's right.

20     Q.   But during the time period between August

21  of 2003 to the end of 2003 when you said the

22  productivity was about 40 to 60 percent off, do you

23  know how much having to do the rework contributed to

24  that shortfall?

FLYNN REPORTING ASSOCIATES

1     A.   Not off the top of my head, no, I don't.

2     Q.   Do you know when Crown Corr brought in a

3  fresh group of employees from the outside?

4     A.   No.

5     Q.   Would that have been in this time period

6  before the end of 2003?

7     A.   I believe it was.

8     Q.   It was at that point that the productivity

9  numbers became more balanced?

10    A.   Yes.

11    Q.   Would it be fair to say that the numbers

12  remained balanced after the end of 2003?

13    A.   Yes.

14    Q.   Now, the overtime that was being worked

15  Saturdays and Sundays, do you know whether M.R.S.

16  had to work that kind of overtime after the end of

17  2003?

18    A.   I don't remember.

19    Q.   But the project was on schedule in, say,

20  the spring of 2004?

21    A.   The overall schedule was on schedule in

22  2004, yes.

23    Q.   And M.R.S. and Crown Corr's part of it was

24  back to being on schedule by that time -- by the

FLYNN REPORTING ASSOCIATES

281

1    spring of '04?

2        A.   There were still some issues hanging out

3    there.  There were some expansion joints and some

4    miscellaneous parts and pieces that weren't buttoned

5    up on time.

6        Q.   How about the summer of 2004, was it on

7    track by then?

8        A.   I would say, as best I can recall, it was.

9        Q.   So, as far as you know, would there have

10   been any need for M.R.S. to work Saturdays and

11   Sundays and overtime after, say, June of '04?

12       A.   I don't know.  I would have to look at

13   something to tell.

14       Q.   As you sit here, you're not sure?

15       A.   I'm not sure.

16       Q.   Do you remember when this one month when

17   there was a rash of accidents was?  Was that in

18   2003?

19       A.   I believe it was in the late summer or

20   early fall time frame, if I remember right.

21            MR. ANDERSON:  Nothing further.

22            CROSS-EXAMINATION OF PETER JOHNSON

23   BY MR. KELLY:

24       Q.   I just have one or two questions.  I

FLYNN REPORTING ASSOCIATES

282

1    represent Local 17, Mr. Johnson.  You said earlier a

2    couple of things.  One is that the satellite

3    building wall system was performed by Crown Corr or

4    its employees.  Is that accurate?

5        A.    I believe Crown Corr brought in their own

6    work force from other parts of the country to work

7    on that building, yes.

8        Q.    Is it also true that that satellite

9    building work that we're talking about began after

10    the main terminal building?

11        A.    Probably.  I would say a month after, yes,

12    and I believe M.R.S. -- strike that.  Never mind.

13        Q.    You believe M.R.S. was going to do --

14        A.    I know they were.

15        Q.    But Crown Corr took it over?

16        A.    Crown Corr took it over, yes.

17        Q.    But in response to questions that

18    Mr. Grosso asked you, you indicated that you

19    understood these were Crown Corr's own employees as

20    opposed to Local 7 members who happened to go to

21    work for Crown Corr; is that right?

22        A.    From the way I understood it, they were

23    travelers from out of town.  They worked around the

24    country for Crown Corr.

FLYNN REPORTING ASSOCIATES

283

```
1      Q.   If I were to suggest to you that the

2    employees who went to work for Crown Corr on the

3    satellite building were the same employees who had

4    previously worked for M.R.S. on the Terminal A

5    building, would you have any basis for disagreeing

6    with that?

7                MR. GROSSO:  First of all, I object.

8    How do we know that that's a fact?

9                MR. KELLY:  I'm asking if he has any

10   basis for determining whether it's a fact or not.  I

11   think I'm entitled to that answer.

12               ARBITRATOR ASHER:  Go ahead and

13   answer.

14      A.   The only way I would know would be to look

15   at the payroll records of M.R.S. and Crown Corr.

16      Q.   To look and see if they're the same people

17   or not?

18      A.   Right.  I couldn't give you a straight

19   answer right now.

20      Q.   But you testified earlier I thought that it

21   was based on some information that somebody gave you

22   that the employees were Crown Corr employees and not

23   Local 17 people?

24      A.   That is correct.  The conversations I had
```

FLYNN REPORTING ASSOCIATES

284

1    with John Pickford and Crown Corr, that is what I

2    was led to believe.

3         Q.   So Mr. Pickford told you that?

4         A.   Yes.

5              MR. KELLY:  That's all I have.

6              (Discussion off the record.)

7              CROSS-EXAMINATION OF VENANCE JR LAFRANCOIS

8    BY MR. KELLY:

9         Q.   JR, my name is Paul Kelly, and I represent

10   Local 17, and I do have a few questions for you.

11        A.   Okay.

12        Q.   Do I understand correctly you arrived on

13   the job in early October of 2003?

14        A.   That's correct.

15        Q.   And I also understand that the job had been

16   underway since about August?

17        A.   That's correct.

18        Q.   Tell me what the situation was when you got

19   there in terms of work that had been performed with

20   respect to the Terminal A building and the satellite

21   building.

22        A.   We had already started to install metal

23   studs, panels.  We had crews doing both.

24        Q.   Both?

FLYNN REPORTING ASSOCIATES

285

1      A.   Correct.

2      Q.   On both buildings?

3      A.   The satellite we had little at that point

4   in time, but we were starting on them.

5      Q.   So when you got there, you were just

6   starting on the satellite building, but much of the

7   stud work had been done on the terminal building?

8      A.   No.  We were progressing throughout the job

9   with the stud work.

10     Q.   But it's fair to say that most of the work

11  that had been done by the time you got there had

12  been done on Terminal A as opposed to the satellite?

13     A.   No.

14     Q.   No?

15     A.   No.  We still had substantial stud work to

16  do on Terminal A, yet to be completed.

17     Q.   I understood that sometime in mid-October

18  shortly after you got there that there was 800 feet

19  of wall that was taken out, the so-called rework?

20     A.   The metal panels were taken down, only the

21  metal panels.

22     Q.   The panels were taken off of the stud work?

23     A.   Correct.

24     Q.   But give me an idea of that 800 feet in

FLYNN REPORTING ASSOCIATES

286

1    comparison to what work had been done.  Was that all

2    the work you had done on Terminal A?

3        A.    That was just a piece of it.

4        Q.    Give me an idea.  Had you done 1,600 feet

5    of work?

6        A.    Probably with metal studs and clips because

7    there were a couple of different operations going

8    on.  We had crews doing metal clips and crews that

9    would come around and install the studs, dense

10   glass, and then metal panels, so if we're talking

11   metal studs only or just the overall package, we

12   probably had when I got there, probably 2,400 feet

13   or something like that.

14       Q.    Of the --

15       A.    Of the metal studs, panels on.

16       Q.    So that's the complete deal -- the clips,

17   the studs, and the panels?

18       A.    No panels, but studs, yes.  Panels we had

19   on the first 800 feet.  The metal studs and we had

20   clips and metal studs on further than the 800 feet

21   by the time I got there.

22       Q.    And the only thing that was replaced was

23   the panels of 800 feet?

24       A.    Correct.

FLYNN REPORTING ASSOCIATES

287

```
 1      Q.   And all that stud work and the clip work

 2   that was already done, that was all done by the

 3   Local 40 M.R.S. employees?

 4      A.   No.  It was also done with Local 17

 5   employees.

 6      Q.   I understood that by the time you got there

 7   that there were only your own employees there?

 8      A.   No.  We had both.

 9      Q.   What was the size of the crew when you got

10   there?

11      A.   We were probably up to 18, 20 guys by the

12   time I got there.

13      Q.   I thought there were 20 guys from M.R.S.

14   there.

15      A.   During the progression of the job?

16      Q.   Yes.

17      A.   Yes.

18      Q.   So there were 18 to 20 when you got there

19   of which some were --

20      A.   Local 17.

21      Q.   What was the breakdown, approximately?

22      A.   We probably had close to a half and half

23   ratio, 17 M.R.S. guys, and as the work progressed we

24   had more M.R.S. guys and more 17 guys.
```

FLYNN REPORTING ASSOCIATES

288

1     Q.    In terms of the panel that was taken off,

2     is that approximately -- well, that 800 feet is

3     about one-third of the total stud work you had done

4     at that point?

5     A.    Probably, yes.

6     Q.    Around 2,400 feet of stud work.  How does

7     that compare to the total amount of stud work for

8     Terminal A?

9     A.    Very small.

10    Q.    It's small?

11    A.    Yes, it's a very small portion of the job.

12    Q.    2,400 feet is a small portion of the job?

13    A.    800 feet was a small portion that we took

14    down because that's the question you were asking.

15    Q.    I'm trying to get an idea of how many feet

16    of wall on Terminal A you had to do altogether.

17    A.    In linear foot -- you're talking somewhere

18    around 7,000 or 8,000 linear feet.

19    Q.    So 2,400 feet is about one-third of the

20    stud work?

21    A.    Yes.

22    Q.    I have just a couple more questions.  You

23    said you worked for two metal building companies

24    prior to M.R.S.?

FLYNN REPORTING ASSOCIATES

289

1     A.    Yes.

2     Q.    Kenerect was one.  Who was the other one?

3     A.    It was Frenchie Construction.

4     Q.    Frenchie?

5     A.    Yes.

6     Q.    Are they both in Connecticut?

7     A.    Correct.

8     Q.    This job I think you said was the largest

9  of these metal panel system jobs?

10    A.    Metal stud jobs.

11    Q.    You had done metal stud jobs before?

12    A.    Supervised them.

13    Q.    But the stud work had been subcontracted on

14  those jobs; right?

15    A.    Right.

16    Q.    What was the largest metal stud job before

17  this one that you had bid on?

18    A.    It was the Amgen (phonetic) in

19  Rhode Island.

20    Q.    Was that the Rhode Island job you referred

21  to earlier?

22    A.    Yes.

23    Q.    And Conn Acoustics was the sub?

24    A.    Yes.

FLYNN REPORTING ASSOCIATES

290

1    Q.    And when was that?

2    A.    That was going back probably 2001.

3    Q.    How did it compare in terms of size to the

4    Delta job?

5    A.    It was smaller than the Delta job.

6    Q.    Half the size?

7    A.    Probably 3/8th of the Delta job.

8    Q.    Conn Acoustics, do you I understand

9    correctly they do the installation of the frame, the

10   stud work?

11   A.    Correct.

12   Q.    Do their people supervise the installation?

13   A.    They have a foreman on site.

14   Q.    That supervises the Carpenters I guess they

15   are; right?

16   A.    Correct.

17   Q.    I want you to take a look, if you can, at

18   another exhibit, Employer Exhibit 7.  You were asked

19   on direct when you first met a representative of the

20   International, and I think said it was Dan

21   Pasquinucci.  This Exhibit 7, if I understand

22   correctly, documents a meeting in October of 2003,

23   and I guess my question is, Is that the meeting at

24   which you first met Dan Pasquinucci?

FLYNN REPORTING ASSOCIATES

291

1    A.   It could be.  Without going back to my own

2    records, this could be the meeting because we did

3    talk about a lot of things that the guys would be

4    trained on the module that was down there.  It was a

5    question we asked almost the Local guys coming into

6    the job, whether or not they had been trained on the

7    module, and there was not one that could say he was

8    trained on that module.

9    Q.   I'm going to play percentages with you for

10   a minute.  I thought you originally said that 70

11   percent of the referrals you got from Local 17 were

12   not qualified to do this kind of work.  Is that

13   about right?

14   A.   Correct.

15   Q.   And by that you mean they had no experience

16   in this work?

17   A.   Correct.

18   Q.   You're not saying they were not qualified

19   HVAC men, for example?

20   A.   I never said that.

21   Q.   But when you were saying they were

22   unqualified, you were saying that --

23   A.   They were unqualified to do metal studs.

24   Q.   Inexperienced, untrained?

FLYNN REPORTING ASSOCIATES

292

```
 1      A.   Metal studs, installation, dense glass,

 2   metal panels.  There's a handful of guys that we had

 3   that installed metal panels.

 4      Q.   That had done it before?

 5      A.   Consistently.

 6      Q.   Now, you also said that approximately

 7   35 to 40 percent didn't last a week?

 8      A.   Correct.

 9      Q.   And that would be a subset of those

10   70 percent that were not qualified?

11      A.   A subset in addition to or mixed in between

12   them?

13      Q.   Well, the people that didn't last a week

14   were, by and large, unqualified when they got there?

15      A.   Correct.

16      Q.   That's what you're saying?

17      A.   Right.

18      Q.   So even though some people were

19   unqualified, they lasted more than a week and after

20   a while they figured it out; right?

21      A.   Correct.

22      Q.   My question to you is, and I understand

23   that early on in the game when you first got there,

24   maybe 60 guys were on and off the job.  Do you know
```

FLYNN REPORTING ASSOCIATES

293

1    one way or another whether those guys or some of

2    those guys went to work for Crown Corr on the

3    satellite building?

4        A.   Later on?

5        Q.   Yes.

6        A.   Yes, they did.

7        Q.   After they left M.R.S. they went to work

8    for Crown Corr?

9        A.   Yes.

10        Q.   Were there disputes on the job with the

11    supervisors with the M.R.S. supervisors?

12        A.   Amongst the M.R.S. supervisors?

13        Q.   No.  Between the supervisors and the people

14    they were supervising.

15        A.   Yes.

16        Q.   You were managing them, weren't you?

17        A.   Correct.

18        Q.   So one of the issues you had to deal with

19    was the conflict between the supervisors and the

20    workers?

21        A.   There was continuously a conflict between

22    this agreement that was made by the International or

23    the arbitration that was taking place to have all

24    Sheet Metal on the job.  A lot of guys didn't want

FLYNN REPORTING ASSOCIATES

294

1   to be there -- Local 17 guys.  They did not want to

2   be doing that work, so there was always a little bit

3   of friction going on, and we also had some friction

4   because the president of the Local 17 was there, and

5   he was typically their speaker.

6        Q.   Who was that?

7        A.   Ben Foley.  He caused a lot of friction for

8   his own people on the site, so there was a little

9   bit of friction there with the supervisors because

10  of that.

11       Q.   That's all I have, JR.  Thank you.

12          REDIRECT EXAMINATION OF VENANCE JR LAFRANCOIS

13  BY MR. GROSSO:

14       Q.   I just have a couple.  You said

15  Mr. Pasquinucci gave a speech about how people had

16  to be productive and how to work?

17       A.   Yes.

18       Q.   Did the quality of the manpower change

19  significantly after that speech?

20       A.   No.

21       Q.   You said not one person referred from

22  Local 17 could admit that he had been trained on the

23  module.  Do you remember saying that?

24       A.   Yes.

FLYNN REPORTING ASSOCIATES

295

1    Q.   So is it fair to say that all the training

2    done of Local 17 people with was done by M.R.S.?

3    A.   Yes.  Can I elaborate on that?

4    Q.   Go right ahead.

5    A.   We had tried at one point in time -- I had

6    set up an employee sign-in sheet for qualifications

7    so we could better understand what the guys were

8    qualified for.  If they had previously worked on

9    metal panels, it would make the adjustment easier to

10   say, Okay, this guy has had experience with metal

11   panels so he can go to metal panels.  If they were

12   trained on the module, if they had done metal studs;

13   however, when I implemented that, Local 17 was

14   totally against it and said it was illegal to do

15   so.  It was no more than something like a resume and

16   I had to discontinue it.

17   Q.   So Local 17 would not allow you to ask

18   their members when they were referred to the job if

19   they had had any previous experience on metal panels

20   or stud work?

21   A.   In writing they would not let the employees

22   fill that form out.

23   Q.   Mr. Anderson asked you some questions about

24   whether or not you could use other trades.  He said

FLYNN REPORTING ASSOCIATES

296

1    if he looks down the list, there are operating

2    engineers and laborers.  They didn't do any of this

3    work, did they?

4        A.   No.  There was an agreement met with

5    Local 17 and the laborers.  There was also a deal

6    with Roofers on that, the Roofers local, and I

7    forget what local they were.  They were on that as

8    well.  Local 17 followed all the local agreements

9    that were around the area.  We had a forklift on

10   site that had to be run by an operating engineer.

11   We had some blue skin and vapor barrier to install.

12   Local 17 wanted to keep the peace with the Roofers

13   because they work composite crews, roofers, and

14   sheet metal, so we had to hire the Roofers local.

15   The laborers -- same thing.  Local 17 wanted to keep

16   the peace with the laborers, so there was an

17   agreement made between M.R.S. and Local 17 to hire

18   these separate different locals -- the engineers,

19   the roofers, the laborers, so everybody could

20   maintain some peace and harmony.

21       Q.   But the laborers didn't work on the metal

22   panels, did they?

23       A.   No.  They were picking up garbage and

24   cleaning up.

FLYNN REPORTING ASSOCIATES

297

1    Q.   They were doing laborers' work?

2    A.   That's right.

3    Q.   One more question.  Mr. Anderson asked

4    many, many questions about the change in the design

5    and that 800 feet of wall and the change from the

6    use of the Hilti gun and shooting pins to using

7    screws.  Was that the new fastener?  What was the

8    new fastener?

9    A.   Well, typically, we have to start from the

10   estimating stage.  When the estimator estimates, he

11   doesn't say, Okay, this is going to be Hilti or

12   Hilti shots or fasteners because we typically use

13   fasteners.  We know the kind that it takes to

14   install a fastener, so when he estimated the job, he

15   estimated the job based on fasteners because that's

16   the way we always take them down, so whether it's

17   Hilti shots or a screw that screws into the steel,

18   it would have been the same time on our estimate

19   than using the Hilti shot.  Now, the question was

20   asked to me, Does it take longer to put the fastener

21   in than the Hilti shot.  Yes.  One is just a clean

22   shot and the other one is a fastener that takes a

23   little longer, the iron is a little thicker.

24   Q.   With respect, however, to the use of the

FLYNN REPORTING ASSOCIATES

298

1    fastener, would the Local 17 people who were

2    referred to you, were they any  more productive with

3    the fasteners than they were with the Hilti guns?

4        A.   No, because they had a hard time with the

5    screw guns because they were used to screwing into

6    light metal gauge studs, and now they were screwing

7    into three-quarter inch steel, so there's a

8    technique to it.  You can't just grab a screw gun

9    and run it at 2,500 rpms and expect the screw to go

10   through the steel because you'll burn out the tips,

11   so each guy had to be technically trained on the

12   screw gun to operate it.

13       Q.   So did the change in design require even

14   more training by M.R.S. of the Local 17 people?  Did

15   the change from the Hilti gun to the fastener

16   require M.R.S. to further train Local 17 people?

17       A.   Well, we had the same problem, the same

18   instance with the metal panels.  We trained them

19   with the screws guns, the drills -- the whole nine

20   yards.

21               (Adjourned at 5:10 p.m.)

22

23

24

FLYNN REPORTING ASSOCIATES

299

```
 1              C E R T I F I C A T E

 2    COMMONWEALTH OF MASSACHUSETTS

 3    Middlesex, ss.

 4                  I, Jean Parrish Zbinden, Certified

 5    Shorthand Reporter, do hereby certify that this

 6    document is an accurate transcript of the

 7    aforementioned proceeding, taken and transcribed to

 8    the best of my knowledge, skill, and ability.

 9

10

11

12                   _____
13                   Certified Shorthand Reporter
14

15

16

17

18

19

20

21

22

23

24
```

FLYNN REPORTING ASSOCIATES

1

```
 1              Volume 2, Pages 1-225

 2

 3

 4

 5  IN THE MATTER OF:

 6       M.R.S. ENTERPRISES, INC.

 7            and

 8       SHEET METAL WORKERS' INTERNATIONAL
         ASSOCIATION LOCAL 17 - BOSTON
 9
            and
10
         SHEET METAL WORKERS' INTERNATIONAL
11       ASSOCIATION

12

13            **********************
14

15
             Thursday, August 17, 2006
16                 9:15 a.m.

17        Hilton Hotel at Logan Airport
                 Harborside Drive
18           Boston, Massachusetts

19

20            **********************

21

22          FLYNN REPORTING ASSOCIATES
                One Exchange Place
23        Worcester, Massachusetts 01608
          (508) 755-1303 * (617) 536-2727
24           TOLL FREE: (888) 244-8858
```

FLYNN REPORTING ASSOCIATES

2

```
 1   APPEARANCES:

 2       Michael J. Asher, Esq., Arbitrator
         SULLIVAN, WARD, ASHER & PATTON, P.C.
 3       1000 MacCabees Center
         25800 Northwestern Highway
 4       Southfield, Michigan 48075-1000

 5
         H. Dean Ball, Arbitrator
 6       SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION
         9939 Chestnut Ridge Road
 7       Heiskell, Tennessee  37754

 8
         James F. Grosso, Esq.
 9       O'REILLY, GROSSO & GROSS, P.C.
         1671 Worcester Road, Suite 205
10       Framingham, Massachusetts 01701
         for M.R.S. Enterprises, Inc.
11

12       Paul F. Kelly, Esq.
         SEGAL, ROITMAN & COLEMAN
13       11 Beacon Street, Suite 500
         Boston, Massachusetts 02108
14       for Sheet Metal Workers' International
             Association Local 17 - Boston.
15

16       Michael Anderson, Esq.
         DAVIS, COWELL & BOWE, L.L.P.
17       8 Beacon Street, 4th Floor
         Boston, Massachusetts 02108
18       for Sheet Metal Workers'
             International Association.
19

20       Also Present:  M. Benny Hernandez.

21

22

23

24


              FLYNN REPORTING ASSOCIATES
```

3

```
 1                      I N D E X

 2    Testimony of:       Direct  Cross  Redirect Recross

 3    DANIEL F. LYNCH
        by Mr. Grosso       5              30
 4      by Mr. Anderson           14
        by Mr. Kelly              21
 5

 6    SCOTT M. D'ANGELO
        by Mr. Grosso     32/46          83/91
 7      by Mr. Anderson           54                  88
        by Mr. Kelly              72                  90
 8

 9    JOHN T. PICKFORD
        by Mr. Grosso       92           146
10      by Mr. Anderson          115
        by Mr. Kelly             130                 155
11

12    ROBERT L. BUTLER
        by Mr. Kelly       157
13      by Mr. Grosso            174

14
      DANIEL PASQUINUCCI
15      by Mr. Anderson    188
        by Mr. Grosso            196                 204
16      by Mr. Kelly             202                 209

17
      JAMES NEARY
18      by Mr. Anderson    211
        by Mr. Grosso            216
19      by Mr. Kelly             222

20

21

22

23

24
```

4

```
 1                  E X H I B I T S

 2
    Exhibit No.        Description
 3
       Joint 8        Affidavit of Joseph Bergantino
 4
       Union 1        E-mail dated 10/22/03
 5
       Union 2        E-mail dated 11/3/03
 6

 7
        ALL EXHIBITS MAILED BY COURT REPORTER TO
 8      ARBITRATOR ASHER AND ARBITRATOR BALL

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

5

```
 1                P R O C E E D I N G S

 2

 3                MR. GROSSO:  I would like to call as

 4    my next witness Daniel Lynch.

 5                DANIEL F. LYNCH, sworn.

 6           DIRECT EXAMINATION OF DANIEL LYNCH

 7    BY MR. GROSSO:

 8        Q.   Would you state your full name for the

 9    panel, please.

10        A.   Daniel Francis Lynch.

11        Q.   And are you employed, sir?

12        A.   Yes.

13        Q.   With whom are you employed?

14        A.   Lymo Construction Company.

15        Q.   How long have you been with Lymo

16    Construction Company?

17        A.   Twenty years.

18        Q.   And what type of work does Lymo

19    Construction Company do?

20        A.   We're involved in architectural metal panel

21    systems in the Greater New England Area.

22        Q.   Where is your firm located?

23        A.   We're presently located in Merrimack,

24    New Hampshire.
```

FLYNN REPORTING ASSOCIATES

6

1    Q.   And where do you work?

2    A.   Primarily in Greater Boston or within the

3    495 belt, but we do perform work throughout

4    New England and on rare occasions outside of

5    New England.

6    Q.   When you say you do architectural metal

7    panel work, can you be a little bit more specific

8    and describe exactly what you do?

9    A.   Sure.  We do metal wall panel systems that

10   compromise many different components primarily of

11   ACM, which is traditionally known as Alucobond and

12   there are other manufacturers involved.  We're

13   heavily involved in that type of application.  We

14   fabricate, engineer, and install that, but we also

15   do other preformed panel systems, such as insulated

16   panels or corrugated panel systems such as Centuria

17   (phonetic) or products that are similar to that.

18   Q.   Do you have any collective bargaining

19   agreements with any unions?

20   A.   Yes, I do.

21   Q.   With whom?

22   A.   Presently we have the Carpenters --

23   the New England Regional Council of Carpenters.  I

24   believe we still have an existing agreement with the

FLYNN REPORTING ASSOCIATES

7

1    Operating Engineers, and my understanding is that

2    our agreement has expired with the Siding and

3    Decking and/or Sheet Metal agreement, but it's been

4    a while since we've utilized it and so I'm a little

5    bit uncertain if that has completely expired.

6        Q.   At some point in time were you signatory

7    with the Sheet Metal Workers?

8        A.   Yes.

9        Q.   And just for the record, how did it happen

10   that you are here today as a witness?

11       A.   You had sent me a fax copy of a request to

12   come down and testify.

13       Q.   Was it a summons or a subpoena?

14       A.   I don't know what the legal term is.  I

15   have a copy of it.

16       Q.   First of all, let me ask you if you are

17   familiar with the Delta project, Terminal A at Logan

18   Airport.

19       A.   I'm very familiar with it, yes.

20       Q.   How did you become familiar with that

21   project?

22       A.   We were invited to bid on that contract --

23   I forget the time frame -- three or four years ago,

24   whatever it was, from the general contractor.

FLYNN REPORTING ASSOCIATES

8

```
1       Q.   Who was that?

2       A.   Skanska Construction.

3       Q.   And did you bid on the project?

4       A.   We did bid.  We bid a joint venture with

5   another contractor, a local glass company, so we

6   were acting as a sub with them being the lead.

7       Q.   And what was the name of that company?

8       A.   Cheviott Corporation.

9       Q.   What package did you bid?

10      A.   That job was unusual in that they packaged

11  many different scopes into really the exterior.  I

12  think everything on the exterior of the wall was

13  under one scope other than the membrane roofing, if

14  I remember correctly, so, essentially, the glass

15  portion was being picked up by Cheviott Corporation,

16  which is what they specialize in, and we were

17  picking up the metal stud frame assembly and the

18  wall panels.

19      Q.    In the preparation of your bid did you

20  include to be done with your own forces the stud

21  support system for the panels?

