# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M.R.S. ENTERPRISES, INC.<br><br>    Plaintiff,<br><br>v.<br><br>SHEET METAL WORKERS'<br>INTERNATIONAL ASSOCIATION<br>LOCAL 17 - BOSTON, and<br>SHEET METAL WORKERS'<br>INTERNATIONAL ASSOCIATION,<br><br>    Defendants. | C.A. NO.:   05 10694 JLT |

## DEFENDANT
## SHEET METAL WORKERS INTERNATIONAL ASSN.'S
## CROSS-MOTION TO ENFORCE ARBITRATION AWARD,
## AND FOR CONTRACTUAL ATTORNEYS FEES

Defendant Sheet Metal Workers' International Association, AFL-CIO, hereby moves this Court for an order enforcing the January 16, 2007 arbitration award by the National Siding and Decking Grievance Panel, and entering judgment based on that award, under the Labor-Management Relations Act, 29 U.S.C. §185(a), 9 U.S.C. §9, and Fed.R.Civ.P. 43(e). The International Union further moves for an award of its attorneys' fees and costs incurred in seeking to enforce the award pursuant to Article X, section 4 of the parties' agreement.

1

This Motion is based on the Declaration of Michael T. Anderson filed herewith, all exhibits attached thereto, the accompanying Memorandum, and all other papers and pleadings in this action.

WHEREFORE, Defendant Sheet Metal Workers International Association, AFL-CIO, respectfully moves for an order enforcing the January 16, 2007 arbitration award issued by the National Siding and Decking Grievance Panel, for entry of judgment for Defendant based on that award, and for an award of its attorneys' fees and costs incurred in seeking to enforce the award pursuant to the fee-shifting provisions of Article X, section 4 of the parties' agreement.

Respectfully submitted,

Dated: February 26, 2007      DAVIS, COWELL & BOWE, LLP


By:    /s/ Michael T. Anderson
         Michael T. Anderson
         BBO #645533

8 Beacon Street, 4th Floor
Boston, MA 02108
Tel: (617) 227-5720
Fax: (617) 227-5767

Attorneys for Defendant Sheet Metal
Workers International Ass'n, AFL-CIO

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| M.R.S. ENTERPRISES, INC. | C.A. NO.:  05 10694 JLT |
| Plaintiff, | |
| v. | |
| SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION LOCAL 17 - BOSTON, and SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, | |
| Defendants. | |

**[Proposed] ORDER GRANTING DEFENDANT**
**SHEET METAL WORKERS INTERNATIONAL ASSN.'S**
**CROSS-MOTION TO ENFORCE ARBITRATION AWARD**
**AND FOR CONTRACTUAL ATTORNEYS' FEES**

FOR GOOD CAUSE SHOWN, the Court, having reviewed Plaintiff M.R.S.

Enterprises' Motion to Vacate the January 16, 2007 Arbitration Award and

Defendant Sheet Metal Workers' International Ass'n's Cross-Motion to Enforce

the Arbitration Award, hereby DENIES Plaintiff's Motion to Vacate, GRANTS

the Defendant International Union's Motion to Enforce the January 16, 2007

Arbitration Award issued by the National Siding and Decking Grievance Panel,

and ENTERS JUDGMENT for Defendant Sheet Metal Workers' International

Ass'n based on the Award.

The Court further GRANTS Defendant Sheet Metal Workers' International Ass'n AFL-CIO's Motion for Attorneys' Fees and Costs incurred in litigation to enforce the award pursuant to Article X, section 4 pursuant to the National Siding and Decking Agreement.  Defendant Sheet Metal Workers' International Ass'n AFL-CIO shall submit an application and supporting declarations for the attorneys fees claimed within 14 days of this Order.

IT IS SO ORDERED.

Dated: _____          _____
                                     U.S. DISTRICT JUDGE

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M.R.S. ENTERPRISES, INC.<br><br>        Plaintiff,<br><br>v.<br><br>SHEET METAL WORKERS'<br>INTERNATIONAL ASSOCIATION<br>LOCAL 17 - BOSTON, and<br>SHEET METAL WORKERS'<br>INTERNATIONAL ASSOCIATION,<br><br>        Defendants. | C.A. NO.:  05 10694 JLT |

### DECLARATION OF MICHAEL T. ANDERSON
### IN OPPOSITION TO  PLAINTIFF'S MOTION TO VACATE
### ARBITRATION AWARD AND IN SUPPORT OF
### DEFENDANT SHEET METAL WORKERS' INTERNATIONAL ASSN.'S
### CROSS-MOTION TO ENFORCE ARBITRATION AWARD
### AND FOR CONTRACTUAL ATTORNEYS' FEES

I, Michael T. Anderson, declare under penalty of perjury as follows:

1.      I am attorney for Defendant Sheet Metal Workers' International

Association, AFL-CIO in this case.  The facts described in this affidavit are

personally known to me.  If called as a witness, I could and would competently

testify to the contents of this affidavit.

1

2.     On August 16-17, 2006, the parties participated in arbitration proceedings in Boston pursuant to the Court's motion to stay.  The National Association of Siding and Decking Contractors appointed Michael J. Asher of Sullivan, Ward, Asher & Patton as the management arbitrator.  The Union appointed H. Dean Ball, International Union representative.

3.      In off-the-record discussions at hearing, all parties acknowledged their awareness that Michael J.  Asher is the son and law partner of Anthony Asher, the administrator of the National Association of Siding and Decking Contractors.  M.R.S. did not object to management arbitrator Michael J. Asher at any time prior to the issuance of the Panel's award.

4.     On October 31, 2006, the parties filed post-hearing briefs.  A true and correct copy of M.R.S.'s initial post-hearing brief to the arbitration Panel is attached as Exhibit A to this Declaration.

5.     In its post-hearing brief, the International Union attached two Sheet Metal industry arbitration decisions in which the International Union representative voted with the management-appointed arbitrator to deny a local union grievance on timeliness grounds.  *A.J. Fritch & Sons (SMW Local 91)* Case #03-16 (September 15, 2003); *Aaero Heating (SMW Local 104)* Case # 01-11 (September 12, 2001).  A true and correct copy of these two decisions (which had

been appendices to the Union's post-hearing brief) is collectively attached hereto as Exhibit B to this Declaration.

6.    On November 13, 2006, the Panel directed the parties to file supplemental briefs further addressing the timeliness of the grievance.  A true and correct copy of the Panel's supplemental briefing order is attached as Exhibit C to this Declaration.

7.    M.R.S. filed its supplemental brief on December 8, 2006.  A true and correct copy of M.R.S.'s supplemental brief is attached as Exhibit D to this Declaration.

8.    On January 16, 2007, the Panel issued a unanimous decision denying the grievance in full.  A true and correct copy of the Panel decision is attached as Exhibit E to this Declaration.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 26, 2007

Michael T. Anderson, BBO #645533

DAVIS, COWELL & BOWE
8 Beacon Street, 4th Floor
Boston, MA 02108
Tel:  (617) 227-5720
Fax: (617) 227-5767

Attorneys for Defendant Sheet Metal Workers International Ass'n, AFL-CIO

50/C:\DCB\MTA\mrs MTA decl to confirm FINAL.wpd
2/26/2007/12:27:54 USM 4925

3

EXHIBIT A

THE SIDING AND DECKING GRIEVANCE PANEL

IN THE MATTER OF                          )
                                          )
M.R.S. ENTERPRISES, INC.                  )
                                          )
and                                       )
                                          )
SHEET METAL WORKERS'                      )
INTERNATIONAL ASSOCIATION and             )
SHEET METAL WORKERS'                      )
INTERNATIONAL ASSOCIATION                 )
LOCAL 17 – BOSTON                         )

POST HEARING BRIEF OF
M.R.S. ENTERPRISES, INC.