22      A.    The stud framing and I believe the exterior

23  sheathing we ended up taking pricing.  Typically, we
```

24    don't get involved with that.  Traditionally, bids

FLYNN REPORTING ASSOCIATES

9

1    are put out as a metal panel bid package only.

2    Traditionally, the drywall contractor is picking up

3    the exterior stud framing.  On this particular

4    project and simultaneous to this bid we were working

5    on Terminal E for Modern Continental, so we ended up

6    teaming up with the stud wall contractor for

7    Terminal E, which is company called Save-On-Walls.

8    They do a lot of work inside Boston.  So we had them

9    bid to us the metal stud framing, dense glass

10    application, and then we were taking it from that

11    point out.

12        Q.    So what work were your forces going to

13    actually perform?

14        A.    The focus of the work was clearly the metal

15    panels, which was the fabrication, engineering,

16    installation of the Alucobond or the ACM metal

17    panels. I believe there was a small amount of

18    insulated foam panels that was clearly within our

19    scope.  There were a lot of accessories, if I

20    recall, in this bid that they were throwing in like

21    abutting expansion joints -- things that

22    traditionally we wouldn't pick up, but they wanted

23    really one trade to do the exterior shell, so there

24    was a lot of miscellaneous things in there, but the

FLYNN REPORTING ASSOCIATES

10

1    focus of the bid or the brunt of the bid clearly was

2    light gauge framing, in our case a subcontractor

3    Save-On-Walls with Lymo picking up the metal panels.

4        Q.    Have you worked for Save-On-Walls before?

5        A.    We have worked with them on jobs.  We have

6    not worked in conjunction with the same contract.

7        Q.    Do you know what trades Save-On-Walls was

8    going to use to install the metal light gauge metal

9    studs and the sheathing?

10       A.    On that particular bid, and I think

11   generally it's a safe assumption, they would

12   certainly use Carpenters to do the light gauge metal

13   framing.

14       Q.    Are they primarily a drywall contractor?

15       A.    Yes, they're primarily a drywall, so I'm

16   sure they have multiple agreements with other trades

17   that I'm not familiar with, but, as far as the light

18   gauge metal framing, all of my experience with jobs

19   in Terminal E and other jobs we've been on has all

20   been done with Carpenters.

21       Q.    Now, on Terminal E what was the nature of

22   the exterior finish on that building?

23     A.   It was light gauge metal framing.  It was a

24   different metal system than on Terminal A.  That was

FLYNN REPORTING ASSOCIATES

11

 1   a multi-component wall assembly with an ACM panel

 2   skin.  On Terminal E it was light gauge metal

 3   framing, no dense glass, a pre-insulated panel that

 4   went directly to the metal studs.

 5     Q.   What work did your company perform on

 6   Terminal E?

 7     A.   We installed -- our contract was to supply

 8   and install the metal panel system only.

 9     Q.   I think your prior testimony was

10   Save-On-Walls did the stud work?

11     A.   That's correct.  It was a separate contract

12   and no involvement with Lymo.

13     Q.   So he was not a sub to you?

14     A.   No.  He was contracted directly by Modern

15   Continental to put out the exterior stud and also

16   all the interior work, also.

17     Q.   So that was all up when you arrived on the

18   project?

19     A.   They started and we mobilized about the

20   same time, so we were on the job continuously.

21     Q.   Can you explain briefly how the process

22   went?

23      A.   Traditionally, structural steel is put up.

24   The light gauge metal framing contractor will come

FLYNN REPORTING ASSOCIATES

12

1    in and start to hang the studs, put the studs on.

2    In the case of Terminal E, we would then proceed

3    with the installation of metal panels after the stud

4    framing.

5       Q.   Would you follow the framer?

6       A.   We'd generally be two, three, four weeks

7    behind him, depending on how their abutting

8    materials and so forth are --

9       Q.   How long has Lymo been in business?

10      A.   Twenty years.

11      Q.   Have you been doing the type of work that

12   you described for that 20-year period?

13      A.   We were involved for 20 years in the ACM.

14   We've always done metal wall panels.  At one point

15   we were heavily involved with roofing which we don't

16   do anymore.  The ACM market is much stronger in the

17   past 10 years than it was 20 years ago, so we have

18   heavily involved in the ACM market in the past

19   10 years.

20      Q.   During the course of that 20 years you've

21   been in business and I guess more particularly the

22    last 10 years, have you ever installed the stud

23    support system for these metal panels and/or the

24    dense glass, depending on the product?

FLYNN REPORTING ASSOCIATES

13

1        A.    The metal studs -- on some projects there

2    are two support systems.  There's the primary metal

3    stud, which we're talking about in Terminal A.

4    Sometimes that's put up and the dense glass in most

5    cases by the drywall and sometimes there is an

6    additional light gauge framing channel outboard of

7    the dense glass.  That additional light gauge

8    framing channel generally is put into out package

9    because that's a component of the metal panel.  The

10    primary metal stud we have never put on.  To my

11    knowledge in my 20 years I can't think of another

12    job other than Terminal A, which was very unique.

13    It was being purchased in that scope project.  There

14    are different specifications in the contract

15    documents, so outside of Terminal A that has never

16    been put into our package.

17        Q.    When you performed work under a collective

18    bargaining agreement with the Sheet Metal Workers

19    Local 17, did you ever install the light gauge metal

20    stud framing, which is not the channel that you were

21    talking about, but the stud framing, did you ever

22    install that with Local 17 employees?

23        A.   There's only one job I can recall and it

24    was a small portion of that job.  To be honest, I

FLYNN REPORTING ASSOCIATES

14

1     can't recall if it was done with 17 or Carpenters.

2     It was the Astro project which we talked about with

3     different issues on different jobs.  There was a

4     very small portion of that job that required me to

5     put the studs up, and it may have been even a change

6     order or an extra.   I'm going back four years ago,

7     so I can't recall, but, generally speaking, the vast

8     majority of the hours of projects, no, that would

9     not be put up by either 17 or even in my agreement

10    with the Carpenters.

11              MR. GROSSO:  No further questions.

12              CROSS-EXAMINATION OF DANIEL LYNCH

13    BY MR. ANDERSON:

14        Q.   Mr. Lynch, I'm Michael Anderson for the

15    Sheet Metal Workers' International.

16        A.   Good morning.

17        Q.   Did M.R.S. Enterprises ever approach Lymo

18    to act as a subcontractor for Terminal A?

19        A.   I don't think they did.  I don't recall.

20    We're friendly competitors.  We do speak on

21    occasion.  I've known Roland and Steve for many

22    years.  We go to different organization meetings

23    together.  I don't think we ever had a conversation

24    at bid stage on that project.

FLYNN REPORTING ASSOCIATES

15

1        Q.    Did Crown Corr ever approach Lymo to be a

2    subcontractor on that job?

3        A.    I did have contact with Crown Corr.  I

4    can't recall if they contacted me directly or if I

5    was requested to contact them, so I don't recall who

6    initiated the first contact, but I did have numerous

7    discussions with them.

8        Q.    Do you remember when that was?

9        A.    At the bid stage of the project.

10       Q.    Do you recall an arbitration that resolved

11   the jurisdictional dispute relating to Terminal A?

12       A.    I wasn't involved with that, but I'm aware

13   of the situation.

14       Q.    Do you know whether that arbitration

15   occurred before or after you talked to Crown Corr

16   about subbing the job?

17       A.    I'm sorry, would you repeat the question?

18       Q.    Do you know whether the arbitration that

19   resolved the jurisdictional dispute, whether that

20   took place before or after you talked to Crown Corr?

21      A.    That was after.

22      Q.    Do I have it right that that jurisdictional

23    dispute, as far as you understand it, awarded the

24    job to the Sheet Metal Workers?

FLYNN REPORTING ASSOCIATES

16

1      A.    I've heard only secondhand information, so

2    I wasn't involved with that directly.

3      Q.    After that arbitration did anyone approach

4    Lymo to do work on the Terminal A job?

5      A.    I recall having numerous conversations with

6    the Carpenters' counsel about that arbitration, but

7    I don't recall anyone requesting us to bid the

8    work.  I don't recall that.  I don't think that

9    happened.

10      Q.    Has Lymo ever been involved in a

11    jurisdictional dispute on any project that involved

12    the Carpenters?

13      A.    Yes.

14      Q.    Which ones were those?

15      A.    All.  There was a period of time for

16    several years that there was numerous, and Mr. Kelly

17    and Mr. Grosso would be able to go through their

18    records and tell you every job, but it was numerous

19    projects.

20    Q.   In particular there was an NORB, a 10-K

21    proceeding, involving the Carpenters and the Sheet

22    Metal Workers; is that right?

23    A.   My attorney, Mr. Grosso, would be able to

24    comment.  I believe that is correct.  I believe so,

FLYNN REPORTING ASSOCIATES

17

1    yes.

2    Q.   Had the Carpenters ever been awarded work

3    involving the installation of panels in a

4    jurisdictional dispute against the Sheet Metal

5    Workers that you're aware of?

6    A.   In what context -- with Lymo Construction?

7    Q.   Let's start with Lymo.

8    A.   Can you repeat that question?

9    Q.   Are you aware of any jurisdictional dispute

10    where the Carpenters have prevailed over the Sheet

11    Metal Workers over the installation of metal panels?

12    A.   I'm not trying to be evasive, but I don't

13    know -- I don't believe that my disputes -- my

14    disputes were issues from my contract related to

15    Local 17, not necessarily between the two different

16    unions of arbitration, so I'm not sure if I'm

17    answering that correctly.  I just don't think there

18    was that type of procedure.

19    Q.   You can't think of a jurisdictional dispute

20    where an arbitrator or the NORB has awarded panel

21    installation work to the Carpenters rather than the

22    Sheet Metal Workers?

23         A.   No, I can't think of one.

24         Q.   Let me show you Employers's Exhibit 6, if

FLYNN REPORTING ASSOCIATES

18

1    we have it.

2              MR. GROSSO:  Employer 6?

3              MR. ANDERSON:  Employer 6.

4              MR. GROSSO:  That's the e-mail?

5              MR. ANDERSON:  Yes -- the one that

6    says Roland Levesque at the top.

7         Q.   I'm looking at the top message from

8    Mr. Levesque to Mr. Pellar.  "Does he recognize that

9    Sheet Metal will challenge the stud installation in

10    concert with the Iron Workers?  The Carpenters will

11    not be able to prove preponderance of work for the

12    panels."  Do you understand what Mr. Levesque is

13    saying in that e-mail?

14         A.   This is just one section of an e-mail, so

15    without seeing all the others -- just give me one

16    second to read it.  I'm sorry.  Go ahead.

17         Q.   Just focus your thoughts on the second

18    sentence of that e-mail.  Have you ever been in a

19    dispute where the Carpenters prevailed in proving a

20    preponderance of the work for the installation of

21    panels?

22        A.   I have not.

23        Q.   Now, Mr. Lynch, have you ever been on a job

24    where Carpenters have done the stud framing work,

FLYNN REPORTING ASSOCIATES

19

1    but a different trade has done the installation of

2    metal panels?

3        A.   Yes.

4        Q.   Who was it that did the installation of

5    metal panels?

6        A.   Which trade or which company?

7        Q.   Which trade.

8        A.   There have been instances where Iron

9    Workers have done the work and/or where Sheet Metal

10   Workers have done the work, but also I think that's

11   a very minority share of projects.  In the Boston

12   area, clearly, the preponderance of work for metal

13   panels falls in the hands of the Carpenters.  That

14   has been the case for many years now.

15       Q.   You said there was work on the Terminal A

16   project that Lymo would not normally pick up.  Could

17   you spell out more exactly what work that was?

18       A.   In Terminal A?

19      Q.   Yes.

20      A.   In our bid package the metal stud framing

21   slash exterior sheathing is something we don't form

22   and traditionally is not requested of us to perform,

23   so on that scale of a project we clearly felt it was

24   in our interest to let someone who does that day in

FLYNN REPORTING ASSOCIATES

20

1   and day out, those being the drywall companies,

2   perform that work.

3      Q.   At the time you looked at placing a bid on

4   Terminal A were you looking at the specifications on

5   the project?

6      A.   We were looking at all contract documents.

7      Q.   Would that include the gauge of the studs

8   that were used?

9      A.   I don't recall.  That was several years

10   ago.  You have the dates of when this job started.

11   I don't recall the specific terminology.  Typically,

12   the architect won't design the gauge.  That's put on

13   the competent bidder to do an engineering analysis

14   and meet certain requirements, such as building

15   codes or size of loads and things like that, so they

16   generally don't call out gauge.

17      Q.   So it's the bidder who decides what gauge

18    to use?

19        A.    Not necessarily the bidder.  The burden is

20    on the professional engineer to design it.

21        Q.    Do you know who that engineer was on the

22    Terminal A job?

23        A.    It was the successful bidder.  The bidder

24    is required to have a stamped drawing by a

                    FLYNN REPORTING ASSOCIATES

                                                                    21

1    professional engineer.

2        Q.    I take it Lymo did not get to the point

3    where it hired its own expert to draw up those kinds

4    of specifications?

5        A.    Again, if we were successful in that job,

6    that would have been the responsibility of

7    Save-On-Walls.  They were the ones that engineered

8    and designed the stud wall.

9        Q.    That's all I have.  Thank you.

10                CROSS-EXAMINATION OF DANIEL LYNCH

11    BY MR. KELLY:

12        Q.    Just so you understand, Michael is the

13    International lawyer, and I'm Local 17's lawyer.  If

14    I understand what happened with respect to the bid

15    on Terminal A and your involvement in that, you

16    supplied a price to your joint venture partner

17    Cheviott?

18    A.    Correct.  Cheviott was taking the lead

19    because the dollar value of the glass was greater

20    than the metal panels, and typically on a

21    combination like that the company that has the

22    higher dollar value will take the lead.  It was

23    almost a flip of the coin which company would take

24    the lead, but we felt it was in the interest -- but

FLYNN REPORTING ASSOCIATES

22

1    the contractor being Skanska clearly knew it was a

2    package deal in all the negotiations and meetings

3    that we had with Skanska.

4    Q.    Your portion of that package, just so I

5    understand, included a Save-On-Walls piece, the

6    studs and the sheathing, and the wall panels which

7    were your piece?

8    A.    Generally, yes.

9    Q.    Is that right?

10    A.    Yes.

11    Q.    That combination, do you understand that's

12    what MRS was doing?

13    A.    I don't know.  I don't have knowledge of

14    what they did.

15    Q.    Do you recall that bid?

16    A.    Again, it was three or four years ago.

17          Q.   I mean, the magnitude of it.  It was a big

18    job, wasn't it?

19          A.   Oh, it was very large project, yes.

20          Q.   What was the relative value of your piece

21    of it and Save-On-Walls' piece of it?

22          A.   I don't recall the exact dollars.  It was

23    certainly a multi-million dollar contract.  The

24    metal portion of it was -- I don't recall exactly

FLYNN REPORTING ASSOCIATES

23

1     what Save-On-Walls was, but I believe that the metal

2     panels were greater than the stud framing, but I

3     couldn't give you specific numbers.

4          Q.   Was it in the $10 million range?

5          A.   Combined, meaning mine and Save-On's?

6          Q.   Yes.

7          A.   Honestly, I don't recall.  I forget it if

8     it broke $10 million.  It was multi-million

9     dollars.  I don't remember whether it was five or

10    eight or ten.  It was a very large project.

11         Q.   At bid stage you were talking to

12    Crown Corr?

13         A.   Prior to bid I did not talk to Crown Corr,

14    and I was requested to talk to Crown Corr -- I think

15    the initial contact was from Crown Corr to me at the

16    direction of Skanska.  I believe that's how the

17    first initial contact was.

18        Q.    What was the nature of the discussion?

19        A.    To try to team us up together to perform

20    the work.

21        Q.    After the bids had been submitted?

22        A.    After my initial bid went in, yes.

23        Q.    When you say your initial bid went in, you

24    are talking about the joint venture bid to Skanska?

FLYNN REPORTING ASSOCIATES

24

1        A.    After the joint venture between Lymo and

2    Cheviott and after scope review meetings with

3    Skanska, Skanska requested us that we bid to, in

4    essence, our competitor, which was an unusual

5    circumstance because we knew it was clearly down to

6    Crown Corr, and at that point I don't think it was

7    committed to M.R.S., but, clearly, Crown Corr was

8    our competitor versus the Lymo Cheviott bid, so

9    clearly we knew it came down to those two bidders,

10    as far as the entire scope, so I thought it was

11    unusual that we were directed to discuss with them a

12    potential hooking-up agreement.

13        Q.    So do I understand correctly that you were

14    being asked to separate from Cheviott and throw your

15    package in with Crown Corr?

16    A.    Not necessarily to separate.  There was a

17    lot of politics involved, and there were

18    reservations with the bids.  I think Skanska was

19    extremely comfortable with Lymo on the panels.  As

20    far as Cheviott, the way I was directed as far as

21    Cheviott, but they were very concerned with Cheviott

22    on the glass, so that number or that combination was

23    concerning to Skanska because I think we were being

24    weakened by Cheviott's presence.

FLYNN REPORTING ASSOCIATES

25

1    Q.    Was Crown Corr bidding the glass, too?

2    A.    To my knowledge, they bid, and I don't know

3    under what name they bid the entire job and I

4    believe they had a subsidiary or a separate company

5    perform all that glass work.  It was definitely part

6    of the package.

7    Q.    So you understand that the package that the

8    Cheviott and Lymo team was bidding and the package

9    that Crown Corr was bidding was the same thing?

10    A.    Yes, that was my understanding.

11    Q.    Who was the Carpenters' counsel you had

12    your discussions with?

13    A.    All of them.  Numerous.

14    Q.    I just wondered who they were.

15            MR. GROSSO:  I think he meant CIL.

16      Q.    You mean the New England District Counsel?

17  You're not talking about the Carpenters' lawyers?

18      A.    No.    The council would surely be bent out

19  of shape if they lost that project, certainly.

20      Q.    Now, you're pretty clear that in your

21  experience as a wall panel contractor you don't do

22  the stud work; right?

23      A.    Yes.    If someone asked us to bid a scope

24  today certainly of the size and complexity of Logan,

FLYNN REPORTING ASSOCIATES

26

1   we would never entertain that.    That is just our

2   decision.    We would never entertain doing it for

3   economics.    Why try to reinvent the wheel and do

4   something on a very large scale than getting a

5   company that does that day in and day out and, quite

6   frankly, it would cost be less money than we would.

7       Q.    Save-On-Walls is a Carpenters' contractor,

8   as I understand it?

9       A.    They do the metal studs.    I think they have

10  agreements with multiple different trades like many

11  companies do who do different things, but certainly

12  they do metal stud framing with Carpenters.    There

13  is no doubt about that.

14      Q.    On a big job I assume that Save-On-Walls

15    would call the hall and get guys to come in and do

16    that work?

17        A.    I can't speak for them.  I'm sure they

18    have, like many large contractors do, numerous

19    people on staff, but how they use those employees, I

20    can't speak to that.

21        Q.    Let me ask you this.  You decided that you

22    wished to do the stud package rather than having a

23    sub do it, wouldn't you be able to hire people from

24    the hall to supply your needs?

FLYNN REPORTING ASSOCIATES

27

1        A.    Well, I'm contracted under agreement with

2    the union, so the process is I would have to use a

3    union personnel to do that work.  The means of

4    getting those people if they're not currently on

5    your payroll is to call the hall and obtain people.

6        Q.    Assuming for the sake of argument that you

7    or Save-On-Walls was doing the work and assuming for

8    the sake of argument that you and Save-On-Walls

9    called on the same supply of workers to do it, what

10    is the difference between you doing it and

11    Save-On-Walls doing it that makes it more economical

12    to have Save-On-Walls do it?

13        A.    They do it day in and day out.  It's their

14    expertise.  That's what their company is based on.

15    We are not a metal stud frame company, so we would

16    have to learn the procedures and the design of it

17    and the engineering, and traditionally the men that

18    work consistently for Lymo don't perform that work.

19    There is certainly a learning curve and skill level

20    that would be difficult.

21        Q.   Let's assume the Terminal A building, if

22    for some reason you were to have bid that, would you

23    expect that the price you would have to figure for

24    that work would be higher than the price

FLYNN REPORTING ASSOCIATES

28

1    Save-On-Walls had to figure?

2        A.   For many reasons -- efficiency, buying

3    power of studs and materials, yes.  That's why we

4    made the decision to team up with a strong company

5    based on the best performance and cost effectiveness

6    necessary.

7        Q.   What would be the order of magnitude in

8    terms of what kinds of framing you would have to pay

9    to do the work as efficiently as Save-On-Walls?

10           MR. GROSSO:  I'm going to object to

11    the question because we are far afield here in

12    speculation.  He's asking this witness to speculate

13    that he's going to take all of his men out of the

14    hall and Save-On-Walls would take all of his men out

15    of the hall, and now he's asking him to speculate

16    how much more he would bid for the work if he was

17    doing it instead of Save-On-Walls.  It's absolute

18    wild guesses.  There are no facts.  You haven't

19    established any foundation that he's ever done that,

20    in fact -- that he's hired people out of the hall

21    completely to do this kind of work so he could say,

22    From experience it's costing "X" percent more.  That

23    would be an absolute wild guess.

24            MR. KELLY:  I don't really dispute

                    FLYNN REPORTING ASSOCIATES

                                                        29

1     that, but it gets to the point I think of this case

2     because what is being asked here is that this panel

3     award essentially the difference between what Conn

4     Acoustics did who had experience and the same

5     experience, as I understand it, as Save-On-Walls in

6     doing this kind of work and saying that because

7     these guys decided to do it on their own, it cost

8     them more money, and I'm trying to figure out what

9     the value of that learning curve is.  I agree it's a

10    hypothetical question, but that doesn't mean it

11    doesn't deserve an answer.

12            ARBITRATOR ASHER:  Restate the

13    question.  If you can answer it, you can answer.

14      Q.   My question, Dan, if you can answer it, is,

15   In order for you to have bid the stud package,

16   knowing that you had no experience doing it, but

17   assuming you could get workers to do it, what kind

18   of a premium above the Save-On-Walls' price would

19   you anticipate you would have to put in there in

20   order to accomplish the same work?

21      A.   I really wouldn't be able to give you that

22   number.  The basis is we would have a difficult time

23   even estimating it because of our lack of knowledge

24   of materials and engineering because it's not our

FLYNN REPORTING ASSOCIATES

30

1   trade.  Anytime you're asked to put a number to

2   something you don't know how to do, that's very

3   difficult, so for me to say it's ten or 50 percent,

4   I wouldn't have a clue because I can't even go to

5   square one to start to do the bid.

6      Q.   So the real answer is you wouldn't do that,

7   would you?

8      A.   Again, we would won't do it for

9   knowledge-wise or experience-wise and, clearly,

10   economics-wise.

11            MR. KELLY:  I have no further

12   questions.

13                    MR. GROSSO:  Just a couple of

14   redirect.

15                    REDIRECT EXAMINATION OF DANIEL LYNCH

16   BY MR. GROSSO:

17        Q.   In response to one of Mr. Anderson's

18   questions, Mr. Lynch, you said that the

19   preponderance of the practice in the Boston area is

20   for Carpenters to do the metal panels; is that a

21   fair representation of your answer?

22        A.   Yes.

23        Q.   Are you familiar with the Boston Convention

24   Center?

FLYNN REPORTING ASSOCIATES

31

1         A.   Very familiar.

2         Q.   What is the siding on that building?

3         A.   It's a metal siding product.

4         Q.   Were you involved in that project?

5         A.   Yes, I was.

6         Q.   Do you know which trade installed the metal

7    panel siding?

8         A.   The metal wall siding was installed by

9    Carpenters.

10        Q.   How big a project was that comparing it to

11   the Terminal A project?  Is it bigger or smaller?

12        A.   The square footage was larger, and I assume

13    in dollars because the square footage was large, was

14    larger, also, it was larger also, but I don't

15    remember exactly what Terminal A was.

16        Q.    Forgetting the dollars, in terms of size,

17    the square footage, would the Convention Center be

18    twice as big as Terminal A or ten percent bigger?

19        A.    The Convention Center in total wall area

20    was approximately 600,000 square feet.  I don't

21    recall what Terminal A is, but I'm sure there's been

22    testimony earlier.  My belief is it's certainly

23    less.

24        Q.    Terminal A was less?

FLYNN REPORTING ASSOCIATES

32

1        A.    Yes, Terminal A was less.

2        Q.    The metal panels on Terminal E, who

3    installed those -- what trade?

4        A.    Carpenters.

5        Q.    Do you know of any contractors in the

6    New England area who install the light gauge metal

7    studs?  Again, I'm not talking about channels or

8    girths, but the light gauge metal studs that form

9    the structural support for metal panels.  Do you

10    know of any contractor in the New England area who

11    does that work with Local 17 Sheet Metal Workers?

12      A.   No.

13           MR. GROSSO:  No further questions.

14           (Short recess taken.)

15           SCOTT M. D'ANGELO, sworn.

16           DIRECT EXAMINATION OF SCOTT D'ANGELO

17  BY MR. GROSSO:

18      Q.   Would you state your full name for the

19  panel, please.

20      A.   Scott Matthew D'Angelo.

21      Q.   Are you employed, Mr. D'Angelo?

22      A.   Yes, I am.

23      Q.   With whom?

24      A.   M.R.S. Enterprises.

FLYNN REPORTING ASSOCIATES

33

1      Q.   How long have you worked for M.R.S.?

2      A.   Approximately eight years.

3      Q.   Before working for M.R.S. were you

4  employed?

5      A.   Yes, I was.

6      Q.   With whom?

7      A.   A fire protection consulting firm called

8  Hartford Fire Equipment in Connecticut.

9      Q.   With your employment at M.R.S. what is your

10  job title?

11      A.   I'm a foreman for the company.

12          Q.   What do you do as a foreman?

13          A.   Dictate work, lay out certain elevations on

14    the buildings for the employees, communicate with

15    superintendents and project managers.

16          Q.   Do you ever work with the tools?

17          A.   Yes, I do.

18          Q.   Are you familiar with the Delta Terminal A

19    project?

20          A.   Yes, I am.

21          Q.   Did you work on it?

22          A.   Yes, I did.

23          Q.   Were you a foreman on that job?

24          A.   Yes, I was.

FLYNN REPORTING ASSOCIATES

1          Q.   At the time you worked on the Delta

2    terminal were you a member of any building trades

3    unions?

4          A.   Yes, I was -- Sheet Metal Local 40 out of

5    Connecticut.

6          Q.   What were your specific duties as foreman

7    on the Delta Terminal A project?

8          A.   Basically, supervise the manpower, lay out

9    the elevations for them to construct the building,

10    and occasionally work with the crews to perform the

11    jobs.

12        Q.    When did you start working on the Delta

13    project?

14        A.    I'm not 100 percent sure of the date, but I

15    was there the very first day.

16        Q.    So the first day that M.R.S. started on the

17    project you were there?

18        A.    Yes, I was.

19        Q.    What was your initial crew?  What trades

20    were they and where did they come from?

21        A.    They were Sheet Metal Workers from Local

22    17.  The first guy on the job was the job site

23    steward, and I worked hand in hand with the Harold

24    Bates, the other foreman on the job site.

FLYNN REPORTING ASSOCIATES

35

1        Q.    Do you remember the name of the secured?

2        A.    Jerry Slack.

3        Q.    Did you work with Mr. Slack during the

4    course of the project?

5        A.    Yes, I did.

6        Q.    What work was Mr. Slack assigned to?

7        A.    Framing with the metal studs, insulation,

8    Sheetrock, metal panels.  He was there the longest

9    out of everybody other than me.  He pretty much did

10    everything on the job site.

11    Q.   What would you say the quality of his skill

12  level was for the work you just described?

13    A.   Very minimal.  Everything he did we trained

14  him on everything -- all the procedures of how to

15  install metal studs.  He was trained on how to do

16  each individual task.

17    Q.   When he first arrived on the project, would

18  you say he was capable of doing any of the work he

19  was assigned to do?

20    A.   No.

21    Q.   Now, you said that you trained Mr. Slack on

22  doing this type of work.  What about the other

23  referrals from Local 17, how did they compare to

24  Mr. Slack in terms of skill level?

FLYNN REPORTING ASSOCIATES

36

1    A.   Skill level -- they were all pretty much

2  the same.  Everybody that came onto the job site

3  need to be trained on the specific jobs they were

4  asked to do.  They really did not have much

5  education when it came to doing what we were doing

6  over there to build the job.

7    Q.   Now, did you personally instruct Mr. Slack

8  and other members of Local 17 on how to install

9  metal studs?

10      A.   Yes, I did.

11      Q.   What expertise did you have in installing

12   metal studs?

13      A.   Just previous jobs that M.R.S. had done

14   before the Local job.  We did a lot of small jobs

15   and it's pretty much common sense if you can read a

16   blueprint.

17      Q.   And could the Local 17 people read the

18   blueprints?

19      A.   No.  I don't want to say no because some of

20   them could read blueprints but not understand them

21   the way they needed to understand them.

22      Q.   When you say layout work, could you

23   describe what you mean by layout work?

24      A.   When you get to a specific elevation on a

FLYNN REPORTING ASSOCIATES

37

1   job, they give you control lines and dimensions and

2   you need to lay out basically on the floor where the

3   metal studs need to be installed and locations and

4   heights and things of that nature.

5      Q.   Did you ever ask any Local 17 referrals to

6   do that work?

7      A.   Yes, I did.

8      Q.   And were they able to perform it?

9      A.   Very few.  Some were able to do it but not

10      to the capabilities they should have been able to do

11      it, but I would have them lay it out and then

12      doublecheck it before they started the work.

13          Q.   Now, did you have an opportunity to observe

14      the Local 17 men as they were performing the work

15      after you and others had trained them to do it?

16          A.   I watched every one of them.

17          Q.   What would you say their productivity level

18      was?

19          A.   Very low.

20          Q.   Did you also teach the Local 17 referrals

21      how to install the dense glass board?

22          A.   Yes, I did.

23          Q.   And how was that installed?

24          A.   It was installed -- basically, you start

FLYNN REPORTING ASSOCIATES

38

1       with the bottom course and you work your way up

2       stacking Sheetrock and staggering the joints.

3           Q.   This dense glass board, what does it look

4       like?

5           A.   It looks just like Sheetrock, but it has a

6       yellow membrane on the face of it.  It's identical

7       to Sheetrock but maybe a little bit thicker.

8           Q.   About what size are the panels?

9        A.   Four-by-eight sheets.

10       Q.   How do you attach them to the studs?

11       A.   You screw them with a screw gun to the

12   Sheetrock and to the metal studs.

13       Q.   Before you trained the Local 17 referrals

14   how to do that work, could they do it?

15       A.   Probably they could but not to the

16   specifications or requirements that they needed to

17   know on this Logan job, but, yes, they probably

18   could have installed it on their own.

19       Q.   Can you explain for the panel so that they

20   can sort of the quantify this productivity, can you

21   describe for the panel how many sheets of dense

22   glass board the Local 17 people could put up

23   compared to the Local 40 people who had been regular

24   employees of M.R.S.?

FLYNN REPORTING ASSOCIATES

39

1            MR. KELLY:  Can we have a time when

2   he's talking about?  I understand that there's a

3   learning curve, so if he's talking about October

4   or --

5            MR. GROSSO:  First, I want to ask him

6   if he can do it at all and then whatever his answer

7   is, I'll ask him when did it happen.

8        Q.   Can you give us some sort of comparison

9    about the installation of dense glass by the

10   Local 17 people compared to the installation of

11   dense glass by the Local 40 people?

12       A.   Well, I know of one situation where I was

13   installing dense glass.

14       Q.   Do you remember when that was?

15       A.   That was approximately around the mid-span

16   of the job.

17       Q.   The mid-span?

18       A.   Date-wise I couldn't really give you a

19   date, but it was definitely around the mid-point of

20   the duration of the job.

21       Q.   The job started in August of 2003, and it

22   finished -- without the extra work -- it finished in

23   December of 2004, so that's roughly about --

24       A.   May or June of '04, roughly.

FLYNN REPORTING ASSOCIATES

40

1        Q.   Can you then describe what you were going

2    to say?

3        A.   There was a specific occasion where I was

4    installing dense glass with a company guy, and there

5    were also two Local guys installing dense glass at

6    the same time.  They installed six sheets of dense

7    glass, which was basically an average for them, and

8    we installed 36 sheets the same day.

9        Q.   So the two Local 40 did 36 four-by-eight

10   sheets?

11       A.   Correct.

12       Q.   And the two Local 17 guys did six

13   four-by-eight sheets?

14       A.   That's correct.

15       Q.   This was in May of 2004?

16       A.   Correct.

17       Q.   Now, how was the safety on this project,

18   specifically injuries to M.R.S. employees?

19       A.   M.R.S. employees -- very minimal for

20   injuries.  I believe we may have had one or two from

21   M.R.S. company members, if that's what you're asking

22   me.

23       Q.   How about the Local 17 employees of

24   M.R.S.?  They were M.R.S. employees as well.

FLYNN REPORTING ASSOCIATES

41

1        A.   The Local 17 employees had numerous

2    accidents, specifically around the wintertime when

3    winter was starting.  They had a fair number of

4    injuries in one month.

5        Q.   What types of injuries?

6        A.   A lot of them were minor cuts on their

7    fingers or a scrape somewhere or they banged their

8  knee.  They were classified as injuries.  We never

9  once denied them to seek medical attention when they

10  claimed they had an injury.

11      Q.  Did most of people who were injured stay on

12  the job?

13      A.  No.

14      Q.  Where did they go?

15      A.  They took them to the clinic and got them

16  checked out and, depending on whether or not the

17  doctor said they could return to work or not, they

18  would either return to work or take the time off

19  that was required.

20      Q.  Can we see Terminal A from this window,

21  from this room?

22      A.  Yes.

23      Q.  Can you point it out?

24      A.  Yes.  It's beyond that tower straight

FLYNN REPORTING ASSOCIATES

42

1  ahead, the building behind it.

2      Q.  The building that goes to the left?

3      A.  Yes, to the left and also to the right

4  across the tarmac.

5      Q.  And this connecting section, I guess that's

6  a bridge?

7     A.   Yes.

8     Q.   Are you familiar with that bridge?

9     A.   Yes.

10    Q.   Did M.R.S. install that bridge?

11    A.   The one that goes across the highway, no.

12    Q.   Is there another bridge at the further end

13 of the building?

14    A.   Yes, there is -- the east bridge.

15    Q.   Did M.R.S. install that bridge?

16    A.   Yes, we did.

17    Q.   Is it about the same length as this?

18    A.   It's a little shorter.

19    Q.   Is it the same type of construction with

20 glass and panels?

21    A.   It's identical.

22    Q.   Just a little shorter?

23    A.   It's smaller.

24    Q.   Were you involved in the construction of

FLYNN REPORTING ASSOCIATES

43

1 that east bridge?

2     A.   Yes, I was.

3     Q.   Which employees did M.R.S. use to build

4 that bridge?

5     A.   Edward Dionne was one of the employees,

6 Thomas Morin was one of the employees, myself,

7    Peter Lebausseur.

8        Q.    Did any of these people belong to Local 17?

9        A.    No.

10       Q.    Why did you not use any people from

11   Local 17 on that bridge?

12       A.    Because of the complexity of the design of

13   it.  They were not capable of doing the work.

14       Q.    When did you do that bridge?  In the course

15   of the project when was that bridge constructed?

16       A.    That was one of the last details on the job

17   to be finished.  I want to say it was probably

18   around September of '04.

19       Q.    So near the end of the job?

20       A.    Yes, close to the end of the job.

21             MR. GROSSO:  No further questions.

22             ARBITRATOR ASHER:  We talked about the

23   studs and the sheathing.

24       A.    Yes.

FLYNN REPORTING ASSOCIATES

44

1             ARBITRATOR ASHER:  Describe for me as

2    if you were talking to someone who has never seen it

3    before exactly what the worker would have to do --

4    what the basic steps were, where to put the studs

5    from reading the blueprints.  What's the next step

6    and the next step?  Take it that way.

7        A.    To start I would be the individual to go

8    there, like I said, and lay out the actual wall,

9    where the face of the studs would need to be in

10   comparison to the rest of the building.  I would lay

11   out on the floor where the stud would be located in

12   series, the height where the studs would be

13   terminated, and, basically, the worker after I had

14   done that would go and actually install the metal

15   track on the floor or maybe it would need some metal

16   decking and they would install the vertical studs, a

17   lot of which we would preassemble on the ground to

18   make things easier and then pick the wall up and set

19   it at the proper elevations and attach it to the

20   steel clips on the building.  Once that was

21   completed, they would actually install the dense

22   glass onto the wall onto the metal studs.

23             MR. GROSSO:  Can you explain for the

24   panel how you attached the wall to the structural

FLYNN REPORTING ASSOCIATES

45

1    steel?

2        A.    There were clips coming off the structural

3    steel that were set exactly where the studs would

4    land so you could attach them to the studs, and they

5    would be attached with fasteners.

6                    ARBITRATOR ASHER:  After the track and

7     the studs, you then attached the panels?

8         A.   The dense glass or Sheetrock would be

9     attached to the metal studs and fastened, whatever

10    the spec. of that area was, how many screws, how far

11    apart, and then after that they would install vapor

12    barrier on the face of the Sheetrock, which is

13    classified as an ice and water barrier, and then

14    there the panel is actually installed to the dense

15    glass and the metal composite panels.

16                    ARBITRATOR ASHER:  So there are three

17    layers?

18        A.   Correct.

19                    ARBITRATOR ASHER:  Of --

20        A.   Metal composite panels.  After all the

21    dense glass was up, I returned back to the elevation

22    and I would lay out where the center of the metal

23    panel should be so they could install it after that.

24                    ARBITRATOR ASHER:  Was that going back

                    FLYNN REPORTING ASSOCIATES

                                                              46

1     to Step 1 again?

2         A.   No.  That was with the metal panel.  After

3     the dense glass and the vapor barrier was installed,

4     you would lay out the wall on the face of the

5      Sheetrock again where in sequence the metal panels

6      would be located.

7                    ARBITRATOR ASHER:  That's something

8      you would do?

9           A.   Yes.

10          CONTINUED DIRECT EXAMINATION OF SCOTT D'ANGELO

11     BY MR. GROSSO:

12          Q.   How wide were the metal panels?  Were they

13     the same width as the Sheetrock?

14          A.   They varied in size.  Most of them were

15     about four foot by eight foot or four foot by six

16     foot.  Depending on which elevation you worked on,

17     they varied in size and shape.

18          Q.   How did you fasten them to what's now vapor

19     barrier board and stud?  How did you fasten them to

20     that?

21          A.   Just screws with a screw gun to the

22     extrusion on the panel, and it would hold it to the

23     wall.

24          Q.   What do you mean by "extrusion on the

                        FLYNN REPORTING ASSOCIATES

                                                                  47

1      panel?"

2           A.   On every metal composite panel there is

3      interior framing around the panel and that's how

4      they corrugate to each other, and they call that a

5    metal extrusion.  The metal extrusion is what is

6    attached to the building and then corrugated -- the

7    following panel is corrugated into that metal

8    extrusion like a tongue and groove section.

9        Q.   So you have to make sure that when you

10   screw that in, the screws go into the studs?

11       A.   The metal studs, and if they don't, the

12   panel will fall off the wall.

13       Q.   If it just goes into the Sheetrock, it will

14   just fall off the wall?

15       A.   Right, if there's nothing to hold it to.

16       Q.   Is there some way that whoever is

17   installing that panel, can know because once he puts

18   the panel up, he can't see the studs anymore?

19       A.   The studs are generally marked on the floor

20   so they can always reference back to the layout on

21   the floor to find out where the studs are and return

22   to the layout on the face of the wall.  Most of the

23   time we would snap chalk lines at least one this way

24   and one this way, so they could always measure back

FLYNN REPORTING ASSOCIATES

48

1    to figure out where the studs were.

2        Q.   When you were installing the glass on the

3    studs, you can see the studs; right?

4      A.    That's correct, and even after the vapor

5   barrier was installed on the wall, you could see the

6   head of the screw behind the vapor barrier.

7      Q.    So is it easier to install the Sheetrock to

8   the studs than the metal panel to the Sheetrock?

9      A.    There's no difference.  They're both the

10  same principal.

11            ARBITRATOR BALL:  I have a question.

12  You said that two Local 17 guys installed six sheets

13  in one day and in the same day two 40 guys hung

14  36 sheets?

15     A.    That's correct -- in the same time.  Four

16  guys were installing Sheetrock.

17            ARBITRATOR BALL:  Was that on straight

18  runs?

19     A.    It was straight runs.

20            ARBITRATOR BALL:  Who was the

21  supervision?

22     A.    Of that crew?

23            ARBITRATOR BALL:  Yes.

24     A.    I was.  I was actually working in --

FLYNN REPORTING ASSOCIATES

49

1            ARBITRATOR BALL:  You didn't say

2   anything to the guys about hanging six sheets?

3      A.    That was their capability.  We told them

4    they needed to be more productive, but they could

5    only do six sheets.

6                ARBITRATOR BALL:  You didn't terminate

7    them?

8        A.   There was a steward on the job.  The

9    project manager on the job was notified of their

10   production and he handled it accordingly.

11               ARBITRATOR BALL:  That's all I have.

12       Q.   As a follow-up to the panel's question, do

13   you know how many Sheet Metal Workers from Local 17

14   actually got referred to this job?

15       A.   I think there were probably around 120

16   total during the duration of the job.

17       Q.   Do you know how many were terminated?

18       A.   I would say about half.

19       Q.   So even though you didn't terminate these

20   two people AS Arbitrator Ball asked you, other

21   people would terminate Sheet Metal Workers?

22       A.   That's correct.

23       Q.   Who was the one that mostly terminated

24   people?

FLYNN REPORTING ASSOCIATES

1        A.   My supervisor, which would be JR, the

2    project manager, or the general foreman.  My job was

3    to report to him if there was an issue.

4              ARBITRATOR ASHER:  Scott, you

5    described six steps, essentially.  You lay out the

6    location of the studs; correct?

7        A.   Right.

8              ARBITRATOR ASHER:  So that doesn't

9    involve the worker?

10       A.   Right.

11             ARBITRATOR ASHER:  The workers install

12   the tracking studs; right?

13       A.   Yes.

14             ARBITRATOR ASHER:  For how you've laid

15   it out?

16       A.   Correct.

17             ARBITRATOR ASHER:  They attach the

18   Sheetrock panel to the studs?

19       A.   Correct.

20             ARBITRATOR ASHER:  Then they attach a

21   vapor barrier onto the Sheetrock?

22       A.   Correct.

23             ARBITRATOR ASHER:  You then go and lay

24   out where the metal composite panel should be

                  FLYNN REPORTING ASSOCIATES

                                                        51

1    installed?

2        A.   Correct.

3                    ARBITRATOR ASHER:  And the worker then

4    installs the panel?

5       A.    Correct.  Then after all those steps were

6    completed, we would on the inside of the wall

7    insulate the wall after it was pretty much paneled

8    and completed unless there was an area where we

9    needed to insulate it as we went if we couldn't

10   reach it from the inside of the building.

11      Q.    There's one step actually that I think you

12   missed.  The studs are then fastened to the clips on

13   the structural columns?

14      A.    Right.  It's a part of attaching the studs,

15   that's correct.

16                    ARBITRATOR ASHER:  That's a part of

17   Number 2?

18      A.    Correct.

19                    ARBITRATOR ASHER:  That's the entire

20   assembly process for the construction of these

21   panels.  The work that we're talking about, doing

22   the studs and the sheathing, which steps would those

23   be?  Is that included with installing the tracks and

24   studs and attaching the Sheetrock?

FLYNN REPORTING ASSOCIATES

52

1       A.    Yes.

2                    ARBITRATOR ASHER:  And the vapor

3    barrier on the Sheetrock?

4        A.   Correct.

5                    ARBITRATOR ASHER:  When we're talking

6    about this work at issue, which steps are --

7        Q.   The ones you just described?

8                    ARBITRATOR ASHER:  Installing the

9    tracking studs, attaching the Sheetrock panel, and

10   the vapor barrier; correct -- those three steps?

11       A.   Correct.

12       Q.   Because those were the steps that M.R.S.

13   originally subcontracted to Conn Acoustics.

14       A.   Correct.

15       Q.   M.R.S. was not going to do that work.

16   M.R.S. was just going to put the panels, that last

17   phase?

18       A.   Right.

19                   ARBITRATOR BALL:  I'm still thinking

20   about the six and the 36.  When you terminated the

21   people on the job for non-productivity, were there

22   any grievances filed.

23                   (Witness gestured.)

24                   MR. GROSSO:  You have to answer out

FLYNN REPORTING ASSOCIATES

53

1    loud.

2      A.   No.

3                ARBITRATOR BALL:  That's all I have.

4                ARBITRATOR ASHER:  How was the metal

5      composite panel installed -- by what means?

6      A.   They call them a tech. screw and a screw

7      gun and you align it on the wall to the location

8      where I laid it out and just screw it to the wall.

9      That's pretty much it.  Then they would corrugate

10     the following panel to the previous one and screw it

11     onto the wall.

12               ARBITRATOR ASHER:  The previous step

13     of the Sheetrock, how was that attached?

14     A.   The same principal -- screwed on with a

15     Sheetrock screw into the metal stud.

16               ARBITRATOR ASHER:  How was the vapor

17     barrier attached?

18     A.   The vapor barrier -- there was glue that

19     was applied to the Sheetrock prior to rolling the

20     vapor barrier onto the face of the dense glass.

21               ARBITRATOR ASHER:  Attaching the metal

22     composite panel, is that something that the

23     Local 127 workers were adept at doing?

24     A.   They were not the greatest at it.  After a

FLYNN REPORTING ASSOCIATES

1     time there were a few people you could count on from

2     the hall to leave alone to install metal panels, but

3     for the most part you had to monitor what they were

4     doing to make sure that it was being done right

5     because the process was if they made a mistake along

6     the way, and if it's not noticed, the problem just

7     carries on and then you have to remove panels all

8     the way up to where the mistake was made.  You can't

9     just remove one panel and fix the problem.

10          ARBITRATOR ASHER:  In your opinion,

11    did they have greater difficulty in the steps we've

12    outlined before -- installing the tracks and studs,

13    attaching the Sheetrock panel, and the vapor barrier

14    than they did in attaching the composite panel?

15    A.   I think it was actually the same between

16    both -- their capabilities -- because the job

17    function was essentially the same to follow marks

18    and follow dimensions, and I think their

19    capabilities were the same on both.

20          CROSS-EXAMINATION OF SCOTT D'ANGELO

21    BY MR. ANDERSON:

22    Q.   Mr. D'Angelo, I'm Michael Anderson

23    representing the International.  You said that

24    Local 40 employees of M.R.S. had been trained to do

FLYNN REPORTING ASSOCIATES

1    this kind of stud work; is that right?

2        A.    They had been trained from previous jobs

3    and training we had in-house, yes.

4        Q.    And that would be on stud work in

5    particular?

6        A.    There were a few occasions where, yes, if

7    we had a job coming up, we did some training.

8        Q.    When you say "we did some training," who is

9    "we?"

10       A.    M.R.S. employees.

11       Q.    As far as you know, did Local 40 itself

12   train any of these employees in stud framing?

13       A.    No.

14       Q.    What did M.R.S. do to train employees?

15       A.    There would be after-hours sessions in

16   reading blueprints and explaining the process.

17   There was basically on-the-job training as well.

18       Q.    On-the-job training?

19       A.    Yes.  Smaller jobs that we had previously

20   done.

21       Q.    What were those smaller jobs that you had

22   previously done involving stud framing?

23       A.    Me personally?

24       Q.    Yes.

FLYNN REPORTING ASSOCIATES