INTRODUCTION

The matter before the arbitration panel involves a dispute between the employer, M.R.S.

Enterprises, Inc. (M.R.S.), the Sheet Metal Workers' International Association (SMWIA) and the

Sheet Metal Workers' International Association Local 17 – Boston (Local 17) regarding the

installation of light gauge metal framing, dense glass board sheeting and a vapor barrier which

formed the support structure for metal panel siding (the support structure) on the Delta Airlines

Terminal A project in Boston, Massachusetts. The work was performed pursuant to a national

agreement between M.R.S. and the SMWIA known as the National Siding and Decking

Agreement (NSDA). M.R.S. actually employed sheet metal workers from Local 17 pursuant to

the NSDA although M.R.S. never had a collective bargaining agreement with Local 17. The

NSDA permits signatory employers to travel throughout the country and to perform siding and decking work with sheet metal workers from the local union in the particular area where the project is located without the employer having to sign the local agreement.

M.R.S. filed a grievance against the SMWIA and Local 17 for violation of Article IV, Section I, of both the NSDA and the Local 17 Agreement for failure to supply skilled workmen to M.R.S. to perform the work on the Terminal A project. A meeting was held between all the parties in Washington, DC in January 2005 which has been characterized as Step 1 of the grievance procedure under the NSDA. The Step 2 arbitration before the Siding and Decking Grievance Panel (the Panel) was held on August 16 and 17, 2006 in Boston. M.R.S. herewith submits its Post Hearing Brief to the Panel.

FACTS

Skanska USA was the general contractor for the Terminal A project.  Skanska subcontracted the metal panel siding, including the support structure to Crown Corr, Inc. who in turn subcontracted the actual work to be performed on the project to M.R.S.  M.R.S. initially intended to subcontract the support structure to a company called Conn Acoustics Inc. who would utilize carpenters for that work. M.R.S. then intended to install the actual metal panel siding to the support structure with sheet metal workers from Local 17 and from M.R.S.'s own workforce. (See testimony of Roland O. Levesque Sr., President of M.R.S. TR. Vol. 1, pp. 43-46)  The Conn Acoustic price to perform that work was $1,191,500.  Before the bids were submitted, a meeting was held in Washington, DC in April 2003 between representatives of the SMWIA, including Joseph Nigro, Assistant to the International President, Joseph Bergantino, Business Manager for Local 17, Richard Pellar, President of Crown Corr, Roland O. Levesque Sr., Anthony Asher, counsel for the National Association of Siding and Decking

- 2 -

Contractors (NASDC) Daniel Pasquinucci, the International Representative for Connecticut and Massachusetts, Benny Hernadez, another International Representative and Fred Machewski, an International Representative from the Midwest. At that meeting, the representatives of the SMWIA and Crown Corr told Levesque that M.R.S. would do all of the metal panel siding work, including the support structure, with sheet metal workers from Local 17. Levesque was told he could not use Conn Acoustics to perform that work and that he should plan on doing the work with sheet metal workers. (See Levesque testimony TR. Vol. 1, pp. 48-51)

M.R.S. could not find any siding contractors in Massachusetts or New England who were signatory to a sheet metal worker collective bargaining agreement and who performed metal panel siding work including the support structure. M.R.S. then made a decision to perform the work itself using its own employees from Connecticut and sheet metal workers to be referred from Local 17. The SMWIA and Local 17 promised Levesque that they would supply skilled sheet metal workers who could perform this work. (See Levesque testimony TR. Vol. 1, pp. 53-54) The project started in August 2003 and was completed in December 2004. M.R.S. actually did some additional work which concluded in March 2005.

M.R.S. spent $4,372,299 to complete the project utilizing sheet metal workers for all of the work. The Conn Acoustic bid was $1,191,500. The M.R.S. grievance against the SMWIA and Local 17 seeks reimbursement of $3,180,779, the amount it cost M.R.S. to perform the support structure work using sheet metal workers from Local 17. The damages sought are only for the installation of the metal studs, dense glass board insulation and vapor barrier. M.R.S. is not seeking any damages for installation of the metal panel siding. (See Levesque testimony TR. Vol. 1, pp. 87-89)

- 3 -

ISSUES

1. Is Local 17 subject to the grievance procedure in the NSDA?

2. Was the Grievance Timely

3. Did the Sheet Metal Workers' International Association and Local 17 violate Article IV, Section I of the NSDA and Article IV, Section I of the Local 17 Agreement by failing to supply skilled journeymen, specialty sheet metal workers and apprentices to M.R.S. for the installation of the metal stud, dense glass board insulation and vapor barrier support structure on the Terminal A project in Boston, Massachusetts?

ARGUMENT

**A.    Local 17 is party to the grievance procedure in the NSDA.**

At the outset of the proceedings on August 16th, Paul Kelly, attorney for Local 17, argued that M.R.S. had never filed a grievance against Local 17 and that Local 17 therefore was not a participant in the arbitration before the Panel. The NSDA is dispositive on this issue because in Article X, the agreements states: "The grievance procedures of the National Siding and Decking Agreement are the sole and exclusive remedy for any asserted breaches of this Agreement and supercedes the grievance procedures of any other collective bargaining agreement that the Employer is signatory . . ." (Jt. Ex. 1) The project was performed under the NSDA and therefore the grievance procedure which must be followed against both the SMWIA and Local 17 is the procedure described in Article X of the NSDA. Local 17's argument is legally and factually without merit.

**B.    The SMWIA and Local 17 are estopped from raising the timeliness defense**

At the outset of the hearing, the SMWIA raised the issue of the timeliness of the arbitration. Both the SMWIA and Local 17 are estopped from raising that defense because they moved before the United States District Court for the District of Massachusetts to stay the Complaint which had been filed by M.R.S. and to order the parties to arbitration. Specifically,

the SMWIA stated in its memorandum in support of its motion to stay that: ". . . the Court may not similarly defer a stay motion while a live arbitration is pending. Now that the International Union has taken the initiative to move the grievance forward to Step 2, arbitration is not really a defense, but an ongoing proceeding before the National Siding and Decking Grievance Panel." Further in its memorandum, the International stated: "All parties agree that the Employer initiated a Step 1 grievance under Article X, Section I of the Agreement on November 22, 2004 . . . All parties agree that the International Union met with M.R.S. to discuss the damages demand on January 28, 2005, with follow-up correspondence over the following month fleshing out the Employer's $3,500,000 claim and asking for the Union's initial 'formal response'." The SMWIA then acknowledged "Any grievance that has not been settled at Step 1 may be appealed jointly or by either party to the Siding and Decking Grievance Panel." Step 1 provides no time limits, and requires no formal structure for settlement discussions. Lastly the SMWIA stated in its memorandum that: "The International Union's current invocation of Step 2 moots any argument that it has been too passive until now."

It is very clear from the position taken by the SMWIA and Local 17 in the Federal Court that they have invoked Step 2 and that there are no time limits between Step 1 and Step 2. Therefore, their argument that the arbitration is not timely is disingenuous.

## C.    The SMWIA and Local 17 violated Article IV, Section I of the NSDA and the Local 17 Agreement.

Article IV, Section I of the NSDA (Jt. Ex. 1) states:

"The Union agrees to furnish upon request by the Employer duly qualified Building Trades Journeyperson(s), Specialty Sheet Metal Workers and Specialty Trainees (wherever the Specialty Trainee classification is mentioned in this Agreement it may include Apprentices and Pre-Apprentices solely at the Local Union's Business Manager's discretion) in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement."