```
 1        A.   There was one job in particular, ESPN.

 2        Q.   ESPN where -- in Connecticut?

 3        A.   Yes, in Connecticut.

 4        Q.   Did that involve the same type of stud

 5   framing as you had in Terminal A?

 6        A.   The basic same design, yes.

 7        Q.   Was that job subbed out, or was it done

 8   directly by M.R.S.?

 9        A.   M.R.S. did that.

10        Q.   Would it be fair to say that M.R.S. usually

11   subs out stud framing on jobs like this?

12        A.   Yes.

13        Q.   To whom does it normally sub that kind of

14   work out?

15        A.   Carpenters generally do that type of work.

16        Q.   But I'm talking about what firms.

17        A.   I don't know in particular.

18        Q.   Does Conn Acoustics ring a bell?

19        A.   Yes, I believe we have done work with them

20   before, yes.

21        Q.   Would it be fair to say that Conn Acoustics

22   has more experience doing stud framing than M.R.S.

23   does?

24        A.   Yes.
```

FLYNN REPORTING ASSOCIATES

1     Q.    Does Local 40 have any sort of training

2    module to teach its members how to do stud framing?

3     A.    Not that I'm aware of.

4     Q.    As far as you're aware, has Local 40 taken

5    any role in training employees to do stud framing?

6     A.    Not that I'm aware of.

7     Q.    But employees who were referred or who were

8    from Local 40 who worked for M.R.S., they had

9    learned how to do stud framing from M.R.S.?

10    A.    Correct.

11    Q.    And that comes from on-the-job training?

12    A.    Yes.

13    Q.    About how long does it take a Local 40

14    employee who knows nothing about stud framing to

15    become proficient at it?

16    A.    It depends on the type of framing, to be

17    quite honest with you.  There are several designs

18    that you could be working with, but a typical design

19    probably three hours.

20    Q.    So on the type of stud framing that was

21    being done at Terminal A, did you have any Local 40

22    employees on the job who had never had any prior

23    experience with stud framing?

24    A.    Not that I'm aware of, no.

FLYNN REPORTING ASSOCIATES

58

1       Q.   But in their past experience on earlier

2   jobs, do I have it right that it took about three

3   hours of on-the-job work to get them up to speed?

4       A.   Yes.  Again, that's my approximation.

5   Everybody would be a little different, but that's

6   the common sense answer.

7       Q.   That would be M.R.S. foremen and

8   supervisors like yourself would actually be teaching

9   them this?

10      A.   Correct.

11      Q.   Now, on jobs like the ESPN job, did you

12  personally perform the stud work or --

13      A.   I performed it, yes.

14      Q.   Any other jobs besides ESPN?

15      A.   Me personally, no.

16      Q.   How did the ESPN job compare in size to

17  Terminal A?

18      A.   It was very small in comparison.  Probably

19  1/16th of the size, if not even smaller.

20      Q.   And that was the only prior job that you

21  had personally done stud framing on?

22      A.   Correct.

23      Q.   On that ESPN job did you act as a foreman?

24      A.   No, I did not.

59

1    Q.    Just as a rank and file Sheet Metal Worker?

2    A.    Yes.

3    Q.    Who instructed you on the ESPN job?

4    A.    The foreman on the job site.  I don't

5    recall what his name was at the time.  I believe it

6    was Leland possibly.  Honestly, I can't recall.

7    Q.    Did you have a separate training session,

8    or was that on-the-job training?

9    A.    It was on-the-job training there and they

10   also had some activities after work to help the guys

11   out and to train them further.

12   Q.    About how many hours, if you remember, of

13   classroom work did that activity take?

14   A.    I would say probably two hours.

15   Q.    Now, I understand that a lot of the people

16   referred by Local 17 were terminated; is that right?

17   A.    Right.

18   Q.    Were these people typically terminated

19   shortly after they came on the job site?

20   A.    Correct.

21   Q.    So that it didn't take M.R.S. long to

22   figure out who could cut it and who couldn't; is

23   that right?

24   A.    You could normally tell within two or three

FLYNN REPORTING ASSOCIATES

60

1    days whether an employee was capable doing the work

2    or even wanted to do the work.

3        Q.   M.R.S. didn't hesitate to get rid of

4    workers who were not making it?

5        A.   If they were doing the job that they were

6    asked, they would remain on the site.

7        Q.   And if they weren't doing the job they were

8    asked --

9        A.   They were terminated or for other reasons a

10   lot of them didn't want to be there.  There were a

11   lot of people that just couldn't do the work or just

12   didn't want to be on the job.

13       Q.   Would it be fair to say that most of the

14   terminations happened in, say, the first half of the

15   job?

16       A.   I would say that would be a fair statement.

17       Q.   By the end of the job the workers who were

18   there had been there for several months?

19       A.   Correct.

20       Q.   Now, there came a time when M.R.S. needed

21   to do some rework on an exterior wall in 2003.  Do

22   you remember that?

23       A.   Yes, I do.

24       Q.   When you did that rework, was it necessary

FLYNN REPORTING ASSOCIATES

61

1    to redo the studs in the framing that had already

2    been installed?

3        A.    That's correct.

4        Q.    Just so I understand it, I understand that

5    there was about 800 foot of wall that actually had

6    to be replaced; is that right?

7        A.    Approximately, yes.

8        Q.    But there was a greater length, about

9    2,400 feet of stud framing that had already been

10   done at that point?

11       A.    Correct.

12       Q.    On that greater length, the 2,400 feet, was

13   it necessary to redo the studs?

14       A.    Yes.

15       Q.    And the spacing?

16       A.    Yes.

17       Q.    Were you using a different kind of

18   fastener?

19       A.    There was different engineering, yes, that

20   came out with the rework.

21       Q.    That was the engineering that was ordered

22   by the Larson Company?

23       A.    I believe so.

24       Q.    That would be Crown Corr's engineer?

62

```
1      A.   I really wasn't involved in that aspect of

2  it.

3      Q.   Who was in charge of recording the time

4  that workers spent, that is to say, that different

5  work hours were assigned to different categories?

6      A.   That was recorded on a daily production

7  sheet.  There was a specific category for rework.  I

8  would be the person to assign to the men how many

9  hours they worked, and that information went to the

10  office.

11      Q.   Did you have problems during the winter of

12  2003 keeping workers because of the cold weather?

13      A.   Yes, we did.

14      Q.   Did some men tell you that they didn't want

15  to be out there because of the cold?

16      A.   That's correct.

17      Q.   Would it be fair to say that workers were

18  fired because they didn't have good attendance

19  during that period?