The Local 17 Agreement (Jt. Ex. 2) provides in Article IV, Section I

"The Union agrees to furnish upon request by the Employer duly qualified journeymen and apprentice sheet metal workers in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement."

In addition to the clear language of both collective bargaining agreements, Roland O. Levesque, Sr. testified that at the meeting in Washington, DC in April 2003, Michael Sullivan, President of the SMWIA directed Joseph Bergantino, Business Manager for Local 17, ". . . to provide qualified manpower and training in order to fulfill the obligation they were about to embark on". (See Levesque testimony TR. Vol. 1, pp. 52-53) Although Levesque contended that sheet metal workers do not normally do stud work and that the carpenters were the best trade to install metal studs (TR. Vol. 1 pp. 52, 61-62) he was directed to use sheet metal workers for this work. Levesque further testified that in order to insure qualified journeymen on his project, he made an arrangement with Joe Bergantino to provide a skilled instructor to train Local 17 people. (Levesque testimony TR. Vol. 1, pp. 56-58) Levesque's testimony that only one retiree showed up (TR. Vol. 1 p. 58) was uncontroverted throughout the two days of arbitration.

Joe Bergantino testified that at the time the Terminal A project was being constructed, Local 17 had no "classified or specialty workers" (TR. Vol. 1, p. 194). Bergantino also testified that he was willing to enter into an agreement with the carpenters union and M.R.S. whereby the carpenters would install the support structure. The sheet metal workers from Local 17 would only install the metal panels. (TR. Vol. 1, pp. 191-192) Bergantino also agreed during his testimony that the only training provided for metal stud structural support systems for metal siding is all done on the job. He was unfamiliar with any curriculum in the apprentice-training program that instructed apprentices on the installation of the structural support system. (TR.

- 6 -

Vol. 1, pp. 198-200) Finally, Bergantino testified that the Terminal E project at Logan Airport which had the exact same siding materials as Terminal A was performed by Lymo Construction Company who used carpenters to install not only the support structure, but also the metal panel siding. (TR. Vol. 1, pp. 201-202) This testimony was corroborated by Daniel Lynch, the President of Lymo Construction Co., Inc. (TR. Vol. 2, pp. 9-11) In fact, Bergantino could only recall one project in Massachusetts where sheet metal workers had actually installed a metal stud support structure for metal panels and that was the University of Massachusetts Boston campus. He stated that only the soffitts at the roof level were installed by the sheet metal workers. (TR. Vol. 1, p. 201)

**D.    The Evidence Established Local 17 Members Were Not Trained**

The overwhelming weight of the evidence produced during the two-days of arbitration by representatives of M.R.S., Skanska, Crown Corr and even the Sheet Metal Workers Union itself, was that the Local 17 members referred to the Terminal A project were not trained in the installation of the support structure for the metal siding. The most damaging testimony came from Scott D'Angelo, the foreman for M.R.S. on the Terminal A project. Mr. D'Angelo testified that he was on the project from the first day to the last day. He described the skill level of the M.R.S. Local 17 members who were referred to the project from the very first member, Jerry Slack, who was the steward for the project and was on the project for its entirety. D'Angelo testified that he had to teach Slack and all the other Local 17 members referred to the site how to do every task that they were assigned to. (TR. Vol. 2, pp. 34-37) D'Angelo further described the relative skill level of the Local 17 referrals when he testified that two Local 17 members installed 6, 4x8 sheets of dense glass board in one day while D'Angelo and another employee of M.R.S. from Connecticut installed 36, 4x8 dense glass board sheets on the very same day. (TR.

Vol. 2, p. 40) Even the panel was stunned by the lack of skill level of the Local 17 members. (Tr. Vol. 2, pp. 48-54) When asked by Arbitrator Ball how many sheet metal workers from Local 17 were referred to the project, D'Angelo testified that approximately 120 from Local 17 were hired throughout the course of the project and when Arbitrator Ball further inquired as to how many were terminated for their lack of skills, D'Angelo testified "about half." (TR. Vol. 2, p. 49) Finally, D'Angelo testified that the east bridge connecting two buildings of Terminal A had to be constructed by only company employees of M.R.S. from Connecticut. D'Angelo testified that "Because of the complexity of the design of it. They were not capable of doing the work." (TR. Vol. 2, p. 43)

D'Angelo's testimony corroborated the previous testimony of Venance (JR) La Francois. JR was the project manager for M.R.S. on the Terminal A project. He described his duties as oversight of the entire project which included calling the Local 17 union hall for manpower requirements. (TR. Vol. 1, p. 220) He further testified that when he needed sheet metal workers from Local 17, he would call Bobby Butler, the agent for the airport area, and ask for skilled sheet metal workers. He stated that "Every time I did order men, if I ordered five, I got two. If I ordered ten, I got six, and so I never got the full amount of manpower requested." (TR. Vol. 1, p. 228) JR further testified that every referral from Local 17 had to be physically trained on the site and had to be paired up with a trained M.R.S. employee from Connecticut. (TR. Vol. 1, p. 228) JR stated that none of the Local 17 referrals could read stud drawings and that 70% of those referred from the Local were unqualified. (TR. Vol. 1, pp. 229-232) JR testified that some of the people referred from Local 17 would fight amongst themselves, ". . . urinate in each other's bags" and had a "Total disregard for coming in on time in the morning." (TR. Vol. 1, pp. 232-233)

- 8 -

In addition to being unqualified and having no skills to install the support structure, JR testified that the Local 17 people were constantly getting injured on the project. Specifically, he stated that Skanska and Crown Corr threatened to terminate M.R.S. on the project because of the number of accidents that had occurred in one month's time. JR stated that 17 to 19 Local 17 employees were injured in a one-month period from the middle of October to the middle of November 2003 and that that number exceeded all of the injuries for all of the other trades combined who were working on the project. (TR. Vol. 1, pp. 234-235)

JR further testified about the difficulty in getting referrals from Local 17. He stated that M.R.S. needed 10 to 12 certified welders on the project and Local 17 was unable to meet that request. On October 22, 2003, John Pickford, the project manager for Crown Corr, sent an e-mail to Daniel Pasquinucci and Joseph Nigro, the International Representatives for the SMWIA, and Robert Butler, Business Agent for Local 17, threatening to hire five Local 7 ironworker welders for the project if Local 17 could not supply the manpower. JR testified that John Pickford made good on his threat when M.R.S. hired five ironworkers who were certified welders because of the inability of Local 17 to meet that requirement. (TR. Vol. 1, p. 236)

Although Local 17 was the primary source of labor for the Terminal A project, the SMWIA had promised M.R.S. that Local 17 would have an adequate supply of skilled sheet metal workers to perform the work. (Testimony of Roland Levesque, TR. Vo. 1, pp. 53-54) JR testified that the situation at Terminal A with respect to the availability of skilled sheet metal workers from Local 17 became so critical that the SMWIA assigned one of its international representatives to the project. JR stated that James Neary, an international representative of the SMWIA was assigned to the Terminal A project (TR. Vol. 1, pp. 236-240). JR would explain the manpower shortage to Neary and Neary would call Bobby Butler at Local 17 to try to get a

sufficient supply of manpower. (TR. Vol. 1, p. 238) The situation became so bad that M.R.S. actually obtained skilled sheet metal workers from Detroit, Michigan and Illinois. (TR. Vol. 1, p. 238) Despite the intercession of the SMWIA, Local 17 was never able to meet the manpower requirements for the project. JR testified that he asked Bobby Butler for permission to use ironworkers or carpenters  to supplement the Local 17 workforce. JR testified that Butler responded that ". . . if he could, he would let me, but his hands were tied with the International." JR further testified that Bobby Butler ". . . would rather have seen a carpenter and sheet metal mix on site rather than just plain sheet metal." (TR. Vol. 1, pp. 238-239) JR further testified that M.R.S. never obtained a level of productivity necessary to complete the work. He stated that M.R.S. had to work overtime, had to work six and seven day weeks and that they employed far more sheet metal workers than where necessary if they had had the necessary skill level. (TR. Vol. 1, pp. 242-243)