20      A.   There were quite a few people that did not

21  show up for work.  To be quite honest with you, I

22  don't know if they were terminated or not, but I

23  know that there were quite a few employees who just

24  decided they were not going to show up.
```

FLYNN REPORTING ASSOCIATES

63

1     Q.   Now, do you remember exactly -- I think you
2   said it was May of '04 that you compared the
3   Local 40 installation of the 36 sheets versus the
4   Local 17 six sheets.
5     A.   Right.
6     Q.   Do you remember who those two Local 40
7   workers were?
8     A.   It was myself and Peter Lebausseur.
9     Q.   Is Peter Lebausseur a supervisor?
10    A.   He's an employee of M.R.S.
11    Q.   He's not a foreman?
12    A.   I believe he is now a foreman now, yes.
13    Q.   So the two Local 40 people that installed
14   the 36 sheets were both foremen; is that right?
15    A.   Correct.
16    Q.   How about the two Local 17 workers, were
17   they foremen?
18    A.   No.  One was the job site steward and one
19   of them was just another guy that I had informed the
20   steward to go get one of your men and hang some
21   Sheetrock.
22    Q.   When they were hanging the six sheets, were
23   those Local 17 folks supervised?
24    A.   They were supervised by me.  They were

FLYNN REPORTING ASSOCIATES

64

1    instructed on how to do it, and at the same time we

2    did the same operation on the same wall, so

3    technically, yes, they were supervised by me.

4        Q.    But you were supervising them at the same

5    time you were hanging those 36 sheets?

6        A.    Correct.

7        Q.    We were talking about the shop steward.

8    Was that Jerry Slack?

9        A.    Yes, it was.

10       Q.    Was Jerry Slack doing anything besides

11   hanging the six sheets during the time you were

12   measuring him?

13       A.    To be quite frank, the reason why that

14   happened is I questioned the production of Jerry

15   Slack, and he claimed to me that nobody could hang

16   any more than what they were doing per day, so I

17   stated to Jerry Slack, Go get your best Local guy

18   that you have on site and I'll grab one of my

19   company men and we'll compare production to

20   production, and that was the basis on how that all

21   took place.

22       Q.    Is it fair to say that you were trying to

23   prove a point when you did this comparison?

24       A.    Yes, it's fair to say that I was trying to

FLYNN REPORTING ASSOCIATES

65

1    prove a point that six sheets a day was not an

2    adequate amount of Sheetrock to put up.

3         Q.    Did you ever communicate any standard quota

4    of sheets a day that workers would be expected to

5    hang?

6         A.    Yes, I did.

7         Q.    What was that?

8         A.    Approximately 15 to 16 sheets was a minimum

9    and what they should have been doing.

10        Q.    Did you keep track of how many people made

11   that quote?

12        A.    It was done on a daily report on a crew

13   basis per elevation.  It never went down to the

14   individual.

15        Q.    Did your Local 40 members make that quota?

16        A.    Most of the time.

17        Q.    How much of the time did the Local 17

18   referrals make that quota?

19        A.    Seldom or never.

20        Q.    Did they ever make it above, say,

21   12 sheets?

22        A.    Depending on the day.  I would imagine

23   there were a few days when they did get that quota.

24   It's been a while since this all happened.

FLYNN REPORTING ASSOCIATES

66

1      Q.    Did M.R.S. ever take any disciplinary

2    action against the Local 17 people for not making

3    quota?

4      A.    Again, that wasn't my part of it.  I would

5    report their production to the office, and it was

6    handled that way.

7      Q.    Did you ever consider mixing the crews,

8    that is, using Local 40 people working side by side

9    with Local 17 people?

10     A.    Yes, we did, and we did do that.

11     Q.    How did that work out?

12     A.    It worked out better.  We actually got

13   production out of them.

14     Q.    The Local 17 production would improve if

15   they were working side by side with the Local 40

16   folks?

17     A.    Yes.

18     Q.    Did you stay with that plan after it

19   worked?

20     A.    Correct.

21     Q.    About when did you inaugurate that mixing

22   of the crews?

23     A.    As soon as we realized that there was a

24    problem, and that was very early on in the job.  At

FLYNN REPORTING ASSOCIATES

67

1    the very beginning of the job we realized that they

2    had to be supervised by M.R.S. employees slash

3    Local 40 employees to make sure they performed the

4    job properly, sufficiently, and productively.

5        Q.   So would you say that by the winter of 2003

6    you had Local 40 people deliberately assigned with

7    Local 17 people to improve productivity?

8        A.   Could you repeat that?

9        Q.   Would you say that by the winter of 2003

10   M.R.S. had decided to mix Local 40 people with

11   Local 17 people --

12       A.   Yes.

13       Q.   -- to improve productivity?

14            MR. GROSSO:  You have to answer.  You

15   can't look to anyone else.

16            MR. ANDERSON:  He did.

17            MR. GROSSO:  Sorry.  I was listening

18   for the answer, but I didn't hear it.

19       Q.   So when you said that Local 40 crews would

20   make a 15- to 16-sheet minimum, were those ever

21   crews that included Local 17 people?

22       A.   Yes.  Like I said, there were a lot of days

23    on the job and a lot of crews and a lot of men.

24    To be able to give you an exact sheet count

FLYNN REPORTING ASSOCIATES

68

1    everyday, I can't do that.  Every elevation was

2    different, but based on what they were doing, we

3    could determine what their production should be and

4    what it shouldn't be.  To say that an average of

5    12 sheets a day, that could vary depending on

6    elevation and we knew what to expect out of them

7    based on where they were working on the job.

8        Q.    I understand, but would it fair to say that

9    when you had Local 17 people working together with

10    more experienced Local 40 people, you got more

11    production out of the crew?

12        A.    Correct.

13        Q.    Once you realized that, you made a choice

14    to try to mix Local 17 with Local 40 people?

15        A.    To the best we could, yes.

16        Q.    By the second half of the project would you

17    say that that was pretty much M.R.S.'s practice

18    whenever possible?

19        A.    Well, based on the fact that they were

20    working with an M.R.S. employee, the hope was that

21    they learned something to improve their production

22    along the way and would try to put them back on

23    their own to see if they could still perform the

24    task, and, generally, most the time unfortunately

FLYNN REPORTING ASSOCIATES

69

1    the production would slack again.

2        Q.   So did you go back to keeping them with

3    Local 40 employees?

4        A.   The best we could.

5        Q.   Do you remember Sheet Metal Workers coming

6    in from out of town on the job?

7        A.   Yes.

8        Q.   Do you remember where they were from?

9        A.   There were a few from Detroit,

10   Pennsylvania, Maine.

11       Q.   Do you know who brought them in?

12       A.   To the best of my knowledge, the people

13   from Maine came in from Local 17.  There were some

14   that came from Detroit, which I believe we called

15   for those people, if I remember correctly, but, for

16   the most part, Local 17 was trying to get the

17   manpower on the job, and they couldn't supply it.

18       Q.   Do you remember whether the International

19   brought anybody in?

20       A.   I'm not sure if they did or not.

21       Q.   What was the quality like with these

22    out-of-state workers?

23        A.   I know the three or so guys that we brought

24    in from Detroit, they were excellent workers.

FLYNN REPORTING ASSOCIATES

70

1        Q.   How about the ones from Pennsylvania and

2    Maine?

3        A.   They were mediocre.

4        Q.   Were they better than the Local 17

5    referrals from Boston?

6        A.   Yes.

7        Q.   Did you end up terminating any of the

8    out-of-state workers?

9        A.   I don't think we did.

10       Q.   Did you ever recommend to JR that any

11   workers be fired?

12       A.   Yes.

13       Q.   Did that happen a lot?

14       A.   Safety violations.  I would be the

15   individual to witness safety violations on the job.

16   If I noticed it, I would report it to JR.

17   Insubordination on the job wasn't accepted.  If I

18   was a witness, my recommendation would be to fire

19   them.

20       Q.   Do you know if any workers that were fired

21   by M.R.S. ended up working for Crown Corr?

22        A.    Actually, yes, they did.

23        Q.    Do you have a sense of how many?

24        A.    I think it was just a handful of guys.

FLYNN REPORTING ASSOCIATES

71

1        Q.    Did there come a time when Crown Corr took

2    over part of the project that had originally been

3    assigned to M.R.S.?

4        A.    That's right.

5        Q.    Did anyone tell you why that was?

6        A.    No.  I wasn't notified.

7        Q.    Did you ever hear criticisms of M.R.S.'s

8    management from Crown Corr?

9        A.    What do you mean by "criticisms?"

10        Q.    Any point where someone from Crown Corr

11    said M.R.S. was not managing the project as well as

12    it might.

13        A.    Not that I'm aware of, no.  Again, I was in

14    the field most of the time, and I didn't hear a lot

15    of that stuff if it went on.

16        Q.    One last detail.  Do you remember when the

17    ESPN job was, about how long before the Terminal A

18    job?

19        A.    I think it was about a year maybe.  I don't

20    exactly recall.

21        Q.    That's your best estimate?

22        A.    About a year or a year and a half.

23        Q.    By the way, have you been personally

24   involved with any stud framing jobs since the

FLYNN REPORTING ASSOCIATES

72

1   Terminal A job?

2        A.    Yes -- to an extent -- not similar to what

3   we done here, but the same kind of details, yes.

4        Q.    What job was that?

5        A.    UMass.

6        Q.    That job, was it subbed out?

7        A.    We did it.  They were classified as a

8   louvered system, but they were built out of metal

9   studs.  M.R.S. did the work.

10        Q.    With Local 40 employees?

11        A.    Local 40 and Local 15 or 57 out of

12   Worcester.

13                MR. KELLY:  63?

14                MR. GROSSO:  No.

15                (Discussion off the record.)

16                MR. ANDERSON:  I've got nothing

17   further.

18                CROSS-EXAMINATION OF SCOTT D'ANGELO

19   BY MR. KELLY:

20        Q.    I have a couple of questions.

21          A.    Sure.

22          Q.    I may be going back over stuff that you

23     assume everybody knows, but I don't.  The initial

24     step, as I understood it, was laying out the wall,

                    FLYNN REPORTING ASSOCIATES


                                                          73


1      which was something you did or foremen did; is that

2      right?

3           A.    That's correct.

4           Q.    And then a track goes down on the floor?

5           A.    A track would either go on the floor or the

6      decking on the roofs.  Different elevations require

7      different areas to be installed.

8           Q.    But the track is what the --

9           A.    What the studs sit in.

10          Q.    So the studs are affixed to the track?

11          A.    Correct.

12          Q.    And sometimes you fabricate them and put

13     the wall up in one piece on the track?

14          A.    Correct.

15          Q.    And then the studs are clipped to the beams

16     at the top?

17          A.    Correct.

18          Q.    Did you show up on the job before JR or

19     after JR?

20     A.  Before.

21     Q.  You weren't there when the job started?

22     A.  I was there the very first day the job

23  started.

24     Q.  You were?

FLYNN REPORTING ASSOCIATES

74

1     A.  Yes, I was.

2     Q.  So you were there in August?

3     A.  Yes.

4     Q.  So all the stud work that was up when he

5  got to the job, you had been involved in?

6     A.  Yes, you could say that.

7     Q.  When they changed how it was going to work,

8  rework I guess they called it; right?

9     A.  Correct.

10     Q.  There was a heavier gauge stud that was

11  used?

12     A.  Correct.

13     Q.  And you had to go around in various points

14  and put this heavier gauge stud in?

15     A.  Remove the existing, install the new studs,

16  correct.

17     Q.  Was this only in certain spots or --

18     A.  Yes, it was.

19          MR. GROSSO:  Let him finish his

20    question before you answer.

21        Q.    I'm trying to get an idea of what the

22    rework meant in terms of the existing stud structure

23    that was up.

24        A.    There were specific locations in which the

FLYNN REPORTING ASSOCIATES

75

1    studs that were previously installed had to be

2    removed.  It was not every stud, but there were

3    specific locations where they did need to be removed

4    and installed with new studs, correct.

5        Q.    This was a heavier gauge stud?

6        A.    Correct.

7        Q.    So in certain points in the structure that

8    had to bear more weight perhaps?

9        A.    Correct.

10        Q.    There was also some change that has been

11    mentioned with respect to the spacing of the

12    studs --

13        A.    Yes.

14        Q.    -- as part of the rework?

15        A.    Yes, there was.

16        Q.    Did that mean putting more studs in?

17        A.    Correct.

18        Q.    Were those only in certain areas?

19      A.   It was only in certain areas, correct.

20   Wherever the engineering called for the rework is

21   where we would go back and rework it.

22      Q.   But the scope of the rework, as I

23   understand it, was consistent with the scope of all

24   the work that had been done so far; is that right?

FLYNN REPORTING ASSOCIATES

76

1       A.   Not on the entire building, no.

2       Q.   No?

3       A.   Well, we didn't complete the entire

4    building prior to the rework.

5       Q.   I understand.

6       A.   So when the rework came out, obviously,

7    things were changed and studs were added at

8    different dimensions.

9       Q.   In the work that had been done so far?

10      A.   Correct.

11      Q.   Now, in addition, was there some change in

12   the clips on the beams?

13      A.   Correct.

14      Q.   So was it true that all of those clips had

15   to be replaced?

16      A.   Not all the clips needed to be replaced.

17   Just fastener type and occasionally where the

18   heavier gauge studs were installed, yes, there was a

19    different size clip that was installed.

20        Q.    So that was consistent with the stud

21    replacement?

22        A.    Correct.

23        Q.    You were the foreman or the supervisor?

24        A.    The foreman.

FLYNN REPORTING ASSOCIATES

77

1         Q.    You reported to who?

2         A.    JR LaFrancois.

3         Q.    Do you know who JR reported to?

4         A.    Roland Levesque.

5         Q.    Do you know the metal panels?

6         A.    Yes.

7         Q.    Were they predrilled?  Were there holes in

8     them where you shot the screws through?

9         A.    I don't believe so.  To be honest with you,

10    I don't remember if there was or if there wasn't.

11        Q.    I'm just thinking it would have been a

12    cleaner finish if they were.

13        A.    I honestly don't remember.

14        Q.    You indicated that there was some problem

15    with insubordination?

16        A.    Correct.

17        Q.    And this is the relationship between the

18    workers and the foremen such as yourself?

19        A.    No.  It was basically between the Local 17

20    employees amongst themselves.

21        Q.    They were insubordinate with each other?

22        A.    Correct.

23        Q.    Were Local 17 people in a foremen

24    capacity?  Were they telling each other what to do?

FLYNN REPORTING ASSOCIATES

78

1        A.    They were trying to.  There were a few of

2    them that were trying to tell the Local 17 employees

3    what to do.  Most of the time the information was

4    incorrect.  There were a lot of physical issues

5    between the men.  There were a lot of problems.  I

6    can go into detail if you want.

7        Q.    I appreciate there was a lot of different

8    stuff, but I was focusing in on the problem of

9    insubordination.  Historically, I have understood it

10    to be a problem between a worker and his

11    supervisor.

12        A.    There were a few occasions where I was

13    confronted by Local 17 employees, and I think the

14    basis of it was that I was a young foreman and I was

15    telling a lot of older gentlemen who had a lot of

16    years in the trade how to perform their jobs, and I

17    don't think they particularly appreciated it.

18  Whether or not they understood the fact that I knew

19  what I was doing or not, it was a hard thing for

20  them to comprehend.

21       Q.   You indicated that on certain occasions you

22  would recommend people to JR to be terminated?

23       A.   Correct.

24       Q.   Did the people you recommended to be

FLYNN REPORTING ASSOCIATES

79

1   terminated include people who were insubordinate to

2   you?

3        A.   Not necessarily.

4        Q.   I understand, but the question is a yes or

5   a no.  If they did, then say yes.  If they didn't,

6   then say no.

7        A.   No, they didn't all get fired.

8        Q.   My question is, People who were

9   insubordinate to you, who you considered to be

10  insubordinate, did you recommend that any of them be

11  terminated?

12       A.   Yes.

13       Q.   And did JR terminate them?

14       A.   Yes.

15       Q.   On the ESPN job that you discussed, did the

16  work proceed in the same fashion, albeit on a

17    smaller scale, on that job as on the Terminal A job?

18        A.    Yes.

19        Q.    By that I mean, Did the people who did the

20    layout, were they different from the people who did

21    the installation?

22        A.    Yes.

23        Q.    If I understood your testimony earlier, you

24    did the actual installation on that job?

FLYNN REPORTING ASSOCIATES

80

1        A.    That's correct.

2        Q.    Mr. Lebausseur, he was the foreman on that

3    job?

4        A.    At ESPN?

5        Q.    Who was the foreman on ESPN?

6        A.    I believe his name was Leland Dechaine.

7        Q.    You made a distinction which I want to ask

8    you about between people who were working on this

9    Terminal A job, and the distinction was I think

10    between people who were capable of doing the work

11    and people who wanted to do the work, and I

12    understood that some people may have been capable of

13    doing it but didn't want to do it.  Was that your

14    experience?

15        A.    That's correct.

16        Q.    The people that didn't want to do it, they

17    created problems either because they didn't show up

18    or gave you a hard time or whatever; is that right?

19        A.   Right.

20        Q.   But in terms of the capability or the

21    ability of people to do the work, was it about the

22    same?

23        A.   They were all about the same.  They

24    couldn't do the work.  They had to be trained on how

FLYNN REPORTING ASSOCIATES

81

1    to do it, and their capabilities even after that

2    point were not what was expected on the job site.

3        Q.   Well, after they were trained, I think

4    their capabilities was whatever a trained person's

5    capability was; right?

6        A.   Correct.

7        Q.   You're talking about productivity?

8        A.   Correct.  They were capable of doing the

9    work.

10        Q.   When you were talking about the

11    productivity quotas, you were talking in terms of a

12    crew of two people?

13        A.   A crew of two people, correct.

14        Q.   And 15 to 16 sheets is what two people

15    ought to be doing?

16    A.   Correct, depending on, like I stated

17  before, the elevation.  It may have been different

18  of what was expected of them.

19    Q.   So two crews could do 42.  That's pretty

20  good, isn't it?

21            MR. KELLY:  I have no further

22  questions.

23            ARBITRATOR ASHER:  You talked about

24  attaching the metal composite panels?


                FLYNN REPORTING ASSOCIATES


                                                        82


1    A.   Right.

2            ARBITRATOR ASHER:  That's tradition

3  siding and decking work?

4    A.   Yes.

5            ARBITRATOR ASHER:  That's what you do

6  day in and day out?

7    A.   Yes.

8            ARBITRATOR ASHER:  You do it back home

9  in Connecticut?

10    A.   Yes.

11            ARBITRATOR ASHER:  You indicated

12  attaching the Sheetrock and attaching the vapor

13  barrier was the same method?

14    A.   Essentially the same method, yes.

15            ARBITRATOR ASHER:  How does that

16    differ from attaching the composite panels?

17        A.   In regards to the Sheetrock?

18             ARBITRATOR ASHER:  Yes.

19        A.   It's essentially the same.

20             ARBITRATOR ASHER:  Is it your opinion

21    that the Local 17 workers were not -- their skills

22    and productivity were lacking overall, not just in

23    the Steps 2, 3, and 4 that are at issue in the case

24    but their entire performance?

FLYNN REPORTING ASSOCIATES

83

1        A.   Correct.

2             ARBITRATOR ASHER:  Do you feel that

3    the Local 17 members that you saw were incapable of

4    performing siding and decking work for you?

5        A.   Correct.

6             REDIRECT EXAMINATION OF SCOTT D'ANGELO

7    BY MR. GROSSO:

8        Q.   I suppose we'll pick up right here.  On the

9    UMass. project what union is represented by

10    Local 57?

11        A.   Iron Workers.

12        Q.   So they're not Sheet Metal Workers?

13        A.   No.

14        Q.   Mr. Anderson asked you if the productivity

15    of the Local 17 people increased when they were

16    paired with Local 40 people.  Do you remember that

17    question?

18         A.   Yes.

19         Q.   Did you have enough Local 40 people to pair

20    up with the roughly 50 or 60 Local 17 people that

21    you had working at any one time?

22         A.   No.

23         Q.   What was the most number Local 40 people

24    you ever had on the project?

                    FLYNN REPORTING ASSOCIATES

                                                          84

1          A.   I'd say approximately 15.

2          Q.   So the most you could pair up those 15, did

3     that include yourself?

4          A.   Yes.

5          Q.   So you could maybe pair up those 15 with 15

6     Local 17 guys?

7          A.   Correct.

8          Q.   But I think you said they hired 130 and

9     they fired half of them.  Were there about 50 or 60

10    on the job at all times?

11         A.   I would say that would be a fair statement.

12         Q.   So if you could pair up 15 and 15, you

13    still had 30 guys remaining?

14         A.   Remaining, yes.

15      Q.    And they had to work by themselves --

16      A.    Correct.

17      Q.    -- without a Local 40 person helping?

18      A.    Correct.

19      Q.    You said 15 to 16 sheets was a minimum

20  depending on the elevation; is that correct?

21      A.    That's correct.

22      Q.    So you were not really expecting the

23  Local 17 people to produce 36 sheets a day, were

24  you?

FLYNN REPORTING ASSOCIATES

85

1      A.    I was hoping they would.  That would have

2  been nice, but it didn't happen.

3      Q.    Now, Mr. Anderson asked you if you could be

4  installing with your partner 36 sheets of glass

5  board while two 17 guys were installing six sheets

6  of board.  How could you be doing that work and

7  supervising them at the same time?

8      A.    Well, for one, Jerry Slack was the first

9  employee from Local 17 on the job with me, and by

10  that time he should have been more than sufficiently

11  trained to outdo me.

12      Q.    But physically could you see the other

13  crew?

14    A.   Yes.  There was a wall like this and a wall

15    like this, and we were on one and they were on the

16    other.  We could physically watch each other all

17    day.

18    Q.   So while you were putting up your glass

19    board with your partner, you could see the other two

20    guys as they were working?

21    A.   Right through the framing.

22    Q.   So it wasn't like they were around the

23    corner --

24    A.   No.

FLYNN REPORTING ASSOCIATES

86

1    Q.   -- nd they were having coffee while you

2    guys were doing 36 sheets?

3    A.   Correct.

4    Q.   You said you had Mr. Lebausseur working

5    with you?

6    A.   Correct.

7    Q.   Was he a foreman on the Delta job?

8    A.   Yes, he was.

9    Q.   Mr. Kelly and Mr. Anderson asked you about

10    this rework.  Did the work stop on the project while

11    you went and did the rework?

12    A.   It couldn't.  We had to still hold to a

13    schedule, and at the same time we had to fall back

14    and keep up with the rework to maintain the schedule

15    on the job.  No, we did not stop work on future

16    elevations of the building to do the rework.

17        Q.    Did the productivity level of the Local 17

18    people ever reach the same level as those of the

19    Local 40 people after you had trained them?

20        A.    A few, yes, very few, but there were some

21    that their capabilities were adequate.  I would say

22    maybe four or five.

23        Q.    That's it?

24        A.    Yes, and those were probably the same four

FLYNN REPORTING ASSOCIATES

87

1     or five guys that lasted until the end of the job.

2         Q.    You talked about stuff going on.  Mr. Kelly

3     asked you about insubordination.  Could you briefly

4     describe for the panel the kind of stuff that was

5     going on, the kind of stuff that would make you go

6     to JR and say, These people should be terminated?

7         A.    Sure.  There was one individual who was a

8     journeyman out of Local 17.  Supposedly, he was a

9     highly respected individual in the Local.  He

10    actually urinated in one of the apprentice's bags

11    one day at lunch.

12        Q.    Other stuff?

13    A.    Fighting on the job amongst the Local men.

14    Q.    What would they be fighting over?

15    A.    To be honest with you, I tried to stay out

16    it.  I don't know what they were fighting over.  I

17    know there was a lot of hostility on the job amongst

18    guys that wanted to perform the jobs, and it seemed

19    like there were others that were trying to hinder

20    other people from doing their jobs, and I think that

21    had a lot to do with it.  I'm sure I could think of

22    a few others.

23    Q.    You said a lot of people didn't show up for

24    work.  Could you elaborate on that?

FLYNN REPORTING ASSOCIATES

88

1    A.    Especially when the cold weather started,

2    my opinion is that they were not accustomed to

3    working outside in the cold and couldn't work in the

4    cold.

5    Q.    Did you do anything to help these guys work

6    outside in the cold -- you as a company, M.R.S.?

7    A.    Yes.  We supplied them with safety

8    equipment, gloves, hard hat liners -- stuff of that

9    nature -- to help them.  Any safety equipment that

10    they needed we always got for them.

11    Q.    Did you help them out with telling them the

12    type of clothing they should be wearing since they

13   were working outside?

14        A.   You would think you wouldn't have to tell

15   them that, but, yes.

16             MR. GROSSO:  I think that's it.

17             RECROSS-EXAMINATION OF SCOTT D'ANGELO

18   BY MR. ANDERSON:

19        Q.   Mr. D'Angelo, just a few quick questions.

20   Just to be clear, the guy who urinated in the

21   apprentice's bag, was he terminated?

22        A.   He was eventually terminated, yes.

23        Q.   When there was physical hostility between

24   workers, didn't you take steps to resolve it and


                    FLYNN REPORTING ASSOCIATES


                                                              89


1    terminate the people who were at fault?

2         A.   I notified my supervisor and let him deal

3    with it.

4         Q.   When you spoke of the cold weather when

5    people didn't show up, you're talking about the

6    winter of 2003, aren't you?

7         A.   2003, and I believe there was partial 2004

8    as well.

9         Q.   You mean into the first part of 2004?

10        A.   Yes.

11        Q.   I take it you didn't have the same problems

12    in November and December of 2004 towards the end of

13    the job?

14        A.    Not as drastic, no.

15        Q.    Now, on the 15 to 16 panel minimum, was

16    that a quota that you ever negotiated with the

17    unions?

18        A.    What do you mean by "the unions?"

19        Q.    The International Union or Local 17.

20        A.    No.    That was a number I came up with based

21    on the elevations they were working on, what would

22    be an adequate number to do, and it was very

23    conservative.

24        Q.    Just to be clear, when you and Peter

FLYNN REPORTING ASSOCIATES

90

1    Lebausseur 36 sheets, that was well above the quota?

2        A.    That's what we do every day.

3        Q.    I take it that Local 17 people would hang

4    more than six sheets normally, wouldn't they?

5        A.    Like I said, it all depended on the

6    elevation and the guys.    If they were somewhat

7    decent hands, they would want to work.

8        Q.    Some decent Local 17 would hang more than

9    six sheets usually?

10        A.    That's correct.

11        Q.    The somewhat decent employees, those were

12    the ones that stayed on; is that correct?

13        A.    That's correct.

14            MR. ANDERSON:  Nothing further.

15            RECROSS-EXAMINATION OF SCOTT D'ANGELO

16    BY MR. KELLY:

17        Q.    We've heard so much about guys that were

18    fighting and urinating.  Who were the guys that did

19    a job and stayed with you the whole time?

20            MR. GROSSO:  We're afraid if we give

21    you the name, they might get retaliated against.

22        A.    One of them was the guy who got his bag

23    urinated in.

24        Q.    He was one of the good workers?

FLYNN REPORTING ASSOCIATES

91

1        A.    Yes.

2        Q.    Who was that?

3        A.    I'm not telling.

4            FURTHER EXAMINATION OF SCOTT D'ANGELO

5    BY MR. GROSSO:

6        Q.    I just have one more question.  Do you know

7    why you were installing the stud framing with

8    sheet metal work instead of using Conn Acoustics?

9        A.    I really don't know the particulars of the

10    whole situation.  I know it went to some sort of

11  arbitration, and I honestly don't know the whole

12  story.

13       Q.   That's fair.

14            ARBITRATOR ASHER:  You don't see

15  anything particularly demanding or unique about the

16  sheet and the stud work that would prevent the

17  Local 17 workers from being capable of doing it;

18  right?

19       A.   No, I don't.

20            ARBITRATOR ASHER:  So you're saying

21  it's not the skill level or the learning curve, but

22  they weren't doing the work in a professional or

23  fast enough manner; right?

24       A.   That's correct.

                   FLYNN REPORTING ASSOCIATES


                                                    92


1             ARBITRATOR ASHER:  And there was

2   nothing you could see that would have prevented them

3   from doing it?

4        A.   Correct.

5             ARBITRATOR ASHER:  That's all I have.

6             (Short recess taken.)

7             JOHN T. PICKFORD, sworn.

8             DIRECT EXAMINATION OF JOHN PICKFORD

9   BY MR. GROSSO:

10       Q.   Would you please state your full name for

11    the panel.

12        A.    John Thomas Pickford.

13        Q.    Are you employed, Mr. Pickford?

14        A.    Yes.

15        Q.    With whom are you employed?

16        A.    Crown Corr, Incorporated.

17        Q.    What position do you hold with Crown Corr?

18        A.    Executive vice president.

19        Q.    How long have you worked in any capacity

20    for Crown Corr?

21        A.    Twenty years.

22        Q.    How long have you been executive vice

23    president?

24        A.    Approximately six years.

FLYNN REPORTING ASSOCIATES

93

1        Q.    What are your duties as executive vice

2    president?

3        A.    Operations management.

4        Q.    Are you familiar with the Delta Terminal A

5    project at Logan Airport?

6        A.    Yes.

7        Q.    How are you familiar with that project?

8        A.    I was the project executive on that project

9    for Crown Corr.

10      Q.   How often were you on the site when the

11  project was being constructed?

12      A.   Frequently.

13      Q.   Could you narrow that down to every week or

14  twice a month or something a little bit more

15  specific?

16      A.   On average I was probably there at least

17  four days a month I would say as a general time

18  frame and sometimes more.

19      Q.   Where is Crown Corr located?

20      A.   Gary, Indiana.

21      Q.   So is it fair to say that you live in

22  Indiana?

23      A.   Yes.

24      Q.   So you spent about four days a month at

FLYNN REPORTING ASSOCIATES

94

1   this project?

2       A.   Yes.

3       Q.   When you were here, what did you do when

4   you were at the project?

5       A.   I helped our project management and field

6   teams coordinate the work with Skanska, the general

7   contractor, and our subcontractors.

8       Q.   Was M.R.S. Enterprises, Inc. one of your

9   subcontractors?

10      A.   Yes.

11      Q.   What work were they given on this project

12 by Crown Corr?

13      A.   They were awarded the contract to furnish

14 and install the exterior metal siding, inclusive of

15 supports.

16      Q.   Are you familiar with the support system?

17      A.   Yes.

18      Q.   What was it?

19      A.   Metal stud framing over gyp. sheathing.

20      Q.   Are you familiar with a meeting that took

21 place in April of 2003 in Washington, D.C.?

22      A.   I've been a party to discussions in regard

23 to that meeting, but I was not a participant in that

24 meeting.

FLYNN REPORTING ASSOCIATES

95

1       Q.   Do you have any knowledge about the

2 assignment of the work by Crown Corr to any

3 particular trade to perform the work on the

4 Terminal A project?

5       A.   Yes.  The work was assigned to the Siding

6 and Decking Association.

7       Q.   Sheet Metal?

8       A.   Yes.

9      Q.    Who made that decision to assign the work

10    to the Sheet Metal Workers?

11     A.    Rich Pellar.

12     Q.    Mr. Pellar, what position does he hold with

13    Crown Corr?

14     A.    He's the president and chief executive

15    officer of Crown Corr.

16     Q.    How as a result of that assignment, did

17    some dispute arise with another building trade on

18    the project that you're aware of?

19     A.    The Roofers filed a claim for some of the

20    work, and the Carpenters -- I'm not sure if they

21    ever filed a formal claim or not, but I know there

22    were discussions.

23     Q.    But, ultimately, the work was to be done by

24    Sheet Metal Workers?

FLYNN REPORTING ASSOCIATES

96

1      A.    There was an award, and it was upheld to be

2     Sheet Metal.

3      Q.    In your capacity as executive vice

4     president on this project, did you review the bid

5     that was prepared by M.R.S. and presented to

6     Crown Corr in the bidding stage?

7      A.    Yes.

8      Q.    Did you know how M.R.S. intended to

9    construct this project?

10    A.    I was party to a meeting at the M.R.S.

11    office where Rich Pellar and myself both went and

12    interviewed Mr. Levesque and discussed how he was

13    going to be able to procure materials, deliver those

14    materials to the site, and what type of manpower he

15    was going to employ on the project.

16    Q.    And what did he tell you specifically about

17    the manpower as opposed to the materials?

18    A.    That he was going to do the work, sheet

19    metal, siding and decking.

20    Q.    Now, at the bidding stage, which is the end

21    of 2002, were you aware that M.R.S. had intended to

22    subcontract out some of the work?

23    A.    Yes.

24    Q.    Do you remember who he was going to

FLYNN REPORTING ASSOCIATES

97

1    subcontract the work out to?

2    A.    All I remember, without referring to my

3    notes, is that he was going to have a subcontractor

4    for the stud framing component of the work.

5    Q.    Did you know what trade that subcontractor

6    was intending to use?

7    A.    I believe at that point he was looking at

8  Carpenters.

9      Q.    So you were aware at one point he was

10  considering using Carpenters to do that work?

11      A.    I believe so.

12      Q.    At some point after the assignment was made

13  by Crown Corr that changed, didn't it?  The trade

14  that was going to do the work changed?

15      A.    Yes.  I'm not sure if it changed, but our

16  agreement with Roland or with M.R.S. was that the

17  work would be done with all Sheet Metal.

18      Q.    So whatever he planned to do with

19  Carpenters, it had now had to be done with Sheet

20  Metal Workers?

21      A.    I would assume.

22      Q.    You mean Crown Corr's arrangement with

23  M.R.S. was that the work had to be done with Sheet

24  Metal Workers?

FLYNN REPORTING ASSOCIATES

98

1      A.    Yes.  We were signatory and we asked that

2  he do the work with Sheet Metal.

3      Q.    Was it part of the contract requirement in

4  writing?

5      A.    I don't recall.  I would have to look at

6  the contract again.

7      Q.    Were you present when the job started?

8      A.   For his first mobilizations, no, but I was

9   out very early in the project, and I came

10   frequently.

11      Q.   Did you get involved in working with M.R.S.

12   to build up its work force so they could perform

13   this work?