The testimony regarding the skill level of the Local 17 referrals and the productivity of those Local 17 members who actually worked on the job was corroborated by Peter Johnson, the general superintendent for Skanska on the Terminal A project. Mr. Johnson testified that Skanska had concerns about the schedule, that the productivity of the sheet metal workers installing the support structure and metal siding was off by anywhere from 40 to 60 percent of what Skanska expected for productivity. Peter Johnson testified that Crown Corr brought in manpower from other parts of the country and that the M.R.S. employees worked overtime on Saturdays and Sundays and 10 and 12 hour days in order to recapture the schedule. (TR. Vol. 1, pp. 270-276) Johnson also corroborated the previous testimony regarding the unusually high number of accidents involving the sheet metal workers referred by Local 17. (TR. Vol. 1, pp. 277-278)

John Pickford, the Executive Vice President for Crown Corr, corroborated the previous testimony of other witnesses regarding the lack of training and productivity of the Local 17 workforce. He testified that the productivity was no where near what Crown Corr expected and that at some point Crown Corr decided to take away the satellite building and other portions of the work from M.R.S. so that M.R.S. could focus on a smaller segment of work. Pickford testified that Crown Corr utilized the services of CCL Construction (CCL), an affiliated company of Crown Corr, to work on the satellite building utilizing sheet metal workers from Detroit, Michigan, who comprised at least half of the workforce that CCL employed on the project. (TR. Vol. 2, pp. 98-110) Pickford also corroborated the previous testimony regarding the high number of accidents among the Local 17 workforce and that Skanska had called Crown Corr to a special meeting along with M.R.S. and Bobby Butler, to discuss means and methods of preventing accidents among the Local 17 sheet metal workers. (TR. Vol. 2, p. 111)

As part of its defense, the SMWIA and Local 17 claimed that M.R.S. was responsible for not meeting the schedule on the project because it had poor supervision and management. When specifically asked about the skill level of the M.R.S. management, John Pickford of Crown Corr testified that "JR is knowledgeable, hard-working, understands the trade requirements and similar construction activities." And that "No, I did not criticize JR's performance as a supervisor." (TR. Vol. 2, p. 112)

The SMWIA and Local 17 also alleged as a defense that part of the $3,180,779 M.R.S. was seeking in damages from the SMWIA and Local 17 was the cost to redo approximately 800 linear feet of wall where the wrong strength metal studs had been installed. Pickford testified that in fact the metal studs installed in that section of wall did not meet the specifications and that Crown Corr hired an engineering firm to design the rework of that section. Pickford further

testified that M.R.S. complied with the rework design by Crown Corr's engineering firm and that it made no claim for any additional cost to Crown Corr for that work. (TR. Vol. 2, pp. 113-114)

### E.    Neither the SMWIA nor Local 17 Trained Their Members to do Metal Stud Support Structures

There were three representatives of the SMWIA and/or Local 17 besides Business Manager Bergantino who testified at the hearings. All three of them testified that Local 17 did not train its members to do metal stud framing. In response to the specific question "Do you instruct Local 17 people on the installation of light gauge metal studs and tracks for the purpose of supporting either dense glass board or gypsum board?", Bobby Butler responded "No". When asked if it was part of their training, Bobby Butler again answered "No. They go over it in the drawings and architectural – they touch on it." (TR. Vol. 2, p. 175)

Further in his testimony, Mr. Butler responded to the questions of counsel for M.R.S. as follows:

"Q. I would like an answer to my specific question as to whether or not you had Local 17 members who were trained to install light gauge metal stud framing in tracks connected to clips on structural steel.

A. I can't answer that one because I don't know of their capabilities of doing studs.

Q. You know whether Local 17 trained them don't you?

A. I do.

Q. And did they train them to do that kind of work?

A. Not particularly, no." (TR. Vol. 2, pp. 176-177)

Two international representatives of the SMWIA were dispatched to the Logan Airport project to assist Local 17 in supplying skilled labor to M.R.S. In his testimony, Daniel Pasquinucci testified that skilled sheet metal workers and specialty sheet metal workers were available in

other locals throughout the country including Local 19 in Philadelphia, Pennsylvania, Indiana,

Detroit, Michigan and Seattle, Washington.  When asked specifically whether or not Mr.

Pasquinucci had assisted in obtaining skilled sheet metal workers, Pasquinucci testified as

follows:

> "Q.   Did you undertake any efforts to call Local 19 to get manpower to
> supplement Local 17 – you personally?
>
> A. No.
>
> Q. Did you call the Local in Indiana?
>
> A. No.
>
> Q. Detroit?
>
> A. No.
>
> Q. Washington?
>
> A. No.
>
> Q. Seattle, Washington?
>
> A. No." (TR. Vol. 2, pp. 198-200)

With respect to Mr. Pasquinucci's knowledge of the sheet metal worker training program, he

testified as follows:

> "Q.  Are you familiar with the International Training Program for Sheet Metal
> Workers?
>
> A. Yes.  It's called the ITI.
>
> Q.  Do you know if the ITI has a program that teaches Sheet Metal Workers how
> to install light gauge metal stud framing into tracks which connect to structural
> steel columns that receive dense glass insulation board or gypsum board similar to
> a drywall setup?
>
> A.  No, I can't honestly say that I know that would be in their curriculum.  I'm
> familiar somewhat, I can't honestly say that would be that specific duty, no.  It
> may be, but I have no knowledge of that." (TR. Vol. 2, pp. 201-202)

The last witness was International Representative James Neary who was formerly the Business Manager for Local 40 in Connecticut, the home local for M.R.S. In responding to the specific question of the relationship between Local 40 and M.R.S. with respect to the supply of specialty sheet metal workers, Mr. Neary responded as follows:

> "A. M.R.S. would sometimes call us and ask for people. If we couldn't supply them people, the arrangement we worked out was that he could go and get anyone he wanted and bring them down to us and we'd give them a slight indoctrination and they'd pay the initiation fee, and then he would hire them.
>
> Q. So he would hire the men?
>
> A. Yes.
>
> Q. And they would become members of Local 40?
>
> A. That's correct.
>
> Q. And who would train them?
>
> A. A lot of the siding work was very basic work, so he had the responsibility of training them.
>
> Q. So why do you say he had the responsibility?
>
> A. M.R.S. had the responsibility.
>
> Q. Why do you say that? Did Local 40 have an apprenticeship program?
>
> A. Yes.
>
> Q. But you didn't put these people in the apprenticeship program?
>
> A. No, because the apprenticeship program was mostly duct, copper work, and things of that nature." (TR. Vol. 2, pp. 220-221)

It was abundantly clear after the testimony of eight witnesses that Local 17 did not train either journeymen sheet metal workers, specialty sheet metal workers or apprentices on the work of installing the support structures for metal panel siding. The representatives of Local 17

testified that they had no specialty sheet metal workers and that they did not train their members in that type of work. The testimony of the two international representatives confirmed that neither the program in Local 40 in Connecticut nor the International Training Institute Program trained sheet metal workers in the installation of the structural support system for metal panel siding. The two international representatives also testified that they did nothing to assist M.R.S. in obtaining skilled sheet metal workers from any other part of the country. All of this evidence was uncontroverted.