14      A.   I had a lot of conversations with M.R.S.'s

15   supervision and with Mr. Levesque personally in

16   regards to manpower requirements and procuring those

17   from Local 17.

18      Q.   Was M.R.S. experiencing any problems in

19   manning up this project?

20      A.   Yes.  I believe the records will show that

21   I had some correspondence to M.R.S. indicating that

22   I felt that they were short staffed on the job and

23   that they were not maintaining the schedule because

24   of not having adequate manpower on the project.

FLYNN REPORTING ASSOCIATES

99

1      Q.   Did you try to assist M.R.S. with its

2   application to Local 17 for manpower?  Did you try

3   to help them get more manpower on the job?

4      A.   Yes.  I called Mr. Bergantino and

5   subsequent from that phone call there was a meeting

6   in October where Local 17 and the International both

7     came to the job site and we had discussions as to

8     what the schedule requirements were going to be,

9     what kind of manpower was required for the project,

10    manpower ratios, time frames for work, work days,

11    durations, makeup days.  We went through a whole

12    laundry list of events, and I followed that up with

13    a letter that was copied to the attendees of that as

14    meeting minutes.

15        Q.   Let me show you what's previously been

16    marked in this arbitration as the Employer's Exhibit

17    Number 10 and ask you if you can identify it, if

18    you've ever seen it before.

19        A.   It looks like I read it.

20        Q.   So I guess you can't deny it now?

21             MR. ANDERSON:  I'm sorry, can you help

22    me out?

23             MR. GROSSO:  It's Employer's Exhibit

24    Number 10, the e-mail.

                   FLYNN REPORTING ASSOCIATES


                                                        100


1         A.   October 21, 2003 at 4:52 p.m.

2         Q.   It's the e-mail from John Pickford --

3         A.   To Bob Butler, Joe Nigro, and Dan

4     Pasquinucci.

5              MR. GROSSO:  Got it, Mike?

6              MR. ANDERSON:  Yes.  Thanks.

7        Q.   Sir, if you would look at that document.

8    As you just testified, you were the creator of that

9    document?

10       A.   Yes.

11       Q.   You sent it to Local 17?

12       A.   Yes -- specifically Bob Butler and Steve

13   McKenzie.

14       Q.   And he's also with Local 17?

15       A.   Yes.  He's the apprenticeship coordinator.

16       Q.   What is the tenor of that document?

17       A.   The tenor of the document is that we need

18   manpower.

19       Q.   What is the date of the e-mail, sir?

20       A.   October 21st.

21       Q.   Of?

22       A.   2003.

23       Q.   So the job had been ongoing now since

24   approximately August?

FLYNN REPORTING ASSOCIATES

101

1        A.   Yes.

2        Q.   And still in October there was a need for

3    manpower?

4        A.   Yes.

5        Q.   In there do you refer to any actions that

6    you anticipate the general contractor to take

7    against Crown Corr because of the shortage of

8    manpower?

9       A.   I believe that I state in here that I was

10   concerned of being put on notice by Skanska for not

11   meeting the schedule requirements.

12      Q.   You also make some specific reference to

13   the types of employees that are needed on this

14   project.  Take your time.

15              MR. KELLY:  I think the document is in

16   evidence.

17              MR. GROSSO:  I know, but I'm asking

18   about his --

19              MR. KELLY:  About what?

20              MR. GROSSO:  About what he was looking

21   for from Local 17, and if he can do it from memory

22   without reading the document.

23      A.   In this specific document I was looking for

24   welders.


                    FLYNN REPORTING ASSOCIATES


                                                      102


1       Q.   Do you suggest to the union in that e-mail

2    that if they don't produce what you're looking for,

3    you're going to go somewhere else to get those

4    welders?

5       A.   I believe the tone of the document is that

6    I had furnished M.R.S. with a 48-hour notice to

7    staff the job correctly, and the duty would then

8    fall upon M.R.S. to staff the job accordingly.

9        Q.    But specifically don't you mention going to

10   another trade to obtain welders?

11             MR. KELLY:  The document speaks for

12   itself.  If you want to ask him questions, ask him.

13             ARBITRATOR ASHER:  He can ask that.

14       A.    It says that I may have to hire men from

15   another source to meet the project requirements.  I

16   don't think I specifically recognize any other

17   trade.

18       Q.    Is there a reference in there to Local 7?

19       A.    Yes, there is.  "If I do not have the men

20   by orientation time tomorrow morning, I may have to

21   call Local 7."

22       Q.    Do you know who Local 7 represents?

23       A.    The Iron Workers.

24       Q.    Was this the only time you gave any

                    FLYNN REPORTING ASSOCIATES

                                                          103

1    requests to Local 17 to supply people to this

2    project?

3        A.    No.

4        Q.    Had you done so prior to this date?

5      A.   I believe so.

6      Q.   And had you done so after this date?

7      A.   Yes.

8      Q.   Is it fair to say that Local 17 was not

9   complying with the requests for the manpower you

10  were seeking on this project?

11          MR. KELLY:   Objection.   There are

12  specific requests that have been mentioned -- this

13  one and apparently some before and some after, so

14  there may be testimony as to what the responses were

15  for the various requests, I object to the summary

16  question, Is it fair to say that they were not

17  responding.

18          ARBITRATOR ASHER:   I don't think he

19  got the whole question out.

20      Q.   In Paragraph 2 of your e-mail,

21  Mr. Pickford, you say that three men showed up when

22  you requested eight; that you needed ten to twelve

23  welders and you couldn't get them.   Based on what

24  you've stated here in your e-mail, was Local 17

FLYNN REPORTING ASSOCIATES

104

1   complying with your requests in supplying sufficient

2   men?

3      A.   Local 17 failed frequently to meet the full

4   requests for manpower.

5          Q.   Now, did you have occasion to observe the

6     Local 17 men while they were working on the project?

7          A.   Yes.

8          Q.   And in your experience of 20-some years at

9     Crown Corr have you had the occasion to observe

10    Crown Corr's employees doing similar work?

11         A.   Yes.

12         Q.   So you have an opinion or an understanding

13    as to what a normal productivity level should be for

14    the type of work that was being performed?

15         A.   Yes.

16         Q.   How would you describe the productivity of

17    the Local 17 people on the Delta A project compared

18    to what your employees at Crown Corr do?

19         A.   I personally feel that the production that

20    was exhibited on the site was less than we would

21    have expected.

22         Q.   And did you speak to any of the officials

23    of Local 17 about that concern?

24         A.   Without being able to refer to my notes or

FLYNN REPORTING ASSOCIATES

105

1     e-mails, I don't know if I specifically addressed

2     that concern.  I know that in the October meeting we

3     did address that there was a need for training of

4    the Local 17 men for the site-specific duties of the

5    metal panel installation, the stud sheathing

6    installation and layout work, and there were some

7    specific discussions about what type of instruments

8    to use, et cetera.

9        Q.   Let me show you, sir, what has been

10   previously marked as Employer's Exhibit Number 7.

11       A.   Yes.

12       Q.   And take your time to review it, please.

13       A.   Okay.

14       Q.   Do you recognize that document?

15       A.   Yes.

16       Q.   Are these minutes of the meeting that you

17   have referred to that took place in October of 2003?

18       A.   Yes.

19       Q.   Were you present at that meeting?

20       A.   Yes.

21       Q.   Do the minutes reflect what you testified

22   to about training and the need to have sufficient

23   manpower?  Are those the topics that were discussed

24   that day?

FLYNN REPORTING ASSOCIATES

106

1        A.   We discussed training, that the training

2    module was available.  I don't think I specifically

3    addressed that in this set of minutes as to specific

4      training for the metal panel installation or the

5      stud installation, but we do address that when the

6      training module is available.

7          Q.    And the training module would involve those

8      components?

9          A.    Right.

10         Q.    After your October 2003 meeting did the

11     productivity of the Local 17 people change in any

12     way from what you had previously observed?

13         A.    I would say no.

14         Q.    Were you present throughout this project to

15     its completion -- your four days a month?

16         A.    Yes.

17         Q.    Did it ever get any better?  Did the

18     performance of the Local 17 people ever get

19     significantly better than what you had seen in the

20     fall of 2003?

21         A.    As the project progressed, the production

22     rates increased.  To quantify that, that's a harder

23     question.

24         Q.    Would you say that it got up to the levels

                    FLYNN REPORTING ASSOCIATES

                                                              107

1      that Crown Corr is used to receiving from its crews?

2          A.    No.

3      Q.   Now, at some point in time a decision was

4   made to actually bring Crown Corr onto the site to

5   perform some work.  Do you remember that?

6      A.   Yes.

7      Q.   And why was that?

8      A.   That occurred at the end of November, and

9   we felt that in the interest of the project, it

10   would be better for Crown Corr to separate the

11   project and do the satellite building and terminal

12   building so that M.R.S. could focus its efforts and

13   its manpower on a smaller segment of the work and

14   that we would then focus our resources on the other

15   portion of the work to get the job done.

16      Q.   Initially, when Crown Corr first bid this

17   project to the general contractor Skanska, did

18   Crown Corr intend to do any on-site work?

19      A.   Yes.

20      Q.   What work did you intend to do?

21      A.   We intended originally to self-perform the

22   package that we awarded to M.R.S.

23      Q.   So originally you intended to do it

24   yourself?

FLYNN REPORTING ASSOCIATES

108

1      A.   Yes.

2      Q.   Are you aware of what went into the

3   decision to not do it yourself and to subcontract it

4   to M.R.S.?

5       A.   I believe that there were some

6   conversations between Mr. Pellar and Mr. Levesque.

7   I'm not sure if Mr. Levesque was a separate bidder

8   who then approached us after the fact or if we

9   approached him, but I know that he was given the

10  opportunity to provide pricing to us for the

11  performance of that scope.

12      Q.   As a result of that presentation, a

13  decision was made to use M.R.S.?

14      A.   Yes.

15      Q.   When Crown Corr stepped in and separated

16  the Terminal A building from the -- what was that

17  other building called --

18      A.   Satellite building.

19      Q.   -- the satellite building, was that taken

20  out of their subcontract?

21      A.   No.  We supplemented it, and I believe

22  there is a letter that I authored where we reached

23  an agreement where with we would supplement M.R.S.'s

24  labor force.  They would continue to provide the

FLYNN REPORTING ASSOCIATES

109

1   materials and we would complete the satellite

2    building.

3        Q.    So what was the arrangement -- you would

4    bill M.R.S. for your costs?

5        A.    For our costs, travel, and a five percent

6    markup.

7        Q.    So rather than taking it out of his

8    contract, you just performed the work for him and

9    billed him for it with a five percent markup?

10       A.    Yes.

11       Q.    Did Crown Corr utilize any of its regular

12   employees from Indiana on the satellite building?

13       A.    We subcontracted the satellite building to

14   CCL, which is a company that we work with

15   frequently.

16       Q.    What does CCL stand for?

17       A.    CCL and CCL Construction.

18       Q.    It's just initials?

19       A.    Yes.

20       Q.    Is it a related firm to Crown Corr?

21       A.    We work with them frequently.

22       Q.    But in the legal sense, is it an affiliate

23   of Crown Corr, or is there an ownership interest?

24       A.    No, not to my knowledge.  The ownership of

FLYNN REPORTING ASSOCIATES

110

1    CCL is Rich Pellar's sister Joanne.

2      Q.   So we have a familial relationship but not

3    a corporate relationship?

4      A.   Correct.

5      Q.   Where did CCL get its manpower to do the

6    satellite building?

7      A.   They got most of their manpower from

8    Local 20 or out of the Detroit Local.

9      Q.   So it brought most of the manpower from

10   either Detroit or Indiana?

11     A.   And then they probably brought 50 percent

12   of the people in, I would say somewhere between 16

13   and 20, and the other 16 or 20 employees were

14   supplied by Local 17.

15     Q.   The Local 20 people and the Detroit people,

16   are they regular employees of CCL, if you know?

17     A.   Yes.

18     Q.   Was there a problem on the project with

19   Local 17 people on the payroll of M.R.S.

20   experiencing more job injuries than you would expect

21   on this project?

22     A.   Yes.

23     Q.   Was Crown Corr ever contacted by Skanska

24   specifically because of that problem?

FLYNN REPORTING ASSOCIATES

111

1    A.   Yes.  We were requested to attend a

2    specific meeting at Skanska's request and their

3    safety people's request that specifically addressed

4    the incidence rate of accidents related to our scope

5    of work.

6    Q.   Was it a greater incidence of injury?

7    A.   Skanska said yes.  Skanska said it was

8    significantly greater than the rest of the trades on

9    the project.

10   Q.   And what was the result of this meeting?

11   A.   Again, the specific result I would have to

12   go back and look at the notes, but I know that we

13   were asked to implement special procedures in

14   regards to safety on the job and to monitor safety

15   and performance in a much stricter tone, and we

16   agreed to do so voluntarily.

17           MR. GROSSO:  I think I may be done

18   with Mr. Pickford.  I just want to consult my client

19   for a minute.

20           (Short recess taken.)

21   Q.   Do you know a person named JR LaFrancois?

22   A.   Yes.  I had the pleasure of meeting JR.

23   Q.   Who was JR?

24   A.   JR was the field superintendent slash field

FLYNN REPORTING ASSOCIATES

1    project manager for M.R.S.

2        Q.    So when you were on the project, would you

3    be working or dealing in some manner with JR?

4        A.    I interfaced directly with JR, yes.

5        Q.    What is your opinion of JR in terms of his

6    capabilities as the superintendent for M.R.S. on

7    this project?

8        A.    JR is knowledgeable, hard working,

9    understands the trade requirements and similar

10   construction activities.

11       Q.    Did you have any issues with the way he ran

12   this project?

13       A.    Sure.  He was a subcontractor.

14       Q.    Aside from the typical relationship of the

15   subcontractor, did you criticize his performance as

16   a supervisor?

17       A.    No, I did not criticize JR's performance as

18   a supervisor.

19       Q.    At some point, and you are going to have a

20   series of questions from Mr. Anderson on this, but

21   at some point there was a need to do some rework.

22   Are you familiar with that?

23       A.    Yes.

24       Q.    Are you familiar with what caused this

FLYNN REPORTING ASSOCIATES

1    rework, what was the reason for the rework?

2        A.    If it's the stud frame issue that you're

3    referring to, yes.

4        Q.    What was the reason?

5        A.    My belief is that there was some

6    engineering that was done by a firm that was

7    subcontracted to M.R.S. or purchased an agreement

8    from M.R.S., that the engineering for the stud frame

9    system and the buyout of the stud frame system

10   necessarily didn't meet the project requirements.

11       Q.    Who made that decision -- that it didn't

12   meet the project requirements?

13       A.    Larson Engineering.

14       Q.    Who hired Larson?

15       A.    We did.

16       Q.    Prior to your hiring Larson to review this,

17   had the engineering that was done by the

18   subcontractor to M.R.S., had shop drawing been

19   prepared and approved by the architect, if you know?

20       A.    I don't know if anybody had been approved.

21   The issue arose when some metal certificates were

22   issued as part of the standard submittal

23   requirements that reflected a different yield

24   strength of material than what was shown in the

FLYNN REPORTING ASSOCIATES

1    specifications.

2    Q.    Now, as a result of that, Crown Corr hired

3    Larson?

4    A.    We had conversations with M.R.S. in regards

5    to the engineering, and we asked them to go back and

6    revisit their engineering and make sure that it was

7    in full compliance, and we hired Larson

8    independently to review the submittals.

9    Q.    Did Larson come up with a different design

10   than the M.R.S. engineer had come up with?

11   A.    Yes.

12   Q.    Did Crown Corr direct M.R.S. to follow the

13   Larson design?

14   A.    We requested M.R.S. to comply, yes, and

15   there was a mutual agreement to do so.

16   Q.    And, in fact, did the design change?

17   A.    Yes.

18   Q.    And it was the design that Larson prepared?

19   A.    Yes.

20   Q.    Did M.R.S. ever seek additional

21   compensation from Crown Corr for this change in

22   design?

23   A.    No.

24   Q.    They just agreed to do the new design at no

FLYNN REPORTING ASSOCIATES

1    additional cost to Crown Corr?

2        A.    Correct.  There was an agreement that they

3    would abide by Larson's engineer of record and that

4    they would furnish detailing services through their

5    own draftsmen and detailers to produce documents

6    that reflected the Larson designs.

7        Q.    Was JR involved in now implementing this

8    change in design with his work force?

9        A.    From a field perspective?

10       Q.    Yes.

11       A.    Yes.

12       Q.    What is your opinion of the way he handled

13   that change?

14       A.    Pretty well.

15             MR. GROSSO:  I have no further

16   questions.

17             CROSS-EXAMINATION OF JOHN PICKFORD

18   BY MR. ANDERSON:

19       Q.    Mr. Pickford, I'm Michael Anderson for the

20   Sheet Metal International.  When you discussed

21   M.R.S.'s bid in 2002, did you make any guarantees to

22   M.R.S. about what their labor cost would be?

23       A.    I did not personally make any guarantees to

24   that effect.

FLYNN REPORTING ASSOCIATES

116

1      Q.   Did they tell you that they had solicited a

2  bid from Conn Acoustics at any point?

3      A.   Yes.

4      Q.   Did they tell you how much that bid was?

5      A.   No.

6      Q.   Did you guarantee them that the cost in

7  using Sheet Metal Workers would be the same as if

8  they were to subcontract to Conn Acoustics?

9      A.   No.  I made no such guarantee.

10     Q.   Now, as I understand it, there were

11 problems in manning the job in October 2003?

12     A.   Yes.

13     Q.   Do you know whether at that point M.R.S.

14 had terminated a number of Local 17 referrals?

15     A.   I can't speak one way or the other without

16 looking at the records.  That was three years ago.

17 There were a lot of manpower comings and goings

18 through the six-month turbulent period on the

19 project.

20     Q.   By the way, when was the six-month

21 turbulent period?

22     A.   I would say that it was the beginning of

23 September through February.

24     Q.   September of 2003 through --

FLYNN REPORTING ASSOCIATES

117

1    A.    February 2004.

2    Q.    After February 2004 did things remain as

3    turbulent?

4    A.    No.  By then the work was phasing down.

5    Q.    Well, without pinning you down to a

6    specific month, were you aware during this turbulent

7    period that M.R.S. had terminated a large number of

8    Local 17 referrals?

9    A.    I know they terminated men.

10    Q.    They didn't tell you how many?

11    A.    Pardon?

12    Q.    They didn't tell you how many?

13    A.    No.  We requested that they advise us of

14    their manpower on a weekly basis.  We didn't ask

15    them to necessarily advise us of every hiring and

16    termination.  We just wanted to know and we had a

17    weekly meeting established where we reviewed the

18    total number of men on the job and what their

19    activities were.

20    Q.    In some weeks their available manpower was

21    less than it had been in previous weeks?

22    A.    Yes.

23    Q.    Now, let me take you back to Employer's

24    Exhibit Number 10, if you have it in front of you.

FLYNN REPORTING ASSOCIATES

118

1            MR. GROSSO:  He doesn't.

2       Q.   I want to refer you to the fourth

3  paragraph, "Please be advised."  Do you have that?

4       A.   Yes.

5       Q.   Crown Corr normally operates under the

6  terms of the Siding and Decking Agreement, doesn't

7  it?

8       A.   Correct.

9       Q.   And Crown Corr's employees are members of

10  the Sheet Metal Workers governed by that agreement?

11      A.   The majority of the employees are, yes.

12      Q.   In that sentence where you say "I may have

13  to hire men from another source," is that something

14  that you understood you would have been privileged

15  to do as the employer on this project?

16      A.   Once I had served as the contract-holder of

17  M.R.S.'s subcontract and having served them with

18  48 hours of notice, our subcontract gives us the

19  right to supplement their work force should they not

20  meet the terms of their contract.

21      Q.   Would that violate the terms of your Siding

22  and Decking Agreement with the Sheet Metal Workers,

23  as you understand it?

24      A.   No.

FLYNN REPORTING ASSOCIATES

119

1    Q.   Now, the e-mail refers to "We have met the
2    requirements for the 48-hour notice," do you know
3    which contract contains the 48-hour notice
4    requirement?
5    A.   That 48-hour notice would be the 48-hour
6    notice in the Siding and Decking Agreement.
7    Q.   Does Article 4 ring any bells?
8    A.   Yes.
9    Q.   When you refer to the 48-hour notice,
10   you're referring to --
11   A.   Siding and Decking Agreement.
12   Q.   Now, in the next sentence you say "If I
13   don't have the men by orientation time tomorrow
14   morning, I may have to call Local 7."  For the
15   record, you're talking about Iron Workers Local 7?
16   A.   Yes.
17   Q.   Did you, in fact, call Iron Workers Local 7
18   for some workers?
19   A.   As to this specific request, I can't speak
20   without seeing the rest of the string of e-mails
21   that would go with it, but we did employ Iron
22   Workers from Local 7 for work that Crown Corr was
23   doing.
24   Q.   Let me give what you I'll mark as Union

FLYNN REPORTING ASSOCIATES

120

1   Exhibit 1.

2                  (Discussion off the record.)

3        Q.   Mr. Pickford, do you recognize this e-mail?

4        A.   Yes.

5        Q.   Did you send that?

6        A.   Yes.

7                  MR. ANDERSON:  I'll move it into

8    admission at this point.

9                  MR. GROSSO:  No objection.

10                  ARBITRATOR ASHER:  Admitted.

11       Q.   Does this refresh your recollection as to

12   Local 7 Iron Workers you hired were the ones you

13   referred to in the previous e-mail?

14       A.   I didn't hire these men.  M.R.S. hired

15   these men, but they had asked to do so, and I told

16   them they had to do what was necessary to meet their

17   contractual obligations.

18       Q.   As you understood it, this was something

19   that M.R.S. had the right to do under its Siding and

20   Decking Agreement?

21       A.   I would believe so, yes.

22       Q.   And it shows that you copied this e-mail to

23   Daniel Pasquinucci and Joe Nigro.  Who are those

24   fellows?

FLYNN REPORTING ASSOCIATES

121

1      A.   International Sheet Metal.

2      Q.   International representatives?

3      A.   Yes.

4      Q.   Did the International ever file a grievance

5    either against Crown Corr or M.R.S. about the use of

6    those Local 7 Iron Workers?

7      A.   Not to my knowledge.

8      Q.   Let me give you what I'll mark as Union

9    Exhibit Number 2.  Do you recognize that e-mail

10   dated November 3rd of 2003?

11     A.   I recognize it underneath the heading.  I

12   don't think I was ever copied on the e-mail from Dan

13   to Benny.

14     Q.   I should be clear.  I'm talking about the

15   original message that is pasted into that e-mail.

16     A.   Yes.

17     Q.   You sent that e-mail?

18     A.   Yes.

19          MR. ANDERSON:  I'll move it into

20   admission.

21          MR. GROSSO:  No objection.

22          ARBITRATOR ASHER:  Admitted.

23     Q.   I want to refer you to the last paragraph,

24   "Bob, if the men do not arrive on Wednesday," who

FLYNN REPORTING ASSOCIATES

122

1    is Bob that you're referring to?

2        A.    Bob Butler.

3        Q.    From Local 17?

4        A.    Local 17.

5        Q.    "If the men don't arrive on Wednesday at

6    7:00 A.M. I will again at that time instruct M.R.S.

7    to staff the project as necessary to meet the

8    schedule."

9        A.    Uh-huh.

10        Q.    As you understood it, did M.R.S. have that

11    right under the Siding and Decking Agreement?

12        A.    Yes.

13        Q.    For the record, did the International or

14    Local 17 ever filed a grievance against the

15    intention you stated on November 3rd?

16        A.    Not to my knowledge.

17        Q.    Do you know whether the International took

18    any steps to try to alleviate the manpower problems

19    on the Terminal A site?

20        A.    Yes.

21        Q.    Who was involved with that effort?

22        A.    Joe Nigro.

23        Q.    For the record, can you state who Joe Nigro

24  is?

FLYNN REPORTING ASSOCIATES

123

1       A.   Sheet Metal International.

2       Q.   Anybody else?

3       A.   Dan Pasquinucci, Jim Neary.

4       Q.   When did the International get involved

5   with the Terminal A project?

6       A.   I believe that there was an early meeting

7   with the International pre-bid or just post-bid that

8   Rich Pellar attended.  I can't speak to that.  All I

9   know is that there was a meeting.  You'll have to

10  ask him.  My first contact with the International

11  was the October 14th meeting.

12      Q.   The one that's memorialized in this memo?

13      A.   Yes.

14      Q.   Employer's Exhibit 7?

15      A.   Yes.

16      Q.   What did the International do after

17  October 14th to help alleviate the manpower problem?

18      A.   The International asked that we copy them

19  on manpower requests to Local 17.  That all the

20  manpower requests be put in writing.  That was also

21  a request of Local 17.  And when some staffing

22  problems continue to exist, the International put

23  Mr. Jim Neary on the project full time as a

24    representative.

FLYNN REPORTING ASSOCIATES

124

1      Q.   Do you know what Mr. Neary did?

2      A.   Mr. Neary tracked -- to my knowledge, he

3    was tracking manpower, making sure that the men were

4    on the site, and acting as a liaison between M.R.S.,

5    Crown Corr, and Local 17.

6      Q.   Do you know if the International did

7    anything to get manpower from outside Boston?

8      A.   My specific knowledge of that, I don't have

9    any.

10     Q.   But, in fact, there were Sheet Metal

11   Workers that came in from other jurisdictions; is

12   that right?

13     A.   Let me rephrase the last answer.  I know

14   that the International was involved in getting

15   manpower from other jurisdictions because we had

16   some problems getting some men in from Local 66.

17   Freddy Majewski was involved in that as well as

18   Joe Nigro.

19     Q.   Did the International help in that regard?

20     A.   Yes.

21     Q.   Do you know exactly what they did?

22     A.   I believe Fred made some phone calls to

23     both Local 17 and to Charlie Mulcahey in Local 66 to

24     confirm with Charlie that, in fact, the men were

FLYNN REPORTING ASSOCIATES

125

1     allowed to come to work in Local 17.

2          Q.     And for the record, where is Local 66?

3          A.     Seattle.

4          Q.     Did you feel that the International

5     representatives were acting in good faith in trying

6     to get manpower to the job?

7          A.     Yes.

8          Q.     Now, let's talk about the rework that had

9     to get done.  I take it that the rework required

10    some welding; is that right?

11         A.     Yes.

12         Q.     Do you know whether that was the welding

13    work that caused the e-mails in October that we've

14    looked at?  I'm talking about Employer's Exhibit

15    Number 10 and Union Exhibit 1, and I'll rephrase the

16    question to make it clearer.  In Employer's Exhibit

17    Number 10 you say at the beginning "Bobby, we

18    continue to be short manpower and welders."  You

19    were talking about the need to get welders, that

20    Local 17 did not have sufficient numbers of; is that

21    right?

22         A.     Correct.

23     Q.   And then the next day you sent an e-mail to

24     confirm that you placed five Local 7 Iron Workers

FLYNN REPORTING ASSOCIATES

126

1      who are certified welders on the M.R.S. payroll?

2      A.   I didn't place them on the M.R.S. payroll.

3      Q.   But M.R.S. placed them on their payroll

4      with your permission?

5      A.   Yes.

6      Q.   Do you know if those welders were working

7      on the rework project at all?

8      A.   I don't know if they were specifically

9      working on the rework.  The scope of work always

10     required welding of the frame assemblies into the

11     structure.  There was additional welding that was

12     required for further rework.

13     Q.   Wasn't the rework occurring in October

14     2003, at about this time?

15     A.   Yes, it continued.

16     Q.   Did the rework project, in your view,

17     contribute to delays in the progress of the project?

18     A.   Yes.

19     Q.   Now, we've heard testimony that M.R.S. had

20     to work overtime and make up days to catch up.  Was

21     that problem particularly severe during this

22    turbulent period you mentioned?

23        A.   Yes.

24        Q.   After February of 2004 would you say that

1    the project was running closer to schedule?

2        A.   Yes.

3        Q.   Did you have any notices from Skanska

4    threatening to take action against Crown Corr and

5    M.R.S. after February of 2004?

6        A.   I can't recall specifically.  There were

7    lots of scheduling meetings.  Whether we received a

8    threatening notice from Skanska, I can't

9    specifically recall.

10        Q.   Now, when you observed the Local 17

11    employees, did you form an opinion about what caused

12    their bad productivity?  Was it laziness or

13    insubordination?

14        A.   No.  Do you want me to answer the first

15    part of the question?

16        Q.   Yes, please.

17        A.   I believe that there was a lack of specific

18    knowledge as to the trade craft required for the

19    installation of the stud frame, sheathing, vapor

20    barrier assemblies, and the metal panels.

21        Q.   Did you observe M.R.S.'s supervisors giving

22    on-the-job training?

23        A.    Yes.

24        Q.    Were there some Local 17 employees who

128

1    picked it up quicker than others?

2        A.    Yes.

3        Q.    Would it be fair to say that those

4    employees were more likely to stay on the job for

5    the duration?

6        A.    Yes.

7        Q.    Do you know how big the turnover was among

8    Local 17 employees working for M.R.S.?

9        A.    I thought it was significant.

10        Q.    Now, when Crown Corr started work on the

11    satellite facility, did it take on any Local 17

12    employees who had previously worked for M.R.S.?

13        A.    Yes.

14        Q.    When Crown Corr took on Local 17 employees

15    who had worked for M.R.S., did you know at the time

16    that they had previously worked for M.R.S.?

17        A.    Yes.  What we did was we tried to take over

18    the crews that were already working on the satellite

19    building since they were familiar with that

20    structure.

21    Q.   But once Crown Corr took over, Crown Corr

22  supervised them directly?

23    A.   CCL.

24    Q.   I'm sorry, CCL's supervised them directly

FLYNN REPORTING ASSOCIATES

129

1  with their own supervisors?

2    A.   Yes.

3    Q.   For the record, has Crown Corr filed any

4  grievance against the unions over this job?

5    A.   Not to my knowledge.

6    Q.   One final detail.  We were talking about

7  the training module at the Local 17 hall.  Do you

8  remember whether a representative from M.R.S. was

9  needed to come and do the training at that module?

10    A.   I don't know if a representative from

11  M.R.S. was needed, but at the October meeting

12  Crown Corr specifically offered to furnish and

13  assist in training.

14    Q.   Did you have any further conversations with

15  Local 17 about that?

16    A.   A few.

17    Q.   And that was with Bobby Butler?

18    A.   Bob Butler and Steve McKenzie.

19    Q.   What came out of those conversations?

20    A.   We did not end up furnishing the manpower

21    to help train on the module.  They felt that they

22    had adequate people to do so, but we did furnish

23    information as to specific tools that would aid

24    them, including surveying instruments.

FLYNN REPORTING ASSOCIATES

130

1        Q.    Thank you.  Mr. Pickford.

2               CROSS-EXAMINATION OF JOHN PICKFORD

3    BY MR. KELLY:

4        Q.    My name is Paul Kelly, and I represent the

5    Sheet Metal Workers Local 17.  I would like to ask

6    you some questions about what you've said this

7    morning.  You discussed a meeting that you and

8    Mr. Pellar had at M.R.S.'s headquarters.  Do you

9    recall when that was?

10       A.    Off the top of my head, I'd have to say

11   April or May of 2003.  Subsequent to that -- it

12   would be easy to find out because we generated a

13   letter of intent after that meeting.

14       Q.    If I understand correctly, the bid from

15   M.R.S. was in December of 2002.  Is that about

16   right?

17       A.    I can't recall when we received M.R.S.'s

18   pricing to us.  I know that we furnished our bid to

19   the Skanska team originally in December.

20      Q.   In December of '02?

21      A.   Yes.

22      Q.   And, therefore, you would have received

23   M.R.S.'s bid before that I would assume?

24      A.   I can't recall.  Mr. Pellar was -- you'll

1    have to ask Mr. Pellar.  I didn't handle their

2    initial pricing to us.

3       Q.   But at the time of the meeting at M.R.S.'s

4    headquarters was after the Washington, D.C. meeting

5    that you were at; is that fair?

6       A.   I believe so.

7       Q.   So the agreement you reached with M.R.S. at

8    that meeting was that the job was going to be done

9    under the Siding and Decking Agreement with Sheet

10   Metal Workers?

11      A.   Yes.  I believe that we had already issued

12   our assignment to the Siding and Decking Association

13   prior to engaging M.R.S.

14      Q.   When you say you had already issued your

15   assignment to the Siding and Decking Association,

16   what does that mean?

17      A.   We issued notice to the Siding and Decking

18   Association that we intend to award our work to them

19   outlining an estimated number of man hours and the

20    project name and location.

21        Q.   When you first came to the job, was that in

22    about October of 2003?

23        A.   No.  It was before.  I visited the site --

24    I know I was extensively there after the beginning

FLYNN REPORTING ASSOCIATES

132

1    of September, and I believe I was there once or

2    twice in July or August.

3        Q.   But at some point you had a concern that

4    M.R.S. was not maintaining the schedule?

5        A.   Correct.

6        Q.   And is it accurate that the first written

7    manifestation of that concern was this meeting in

8    October?

9        A.   No.

10        Q.   When did you first communicate your

11    concerns to M.R.S.?

12        A.   Working from memory and without documents,

13    I believe the first written memo would be September.

14        Q.   And your concern was that the job, at least

15    M.R.S.'s piece of the job, was not maintaining the

16    schedule that they were supposed to?

17        A.   Correct.

18        Q.   Can you give me some idea of what it was

19   that the schedule required and where M.R.S. was in

20   terms of meeting that schedule?

21      A.   The early phase of the project had us going

22   down what is termed the air side of the terminal

23   building.  There were specific zones established by

24   column lines to comply with Skanska's master

FLYNN REPORTING ASSOCIATES

133

1    schedule.  I felt that we got out of the gate a

2    little slow and that we needed to get additional

3    manpower on the site to meet and maintain the

4    Skanska schedule, and that I believe was the tone of

5    the documents in September.

6       Q.   I guess I'm trying to figure out, What was

7    it that the schedule called for that had not been

8    met?

9       A.   Installation of siding.  Installation of

10   support and siding, and I felt that we were not

11   going to meet milestones that were established.

12      Q.   Had the milestones come up yet?

13      A.   No.

14      Q.   So you're prospectively saying, We have to

15   move this along?