F.    **The SMWIA and Local 17 Breached Their Respective Agreements**

The evidence established beyond a doubt that the SMWIA breached its promise and Article IV, Section I of the NSDA notwithstanding its directive to Joseph Bergantino in April 2003 that he supply skilled journeymen, specialty sheet metal workers and apprentices to M.R.S. for the Terminal A project. The evidence also established beyond any doubt that Local 17 breached Article IV, Section I of the NSDA ad well as Article IV, Section I of its own standard form of agreement because it could not and did not supply skilled sheet metal workers, specialty sheet metal workers or apprentices to M.R.S. for the installation of the support structure.

The United States Supreme Court and various Circuit Courts of Appeals have held that *"Interpretation of labor contracts . . . under the LMRA is a matter of federal common law."* Senior v. NSTAR Electric and Gas Corp., 2006 U.S. App. Lexis 13407 (1st Cir. 2006) *"Under the federal labor law governing interpretation of a labor contract under the LMRA, a court should resort to traditional principles of contract interpretation to the extent such principles are consistent with federal labor law."* Textile Workers Union of America v. Lincoln Mills, 353 US 448, 456. In this case, the two contracts contained an identical provision in Article IV, Section I, respectively. The contracts provide: "The Union agrees to furnish upon request by the Employer

duly qualified journeymen and apprentice sheet metal workers in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement." The language in the NSDA is similar except that it refers to journeymen as "Building Trades Journeyperson(s)" and uses the terms Specialty Sheet Metal Workers and Specialty Trainees. The NSDA then further defines the Specialty Trainee classification as including Apprentices and Pre-Apprentices at the discretion of the local business manager. All other language in Article IV, Section I of the NSDA is exactly the same as the language quoted above from the Local 17 Standard Form of Local Agreement. (Jt. Ex. 2)

The contract language is clear and unambiguous. *"An unambiguous contract must be enforced according to its terms, under both common law and labor law."* Federation of Grain Millers v. International Multi-Foods Corp., 116 F. 3d 976, 980 (1997) *". . . we will affirm a summary judgment grant on an issue of contract interpretation only if the contractual language is 'subject to only one reasonable interpretation'"* Electrical Workers IBEW Local 827 v. Verizon New Jersey, Inc., 2006 U.S. Dist. Lexis 56453. Citing Local Union No. 1992 International Brotherhood of Electrical Workers v. Okonite Company, 189 F. 3d 339, 341 (3d Cir. 1999).

The language of the two collective bargaining agreements cannot be more clear. Local 17 was required to supply skilled journeypersons, specialty sheet metal workers and apprentices to M.R.S. capable of installing the support structure as directed by the SMWIA and they both failed to do so. This is a clear breach by Local 17 and the SMWIA of the unambiguous language of the collective bargaining agreements as well as the affirmative promises made during the April 2003 meeting in Washington, DC. At that meeting, notwithstanding the contention by Roland Levesque that the carpenters were better skilled at performing this work, the SMWIA

and Local 17 insisted that the work be done by sheet metal workers. They engineered the dispute which was resolved by the Impartial Jurisdictional Disputes Board in Washington to assign this work to the sheet metal workers and then they directed M.R.S. to utilize only sheet metal workers on this project. Bobby Butler testified that he could not allow M.R.S. to utilize carpenters or ironworkers to perform this work because "his hands were tied" by the International. The breach by the SMWIA and Local 17 is clear and they must be accountable for the $3,180,779 lost by M.R.S. because it was forced to use unskilled sheet metal workers to perform the work.

M.R.S. put in detailed information supporting its claim for the monetary damages. The claim was neither disputed nor controverted and no evidence was presented to suggest that the $3,180,779 was not an accurate figure. Recall that M.R.S. is only seeking reimbursement of the money lost in installing the structural support system and is not seeking reimbursement for installation of the metal panel siding itself.

## G. The NSDA and Local 17 Contracts Should be Read As One

Local 17 argued at the outset of the hearings that it was not bound to the procedure because M.R.S. had never filed a grievance under the Local 17 Agreement (Jt. Ex. 2). As stated earlier in this Memorandum, the NSDA controls this project and the testimony of all involved corroborated that fact. The language of the NSDA is equally clear in stating that its grievance procedure shall supercede any grievance procedure contained in the local agreement. (NSDA Jt. Ex. 1)   Again, many federal courts including the United States Supreme Court have acknowledged that it may be necessary to look to two collective bargaining agreements when resolving a dispute. *". . . [i]n order to interpret [a labor] agreement, it is necessary to consider the scope of other related collective bargaining agreements as well as practice, usage and*

*customs pertaining to such agreements."* Transportation-Communication Employees Union v. Union Pacific Railroad, 385 US 157, 161 (1966) *"Every indication surrounding the execution of the CBA points to the conclusion that the Union and Kroger intended the Master Agreement and the Local Supplement to comprise one agreement, and any consideration of the CBA must begin with the recognition that it is one contract we are examining – not two."* Central States, Southeast and Southwest Areas Pension Fund v. Kroger Company, 73 F. 3d 727, 731 (7th Cir. 1996).

In this case, clearly the NSDA and the Local 17 Agreement comprise one agreement with respect to the work to be performed on the Terminal A project. The status of M.R.S. as signatory to the NSDA provided it with both the benefits and the responsibilities of that agreement and the local agreement in whatever states it was working. Specifically, M.R.S. was entitled to the benefits of both the NSDA and the Local 17 Agreement provided it met its obligations under those contracts. M.R.S. employed members of Local 17 paying them the wages contained in the collective bargaining agreement as well as the fringe benefit contributions. M.R.S. complied with all of the terms and conditions of both the NSDA and the Local 17 Agreement. Quite to the contrary, neither the SMWIA nor Local 17 complied with their obligations under those two contracts. The specific quid pro quo of the collective bargaining process is that the union will refer to the employer a readily available supply of skilled manpower. The incentive for contactors in the construction industry to sign a union labor agreement is the pool of skilled labor. The SMWIA and Local 17 breached the most basic premise of the collective bargaining process. As the United States Supreme Court stated in Consolidated Rail Corp. v. Railway Labor Executive Association, 491 US 299, 311-312 (1989)

> *"A collective bargaining agreement is not an ordinary contract for the purchase of goods and services . . . it is a generalized code to govern a myriad of cases*

> *which the draftsmen cannot wholly anticipate . . . the collective agreement covers*
> *the whole employment relationship. It calls into being a new common law – the*
> *common law of a particular industry or a particular plant."*

If ever a particular industry had its own "common law" it is the construction industry. Federal

labor law had to be amended to permit the use of pre-hire agreements because the very nature of

such agreements violated existing labor law. The benefit of the pre-hire agreement, which no

other industry has, is the ability of an employer to execute a collective bargaining agreement

with a building trades union prior to employing one craftsmen. Again, the quid pro quo is a

readily available skilled source of labor in return for compliance with the terms and conditions of

the collective bargaining agreement and the payment of prevailing wages and benefits by the

employer. That most basic principle has been breached by the SMWIA and Local 17.

## H.    The Defenses of the SMWIA and Local 17 are Without Merit

At the hearing, both the SMWIA and Local 17 maintained two defenses. One was that

Article IV, Section I of both collective bargaining agreements provided the employer with an

opportunity to obtain his own supply of skilled labor if the union was unable to supply labor

within 48 hours of the request. While it is true that both agreements contain that clause, to

suggest that M.R.S. was free to use carpenters, ironworkers or any other skilled craftsmen to

replace sheet metal workers is specious. Both collective bargaining agreements require that

anyone hired by an employer who is not a member of the Sheet Metal Workers International

Association must be terminated if he does not join the Sheet Metal Workers Union within eight

days of his hire. (NSDA Jt. Ex. 1, Article V, Section I and the Local 17 Agreement Jt. Ex. 2,

Article V, Section I.)