16      A.   Right.  Crown Corr and M.R.S. had

17   collectively worked out a labor flow schedule to

18   correspond to the Skanska schedule.  We had interim

19    dates as targets to meet, and those were a

20    scheduling tools and a tracking tool for management,

21    and I felt that we needed to add manpower to meet

22    the schedule.

23        Q.    The work, if I understand the way the work

24    was progressing, there is a support system that is

FLYNN REPORTING ASSOCIATES

134

1    constructed and there are panels that follow along

2    and are put on it to complete the wall system.  Is

3    that what you understand?

4        A.    Correct.

5        Q.    Was your concern directed at both phases of

6    that -- the construction of the support system and

7    the construction of the wall panel system?

8        A.    Yes.

9        Q.    When you first testified, you said it was

10    your observation that M.R.S. was short-staffed.  Do

11    you recall that?

12        A.    Yes.

13        Q.    Which means that they didn't have enough

14    people on the site; is that right?

15        A.    Correct.

16        Q.    Was that a reality, or was that your

17    perception in September when you got there?

18    A.    Yes.

19    Q.    Now, take a look, if you would, at what has

20    been marked as Employer's Exhibit Number 7.  That's

21    the minutes.

22    A.    Yes.

23    Q.    This is something that you prepared.  Am I

24    right that this meeting occurred shortly after the

FLYNN REPORTING ASSOCIATES

135

1    Larson re-engineering, rework was required?

2    A.    Approximately a month after Larson first

3    was involved.

4    Q.    Larson was first involved in September?

5    A.    Yes.

6    Q.    But Larson's involvement, if I understand

7    correctly, was to do some kind of an analysis as to

8    the bearing strength of the system; is that right?

9    A.    Yes -- and to help supplement M.R.S.'s own

10    engineering services to complete design

11    requirements.  The metal package and the design

12    requirements were phased, so in an effort to help

13    M.R.S. meet those submittal requirements for work

14    that was in the future, we and with M.R.S.'s consent

15    collectively used Larson to do so.

16    Q.    But what you said earlier was that M.R.S.

17    went back to their engineering team, Sabbagh, and

18    you had Larson do the same sort of review, so it was

19    all going on at the same time?

20        A.   Yes.

21        Q.   And this started in September?

22        A.   I believe so, yes.

23        Q.   And at some point as a result of the

24    combined efforts of all these engineers, a decision

FLYNN REPORTING ASSOCIATES

136

1    was made that we had to do some rework?

2        A.   Yes.

3        Q.   When was that decision made?

4        A.   It was made almost immediately.

5    Mr. Levesque immediately recognized that there was

6    an issue with the engineering, and he immediately

7    put into place some remedial action with replacing

8    materials, changing design, and staffing to make the

9    repairs in the field for the work that had already

10   been installed.

11       Q.   You showed up in September?

12       A.   I became more frequent on site in

13   September, yes.

14       Q.   This was around the same time that these

15   engineers were at least rethinking this project?

16       A.   Yes.

17     Q.   And shortly after they actually got engaged

18  in the rethinking of the project remedial action was

19  taken?

20     A.   Yes.

21     Q.   Yet this was co-extensive with you becoming

22  concerned that we're short-staffed?

23     A.   Yes.

24     Q.   Now, on this Exhibit 7 there's a paragraph

FLYNN REPORTING ASSOCIATES

137

1  about manpower, Number 3.  Do you see that?

2     A.   Yes.

3     Q.   It says in it "The schedule of anticipated

4  manpower requirements was distributed and copies of

5  both are attached for the record."

6     A.   Yes.

7     Q.   Do you have copies of those?

8     A.   I don't believe I have those with me.

9     Q.   But they were attached to this memo?

10     A.   Yes, they were attached to this memo

11  originally, and they were distributed at the

12  meeting, and I'm sure that I can find those in our

13  records.

14     Q.   But you don't think you have them with you?

15     A.   I don't think so.

16     Q.   But the idea of manpower requirements being

17    set forth and distributed was so that everybody

18    would have an idea of how many people we need?

19        A.    Yes.

20        Q.    Is that right?

21        A.    Yes.

22        Q.    Including Local 17?

23        A.    Yes.

24        Q.    And you heard from Local 17 that they can't

                    FLYNN REPORTING ASSOCIATES

                                                              138

1    produce 20 people at the drop of a hat, that they

2    need a little notice?  Didn't they say that?

3        A.    I can't specifically recall what they

4    said.  I know that they asked for the manpower

5    requirements in writing.

6        Q.    But they were having difficulty with

7    supplying a number of workers on short notice; isn't

8    that fair?

9        A.    Yes.

10        Q.    And one of the ways to address that concern

11    was these written manpower requirement sheets;

12    right?

13        A.    Yes.

14        Q.    Now, Paragraph 2 reports that M.R.S. on

15    October 14th it needs four welders; correct?

16      A.   Correct.

17      Q.   And that was discussed and manpower

18  requirements were distributed; is that fair?  Did

19  that happen on October 14th?

20      A.   Yes.

21      Q.   Then Crown Corr is saying, We need ten or

22  twelve welders; correct?

23      A.   I would say that that's probably correct.

24  Without seeing subsequent documents -- well, I think

                    FLYNN REPORTING ASSOCIATES


                                                        139


1   we have the October 21st document.

2       Q.   That's a week later?

3       A.   Right.

4       Q.   Why didn't we discuss on October 14th that

5   we need ten or twelve welders?

6       A.   What transpired there, so that you know, is

7   that the welders that came on site originally didn't

8   have the correct certifications to do the work.

9   Part of the requirements of the project were to

10  submit welder certifications.  Some of the men from

11  Local 17 did not have any certifications or full

12  certifications, so that made the welding

13  requirements jump significantly -- working off

14  memory.

15      Q.   In other words, the four welders -- let me

16     ask you this.  Employer's Exhibit Number 7 says that

17     M.R.S. needs four welders and Local 17 will furnish

18     these men from the start of work on Wednesday or

19     Thursday; right?

20          A.   Yes.

21          Q.   Did that happen?

22          A.   I don't know without looking at the hiring

23     records.

24          Q.   Didn't Local 17 themselves certify welders

FLYNN REPORTING ASSOCIATES

140

1     or the training center -- didn't they certify

2     welders?

3          A.   Not to my knowledge.

4          Q.   No?

5          A.   No, not to my specific knowledge.  I don't

6     know where their certifications came from.

7          Q.   You talked earlier about a safety meeting?

8          A.   Yes.

9          Q.   Do you know when that was?

10          A.   Not offhand.  Close to this time frame.

11          Q.   Did you discuss with M.R.S. the fact that

12     the Siding and Decking Agreement under which this

13     project was being performed had a provision in it

14     that said on 48 hours' notice if you don't get the

15  people you need from the hall, you could hire them

16  yourself?

17      A.   I don't believe that I specifically had

18  that conversation with M.R.S.  I believe that I

19  would understand that M.R.S. was familiar with their

20  collective bargaining agreement.

21      Q.   Had M.R.S. been a party to the Siding and

22  Decking Agreement prior to this project?

23      A.   I don't know.  I can't speak for them.

24      Q.   You never received a grievance from

FLYNN REPORTING ASSOCIATES

1  Local 17 about the hiring of Iron Workers on this

2  job?

3      A.   No.

4      Q.   Are you aware of any such grievance?

5      A.   No.

6      Q.   Do you know Mr. Nigro?

7      A.   I've met Mr. Nigro, yes.

8      Q.   Mr. Nigro at the time was the assistant to

9  President Sullivan?

10      A.   I believe so.

11      Q.   Do you know that he was also the former

12  business manager at Local 17?

13      A.   No, I did not.

14      Q.   Your e-mail, Employer Exhibit 10, talks

15   about, We are at risk of being put on notice by

16   Skanska?

17        A.   Yes.

18        Q.   You're making reference to a contractual

19   written notice provision in the contract between

20   Crown Corr and Skanska?

21        A.   Correct.

22        Q.   And you didn't receive such a notice, did

23   you?

24        A.   I can't say yes or no.  We received some

FLYNN REPORTING ASSOCIATES

142

1   directed correspondence from Skanska regarding

2   schedule and schedule compliance.  Whether it was a

3   specific document that was elaborated in their

4   subcontract agreement to us, I'd have to look at the

5   records.  I'd have to look at the documents.

6        Q.   But if you had received a contractual

7   written notice from Skanska prior to October 21st,

8   you certainly would have said, We received one,

9   rather than, We are at risk; right?

10        A.   Yes.

11        Q.   Isn't it also true that the problems were

12   at their peak in October of 2003 -- manning problems

13   on this job?

14     A.   That was one of the worst periods.  It

15  continued through November, December and into

16  January.

17     Q.   I believe you testified that one of the

18  things that you observed was that journeymen from

19  Local 7 were not trained to do this work?

20     A.   Local 17.

21     Q.   I'm sorry.  Were not trained to do this

22  work?

23     A.   In my opinion, they did not appear to be

24  specifically trade-trained for this work.

FLYNN REPORTING ASSOCIATES

143

1     Q.   When you say "this work," do you mean both

2  the support system, the application of the dense

3  board, and the wall system?

4     A.   Yes, the support system and the metal wall

5  panels.

6     Q.   The whole thing?

7     A.   The whole thing.

8     Q.   Do you have an opinion one way or another

9  where they were qualified journeymen?

10     A.   No, because I don't know what Local 17 uses

11  to document that qualification.

12     Q.   Do you have a view as to how much training

13  is necessary in order to be considered trained in

14     the application of the support system and the wall

15     system that was used on the Delta job?

16          A.    Would you repeat that, please?

17          Q.    What kind of training do you think is

18     necessary so that if you walk down there, instead of

19     saying, These guys are not trained, you would say,

20     These guys are trained?  How many training do you

21     need?

22          A.    They have to be shown how the systems are

23     built, specifically the stud frames, and the

24     installation of those and the layout of those.  They

FLYNN REPORTING ASSOCIATES

144

1     have to be shown how the sheathing is applied, how

2     the air barrier products are applied and the quality

3     control procedures for those.  Then they have to be

4     shown specifically how the metal panel system

5     installs and the registration of that so that it

6     continues to meet its layout requirements and how to

7     flash off and seal it.  Those are things that are

8     specific needs and requirements to do that work.

9          Q.    If I'm on that job a week, am I going to

10     learn how to do that?

11          A.    You're going to do in a week whatever task

12     you're trained to do.  Are you going to learn all of

13    those in a week?  No.

14        Q.    But if I had spent a week doing some

15    portion of it, I would be adequately trained to do

16    that portion of it?

17        A.    I would expect a man to be, yes.

18            ARBITRATOR ASHER:  Starting at what

19    level?  You're talking like Attorney Kelly?

20        Q.    An unskilled worker like Attorney Kelly,

21    would you expect him after a week to be able to do

22    the application of the dense board to the stud

23    system, for example?

24        A.    No, but I would expect a journeyman or

FLYNN REPORTING ASSOCIATES

145

1    somebody with trade familiarization I would expect

2    them within a week to be competent at the task.

3        Q.    Did you understand that there was a module

4    system at the training center in Boston to train

5    people to do this?

6        A.    Yes.

7        Q.    Is it typically an expense of the employer

8    to train employees?

9            MR. GROSSO:  I'm going to object to

10    that question.  We have two contracts in evidence

11    here as joint exhibits, both of which say it's the

12    responsibility of the union to provide skilled

13    craftsmen.

14    Q.    Did anybody suggest, Mr. Pickford, on this

15    job that the workers be trained at the training

16    center prior to being sent over to the job site?

17    A.    Yes, and it was specifically discussed at

18    the October 14th meeting.

19    Q.    Did anybody undertake to compensate the

20    workers for the training?

21    A.    I couldn't speak to that.

22    Q.    That wasn't discussed?

23    A.    No.

24    Q.    No?

FLYNN REPORTING ASSOCIATES

146

1    A.    No.

2              MR. KELLY:  No further questions.

3              MR. GROSSO:  I have a few.

4              REDIRECT EXAMINATION OF JOHN PICKFORD

5    BY MR. GROSSO:

6    Q.    Mr. Kelly just asked you about your

7    statement as to the quality of the skill level of

8    these people, the knowledge of the system when they

9    came to the job.  Wasn't that really the problem

10    with Local 17?  It wasn't a problem of notice as to

11    how much time they needed to supply these people.

12    Whatever people they referred to this job either

13    were not trained, were poorly skilled, or they

14    didn't have the necessary certifications.  Isn't

15    that basically what happened with every referral

16    that came out there?

17        A.    I couldn't say that it's every referral.

18    There was a broad spectrum of men that came out.  I

19    know for a fact that there was gentleman who was

20    referred by the name of Dave Shelton who had all the

21    skills.  He had been an employee of mine in Florida

22    previously, and he ended up here and I knew he had

23    the skill set.  There were other men who came out

24    and who had never done this trade craft before and

FLYNN REPORTING ASSOCIATES

147

1    said they had never done it.

2        Q.    Mr. Kelly asked you about the module, and I

3    think previously you testified that you had offered

4    the services of Crown Corr to Local 17 to assist

5    them in training on that module.  Is that a fair

6    representation of what you said earlier?

7        A.    Yes.

8        Q.    And they didn't take you up on that offer,

9    did they?

10        A.    No.

11        Q.    Do you know if that module actually had as

12    part of its components a similar stud support system

13    with dense glass board and vapor barrier?

14         A.   I never saw it their assembled module.

15         Q.   So you don't know if it had training on

16    studs at all?

17         A.   No.

18         Q.   You mentioned Joe Nigro -- or maybe it was

19    Mr. Majewski -- assisted you in getting some skilled

20    people from Local 66?

21         A.   He made some calls, yes.

22         Q.   Were those people supplied to CCL or to

23    M.R.S.?

24         A.   CCL.


                    FLYNN REPORTING ASSOCIATES


                                                            148


1         Q.   So Mr. Majewski did not assist M.R.S. on

2    behalf of the International to get those people?

3    That was for CCL?

4         A.   I believe that's correct.

5         Q.   If I show you Exhibit 11, which is a list

6    of about 135 people all who had been employed by

7    M.R.S. on this project, and if you subtract the

8    laborers and the operating engineers, there are

9    about 130 Sheet Metal Workers, I find no one from

10    the State of Washington.

11      A.   I would not doubt that.

12      Q.   Now, both Mr. Anderson and Mr. Kelly

13   referred to the contractual provision in

14   Article 4 of the National Siding and Decking

15   Agreement, and I'm going to put it in front of you

16   for your benefit as Joint Exhibit Number 1.

17           MR. GROSSO:  This was the one that was

18   entered into on the first day the June of 2000.

19   This is not the '05 one.  This one was the one in

20   force at the time.

21      Q.   You correctly stated about the 48-hour

22   notice.  I believe it's at the top of Page 5.  Do

23   you see where it says --

24      A.   "In the event the Union is unable to supply

FLYNN REPORTING ASSOCIATES

149

1    an adequate number of Sheet Metal Workers within

2    48 hours, excluding Saturday, Sunday, and holidays,

3    the employer may directly hire such employees from

4    any source and refer to the Union."

5       Q.   And that's the 48-hour notice you were

6    referring to your e-mail to Local 17; correct?

7       A.   Yes.

8       Q.   Now, isn't it also true, and you don't have

9    to read it into the record, you can just read the

10   section and then respond to my question.  Isn't it

11    also true that although the employer has the right

12    to obtain employees from any other source after the

13    Union fails to meet the 48-hour requirement, that

14    those employees must join the Sheet Metal Workers

15    Union within eight days after they're employed by

16    the employer?

17              MR. ANDERSON:  I object.  This call

18    for a legal conclusion.

19              MR. GROSSO:  He can read Article 5 and

20    he can tell me what he thinks it says.

21    A.    I don't think it says that they need to

22    join.  I believe it says they have to be referred.

23    Q.    Would you look at Section 1 of Article 5

24    because the language you just mentioned is in

                FLYNN REPORTING ASSOCIATES

                                                        150

1    Article 4.

2    A.    I believe that that's what that section

3    says.

4    Q.    Thank you.  You said Mr. Neary was on the

5    job on a regular basis after this October 14th

6    meeting set by the International?

7    A.    He came in November, I believe.

8    Q.    And his job was to coordinate and monitor

9    the work force and coordinate with Local 17 on the

10    supply of manpower; is that what you said?

11        A.    Yes.

12        Q.    Did Mr. Neary, to your knowledge, ever

13    reach outside of Massachusetts as a representative

14    of the International to try to find skilled Sheet

15    Metal Workers for this project?

16        A.    I don't know specifically what Mr. Neary

17    did.

18        Q.    Did M.R.S. complete the project on time?

19        A.    Yes.

20        Q.    And did they seek any additional

21    compensation from Crown Corr for any of the overtime

22    or anything they had to do to meet that schedule?

23        A.    No.

24        Q.    Do you know, and if you don't, it's fine,

FLYNN REPORTING ASSOCIATES

151

1    do you know whether or not M.R.S. incurred

2    significant additional costs to finish this project

3    on time?

4        A.    Mr. Levesque and I had several

5    conversations, and I understand from those

6    conversations that they incurred significant costs.

7        Q.    With respect to the work on the satellite

8    building, I think you testified that you took over

9    the M.R.S. crews that were already there.  Did you

10    say that?  I'm sorry, CCL.

11        A.    CCL assimilated the Local 17 manpower that

12    was on that portion of work.  The M.R.S. employees

13    that were from their home local or their regular

14    company employees went back to the terminal so they

15    could focus on those efforts.

16        Q.    So the Local 17 people were the ones that

17    stayed on the satellite building?

18        A.    Correct.

19        Q.    They were assimilated into the CCL crew,

20    which I think you said 50 percent of which came from

21    Detroit or Indiana, approximately?

22        A.    Yes, and a few other locals in between.

23        Q.    When Crown Corr made the decision and

24    notified the National Siding and Decking Association

FLYNN REPORTING ASSOCIATES

152

1    that it was going to perform this work under that

2    agreement, is there an economic benefit for doing it

3    under the National Siding and Decking Agreement?

4        A.    Yes.

5        Q.    What is that benefit?

6        A.    There is a reduced labor cost for working

7    within the ratios of the Siding and Decking

8    Agreement by employing specialty workers, classified

9   workers, and pre-apprentices that cost less on an

10  hourly rate than a journeyman does.

11      Q.   Do you know whether or not on the

12  Terminal A project Local 17 was able to meet those

13  ratios that are contained in the National Siding and

14  Decking Agreement of journeymen, specialty workers,

15  and apprentices to achieve those lower costs?

16      A.   My understanding is that they could not

17  meet those ratios, and the meeting of October 14th

18  addressed that they don't have specialty workers and

19  addresses a provision that was available to supply

20  one first-year apprentice for every journeyman as a

21  subsequent ratio rather than the ratio that was

22  outlined in the Siding and Decking Association

23  manual.

24      Q.   In your opinion, based on your 20 years of

FLYNN REPORTING ASSOCIATES

153

1   experience in this business, does a first-year

2   apprentice have the requisite skills to be

3   productive on this type of installation?

4       A.   Yes.

5       Q.   A first-year apprentice does?

6       A.   Yes. There is a lot of work that is two-man

7   work where one man necessarily doesn't have to have

8   the full skill set of a journeyman.  He's assisting

9   in moving the material, holding the material,

10  running a screw in, doing something like that where

11  he's working side by side with a journeyman.

12      Q.   So provided the journeyman has the skill

13  set, a journeyman and a first-year apprentice can be

14  productive?

15      A.   Yes.

16      Q.   But if the journeyman doesn't have the

17  skill set, you have a two-man team that is not

18  productive?

19      A.   It would be much more difficult, yes.

20      Q.   Mr. Kelly asked you about the need for

21  additional manpower early on in the project based on

22  your observations, and when you got there in

23  September, you felt that you were not going to

24  milestones with the work force that M.R.S. had

FLYNN REPORTING ASSOCIATES

154

1   present on the site.  Is that a fair representation

2   of what you said?

3       A.   Yes.

4       Q.   And was the need for additional manpower

5   for your prospective look at the milestones

6   necessary because of the productivity and the skill

7   level of what was out there as opposed to the number

8    of what was out there?

9       A.   It's a double-edged sword.  It's both.

10   There was a lack of productivity from the manpower

11   that was on site and there was a shortage of bodies.

12      Q.   What was Crown Corr's schedule which had

13   been agreed to with Skanska for the start date for

14   M.R.S., do you remember?

15      A.   I believe it was sometime in August.

16      Q.   So they actually started when they were

17   supposed to start?

18      A.   Yes.

19      Q.   You said something about them being a

20   little late out of the gate?

21      A.   The start of the project was fairly

22   aggressive versus an industry standard of what's

23   called a soft start, so getting ramped up within the

24   curb of the schedule, they had manpower problems.

FLYNN REPORTING ASSOCIATES

155

1                MR. GROSSO:  I have no other

2    questions.

3                MR. ANDERSON:  I have nothing further.

4                MR. KELLY:  I have just a couple.

5                RECROSS-EXAMINATION OF JOHN PICKFORD

6    BY MR. KELLY:

7       Q.   In fact, Iron Workers were put on the job

8      in October; isn't that right?

9          A.   Yes.

10         Q.   Did anybody ever complain that they never

11     joined Local 17, to your knowledge?

12         A.   Not to my knowledge.

13         Q.   I apologize because I should have asked you

14     this earlier, but you testified I think fairly that

15     you had a good opinion of a gentleman named JR who

16     was the project manager for M.R.S.?

17         A.   Yes -- JR LaFrancois.

18         Q.   My question is, Did you have an opportunity

19     to observe the supervisory personnel which was,

20     like, one level below JR?

21         A.   I worked somewhat in a direct environment

22     with a gentleman by the name of Scott who was very

23     qualified.

24         Q.   A foreman?

FLYNN REPORTING ASSOCIATES

156

1          A.   Yes, I believe he was a foreman.  He acted

2      in a foreman capacity.  If he was a foreman

3      officially, I couldn't tell you, but he had

4      leadership duties and responsibilities, and he

5      managed crews that interfaced with my project

6      management team, and I had direct conversations with

7    him about his productivity, where his men were

8    going, and how long it was going to take him to get

9    certain tasks done, and he was knowledgeable and

10   skilled.

11       Q.   Did you have an opportunity to interface

12   with other M.R.S. foremen besides Scott?

13       A.   I met and interfaced with a gentleman by

14   the name of Marcel.  Other than that, I wouldn't say

15   that I had direct contact with their manpower.  We

16   as Crown Corr or CCL did not direct the M.R.S.

17   manpower.  What we did was we met with JR and

18   established schedules to be done, and then JR

19   managed his people.

20       Q.   Do you know one way or another whether

21   there are lights at the training center module?

22       A.   I've never seen the training center

23   module.

24              MR. KELLY:  No further questions.


                   FLYNN REPORTING ASSOCIATES


                                                      157



1              MR. GROSSO:  The employer has rested.

2              (Lunch break taken.)

3              ROBERT L. BUTLER, sworn.

4              DIRECT EXAMINATION OF ROBERT BUTLER

5    BY MR. KELLY:

6        Q.   Good afternoon, Mr. Butler.

7          MR. KELLY:  Before we begin with

8     Mr. Butler, I would like the record to reflect that

9     earlier in the day I supplied copies of what was

10    Joint Exhibit Number 7, and we talked about that

11    yesterday, which was the answer of Local 17 to the

12    complaint, and there was a question from the panel

13    yesterday about Local 17's position in this case as

14    to whether we took the position in the court case

15    concerning the filing of the grievance and so forth.

16    At the time I responded that Mr. Bergantino had

17    submitted an affidavit in that case, and I would

18    like to put that affidavit into the record by

19    agreement if we can do it.  This is a copy of the

20    document that was filed in that case.  Otherwise,

21    I'll offer it as Local 17.

22          ARBITRATOR ASHER:  Any objection?

23          MR. GROSSO:  No objection.  Is that

24    Joint 8?

FLYNN REPORTING ASSOCIATES

158

1          ARBITRATOR ASHER:  So admitted.

2          (Discussion off the record.)

3     Q.   Would you for the record state what your

4     position is with Local 17.

5     A.   I'm a business rep.

6      Q.   How long have you been a business rep.?

7      A.   Four years.

8      Q.   Were you just recently re-elected?

9      A.   Yes, I was.

10     Q.   This past June?

11     A.   Yes.

12     Q.   How long have you been a member of

13  Local 17?

14     A.   Twenty years.

15     Q.   Did you come into Local 17 through the

16  apprenticeship program?

17     A.   Yes, I did.

18     Q.   Tell us a little bit about the apprentice

19  program.

20     A.   Five-year apprenticeship and you learn the

21  basics of welding, duct installation, duct

22  fabrication, skylight work, siding work.  They go

23  over the books cost work, balancing, a little bit of

24  CAD, not much because they were just introducing it,

FLYNN REPORTING ASSOCIATES

159

1  a lot of specialty work that we do.  Pretty much the

2  whole industry, you name it.  Mechanical systems,

3  design.

4      Q.   Did you serve a five-year apprenticeship?

5      A.   Yes, I did.

6     Q.   While you were serving your apprenticeship,

7   did you work for various employers?

8     A.   Yes, I did.

9     Q.   How many members are there in Local 17?

10    A.   Boston is probably about 1,400.

11    Q.   When you say Boston, does Local 17 cover

12  more than Boston?

13    A.   Part of our bargaining area is

14  Rhode Island, New Hampshire, Maine, and New Bedford,

15  Fall River.

16    Q.   When you say bargaining area, does each one

17  of those areas have a different collective

18  bargaining agreement?

19    A.   Yes, they do.

20    Q.   And Local 17 is the union party to each?

21    A.   Yes.

22    Q.   So when you say 1,400 in Boston, you are

23  talking about --

24    A.   Just Local 17 Boston.

FLYNN REPORTING ASSOCIATES

160

1     Q.   That bargaining union?

2     A.   Right.

3     Q.   How many members do you have altogether?

4     A.   Probably around 2,200 I would say.

5     Q.   How is it that work is distributed amongst

6  the membership?

7     A.   The contractor calls you for men and you

8  send them to him.

9     Q.   Are there Local 17 members who work steady

10  for certain contractors and never hit the hall?

11     A.   Sure -- many.

12     Q.   Is it true that employment varies so that

13  sometimes you have relatively unemployment and other

14  times you have full employment?

15     A.   That's right, yes.

16     Q.   Do you recall this job back in the summer

17  of 2003?

18     A.   Yes, I do.

19     Q.   Where were you?

20     A.   Boston.

21     Q.   How many business agents are there?

22     A.   Five.

23     Q.   Are they assigned to each of those five

24  bargaining areas that you just discussed?

FLYNN REPORTING ASSOCIATES

161

1     A.   Yes, they are.

2     Q.   What is the time period for the assignment?

3     A.   One year.

4     Q.   So we're going back to 2003, and you were

5  assigned to the Boston area?

6      A.   Yes.

7      Q.   And you had that assignment for a year?

8      A.   Yes, I did.

9      Q.   Where did you go after that?

10     A.   I went to New Hampshire.

11     Q.   But you didn't have Boston after that?

12     A.   No.

13     Q.   After June of 2004?

14     A.   Right.

15     Q.   So for at least the first ten or eleven

16  months on the Delta project you were the business

17  agent in charge of that project?

18     A.   Yes, I was.

19     Q.   Do you remember it?

20     A.   Well.

21     Q.   Was it a happy memory?

22     A.   No.

23     Q.   Do you recall issues on that project around

24  manpower and staffing the job?

FLYNN REPORTING ASSOCIATES

162

1      A.   Yes, I do.

2      Q.   From your perspective, what were the

3  manpower issues that confronted that job?

4       A.    In the beginning we don't have specialty

5    workers, so we subsidized them with apprentices.

6    At the time we tried to get as many apprentices from

7    other companies and bring them over to the airport.

8    I went out of my way to get apprentices on that

9    project.  It was a battle every day.  Guys would go

10   to the job and if they didn't like the guy, they

11   were gone.  If they had a problem with an individual

12   not getting the work done, they would get rid of

13   them.

14       Q.    Who would get rid of them?

15       A.    M.R.S.

16       Q.    Let me ask you first about the apprentices.

17   You have a particular position with the Local 17

18   joint apprenticeship training committee now?

19       A.    Yes, I do.

20       Q.    What is your position?

21       A.    I'm a trustee on the fund.

22       Q.    When the fund admits apprentices or when

23   the JAPC admits apprentices into the program, they

24   are required to take certain courses at the school,

1    are they not?

2        A.    Absolutely.

3        Q.    Do they also get apportioned out to the

 4    various employers?

 5        A.    Yes, they do.

 6        Q.    Can you access if an apprentice is assigned

 7    to Harrington Brothers, for example, that's a big

 8    employer of yours?

 9        A.    Yes.

10        Q.    If Harrington Brothers has apprentices and

11    then M.R.S. comes into town and says, I need

12    apprentices, can you get apprentices from Harrington

13    Brothers?

14        A.    No.

15        Q.    How do you access apprentices during the

16    year?

17        A.    If there's a company that's slow and

18    there's apprentices who are local, we will take them

19    and try to put them in other companies.  That's what

20    we did with M.R.S.  Some of the contractors got slow

21    and we tried to push them around and we gave them to

22    M.R.S., but we can't take from other contractors.

23    Can't do that.

24        Q.    So the process for accessing journeymen,

FLYNN REPORTING ASSOCIATES

164

 1    for example, if somebody says, I need journeymen, to

 2    you, it's pretty much the same thing, is it not?

3       A.   Pretty much, yes.

4       Q.   If they get laid off because contractors --

5       A.   We'll call the hall and try to get them a

6  job.

7       Q.   Now, you were describing what the manpower

8  issues were.  What were they?  What did you consider

9  as the business agent, what did you consider the

10  challenges to be for you on that job?

11      A.   Getting people out there.  M.R.S. demanded

12  a lot out of guys.  With every company it's pretty

13  much the same thing.  It's attitude.  Sometimes they

14  don't like the foreman or they don't like the

15  superintendent on the job, it's attitude towards --

16  people's attitudes working with each other.  There

17  are a lot of little things like that -- petty

18  things.

19      Q.   Did you have problems with your own people

20  out at that problem?

21      A.   I had some problems with people who didn't

22  want to work with each other, sure.  You have it on

23  every job.

24      Q.   How did you address it?

                    FLYNN REPORTING ASSOCIATES


                                                            165


1       A.   I would go up there and talk to them and

2  talk to the contractor about splitting them up or

3    doing something or putting them on that building.

4    You have to have attitudes.  Every job is the same

5    way, so you try to go out there as a business agent

6    to nip it in the bud.

7        Q.   Did you have any problems with M.R.S. in

8    terms of these staffing issues?

9        A.   I had them with JR.  My feeling on that job

10   was you had JR and I can't think of the other guy.

11              MR. GROSSO:  You can't ask him.

12       A.   There was another guy and they were both

13   Iron Workers, and I don't think they wanted Sheet

14   Metal Workers on the job, to be honest with you,

15   because they were Iron Workers.

16       Q.   How did that cause a problem for you?

17       A.   Because I'm a Sheet Metal Worker, and they

18   are Iron Workers.

19       Q.   I understand, but what happened on the job

20   to make it difficult?

21       A.   I could never give them enough.  Every guy

22   that I sent them, they seemed like they had a

23   problem with everybody.

24       Q.   Do you remember Mr. Pickford?

FLYNN REPORTING ASSOCIATES

1        A.   Yes, I do.

2       Q.    Did he at some point come down to this job

3    and become a presence at the job?

4       A.    Yes, he did.

5       Q.    Did he deal with manpower issues?

6       A.    Yes.  In the beginning he did and then it

7    went back to Roland or JR.

8       Q.    Directing your attention to Employer's

9    Exhibit Number 7, do you recall that meeting that

10   this document references?

11      A.    Yes, I do.

12      Q.    Directing your attention to Paragraph 2,

13   what was going on that created a need for certified

14   welders?

15      A.    What happened was we were shooting the flat

16   stock into the steel, and what happened was a guy

17   got hurt out there.  A piece fell down and hit him

18   and it kind of opened up a can of worms with the

19   contractor Skanska, and they were saying that the

20   Sheet Metal Workers weren't installing them

21   properly.  Two men from M.R.S., their own guys, put

22   it on and it fell off.  They had a Hilti come out

23   and they did a demonstration on an I beam, and they

24   put the flat stock on it and they were going to

FLYNN REPORTING ASSOCIATES

167

1    train the Sheet Metal Workers how to use their Hilti

2    guns because they said they were not using them

3    properly, so they set up a test and they shot the

4    pins into the steel and they didn't hold, so it

5    opened up a can of worms, and they went back and

6    they had to rip all the siding off the building,

7    dense glass, Sheetrock, the studs, and they had to

8    go back and re-weld these.  I had welders out there

9    at the time, but they weren't certified, so what

10   happened was Roland hired some Iron Workers that

11   were certified to go out and weld until I could get

12   him certified Sheet Metal Workers, and what we did

13   was we put a class in the school to certify Sheet

14   Metal Workers to go to that job site.

15        Q.   Does the school issue welding

16   certifications?

17        A.   Yes, we do, but it was a certain type of

18   wire they were using up there.  There are different

19   certifications for different welding rods that we

20   use and we weren't certified to use that type of

21   welding rod, so we got certified in that.

22        Q.   In the meantime, there were Iron Workers

23   welding on the job?

24        A.   Yes.


                    FLYNN REPORTING ASSOCIATES


                                                          168