The defense rings hollow for two reasons. In the first instance, the testimony of all

parties was uncontroverted that M.R.S. was prohibited from hiring carpenters or ironworkers to

supplement the sheet metal worker workforce (with the exception of the five Local 7 ironworker welders that Local 17 did permit M.R.S. to employ).   Secondly, the union's defense basically states that M.R.S. is free to hire people off the street who do not belong to any labor organization, train them and then offer them for admission into the Sheet Metal Workers Union. In order to validate that defense, the relationship between employers and building trades unions would be completely reversed.   Instead of the union providing skilled manpower to the employers, the employers would be locating unskilled labor, training it and then referring it to the union for membership. No one could make such an argument with a straight face.

The other defense proffered by the SMWIA and Local 17 was that M.R.S. lacked the management and supervisory skills to perform the work in an efficient and economical manner. In the first place, how does a union that doesn't train its people to perform such work criticize an employer's ability to perform such work?  Secondly, John Pickford, Executive Vice President of Crown Corr , and clearly an expert in the installation of the support structure, testified that JR, the general superintendent for M.R.S. on the project was ". . . knowledgeable, hard working, understands the trade requirements and similar construction activities." (TR. Vol. 2, p. 112)  I respectfully suggest that the opinion of Mr. Pickford with over 20 years experience in this exact type of work be given more weight then the testimony of the Sheet Metal Workers representatives who by their own admission do not perform this type of work and don't train their members to perform this type of work.

## CONCLUSION

The SMWIA and Local 17 breached Article IV, Section I of the NSDA, Jt. Ex. 1, and Article IV, Section I of the Local 17 Agreement, Jt. Ex. 2, by failing to supply M.R.S. with skilled sheet metal workers, specialty sheet metal workers, specialty trainees and apprentices to

perform the installation of light gauge metal stud framing and dense glass board support structure on the Terminal A project at Logan Airport. The SMWIA and Local 17 should make M.R.S. whole for the $3,180,779 it lost as a result of the breach by the Unions.

M.R.S. ENTERPRISES, INC.
By its attorney,

DATED: October 31, 2006

James F. Grosso
O'Reilly, Grosso & Gross, P.C.
1671 Worcester Road, Suite 205
Framingham, MA 01701-5400
Tel:  508/620-0055
Fax: 508/620-7655

EXHIBIT B

Form C

## NATIONAL JOINT ADJUSTMENT BOARD
## ARTICLE X SECTION 3

UNANIMOUS DECISION
(Panelists shall state Findings of Fact, Award and Reasons Therefor)

PARTIES TO THE DISPUTE (NAMES & ADDRESSES):

Case #03-16

Union:                          Contractor:
SMWIA Local #91                 A.J. Frith & Sons
8124 42nd St West               1016 NE Adams St
Rock Island·il 61201            Peoria IL 60603

The Panelists first looked at the issue of timeliness. They determined that since the travel pay in questions was paid in 2000 and the grievance was not filed until March 31, 2003, it was not brought properly before the Panel.

Setting aside the issue of timeliness, the Panelists find that there was no contract violation at the time of this claim.

We direct your attention to Article X, Section 3 of the S.F.U.A. which provides as follows:
"Except in the case of a deadlock, the decision of the Panel shall be final and binding."

Date: ___9/15/03___               Date: ___9-18-03___


FRED MISZEWSKI                    BRUCE STOCKWELL
Chairman - SMWIA                  Secretary - SMACNA


3c y45-14


DATE    9-15-03

Page ___ of ___

Use Additional Sheets As Necessary

**Appendix A**

NATIONAL JOINT ADJUSTMENT BOARD
ARTICLE X, SECTION 3

UNANIMOUS DECISION
FORM C
CASE # 01-11
(Panelist shall state Findings of Fact, Award and Reasons Therefor)

PARTIES TO THE DISPUTE (NAMES & ADDRESSES):

| Union | Company |
|---|---|
| Sheet Metal Workers' Local Union No. 104 | Aaero Heating |
| Mr. James "Bill" Scott | Mr. Dave Milano |
| 1250 Petaluma Blvd., North | 860 Sweetser Ave. |
| Petaluma, CA 94952-1951 | Novato, CA 94945-2429 |

The Panelists met on August 28, 2001 in Oakland, California to consider the grievance. During the hearing, the company raised the issue of "timeliness" in filing for the LJAB hearing by the union. After hearing from both parties as to the issue raised, the Panelists below found merit in the company's arguments as to the timeliness in the filing. After hearing the testimony, it was very clear to the Panelists that the union and the company interpret the overtime language of the Service Addendum differently.

Therefore, it is the unanimous decision of the Panelists that the issue of interpretation of Addenda Number Two (2) to the Standard Form of Union Agreement (SFUA A-3-91) - Service Work Addenda, Service Work, Section B. is recommended for referral to the "Labor/Management Task Force" for language clarification. In addition, the Panelists have accepted the company's arguments as to the "timeliness" issue and have ruled the that the grievance was not filed timely in the step two process. Therefore, the union grievance against the company is to be dismissed.

We direct your attention to Article X, Section 3, of the S.F.U.A. which provides as follows: "Except in the case of a deadlock, the decision of the Panel shall be final and binding."

KURT P. SMITH
Chairman-SMACNA

BRAD L. PLUEGER
Secretary-SMWIA

9-12-01
Date

9-12-01
Date

Appendix B

EXHIBIT C



# SULLIVAN, WARD, ASHER & PATTON, P.C.

ATTORNEYS AND COUNSELORS AT LAW

1000 MACCABEES CENTER
25800 NORTHWESTERN HIGHWAY
SOUTHFIELD, MICHIGAN 48075-1000

TELEPHONE: (248) 746-0700
FAX: (248) 746-2760

WEB SITE: www.swappc.com

ROBERT E. SULLIVAN, SR. (1922-1998)
DAVID M. TYLER (1930-2002)
RICHARD G. WARD (RETIRED)

MICHAEL J. ASHER
masher@swappc.com
(248) 746-2728

November 13, 2006

Mr. James F. Grosso
O'Reilly, Grosso & Gross, P.C.
1671 Worcester Road, Suite 205
Framingham, MA 01701-5400

Mr. Paul F. Kelly
Segal, Roitman & Coleman
11 Beacon Street, Suite 500
Boston, MA 02108

Mr. Michael T. Anderson
Davis, Cowell & Boew, LLP
8 Beacon Street, 4th Floor
Boston, MA 02108

Re:    MRS Enterprises, Inc. and Sheet Metal Workers' International Association
       Appeal Grievance

Gentlemen:

The arbitration panel directs the parties to file supplemental briefs which address the timeliness of the grievance under Article X, Section 1, of the Agreement which states, in pertinent part, "To be valid, grievances must be raised within 30 calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within 30 calendar days of the first knowledge of the facts giving rise to the grievance."

The supplemental briefs are due to the arbitrators on or before December 8, 2006.

Any party may elect not to file a supplemental brief and therefore rest on the statements contained in their post-hearing briefs already filed.

Very truly yours,

SULLIVAN, WARD,
ASHER & PATTON, P.C.