```
1       Q.   How long were the Iron Workers there?

2       A.   I'm going back three years ago, and I'm

3   trying to think.  A couple of weeks I want to say.

4       Q.   At some point did you supply sufficient

5   numbers of welders that they could replace the Iron

6   Workers?

7       A.   Yes, I did.

8       Q.   Did you require at anytime that the Iron

9   Workers join Local 17?

10      A.   No.

11      Q.   Did M.R.S. at anytime file a grievance

12  against you for the way Local 17 staffed the job?

13      A.   No, not while I was there.

14      Q.   There has been a lot of testimony variously

15  about the level of training of the Local 17 members

16  who were referred to the job and about the attitude

17  of the Local 17 members on the job.  Were you there

18  often enough to observe?

19      A.   I was there a lot, yes, believe me.

20      Q.   Were there a fair number of men from

21  Local 17 who were referred to the job who for one

22  reason or another did not stay?

23      A.   Yes.  People have reasons why they want to

24  leave.  If you look outside, you'll see they're
```

1   working outside in the wintertime.  For a lot of

2   guys if they get a duct job, they go inside.  Some

3   of them on their own and some of them left because

4   they weren't producing and they got laid off.  That

5   is the nature of the business.  If you go to work,

6   you work and you stay; if you don't work, you get

7   laid off.  That's the way it goes.

8        Q.   When M.R.S. laid men off, did they then

9   come to you and say, I need to replace them?

10       A.   Yes.

11       Q.   Did you attempt to get them replacements?

12       A.   Yes -- every time.

13       Q.   Are the members of Local 17 permitted to

14  solicit their own work?

15       A.   They are with the Local contracts but not

16  from out of town.

17       Q.   So if I'm working in December on the Delta

18  job, I can call up Harrington Brothers if that's who

19  I worked for last summer and say, Do you have any

20  work for me?

21       A.   Absolutely.

22       Q.   And if I do that, I can leave M.R.S. and go

23  work for Harrington?

24       A.   Yes.

FLYNN REPORTING ASSOCIATES

1    Q.   Did that happen?

2    A.   It could have, Paul, but I'm not sure.

3    Those guys that got laid off -- again, I'm the

4    business agent.  I would have had them jobs

5    elsewhere.

6    Q.   What was the level of employment and

7    unemployment back in the fall of 2003?

8    A.   I think we probably had maybe 60 guys out

9    of work at that time, and as the job went on I think

10   we had more people getting laid off because it was

11   slow.

12   Q.   Did you ever have more requests for

13   journeymen Sheet Metal Workers from M.R.S. than you

14   had people --

15   A.   No, because I would have brought them in

16   from other areas -- Local 63 or Local 40 -- but that

17   was an issue because a lot of times Roland would

18   call me and say, I need ten guys, and I would call

19   JR and say, JR send me ten guys tomorrow morning,

20   and Roland would say, I don't need ten but I need

21   six, so that's where it really got ugly and that's

22   where I think John Pickford stepped in.  John was

23   communicating to me with e-mails for a little

24   while.  It got all blown out of proportion, to be

FLYNN REPORTING ASSOCIATES

1    honest with you.

2        Q.   Because you were getting conflicting

3    signals?

4        A.   Yes.

5        Q.   Is that why the manpower requirements were

6    being set forth in writing?

7        A.   Yes.

8        Q.   Bear with me for just a second.  Now, when

9    M.R.S. called for journeymen, at least while you

10   were there, you always had a supply of journeymen in

11   the hall?

12       A.   Yes.

13       Q.   What about apprentices?

14       A.   No, I couldn't say that because they only

15   take "X" amount of apprentices into the program a

16   year.  If they don't have a home or a shop they can

17   work for, if they're on the bench loafing, Steve

18   McKenzie who is the coordinator would call me and

19   say, I have an apprentice, do you want him, and I

20   would take him.

21       Q.   So there was a problem staffing with

22   apprentices but not with journeymen?

23       A.   Never a problem with journeymen, no,

24   because there were other areas I could have reached

FLYNN REPORTING ASSOCIATES

172

1     out to, Paul.

2          Q.   There was testimony I think of Mr. Levesque

3     that somebody offered the opinion that the Local 17

4     members that were working for him were the, quote,

5     dregs of the Local.  Do you share that view?

6          A.   Absolutely not.  Most of those guys who

7     were working on the job are working now.

8          Q.   Do you have unemployment in your Local now?

9          A.   I do.  I have 170 guys out of work.

10         Q.   So you're saying the people that worked for

11    M.R.S. are not among the 170 that are out of work?

12         A.   Some of them could be, but the majority of

13    the guys are working.  I have a lot of them working

14    down on the power plant doing lagging.

15         Q.   What is lagging?

16         A.   Laying a boiler, metal siding on a boiler.

17         Q.   I want you to look at -- this is my copy,

18    but this is Company Exhibit 11, which I understand

19    to be a complete roster of the people that were

20    working at M.R.S. on the Delta job.

21         A.   Uh-huh.

22         Q.   In light of your review of that document,

23    can you say that the people that are listed here are

24    not among the 170 that you've got unemployed

FLYNN REPORTING ASSOCIATES

173

1   presently?

2       A.   I can't say that right now, Paul.  I would

3   say the majority of them whose names I know are

4   working.  There's a lot of them on this list that

5   are working or retired.

6       Q.   Did you ever make any promises to M.R.S.

7   about the attitude of the members towards M.R.S.?

8       A.   I talked to JR about it.  JR is a tough guy

9   to work for, to be honest with you.  JR got in a lot

10  of fights with a lot of different people on the job.

11      Q.   What did you understand your responsibility

12  was with respect to those people?

13      A.   I represent them, so mediate, calm them

14  down, basically keep the peace on the job.

15      Q.   If JR wanted to throw one of them off the

16  job, what was your responsibility?

17      A.   If he had a good reason, but nine out of

18  ten times he got rid of them.

19      Q.   Then what did you do?

20      A.   Nothing.

21      Q.   Would you get him someone else?

22      A.   Yes.  He went through a lot of people out

23  there.  Some of his own people that were working for

24  M.R.S. didn't like him too much, and a lot of them

FLYNN REPORTING ASSOCIATES

174

1    guys are gone, too.

2              MR. GROSSO:  Objection.  First of all,

3    there was no question before him, and how does he

4    know that M.R.S.'s own people didn't like M.R.S.  If

5    he says so, it's going to be hearsay.

6              ARBITRATOR ASHER:  There was no

7    question.  Sustained.  I'll disregard that.

8              CROSS-EXAMINATION OF ROBERT BUTLER

9    BY MR. GROSSO:

10    Q.  Mr. Butler --

11    A.  Yes.

12    Q.  -- you just said looking down this list

13    that a lot of people on this list are retired?

14    A.  Or retired.  I didn't say a lot are

15    retired.

16    Q.  Do you know how many on this list are

17    retired?

18    A.  No.  Just the names that I can pick out.

19    Q.  Going down the front page, how many names

20    can you pick out?

21    A.  Probably three.

22    Q.  On the first page?

23    A.  Yes.

24    Q.  How about the second page?

FLYNN REPORTING ASSOCIATES

175

1    A.    Nobody on that page.

2    Q.    So three out of these people were working

3    two years ago towards the end of their careers?

4    A.    Yes.

5    Q.    Do you know whether or not any of these

6    people had ever been trained on doing metal stud

7    installation and dense glass board?

8    A.    There's one guy that did retire I know

9    absolutely did -- Billy Chappell.

10    Q.    What is the training program at Local 17

11    for the metal siding work that you referred to?

12    A.    Metal roofs, metal siding.

13    Q.    Do you instruct Local 17 people on the

14    installation of light gauge metal studs and tracks

15    for the purpose of supporting either dense glass

16    board or gypsum board?

17    A.    No.

18    Q.    That's not part of your training, is it?

19    A.    No.  They go over it in the drawings and

20    architectural -- they touch on it.

21    Q.    But isn't it true that when the Sheet Metal

22    Workers' International refers to architectural metal

23    siding, they're talking about just the metal,

24    whether it's copper or some other form of metal --

FLYNN REPORTING ASSOCIATES

176

1    aluminum or steel or bronze -- that gets attached to

2    a building?  Isn't that what they're talking about?

3        A.    I can tell you with Local 17, yes.

4        Q.    That's what I'm asking you about.

5        A.    Yes.

6        Q.    So isn't it fair to say that when M.R.S.

7    came into town and asked you for significant amounts

8    of manpower, you didn't have manpower in Local 17

9    who were specifically trained to install metal studs

10   in tracks connected to clips on structural steel?

11       A.    They could learn it.

12       Q.    That was not my question.

13       A.    Did I have them?  They're Sheet Metal

14   Workers.

15       Q.    I would like an answer to my specific

16   question as to whether or not you had Local 17

17   members who were trained to install light gauge

18   metal stud framing in tracks connected to clips on

19   structural steel.

20       A.    I can't answer that one because I don't

21   know of their capabilities of doing studs.

22       Q.    You know whether Local 17 trained them,

23   don't you?

24       A.    I do.

FLYNN REPORTING ASSOCIATES

177

1     Q.    And did they train them to do that kind of

2    work?

3     A.    Not particularly, no.

4     Q.    You said there was a high turnover on this

5    job, you'd keep sending men over there and M.R.S.

6    kept sending them back?

7     A.    No.  They didn't send them back right away.

8    They'd work for a couple of weeks and then send them

9    back.

10    Q.    You said they had a lot of problems with

11    the guys?

12    A.    Yes -- attitudes towards different people,

13    yes.

14    Q.    Did they tell you why they were sending

15    these guys back?

16    A.    No, because in the beginning of a job we

17    said to Roland and we said to JR, If a guy wasn't

18    working out and holding his weight, you can do what

19    you want because that was stated in one of the first

20    meetings that we had.  If they were not happy with a

21    guy and they didn't want Local 17 to fire him, and

22    we didn't, so I just kept sending them another guy.

23    This was the early stage of the job, too.

24    Q.    You said that you had journeymen, but you

FLYNN REPORTING ASSOCIATES

178

1    didn't have any apprentices that you could send to

2    the M.R.S. job?

3        A.   I didn't say I didn't have any

4    apprentices.  I said I had to work hard to get them

5    apprentices.

6        Q.   Were you aware that this job was being

7    performed under the National Siding and Decking

8    Agreement?

9        A.   I was, yes.

10       Q.   Are you familiar with that agreement?

11       A.   I am now.

12       Q.   At the time that --

13       A.   I wasn't.

14       Q.   At that time that the Delta project was

15   built you were not familiar with it?

16       A.   No, because we never used it.  I never

17   worked under the agreement.

18       Q.   In 2003 and 2004 had Local 17 had a lot of

19   experience working under the National Siding and

20   Decking Agreement?

21       A.   I would say no, but I think we had one

22   other job, maybe Lymo did, but I'm not sure.  I

23   didn't cover that job, so I don't know.  As far as

24   I know, no.

FLYNN REPORTING ASSOCIATES

179

1       Q.   Except for maybe one Lymo job?

2       A.   Yes -- that I know of.

3       Q.   You were not familiar with the ratios in

4    that agreement that allow the contractor to do

5    siding work at less than the building trades' rate?

6       A.   I did when I took it over.  The first day I

7    got the job I did.  I went through the contract,

8    yes.

9       Q.   That's the first time you learned about it?

10      A.   Yes.

11      Q.   And I believe you testified and I'll tell

12   you that Mr. Bergantino has testified to it and

13   others have testified that Local 17 did not have any

14   specialty workers, did it?

15      A.   No, we don't have specialty workers.

16      Q.   Of any type?

17      A.   No.

18      Q.   You simply have building trades people?

19      A.   We have building trades and we have

20   production workers.

21      Q.   What are production workers?

22      A.   At a lower rate working in a production

23   shop.

24        Q.    So for outside work you have journeymen and

                    FLYNN REPORTING ASSOCIATES

                                                                    180

1    apprentices?

2        A.    Yes.

3        Q.    And for shops you have a production

4    classification?

5        A.    Yes.

6        Q.    But you do not have in Local 17 the

7    so-called specialty worker?

8        A.    Exactly, yes.

9        Q.    Were you aware once you told M.R.S. and/or

10   Crown Corr that you had no specialty workers, did

11   they ask you to supply them with a ratio of

12   journeymen and apprentices to try to bring the

13   overall labor costs down on this Delta project?

14       A.    Yes.

15       Q.    And you've already testified that you had

16   some trouble finding enough apprentices for this

17   job; correct?

18       A.    I did.

19       Q.    Did you ever meet the ratio?  Were you ever

20   able to give them the aero of journeymen to

21   apprentices that would bring the costs down?

22       A.    Looking at this list, I'm trying to count

23   how many apprentices, and this is going back three

24   years ago, but I think I did.

FLYNN REPORTING ASSOCIATES

181

1        Q.    You think you met the ratio?

2        A.    I never really checked the ratio.  I met

3    his demands.  When he called me for apprentices, I

4    gave him who I had, and he was happy.

5        Q.    Well, from your previous testimony you said

6    M.R.S. was never happy?

7        A.    Well, at that time he was after I got them

8    for him.

9        Q.    You said that you always had, and I think

10   this is your testimony -- I think you testified and

11   please correct me if I misstate your testimony, that

12   you always had enough people to send M.R.S. when

13   they called asking for men?

14       A.    Yes.

15       Q.    Not necessarily apprentices but you always

16   had enough people?

17       A.    Right.

18       Q.    So I correctly stated that.  I want to show

19   you what has been marked as Employer's Exhibit 10.

20   Have you ever seen that before?

21       A.    Yes.

22       Q.    That's an e-mail from John Pickford to you?

23      A.   Yes.

24      Q.   And in that e-mail is he complaining you

                    FLYNN REPORTING ASSOCIATES

                                                                182

1    are not supplying him with enough men?

2       A.   Yes.

3       Q.   But you just said you always had enough men

4    to send over there?

5       A.   I did.

6       Q.   Well, according to that e-mail --

7       A.   That was one time that the guys that I sent

8    didn't show up.  There was one time that that

9    happened.

10      Q.   Just that one day?

11      A.   One time.  Wait a minute.  I have to go

12   back and think about this.  This was when we started

13   communicating with John because this would be a time

14   when I called Roland and I called JR, and then John

15   got involved, but it might have been the one time,

16   but nine out of ten times I provided him with the

17   manpower.  I probably sent eight and three showed

18   up.

19      Q.   Right in front of you on the table is

20   Exhibit 7.  Do you see that?

21      A.   I do.  It's all on the same date.

22      Q.   What's the date of Exhibit 10?

23     A.   The 21st.

24     Q.   Of what?

                    FLYNN REPORTING ASSOCIATES


                                                            183


1      A.   October.

2      Q.   Of what year?

3      A.   2003.

4      Q.   What's the date of Exhibit 7?

5      A.   October 14th.

6      Q.   So it's a week before?

7      A.   Right.

8      Q.   Does that show you as being present at a

9  meeting at the site?

10     A.   Yes.

11     Q.   Were there discussions on October 14th

12 about not getting sufficient manpower on the

13 project?

14     A.   That's what it says in the minutes, yes.

15     Q.   So on the 14th everybody was complaining

16 about not getting enough manpower?

17     A.   That was the apprentices.

18     Q.   And on the 21st again is this complaint to

19 you that you were not getting enough manpower on the

20 project?

21     A.   He got the manpower.

22    Q.   Well, don't those two documents --

23    A.   I don't care what this says because I would

24    call Roland and Roland would tell me one thing and

FLYNN REPORTING ASSOCIATES

184

1    he would tell me that John Pickford is not running

2    his job and JR would tell me the same thing.  That

3    was a problem I had.  I had three people telling me

4    how many guys they needed.

5    Q.   In response to one of Mr. Kelly's questions

6    you said that you permitted four or five Iron

7    Workers to go on M.R.S.'s payroll to do welding for

8    a couple of weeks until you could replace them with

9    Local 17 welders; is that true?

10    A.   Yes.

11    Q.   But did you ever permit M.R.S. to use Iron

12    Workers or Union Carpenters to supplement your

13    Local 17 people on the erection of the stud and

14    dense glass board panels?

15    A.   That wouldn't be a decision I could make.

16    Q.   Who could make that decision?

17    A.   The business manager.

18    Q.   And that was Mr. Bergantino?

19    A.   Yes.

20    Q.   Did he ever tell you in words or substance

21    that you were never to allow Carpenters or Iron

22    Workers to work in a composite crew with Local 17

23    people putting up those walls?

24        A.    I don't remember him saying that to me, but

FLYNN REPORTING ASSOCIATES

185

1    the job was going to be done by Sheet Metal Workers.

2    I don't remember him saying that to me.

3        Q.    Do you remember him saying it to anybody at

4    M.R.S.?

5        A.    I don't know.

6            MR. GROSSO:    No further questions.

7            ARBITRATOR ASHER:    Sir, Local 17's

8    application was to provide skilled workers?

9        A.    Yes.

10           ARBITRATOR ASHER:    For instance, as

11   far as the installation of the studs and tracks,

12   what did Local 17 do, if anything, to ensure workers

13   were skilled in that work?

14       A.    Well, we had this discussion way before the

15   job started.  We talked about -- Roland said -- I

16   don't know it was Roland or JR -- it's going to be

17   hands-on.  Once a Sheet Metal Worker, he's a Sheet

18   Metal Worker, and he can pretty much do anything.

19   Laying out the walls.  He had 18 of his own guys on

20   the job that could do that work, have done that type

21   of work.  They were Sheet Metal Workers, and they

22   would put them with guys who knew what they were

23   doing and they'd follow right along with them, so I

24   think they might have had upwards of maybe 20 of

FLYNN REPORTING ASSOCIATES

186

1    their own guys at one time and maybe even more.

2              ARBITRATOR ASHER:  Did you personally

3    consider it something that needed separate training

4    before they got to the job site?

5    A.   Not really, no, because the job happened so

6    fast.

7              ARBITRATOR ASHER:  Was there a

8    difference in the skills required, in your opinion,

9    for the installation of the studs and the sheet as

10   opposed to the exterior wall panels?

11   A.   Yes.  Sheetrock is Sheetrock.  There is a

12   little bit of a difference.

13             ARBITRATOR ASHER:  What is the

14   difference?

15   A.   You're doing studs all day versus putting a

16   panel up.  It takes more time and you have to lay

17   out the wall through a laser and put the studs up

18   and then Sheetrock it.  It's different from what we

19   usually do in the past, absolutely, but other locals

20   probably train to do that.  I don't know.

21          ARBITRATOR ASHER:  What about the

22    differences in skills between attaching the

23    Sheetrock, glass panel, vapor barrier, compared with

24    putting the metal up?


FLYNN REPORTING ASSOCIATES


187


1     A.   It's the same application pretty much.

2     You're putting a piece of Sheetrock on with screws

3     and then you're putting rubber over it.  You're

4     right there on the staging.

5          ARBITRATOR ASHER:  Did Local 17 ever

6     consider filing a grievance against the large number

7     of workers that were being terminated or laid off?

8     A.   No, because that was a deal that we made.

9     We said, If you don't like the guy -- I fought for a

10    couple that I knew that just didn't get along, but,

11    for the most part, no.  If he didn't want them, he

12    didn't want them.

13         ARBITRATOR ASHER:  Was it your

14    interpretation of the contract that the employer was

15    free to terminate?

16    A.   Yes, absolutely.  On any given day a

17    contractor can let people go.  We don't go out there

18    fight them because they can do that.  That's the way

19    it is.  They have the right to refuse anybody, so we

20    didn't hold them to that.  If the guy wasn't working

21    out or had a bad attitude, send him on his way.

22              ARBITRATOR ASHER:  That's all I have.

23              MR. ANDERSON:  Nothing further.

24              (Short recess taken.)

                FLYNN REPORTING ASSOCIATES


                                                    188


1              DANIEL PASQUINUCCI, sworn.

2              DIRECT EXAMINATION OF DANIEL PASQUINUCCI

3    BY MR. ANDERSON:

4        Q.    Mr. Pasquinucci, by whom are you employed?

5        A.    Sheet Metal Workers' International

6    Association.

7        Q.    What is your job there?

8        A.    International representative.

9        Q.    How long have you worked for the

10   Sheet Metal Workers' International Association?

11       A.    Fifteen years this September.  Going on

12   16 years next month.

13       Q.    In the course of your duties did you ever

14   have any work that was connected to the Terminal A

15   job at Logan Airport?

16       A.    Yes.

17       Q.    And what was your first contact with the

18   Terminal A job?

19       A.    There was a meeting in April of -- I think

20    it might have been 2002.

21        Q.    2003; would that sound right?

22        A.    Yes, 2003.  It was at a restaurant in

23    Washington, D.C.

24        Q.    Was there a time when you ever assumed any

FLYNN REPORTING ASSOCIATES

189

1     responsibilities on behalf of the International for

2     assisting with that project?

3         A.    No, no different than any other project.

4         Q.    But was there a time when you came to

5     Boston to work on that project?

6         A.    I had visited that project, yes.

7         Q.    Let me show you what has been marked as

8     Employer's Exhibit Number 7, and take your time to

9     take a look at that.  This is a memo written by --

10        A.    Let me back up and you can ask me a

11    question.  Now that I see this, Back in late June or

12    early July of that year I had a jurisdictional

13    meeting, and I believe it was in this hotel at the

14    airport, either here or at the Hyatt, with the

15    Carpenters over jurisdiction of this job, which was

16    part of my duties.  Since I was here hotel, that job

17    obviously was out of the ground with construction,

18    so we would have met him here in the hotel which was

19    normal, and we met with the Carpenters'

20    representative who they designated from their

21    International, he business manager from this Local,

22    the business agent, and myself over jurisdiction.

23        Q.    Was that before or after M.R.S. began work

24    on the Terminal A job?

FLYNN REPORTING ASSOCIATES

190

 1        A.    I'm not sure.  Probably before on or about.

 2        Q.    Let me focus you back on this document,

 3    Employer's Exhibit Number 7.

 4        A.    Uh-huh.

 5        Q.    It lists you as one of the recipients.  Do

 6    you recall getting that memo?  Actually, let me

 7    withdraw that question.  The memo describes a

 8    meeting that took place with John Pickford and

 9    representatives of the International, Local 17, and

10    M.R.S.; right?

11        A.    Right.

12        Q.    Do you remember that meeting?

13        A.    Yes.

14        Q.    And would it be correct to say that was

15    sometime around October 14th?

16        A.    Yes, to the best of my recollection, it was

17    around that time.

18        Q.    And you were in Boston for that meeting?

19    A.    Yes.

20    Q.    Do you remember when you were first in

21  Boston to deal with the M.R.S. Terminal A project

22  after it began?

23    A.    Probably that day.

24    Q.    Now, what was discussed at that

FLYNN REPORTING ASSOCIATES

191

1  October 14th meeting, if you remember?

2              MR. GROSSO:  Does he remember, or can

3  he read the minutes?

4              MR. ANDERSON:  He can read the minutes

5  to refresh his recollection.

6    A.    I guess this is a clear recollection of

7  what was discussed.

8    Q.    The memo is an accurate summary of what was

9  discussed at the meeting?

10    A.    Yes.  There are some omissions, as I

11  remember.

12    Q.    As you remember, what was omitted?

13    A.    M.R.S. complaining about the shop steward's

14  duties -- little complaints that they may have had.

15  What his duties were, as I recall.  I remember a

16  meeting about that.  Whether it was that particular

17  meeting or not, I don't recall.

18     Q.   Do you remember M.R.S. or Crown Corr saying

19   that the men referred by Local 17 were not being

20   referred in sufficient numbers?

21     A.   No, not really.  My best recollection is

22   that were they able to or were they going to be able

23   to supply the amount of men that was needed and

24   trained.

FLYNN REPORTING ASSOCIATES

192

1      Q.   Were there concerns in particular about

2    whether Local 17 was supplying enough men?

3      A.   No, not at that meeting, no.

4      Q.   Did concerns about that come up later on?

5      A.   Not that I directly got a complaint from

6    M.R.S., no.

7      Q.   Let me show you Union Exhibit 1.  That's an

8    e-mail from John Pickford saying that they needed

9    welders.  Do you recall Mr. Pickford saying that he

10   might have to bring welders in from the Iron

11   Workers?

12     A.   Yes.  Well, I don't know whether he

13   actually said what he's saying there.  My

14   recollection of that was that Local 17 complained to

15   me that on such a short notice -- their call was on

16   a Friday afternoon and to have ten men show up on

17   Monday morning and it was putting them in a lousy

18    situation.  Their take was that M.R.S. was putting

19    them into a position where he didn't give them

20    enough time to supply the manpower.

21        Q.   When you say "manpower," are you talking

22    about the welders?

23        A.   Whatever they were asking for.  They asked

24    for ten men on short notice is what their complaint

FLYNN REPORTING ASSOCIATES

193

1    was.

2        Q.   Let me show you Union Exhibit Number 2.

3    That's an e-mail from John Pickford to a series of

4    people, including you, saying that if Local 17 can't

5    supply men in the future that he will --

6        A.   This is from me?

7        Q.   No, no, no.  From John Pickford.

8        A.   At the top it says "from."

9        Q.   Right.  That is you forwarding it to Benny

10    Hernandez.  I'm talking about the message underneath

11    that.

12        A.   Okay.

13        Q.   So my question is, Do you recall a time

14    when Crown Corr had the Iron Workers Local 7 send

15    members to the Terminal A job?

16        A.   Local 7?

17    Q.   Yes.

18    A.   I wouldn't recall whether it would be

19  Local 7.

20    Q.   Well, Iron Workers from any local.

21    A.   Yes.  Our position with any of this is, If

22  we can't supply manpower, he has a right to get them

23  from anywhere.

24    Q.   And that would include the Iron Workers?

FLYNN REPORTING ASSOCIATES

194

1    A.   Yes.

2    Q.   Did the International ever file a grievance

3  about the use of Iron Workers on that job?

4    A.   Not to my knowledge.

5    Q.   Did you do anything on behalf of the

6  International to make sure that there was manpower

7  available to staff that job?

8    A.   Did I do anything?

9    Q.   Yes.

10    A.   No.  I might have had conversations with

11  people about how to handle it, but I did not do

12  anything.

13    Q.   Who did you talk to about manpower on that

14  job?

15    A.   Pickford, JR from M.R.S., Butler,

16  Bergantino or just anyone.  If they're Union, we are

17    required to get the manpower.  I did speak, for

18    continuity, requested to JR and to Pickford that the

19    situation could be helped if he needed ten people,

20    don't call on Friday afternoon for ten people on

21    Monday morning.  That puts the Union in a very

22    difficult situation.

23        Q.   How long did you have responsibility for

24    the Terminal A job on behalf of the International?

FLYNN REPORTING ASSOCIATES

195

1         A.   Responsibility in the sense that I'm the

2    International representative that services Local 19.

3         Q.   Local 19?

4         A.   I mean, Local 17.  I'm sorry.  Local 28,

5    New York.  I'm the Union representative for this

6    region of the country.

7         Q.   How long was it the case that you were in

8    Boston looking at this job?

9         A.   What do you mean?

10        Q.   Was there a time when Jim Neary came in

11    from the International to work on this?

12        A.   Yes.

13        Q.   When Jim Neary came in, did he essentially

14    take over the responsibility for that job?

15        A.   Yes.  More or less, it was suggested that

16    Jimmy, along with his other duties, certainly

17    doesn't work for me.  He works for the

18    International, but I suggested that the complaints

19    were coming and we needed somebody to concentrate.

20    I didn't have the time to look at one job.

21        Q.    Because you had responsibilities for the

22    broader area?

23        A.    Yes.

24            MR. ANDERSON:  That's all I have.

                    FLYNN REPORTING ASSOCIATES

                                                        196

1            CROSS-EXAMINATION OF DANIEL PASQUINUCCI

2    BY MR. GROSSO:

3        Q.    Mr. Pasquinucci, how much involvement did

4    you have with this Delta Terminal A project as the

5    International representative for the Sheet Metal

6    Workers?

7        A.    Involvement?

8        Q.    How often were you here?

9        A.    If I had an occasion to come to Boston, I

10    concentrated on it and I made sure -- I recall

11    coming to Boston sometime -- I remember specifically

12    I called JR and I had his phone number to see if

13    everything was going right and I would check with

14    him from time to time, but maybe one or two visits

15    that -- I remember this visit that was before with

16    Nigro.  We went to the site.  I remember coming here

17    to the hotel specifically, but if I came, I might

18    have had a jurisdictional dispute with the Roofers

19    or another craft, and I made sure of the magnitude

20    to stop by see if everything was okay, so I did make

21    visits but not specifically for that.

22        Q.   So you were here before the job even

23    started to resolve that dispute between the

24    Carpenters and the Sheet Metal Workers before the


                    FLYNN REPORTING ASSOCIATES


                                                        197


 1    Impartial Jurisdictional Dispute Board?

 2        A.   Yes.

 3        Q.   Is that the meeting you had here in the

 4    hotel?