Michael J. Asher

MJA/mps

cc:    Dean Ball
W0494661

EXHIBIT D

THE SIDING AND DECKING GRIEVANCE PANEL

IN THE MATTER OF               )
                                          )
M.R.S. ENTERPRISES, INC.         )
                                          )
and                                   )
                                          )
SHEET METAL WORKERS'      )
INTERNATIONAL ASSOCIATION and  )
SHEET METAL WORKERS'      )
INTERNATIONAL ASSOCIATION   )
LOCAL 17 – BOSTON          )

## SUPPLEMENTAL POST HEARING BRIEF OF
## M.R.S. ENTERPRISES, INC

### INTRODUCTION

This matter was arbitrated before a Siding and Decking Grievance Panel (the Panel) on August 16 and 17, 2006 in Boston, Massachusetts. M.R.S. Enterprises, Inc. (M.R.S.) submitted its Post Hearing Brief to the Panel on October 31, 2006. After reviewing the briefs, the Panel requested, by letter dated November 13, 2006, that the parties address the timeliness of the arbitration pursuant to Article X, Section 1 of the Agreement in a supplemental brief. M.R.S. herewith submits its supplemental brief dealing with the issue as requested by the Panel.

Specifically, the Panel has asked the parties to address Article X, Section 1 which requires that "To be valid, grievances must be raised within 30 calendar days following the

occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within 30 calendar days of the first knowledge of the facts giving rise to the grievance."

On the first day of arbitration, Roland Levesque, President of M.R.S. testified that the project began in July or August 2003 and that the project was completed in December 2004. He further testified that additional work was done between December 2004 and March 2005 when ". . . we were totally off the job . . ." (See Levesque testimony TR. Vol. 1, p. 74). The SMWIA and Local 17 admit that they accepted the M.R.S. letter of November 22, 2004 as an initiation of the Step 1 grievance procedure pursuant to Article X, Section 1. Since the project had not been completed by November 22, 2004, M.R.S. filed its grievance regarding the damages incurred on the Terminal A project in a timely manner. It could have filed the grievance after the job was finally completed in March 2005, or 30 days after December 2004, when the base contract work was completed. The critical fact here is the SMWIA and its local have accepted this letter as the initiation of the grievance procedure. Therefore, M.R.S. is within the 30-day requirement of Article X, Section 1.

M.R.S. addressed this issue in its original brief, and for the sake of expediency, that argument has been reproduced here in this Supplemental Post Hearing Brief.

### The SMWIA and Local 17 are estopped from raising the timeliness defense

At the outset of the hearing, the SMWIA raised the issue of the timeliness of the arbitration. Both the SMWIA and Local 17 are estopped from raising that defense because they moved before the United States District Court for the District of Massachusetts to stay the Complaint which had been filed by M.R.S. and to order the parties to arbitration. Specifically, the SMWIA stated in its memorandum in support of its motion to stay that: ". . . the Court may not similarly defer a stay motion while a live arbitration is pending. Now that the International

Union has taken the initiative to move the grievance forward to Step 2, arbitration is not really a defense, but an ongoing proceeding before the National Siding and Decking Grievance Panel." Further in its memorandum, the International stated: "All parties agree that the Employer initiated a Step 1 grievance under Article X, Section I of the Agreement on November 22, 2004 . . . All parties agree that the International Union met with M.R.S. to discuss the damages demand on January 28, 2005, with follow-up correspondence over the following month fleshing out the Employer's $3,500,000 claim and asking for the Union's initial 'formal response'." The SMWIA then acknowledged "Any grievance that has not been settled at Step 1 may be appealed jointly or by either party to the Siding and Decking Grievance Panel." Step 1 provides no time limits, and requires no formal structure for settlement discussions. Lastly the SMWIA stated in its memorandum that: "The International Union's current invocation of Step 2 moots any argument that it has been too passive until now."

It is very clear from the position taken by the SMWIA and Local 17 in the Federal Court that they have invoked Step 2 and that there are no time limits between Step 1 and Step 2. Therefore, their argument that the arbitration is not timely is disingenuous. In fact, the Sheet Metal Workers' International Association stated in its reply memorandum in support of its motion to dismiss that "There is no time limit in Article X, Section 1 for either party to respond to a grievance or discuss settlement." This point was confirmed by the Affidavit of Patrick Riley (a copy of which is attached to this Supplemental Brief). The SMWIA and Local 17, therefore, are estopped from raising the timeliness of the filing of the grievance as a reason for the panel to dismiss.

## CONCLUSION

M.R.S. filed its grievance in a timely manner and within 30 days as required by Article X, Section 1 of the National Siding and Decking Agreement.

M.R.S. ENTERPRISES, INC.
By its attorney,

DATED:  December 8, 2006

James F. Grosso
O'Reilly, Grosso & Gross, P.C.
1671 Worcester Road, Suite 205
Framingham, MA 01701-5400
Tel:  508/620-0055
Fax: 508/620-7655

- 4 -

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

M.R.S. ENTERPRISES, INC.                    C.A. NO.:  05 10694 JLT

         Plaintiff,

     v.

SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION
LOCAL 17 - BOSTON, and
SHEET METAL WORKERS'
INTERNATIONAL ASSOCIATION,

         Defendants.

## AFFIDAVIT OF PATRICK J. RILEY IN SUPPORT OF DEFENDANT SHEET METAL WORKERS' INTERNATIONAL ASSN.'S MOTION TO DISMISS

I, Patrick J. Riley, being first duly sworn, depose and say under penalty of perjury as follows:

1.      I am Director of the Legal Department of the Sheet Metal Workers' International Association, AFL-CIO. I am a 1977 graduate of Georgetown University Law Center. I have been a member in good standing of the bar of the District of Columbia since 1978. The facts described in this affidavit are personally known to me. If called as a witness, I could and would competently testify to the contents of this affidavit.

1

2.    The Sheet Metal Workers' International Association and M.R.S. Enterprises

are parties to a collective-bargaining agreement, the National Siding and Decking

Agreement for the United States of America between National Association of Siding and

Decking Contractors and Sheet Metal Workers' International Association, AFL-CIO, for

the term of January 1, 2000 through May 31, 2005. A true and correct copy of the 2000-

2005 National Siding and Decking Agreement is attached as Exhibit A hereto.

3.    On November 29, 2004, the office of Michael J. Sullivan, General President

of the Sheet Metal Workers International Association, received a letter dated November

22, 2004 from Jane I. Milas of Garcia & Milas in New Haven on behalf of M.R.S.

Enterprises. A true and correct copy of Ms. Milas's letter to Mr. Sullivan is attached as

Exhibit B hereto.

4.    To my knowledge, the Sheet Metal Workers' International Association's

Jurisdiction Department has never received a copy of any Step 2 appeal to the Siding and

Decking Grievance Panel by M.R.S. Enterprises raising Ms. Milas' November 22, 2004

grievance, as provided under the National Siding and Decking Agreement, Article X,

Section 2.

5.    To my knowledge, the Sheet Metal Workers' International Association has

never repudiated the grievance-arbitration procedure of the 2000-2005 National Siding

and Decking Agreement, Article X, as to any grievance filed against it by any signatory

employer, including M.R.S. Enterprises.

2

I swear under penalty of perjury that the foregoing is true and correct.

Dated: June 6, 2005

Patrick J. Riley

DISTRICT OF COLUMBIA           )       ss

On June 6, 2005 _____, 2005, before me, Patrick J. Riley
Lisa a. Mead , a Notary Public, personally appeared: Patrick J. Riley
personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) are subscribed to the within instrument and acknowledged to me
that he/she executed the same in his/her authorized capacities, and that by his/her
signatures on the instrument the person(s) or the entity by their signatures on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed
the instrument.

WITNESS by hand and official seal.