 5        A.   I honestly and truly can't recall whether

 6    it was here or at the Hyatt.

 7        Q.   It was a hotel in Boston?

 8        A.   Yes, it was.

 9        Q.   The Sheet Metal Workers prevailed on that

10    challenge; right?  You got the assignment?

11        A.   Yes.

12        Q.   So except for that meeting, the meeting of

13    October 14th that shows you in attendance, and

14    occasionally coming here to settle other

15    jurisdictional disputes that arose with other trades

16    and phone calls to JR, that was the extent of your

17    involvement on this project?

18         A.    Or Pickford.

19         Q.    Telephone calls or e-mails?

20         A.    I'm not big on e-mails, but, yes.

21         Q.    Did you try to assist Local 17 or

22    John Pickford at Crown Corr or Roland Levesque at

23    M.R.S. in obtaining qualified, skilled Sheet Metal

24    Workers for this project, specifically that

                    FLYNN REPORTING ASSOCIATES


                                                           198


1     function?  Did you try to help them get qualified

2     Sheet Metal Workers for this job?

3          A.    Only in the fact as to say that they were

4     available if they needed them.

5          Q.    From where?  From what source?

6          A.    From Crown Corr.  In fairness, the players

7     that are in Crown Corr does work nationally or even

8     M.R.S., it would be my opinion and it would be

9     common knowledge that when you need manpower, that

10    you could call around.  According to the agreement,

11    Crown Corr, which is an Indiana employer, could

12    bring in their own people.  They had just completed

13    a job in Philadelphia.  It may have even been going.

14    It was one of the stadiums there, and they had

15    plenty of people down there who were unemployed and

16    they could have certainly and they may have brought

17    people in from Philadelphia, so there was severe

18    unemployment in all the surrounding areas of where

19    they could have gotten qualified manpower who had

20    previously been in the employ of Crown Corr.  I

21    can't specifically say for M.R.S., but Local 40 had

22    unemployment, and then Local 17 could supply them

23    with their manpower and they could have brought in

24    Local 40 members, which they did.

FLYNN REPORTING ASSOCIATES

199

1      Q.   So it's your position that the resources

2    available to supply Crown Corr or M.R.S. with

3    qualified Sheet Metal Workers was Crown Corr or

4    M.R.S. using their own employees either from

5    Pennsylvania or from Indiana or from Detroit or from

6    Connecticut?  The resources were there own

7    employees?

8      A.   No.  Their resources were that they could

9    have had -- some of their own employees, they had a

10    right to bring them in.  By contract, if we can't

11    supply manpower within 48 hours, they had the right

12    to get them from other sources.

13      Q.   But if I understand your answer correctly

14    and correct me if I misstate this, When I asked you

15    from what resources, you said Crown Corr is a

16    nationwide company and they had a big job in

17    Philadelphia and they had people out of work there

18    and they could bring their own people from those

19    locations to here?

20        A.    That's not what I meant.  What I meant was

21    Crown Corr was in the process I believe of

22    completing or had just completed a large job in

23    Philadelphia.  I don't know if it was the baseball

24    stadium and the football stadium, a much larger

                    FLYNN REPORTING ASSOCIATES


                                                        200


1    project I believe than may have been Logan.  At

2    least manpower-wise, I think it was larger, and

3    Local 19 had severe unemployment and certainly they

4    could call Local 19 and they would be able to supply

5    them with manpower if Local 17 could not supply

6    them.

7        Q.    Did you undertake any efforts to call

8    Local 19 to get manpower to supplement Local 17 --

9    you personally?

10        A.    No.

11        Q.    Did you call the Local in Indiana?

12        A.    No.

13        Q.    Detroit?

14     A.    No.

15     Q.    Washington?

16     A.    No.

17     Q.    Seattle, Washington?

18     A.    No.

19     Q.    So you didn't personally take any

20   initiative to bolster the supply of people that

21   Local 17 had here to man this project -- you

22   personally didn't do anything?

23     A.    Except to -- I did try to monitor through

24   my position with the International through Pickford

FLYNN REPORTING ASSOCIATES

201

1    or JR if they needed someone above and above that

2    Local 17 wasn't supplying -- I mean there was

3    manpower that would have been available that they

4    could have gotten if they chose not to hire Iron

5    Workers after their 48 hours.  What I was trying to

6    avoid was a conflict.  I believe one of these

7    e-mails even alludes to the fact, Don't call me late

8    Friday afternoon and try to get people here on

9    Monday morning.  That's almost like saying, We

10   really don't want you to get these people.  I was

11   trying to be a mediator to make sure that the job

12   ran smooth just like any -- which is my job to do.

13      Q.   Are you familiar with the International

14   training program for Sheet Metal Workers?

15      A.   Yes.  It's called the ITI.

16      Q.   Do you know if the ITI has a program that

17   teaches Sheet Metal Workers how to install light

18   gauge metal stud framing into tracks which connect

19   to structural steel columns that receive dense glass

20   insulation board or gypsum board similar to a

21   drywall setup?

22      A.   No, I can't honestly say that I know that

23   would be in their curriculum.  I'm familiar

24   somewhat, I can't honestly say that would be that

FLYNN REPORTING ASSOCIATES

202

1   specific duty, no.  It may be, but I have no

2   knowledge of that.

3           MR. GROSSO:  No further questions.

4           CROSS-EXAMINATION OF DANIEL PASQUINUCCI

5   BY MR. KELLY:

6      Q.   Dan, you mentioned earlier a meeting at a

7   restaurant in April of 2003?

8      A.   Yes.

9      Q.   Do you remember that?

10      A.   Yes.

11      Q.   Do you remember if there was any discussion

12   at that meeting about whether Local 17 has members

13    that are called specialty workers?

14         A.    Yes.

15         Q.    What was the discussion that you recall?

16         A.    Local 17 I believe replied that they do not

17    have specialty workers.  To be honest with you, to

18    this day I'm not sure if they do have specialty

19    workers.  I don't know that that's a requirement

20    that they do by their collective bargaining

21    agreement, but I do know that they didn't have

22    specialty workers, and the International's position

23    was that if you don't have them, you're going to

24    supply labor to Crown Corr because I believe at that

FLYNN REPORTING ASSOCIATES

203

1    time it was Crown Corr who had the job, and you will

2    supply to Crown Corr as per live up to our end of

3    the International agreement to compensate for, for

4    lack of a better word, the contract, and if you said

5    I believe there were either first-year apprentices,

6    there would be apprentices to compensate or

7    specialty workers, but they didn't have them, and

8    our position was contractually we live up to the

9    agreement, and I believe that when the job was

10    underway, as the manpower component grew, the

11    requirements of the job there were specialty workers

12    on the job.  Whether they came from Local 40

13    specialty workers or Local 20, Local 17, I am not

14    sure still to this day as we speak by their

15    collective bargaining agreement, which is a separate

16    agreement from the National Siding and Decking

17    Agreement, which that job was worked under they

18    probably -- unless it's changed and I don't believe

19    they have specialty workers as we speak, but their

20    collective bargaining agreement doesn't call for

21    specialty at this workers, and that's not -- there

22    are other local unions in the area that I cover that

23    don't have specialty workers by their collective

24    bargaining agreement, so that's not unique to

FLYNN REPORTING ASSOCIATES

204

1    Local 17.

2        Q.   That was clear at the April 2003 meeting?

3        A.   As far as I was concerned, it was clear.

4        Q.   And Crown Corr was at that meeting?

5        A.   Yes.

6             MR. KELLY:  That's all I have.

7             RECROSS-EXAMINATION OF DANIEL PASQUINUCCI

8    BY MR. GROSSO:

9        Q.   To follow up on those last questions, at

10    this meeting in April in Washington, D.C. it was

11    determined that Crown Corr was going to make the

12    assignment to the Sheet Metal Workers to perform the

13    work on the Delta project under the National Siding

14    and Decking Agreement; is that true?

15         A.   It was clear at that meeting that Crown

16    Corr was the contractor awarded the job, and, yes,

17    there was a sheet of paper and whether we received

18    it at that meeting, but something came out prior to

19    from Crown Corr with the work assignment, and I did

20    receive that.  Whether I received it at that meeting

21    that particular day or afterwards which explained

22    the scope of work that was the job assignment,

23    whether I received it there or not, and that

24    assignment that went to the general contractor and

FLYNN REPORTING ASSOCIATES

205

1    went to the Local unions is what triggered that

2    meeting that I said I had in July that I wound up

3    with the Carpenters over a jurisdictional dispute.

4    The Carpenters dispute the work assignment from

5    Crown Corr.

6         Q.   But at the meeting that you were in

7    attendance, it was clear at that meeting that

8    Crown Corr intended to do all of this work with

9    Sheet Metal Workers?

10         A.   Yes.

11      Q.    Was Mr. Sullivan present at that meeting?

12      A.    In April?

13      Q.    Yes.

14      A.    Yes, he was.

15      Q.    You said that not notwithstanding the fact

16   that Local 17 had no specialty workers, the

17   International told Local 17 to supply Crown Corr,

18   that's who you thought was going to do the job at

19   the time, with skilled journeymen and apprentices to

20   do the work?  Was that your testimony?

21      A.    Can you rephrase that?

22      Q.    Notwithstanding the fact that Local 17 did

23   not have specialty workers, Mr. Sullivan told

24   Mr. Bergantino, the business manager of Local 17,

FLYNN REPORTING ASSOCIATES

206

1   that he was to supply journeymen and apprentices to

2   Crown Corr to perform the work on the Logan job?

3      A.    To my recollection, the general president

4   said that that agreement, the job site will be

5   worked, we will live up to the provisions of the

6   National Siding and Decking Agreement, which do

7   include specialty workers, I believe.  It might have

8   come out that Local 17 doesn't have specialty

9   workers.

10      Q.    Did the general president explain how the

11    International was going to live up to its

12    obligations under the National Siding and Decking

13    Agreement knowing that Local 17 did not have

14    specialty workers?

15        A.    No.    The general president said that we

16    will live up to that agreement.    I believe there

17    might have been a side bar conversation that might

18    have taken place from Joe Bergantino to Crown Corr

19    and/or M.R.S..    It was kind of like side bar.    We

20    were sitting at a long table, but there might have

21    been a side bar conversation saying that, I don't

22    have specialty workers, but I'll make sure you get

23    low cost -- if I can't get you specialty workers,

24    you can bring your own in or I will get you first-

FLYNN REPORTING ASSOCIATES

207

1    or second-year apprentices that would be a

2    comparable labor price.    My take on specialty

3    workers is to make us competitive with the other

4    crafts who bid this work, such as Carpenters and

5    Iron Workers, mainly Carpenters, where it would

6    allow someone to be competitive as the price to

7    specialty workers are not journeymen and they're not

8    graduate apprentices.    They're trained and they can

9    be hired from the street.    It could be you or I, and

10    I honest and truly don't have any experience doing

11    that work, but I could be hired and I would train as

12    a specialty worker at a lesser rate than a building

13    trades journeyman to work along with a building

14    trades journeyman to be trained.  That's what a

15    first-year apprentice does or a second-year

16    apprentice.  They're new employees who are brought

17    in to be trained at the skill.  They had agreed they

18    would supply manpower, and I believe --

19        Q.   Let me stop you there.  You said "they

20    agreed."  Who do you mean?  Who is "they?"

21        A.   Local 17 said that -- it was kind of -- I

22    believe M.R.S. was in that, again, side bar, and it

23    might have been M.R.S. and Crown Corr and the people

24    of Local 17 that were there.  Joe Bergantino, the

FLYNN REPORTING ASSOCIATES

208

1    then business manager, and Fred Creeger (phonetic),

2    a business agent, were at that meeting, and they had

3    agreed that if they couldn't get specialty workers,

4    we will get you apprentices, and if we can't, then

5    you get your own specialty workers, and we'll live

6    up to -- you know, it was understood that they would

7    live up to the terms of the agreement.

8        Q.   Did the International offer to assist

9    Local 17 in providing skilled Sheet Metal Workers

10    from other areas of the country if Local 17 could

11    not meet the demands for this job?

12        A.    We had that provision with the

13    International.

14        Q.    But specifically at this meeting, were

15    words to that effect stated by anybody from the

16    International?

17        A.    Just that we were going to live up to the

18    terms of the agreement which said, In 48 hours the

19    agreement says that if the local union can't supply

20    members, qualified manpower, the employer can get

21    them anywhere they want where they wish, so it's

22    understood or I understood that if Local 17 could

23    not supply manpower, we called the job bank and we'd

24    get men from other areas, other resources, and, if

FLYNN REPORTING ASSOCIATES

209

1    not, then the employer certainly would have a right

2    to bring in Iron Workers, Carpenters, or anybody

3    else they had in their employ.

4        Q.    After you saw these e-mails from

5    Mr. Pickford, and you said you were a recipient of

6    these e-mails, did you take it upon yourself as the

7    International representative for this region to call

8    the job bank and see if they had people available to

9    send to this project?

10    A.    No.

11    Q.    Did you ever do that?

12    A.    No.

13         MR. GROSSO:  No further questions.

14         MR. ANDERSON:  Nothing further.

15    RECROSS-EXAMINATION OF DANIEL PASQUINUCCI

16  BY MR. KELLY:

17    Q.    Is it accurate that in order for the job

18  bank to supply workers, the employer has to

19  guarantee them 30 days' employment?

20    A.    There is a requirement for length of time.

21  The job bank, and I'm sorry if I can't answer you

22  directly.  If you're saying it could be 30 days.

23  It's not like one of these things, We need a

24  certified welder for three days.  I'm not very good

FLYNN REPORTING ASSOCIATES

210

1  at e-mails.  When there are calls from the job bank,

2  I along with the other International representatives

3  see them where they might need a CAD draftsman and

4  it will describe, but it's not one of these things

5  where someone could go to Detroit for three days for

6  a CAD draftsman.  There is some kind of time to it

7  because there are travel rewards that you get.  We

8  have a program called SASMI.  SASMI is a

9    stabilization agreement with the sheet metal

10   industry where you will get travel money to go to a

11   site as a setup.  It's per a collective bargaining

12   agreement, so it would say that the job is for

13   30 days and it may be a ten-hour job with overtime

14   or working presently seven days a week, and it will

15   describe what the job will be.

16        Q.    Two aspects of the question that I am

17   interested in.  Is there some period of time, if

18   it's not 30 days, is there some period of time that

19   is a minimum that you have to have in order to call

20   on the job bank?

21        A.    To my knowledge, yes.

22        Q.    Is it something that is unilaterally

23   accessed by the Union or does there have to be

24   employer involvement in the request?

                    FLYNN REPORTING ASSOCIATES

                                                        211

1         A.    Yes.  The employer has to guarantee the

2    employment for that period of time, to my knowledge.

3         Q.    That's what I thought, but I wanted to

4    confirm it.

5         A.    Yes.  I just saw something pretty nice for

6    Hawaii and they wanted a CAD draftsman who would be

7    there for a certain period of time.

8      Q.   Do they want a lawyer?

9      A.   It's nice because it was there, but it's

10   the Local and the company where you would go, so you

11   would contact the Local.

12     Q.   Thank you, sir.

13             (Short recess taken.)

14             JAMES NEARY, sworn.

15             DIRECT EXAMINATION OF JAMES NEARY

16   BY MR. ANDERSON:

17     Q.   Mr. Neary, by whom are you employed now?

18     A.   I'm retired.

19     Q.   Before you retired who employed you?

20     A.   Sheet Metal Workers' International

21   Association.

22     Q.   In what capacity?

23     A.   As an International rep.

24     Q.   Now, did there come a time when you assume

FLYNN REPORTING ASSOCIATES

212

1    some responsibilities on behalf of the International

2    to look over the Terminal A job at Logan Airport?

3      A.   I was given the assignment, and I think it

4    was on or about December 3, 2003.  My assignment

5    would be to stay until I retired at Logan Airport on

6    a daily basis.

7      Q.   Did you, in fact, stay at Logan Airport on

8    a daily basis as of December 3rd?

9        A.   Yes, I did.

10       Q.   What were you supposed to be doing day to

11   day at Logan Airport?

12       A.   Monitoring the contractors on the job, the

13   local union involved or unions in some cases, and

14   just checking to make sure the progress was where it

15   was supposed to be.

16       Q.   At the time you began work in December of

17   2003 were you aware of any problems concerning

18   manpower and staffing on that job?

19       A.   There was a multitude of problems on the

20   job with regard to manpower both with Crown Corr and

21   M.R.S.

22       Q.   Can you describe what those problems were?

23       A.   Just the regular, normal whenever you have

24   a large job, there are always normal problems --

FLYNN REPORTING ASSOCIATES

213

1    anywhere from people not showing up on the job to

2    people having personal conflicts and things of that

3    nature.

4        Q.   And what did you do as International

5    representative to help deal with problems like that?

6        A.   I tried on a daily basis to meet with all

7    the parties concerned from M.R.S. to Crown Corr and

8    made my presence known by walking the job so

9    everyone could see I was on the job doing those

10   types of things.

11       Q.   What people did you meet with from M.R.S.?

12       A.   Roland.  He had a gentleman, whose name

13   escapes me, at the time who took a lot of the

14   information off the prints and things of that

15   nature.

16       Q.   Was this an older gentleman?

17       A.   Yes.  And Mr. Francis or --

18       Q.   LaFrancois?

19       A.   Yes.

20       Q.   Otherwise known as JR?

21       A.   Yes, JR.  And also with Pickford from Crown

22   Corr, Jim Cardillo from Crown Corr, meetings to find

23   out if there were any problems, trying to eliminate

24   any problems in the future.


FLYNN REPORTING ASSOCIATES


214


1        Q.   What, if anything, did you do on behalf of

2    the International to eliminate problems in the

3    future?

4        A.   Well, we tried to keep the manpower up.  If

5    they were going to have a layoff or doing anything

6    of that nature, I wanted to know about it to make

7    sure that we could use the people -- that if Crown

8    Corr was laying somebody off, maybe M.R.S. wanted

9    someone or things of that nature.  Just trying to

10   promote harmony on the job between Crown Corr,

11   M.R.S., the general contractor, the architect --

12   anywhere there was a problem we tried to eliminate

13   it.

14       Q.   When did you retire?

15       A.   March 1, 2004.

16       Q.   At the time you retired on March 1st was

17   there the same degree of problems on the job that

18   there were when you took over on December 3rd of

19   2003?

20       A.   Absolutely not.

21       Q.   How was it different?

22       A.   Well, there was a better harmony, from what

23   I understand.  From what one of the Crown Corr

24   people told me, once I was on the job for a few

                    FLYNN REPORTING ASSOCIATES

                                                            215

1    weeks, things seemed to go better, not only with

2    manpower but friction and things of that nature, and

3    by the time I got through in late February or

4    March 1st actually, everything seemed to be running

5    smoothly.  We didn't have any problems.  There

6    wasn't anybody complaining about any contractors

7    that were not on time with their work -- things of

8    that nature.

9        Q.   Did you do anything to help get Sheet Metal

10   Workers in working on the job during that time

11   period?

12       A.   Well, actually, when they wanted somebody,

13   they could have gone through me, but a lot of times

14   they would go right to Local 17.

15       Q.   When you say "they," who are you talking

16   about?

17       A.   The contractors -- Crown Corr and M.R.S.

18       Q.   Do you know whether Crown Corr and M.R.S.

19   got Sheet Metal Workers from outside the Boston

20   area?

21       A.   They had people from outside the Boston

22   area.  They had people from Local 40.  They had

23   people from I think the Detroit Local.  I think they

24   had a couple of Iron Workers on the job.  There may

FLYNN REPORTING ASSOCIATES

216

1    have been people -- as a matter of fact, there were

2    people also from Maine, which is part of Local 17,

3    incidentally.

4              MR. ANDERSON:  That's all I have.

5              CROSS-EXAMINATION OF JAMES NEARY

6  BY MR. GROSSO:

7      Q.   Mr. Neary, you were then on the job about

8  three months?

9      A.   Yes.

10     Q.   You started in December of 2003, and you

11  retired on March 1, 2004?

12     A.   Yes.

13     Q.   So you were there for December, January,

14  and February?

15     A.   Yes.

16     Q.   Did you have any involvement on the project

17  prior to December of 2003?

18     A.   I don't think so, no.

19     Q.   So you were not there in September,

20  October, and November when there were issues about

21  manpower on the project?

22     A.   No.

23     Q.   The three months that you were there, did

24  you hear of any complaints by M.R.S. about either

FLYNN REPORTING ASSOCIATES

217

1  sufficient numbers of people on the job or people

2  not showing up for work because you were there in

3  the winter months of December, January, and

4  February?

5    A.   Yes.

6    Q.   You did hear such complaints?

7    A.   Just the normal complaints that you have on

8    every large job of people not showing up when the

9    weather was too cold.  There was one particular day

10   when there was a snowstorm and whatnot, and it was

11   so bad that people couldn't work.  Those are the

12   normal types of complaints, yes.

13   Q.   Aside from snowstorm days, when jobs

14   typically get shut down anyway, just regular cold

15   winter days, did you receive complaints from M.R.S.

16   that people who were on their payroll were not

17   showing up for work?

18   A.   I don't recall anything of major

19   proportions.  He may have said something offhand.

20   He didn't put it to me as a grievance or anything of

21   that nature -- some guys didn't show up today or

22   that type of thing.

23   Q.   When you were on this project during those

24   three months, where were you physically?

FLYNN REPORTING ASSOCIATES

218

1    A.   On the project I was actually walking

2    around the project.  I tried to have meetings and

3    let my presence be known.  There was a large

4    building on one side and on the east side there was

5    another building, and I was walking through those

6    buildings.

7        Q.   So you would periodically actually patrol

8    the site?

9        A.   Yes.

10       Q.   Or you were in somebody's trailer?

11       A.   In M.R.S.'s or Crown Corr's trailer, yes.

12       Q.   Was Crown Corr actually working on the

13   site?

14       A.   Yes.

15       Q.   As Crown Corr?

16       A.   As Crown Corr, as far as I know, yes.

17       Q.   Did you see a company called CCL?

18       A.   CCL --

19       Q.   No?

20       A.   The only people that I knew were from

21   Crown Corr.

22       Q.   Okay.  I think Mr. Anderson asked you if

23   you assisted either Local 17 or M.R.S. in augmenting

24   the work force on the project, and I think your

                    FLYNN REPORTING ASSOCIATES

                                                          219

1    answer was they just went straight to Local 17.  Is

2    that correct?

3        A.   Yes.  Sometimes there was discussion

4      between Crown Corr and M.R.S., as far as I was

5      somewhat familiar with it.  There were some

6      discussions with me with regard to, If we need

7      people in the future, can you get people from other

8      parts, and I said, Yes, we can.  Give me sufficient

9      notice and I'll do whatever I can.  If you give me a

10     date and tell me how many people you need, I'll do

11     whatever I can do get as many people as you need.

12          Q.   Did you ever do that?  Did you ever call

13     around to get people to the site?

14          A.   That's kind of vague.  I think we did to

15     some degree.  I think we put out a call at one

16     time.  I might have talked to Benny Hernandez about

17     that, but we always had the option that if we

18     couldn't supply people, M.R.S. could work something

19     out like they did in my local union and bring people

20     in themselves.

21          Q.   Speaking your of your local union, prior to

22     you becoming an International representative were

23     you the business manager for Local 40?

24          A.   Yes, I was.

                    FLYNN REPORTING ASSOCIATES

                                                          220

1          Q.   And M.R.S. was signatory to Local 40 when

2      you were the business manager?

3          A.   That's correct.

4      Q.   So what sorts of arrangements are you

5   talking about that you would make with M.R.S. and

6   your Local?

7      A.   M.R.S. would sometimes call us and ask for

8   people.  If we couldn't supply them people, the

9   arrangement we worked out was that he could go and

10  get anyone he wanted and bring them down to us and

11  we'd give them a slight indoctrination and they'd

12  pay the initiation fee, and then he would hire them.

13     Q.   So he would hire the men?

14     A.   Yes.

15     Q.   And they would become members of

16  Local 40?

17     A.   That's correct.

18     Q.   And who would train them?

19     A.   A lot of the siding work was very basic

20  work, so he had the responsibility of training them.

21     Q.   So why do you say he had the

22  responsibility?

23     A.   M.R.S. had the responsibility.

24     Q.   Why do you say that?  Did Local 40 have an

FLYNN REPORTING ASSOCIATES

221

1   apprenticeship program?

2      A.   Yes.

3     Q.   But you didn't put these people in the

4  apprenticeship program?

5     A.   No, because the apprenticeship program was

6  mostly duct, copper work, and things of that nature.

7     Q.   So you don't have a segment of your

8  training program at Local 40 that deals with light

9  gauge metal installation and gypsum board?

10     A.   That's correct.  We did.  After I left,

11  they did start a program of that nature, as I

12  understand it, but at that time there was nothing,

13  no.

14     Q.   Were some of M.R.S.'s Local 40 employees

15  working on the Delta job?

16     A.   This particular job at Logan Airport?

17     Q.   Yes.

18     A.   Yes.

19     Q.   Did you know any of those people?  Were

20  those some of the people he put in your Union?

21     A.   That's an interesting question.  I don't

22  recall.  I might have seen one or two guys there

23  that I knew.  There was an Iron Worker there that

24  worked for Roland, but I don't recall if I knew

FLYNN REPORTING ASSOCIATES

222

1  anybody on a personal basis.

2     Q.   Did you have any conversations with

3    Mr. Bergantino at Local 17 about M.R.S. utilizing

4    either Iron Workers or Carpenters to supplement his

5    Local 17 work force doing that siding work?

6        A.    Iron Workers.  I don't recall having

7    conversations with regard to Carpenters, but with

8    regard to Iron Workers, yes.

9        Q.    This was a conversation with

10   Mr. Bergantino?

11       A.    Yes.

12       Q.    What were those Iron Workers going to do?

13       A.    Normal decking and siding work.

14       Q.    Did Mr. Bergantino say it was okay?

15       A.    We tried to work something out with the

16   Iron Workers, and it ended up that they didn't need

17   people anymore or M.R.S. didn't need people anymore,

18   so we never consummated it.

19                MR. GROSSO:  No further questions.

20                MR. ANDERSON:  Nothing further.

21                MR. KELLY:  I just have a bit of

22   follow-up.

23                CROSS-EXAMINATION OF JAMES NEARY

24   BY MR. KELLY:


                    FLYNN REPORTING ASSOCIATES


                                                    223


1        Q.    Mr. Neary, do I understand correctly that

2     Mr. Bergantino, at least in his discussions with

3     you, would have agreed with the employment of Iron

4     Workers on the site if it could have been worked

5     out?

6         A.   Yes.  We also involved the Iron Workers'

7     business agent, and we were working out a situation.

8     I don't recall how exactly we did it, but they were

9     open that if M.R.S. needed people, we were willing

10    to use the Iron Workers.

11        Q.   Thank you, sir.

12                  MR. KELLY:  That's all I have.

13                  ARBITRATOR ASHER:  Thank you very

14    much.

15                  MR. ANDERSON:  The International

16    rests.

17                  MR. KELLY:  The Local rests.

18                  ARBITRATOR ASHER:  Let's just

19    establish the exhibits for the record.  The admitted

20    exhibits are Union 1 and 2; Employer 1 through 11

21    which includes 8A to 8E, and Joint Exhibit

22    Numbers 1 to 8; is that correct?

23                  MR. GROSSO:  That's correct.

24                  (Discussion off the record.)

                  FLYNN REPORTING ASSOCIATES

                                                        224

1                   ARBITRATOR ASHER:  So the closing

2    briefs are due on or before October 13th from both

3    parties, and we'll leave it to the parties to

4    arrange for the transcript and a copy of the

5    complete transcript to the arbitrators.

6              MR. GROSSO:  Okay.

7              (Adjourned at 4:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

FLYNN REPORTING ASSOCIATES

225

```
 1              C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS

 3   Middlesex, ss.

 4              I, Jean Parrish Zbinden, Certified

 5   Shorthand Reporter, do hereby certify that this

 6   document is an accurate transcript of the

 7   aforementioned proceeding, taken and transcribed to

 8   the best of my knowledge, skill, and ability.

 9

10

11

12              _____

13              Certified Shorthand Reporter

14

15

16

17

18

19

20

21

22

23

24


                 FLYNN REPORTING ASSOCIATES
```