Signature:
                Notary Public

My Commission expires on March 31, 2006



3

# GARCIA & MILAS

ATTORNEYS AND COUNSELORS AT LAW
A PROFESSIONAL CORPORATION

44 TRUMBULL STREET
NEW HAVEN, CT
06510

JANE I. MILAS
(203) 773-3824

FACSIMILE
(203) 782-2312

E-MAIL
jmilas@garciamilas.com

cc: Patrick R
✓ Joe W



RECEIVED
NOV 30 2004
OFFICE OF GENERAL PRESIDENT

November 22, 2004

VIA CERTIFIED MAIL, RETURN RECEIPT

Mr. Michael J. Sullivan
General President
Sheet Metal Workers International Association
1750 New York Avenue, N.W.
Washington, D.C 20006

> Re:  M.R.S. Enterprises, Inc.
>      Delta Terminal A at Logan Airport

Dear Mr. Sullivan:

This office represents M.R.S. Enterprises, Inc. in connection with the above-referenced project.  Pursuant to Article X, section 1 of the Agreement between M.R.S. Enterprises, Inc. ("MRS") and the Sheet Metal Workers International Association ("SMWA"), MRS raises the following grievance:

Breach of the Agreement by the SMWA in connection with the Delta Terminal A project at Logan Airport, for failure to supply duly qualified Building Trades Journey persons, Specialty Sheet Metal Workers, and Specialty Trainees in sufficient numbers and ratios stipulated during the April 8, 2003 meeting in Washington, D.C. as may be necessary to property execute work contracted for by the Employer in the manner and under the conditions specified in the Agreement.

**Exhibit B**

M. Sullivan
November 22, 2004
Page two


        MRS requests that this grievance proceed to step one, as provided in Article X,
section 1 of the Agreement.

                                        Sincerely yours,

                                        Jane I. Milas

JIM/mef
cc.     Roland Levesque

        Joseph Bergantino
        Business Manager
        Local 17, Sheet Metal Workers International Association
        1157 Adams Street
        Dorchester, MA  02124-5788 (via certified mail)

**CERTIFIED MAIL**

7003 1010 0001 6695 5145

"MR. MICHAEL J. SULLIVAN
GENERAL PRESIDENT
SHEET METAL WORKERS INTERNATIONAL ASSOCIATION
1750 NEW YORK AVENUE, N.W.
WASHINGTON, D.C. 20006

closed file 11/24/04

20006+5386 63

GARCIA & MILAS, P.C.
LAW OFFICES
44 TRUMBULL STREET
NEW HAVEN, CONNECTICUT 06510

EXHIBIT E

# SULLIVAN, WARD, ASHER & PATTON, P.C.

### ATTORNEYS AND COUNSELORS AT LAW



1000 MACCABEES CENTER
25800 NORTHWESTERN HIGHWAY
SOUTHFIELD, MICHIGAN  48075-1000
TELEPHONE: (248) 746-0700
FAX: (248) 746-2760

WEB SITE: www.swappc.com

ROBERT E. SULLIVAN, SR. (1922-1998)
DAVID M. TYLER (1930-2002)
RICHARD G. WARD (RETIRED)

MICHAEL J. ASHER
masher@swappc.com
(248) 746-2728

January 16, 2007

Mr. James F. Grosso
O'Reilly, Grosso & Gross, P.C.
1671 Worcester Road, Suite 205
Framingham, MA  01701-5400

Mr. Paul F. Kelly
Segal, Roitman & Coleman
11 Beacon Street, Suite 500
Boston, MA  02108

Mr. Michael T. Anderson
Davis, Cowell & Boew, LLP
8 Beacon Street, 4th Floor
Boston, MA  02108

Re:   MRS Enterprises, Inc. and Sheet Metal Workers' International Association
       Appeal Grievance

Gentlemen:

Please find enclosed the Decision of the Arbitration Panel with regard to the Step II
grievance hearing held on August 16-17, 2006.

Very truly yours,

SULLIVAN, WARD,
ASHER & PATTON, P.C.

Michael J. Asher

MJA/mps
Enclosure

cc:   Dean Ball

## DECISION OF THE ARBITRATION PANEL

| | |
|---|---|
| Grievant: | MRS Enterprises |
| Respondents: | Sheet Metal Workers International Association and Sheet Metal Workers Local No. 17 |
| Step II Hearing: | August 16-17, 2006 |
| Post Hearing Briefs: | Filed October 31, 2006 |
| Supplemental Briefs: | Filed December 8, 2006 |

This grievance concerns work performed by MRS Enterprises ("MRS") at the Delta Terminal A Project at Boston's Logan Airport which began in the fall of 2003. The Grievant alleges violation of Article IV, Section 1 of the National Siding & Decking Agreement for failure to provide sufficient skilled workmen.[1] MRS contends it suffered damages in the amount of $3,180,779 as a result of the alleged breach by the unions.

Following the Step II hearing and the parties' post-hearing briefs, the arbitration panel gave the parties a final opportunity to address Article X, Section 1, which requires that "to be valid, grievances must be raised within 30 calendar days following the occurrence giving rise to the grievance, or, if the occurrence was not ascertainable, within 30 calendar days of the first knowledge of the facts giving rise to the grievance."

For the reasons set forth below, it is the unanimous decision of the grievance panel that this grievance be denied because it is untimely. The decision is reached without resort to the Respondents' arguments; the evidence submitted by MRS is conclusive on this issue.

Roland Levesque is the owner of MRS. He testified as follows:

> ➢ MRS began construction on August 1, 2003 and completed its work by December 2004, including punch list items (Volume 1, page 67, 74-75).[2]
> ➢ He knew in October 2003 that MRS was not getting an adequate supply of skilled labor and, as a consequence, was suffering increased labor costs (Volume 1, page 133-134).
> ➢ MRS filed its grievance on November 22, 2004.

---

[1] Local 17 contests the authority of this panel to render a decision against it because it was not named as a party in the Step I grievance. For the reasons set forth below, it is not necessary to reach a decision on this or several other issues raised at the hearing.

[2] MRS did "extra" work through March 2005, but this was not part of the Terminal A Project at issue.

The alleged violations were resolved long before October 23, 2004 (30 days before November 22, 2004). The following witnesses, presented by MRS, all indicated that the staffing and related damage occurred essentially in the fall of 2003 through January-February 2004: Roland Levesque (Volume I, page 140-142); Venance Lafrancois, Peter Johnson of Skanska, Scott D'Angelo of MRS, and John Pickford of Crown Corr. MRS's own summary of damages, Employer Exhibit 9, is dated October 25, 2004. As MRS's own counsel stated at the hearing, "the violations and damage had to be at least before October."

Thus, MRS did not file the grievance within 30 days of the violation.

MRS argues, however, that its grievance should not be barred for the following reasons:

1.    That it did not have to file the grievance until the job was completed in March 2005 or 30 days after the base contract was finished in December 2004.

2.    The "critical fact" is that the union accepted MRS's November 22, 2004 letter as "initiation of the grievance."

3.    There are no time limits between Step I and Step II of the grievance procedure.

4.    The unions are estopped from raising the issue because they filed a motion in federal court requesting the complaint be stayed so the parties could continue the arbitration.

MRS's arguments are not persuasive. First, the project's completion date is irrelevant. Second, the union's acceptance of the November 22nd letter is not "critical" to the issue in any manner nor has MRS offered any rationale to support this assertion. Third, while there are no time limits between Step I and Step II, the period at issue is the delay in filing the Step I grievance, not the period between Step I and Step II. Fourth, the proceedings before the U.S. District Court did not address, let alone have any bearing, on whether MRS timely filed its grievance within 30 days of its knowledge of the alleged contract violation.

Article X, Section 2 states that "the grievance panel is empowered to render such decision and grant such relief to either party as they deem necessary and proper, including awards of damages or other compensation. Except in the case of deadlock, the decision of the grievance panel shall be final and binding."

It is the decision of this grievance panel that the grievance filed by MRS is denied for the reasons set forth above.

_____
Dean Ball
W0502796

_____
Michael J. Asher

2